IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION


| | |
|---|---|
| HARI HARA PRASAD NALLAPATY; | . CASE NO. 5:20-CV-00470-BO |
| UTS HOLDINGS, LLC; and | . ELIZABETH CITY, NC |
|       Plaintiffs, | . MAY 10, 2023 |
| | . |
| V. | . |
| | . |
| VAMSI MOHAN NALLAPATI; and | . |
| NALLAPATI PROPERTIES LLC, | . |
|       Defendants. | . |

. . . . . . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE TERRENCE W. BOYLE
JUDGE, UNITED STATES DISTRICT COURT


APPEARANCES:

FOR THE PLAINTIFFS:        CHARLES E. COBLE, ESQUIRE
                           CLINTON S. MORSE, ESQUIRE
                           WILLIAM A. ROBERTSON, ESQUIRE
                           BROOKS PIERCE MCLENDON
                            HUMPHREY & LEONARD, LLP
                           PO BOX 1800
                           RALEIGH, NC  27602


FOR THE DEFENDANTS:        K. ALAN PARRY, ESQUIRE
                           DEANNA ANDERSON, ESQUIRE
                           PARRY LAW, PLLC
                           100 EUROPA DRIVE
                           SUITE 351
                           CHAPEL HILL, NC  27517


COURT REPORTER:        MS. SANDRA A. GRAHAM, CVR-CM

Proceedings recorded by stenomask, transcript produced from dictation.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

I-N-D-E-X

EXAMINATION OF THE WITNESSES

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **JEFF MILLER** | | | | |
| BY MS. ANDERSON | 3 | | | |
| BY MR. ROBERTSON | | 7 | | |
| | | | | |
| **CATHERINE EDMOND** | | | | |
| BY MS. ANDERSON | 8 | | 17 | |
| BY MR. ROBERTSON | | 16 | | |
| **ROHIT GANGWAI** | | | | |
| BY MR. PARRY | 18 | | 28 | |
| BY MR. COBLE | | 24 | | |
| **BRIAN BURNS** | | | | |
| BY MR. PARRY | 29 | | | |
| BY MR. MORSE | | 73 | | |
| **TIFFANY COUCH** | | | | |
| BY MR. COBLE | 81 | | | |
| BY MR. PARRY | | 88 | | |

**RULE 50 MOTION**                         93

**PLAINTIFFS' OPENING SUMMATION**      96

**DEFENDANT'S CLOSING ARGUMENT**       110

**REBUTTAL**                               138

**JURY INSTRUCTIONS**                    143

**JURY QUESTION**                        151

**VERDICT**                              152

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

**THE COURT:** Are you ready with your next witness?

**MS. ANDERSON:** At this point, Your Honor, ladies and gentlemen of the jury, we call Jeff Miller.

**JEFF MILLER, DEFENDANTS' WITNESS, SWORN**

DIRECT EXAMINATION BY MS. ANDERSON

Q. Mr. Miller, would you please introduce yourself to the jury and tell them what you do?

A. All right. My name is Jeff Miller. I'm a commercial real estate appraiser. I'm based in Atlanta. I started appraising in 1991, about 32 years ago, and I run and operate a commercial real estate firm in Atlanta with my business partner. We have 12 commercial real estate appraisers, including ourselves. And we serve clients in banking, government institutions and investors.

Q. Approximately how many industrial properties like the warehouse that we're talking about in Atlanta have you appraised?

A. In the last ten years, I've done approximately 300 industrial buildings in the Atlanta, Georgia area.

**MS. ANDERSON:** Your Honor, we'll tender Jeff Miller as an expert in commercial real estate appraising including industrial warehouses such as the Atlanta Warehouse in question in this case, please.

**THE COURT:** He's accepted and allowed to express his opinions.

Q. Mr. Miller, I'm going to show you Exhibit 95, which is an exhibit the jury has seen several times. You've been in the courtroom since Monday, I believe, correct?

A. Yes, I have.

Q. And have you heard the testimony that at the time that they divided the warehouses Vamsi and Prasad decided that they would divide the warehouses based on the purchase price of those warehouses minus the loan value, excuse me, the loan values that were left on those properties. Is that correct?

A. Yes.

Q. And were you, Mr. Miller, just like all the other appraisal experts in this case, not retained until six years after when Prasad decided he didn't want to abide by this agreement anymore?

A. That's correct.

Q. And I've put your report up on the stand, and I'll bring up Defendant's Exhibit 25. Is this a copy of the report that you prepared in this case?

A. Yes, ma'am.

Q. And turning to page 2 of your report, can you tell the jury whether or not you agree with the valuation of Mr. Ryan, who testified here yesterday with regard to the appraisal value of the warehouse that Prasad got as it existed in December of 2021?

A.   So as you can see on the screen my value is nine million, two hundred fifty thousand (9,250,000).  I believe that Mr. Ryan's appraisal of eight million two seventy (8,270,000) is a little low.

**MS. ANDERSON:**  And, Your Honor, may I use the illustration that we started with Mr. Ryan yesterday?

Q.   Mr. Ryan testified that in his opinion the warehouse in 12/12 of '21 was 8.25, excuse me, 8.27 million, correct?

A.   Yes.

Q.   And your opinion is that's low by about a million and you believe that the actual value as of 2021 is 942,500.

A.   Yes, ma'am, he valued it at $80 a square foot, and I valued it at $90 a square foot.

Q.   Okay.  And do you agree with Mr. Ryan's testimony that it's worth more today?

A.   Yes.

Q.   Now in your report you mentioned two emails that you reviewed.  I'm going to bring up Exhibit Number 27.  Can you tell the jury what that is?

A.   Yes.  I saw that email.  It is an email from a broker at NAI Brannen Goddard offering to buy the property from the owners for $90 a square foot.

Q.   And this is in May of 2021, and they wanted to know if they wanted to sell the property for $90 a square foot?

A.   Exactly.  It was about six months before the actual

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 5 of 154

appraisal date.

Q.   And that's the same value that you valued this property at?

A.   Yes, it is, $90 a square foot.

Q.   And let's bring up Exhibit Number 28.  Can you tell the jury what this is, please?

A.   Yes.  This is a second email from Strategic Partners, another brokerage company, to the owners offering to buy the property for a hundred dollars ($100) per square foot.

Q.   And so this is in August of 2021, correct?

A.   Yes.  Again, approximately six to seven months before the (inaudible).

Q.   And how big is this property in Atlanta?  Is it more than a hundred thousand (100,000) square foot?

A.   Yeah.  It's 103,408 square feet.

Q.   And you've heard testimony about the Raleigh and Greensboro warehouses being approximately 50,000 square feet.  Is the Atlanta property worth -- excuse me, is the Atlanta property twice as big as those properties?

A.   Yes, it is.

Q.   And so if, in fact, the warehouse could be sold for $100 a square foot, would that make the value as of 2021 actually 10.34 million dollars?

A.   Yes.  If it was valued at a hundred dollars ($100) per square foot, the value would be ten million, three hundred

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 6 of 154

forty thousand dollars ($10,340,000).

Q. And that's what somebody offered to pay in this email, correct?

A. Yes, it is.

THE COURT: So isn't an acre, about 46,000 square feet?

A. An acre is 43,560 square feet, Your Honor.

THE COURT: So this would be almost three acres, 2.7 acres under roof?

A. Yes, that sounds correct.

Q. And so, Mr. Miller, if in fact the warehouse that Prasad now has possession of is worth $100 per square foot, has increased in value since he took possession by over six million dollars?

A. Yes.

MS. ANDERSON: Your Honor, at this time we would like to move into evidence Exhibits 25, 27 and 28 and also Exhibits identified with Mr. Watts, P-516, 517, 518, 519 and 520.

THE COURT: They're received.

MS. ANDERSON: And those are my questions. Thank you, Your Honor.

THE COURT: Thank you. Any cross?

MR. ROBERTSON: Yes, Your Honor.

                    CROSS-EXAMINATION BY MR. ROBERTSON

Q. Mr. Miller, I just have one question for you. Isn't it a fact that you assigned a retrospective value of four

million, two hundred ninety thousand dollars to the 6582 Peachtree Industrial Boulevard property as of January 1st, 2016?

A.   Yes, sir, that is correct.

**MR. ROBERTSON:**  No further questions.

**THE COURT:**  Thank you.  You're excused.  Call your next witness.

**MS. ANDERSON:**  Your Honor, we call Catherine Edmond, please.

**CATHERINE EDMOND, DEFENDANT'S WITNESS, SWORN**

DIRECT EXAMINATION BY MS. ANDERSON

Q.   Ms. Edmond, would you please introduce yourself to the jury?

A.   Good morning.  I'm Catherine Edmond.  I'm a commercial real estate appraiser in North Carolina.  I'm also a member of the Appraisal Institute, which is an AI.

Q.   And can you tell the jury about your appraisal experience, both in London where you previously lived and in North Carolina.

A.   I have 38 years experience in appraising, 20 years in London, 18 in North Carolina.  I have my own company in North Carolina.  I carry out appraisals of all types of property, particularly industrial property.

Q.   Ms. Edmond, can you speak up just a little bit?

A.   Yes, sorry.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 8 of 154

Q. That's all right. Have you had experience appraising industrial spaces, such as the warehouses in Raleigh and Greensboro that the jury has heard about?

A. Yes. It's a property type I appraise frequently.

Q. And just like the other appraisals, you weren't involved back in 2015 when the parties decided to buy the warehouses based on the purchase price. You were retained after Mr. Watts was retained in this case, correct?

A. Correct.

Q. And you heard his testimony yesterday?

A. I did.

**MS. ANDERSON:** At this time, Your Honor, we tender Catherine Edmond as an expert in the field of commercial real estate, including industrial warehouses like the ones in Greensboro and Raleigh.

**THE COURT:** The Court will accept the witness and allow her to express her opinions.

Q. Ms. Edmond, were you contacted by my office to do a review of the appraisals of Mr. Watts?

A. Yes, I was.

Q. And how many different appraisals did Mr. Watts have?

A. There were two for Greensboro. There were two reports for Raleigh and one preliminary evaluation as well.

Q. And after Mr. Watts completed his appraisals, his preliminary appraisal and original appraisals, did you then

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 9 of 154

issue two reports regarding the calculations and his evaluations in his appraisals?

A.   Yes, I did.

**MS. ANDERSON:**  And I've got those up on the stand.  We will be asking to admit Defendant's Exhibit 148, which is the Greensboro report, and D113, which is the Raleigh Report.

**THE COURT:**  They're received.

Q.   After you issued your reports did Mr. Watts amend his appraisals again?

A.   Yes, he did.

Q.   And did you review his amended appraisals?

A.   Yes, I did.

Q.   And based on your review of the materials in this case, Ms. Edmond, and including Mr. Watts' Preliminary Amended and Final Appraisals, have you formulated an opinion as to whether or not Mr. Watts has produced accurate and credible appraisal reports with regards to the Greensboro and Raleigh properties?

A.   Yes.  I concluded that they're not accurate in my book or credible, because there were multiple mistakes, significant mistakes throughout in both appraisals.  Even after he had rebuttal appraisals the same mistakes still appeared.  And they were particularly math issues, inconsistencies, lack of typical procedure for carrying out a commercial appraisal, omissions, yes.  They were not

credible.

Q.   You heard Mr. Ryan talk yesterday about the steps you have to take when you were comparing properties to come up with a valuation, correct?

A.   Yes.

Q.   And did Mr. Watts take those steps?

A.   No, he didn't.  He failed to adjust his comparable, particularly for 2016.

Q.   Now you mentioned errors.  Did Mr. Watts include inaccurate details of the properties that he chose?

A.   Yes, he did.

Q.   Did he use the wrong square footage?

A.   Yes, he did.

Q.   Did he mistakenly use numbers from his old reports in his amended reports?

A.   Yes, they were all mixed up.

Q.   Now you mentioned bad math.  Did you review the calculations that Mr. Watts did in his reports?

A.   Yes.  I went through every single one, including all the statistics that he produced.

Q.   And did you create a chart of all his calculations?

A.   I did.

Q.   And I will bring up a demonstrative exhibit.  Have you seen this demonstrative exhibit?

A.   Yes.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 11 of 154

Q. And tell the jury what's on this exhibit.

A. So these boxes are taken directly from his report, and they are some of the statistics he's used which he's based his values. And the ones that are highlighted in yellow are incorrect.

Q. So the highlighted numbers are wrong math?

A. Yes, they are.

Q. And can we scroll through. This is the -- initially this is the Raleigh calculations for 2021 and 2016, correct?

A. Yes.

Q. And as we scroll through we get to the Greensboro calculations. Are you telling the jury that all these highlighted numbers are wrong?

A. Based on the information that he put in the report, yes.

Q. Now you heard him testify yesterday about some sort of glitch in his computer?

A. Yes.

Q. Now did Mr. Watts perform an income analysis which the plaintiff's own expert Mr. Ryan testified was not applicable to owner occupied properties like the ones we're talking about here today?

A. Yes.

Q. And did he then actually use that value, the highest

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 12 of 154

value, to assign the value that he has assigned to the properties in this case?

A.    In some cases, yes.

Q.    Now, did you perform a full appraisal of the Raleigh and Greensboro properties?

A.    No.  There was no need.  It was already appraised, each property, two and a half months before carried out by a reputable firm.

Q.    Is this the Keystone Appraisal that we talked about yesterday that were performed by an independent appraiser three months before the date that they are valuing this property at in December of, excuse me, in January of 2016?

A.    Yes, that's right.

Q.    And have you reviewed those appraisals?

A.    I have.

Q.    Do you have an opinion as to whether or not the Keystone appraisals or Mr. Watts' appraisals were credible appraisals.

A.    I found the Keystone appraisals to be credible because they had followed all the correct procedures that we are supposed to carry out when we do our appraisals.  And their conclusions were well reasoned.  I can't say the same for Mr. Watts' report.

Q.    Now the Keystone appraisal for Raleigh, what was the value that the Keystone appraisal assigned to the Raleigh

warehouse?

A. It was three million dollars.

Q. And what did Mr. Watts assign to the Raleigh warehouse as of 2016?

A. It was 3.8 million dollars based on incorrect math.

Q. And what did the Keystone appraisal appraise the Greensboro property as of October of 2015, just two and a half months earlier?

A. Two point three million dollars.

Q. And what did Mr. Watts assign as a value to that property?

A. Two point five million dollars.

Q. Ms. Edmond, if the jury should find from the evidence and its greater weight that the Keystone appraisals are more credible than Mr. Watts' appraisal, by what amount has Mr. Watt overvalued the Raleigh and Greensboro warehouses as of that January 2016 date?

A. One million dollars ($1,000,000).

Q. So Mr. Watts is saying that the properties that Vamsi got were worth a million dollars more than what the independent appraiser said they were just two and a half months earlier, correct?

A. That's correct.

Q. Now are the inconsistencies and errors and omissions that are in Mr. Watts' valuation for 2016, are those

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 14 of 154

repeated in the 2021 evaluations that he has?

A. Yep. There are many of the same type of omissions, errors and inconsistencies.

Q. And do you have an opinion as to whether or not Mr. Watts' analysis for that 2021 date is a credible value?

A. I do have an opinion, and I do not believe that they are credible.

Q. And let me show you our second demonstrative exhibit. You just testified that the value that Mr. Watts assigned to the 2021 appraisals were not credible, correct?

A. Correct.

Q. But even if you assume those numbers and we plug those into the value of the property as of the December 8, 2021 date, and we subtract that loan balance that we already talked about. Even if you use Mr. Watts' incredible numbers, if we use the plaintiff's own expert appraiser for an Atlanta number, who got the most valuable property as of December of 2021? Who got the most valuable property?

A. Mr. Prasad.

Q. And instead of Vamsi owing Mr. Prasad money, does this chart show that in fact Prasad owes Vamsi $97,000?

A. It would appear to be so.

Q. And that assumes Mr. Watts' -- that's using his own numbers, correct?

A. Yes.

Q.   And if, in fact, as Mr. Miller has just testified, the bottom, if in fact the Atlanta warehouse is valued at what he values it at, not 8.27 as Mr. Ryan did, but 9.25, does Prasad owe Vamsi even more money?

A.   The difference is even greater.

Q.   And if we buy it at a hundred dollars a square foot as it was offered to be bought, does he owe him even more money?

A.   Yes.

Q.   Thank you.

**THE COURT:**  Any cross?

**MR. ROBERTSON:**  Yes, Your Honor.

                    CROSS-EXAMINATION BY MR. ROBERTSON

Q.   Ms. Edmond, I believe you said earlier you did not perform your own appraisal on the property, the Greensboro property in this case?  Did I hear that right?

A.   That is correct.  There was no need because there was a perfectly good appraisal by a reputable independent company two and a half months before.

Q.   Isn't it true that the Greensboro and Raleigh properties that we've been discussing in this case were separated from the Atlanta property in 2016?

A.   I believe so.

Q.   And the chart that the defendant just had us look at went through the 2021 property values on the one hand and

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO   Document 250   Filed 06/20/23   Page 16 of 154

the 2016 debt amounts on the other hand. Isn't that right?

A. Yes.

Q. Fair to say that that's comparing apples and oranges?

A. No.

Q. Do you know the amount, the 2021 debt amounts for all three properties?

A. I'm sorry, can you repeat that?

Q. You don't know the 2021 debt amounts on each of those three properties, do you?

A. I do not.

Q. And isn't it a fact that using the 2016 numbers that you and Mr. Miller propose to be reliable would mean that Vamsi kept for himself almost half a million dollars in net equity?

A. I haven't done those calculations. I don't know.

Q. So you don't know?

MR. ROBERTSON: No further questions, Your Honor.

THE COURT: Any redirect?

MS. ANDERSON: Just one.

                    REDIRECT EXAMINATION BY MS. ANDERSON

Q. The calculation that Mr. Robertson talked about, that's if you assume Mr. Watts' final valuations, correct?

A. Yes.

Q. Thank you.

THE COURT: All right. Thank you, ma'am. You're excused.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 17 of 154

Next witness.

**MR. PARRY:** Your Honor, the defense calls Rohit Gangwai.

**ROHIT GANGWAI, DEFENDANT'S WITNESS, SWORN**

DIRECT EXAMINATION BY MR. PARRY

Q. Good morning, Rohit.

A. Good morning.

Q. I'll ask you at the beginning if you could please speak as loudly as you can and as slowly as you can to make sure the jury and the Judge and everyone can hear you.

(Court reporter requests the attorney speak louder).

Q. Will you introduce yourself to the jury, please, and let them know where you live?

A. My name is Rohit Gangwai, and I'm a member of Vivid Cosmos.

**THE COURT:** See, this is exactly what he's talking about. Your cadence -- do you know what cadence means, speed. The speed at which you talk is way too fast, and you're not loud enough.

A. My name is Rohit Gangwai, and I'm a member of Cosmos Granite NC and Cosmos Granite Texas LLC.

Q. Where do you live, sir?

A. I live in Dallas, Texas.

Q. Were you one of the founders of what we've been calling Vivid NC?

A. Yes.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 18 of 154

Q. Rohit, I'm going to put up for you a document that's marked Defendant's 374. Is this document, Rohit, a Field Examination that was signed in Texas?

A. Can you zoom, please? Yes.

Q. And what is a Field Examination?

A. It was to approve the loan, our line of credit.

Q. Was this document created by the appraisers sent in by the bank to look at the value of Vivid Texas assets for purposes of a loan?

A. Yes, that's correct.

Q. Let's look at page 12. Can you blow that up, that whole paragraph?

Rohit, we've put up a page from this Field Examiner. Did you meet with this person when they came to your facility?

A. Yes, I did.

Q. And did they go through and look at the inventory you had in Texas?

A. Yes, they did.

Q. And here on page 12 did they make some conclusions about slow moving and excess inventory at Vivid Texas in 2018

A. That's correct.

Q. In the very last two sentences of this paragraph here the appraiser talks about 986,000,000 of tested inventory

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 19 of 154

being aged greater than 12 months.  Do you see that, the second to last sentence?

A.    Yes.

Q.    And then he concludes, or she, based upon the results of the testing he recommends all of that excess inventory be ineligible.  Do you see that?

A.    Yes.

Q.    Does that mean the bank's appraiser was concluding that inventory for their purposes greater than a year old was worthless?

A.    That's what why proposed.

Q.    Do you own another company, Rohit, called Covetus?

A.    That's correct.

Q.    And does Covetus provide software?

A.    Yes.

Q.    Did Covetus develop that software?

A.    Yes.

Q.    Did Covetus also maintain and upgrade that software over a period of years?

A.    That's correct.

Q.    How long are we talking about?

A.    Since the beginning, since we started the operation in 2007.

Q.    So from 2007 forward your company developed and maintained software for businesses to track inventory?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 20 of 154

A.   That is correct.

Q.   Were Covetus's charges to Vivid more or less than Vivid would have paid on the open market?

A.   It was less.

Q.   Did Covetus get paid for the software development and maintenance work at any time prior to 2020?

A.   No.

Q.   Why didn't you as the owner of Covetus push for payment?

A.   Because I was the part-owner in Cosmos also.  So we decided minimal is fine.  We will adjust the payment and give the payment to Covetus.

Q.   Did Covetus finally get paid something by Vivid right before the transaction we heard about in 2020?

A.   That is correct.  Covetus got partial payment.

Q.   Was that partial payment more or less than would have been paid to have software over that period of time had you bought from the open market?

A.   It will be less.

Q.   Was that amount that Covetus was paid more or less than Covetus was owed at that time?

A.   Less.

Q.   Did Vamsi get any of the money that Covetus was paid?

A.   No.  Vamsi has no involvement in Covetus.

Q.   Let's pull up Defendant's Exhibit 341.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546     sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 21 of 154

I'm sorry to move quickly here, Rohit, but we want to get through some of these documents. This is an April 2018 email at the top from you to Prasad and it is in reference to the new financing efforts that we had talked about. Is that right?

A.    That is correct.

Q.    Would you pull up the first three paragraphs?

Can you just tell the jury in April of 2018 was the purpose of you sending this email to Prasad to ask for his help in trying to get financing for the loans that had been defaulted.

A.    Yes.  So because of loss (inaudible) Vamsi and Prasad we were having hard time getting any financial approval from any of the bank.  So we requested Prasad to help us with a personal guarantee on any of the rates so we can get the loan approved.

Q.    Did Prasad offer you any assistance?

A.    No.

**MR. PARRY:**  Your Honor, we would move the admission of Defendant's Exhibit 341 and the prior Exhibit 374.

**THE COURT:**  It's received.

Q.    Let's pull up Defendant's Exhibit 48.  We've heard some, Rohit, about the appraiser that you all hired named Mark Dayman who came to Texas to value the company prior to the transaction.  Did you meet with Mr. Dayman?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 22 of 154

A.   Yes.

Q.   Did you answer his questions?

A.   Yeah.  I provided all the support he needed for evaluation purpose.

Q.   Did he ask you for information about Vivid Texas?

A.   Yes.

Q.   Did you give him every single thing he asked for?

A.   I did.  We provided him every single thing.

Q.   And if you blow up on page 2.  Go to page 2 of Mr. Dayman's email.

Did you, Rohit, have a meeting and have an interview and give a tour to Mr. Dayman as he requested here?

A.   That is correct.

Q.   Did you all provide him every piece of information he requested?

A.   Yes.

**MR. PARRY:**  Your Honor, we would move the admission of Defendant's 48.

**THE COURT:**  It's received.

Q.   Let's look at Defendant's 51.  Just quickly, Rohit, is Defendant's 51 another request for information from Mr. Dayman listing a bunch of documents he'd like to see?

A.   Yeah.

Q.   And did you in fact collect and provide Mr. Dayman every single document that he asks for here in 51?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 23 of 154

A.   That's correct.

**MR. PARRY:**  Your Honor, we move the admission of Defendant's 51.

**THE COURT:**  Received.

Q.   Rohit, let's look at Defendant's Exhibit 42.  Just quickly, is Defendant's Exhibit 42 the appraisal report from Mr. Dayman?

A.   Yes.

Q.   And did you all send Prasad the full amount that Mr. Dayman included in his independent appraisal was the amount Prasad's interest was worth?

A.   Yes, we did.

Q.   Rohit, would you have continued working at Vivid Texas with Prasad being the owner?

A.   It was very difficult.  It was very -- I mean we were having hard time surviving and sustaining, so it was challenging for us to continue working with that kind of environment.

**MR. PARRY:**  No further questions, Your Honor.

**THE COURT:**  Any cross?

**MR. COBLE:**  Yes, Your Honor.

CROSS-EXAMINATION BY MR. COBLE

Q.   Isn't it a fact, Rohit, that you and Vinay had been partners in Vivid NC since it started in 2007?

A.   That is correct.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Q.   You didn't have any prior experience in (inaudible) before that did you?

A.   No.

Q.   You hadn't been involved in the operation of the (inaudible)

A.   No.

Q.   And you had access to the inventory (inaudible).

A.   I had access.

Q.   Now, did I hear your testimony that you said Prasad didn't offer to help with respect to the financing.  Is that your testimony?

A.   That's correct.

Q.   Isn't it a fact that he offered to help if he would simply be treated equally as the other partners in the new company.  Isn't that true?

A.   Can you repeat that again, please?

Q.   Isn't it a fact that Prasad offered to help with refinancing if he were treated the same as the others were?

A.   He was treated equally.

Q.   I'm sorry?

A.   He was treated equally.

Q.   Well, let's look at Exhibit 137.  You agree, don't you, sir, that he was not provided access to the inventory system for Vivid Texas or Vivid NC since 2017 as Vamsi testified yesterday?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 25 of 154

A.   That is correct.

Q.   (Inaudible) isn't that true?

A.   Yes.

Q.   You'll see here in Exhibit P137, Prasad is ready and willing to explore refinance options for Vivid but cannot because he has been provided with none of the information he would need to do so.  Do you see that?

A.   Yes, sir.

Q.   That email was in 2019 from Prasad's attorney, correct?

A.   Yeah.

Q.   You see the first line, Prasad is willing to provide a guarantee in connection with the refinancing of Vivid provided he receives access to the same information about Vivid that the other members enjoy.  Do you see that?  Is that what the email says?

A.   Yes.

Q.   But he didn't have access to the inventory system that the other members had; isn't that correct?

A.   He didn't have access to the system, but he was provided with all the information that was needed for him.

Q.   He didn't have access to the inventory system; isn't that correct?

A.   Yes.

Q.   Let's pull up Exhibit 136, please.

Prasad asked to be involved in purchasing, didn't he, for Vivid Texas?

A.   He was involved in the purchasing because he wanted to purchase only through DSG.

Q.   But he asked to be involved in purchasing; isn't that true?

A.   In the beginning.

Q.   Isn't it a fact that he was not involved in purchasing?  He was not allowed to be involved in purchasing, correct?

A.   Yeah, because he wanted to only buy through DSG.

Q.   He wasn't allowed to be involved in purchasing; isn't that correct?

A.   Yes.

Q.   And then the last Exhibit, Exhibit P136, do you see here at the bottom that Prasad's access to Vivid's software system is being cut off despite his ownership?  The two prior requests to restore access have been ignored.  Do you see that?  Did I read that correctly?

A.   Yeah.

Q.   And this email, I'm sorry, this letter is dated 2017, June 22nd, 2017; do you see that?

A.   Uh-huh.

Q.   In the end, do you see the last paragraph any discussion about a purchase would be impossible given the

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 27 of 154

very basic information disclosed as referenced above.
Is that how it reads? Did I read that correctly, sir?

A. Uh-huh. That's correct.

MR. COBLE: Your Honor we move Exhibit P136 into evidence.

THE COURT: It's received.

MR. COBLE: No further questions, Your Honor.

THE COURT: Any redirect?

MR. PARRY: Just a couple, Your Honor.

REDIRECT EXAMINATION BY MR. PARRY

Q. Rohit, was Prasad at all involved in the management of Vivid Texas's business?

A. No, not at all.

Q. Had he ever been there?

A. Never.

Q. Not one time?

A. Not a single time.

Q. Between 2017 and 2020, the period of those letters and emails Mr. Coble was showing you, was Prasad involved in suing the Vivid Entities more than once?

A. Yes.

Q. And he had his lawyers send out their demands to Vivid Entities during that time?

A. That is correct.

Q. Was he competing actively with Vivid Entities during that time?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 28 of 154

A.   Yes, he was competing.

Q.   Were any of the other members, you, Vinay and Vamsi, were any of you suing Vivid Entities during that time?

A.   No, sir.

Q.   Were any of you competing with Vivid Entities during that time?

A.   Not at all.

Q.   Were any of you involved in the business and the management of the company?

A.   No.  I'm sorry.  Can you repeat the question?

Q.   Were you involved in the management of the business of the company?

A.   Yes.

**MR. PARRY:**  No further questions.

**THE COURT:**  All right.  Thank you.  You're excused.

TRACK 3

**MR. PARRY:**  Your Honor, the defense calls Brian Burns.

**BRIAN BURNS, DEFENDANT'S WITNESS, SWORN**

DIRECT EXAMINATION BY MR. PARRY

Q.   Mr. Burns, good morning.  Can you introduce yourself to the jury and let them know where you're from?

A.   Sure.  My name is Brian Burns, and I'm from Richmond, Virginia.

Q.   Where do you work?

A.   I work at Forvis, LLP.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 29 of 154

Q. Was that a firm that used to be called Dixon & Hughes?

A. Yes, that's correct. It was called Dixon Hughes Goodman. We merged with another firm and are now called Forvis after last year.

Q. What is your position at Forvis?

A. I'm a partner at Forvis, and I specialize in forensic accounting and evaluation services.

Q. How long have you been at Forvis and Dixon Hughes?

A. So I'm been at Forvis and Dixon Hughes since 2014. And I was with a prior firm from 2005 until 2014 specializing in the same area.

Q. What does a forensics evaluation services group do?

A. So it really entails principally three functional areas and specialty of serving in the CPA. The first of which would be conducting forensic investigations. The second would be providing expert testimony relating to disputes and the financial issues in those disputes. And then finally the third principal area relates to the valuation of businesses and the assets and liabilities that those businesses hold.

Q. And you said you were working in the accounting field prior to Dixon Hughes and Forvis?

A. Yes. That's correct. I worked for a firm in Richmond, Virginia named Keiter Stephens. They had a couple of locations at the time. I had about 150

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 30 of 154

professionals and then joining, Forvis a significantly larger firm. We're ranked in the top ten with over 5,000 professionals and 500 partners, and I'm one of those partners in the firm.

Q. Tell the jury what education and training you had in accounting and evaluation before you started working.

A. So I graduated from Virginia Tech Magna Cum Laude with Distinction with a Bachelor of Science in Finance and a minor in leadership. And I also attended Virginia Commonwealth University to attain a post-baccalaureate certificate in accounting while I was working in public accounting.

Q. But you're a licensed CPA?

A. Yes. I'm a licensed certified public accountant.

Q. Do you have any credentials that relates specifically to the forensic accounting part of your job?

A. Yes, I do. I have a couple of them.

Q. Can you tell the jury what those are?

A. The first would be a certified financial forensics credential with the American Institute of CPAs. And the second one would be the Master Analyst and Financial Forensics credential with the National Association of Certified Valuation Analysts.

Q. Now you mentioned business evaluations. Can you tell the jury what's different about that from forensic

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 31 of 154

accounting?

A. So business valuation principally entails analyzing the value of assets and businesses. Most businesses in the country are not publicly traded on the Nasdaq Exchange or New York Stock Exchange and they're privately held and their shares aren't traded actively. And so they need experts like us to come in and value those companies to help the owners of those companies understand their value.

Q. Do you have any credentials that relate specifically to the valuation part of your job?

A. Yes, I do. I hold a couple of them.

Q. Can you tell the jury what those are?

A. The first would be the Accredited and Business Valuation credential with the American Institute of CPAs. And the second of which would be the Accredited Senior Appraiser designation with the American Society of Appraisers.

Q. And how long have you been working in the fields of forensic accounting and business valuation altogether?

A. Been going about 20 years now. I started my career in 2005.

Q. Are you regularly engaged to testify as an expert in lawsuits like this one?

A. Yes, I am. I've testified dozens of times. I believe it's well into the thirties.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 32 of 154

**MR. PARRY:** Your Honor, we tender Mr. Burns as an expert in the fields of forensic accounting and business valuation.

**THE COURT:** The court will accept the witness as an expert in the field of forensic accounting and allow him to express his opinions.

Q. Mr. Burns, how long have you been involved in working in this engagement?

A. I was retained in the late summer of 2021, so it's been about a year and a half.

Q. Were you initially engaged to review the financial and operational records of what we've been calling the Vivid Entities and to offer opinions about the 2020 transactions we're talking about?

A. Yes, that's correct. That was my scope of work and the assignment.

Q. And were you also asked to review and analyze the reports that we've heard about from the plaintiff's experts, Ms. Couch and Mr. Wilhoite?

A. Yes. I've reviewed several reports of theirs. That's correct.

Q. Did you develop, in addition to your own, a response to what they had to say?

A. Yes. I've conducted extensive analysis of their reports and bases for their opinions, and issued a number of reports in response to those.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO   Document 250   Filed 06/20/23   Page 33 of 154

Q.    Can you give the jury just a sense of the documents you reviewed in connection with your work on all those reports?

A.    Sure.  I've analyzed hundreds and hundreds and hundreds of documents, enormous spreadsheets, Quick Books accounting files that constitute hundreds of thousands of rows of data.  I've also analyzed a number of outside research documents relating to accounting standards, financial reports of publicly traded companies and industry participants.  I've done a lot of research in addition to just looking at these documents to support my opinions.

Q.    Were you also provided access to the Vivid management and employees to talk to them about any questions you had?

A.    Yes.  I conducted numerous interviews of Vamsi, Vinay and Rohit as well as their internal accounting professional, Haresh.  I conducted a site visit and visited one of the Cosmos locations in Raleigh and observed their inventory and discussed their inventory and accounting practices and saw the stones and how they presented them for sale to customers.

Q.    Did you work alone on this engagement or did you have a team that works with you?

A.    I had a significant team.  I had well over ten professionals that were dedicated to this engagement in developing the opinions and bases for the opinions that I'm

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546     sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 34 of 154

expressing today. That team included people of my service line, as we call it, which is forensics evaluation as well as our client accounting team that specializes in Quick Books, which is a big issue we've talked about. And I've also talked with our audit professionals. They audit financial statements on a full time basis and went over some of the accounting issues that Ms. Couch has raised to evaluate their thoughts as to the merits of those that further support my opinions in this case.

Q. Can you give us a ballpark of how many hours of time you and your team have spent analyzing all these Vivid financial records?

A. So in evaluating that we've worked over 17 hundred hours on this case. From a comparative standpoint the most recent disclosures I've seen from the experts on the other side of the case, Ms. Couch and Mr. Wilhoite, they did not reach that level. So we've worked many more hours than they have.

Q. Did you prepare expert reports that summarize your work on this case?

A. Yes, I did.

Q. And those reports included your opinions?

A. Yes, they did.

Q. Do those reports summarize the basis for your opinions and all the information you relied on in coming to them?

A.   There's a lot of content in those reports.  There's about 500 pages of analysis in those reports disclosing my opinions and the basis for them.

Q.   And were there five reports you issued as reports to this case?

A.   Yes, that's correct.

**MR. PARRY:**  Your Honor, we would move the admission of Defendant's 62, 37, 109, 381 and 382, which are Mr. Burns five reports.

**THE COURT:**  They're received.

Q.   Let's turn to some of your issues you looked at, Mr. Burns.  Did you review the Vivid Entities Quick Books accounting system as part of your work?

A.   Yes.  That was definitely something that I undertook.

Q.   And you were here, weren't you, during the testimony yesterday from Ms. Couch and Mr. Wilhoite?

A.   Yes.  I was here all day.

Q.   Did you have any concerns, based on your review, about the level of detail in the Vivid Entities Quick Books system?

A.   No, I did not.

Q.   We've heard criticism from Ms. Couch that she had never seen anything like it, that they weren't sufficiently detailed.  What's your reaction to that?

A.   Well, I was respectfully very surprised at that

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO   Document 250   Filed 06/20/23   Page 36 of 154

assertion. I've reviewed a ton of Quick Books over the course of my career and have consulted with my colleagues on the subject, and the issues that Ms. Couch asserts with regard to the way the Quick Books was done is just something that we observe all the time in the accounting profession. It is not as big a deal as she is making it out to be.

Q. Is there any accounting standard or document that you're aware of that would say you have to keep Quick Books or whatever accounting system you use in the level of detail Ms. Couch described yesterday?

A. No, definitely not. I mean if you think about a credit card statement for a business, there's thousands of transactions, bank statements with hundreds of checks. To document every single one of those in Quick Books individually would be onerous and quite frankly very expensive to have a CPA firm do that and the bookkeepers do that. So I've seen it many times in my career where the entries are batched when you're making the entries in Quick Books. It commonplace, and I've seen it myself as well as my colleagues and in consultation with a client accounting department.

Q. And when you say batched that's the summary she was talking about yesterday, and that's what you're saying you see all the time?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 37 of 154

A.    Yes.  I have a couple of cases that are active right now with batch entries in them.  It doesn't mean it's an indication of them being unreliable or fraudulent.

Q.    Now, she also talked some about the fact that the Quick Books she said were updated and modified a number of times.  Did you hear that testimony?

A.    Yes.  She spoke to this feature of Quick Books where you can create what's called an audit trail feature.  And what that audit trail feature will show is how entries in Quick Books are modified historically.  I joke with my staff sometimes when we push the button to create the audit report you might want to go get some lunch or take some time off because it takes at least a couple of hours for it to run the report because it's so long.  Just because there are a lot of modifications in this audit trail report doesn't mean that there's a problem.  It's very common, and they take a long time to create.

Q.    What are some reasons why a company might make adjustments to the accounting entries they have already put in there?

A.    Well, there's a number of reasons.  Bookkeepers don't have a full understanding of every single transaction that occurs in a business and how it should be put in the books so sometimes they have to put them in place holders and then reclassify them later.  Sometimes they make entries

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 38 of 154

that could be incorrect. They need to go back and fix them after further consultation. And, finally, accounting requires a lot of assumptions and estimates to be in accordance with accounting principles. It's not just money going in and out, cash in and out. There's a lot more that goes into accounting in accordance with accounting principles that require estimates. And CPAs help with that, and bookkeepers always understand how that's going to happen, and it happens sometimes only periodic times during the year. So to have entries that are modified is not unusual.

Q. And you've looked at the specific modifications she was talking about; there were a number of them.

A. Yes, I did.

Q. And you didn't find that to be problematic or unusual based on your experience?

A. No. The results of those entries did not give me any pause for concern.

Q. The bottom line, Mr. Burns, based on your review of their Quick Books system -- and how many years worth of it did you all look at?

A. Oh, we went back many, many, many years, really back to inception if I recall correctly. I mean the principal focus was from 2015 to present because that's what relevant, but we went back for quite some time.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546     sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO     Document 250     Filed 06/20/23     Page 39 of 154

Q. Do you agree with Ms. Couch's assertion that those Quick Books are totally unreliable?

A. I do not. And I just find it troubling with the notion that if the Quick Books files are so unreliable how can it be that these companies are worth 30 million dollars as they assert. There's a big disconnect there in terms of if the books are that unreliable, how can the company be worth that much.

Q. Did you find any evidence, in everything you looked at, all the financial records that this notion that there were two sets of books?

A. I didn't find that at all. I think that that's a misrepresentation based on my opinions and review of the documents in this case. It's very common for a business to maintain separate systems, one of which may be to track their inventory and sales process for a big warehouse of inventory that they have and that is serving a specific function. Then they'll also have other forms of systems for other purposes. They have a payroll system, for instance. They may outsource that. That's another source of information. They also have Quick Books, which is a separate system for the accounting function. That's how you generate financial reports. So all those documents come together for a holistic view of the appropriate financial report and it ultimately goes into the tax

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 40 of 154

returns. Or financial reports that go to a bank, for instance. There was definitely no multiple sets of books here for any malfeasance in my review of this information.

Q. Were you concerned about the fact that we heard that the ERP, the inventory tracking software, had a different number in it than Quick Books did?

A. No, not at all. It's common to have differences between those because there are accounting estimates and adjustments that are made in the accounting system that the ERP system isn't going to have the capability to perform, and frankly it's not relevant to what that system is seeking to accomplish. So those issues are really not relevant.

Q. Did you hear Ms. Couch suggest that the documents that went into the bank were in some way suggesting a different set of numbers for different purposes. Did you hear that testimony?

A. I did. I found it surprising in that the bank agreement itself with Bank of America says, hey, every year you need to send us your tax returns and send us your financial statements that have the devalued inventory in it. So it's not like they were hiding it from the bank. The bank was getting it every year. The bank agreement said that. So the notion there's two sets of books for different purposes is really troubling to me.

Q.   And did you see, were they in fact submitting a higher number to the bank to borrow against that higher number? Is that what was happening?

A.   No.  Not at all.  I mean the bank -- the borrowing base report submitted to the bank had significant adjustments downward for ineligible inventory.  And they were not even remotely close to borrowing up to the limit on that based on my review of the documents.

So there was no -- from my opinion looking at those documents that they were hiding something from the bank, particularly when the bank is getting their tax returns that have the devalued inventory in it.

Q.   Now you mentioned devalued inventory and I want to get to that, because we've all heard an awful lot about inventory accounting.  And specifically the fact that these companies adjusted the inventory or the slabs by age.  Did you see that in your review?  Is that what was happening?

A.   Yes, that is correct.

Q.   Had you ever heard that kind of approach being used outside of these companies?

A.   It's a common approach that's employed in practice across a variety of industries, most importantly in the warehousing business, distribution, and retail companies. Let's just take for instance a department store.  They're always buying different types of inventory that's available

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO   Document 250   Filed 06/20/23   Page 42 of 154

for sale. You have different types of shoes, jewelry, clothing and other items, and they rotate those items fairly quickly in terms of seeking to sell them due to changes in consumer preferences, things going in and out of style. And they cycle that inventory in and out. But when the inventory becomes aged and it can't be sold and nobody is buying it for several months or in this instance years, that's a problem. And the accounting needs to account for that. And it's further exacerbated or a bigger problem here with these slabs that weigh a thousand pounds. You can't just get rid of these slabs or move them around. They just set there for years and years and years. And that's a big problem in terms of value of that inventory and how it should be accounted for.

Q. When you say it's a big problem help us understand why. We heard Ms. Couch say they eventually sell some of them. And why isn't that good enough?

A. Well, a large degree there's a significant carrying cost to having these massive slabs setting in your warehouse, and that's an important consideration. You're also not able to buy new inventory. There's a lost opportunity cost associated with not being able to put new inventory that actually is desirable to sell. The slab setting there for a year or two or three, it's probably pretty ugly and people don't like it, and it's really not

worth as much. It doesn't make any sense. There's a significant cost associated with that that is valid and warranted with the proper accounting treatment.

Q. When you talk about opportunity costs, does that just mean limited space in the warehouse so if the old stuff is setting there, you can't get any new stuff to sell faster?

A. Yeah, that's right. I mean I've seen it in a number of industries. The automobile industry, for instance. If you have a bunch of cars that are setting there that nobody wants, that's a problem. You can't buy and have new cars on your lot. But at least with those cars you can drive them around and move them around. Here you have to have a forklift to move these thousand pound slabs of rock that are setting there for years. It's a big problem.

Q. Now did your review suggest anything about how long they had been doing this? Was this something they just started doing around 2020?

A. My review indicates that they had been doing this inventory methodology for years and years and years and years. And really since the inception of the entity. So this is an accounting practice that they had consistently applied for many years, even before the disputes between Vamsi and Prasad arose.

Q. Is that indicative of some fraud or conspiracy to manipulate the books in the 2020 transaction?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

A.   It definitely is not.  I mean I -- when I investigate fraud and find fraud, I find actions that occur very close to or contemporaneous with the issues of the case.  I mean I do a lot of work in divorce.  When people are getting divorced they hide the money.  They manipulate the financial results right around when they are getting divorced.  Here this has been going on for years and years and years.  And the evidence indicates that Prasad even knew about it.

Q.   Do accounting rules suggest that consistency in approach is an important thing?

A.   Oh, it's a very important thing.  I mean when they talk about the accounting rules and they say generally accepted accounting principles, they say consistently applied.  That's a very important concept.  If you're not consistently applying it, you get weird results.

Q.   Is there another accounting principle called conservatism?

A.   Yes.

Q.   What does that mean?

A.   Conservatism is a very important accounting principle. So one of the biggest risks with financial reporting and the accounting standards is overstating and painting a rosier picture of how the financials really were.  Assets are inflated, they're overstated.  Sales and profits are

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 45 of 154

overstated. You're trying to make the business look financially better than it really is. And so this concept of conservatism is one that is a tenet to prevent that from occurring because users of financial statements like a more conservative view in terms of their assessment of the financial position. And one of the big issues is inventory. If you don't write down your inventory appropriately, you overstate inventory, you overstate profits and you paint a rosier picture than it really is.

Q. In your professional assessment, Mr. Burns did you feel like Vivid Entities followed those accounting rules of consistency and conservatism?

A. Yes, I did.

Q. Is there another accounting rule called the matching principle?

A. Yes.

Q. What does that mean?

A. So the magic principle is designed to recognize revenue and costs and losses and profits in the periods in which they occur. So when inventory is starting to show signs of being slow moving and not moving quickly the cost associated with all that, the issues, it says you want to match those issues when they start to occur on a contemporaneous basis. And so you're just trying to get the timing of the transaction to the real economic picture

of what's happening on a matched basis.

Q. Did you think Vivid Entities followed that principle too?

A. Yes.

Q. You heard Ms. Couch sit here and testify yesterday that these companies, I think she said, broke all the accounting rules. Did you hear that?

A. Yes, I did.

Q. Do you agree with that?

A. I respectfully disagree.

Q. Did you do an analysis, sir, and compare the way Vivid Entities handled their inventory accounting with industry standards of other companies?

A. Yes, I did. I mean clearly there's a difference of opinion between Ms. Couch and her review of the accounting processes of Vivid Entities as opposed to the Vivid Entities CPA and myself. And so accountants can look at things differently. So one way you can try and test the reasonableness of who's right here is you can do some benchmarking to industry comparators, and that's what I did.

Q. Where did you go to find things to compare it against?

A. So we have some data bases to which we subscribe, and I can pull reports specific to the industry in which Vivid Entities operate, and I also found a publicly traded

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 47 of 154

company that is of the industry that Vivid Entities operate as well.

Q. What is a publicly traded company?

A. It's a company that trades like on the New York Stock Exchange or Nasdaq. You can buy stock and sell it on the stock exchange. And when that happens they have to report their financial statements to the public. And you can go out and pull those and look at them.

Q. Do their financial statements get subjected to any kind of special scrutiny?

A. They do. They're subject to a robust audit process by the largest accounting companies in the entire country. And they're also governed by the Securities Exchange Commission for a lot of oversight.

Q. Did you do any charts that would show how Ms. Couch's approach compared to what else you saw across the industry?

A. Yes, I did.

Q. Let's look at Defendant's 381, which is a report you did in February of 2022, and let's go to page 39 of the PDF. Are these charts -- look I guess the one at the bottom. Is this one of the charts that you were just referring to, Mr. Burns?

A. Yes, that's correct.

Q. Can you very quickly tell us what this shows us about Ms. Couch's analysis and why that mattered to you?

A.   So the bar charts on this chart, the higher they are, the higher the profitability, the higher the profit that's being reported.  The blue bars represent Vivid Entities, including the devalued inventory.  So it incorporates the appropriate accounting method they did.  And those blue bars are very close and even exceed the industry bars.  So the red bars is that publicly traded company that I said.  They're actually a lower profitability company compared to Vivid Entities.  Then when you compare them to the orange bars, which are the industry research I did for the data bases, they're in line or just a little bit above those.

If you incorporate what Ms. Couch says to be the appropriate type of accounting and the lower cost of market adjustments that she would have proposed, that would add the green bars on top.  And it puts them way, way higher than all the industry comparators.  And more specifically, a lot higher than the publicly traded company.  The publicly traded company in the red there actually had a material weakness in its internal control of inventory that was remedied in 2018, and when they did that the profitability came down.  And so to me, that shows how important this issue is, when the auditors look at it and fix it, the profitability came down.

Q.   So what does this tell you, bottom line, about the reasonableness and reliability of Ms. Couch's suggested

approach?

A. Really it inflates their profitability to levels that's inconsistent with all these industry companies. In my opinion it's just inflating the results and not painting an appropriate picture.

Q. Did you also consider it to be relevant how banks looked at inventory?

A. Yes. That's another way to test the reasonableness of the accounting assumptions is to look at how banks look at stuff.

Q. And why would a bank be looking at it and why do they care?

A. Well, if a bank is loaning a company money, they want to understand the risk associated with that loan. So just like when you borrow money to buy a house, the bank wants you to get an appraisal on your house that you're buying. So that's what banks do, is they go out and they look at assets and look at their value and tell you that.

Q. Let's look at Defendant's 374 -- actually let's show this one, this Field Examination. Can you go to page 12 again? And just blow up that slow moving excess inventory.

Have you looked at this, Mr. Burns? You were here just a moment ago with Rohit when he looked at those last couple of sentences that the appraiser had to say about the Vivid Texas inventory in 2018. Can you just help us

understand that conclusion and why you found it significant?

A.    Sure.  They looked at over three million dollars of inventory, and they found that almost 32 percent of it or about a million dollars of it was aged greater than 12 months, and they considered it to be slow moving or excess. And then the examiner who wrote this report for the bank says, they recommend that the $986,000 of excess inventory to be ineligible.

Q.    And what does ineligible mean in bank speak?  What does that mean?

A.    It really means they don't deem it of any value. They're not going to loan any money based on it.  They don't think it has any value.  So they say it's worth nothing.  And Vivid Entities ascribed two percent to it. So I mean to me it's very consistent with that.

Q.    So when the bank looked at Vivid Texas in particular it said your stuff older than a year is worth nothing?

A.    That is correct.  And, again, this is Vivid Texas specifically.  And Vivid Texas had only been in business for two years when they did this.  Vivid North Carolina had been in business for years and years and years and years, so they're going to have a lot more aged inventory than this.  This is only after two years.  It's just an issue in this industry that you have to deal with.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Q. Let's put up Defendant's 46.

Mr. Burns, what did you understand Defendant's 46 to be?

A. This is a document that Unity Bank produced in regards to their assessment of Prasad's Cosmos entities that he operates.

Q. And with respect to 46, if you look at page 10 of the PDF. Blow up the collateral evaluation part, the middle part. All the way down.

So Mr. Burns, is this an example of one of Prasad's lenders looking at the inventory at one of Prasad's companies.

A. Yes. That first bullet point is where I would like to focus. It says, adjusted book value of assets. Again, Ms. Couch uses the term adjusted book value in her testimony. They valued accounts receivable at 85 percent, and they valued inventory at 50 percent. That 50 percent figure is very consistent with how the Vivid Entities look at their inventory. It is completely contradictory to Ms. Couch's testimony that it should only be discounted by, you know, just a couple of percent and valued it in the 90s. That's just completely inconsistent with Ms. Couch and it supports my opinions.

Q. So both Vivid's bank and Prasad's bank agreed with Vivid that the older inventory is worth substantially less?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 52 of 154

A.   That's correct.

Q.   Is that consistent with what Ms. Couch suggested yesterday?

A.   No.  It's completely inconsistent with what she has to say.

**MR. PARRY:**  Your Honor, we move the admission of Defendant's 486 and 374.

**THE COURT:**  It's received.

Q.   Did you review other inventory appraisals, Mr. Burns, that were done by banks?

A.   Yes, I did.

Q.   And did your review of those appraisals support your conclusions?

A.   Yes, that's correct.

Q.   Generally tell us how.  I mean what generally did you see from all the bank appraisals you looked at?

A.   I mean the way that they looked at inventory in terms of its market value for lending purposes resulted in a discount through the original cost, very consistent with how the Vivid Entities valued their inventory.

Q.   Now we've heard a little bit in the case about a transaction where Vamsi and others purchased an interest in a company called IGM.  Are you familiar with that?

A.   That's correct.

Q.   Did you also consider that transaction to be relevant

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO   Document 250   Filed 06/20/23   Page 53 of 154

to your analysis?

A.   It was an additional data point that I evaluated just trying to get my arms around as much information as possible that's relevant.

Q.   Were you able to tell in that arms length transaction how the bank valued the inventory there?

A.   Yes.  So in that instance Vamsi and Rohit bought inventory in a transaction from another company at 30 percent of original cost.  So that bank is saying it's worth 50 percent.  Vamsi bought it at 30 percent, so that's an even bigger discount.  That would be a 70 percent discount in an arms length transaction where Vamsi is trying to pay as little as possible to buy and wants to get as much as possible.  They each have a competing interest and that's market value.

Q.   And does arms length mean the two companies aren't related to each other?

A.   That's correct.

Q.   Now did you prepare a chart or table that shows how Ms. Couch's suggested discounts would compare against some of these bank appraisals and other data points you looked at?

A.   I did.

Q.   Let's look at Defendant's 382.  This is another report you prepared in this case.  It was admitted earlier, Mr.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO   Document 250   Filed 06/20/23   Page 54 of 154

Burns. Can you go to page 47. Do you see that? And I think the chart is at the bottom of the page.

Is this the chart you were referring to, Mr. Burns?

A. That's correct.

Q. Helps us understand what this tells us about how Ms. Couch's suggestions compare with industry reality.

A. Sure. So the blue bars represent inventory evaluation or reporting for Vivid North Carolina. The orange bars are Vivid Texas, and the gray bars are how banks look at the inventory for other Cosmos entities. And what this chart represents as -- if you look at cost, the original cost of the inventory, that would be a hundred percent. Ms. Couch is valuing the inventory a little below cost, ranging anywhere between 94 percent to a hundred percent or so of the cost providing very little discount to cost that she deems to be appropriate. When I did my own independent analysis I came in around 60 percent, which is consistent with the way the Vivid Entities did their reporting, which is consistent with the CEA appraisal which is a little bit above that. And then it's also even higher, for instance, that the IGM transaction. That was a much lower evaluation given the issues associated with that business, which I would consider to be appropriate. And then the other two appraisals that were done were also in line with the Vivid Entities reporting and my own independent analysis. And

what you can see is that Ms. Couch's opinions are just really significant outliers and consistent with nobody else in this case.

Q. So the gray bars provide data on that IGM transaction you just told us about and some of those appraisals you looked at in the research?

A. That's right.

Q. And then the middle cluster that's all there together is your independent evaluation of FORVIS and then the middle what the Vivid Entities actually bid. And then is the blue bar the one done by Mr. Robinette, the appraiser who looked at this back in 2020 not in litigation?

A. That's correct.

Q. And those are all evaluated separate. And then the ones that are much higher than everyone else is Ms. Couch's suggested approach?

A. Yes.

Q. So does this suggest to you that Ms. Couch's suggested adjustments are reasonable and reliable?

A. To me this is very demonstrable evidence that or information that would say that her opinions are unreliable and inconsistent with everybody else.

Q. Now we heard Ms. Couch testify that she found some old slabs that were sold later for a profit. Did you hear that?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO   Document 250   Filed 06/20/23   Page 56 of 154

A.   Yes, I did.

Q.   Does that mean that the estimates that they are applying to the older slabs are wrong?

A.   No, it doesn't.  That's just something that happens in the ordinary course of business.  I mean you make accounting estimates as best you can and what you're trying to do is to be conservative, go ahead and recognize the cost.  And if you sell that inventory at above that amount subsequently it just comes into income.  The income comes in, and it's just really a limiting timing difference.  So what they're doing is completely reasonable, and her observations that the slow moving inventory eventually sells doesn't render these accounting methods unreliable.

Q.   So when you make broad accounting estimates in business, do actual results sometimes vary?

A.   Yes.   They most certainly do.

Q.   And in 2020 around the time when these transactions happened, were there market factors going on that impacted sales in this industry?

A.   Yes.  There were a number of factors that would be relevant.

Q.   Let's take a look in this same report at page 59.  Is this another chart in your report, Mr. Burns, that helps illustrate that point you just made?

A.   Yes.   So Ms. Couch expressed opinions about the slabs

that were acquired through the Vivid transactions sold for higher than the written down cost, in significant margins. And one of the important factors that you have to think about that led to that was well the economy and the demand for slabs increased significantly as the pandemic really got going. People were staying at home and making a lot of home improvement projects to their houses. The residential market was booming, and there were supply chain shortages. There was not as much inventory available. The ships were getting caught up. And all these factors made the price go up. And so it's an industry wide phenomenon that the prices went up considerably here. And this is based on information published by the government.

Q. So across the industry construction materials from the period of time beginning around the start of the pandemic in early 2020 prices went up?

A. A whole lot, yeah, that's right.

Q. Did that make the profitability of sales go up?

A. That's correct. I mean for Prasad's own entities in 2021, his sales grew by 30 percent.

Q. Is this kind of price increase something everybody was predicting back in early 2020?

A. No. I mean when the pandemic first got going, there was a lot of uncertainty and a lot of concern about what implications it was going to have for the economy. But as

we got into, you know, 2021 it was very evident that the residential market was doing well due to a lot of the money that the government was putting into the economy and a lot of people were investing in homes, and that means the price would go up. It's this inflation concept that we've been dealing with.

Q. Now we heard Ms. Couch talk about doing a slab by slab analysis. Did you hear that part?

A. Yes.

Q. Did you review her slab by slab work?

A. I did.

Q. Did she have any mistakes or other problems you found when you went through her work?

A. Yes. I found a number of mistakes and then I also found what I deem to be perceptual flaws that render her analysis just incomplete. It's like baking a cake without all the proper ingredients. It can look like a cake, but it ain't gonna taste like a cake. It's just not well done.

Q. Can you give the jury just a quick overview of the problems in this case that you found that were significant?

A. Well, the most significant one was a $640,000 error that she did fix, but she did not cure all the other issues that would provide an accurate assessment of how the inventory should be accounted for relating to all these -- the carrying costs and the other issues associated with

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546     sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO     Document 250     Filed 06/20/23     Page 59 of 154

having this inventory that's so slow.  And what the banks say, is they don't like it either.

Q.   Now you ended your report with costs associated with the value of old inventory setting around (inaudible).  Did you believe Ms. Couch's analysis accounted for those kinds of real world costs?

A.   No, most definitely not.

Q.   Why not?

A.   It just wasn't something that she really evaluated holistically in developing reasonable conclusions.  She used what's called a gross margin methodology, which is the primary methodology or method that she used.  Accounting literature says that that is not the ideal and appropriate way to go about doing it.  So number 1 the accounting literature doesn't incorporate it.  And if you just look at that sales data it gives a very rosy picture.  Like if you look at a sales report for a department store, it's going to look great because it doesn't take into account all the inventory that doesn't move, and they have to do something with at the time it would be in that sales report, the customer's file.

Q.   Did you do your own slab by slab analysis?

A.   Yes, I did.

Q.   And did you come to the same conclusions Ms. Couch did?

A.    No, I did not.  I undertook a very detailed analysis and did the accounting and the methodology appropriately and got a result that was consistent with the other parties I just reviewed.

Q.    When you say consistent with the other parties, help us understand how your analysis of the slab by slab compared with Ms. Couch?

A.    Oh.  My analysis of slab by slab incorporate all those factors appropriately.  They employed the methods that were consistent with these other -- with the other information that I've gone through, and Ms. Couch just didn't consider all those factors appropriately.  It was really just a half baked analysis.

Q.    Did your review also include looking at the reasonableness of the structure of the Vivid NC transaction?

A.    Yes, it did.

Q.    Would you point me to the opinion about the decision of how that transaction is an asset sale rather than selling the whole company?

A.    Yes, I analyzed that.

Q.    And we heard Mr. Wilhoite testify yesterday that he thought the company should have just been sold as a whole company, not just the assets; is that right?

A.    That is correct.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 61 of 154

Q.   Is that the term of a going concern analysis?

A.   Yeah, that's the term that would be appropriate, yeah.

Q.   Do you agree with Mr. Wilhoite that it would have been better or more reasonable if they had sold the whole company Vivid NC in February 2020, rather than the assets?

A.   I do not agree with that?

Q.   Why not?

A.   Vivid NC was facing considerable issues relating to all the litigation that was in and amongst its owners, and that's a big problem.  That litigation, it related to a trademark, which is how the company brands its products and how it goes to market.  Buyers find that to be important.  There's also issues in regards to the lender.  The lender was not happy.  Bank of America, a huge bank, was not happy with the litigation and was putting in what's called forbearance agreements that cost a lot of money.  Their interest rate goes through the roof.  You have to pay all these penalties and fees and that's very expensive.  And all those factors would make it very difficult to monetize and sell Vivid NC as a going concern.  I talked with the investigators of my companies that sell companies and they said if that was going on it would be impossible.

Q.   Did you feel like either one of the plaintiff's experts and Ms. Couch was well (inaudible)?

     Did either of them consider or take account of those

difficulties that Vivid NC was facing in terms of the loan default and the lawsuits and the other issues and complications that we've heard about?

A.   I felt they just minimized them.  In the depositions they didn't know a lot of the details.  And from their standpoint if the financials look great, which they're saying were manipulated, then somehow that means you can sell the company.  But what I keep coming back to is the fact that no lender would refinance the debt with all these issues.  And if you can't refinance the debt with the lender, how in the world could you sell the whole company?

**THE COURT:**  So your suggestion is that this internecine war among the family over the business depresses the value of the business?  Is that fair?

A.   Yes, Your Honor.

**THE COURT:**  Isn't that in a nutshell what you're saying?

A.   Yes.

**THE COURT:**  Okay.

Q.   Now in terms of the transactions -- obviously we're here mainly to talk about the price.  Did you make an assessment of the fairness of the price that was paid to Vivid NC for the excess inventory.

A.   Yes.  I gained an understanding of how it was priced.  I analyzed the appraisals that were done that were associated with it and analyzed the transaction myself.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Q.   So when you were talking about the appraisals done associated with it, I want to be clear.  Is that the one we've heard a couple of names.  With Vivid NC was it Lee Robinette, the guy who came in in 2020 and did an appraisal?

A.   That's correct.

Q.   Have you looked at his work?

A.   Yes, it was something that I considered, and felt that it would be prudent for the entities to hire an appraiser to value those tangible assets.  Yeah, I believe that was appropriate.

Q.   Do you find it -- on that note, do you find it consistent with fraud or conspiracy or an effort to cheat someone to hire an independent expert and then pay whatever they tell you.

A.   I mean, that's the way you should do it.  I mean, frankly that's how I earn a living.  I don't sit here and always testify in court.  It's just part of what I do, but a lot of what I do is I do evaluations to help parties analyze and value their assets.  And so it would be a very prudent thing for a business owner to do.

Q.   Did you do anything to review or assess the reasonableness of Mr. Robinette, the appraiser's conclusion about Vivid NC, or did you just take it at face value?

A.   Well, as a business appraiser initially I just said,

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 64 of 154

look, I think it's a reasonable way to go about it.  I relied upon it.  But then given the critiques and criticisms that Ms. Couch raised in regards to that appraisal I undertook my own analysis of the inventory and evaluated all this bank information that I've talked about and other sources and concluded that it was a reasonable way to go about it.

Q.  I'm sorry, you trailed off a little bit there at the end.  Did you ultimately have a conclusion about the reasonableness of Mr. Robinette's work based on your own analysis?

A.  Yes.  It was reasonable.

Q.  And did you also -- did you form an opinion about the reasonableness of the amount that was paid for Vivid NC assets.

A.  Yes.  I concluded it was fair and reasonable.

Q.  And what was the opinion?

A.  With regard to which entity?

Q.  For Vivid NC.

A.  In terms of the actual number?

Q.  Yeah.

A.  I don't recall right off the top of my head, but I believe it was 13 million dollars, round off.

Q.  Did they just plug in Mr. Robinette's number from 2019, or how did they do it?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546     sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO   Document 250   Filed 06/20/23   Page 65 of 154

A.   Well, so Mr. Robinette's inventory appraisal was as of the end of 2019. And the transaction was two months later. And so what they did was they applied the methodology that he utilized to see what the inventory balance was in February of 2020, which would be the appropriate way to go about it. Then they measured the other assets at that point in time as well. Because the inventory balance that was there declined from the end of 2019 to February of 2020 by over $800,000. I mean that's land and costs, buying and selling the inventory that's moving and that has to be taken into account.

Q.   Now with regard to Vivid Texas, did they also hire an independent expert there and pay whatever he told them?

A.   Yes.

Q.   Did you look at -- is that Mark Dayman?

A.   Yes, that's correct.

Q.   And that was the report -- well, it just showed us from Vivid Texas?

A.   Yes.

Q.   Did you do any review of Mr. Dayman's work and his valuation of Vivid Texas?

A.   Yes. I conducted an appraisal review of his report.

Q.   And summarize for the jury your conclusions once you looked at Mr. Dayman's report?

A.   Every appraiser may agree or disagree on certain parts

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 66 of 154

of the process and the assumptions. He took positions that I would think differently. There were adjustments I would make to make it go up, adjustments to make it go down. But at the end of the day I found it to be a reasonable valuation compared to the one that I did.

Q. Did you get around the same number that Mr. Dayman did?

A. Yes, I did.

Q. Was your number when you did your own independent analysis actually lower than Mr. Dayman's?

A. Yeah, it was about $30,000 lower or 25,000 if I recall correctly.

Q. So not a big difference?

A. No. They were very close.

Q. To the extent Mr. Dayman errored in your view he came up with a value that was too high?

A. Yes, it was higher than mine.

Q. Let's look at Defendant's 413. This is a big chart, Mr. Burns, and we've got limited time, so I don't want you to go through the whole thing, but is this another table from your report and you've sort of bottom lined it for us, what this tells us?

A. Sure. I came to a conclusion that 465,000, it's very close to the number that Mr. Dayman came up with. I applied an income approach and market approach. Those are

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 67 of 154

the same methods that Mr. Dayman applied and also the same methods that Mr. Wilhoite applied for both the income approach and market approach. We just reached different conclusions.

Q. So Mr. Dayman said it was 490,000, which is what they tried to pay Prasad?

A. That's right.

Q. And you went through two different approaches to get to a number there at the bottom that was 465,000?

A. That's correct. That's my opinion of value.

Q. Did you review Mr. Wilhoite's work in coming to valuation estimates for both of the companies?

A. Yes, I did.

Q. Separate and apart from Ms. Couch, did you find any mistakes or errors in his work?

A. Yes, I found a couple.

Q. Will you tell the jury materially what you found in that regard?

A. So Mr. Wilhoite, one adjustment that he made to the value was to add Ms. Couch's inventory adjustment that she identified through its value. And he multiplied it by 50 percent and added it to it. Well, when Ms. Couch identified that 640,000 error Ms. Couch issued a report in September that corrected it and gave a new number. Mr. Wilhoite did not update his report that was from April. He

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 68 of 154

didn't issue a new report in September incorporating that update. So his value doesn't' incorporate the correction that Ms. Couch identified was appropriate, and that's just wrong.

Q. So Mr. Wilhoite relied on Ms. Couch? Was that your understanding?

A. That's correct.

Q. And then you're talking about the 640,000 some odd error that she admitted yesterday and went back and fixed?

A. Yes. And he did not go back and fix that in his report.

Q. So the numbers he showed the jury include the number she admits is wrong?

A. That's correct.

Q. What was the date of Mr. Wilhoite's valuation estimate for Vivid NC?

A. That date was February 28th, 2020.

Q. Did that date as compared to Ms. Couch's work, create any problems in your review?

A. Yes. Well, Ms. Couch's inventory measurement was done as of December 31st, 2019. She did not measure it as of February 28th of 2020. That's two months later. And when you look at the inventory report between those two dates you can see that the cost of the inventory, regardless of this dispute about devaluing inventory, the cost of the

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 69 of 154

inventory decreased by over $800,000. That inventory is gone. His report did not properly incorporate that decrease in inventory between those two dates. That's a significant issue that needs to be corrected.

Q. And so Ms. Couch's adjustments were based on a higher inventory number, and Mr. Wilhoite's valuations were based on a lower number?

A. Well, no, he used her higher number, and he should have used a number that was as of the February date because there was $800,000 in inventory that was sold.

Q. So in your view Plaintiff's experts ignored that $800,000 change in number?

A. Yes. Ms. Couch's explanation yesterday was just flawed and incorrect. You have to take into account $800,000 of inventory not being in the warehouse anymore. That's just very relevant.

Q. Was the difference in inventory, the 800,000, was that some write-down or was that sales? Did you look at that?

A. Yeah, that is the cost. And so the cost is going to change based upon purchases and sales. When I looked at the change in the inventory reserve, which is the inventory write-down change, they only do it by $60,000. So it has nothing to do with the inventory reserve but devaluation has everything to do with the cost. That's the important piece.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 70 of 154

Q. Did you notice any changes that were made between the end of the year 2019 and February 2020 in the way they were approaching write-downs?

A. Yes. They actually modified the write-downs in February of 2020 to make them be more favorable and that the older inventory was going to be discounted less.

Q. So they changed their approach prior to the transaction in the way that that made the adjustments less?

A. That's right.

Q. And made Prasad's interest worth more?

A. Well, the net result was there was a slight increase in devaluation just because the inventory aged, but how the aging methodology was done was actually increased which would be favorable.

Q. So the change they made was favorable to Prasad, not unfavorable?

A. Yes. If they would have kept it the same it would have gone down more. They made a favorable change.

Q. Did the Plaintiff's experts take any of that into account?

A. That was omitted from the discussion.

Q. Now did the issues you found with Mr. Wilhoite's approach have any impact on his final number?

A. Yes. Yes, it did.

Q. Let's look at Defendant's 382, page 68. Last chart,

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 71 of 154

Mr. Burns.

Are these two charts, Mr. Burns, are these illustrative of the point you were just making about Mr. Wilhoite's analysis?

A. Yes. The first would be for Vivid North Carolina. Even if I were to adopt the premise that Vivid North Carolina could be sold as a going concern and be valued based upon the income that it generates despite all these problems we've been talking about, if you do the valuation approach right and correct for these issues in the flaws identified in Mr. Wilhoite's evaluation, I get a value of 3.66 million dollars.

Q. And so even if you -- you and Mr. Wilhoite disagreed on the approach, right? He said it should be a going concern, and you said assets (inaudible)?

A. Right.

Q. Are you saying here that even if you did it the way he said you should, you can't get to his number?

A. That's correct. If I were to value it as a going concern and fix the issues that are identified the value would be 3.666 million.

Q. How do you account for that difference? Why wouldn't it be the same if you did it the way he said?

A. The most significant issue relates to the inventory accounting, and it is inflation of the profitability that

is inappropriate. Mr. Wilhoite assumed a gross profit margin of 36.6 percent, which is inconsistent with Ms. Couch using a 35 percent margin to quantify her inventory adjustment. So even their two experts are not consistent. But moreover the data just doesn't support it when you look at the inventory reporting in an appropriate way.

Q. And does this suggest anything to you about the reasonableness or reliability of Mr. Wilhoite's calculations having done this analysis?

A. It's just vastly overstated.

**MR. PARRY:** Thank you, Your Honor. No further questions.

**THE COURT:** Do you have any cross?

**MR. MORSE:** Yes, Your Honor.

                    CROSS-EXAMINATION BY MR. MORSE

**MR. MORSE:** May I approach?

**THE COURT:** Yes.

Q. Now, Mr. Burns, you were present in this case in February of 2020, is that right, 2022, is that correct?

A. November, is that what you said, sir?

Q. February of 2022?

A. Oh, yes, I think that sounds correct.

Q. And I've just handed you an excerpt from your deposition and the question was: If DH, if Dixon Hughes asked you to personally guarantee a debt owed by Dixon Hughes, would you be willing to do that without access to

Dixon Hughes' financial information to understand what the risks were that you were taking?  Do you see that?

A.    Yes, I do.

Q.    And your answer was: Yeah, that, I mean, that would be information that I would want in terms of, you know, making that type of assessment.  Do you see that?

A.    Yes, I do.

Q.    And I read your answer correctly?

A.    Yes, you read that correctly.

Q.    I'll use the rest of my time now to address what I think is one of the central issues which is whether these write-downs were even legal for tax purposes.

If you would pull up P-478.

To get the jury acclimated, this is one of the reports from Ms. Couch or the table from Ms. Couch's report.

So this is the analysis of the 2019 inventory sold between January and February of 2020.  Would you pull up the columns on the left.

So this report is showing that the cost was ten million, nine hundred ninety-two thousand, three nine one (10,992,391).  Did I write down that number correctly?

A.    Yes.

Q.    The write-down was to six million, nineteen thousand, one sixty-eight (6,019,168).  And you were here yesterday -- did I write down that number correctly?

A.    Yes.

Q.    You were here during Mrs. Couch's testimony, correct?

A.    I was, yes.

Q.    And you remember when the Judge asked her a question about this write-down?

A.    Yes.  I was here and heard everything that was said.

Q.    Okay.  And her testimony was this actually sold for 12 million, for over 12.6 million dollars.  Do you remember that?

A.    Yes, I remember her telling that.

Q.    So I guess my question is, is it even legal for tax purposes to write down an inventory of 6,019,000 and then sell it for 12.6 million?

**MR. MORSE:**  If I may approach, Your Honor.

**THE COURT:**  Yes.

Q.    You would agree that the laws of this country are set by the Supreme Court of the United States?

A.    I mean I'm not a lawyer, so I can't tell you as to how all the laws across the country are set.

Q.    You can't even tell us the Supreme Court of the United States is the highest court of the land setting the laws of the country?

A.    Oh, well, yes.  I would say it's the highest court of the land.  But in terms of what laws apply in what jurisdictions, that's not my area of expertise.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546     sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 75 of 154

Q. Okay. So I've just handed you the case of Thor Power versus Commissioner of Internal Revenue. This is a Supreme Court of the United States case from 1979. If you'll turn with me to page 5. Do you see the highlighted section at the bottom of the page?

A. Okay.

Q. Do you see where the holding begins, The taxpayer must value inventory for tax purposes at cost. That's the 10.9 million number, correct?

A. That's correct.

Q. And then there's an exception, unless the market is low. And market is defined as replacement cost. You didn't do a replacement cost analysis, did you?

A. It's certainly one of the inputs that goes into the analysis associated with my methodology is the gross recovery concept, which is the same concepts that the appraisers of the inventory employed that I've been testifying to today.

Q. Well, Vamsi was just running down the inventory by age. That's not replacement cost, is it?

A. Well, that's one consideration that goes into it, but the more important case is that market is the most relevant consideration.

Q. Then it goes on, and the taxpayer is permitted to depart from replacement cost only in specific situations.

Q. And then it goes on, When it makes any such departure, the taxpayer must substantiate its lower inventory valuation by providing evidence of actual offerings, actual sales, or actual contract cancellations. Do you see that?

A. I do.

Q. And so the actual sales were 12.6 million dollars. Isn't that right?

A. Well, yes, I think that's right, but I think it's void of consideration of a number of relevant factors that would contribute to that.

Q. But the question here is whether this is legal for tax purposes. And you have to assess it by actual sales, which is 12.6 million dollars, which is still more than cost, correct?

A. That's not how you have to do it.

Q. That's what the Supreme Court says you have to do.

A. Well, I have a more comprehensive understanding of the IRS regulations and publications that go into this subject in a much more greater level of detail. This is a very summarized representation as to what that says, and it's not entirely complete. And so I think that trying to use a tax court decision that's applied to very specific factors in this dispute, which I'm not aware of currently, you cannot give me a complete picture in terms of what the regulations actually say.

Q.   Well, Mr. Burns I'll represent to you that the facts of this case are that the taxpayer wrote off the excess inventory greater than a year old, in excess of a year old by 100 percent.  And the inventory between six months and a year at various different levels.  And the Supreme Court explicitly rejected that approach.

**MR. PARRY:**  Objection, Your Honor.  Is that a question?

**THE COURT:**  Overruled.

Q.   That sounds very, very similar to what Vamsi was doing, correct.

A.   I mean it could certainly sound familiar or relative to what he was doing, but, again, it's void of consideration of not looking at this in the appropriate time constraints of what we're dealing with here.  So in 2021 when this happened, right, the market blew up in terms of price, right?  So you can't -- you have to take into account relevant market conditions that could influence this.  You make decisions about you did, what was known at that point in time and that right at the beginning when the pandemic was happening and then thereafter it was even worse.  I mean I think we're kind of looking at things in a vacuum here, and it's not considering all the appropriate factors.

Q.   All right.  So just to be clear, Ms. Couch's analysis based on court power says that the write-downs were not

legal for tax purposes. Is that accurate?

A. No, I don't believe that's accurate.

Q. And your -- your opinion today is not taking into consideration the legality for tax purposes, are you?

A. Well, I'm not a lawyer so I'm not giving legal opinions about the legality of tax compliance, but I can share with you that based on my review of these figures and how they were reported, it is in compliance with the tax regulations based on my experience and consultation with my colleagues, based upon the advice of Vivid Entities' own CPA that has 50 years of experience. And so, again, I think all of that is relevant information and not one tax court case is going to completely void that notion.

Q. This is not one tax court case, is it? This is the Supreme Court of the United States, correct?

A. Well, sure, but that's one case.

Q. By the highest court in this country.

**MR. MORSE:** I have no further questions, Your Honor.

**THE COURT:** Is that it for this witness?

**MR. PARRY:** Nothing further, Your Honor.

**THE COURT:** Thank you. You can step down.

A. Thank you, Your Honor.

**THE COURT:** Do you have any other evidence?

**MR. PARRY:** No witnesses, Your Honor. We're just going to go over our list of exhibits real quick. No further

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 79 of 154

witnesses.

**THE COURT:** Okay.

**MR. PARRY:** Your Honor, there's a couple we have questions about. I just want to make sure we've moved the admission of P-31, P-136, P-351, P-359, P-452, P-42, P-31, and that's all.

**THE COURT:** They will be received.

**MR. PARRY:** Your Honor, the defense rests.

**THE COURT:** Okay. Do you have any rebuttal witnesses?

**MR. COBLE:** Can I have a minute to consult?

**THE COURT:** Yes.

**MR. COBLE:** Your Honor, we call Ms. Couch back as rebuttal.

**THE COURT:** Let's take a break first. You can have a morning recess, ladies and gentlemen.

(Jury out 11:40 a.m.)

**THE COURT:** By my log you have 15 minutes left, and you have 10 minutes left, so the jury is going to have lunch sometime around 12:30 when it gets here. I've been looking at your proposed instructions and issues. This isn't my first rodeo and I think that trials set their own life and life cycle. In my opinion the verdict sheet ought to be, was there a valid partnership between the parties and if yes, what amount is plaintiff entitled to recover. I'm sure, you know, you've got lots of distractions, but the essence -- you can argue all the other things to the jury,

but I think keeping it simple for the jury is critical. That's my judicial opinion, and I may just let it go like that. Think about it. I'm not inclined to change. This will be the third jury trial in seven or eight days here. They're going to do what they're going to do, and your job is to persuade them. I think that gives you wide latitude and prevents you from damaging yourself, because if you have to get into the weeds and argue every little criss-cross and distraction, you'll lose the case, one side or the other. Anyway, that's my wisdom, and we'll come back and finish up.

(Off the record 11:43 - 11:57 a.m.)

**MR. COBLE:** The plaintiff calls Ms. Couch as a rebuttal witness.

**THE COURT:** You're still under oath.

**TIFFANY COUCH, PLAINTIFF'S REBUTTAL WITNESS**

DIRECT EXAMINATION BY MR. COBLE

Q. Good morning, Ms. Couch?

A. Good morning.

Q. Were you here for the testimony of Mr. Burns?

A. I was.

Q. Did anything about what he said change your opinions that you described in your testimony yesterday?

A. It did not change.

Q. Why not?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO   Document 250   Filed 06/20/23   Page 81 of 154

A. It did not change because I'm the only one who has looked at sales.

Q. Can you explain why that's important?

A. It's important because of the law. I'm sorry, I ran up those stairs. Hold on. It's important because of the law. It's important because of accounting rules, lower cost for market. Market clearly showed that these slabs were able to be sold for many months and years after the year they were purchased.

Q. And why did that matter to you?

A. It matters because the -- it matters because the inventory adjustments were improper.

Q. And how did that -- and why does that bear on the reasons we're here today?

A. It bears on the reasons today because these improper write-downs materially impacted the financial statement and the price Prasad was paid.

Q. Ms. Couch, did you see the table that was put up on the screen that Mr. Burns referred to as comparing your analysis to benchmarks and claimed that that showed that your analysis was an outlier?

A. The outlier, yes.

Q. And what's your response to that?

A. So what you have to understand about those other companies that were being compared to the Vivid companies

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 82 of 154

is that they were different. They sold more than just stone slabs. Some of them were fabricators, some of them sold tile, and when you don't sell the same exact product, your markets are going to be different. You're not comparing apples to apples or slabs to slabs. You're comparing apples to oranges, and that's what he was showing.

Q. And what did you see in the financial information that you looked at with respect to Vivid Entities about, what -- what their financial health was during the relevant time period? We heard from Mr. Burns that there were disputes, there were some issues. What did you see about how all that was affecting the companies' financials?

A. I think it's vitally important to understand just how much cash these companies were generating despite the fact that their net incomes were being artificially lowered. So if we put their sales on a map, it would show them increasing. If we put their liabilities on a map it would show them decreasing. If we showed their sales, if we showed their cash distributions to themselves, including Prasad, you would see those increasing. So there are no financial markers here to indicate that the litigation was putting them against the wall.

Q. Do you remember Mr. Burns in his testimony referred to a bank report?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 83 of 154

A.   Yes.

Q.   And what the bank report said about how it was treating inventory in evaluating of a loan?

A.   Yeah.

Q.   What's your response to the testimony he gave about that document and its relevance to whether the write-down was proper?

A.   So when you really read that Texas bank auditor's report you understand that she was asking for reasons why there were inventory discrepancies, and she showed that they don't answer even though she asked those questions. That report indicates that she only looked at inventory. She did not look at sales. And so they showed you one little piece of it without understanding the whole context of what was really going on at that Texas audit.

Q.   And is there a difference in a bank's use of a report like that for the bank's purposes --

A.   Yes.

Q.   -- and the analysis that you did in this case?

A.   In my experience banks will often look at inventory as if they have to liquidate it quickly. Like what would happen if the Vivid Entities went out of business and we had to just get rid of this inventory quickly. That's going to change and usually lower the value of the inventory on that kind of appraisal or audit report than

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO   Document 250   Filed 06/20/23   Page 84 of 154

what we're doing for accounting and GAP.  And as was very clearly pointed out, for tax related purposes.

Q.   I think we heard from Mr. Burns -- did you hear testimony where he was critical of the margins that you used in your analysis, that you arrived at in your analysis?

A.   He was.

Q.   And did you look at margins that Mr. Burns himself derived for these same companies in his report?

A.   I did.

Q.   And how did that compare to the margins that you recommended in this case based on your analysis?

A.   My margins are at 35 percent.  That is based on their sales document that they gave me.  It is what it is.  I didn't make that number up.  That's exactly what their margins were.  Mr. Burns is saying the margins are less than 30 percent in this case, but with the same parties and the same businesses he is saying in another case that the gross profit margins are in that 35 percent range.  So he is testifying two different reasons with the same parties, same companies, but for different purposes.  The numbers are what they are.  You can't change them based on, again, based on the outcome you want to have on a certain day.

Q.   So do you stand by the margins that you rely upon or incorporated in your analysis and that Mr. Wilhoite relied

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 85 of 154

upon in his valuation report?

A.   One hundred percent, because they come from the Vivid Entities sales records.  They come from the ERP system, and they are what they are.

Q.   Did Mr. Burns base his analysis on the actual sales results of these companies?

A.   Mr. Burns never looked at the sale of slabs.  He just never did that.

Q.   Now I think I also heard from Mr. Burns some testimony about the pandemic and in 2020 things blew up.  Did you hear that?

A.   Yes, I did.

Q.   Does that affect at all the conclusions you reached about these write-downs and whether they were proper?

A.   No, because remember I looked at sales from 2017 all the way forward.  And by the way, the sales and the markets didn't change in 2021 or 2022 with the pandemic.  And you're going to see the same thing as was presented on this slide here or this board here.  Actually sold, 12.6 million.  Constant .9 million.  If I showed you the 2018 sales of the 2017 inventory the sales are going to be higher than the landed cost.  If I did that in each and every single year before the pandemic, the market is always going to be higher than the landed cost.  This is again coming from their ERP system.  They are not putting that in

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546     sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO   Document 250   Filed 06/20/23   Page 86 of 154

Quick Books.  They are writing it down from 10.9 million dollars to six million dollars, and that is wholly improper.

Q.   Because they're selling it (inaudible)?

A.   They're selling it usually for two times what they're writing it down for but always, always above landed cost.

Q.   And we also heard from Mr. Burns that this practice that you've said is improper had been going on several years.  Does that change the conclusion that you've reached about it?

A.   It doesn't change my conclusion at all.

Q.   And one other thing, Ms. Couch, I think we heard from Mr. Burns that maybe sales sometimes are above written down values.  I don't know if that was in response to the Taj Mahal example.  Is it accurate to say that based on the performances of the sales report from these entities that sometimes these slabs were written down were sold above cost, or what were your observations?

A.   If that slab was five years old or newer, it is going to be sold at above cost, hundreds of thousands of slabs I looked at.  This is not a one time anomaly with Taj Mahal.  This is all of the time every day.  You're never going to buy more inventory if you can't sell it.  They were buying more inventory because they were selling it, and they were selling it for a really healthy margin.  They just didn't

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 87 of 154

want to report that for tax purposes.

Q.   Or (inaudible) purpose.

A.   Or to pay Prasad his share, which is the share they were all sharing up until the point they no longer wanted to share it.

Q.   So just to close it out here, Ms. Couch, remind us, the total write-down analysis as of the date these two (inaudible) transactions for Vivid NC and Vivid Texas, what were those write-down amounts.

A.   So for Vivid NC we can see it right there, 47 percent of total inventory was written off the books.  And for Vivid Texas that figure was 41 percent on the transaction date, 41 percent.

Q.   Based on your analysis of the actual sales which you said were (inaudible) what opinion did you reach about the validity of those write-downs to be used for purposes of pricing Mr. Prasad's shares.

A.   The inventory write-downs break not only GAP accounting rules, but IRS and Supreme Court regulations in terms of the validities of those write-downs.

Q.   Thank you, Ms. Couch.  No further questions.

**THE COURT:**  Do you have any cross?

**MR. PARRY:**  Yes, Your Honor.

                    CROSS-EXAMINATION BY MR. PARRY

Q.   Ms. Couch, you're not a lawyer?

A.   I'm not.

Q.   And you testified a moment ago I think there was no indication that they were against the wall in 2020.  Is that what you said?

A.   I did.

Q.   But you agreed they lost their loan and were in default?

A.   I would agree that they did not have bank finance -- a line of credit, that's correct.

Q.   They lost their line of credit being used to fund their inventory, correct?

A.   That's correct.

Q.   And they couldn't get a new one for close to two years, correct?

A.   They were unable to use the bank's money for -- it might have been about 18 months, maybe two years.

Q.   I just want to make sure we're clear on where you stand on these issues.  In terms of inventory write-downs you disagree with the Vivid managers, the way they handled it, right?

A.   I do for accounting related purposes, absolutely.

Q.   And you disagree with the Vivid CPA, Mr. Dodd?

A.   Who was helping them to get to an ideal net income, yes, absolutely I do.

Q.   And you disagree with Mr. Burns?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO   Document 250   Filed 06/20/23   Page 89 of 154

A.   Mr. Burns didn't do an analysis, so, yes, I do disagree with Mr. Burns.

Q.   And you disagree with the bank appraisers who came out to Vivid Texas and said the inventory was worthless?

A.   So, again, the banks are only looking at inventory and were not doing a sales analysis and, again, I  think it's, at least on my profession, a standard understanding of banks looking at inventory a bit differently than you're going to look at it for GAP.

Q.   But do you agree or disagree with their conclusion that the inventory overall is valueless for their purposes?

A.   For their purposes, for the bank's purposes, yes.  For accounting purposes, sales purposes and money in your pocket, no.

Q.   Do you also -- do you disagree with the bank appraisers who came out to Prasad's shop and said his inventory should be written way down as well?

A.   For the bank lending purposes I do understand that that would be normal and customary.  It is not GAP.  Absolutely it's not GAP.

Q.   But you disagree with Mr. Robinette too, right?

A.   Of course, yes.

Q.   And you disagree with Mr. Dayman?

A.   Yes, because, yes.

Q.   And you disagree with the auditing department who

looked at Select Interior Concepts books and said they were fine.

A.    You understand Select Interior Concepts only wrote down their inventory by four percent.  I'm suggesting eight to nine percent, and your clients are writing it off by 41 to 47 percent, so, yes, Select Concepts is very interesting because their write-downs of inventory are far lower than - - they're half of what mine are.  And understand, here's what's the most important thing.   There's cash available to all these partners.  They are writing down inventory in 2018.  In 2019 there's 4.7 million dollars of net income on the books, right?  They said net income in 2018 is 2.8 million dollars.  Net income in 2019 is 1.8 million dollars.  There's about 4.7 million dollars of net income on the books in 2018 and 2019.  In 2018 Prasad, Vamsi, Vinay, Rohit, they paid themselves three million dollars. They paid themselves more money than they had in net income on the books.  In 2019 they paid themselves 1.8 million dollars of distributions which was more money than they had in net income on the books.  In addition to that they then paid down their line of credit by 1.2 million dollars. That's, what, five million dollars.  They then bought two million dollars of additional inventory.  They then paid Covetus 330,000.  So in those two years when they're telling the IRS, hey, we've only made 4.7 million dollars,

they spent 8.5. Where does that money come from? That money comes from selling slabs, sir, and that money, they're all enjoying that. They are just not recording it on their tax returns. And now they're saying, oh, sorry, we don't want Prasad to share in that any longer. That's what's happened here. When you look at the books and you understand the cash and you understand what was happening here, there's lots of money in this business. It's not being reported appropriately.

Q. When you talk about Prasad sharing, there's one thing you and I do agree on, is you said as far back as you could look, as many records as you had and as far back as you can see they were doing exactly the same thing, and he knew about it?

A. That's correct.

**MR. PARRY:** No further questions.

**THE COURT:** All right. Thank you. You can step down. Do you have any other rebuttal evidence?

**MR. COBLE:** No, Your Honor.

**THE COURT:** Okay. Thank you. Do you have any surrebuttal?

**MR. PARRY:** No, Your Honor. We just want to renew our Motion for Rule 50.

**THE COURT:** All right. I'll do that out of the presence of the jury.

Ladies and gentlemen, the case now has finished all

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546     sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO   Document 250   Filed 06/20/23   Page 92 of 154

the evidence, so the next thing is the closing arguments. We have to have a conference for a few minutes and then there's lunch. So we'll resume at 1:15. You can go to the jury room now. You'll get your lunch in short order.

(Jury out 12:13 p.m.)

**MR. PARRY:** Your Honor, we would renew our Rule 50 Motion as a matter of law on several independent bases. Number 1, that there is no legal basis for a fiduciary duty with regard to the companies. We are talking about two LLCs in which the parties are not direct members and don't owe fiduciary duties.

Number 2, there's no legal basis for their alternative claim for a limited breach of duty of loyalty. And number 3, we contend that the Nallapati Properties related claims however they are described are time barred and waived by the unexplained passage of more than five years. And also no legal basis for unjust enrichment where there is no evidence of any personal controlled benefit by Prasad to Vamsi. And, finally, Your Honor, no claims, no basis for a jury to find any claims for the plaintiff just holdings. But when their only allegations in this case are that the alleged relationship and alleged partnership are between Vamsi and Prasad. And they have not submitted to the jury any questions related to Claim of Just Holdings. And so I would be happy to go into any of those in more detail, but

as a matter of law, Your Honor, we believe there is no -- we believe sufficient evidence for the jury to find on those issues which would require dismissal of the breach of fiduciary duty, constructive fraud, unjust enrichment and limited duty of loyalty claims they are submitting on their proposed verdict form.

**THE COURT:** Okay. The motion is denied. You can come up to the Clerk's desk, you two lawyers, and you can both share that. I don't have a copy of it. So you go back to your seat, sit down and pass it around, read it and think about it. You need to get the other from him when he is finished.

**CLERK:** I'm sure I can go print more, Judge or --

**THE COURT:** I don't know. They can do it this way.

**CLERK:** Yes, sir.

**THE COURT:** Do you want to give it to the other side?

I'm just giving you notice. That's my construction of the case and you're trying to make it complicated and involved, and I'm trying to make it very, very, very simple. And the jurors are very, very, very simple and so that's the way it's going to be, and I'll take a lunch recess now and we'll come back. I'll let you have 40 minutes on each side for closing argument. The Plaintiff goes first and last. The Defendant goes in the middle, and we'll get it to the jury three o'clock, something like

that, three or four o'clock.

You look like you want to tell me something. I don't want to hear anything. You got it? Just hang on, and we're water skiing through this, okay? Don't let go of the ropes.

(Court recess 12:19 - 1:28 p.m.)

**THE COURT:** Can I retrieve the two documents I gave you?

Who wants to be heard?

**MR. PARRY:** Your Honor, just one request on behalf of the Defendants with regard to the first question. If we could request the Court to modify it to allow for some causal link between the existence of a partnership and harm. Just being a partner isn't enough to recover damages. There must be a breach of duty of some sort.

**THE COURT:** Yeah. That will be implicit, won't it?

**MR. PARRY:** I think the question as it's framed is, are they partners and then the question 2 is, if yes, then what harm? And we would request that it be revised to say something like was a duty breached on account of a partnership or something like that.

**THE COURT:** Yeah. I can give that in an oral argument, oral instruction.

**MR. PARRY:** Thank you, Your Honor. And one housekeeping matter that was called to our attention, we would move the admission of D-413.

**THE COURT:** It's received.

**MR. PARRY:** Thank you, Your Honor.

**THE COURT:** So you get to go first and you have 40 minutes, but that will include your rebuttal.

**MR. MORSE:** Yes, sir.

**THE COURT:** Okay. Bring the jury back in.

Thank you, ladies and gentlemen. We're back resuming the trial. And at this point the parties have their closing argument, so the Plaintiff has the burden of proof, so they get to go first and then you'll hear from the Defendant and then the Plaintiff has rebuttal, and after that I'll give you closing instructions.

So the jury can now be with the Plaintiff for opening summation.

### PLAINTIFFS' OPENING SUMMATION

Thank you, ladies and gentlemen. Thank you for the time and attention that you have given this matter this week. When you tune out some of the extraneous information and other issues that has been raised over these three days the case is actually pretty simple, and it comes down to two things. Were Prasad and Vamsi partners in a partnership and was Prasad hurt. And the answer to both of those questions is yes. The evidence has established that they were partners in a partnership and that Prasad was hurt because he was treated unfairly. And that raises some

familiar concepts to all of us. Stealing is wrong. Taking something that is not yours without paying for it is wrong. Treating your business partner unfairly is wrong, and there should be a remedy for that. And that's why we're here. That's why Prasad has come here asking that fairness be done, asking that he be awarded a verdict that achieves fairness by requiring that Vamsi pay fair value for what he took, for what he took in secret, for what he took from Prasad.

Now when we go back to the elements of the presentation here, it's the same three things that I introduced at the beginning of the case, and really the key issue here in the partnership issue. You'll hear in the instructions that the Judge gives you in just a moment you'll hear what the law requires for there to be a partnership. It's actually not very complicated. The law requires that there be an association of two or more persons to carry on a business as co-owners for a profit. For two or more persons to carry on a business as co-owners for a profit. And this is important. You'll hear also that the partnerships do not have to be established in writing. They can be established by oral agreements, verbal agreements, which is what we heard here, what happened here. They can also be established by conduct even in the absence of an agreement. If the parties are

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 97 of 154

acting and behaving as partners, if they're acting as co-owners, sharing profits in a business, then the law still finds a partnership. And we had that too. So Prasad needs to prove only one of those two things, only one of those two, but the evidence established both. The evidence has established that they were partners in a partnership by oral agreement and also by their conduct.

Let's think about what some of that evidence was. Remember I said that there will be three categories of evidence and that's exactly what you've heard. You've heard testimony from Prasad. You've heard about the 50/50 agreement that they reached, the oral agreement that they reached to be partners in Cosmos in 2005 when they started it. And you've heard that they called each other partners. They held themselves out as partners. How many emails did we see from Vamsi that called Prasad his partner? A lot. We saw a lot of those. And I'm not going to show you all of them again, but let's look at one of them. Let's look at Exhibit 80. Remember this one, Vamsi and Prasad are partners in Vivid. (Inaudible), as we've been calling it. That's why we're here, Vivid. We are partners in Vivid. That's what he says, that's what he wrote. There's really nothing unclear about that, ladies and gentlemen. He didn't just write it in emails. You also heard testimony that he gave in another legal action that he brought, a

case that he brought.  Let's pull up the first of those two.  When we were -- there was a trial in that case and Vamsi was under oath before the Judge and in that case wanted to describe what the origins of the business were.  What did he say?  From 2005 to 2014 me and Prasad were behaving like we were 50/50 partners.  And then of course we heard that's how they operated Cosmos.  Those were his words.  You see the words in there.  Is there anything ambiguous about that?  That was his testimony under oath in the case that he brought.  What did he say down here, same trial, between me and Prasad we had an oral agreement, and that's enough to establish a partnership, an oral agreement that we would be 50/50 in it.  That ladies and gentlemen is the elements of the claim right there.  Let's go to the next excerpt.  You remember this testimony too.  You testified on direct that you and Prasad agreed orally that you would share 50/50 under this new business in Raleigh, correct?  That's correct.

But the agreement, the 50/50 agreement you and he reached as to ownership, that was in exchange for Prasad providing extended terms in DSG, correct?

That's correct.

And then the last one here, ladies and gentlemen, the other locations that you recall starting you used cash from the Raleigh Cosmos business to get them up and running.

Correct?  That's correct.  The location that you and Prasad shared 50/50.  Shared ownership, shared in the profits.  In his own words and testimony that he gave.

And, ladies and gentlemen, you'll hear in the instructions that the Judge gives you that one of your roles as fact finder is to lay credibility, decide who's telling the truth.  We have sworn testimony in the case that he brought.  It's clear, it's not ambiguous.  And then he sits up there and tells you something different here when he faces this matter and is trying to avoid paying fair value to Prasad for the shares he took.  That's something to consider in everything that you heard from him, including on this issue.  It wasn't just Vamsi.  Let's look at Exhibit 375.  You remember the email -- this is a Cosmos attorney and Prasad explained to you Vamsi is the one who interacted with her.  And what does she say, I spoke to Vamsi about it.  He gave me a (inaudible) 50/50 split.  Vamsi and Prasad have always been 50/50 partners in the properties that he owned by Nallapati Properties, that he made equal contributions and any distributions were split 50/50.  This is from the attorney, that she spoke to Vamsi about it and that's what she wrote.

So that evidence right there, ladies and gentlemen, is quite overwhelming I would say of what the parties intended, what they agreed to and how they came together on

this pattern in 2005. But we don't just have that evidence, do we? That was just the first one. What do owners of businesses do? They make decisions together about business, right? You heard from Prasad that they decided on a name together. Did Vamsi deny that on the stand? No. Did they decide on the first location together? Did Prasad travel to Raleigh to look at the new warehouse before they signed up for it together? Vamsi didn't deny that. When they made the expansion decision to move when the business grew, they made that decision together. That's what co-owners do. When they made the investment in Vivid -- this is really what's brought us here today -- in 2009, they made that decision together, because that's what partners do, that's what co-owners do. We heard more than just decisions though, didn't we? We heard about contributions that they each made, Prasad providing money that he paid for the initial marketing materials and that he contributed material at a better price and longer terms. We'll pull up Exhibit 67. It wasn't just Prasad who said so. What does Vamsi say? In his own words in an email that he wrote he said that Prasad's contribution is through material at a better price and longer terms, up here at the top. Prasad's contribution is through supplying material with a better price and longer terms. Yet he testified, I never went in

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 101 of 154

business with Prasad. After all we've seen and all we've heard, is that believable? No. It's not consistent with any of the information that we've seen in the documents nor is it consistent with his own testimony. It wasn't just the decisions and the contribution. Sharing the profits, sharing profits, that's a key element of a partnership, and we have that here. We have it in spades. The real estate that they bought in Raleigh, Greensboro, and Atlanta. That was shared 50/50. Nobody disputes that Prasad received the Atlanta. Why would he have gotten that if they weren't partners. It doesn't make any sense. They just gave him a warehouse in Atlanta? They were partners in it. Just like Ms. Swintosky said, just like Vamsi testified. They were partners. They invested in Vivid. And how was that set up in 2009? In a holding company that Vamsi created with Prasad and Vamsi as 50/50 owners. Prasad in 2009 was a 50/50 owner. Why was he on that entity? Why would he be named if he weren't partners? Why would Vamsi do that? They were partners. They used money from the partnership they had started in Raleigh to invest in Vivid and they shared 50/50 just like partners do. It wasn't just those two things. We heard about the investor who put money in for a share. They shared that equally 50/50. You didn't hear any testimony denying that, did you? We heard that Prasad said he got distributions.

Didn't hear any testimony denying that either. We saw the accounting email that talked about -- look at 87. Remember here at the bottom said, the tax returns allocate most if not all passable income to Prasad because he didn't receive anything. So allocation of income was squared up by these accountants because of their understanding, their agreement. So the evidence, ladies and gentlemen on sort of the key core of this case, were they partners, the evidence has established that in so many ways through so many words that you heard in testimony, things that you see written and shown in the documents that they were partners.

So then let's go back to what comes next, the broken trust. We heard a lot about that, didn't we? There were a number of ways in which he was hurt. He was locked out of the financial information for the Vivid Entities, locked out. The real numbers, as we heard from Vinay's email, the real numbers that showed what the company was worth that was used when Vinay calculated his bonuses. He was locked out of those. But beyond that these transactions that have brought us here, those transactions were done in secret. He wasn't told in advance. He wasn't asked to approve. He didn't negotiate, didn't have the opportunity. When they had them he wasn't told. The case of Vivid NC he wasn't told for almost a year. So you have evidence here has established including withholding information from Prasad

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546     sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO   Document 250   Filed 06/20/23   Page 103 of 154

that was important.  And it brings to mind if you have to hide something that you're doing, you probably shouldn't be doing it.  Or maybe turning it around another way, if you're going to treat somebody fairly, if you're treating somebody fairly and truly believed it, why would you keep that a secret?  So the transactions, what do we hear about those?  How did they hurt Prasad?  Well, you heard from Ms. Couch.  You heard her testimony about those transactions were irregular, meaning that they had no apparent business purpose but to oust Prasad, kick him out.  It's obviously wrote in this email and to harm him by paying him less than what his shares were worth.  We saw -- if you would pull up Exhibit 1 and go to the second page.  Again this email we've seen a couple of times.  Look in the report for the software.  That was the software that he was excluded from.

Let's go to 17.  The real number that Vinay was using to calculate his bonus.  That's not what they used to calculate Prasad's share.  They were using the devalued, depressed numbers that you heard about from Ms. Couch.  And you heard why those numbers were wrong.  They broke the accounting rules and how inventory values were set.  And what did she say about that?  She was the only one who actually looked at what the slabs sold for.  What was the sales price of those slabs?  Mr. Burns didn't do that.  Mr. Robinette, Mr. Dayman, whose reports were referenced.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 104 of 154

Neither of them did that, the banks that Mr. Burns referenced. None of them did what she did, did the work that she did looking at, what do these things actually sell for? And what did that show? That's showed -- if you'll go to Exhibit 8, I'm sorry, Chart 8. What do you see? Inventory that they said was worth $13,000 they sold for one million dollars. Common sense tells you that's not right. Ms. Couch told us that that breaks accounting rules to do it that way. And how did it hurt Prasad? He was paid -- his share was determined based on that inventory being worth only $13,000. It was actually sold for a million dollars. The harm there is obvious. The harm there is clear. We looked also at selling Taj Mahal. You remember those. Let's look at the next Exhibit 9. And this is just an example. Ms. Couch said that this was not an anomaly, but this just sort of illustrates the point. Again, Prasad's share was priced as if these slabs, they were just slightly over a year old. They (inaudible). They turned around after he was kicked out and they sold them for over 25 hundred dollars, 2479, 2479, even though they were two years old. And the fact that that's wrong I think, quite frankly, is common sense. That they would treat him that way and price him that way when the sales records themselves, the sales records that she looked at that this Mr. Burns didn't speak to this. And she explains

there's been some pandemic phenomenon. But this is what you see across the years of these records. So ultimately what happened? When the transactions were carried out, the inventory was written down. You've heard 47 percent, 50 cents on the dollar for Vivid NC. 41 percent, 59 cents on the dollar for Vivid Texas. And yet the inventory was sold after the transaction for far above that. We saw a number back here, six million -- it was written down at six million even though it cost eleven millions, but it sold for 12.6 million. But that's just -- that's the same thing we're seeing here. It's just on the wide scale. Ms. Couch said, these aren't bananas. They don't go bad after a month. These are stone slabs, and they're selling these stone slabs at a healthy profit for a number of years after they bought them. What they were doing was wrong, and what they did hurt Prasad.

We also saw with respect to the real estate even though Vamsi wrote him in 2016 when they separated those warehouses that he acknowledged that he owed Prasad. Again, if they weren't partners why would he do that? Why would he owe him any money at all. Anyway, the calculations even that he did he never paid it. Excluded him from those properties without paying him what even he said that he owed. So what's the remedy, the fix, fair value?

We heard from Mr. Wilhoite that when you push somebody out, when you kick somebody out without their consent and without their approval, without paying fair value, you can't discount it as they did here because it's worth this and you discount down to here and pay this, then you're putting all the rest of that in your pocket, and that's what happened. That's what happened here, millions of dollars in value that were Prasad's they put in their pocket and benefitted from that. So Mr. Wilhoite we heard from him. He's extremely credentialed, very experienced, very thorough, looked at these reports, looked at these records, looked at the adjustments that Ms. Couch said needed to be make, fix these types of mistakes, to fix these errors in the inventory values and would tell you what the fair value actually is of those companies. What was that he said that Vivid NC when you do it properly, the fair value of the entire business was a little over 21 million dollars. Vivid Texas a little over eight million dollars. When you add that up a little more than 30 million dollars. If you think that's familiar, you remember the projection that Vinay sent? Let's look at Exhibit 311. And scroll down. Remember that that estimate for 2019, a little over 30 million dollars. What do you know? That's what they were telling the bank the value of those two companies were when they wanted to borrow money.

That's what Mr. Wilhoite says the fair value was. They didn't use that when they bought out Prasad. They used a number that was about a third of that.

So where does that leave us as far as the remedy. Let's look at the damages, a slide that Mr. Wilhoite walked you through. So there's really three pieces of this, right? We've got a Vivid North Carolina piece, a Vivid Texas piece and the real estate piece. First the Vivid North Carolina. You heard from Mr. Wilhoite that Prasad's 31 percent share fair value of that company was 6.5 million dollars less how much he received equals amount due to a little over four million dollars. That's what's required to treat Prasad fairly. Vivid Texas, as Mr. Wilhoite said the actual value is two million dollars, a little more. Prasad hasn't received anything. So that full amount is what Prasad is entitled to, is asking for, that he be treated fairly, that fairness be done. And then the third piece is the real estate piece. That one we heard a lot of different -- there were a lot of different things and different numbers from different appraisers. This is the number that you arrived at, 742,000 when you take the appraisals that Plaintiffs experts offered. But remember Vamsi said he had $200,000, so it's certainly no less than that. He just never paid it. He just never paid it. Now all this other stuff we heard really doesn't matter to this

case.  It really doesn't affect whether Prasad was treated fairly for these five investments that were taken from him. But the separation has been messy.  There's no doubt about that.  But we heard some about why that was the case. Remember Exhibit 78.  Remember here at the bottom where Vamsi wrote to Mr. Meek regretting the 50 percent arrangement that they reached, the 50 percent partnership that they had, 50 percent agreement that they made saying 20 percent would have been way too far for him.  And that's what set us on the path here.  That's what made things difficult.  That's ultimately what led to the plans that were hatched to kick Prasad out, as he described, kick him out of these companies without paying fair value.  Stealing is wrong no matter why you do it.  Taking something from somebody without paying for it is wrong no matter why you do it.  So the excuses that you might hear, they really don't matter.  When you go back into the deliberation room you're going to have a verdict form.  Let's see what that's going to look like.  And it reflects that this case really is pretty simple when we focus on the things that we're actually here today to talk about.  You're going to deliberate and you've only got two things to fill out here. Did a partnership exist between Prasad Nallapaty and Vamsi Nallapati?  The evidence is overwhelming, ladies and gentlemen, yes, they were.  And what they said, what he

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO   Document 250   Filed 06/20/23   Page 109 of 154

wrote, how he testified, how they acted, what the documents say, what the attorneys say.

The next question is, what are Prasad's damages, by how much was he hurt.  What he's asking, ladies and gentlemen, just as I said when I finished on Monday, he's here asking for your help, asking that you make this right, that he be treated fairly.  We'll go back to the damages slide.  That's the number that should go in that second line.  That's how much he was hurt.  Those are the damages that should be awarded.  Thank you very much again, ladies and gentlemen, for your time and attention.  Thank you.

**THE COURT:**  The jury will be with the Defendant for closing argument.

### DEFENDANTS' CLOSING ARGUMENT

May it please the Court.  I'll try to stay out of the way while the court shuffles here.

First of all, as I said at the beginning when we first met, on behalf of Vamsi we really, really appreciate -- we appreciate your time and we appreciate your patience and we appreciate that you've been here with us for days listening to all this.  So thank you.  Thank you for your service.

Now as I said at the beginning this is and has always been a case about only one thing, and that's Prasad's greed.  Prasad, the evidence has shown you that he ended up with personal interest in these companies Nallapati

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 110 of 154

Properties and Vivid Entities only because of a favorable supply deal between his father's company and Vamsi's original company nearly 20 years ago. The only involvement personally that Prasad has had with these companies that you've been hearing about for three days is sitting in India, collecting checks and filing lawsuits. That's been his contribution to these companies. He's not entitled to one dime more than he's already been paid, which is millions and millions of dollars. Now I also told you up front that the case is boiling down to three key issues, and it does. We're going to talk through these. I want to go back to them now. I want to talk about some of the evidence and they're going to factor right into those two questions that Mr. Coble put up that you're going to be presented with by the Court. And, remember, it's very important here. The Plaintiffs have the burden of proof. It is their burden to convince you that they're right and that they're entitled to all these millions of dollars they're seeking. We believe the evidence shows you that they're not right, but if you have any doubt at all, the burden is theirs and we would submit that on all three of the questions we talked about on the first day they haven't come close to meeting their burden of proof. And so I want to talk them, and we'll come back to each in turn. First of all, again, Prasad and Vamsi were not partners. And

we're going to talk about what the Court is going to tell you that means. You're going to see a sheet that tells you what it means, and we're going to talk about it. They weren't partners not ever, but they certainly weren't partners in Nallapati Properties and Vivid Entities in 2016 and 2020. And that's what we're talking about. You're also going to see and ask and Prasad doesn't deserve anymore money on those warehouses. He cashed out in 2016 for millions of dollars, didn't say a word about it for five years, and the evidence that you have seen from his on estimates is that if there is a difference in value on those warehouses, he owes Vamsi money. I mean, we're not asking for that, but that's what the evidence shows. That's what the value of the property says. The evidence also is ladies and gentlemen that Prasad also doesn't deserve more for his interest in the dividends. Vamsi and the other company managers had no choice but to buy him out. We're going to walk back through what they tried to do instead of that, what they tried to get him to participate in, but it was the only way they could save those companies from the damages that were happening not just by accident. The damages were being caused by Prasad. And it was the only thing they could do, and they paid him every single penny. Every penny that two outside experts who had nothing to do with this, who aren't litigation

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO   Document 250   Filed 06/20/23   Page 112 of 154

experts, those folks came in and said let me tell you everything. Let me tell you how much it is and they paid it, every penny.

Now I want to talk about the questions and I've got a picture of your questions, but you'll be seeing them soon enough. So, again, the first question you're going to see, did a partnership exist between Prasad and Vamsi. Did a partnership exist. We submit, ladies and gentlemen, there are two questions rolled up there but number 1, were they ever partners? Were they partners back at the beginning in 2005 when this all started? If the answer to that is, no, you're done. The answer to question 1 is No. If they weren't partners ever question 1 is no. But even if you thought they were partners back in 2005 there's a second question in there. Were they partners in Nallapati Properties and Vivid Entities, which are two established limited liability companies. Different from a partnership. It's a different kind of company. And their interests were in there plain as day. Mr. Coble asks, why would they pay this and why would they do that? Well, because Prasad's companies have an interest in those companies, and they got paid. So they weren't partners in those companies. In fact you remember Prasad testified he terminated his claim to partnership. Remember that? He said he terminated it in October of 2015. When did they separate Nallapati

Properties, 2016. When did these transactions happen he's complaining about, 2020? So even if you thought there was a partnership at the beginning, you've got to ask yourself is there a partnership in these companies at the time they separated? We'd say the answer to both those questions is no. Now let's talk about what the Court's going to tell you a partnership means. It fits on one page, and I want to walk through these elements, which are really important.

To form a partnership, the Court will tell you, two or more persons combining property, effects, labor or skill in a common business or venture. Well, what did we learn about that? We learned that Vamsi invested his life savings. And you've learned that Vamsi since the very beginning, since before 2005 has been working his tail off day after day with his wife growing and managing the business, expanding locations all over the country. When they got into Vivid you heard about Vinay and Rohit running those locations with all the customer relationships and the employees. Those guys were running the businesses and building value and employing people and doing the things business people do. Now what property effects, labor or skill did Prasad contribute? Remember, his primary claimed contributions to these businesses isn't anything he did. His primary claimed contribution is that his father's company provided longer payment terms to Vamsi's business,

period.  That wasn't Prasad.  That was his father's company.  Prasad didn't contribute a thing.  And I think it's really important to focus on, even DSG didn't give them this inventory.  It wasn't free.  It wasn't like an investment.  They just got longer to pay.  So DSG gave him longer to pay, which Vamsi said was helpful, Prasad gave them nothing.  He was the point of contact with DSG.  And, again, his involvement, as he testified and as the evidence you saw will establish, we believe, his involvement was no where less, and he had very little to do with Cosmos entities at the beginning.  He had nothing to do with that.  He never had a job there.  He never sold a slab, never called on a customer, never even went to visit Texas one time.  Everybody agrees with that.  So no where was he less involved than the ones we're here to talk about.  That was Prasad's contribution.  And, again, we would submit, ladies and gentlemen, it's always been clear.  You heard testimony on this.  Where are Prasad's interests?  His interests are and always have been with his family's company in India which has always been his full time job.  His interest, as he told you, were to set up a company here in the U.S.  They would get assistant buyer of DSG's products at good prices.  And you saw what happened when he got mad, when all of a sudden they got big enough where they could look for supplies from other places what he did.  They weren't

buying enough. They weren't paying enough, and he blew it up. He blew it up in October of 2015. And if you look at Defendant's Exhibit 85, you'll see his email. You don't have to take my words for it. He said, they're not buying enough. That's why he blew it up in October of 2015. So that's where his interests lie and have always lied. In contrast, again, you know Vamsi's contribution, Vinay's contribution, Rohit's contribution.

So point B -- we've talked about the buying of property, effects, labor and skill. Under an agreement to share the profits and losses, and losses, in equal or specified proportions. Vamsi told you he made a bad deal when he started his first company and agreed with his uncle to share profits. He told you that. He agreed and he figured out his first shipment, what a bad deal that was. But you don't tell Uncle Matt. So he stuck with that deal. He shared profits, and he always shared profits and at some point when Prasad took over, those profits weren't going to DSG. They were going to Prasad. But ask yourself when you see this instruction from the Court, did these guys share bosses? No, they didn't. Prasad never signed his name to a lease. He never signed his name to a mortgage. He never stood behind a company obligation. Vamsi did all of that. If these companies had failed back in the day when they started, Vamsi was ruined. It was his everything. If

these companies had failed, Prasad's fine.  Nothing happens to Prasad.  He didn't sign up for anything.  So there was no sharing of the losses in any of those companies.

C.  And here's an important part.  When you look at A, B and C, right after B is an and.  You have to find all three of these things.  Not any of them, you have to find all three of these things and make each partner an agent of the others for partnership business.  Do you remember when Prasad was testifying, and I asked him about those other opportunities that he had that he didn't invite his cousin Vamsi to participate in, in the same business.  Remember that?  And you remember what he said?  The partnership doesn't work both ways.  The partnership only applies to Vamsi's companies, Prasad said.  So the way he understands it to work is if Vamsi owns an interest in the company, Prasad get's half.  If Prasad owns an interest in a company in the same business Vamsi gets nothing.  Well, that's a good deal for Prasad, but that's not how a partnership works, and that's not making each other an agent of the other for partnership business.  That's what the definition you're going to see.  And then you'll see as you scroll down into the next paragraph.  You won't have to scroll down, but you'll have a piece of paper.  It says factors in a unified partnership include, and I want to walk you through each and every one of those, because I'll submit

you haven't seen this evidence. Factors indicating an implied partnership include, filing a partnership tax return. Never happened. Establishing a partnership bank account. Never happened. Everybody agrees with those two things. Holding out an association to the public as a partnership. Well, that was interesting. When I was asking questions of Prasad, and I was asking him about the DSG annual reports. You may remember that. But I didn't have access to this machine, so I couldn't put them up on the screen. You've got them in evidence and I would like to pull up Defendant's 211. This is what I was talking about. Let me stand over here so I'm not in anybody's way. So Defendant's 211 is the 2017-2018 very shocking annual report. Remember this is a public company with all these shareholders and just like here, they've got to send out a report every year to tell how the company is doing and all that sort of thing. Look who signs it, Hari Hara Prasad, Managing Director, that's him. He signed it. Now go to the page, this is for your reference when you're looking at it. It is page 5. There it is at the bottom. So when you're looking at the hard copy document you'll see page 5. You can pop that out. This is a section on page 5, which you'll look at. It asks for disclosures of related party transactions for directors and officers, just like you'd expect. If you own an interest in the company I'd like to

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO   Document 250   Filed 06/20/23   Page 118 of 154

know if the directors and officers have some interest that they need to disclose to me. Well, Prasad disclosed some. He disclosed the  names of his related party companies, Cosmos Granite West, and Cosmos Granite Southeast.  Those two of the Cosmos companies, which Prasad in fact owns. And look at what he says over in the column to the left of that.  What is the nature of the relationship?  Prasad and his relatives are partners in the firm.  That's what he said about the businesses he actually owned.  He told the shareholders about it.  Now you can look all through Exhibit 211 and when -- there's Defendant's Exhibit 210, his earlier report.  You can look at every single page of those.  You're not going to find anywhere in there that Prasad disclosed to the shareholders that he was relatives or partners with Vamsi.  He didn't tell them that.  And he also didn't say in here -- remember he talked about how he made a personal guarantee to his dad?  Of course the company didn't have any records of it and you haven't seen any records anywhere in the papers that would show you that.  But, you know, he says there's this personal guarantee.  You won't find that in here either.  No disclosure to the shareholders that your managing director, his signature is right under that, he secured for himself -- remember his story.  I secured for myself personally half ownership of a company.  How did I do that?  Because I got

DSG, your company's shareholders to give favorable terms to my business. When you give favorable terms to me I get half ownership for myself and you get nothing. But I think that probably would have been in there somewhere, but it's not. You won't find it in any of those annual reports from DSG. So when you talk about holding yourself out publicly ask yourself why Prasad disclosed his businesses he actually owned but not this partnership that he's here claiming in this lawsuit. Obtaining state -- and we're back to the factors, so that's a no, no, no. Then we get down to the next factor, obtaining state licensing as a partnership. You saw no evidence of that. That never happened. Hiring employees on behalf of a partnership. No partnership between Vamsi and Prasad ever hired employee one. Now the real businesses did. Vivid had employees, East and West and Southeast, they all had employees. They're real companies. But the partnership that Prasad claims had no employees. Incurring expenses on behalf of a partnership. They didn't incur any expenses either, so we're noes all the way down. Contributing money to a partnership. Well, we talked about that. Prasad didn't contribute a dime. He talked about Vamsi did hundreds of thousands and I did maybe 15 or 20, but I don't have any documents to proof it. Vamsi testified he didn't give a dime. But in any event everyone agrees he gave a fraction

of what Vamsi did and there was no equal contribution.

The final point, receiving a share of the profits. Again, Vamsi sat there and told you he agreed to give profits but did he say he agreed to give them to Prasad. He said his deal was with his uncle. They went to the uncle and said hey, we'd like to do a 50/50 deal, and the uncle said no. Uncle said no because of this. Uncle said you can't be the director of DSG and own the distributor, be in business with. You can't do that. So because of that, Vamsi ended up cutting his own deal and gave the deal he says he regrets. It wasn't good for him. But he gave 50 percent of his profits to DSG. At some point later when it's not his uncle and it's now his cousin, that money goes to the cousin. That's not Vamsi's business, but that wasn't Vamsi's agreement either.

So that is what you'll see. You'll see those things I just walked you through. When the Court tells you what a partnership is, those are the factors you're going to be asked to look at. We would submit that every single one of those things, every single thing it says to look at the answer is no, no, no, no, no. And that makes the answer to question one then. But as I said first, we're talking now about the beginning. We're talking about were they partners in the very first one. Even if you thought they were, which we don't think they are. We think all those

are no. But even if you thought they were, ask yourself if they're partners in Vivid and Nallapati Properties in the years after Prasad says he came into the partnership in 2015. That's what he said. That's what his email says. And so he says he terminated it and yet the question is whether they are partners in those entities. And, again, remember the first point. Mr. Coble asked you why are they giving him these things? Why did he get a warehouse? Well, he got a warehouse because his company DSG was an actual legitimate interest owner in Nallapati Properties and when they separated it got its share. That's why. It didn't get its share because Vamsi and Prasad were partners. It got its share because it was an interest owner. He asked, you know, why did they each own 50 percent in the Vivid Entities. Well, because they went in together through NC LLC. That's always been on paper. They've always been LLC members in that way. And that's not a partnership. An LLC is something different. And not only did everyone recognize that Prasad and his companies had this interest, he got paid. He got paid. That's what we're about to talk about. He got paid for those interests. And, again, as I've mentioned he testified himself that he terminated the partnership in 2015. So for all those reasons, walking through those two steps, ladies and gentlemen, we think the answer to question 1 is, no.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

They weren't partners ever. And even if they were partners ever back in the day, Prasad testified that that ended in 2015. Remember the document with everybody's interest and Prasad said -- I asked him did you and your family get full credit? He said, yeah. He got full credit. So everything was done in 2015. Everything was on paper, and there is no partnership in response to question 1.

So question 2 then becomes, if you answered yes. So if you answered, no, there is no question 2. If you answered, yes, what amount of damages is he entitled to recover? So if we're talking about question 2 I'd like to get into that. The evidence is clear, and this gets me into the other two points. Was he harmed in Nallapati Properties? Was he harmed in Vivid Entities? Well, let's talk about the warehouses. Even he, even Prasad didn't think he was owed money in 2015. You saw that. That's why he didn't say anything about it for five years and remember he never even tried to offer you an explanation for that. He walked away in 2015. He took his warehouses, took his money. His wife said something we're about to look at, and they never said anything about you owe me more money. And for five years, it wasn't until 2020 that that became a thing. Now, remember, let's look at Defendant's 93 and maybe blow that up just a little bit. Now at the time before the lawsuit started remember this about the

warehouses. This is Defendant's 93. These guys agreed on how to divide those up. They agreed Prasad gets Georgia, they agreed Vamsi gets North Carolina. Vamsi does the purchase price minus loan. He puts it all down there and look at what he says. I don't think we need anymore evaluations at this time, as we're not selling anything. We're transferring to each other. Prasad in November 2015 says, Vamsi, it's okay. And you heard the testimony. Prasad never once pushed back on that. He didn't push back on it here. He didn't come back and say I'm due more, any of that. That's what they agreed at the time. And then you saw the other email where Vamsi sent the numbers and said, here's what the difference would be. And only now all these years later did we have to trot in four real estate appraisers and listen to them testify about what the value was. Here these guys agreed you didn't need to do that to figure out what it was. But his real estate appraisers came in and said the number they agreed on back then and now it's really almost four times more than that. But remember the testimony of those experts? I mean Prasad's expert in North Carolina had more errors in his reports than we could keep up with. And the only way to get to numbers that's inflated as nearly four times more than they talked about here was because Mr. Watts came in and overvalued the North Carolina warehouses Vamsi got by

one million dollars, not like a little mistake. And then his counterpart Mr. Ryan you heard undervalued the Atlanta property Prasad got by another million dollars. That's how you get to nearly four times more than they talked about. And in fact, again, we'll come back to the other testimony you saw about value, but back to what was going on at this time, you saw the emails between Vamsi and Jaishri, Prasad's wife, who was involved in these businesses. And remember, let's pull up Defendant's 305. And, again, just ask yourself if this is what you'd say if you believed somebody owed you about $800,000 or so. In January 2016 Vamsi has just laid out -- here's the amounts in the bank account. We're going to keep half of them in Nallapati Properties. We're going to send half of them to you. Jaishri doesn't say, what are you talking about you're going to keep half of it. You owe me $800,000. She didn't say that. She says, okay. We're officially divorced now. I think that's a frowny face. A final good-bye that's what she said. And then you remember Defendant's 306, which you'll also see in the room. When I got to this she comes back and says, hey, don't forget to cut Prasad off the bank accounts. Now is that what you would say if you thought somebody owed you hundreds of thousands of dollars? And they didn't say one word to the contrary for five years. That's what happened back at the time. And that's because,

as you heard, the parties never agreed or understood that anybody was cutting anybody a check for the warehouses in 2015. That was not what they were talking about. They were having a much larger conversation about separating all of these interests. And the idea was this piece of it is going to go 199 into the good into Prasad's column and then we'll factor out who owes what to whom. But guess what that didn't happen in 2015 like they thought it was going to. And it's been years and years of litigation ever since. So that's why they acted like this. That's why nobody thought they were getting a check. And the reason they didn't say anything about it for five years you saw plain as day, because Prasad got a sweet deal on this split. Prasad got a warehouse that more than doubled in value between this time and 2021 when he actually got appraisers. His appraisers didn't talk about 2021. They did it. They came in and did two appraisals, 2016 and 2021, but they only talked about the one they liked. They didn't talk about the 2021 which shows that as of even that point it more than doubled in value. And if you could go down to the demonstrative that was put up earlier. If you can just blow that up a little bit. You remember this chart, ladies and gentlemen. And to be clear, again, we talked about Mr. Watts and the mistakes and all that. This assumes Prasad's experts. This uses their numbers. And if

you go through their numbers and come all the way through and sort of make it through, who's owned money at the bottom?  Not Prasad, because that's a question that never happened in 2015, never got it figured out and so you fast forward and even by their own account they are sitting on a gold mine.  It has appreciated so much more than the warehouses that Vamsi got.  And all the experts agree.  I think you heard all of them agree, the Atlanta guys anyway, it's more than that today, millions more, millions and millions more.  So we could be here saying, well, as it turns out Prasad owes us money.  But that's not what we're saying.  That's just what the evidence shows.  This is not -- he doesn't need fair value for differences in warehouses.  If we're talking fair value the money goes the other direction.

So let's talk Vivid.  Now, interestingly Plaintiffs haven't even argued that the Vivid managers were not entitled to do what they did.  You haven't heard that.  The operating agreement is in there.  As you can see we talked about the 65 percent vote.  There's no contention that they weren't allowed to do what they did during any of those transactions.  But more than that, they weren't only within their rights to do it, they had no other choice.  You saw the evidence of that.  You saw what Prasad was doing in the months and years leading up to that decision of those

managers. And remember, this wasn't a Vamsi decision. This was a three person decision. Everybody involved in that company, not being Prasad, thought that was the right thing to do. You saw the unanimous consent for Vivid NC. You saw 75 percent consent for Vivid Texas. Everybody thought it was not only the right thing to do but the only way to save those businesses and all those jobs. Those people they hired. You saw Vinay. He got upset about it. Think about that. Here we've got the guy who sits in India and gets the checks and files the lawsuits. Here you've got the guy who hired those people. He brought all those people in. He's accountable for those families, and you saw how he was affected by what was happening to this company. This wasn't just Vamsi. And you saw, again, what happened when Prasad got angry and when he blew up the relationship in 2015 because they weren't buying enough from him. And then shortly after started the lawsuits. I'm not going to go through all of them, but you've heard about the big ones. You heard about the two lawsuits he filed in 2017 on behalf of DSG against the Entities, which caused a bank default. And you don't have to take my word for it. Let's look at Defendant's 335. This is what Bank of America said caused the default. This is the letter Vivid got. And remember, again, when we talk about Vinay and Rohit I mean they're sort of the real victims here even

though they're not in this case. These guys have nothing to do with this. Imagine you're the one running Vivid NC or you're the one running Vivid Texas and you get this. Our line of credit that we use to buy all those slabs that we sell to make our living is gone. We can't use that anymore. It's subject to all these onerous terms. And the reason is the lawsuits Prasad has filed against Vamsi. That's what Bank of America said the reason was. When that happened in 2017, Vivid Entities had nothing to do with that. Now you also saw some of the emails -- I won't go through all of them. You'll see them, you'll have them if you want to look at them. The Vivid managers, not Prasad, were spending the better part of the next two years doing everything they possibly could to find a lender who would replace this defaulted loan. They turned over every rock. You've heard them suggest that Prasad was trying to be helpful in that. Everything he offered, everything he suggested he would do was A, through orders and B, insisted quid pro quo. You give me a bunch of information and control I'm not entitled to? You know I have nothing to do with running your business. I have never been there. I'm competing with you, I'm suing you. But give me all your books, give me all your internal systems and then maybe I'll help. But he never did. That's what was going on as these guys were desperately trying to find a replacement

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 129 of 154

loan. And you heard Plaintiffs' experts say, well, they should have just paid for it. They should have just kept plugging along. I mean their position basically is, Vinay, Rohit and Vamsi should have just kept work for the benefit of Prasad, doing all the work while Prasad did nothing. And pay out of their own pockets while he contributed nothing. Do you remember how they paid off the Vivid Texas loan finally after months of being unable to find any bank. They had to pay for it. And do you know who didn't chip in, this guy. So I mean the idea that they should just keep working, he could sue them, he could compete with them, he could keep sending them demand letters and they should just keep doing that so he could keep collecting checks. That's the story. And you heard Vinay and Rohit say, I'm not doing that. Those guys weren't going to keep doing that forever. They have all the customer relationships, all the employer relationships. They could have walked out the door anytime they wanted and the whole thing would have imploded. There would have been no value for anybody. That's what they were trying to avoid.

And, again, I won't go through all the lawsuits. We can put up -- there was another document, 321 that I asked Prasad about. You didn't get to see it. You'll get to see it in a minute. This is that demand letter that his lawyer

sent back in 2017. And, again, there were a lot of actual lawsuits, but this sums it up pretty well. Here he is writing on behalf of Prasad and Prasad's other two companies, and he's sending this to Vivid. Again, this is at a time Prasad is still around. Why don't you want me anymore? Well, your lawyer sends something saying Vivid needs to stop all competing activity. That's what it says later in the letter, all competing activity must stop. The contact must cease immediately, an apology and a commitment to continue ceasing such conduct. If these demands are not met within three business days there will be a lawsuit. No debate, comply or be sued. Comply or be sued says the member of the company in which he owns an interest. And he wonders why he fell off his information access in 2017. He's competing with them, telling them they can't compete, telling them he's going to sue them. And, as we heard, he did. He made good on that threat. In 2019 he sued them not once but twice. So the transaction -- remember the first one is February 2020. Well, the last couple months of 2019 he sued them twice, Vivid, while he is still involved. So, again, while competing with them, while suing them, while sending them demand letters like this, comply or be sued, he also staked out a personal claim to own the brand name they used to run the business. So they're out there operating. They're selling. They're

dealing with customers. And he just sort of takes ownership of the brand name in the trademark office. Well, that's concerning if you're a Vivid manager that he's done that. And so, again, they want to say, well, the companies were doing well before that. Well, yeah, they were. But the question isn't were they doing well before that. The question is could they continue. Was he by choking out their line of credit, by refusing to help them to refinance, by suing them multiple times, by competing with them, was that success going to continue or was he strangling the golden goose? And, again, I don't need to tell you. You saw the emotion. You saw what the guys who built the business felt about that. They were being hurt and so they had to do something about it. And I think it's really important what they did. When you saw what they tried to do. It wasn't like a fake ask. They did it for years. So let's look at Defendant 146. This is only one. I can show you all three. You saw the others and you'll have them again. This is the 2018 ask. And if we can scroll over to the next page I think it keeps going and maybe we can put up the whole thing. Yeah. Scroll up a little bit and maybe just zoom in. There we go.

Let's look at -- this is Vivid's lawyer. There's a couple of Meeks. Jerry Meek, they're the lawyer. Peter Meek is the Bank of America guy. You'll see both of them.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 132 of 154

Let's look at what Vivid's lawyer says. This is really interesting. He says, again, he's making second ask in two years to buy Prasad out. And he says the Vivid Cosmos Entities have identified a certified evaluation specialist. Somebody like Robinette or Dayman, those guys they later hired. They're ready, willing and able to appraise the interests in an expedited manner. Option 1. Then it comes down -- and if for some reason you don't like Option 1, well, we're open to Option 2. Why don't we go ahead and consider an arrangement in which multiple appraisers are involved. We can do that too. And then that's Option 2. Then they say, well, how about if you don't like either of those, you don't want one appraiser, you don't want multiple appraisers, what if we just do a shotgun approach where somebody assigns a value and you can (inaudible) by yourself. And then they come all the way down here and says, because of the urgent need -- again, he's telling him you're strangling the golden goose here -- because of the urgent need to timely obtain refinancing it's critical we move quickly. Please contact me if your client would agree to a redemption. Then look at that last sentence. Once we have an understanding in principle, Vivid's lawyer says, I feel confident we can work to put together a process for achieving the redemption at a price that is fair to all parties. That's three times in three years. His answer

every time, no. Now Mr. Coble has told you and will tell you the reason he said, no, was because they were freezing him out of information. But you heard the testimony about that and that's plainly just not true. Number 1 you heard that he had access up until 2017 he rarely ever -- even though he had never been there and was a past investor and not involved and all that, he had everything, the same access data up until 2017. Then we saw in 2017 that changed for some pretty good reasons, as we've just looked at. But then even when he asked for information through his lawyers he got it. He got all the information he asked for. He got all the financials. He got access to the accountant, and he had the right as you saw in 2019 to do a full out audit if he wanted to, and he never even bothered. He didn't even ask. That's how badly he cared about getting information. He didn't even take them up on the offer to do an audit.

So let's quickly talk about the price. Again you saw a lot about that. The important facts are these. The Vivid managers didn't pull that price out of the air. They hired two independent experts, Dayman and Robinette, not litigation testifiers but just people who do this for a living, come in and appraise and value. Ms. Couch said, hey, I'm not saying they did anything outside of their professional responsibilities. I'm not saying they didn't

get any information they asked for, but then she just ultimately says, I think they're wrong. So they have two independent experts. And just ask yourselves, if you were going to cheat somebody would you bring in two independent experts, have them tell you what their interest is worth and pay it, because that's what these guys did. That doesn't sound like cheating to me. Then in addition to that you need to look at what they say on the books. Well, if you get around the experts we're going to say the books weren't good and so you provided bad information and that's why it turned out like this. Well, again, remember they've been doing it forever since 2009 without any concerns from the CPA, the bank, the IRS or anybody and is that manipulation. You heard Mr. Burns say it was like a divorce. You would expect it to happen right around the deal. They change something. They do something weird that changes the value. That didn't happen here. And there's also no dispute. You heard Ms. Couch say right here at the end, everybody agrees Prasad knew. And he participated in it. And he benefitted from it. So if it was so bad he did it for years and now he's here complaining that it's wrong and he was misled. There was no dispute about that and you heard every single person who's been bought out of these companies, every one with his involvement has been bought out at the lower number, the lower adjusted actual number,

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 135 of 154

every single one. And the one guy, remember the one guy who was being bought out and he complained and said the numbers should be higher. Remember what Vamsi said about that. Prasad locked arms with everybody else and said, no way, the real number is the lower. That's what he said then. Every other member has been bought out. And ultimately what it comes down to is you have Ms. Couch who says this is wrong and astonishing and I've never seen anything like it. And then you have every one else, the Vivid managers, the CPAs, Mr. Burns, every other entity, the places Mr. Wilhoite went for information, they say Ms. Couch is wrong. Matt Dayman says she's wrong. Every bank appraisal says she's wrong. She disagrees with all of that. And, again, think about it. Mr. Burns said department store, car dealership. We've all seen the bargain rack. We understand that when you go in a place the old stuff isn't as valuable. It doesn't sell as quickly. And that's all that's going on here.

Finally, just remember how far out of whack Ms. Couch was when you compare her with everyone else. If we could put up -- scroll down to 382 if you could real quickly, just to look at 382, skip through a couple of those. Here we go, next page. This is 382 which is Brian Burns' report and just remember this chart and this is really significant. Whichever one of these you want to look at,

they're sort of flip sides of the same coin. Ms. Couch is over here on the left, and every other data source available is on the right. So the real Vivid Entities, Mr. Burns, Mr. Robinette, the other bank appraisals, they're all over there. Ms. Couch is a total outlier. So if you do it the way she said you have to do it, where she disagrees with everyone else. If you did it that way you get an outlier result. Finally, just remember and you don't have to put them up but I'll cite you to, remember as you think about it, this isn't the first time Prasad has made pretty much exactly this claim in this same Court. Remember Exhibits 325, 326 and 328. 325 is the lawsuit he filed in 2018 in this very Court where he said in paragraph 47, the inventory balances don't match. This is talking about the Cosmos entities now. So while Quick Books are different from the ERP. Then they agree to do that forensic audit you've heard so much about. And in Exhibit 328 that you looked at page 3 of that exhibit you'll see what his own auditor says, which is, there's nothing to see here. This is a write-down for obsolete inventory. So he's made the claim once. He's about to make it again. And at the end of the day he's gotten more than he deserved. He's been paid millions of dollars from these companies to which he's made no contribution other than trying to sue them into oblivion. That's the only thing

he's done for these companies. And now ultimately ladies and gentlemen it's in your hands. Mr. Coble gets the last word. I'd respond to it if I could, but that's not how it works. And so just remember there's a lot more evidence than I've been able to show you here. You're going to have all of it and we just, again, on behalf of Vamsi, my colleagues and all of us, we appreciate you. We thank you for taking the time to look through it all and to listen to all of this, and we look forward to your verdict. Thank you.

REBUTTAL

Thank you again, ladies and gentlemen, on behalf of Prasad. Thank you for your time and the opportunity to come before you and ask that this situation be made right, that fairness be done. I'm going to be very brief here. Several things that you heard just then is not what the evidence was. Prasad was just sitting in India collecting checks. That's not what you heard. You heard Prasad, you heard him talk about how he spoke with Vamsi daily after they started this business together, about how he visited the location every few months. About how he traveled with Vamsi to Brazil and other places to source them. His role, remember back over here, his role was sourcing stone, was sourcing stone. He traveled to Brazil and other places with Vamsi sourcing stones. They did different things.

It's just not right, it's not what the evidence was to say he was sitting there doing nothing. It's also not right to say he didn't pay a dime. He did. He told you he did. It's also wrong to say he never stood behind anything. They tell you about the first part of the discussion with Prasad's father where he didn't agree, but they didn't tell you about the second part, which Prasad did. Which is that he convinced him that they could go forward with this partnership for a better price and longer terms which Vamsi said was a contribution and so forth to the business in his email. He convinced him about making a personal guarantee. And he told you sitting there if the business failed and he couldn't pay for the invoices to DSG Prasad would be responsible. So it's wrong, not what the evidence showed to say that he never stood behind anything. It's also wrong to say they were never holding themselves out as partners to the public. Remember the discussion about the marketing materials? Remember that he said the first ones they prepared originally said Vamsi was the founder. Prasad said, no, you and me are founders. They fixed it. And the way it was sent out Prasad and Vamsi were described correctly as the founders of that business.

Let's look at the instruction form that was prepared. They only talked about part of it. Scroll up the first paragraph. North Carolina law recognizes partnerships

based on -- then the last line -- can be based on oral agreements as well as the conduct of the parties which may be express or implied.

Well, what is a partnership?  He didn't read this part.  A partnership is an association of two or more persons to carry on as co-owners of a business for profit.  That's exactly what I said when I started.  That's the definition of a partnership.  The evidence establishes that here in so many ways.  I'm not going to flip back through all these again and take your time, but the decisions they made together, the things that they shared, all the things that they did together with respect to the Cosmos business from 2005 when they started.  And there was an attempt here I think to create some confusion about timing.  The point is that they started this business together in 2005 and when it was profitable they used those profits to make the investment in Vivid.  That's why in 2009 they shared equally as 50/50 partners.  When they bought the first of the warehouses in 2010, the Raleigh warehouse, they shared equally as partners, because they bought it with the funds from their partnership in Raleigh.  That's why.  So this attempt to make this timing distinction is just not right.  Let's look at Exhibit 375 again.  Mr. Parry said there was no partnership in Nallapati Properties.  You heard the company attorney say she had spoken to Vamsi about it and

they had always been 50/50 partners, the company attorney. And that's after -- that's in 2016. That's after the email that he referred to in October of 2015. Let's look now at Exhibit 80. Again, this is -- they weren't partners in Vivid. Well, that's news to Vamsi, that's what he said. He wrote it in November of 2016, after the email that Mr. Parry mentioned in October of 2015. Let's go back to the instruction and grab the bottom part of it. He didn't read the bottom part either. A partnership is inferred by all its circumstances. So the list there is not exclusive. You don't have to find all of those. But the evidence is that the (inaudible) knows all the (inaudible). That's not true. That's not what the evidence has shown. Holding out the association to the public as partnerships, marketing materials, his emails, the discussions that he had. They said they were partners. The testimony in the Court under oath in the case they were partners. Hiring employees on behalf of the partnership, Cosmos was the partnership, ladies and gentlemen, the business they started. This is an attempt here to create confusion where there is none. The answer is clear. Contributing money to the partnership. Prasad contributed money to the partnership. Received a share of the profits, we seen that too. They shared the investment the other investor made equally. They shared the warehouses. They shared the investments in

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 141 of 154

Vivid. They received distributions. All that is in evidence and wasn't disputed, wasn't denied. So when you take that back, the evidence ladies and gentlemen is clear. They were partners. They were partners in because that's what they said. That's how they acted. That's how they've been paid. That's how he testified.

Again, I'll close with this, ladies and gentlemen. I think much of what you heard in the closing argument was sort of a -- encapsulated much of what you heard in evidence from Vamsi during the case, about a whole bunch of other stuff, about a whole bunch of other issues that aren't what we're here to talk about today. What -- whether they're partners and what is the fair value of his share and what was taken from him. Prasad's not asking to be reinstated in Vivid. He's not saying put me back in. What did Mr. Wilhoite say, he really has the answer to that. If somebody is difficult, you're not getting along, you can remove them. Nobody is saying they couldn't do that. The problem is when you do it you've got to pay fair value and that's what they didn't do. They didn't pay fair value and therefore he was hurt. We have the damages, the slide, we'll do that, we'll close with that. Mr. Wilhoite's analysis resting on Ms. Couch's corrections that needed to be made. This shows you what the fair value actually is. Four million owed on Vivid NC. Two million

owed, a little more, on Vivid Texas. Then on the real estate, again, we heard a lot about that too. We also heard Mr. Parry say they agreed on 200,000. They hadn't paid that either. So we leave it to the jury to figure, consider the evidence. But no matter what the amount owed on the property is somewhere between 200,000 and 742,000.

Thank you again, ladies and gentlemen for your time. On behalf of Prasad I very much appreciate this opportunity to come to you asking that fairness be done.

Thank you, Your Honor.

**THE COURT:** Thank you.

### JURY INSTRUCTIONS

You've heard all the evidence in the case and the final arguments. It's my duty to instruct you on the rules of law. You have to follow the law in arriving at your decision in the case. In any jury trial there are in effect two judges. I'm one of the judges and you as the jury are the other judge. It's my duty to preside over the trial and to determine what testimony and evidence is relevant under the law for your consideration. It's also my duty at the end of the trial to instruct you on the rules of law applicable to the case. You as jurors are the judge of the facts. In determining what actually happened in this case, that is, in reaching your decision as to the facts it's your sworn duty to follow the law as the Court

is in the process of defining it for you. You must follow all of the instructions as a whole. You have no entitlement to disregard or give special attention to any instruction or to question the wisdom or the correctness of any rule of law that the Court may say to you. You must not substitute your own opinion or notion of what the law is or ought to be. It's your duty to apply the law as the Court presents it to you regardless of the consequences. By the same matter it is also your duty to base your verdict solely upon the testimony and the evidence in the case without any prejudice or any sympathy. That's the promise that you made and the oath that you took before you were accepted as jurors by the parties in this case. The Court and the law have the right to expect nothing less from you.

As stated earlier, it's your duty to deliberate and to determine the facts. In so doing you must consider only the evidence that's been admitted in the case. The term evidence includes the sworn testimony of witnesses and any exhibits that are admitted into the record. You will recall from my opening remarks that statements, objections or arguments made by the lawyers are not the evidence in the case. The lawyers have an important function to point out those things which are most significant or helpful to their position in the case and in so doing to call your

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO   Document 250   Filed 06/20/23   Page 144 of 154

attention to certain facts or inferences that might otherwise escape your notice. In the final analysis, however, it is your own recollection and your interpretation of the evidence that will control in the case. What the lawyers say is not binding upon you. If during the course of the trial I have made a ruling or a comment to one of the witnesses or in response to the lawyers or asked any questions, you're not to interpret from that that I have any opinion about the outcome of the case. I simply do not. That's not my role. That's your role. Except for my instructions to you on the law you may disregard anything that I have said during the trial in arriving at your findings of fact. In so doing you may consider only the evidence in the case. You are permitted to draw such reasonable inferences from the testimony and the exhibits that you feel are justified in the light of your common experience. You may make such deductions and reach such conclusions which your reason and your common sense lead you to draw from the facts which have been established by the testimony and the evidence in the case.

You can consider both the direct and the circumstantial evidence. Direct evidence is the testimony of someone who asserts actual knowledge about a fact such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances indicating one side's

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 145 of 154

position or another side's position in the case. The law does not make a distinction between the weight to be given either to direct or circumstantial evidence.

I have said that you must consider all of the evidence. This does not mean that you must accept all the evidence as true or as accurate. You are to be the sole judge of the credibility or the believability of every witness and the weight or importance that you want to place on that witness' testimony. In weighing the testimony of a witness, you may consider that person's relationship to one side or the other in the case, the interest that the person has in the outcome of the case, a person's manner of testifying, a person's opportunity to observe or acquire the knowledge about the facts that the witness testifies to, a witness' candor, fairness, and intelligence and the extent to which what that witness tells you is either supported by or contradicted by other credible evidence in the case. In short you may accept or reject the testimony of any witness in whole or in part. Also the matter of the weight of the evidence, meaning the importance of the evidence, is not necessarily determined by the number of witnesses who testify as to the existence or non-existence of some fact. You may find that the testimony of a smaller number of witnesses as to some fact is more believable than the testimony of a larger number or vice versa.

A witness who testifies may be discredited or impeached by contradictory evidence or by a showing that the witness has testified falsely about an important matter or by evidence that at some other time the witness has said or done something or has failed to say or do something which is inconsistent with the witness' present testimony.

The rules of evidence provide that if scientific, technical or other specialized knowledge can assist you in understanding the evidence or in determining a fact in issue, a witness who is qualified as an expert, by that witness' knowledge, skill, experience, training or education, may testify and may state that person's opinion concerning such matters. You should consider any expert opinion received in evidence in the case and give it such weight as you think it deserves. If you decide that the opinion of an expert is not based on sufficient education and experience or if you should conclude that the reasons given in support of the opinion are not sound or that the opinion is outweighed by other evidence then you may disregard the opinion entirely. It's for you to decide the extent to which, if any, you believe and accept and value the testimony of expert witnesses. Use your sound common sense and judgment.

Now the verdict sheet in this case will have the questions that are left for you to answer.

We, the jury, return as our unanimous verdict the following answer to the issues:  First, did a partnership exist between Prasad and Vamsi?  And if you answer that yes, then you would go to the second question.  If you answer that no, that would end the case.

The second question is, if you answered yes, what amount of damages is Prasad entitled to recover from Vamsi.

On the first issue it's whether a partnership existed between Prasad Nallapaty and Vamsi Nallapati.  A partnership is an association of two or more persons to carry on as co-owners of a business for a profit.  To form a partnership two or more persons (a) combine their property, effects, labor or skill in a common business or venture; (b) under an agreement to share the profits and the losses in equal or specified proportions; and (c) make each partner an agent of the others for partnership business.  Plaintiff must prove the partnership existed by a preponderance of the evidence.  North Carolina law recognizes partnerships based upon oral agreements as well as the conduct of the parties which may be either express or implied.  Some of the factors indicating an implied partnership include filing of a partnership tax return, establishing a partnership bank account, holding out an association to the public as a partnership, obtaining state licensing as a partnership, hiring employees on behalf of a

partnership, incurring expenses on behalf of a partnership, contributing money to a partnership, analysis, receiving a share of the profits.  A partnership may be inferred from all of the circumstances so long as they demonstrate a meeting of the minds with respect to the material terms of the partnership agreement.  So if you find that those requirements are satisfied and answer the first question yes, you would go to the second question.  As I said a minute ago, if you answer no, the case is finished and that's the end of it.  If you go to the second question with regard to that, the Plaintiff is entitled to recover actual damages.  On this issue the burden of proof is on the Plaintiff.  This means that the Plaintiff must prove by the preponderance of the evidence the amount of actual damage caused by the conduct of the Defendant.  Damages recoverable consists of the amount of money that insofar as possible will put the Plaintiff back in the same position or condition as if the alleged breech in Count 1 had not occurred.  The Plaintiff's damages are to be reasonably determined from the evidence presented.  Your award must be fair and just.  You may not award any damages based on speculation or conjecture.

Fair market value is the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO   Document 250   Filed 06/20/23   Page 149 of 154

and the latter is not under any compulsion to sell. Both sides have a reasonable knowledge of the relevant fact. If you find by the preponderance of the evidence an amount of actual damages caused by the Defendant's conduct then it would be your duty to write that number in the blank space provided.

Ladies and gentlemen, a preponderance of the evidence is the burden of proof and on this case, in this verdict form, the Plaintiff has the burden of proving both the existence of the partnership and damages if you get to that. And the preponderance of the evidence, it's easy to remember but it's hard to apply necessarily. But it's easy to remember. It's the scale of justice, and the side who has the burden of proof has to make the scale tip in their favor by the evidence. So when you weigh all the evidence and take it into account and make a decision on what you believe and what you don't believe, the Plaintiff has to tip the scale in their favor. If they don't tip it in their favor, then the verdict would be for the Defendant.

Now when you retire one of your group needs to be selected as your foreperson. That can be anyone among you. You decide who it is. That person will preside over your deliberations and will be your spokesperson here in Court. You have a duty to independently examine the evidence in the case and assess the case and your decision, but you're

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

to share your opinions with each other.  You're not required to surrender your honest conviction as to what the verdict should be because of an opinion of your fellow jurors, but you have to work together and try to come up with a unanimous verdict in order to answer the issues in the case.

All right.  I'll see the lawyers up here.

(Bench conference)

**THE COURT:**  Objections to the charge?

**MR. MORSE:**  No, Your Honor.

**MR. PARRY:**  No, Your Honor.

**THE COURT:**  All right, ladies and gentlemen.  You can go to your jury room and begin your deliberations.

(Jury out 3:01 p.m.)

**THE COURT:**  The Court will be in recess awaiting a return of the verdict.

(Off the record at 3:01 p.m.)

                          JURY QUESTION

**THE COURT:**  We have a note.  What do you say to that?

**MR. COBLE:**  From the Plaintiffs standpoint the way that the question has been framed our view would be they need to find that the parties are partners.  However, we have other claims for relief that were deleted that --

**THE COURT:**  But that didn't go to the jury.  So you say that if they say no to being partners, that's it, the case

is over?

**MR. PARRY:** Yes, Your Honor.

**THE COURT:** What?

**MR. PARRY:** Yes.

**THE COURT:** All right. Bring the jury back in.

Is one of your group the foreperson?

**UNIDENTIFIED:** Yes.

**THE COURT:** So your question is, if we say no to being a partner, can Plaintiff still be awarded money for Texas.

The way I instructed you is if you say no to being partners then the case is over. And that is really all I need to say. So damages are awarded if there was a partnership. If there's no partnership, then that's not a matter in front of the court. Are you okay with that?

**UNIDENTIFIED:** Yes. Thank you. We just wanted clarification.

**THE COURT:** All right. You can go back and continue your deliberations.

(Jury leaves the courtroom.)

**THE COURT:** We'll be at ease.

(Off the record 5:15 p.m. - 5:29 p.m..)

**VERDICT**

**THE COURT:** Do you have a verdict?

**MS. MORRIS:** Yes, sir.

**THE COURT:** Ms. Morris, the verdict sheet has been handed

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

Case 5:20-cv-00470-BO    Document 250    Filed 06/20/23    Page 152 of 154

up to me.  Did the jury reach a verdict, without telling me the answer.

**MS. MORRIS:**  Yes, Your Honor.

**THE COURT:**  Okay.  The answer of the jury as to issue one is, yes.  And the answer to issue two is $490,000.  Is that all of your verdict?

**MS. MORRIS:**  Yes, Your Honor.

**THE COURT:**  All right.  Thank you.  Thank you for your service.  You've been very attentive and conscientious, and I appreciate it very much, so you are now excused.

Thank you.  That's the verdict.

(Court adjourned at 5:30 p.m.)

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com

STATE OF NORTH CAROLINA    )
                          ) C-E-R-T-I-F-I-C-A-T-I-O-N
COUNTY OF PERQUIMANS       )

        I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*Sandra A. Graham, CVR-M*                    *06/19/2023*
Sandra A. Graham, CVR-M            June 19, 2023
Court Reporter & Notary Public
Notary Public Number:  19940140086

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4546    sgrahamassoc@gmail.com