UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

HARI HARA PRASAD NALLAPATY - Docket No: 5:20-cv-470-BO
and UTS HOLDINGS, LLC, -
                                      -
     Plaintiffs,                      - Elizabeth City, NC
                                      - May 8, 2023
          v.                          - Jury Trial - Day 1
                                      -
VAMSI MOHAN NALLAPATI and   -
NALLAPATI PROPERTIES, LLC,  -
                                      -
     Defendants.                      -
---------------------------------

TRANSCRIPT OF JURY TRIAL - DAY 1
BEFORE THE HONORABLE TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE, AND A JURY

APPEARANCES:

For the Plaintiffs:   CHARLES E. COBLE, ESQUIRE
                      CLINTON S. MORSE, ESQUIRE
                      WILLIAM A. ROBERTSON, ESQUIRE
                      BROOKS PIERCE MCLENDON HUMPHREY &
                      LEONARD, LLP
                      PO BOX 1800 RALEIGH, NC 27602

For the Defendants:   K. ALAN PARRY, ESQUIRE
                      DEANNA ANDERSON, ESQUIRE
                      PARRY LAW, PLLC
                      100 EUROPA DRIVE, SUITE 351
                      CHAPEL HILL, NC 27517

Court Reporter:       Tracy L. McGurk, RMR, CRR
                      413 Middle St.
                      New Bern, NC 28560
                      (419) 392-6626

Proceedings recorded by mechanical stenography,
transcript produced by notereading.

(Commenced at 11:00 a.m.)

THE COURT:  Madam clerk, administer the oath to the jurors.

THE CLERK:  Jurors, please stand and raise your right hand.

(Whereupon the jury is sworn by the clerk.)

THE COURT:  Ladies and gentlemen, now that you've been sworn, I'll give you some preliminary instructions to guide you through your participation in the trial.  It will be your duty to find from the evidence what the facts are.  You and you alone are the judges of the facts.  You will then have to apply the facts to the law.  The Court will give you the instructions on the law.  You have to follow the law, whether you agree with it or not.

Nothing that I say or do during the course of the trial is intended to indicate nor should it be taken by you as indicating what your verdict should be.  The evidence from which you will find facts will consist of the testimony of witnesses, documents, and other things received into the record as exhibits, and any facts that the lawyers agree on or stipulate to or that the Court instructs you to find.

Certain things are not evidence and should not be considered by you:  The statements, arguments,

and questions by the lawyers are not the evidence in the case. Objections to questions are not evidence. Lawyers have an obligation to their client to make an objection when they believe evidence is being offered that's not admissible under the rules. You should not be influenced by the objection or by the Court's ruling on it. If the objection is sustained, ignore the question. If it's overruled, treat the answer as you would any other answer. If you're instructed that some item of evidence is received for a limited purpose only, you have to follow that instruction. Testimony that the Court may exclude or tells you to disregard is not evidence and should not be considered by you. And finally, anything you've seen or heard outside of the courtroom is not evidence and must not be considered by you.

You're to decide the case solely on the evidence presented here in court.

Generally speaking, there are two kinds of evidence: direct evidence and circumstantial evidence.

Direct evidence is direct proof of a fact such as the testimony of an eyewitness.

Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.

You will hear more about this in other instructions at the end of the case. But bear in mind that you may consider both kinds of evidence.

It will be up to you to decide which witnesses to believe and which witnesses you may not believe, and how much of any witness's testimony you accept or reject. I'll give you some guidelines for determining the credibility of witnesses at the end of the case.

This is a civil case. The plaintiff has the burden of proving his case by what's called a preponderance of the evidence. That means that the plaintiff has to produce evidence which, when considered in light of all the facts, leads you to believe that what the plaintiff claims is more likely true than not true. To put it another way, if you were to place the plaintiff and defendant's evidence on opposite sides of a scale, the plaintiff would have to make the scale tip somewhat to the plaintiff's side in order to satisfy this burden. If the plaintiff fails to meet that burden, then the verdict would be for the defendant.

If you've ever sat on a criminal case or heard of proof beyond a reasonable doubt, that requirement does not apply in a civil case.

In this case the plaintiff claims that he's

entitled to recover from certain partnerships in business that his family had and that his cousin owned and kept from him.

In a few words about your conduct as jurors:

During the trial you're not to discuss the case with anyone or permit anyone to discuss it with you. Until you retire to your jury room at the end of the case to deliberate on your verdict, you're not to talk about the case. Don't read or listen to anything in the case -- about the case in any way. If someone tries to talk to you about it, bring it to the attention of one of the marshals, and they'll bring it to my attention. Don't do any research or make any investigation about the case on your own.

Finally, do not form any conclusive opinions until all the evidence has been received. If you wish, you can take notes. If you do take notes, they're for your own personal use and not to be shared or given to anyone. You can leave them in the jury room, and they'll be protected.

The trial will now begin. Each side may make an opening statement. This is neither evidence nor argument; it's an outline to tell you what that side intends to prove.

After the opening statements the plaintiff

will present plaintiff's witnesses, and defense may cross-examine them. Then defendant will present any witnesses they have, and plaintiff may cross-examine these. After that the attorneys will make closing arguments to summarize and interpret the evidence for you, and I will give you instructions on the law. You will then retire to your jury room to deliberate on your verdict.

That's a thumbnail sketch of how a federal civil jury trial will take place. I think if you follow it along you'll see that will be the course.

The jury can now be with the plaintiff for opening statement.

MR. COBLE: Thank you, Your Honor. May it please the Court, good morning ladies and gentlemen. This case is about whether you can take your partner's property without paying fair compensation for it, whether you can take your partner's property without paying fair compensation for it, because that's exactly what the defendant, Vamsi Nallapati, did when he took his first cousin Prasad's share in two businesses that they still held together, took it secretly without paying him fair compensation for it.

The story begins with the two first cousins starting a business right here in North Carolina in

Raleigh. They called it Cosmos. In 2005. They started that business, you'll hear, as 50/50 partners. The business was successful. They were closer than brothers at the time. And it grew. But as sometimes happens within a family, the relationship soured. And ten years later they decided that they needed to part ways and go their separate ways.

But before that process was complete, Vamsi Nallapati decided to take something that wasn't his, to take his shares of Prasad's interest in these two companies without paying fair value for it. And you'll hear from experts explain to you how he accomplished that, by running two sets of book -- one high, one low -- breaking accounting rules, and arriving at the low value books that were used to price the buyout of his cousin, Prasad.

So Prasad's here asking you, ladies and gentlemen, to make this right, to fix this situation, to do what's right by making Vamsi -- requiring Vamsi to pay what's fair, to pay Prasad fair value for their shares that he took.

Now, the origins of this lie across the ocean in India where Prasad and Vamsi grew up together. I'm going to go low tech here, because the names are a little bit different. I want to make sure that we get

them.

Prasad is the plaintiff. He's seated right here. He's the one who brought this case.

Vamsi, he's the defendant, the one Prasad brought the case against. He's seated over here.

You'll hear about how Vamsi and Prasad grew up together in India and their childhood, the time they spent together, family events, family celebrations.

THE COURT: I don't think we'll hear all that because this is going to be a compressed trial, and you're going to hear only about their business dealings. We're not going to have family history.

I am sorry to interrupt, but I just want everybody to know that. Your time is exclusive and valuable, and we're not going to be here next week. I can guarantee you that.

MR. COBLE: Yes, Your Honor.

THE COURT: I'm sorry to interrupt, but that's what you get.

MR. COBLE: So the cousins were close growing up. Vamsi moved to the United States in 2005 to look for work in the computer science field -- in 2000, I'm sorry.

In 2005, as that work was coming to an end, Prasad came to the United States to visit with him.

And they came up with a business idea, a business that they called Cosmos. A business that they called Cosmos. This was going to be a stone distribution business. A stone distributor. And what that is, that's a company that imports stone like quartz, granite, marble from overseas and then sells that to builders and customers who cut it for installation in homes as countertops.

They were going to have specific roles in this business that they started together. Vamsi was going to manage the day-to-day affairs in Raleigh, where the business started, and Prasad was going to source stone.

And you'll hear about how important sourcing stone is to the success of the stone distribution business. He was responsible for sourcing stone.

Now, they each made important contributions to the start of that business. Vamsi provided most of the money initially, about $100,000. Not all at once, but he paid it over the first several months as bills came due. And that was important. Prasad doesn't deny that.

Prasad also made important contributions to the start of their business. He provided some money as well, some initial money to start the business, but he

made perhaps the most crucial contribution to the start of the business, and that was -- and you'll hear this in Vamsi's own words that he wrote -- providing material at a better price and longer terms.

So what does that mean?

Material is the stone that they were importing and selling.

Better price; we all know what that means.

Longer terms, what is that? Longer terms means longer payment terms. You'll hear that Prasad was able to secure 180-day payment terms, which was a real financial benefit for this new business which had little capital and no real borrowing ability. 180-day terms means they didn't have to pay for the stone they ordered for almost half a year, for 180 days. That allowed them to order the stone, receive it, sell it to their customers, and take that money and buy more stone, all months before they had to pay for that initial order of stone. So that was an important financial benefit. And Vamsi did dent any that; you'll see that in the emails that we'll look at.

Now, an important issue in this case, a central issue in this case, ladies and gentlemen, is whether Prasad and Vamsi were partners in this business that they started together. Whether they were partners.

And that's exactly what the evidence is going to show, that they were partners.

And there's really three categories of evidence that will establish that, ladies and gentlemen:

First is that they agreed to be partners. You'll hear from Prasad that when they started the business in 2005, that's exactly what they agreed, that they would be 50/50 partners sharing equally in the profits and the losses from that business.

Now, you'll also hear that they, because of the close relationship that they had with one another, the close relationship of trust and confidence, that they didn't need to put that agreement down on paper. They were closer than brothers, and they didn't need to, didn't have to.

What you will hear about is that as they started the business, Vamsi suggested that they operate it through a business called NVM. You'll hear about that company, NVM. That was an existing company. Vamsi suggested they use that company to operate their new partnership because it had some credit history.

Prasad asked: Well, can you put my name on the papers?

Vamsi said: No, I can't do that because -- we shouldn't do that because that might limit our

ability to get loans because you're not a resident in the U.S. And if there was a non-U.S. resident on the papers, that might affect our ability to get a loan.

So Prasad believed him. Prasad trusted him. That didn't affect that they were 50/50 owners in the business that they started and they ran through NVM.

You'll also hear evidence, ladies and gentlemen, that they called each other partners. Called each other partners. You'll see a number of email communications that Vamsi wrote to Prasad, to others, to accountants, attorneys, to which he specifically referred to Prasad as his partner.

You'll also hear testimony that Vamsi gave in another court proceeding in which he said under oath that he and Prasad started the business together as 50/50 owners and were partners. He now denies it. Think about that, ladies and gentlemen.

In addition to agreeing to be partners, calling each other partners, you'll hear evidence that they acted as partners. Acted as partners. There will be a number of ways in which they acted as partners, ladies and gentlemen. Evidence showing that they co-owned the business; they made all of the important decisions that a business makes, they made those decisions together. They also agreed that as the

business grew, and it did, and generated profits, that things that they purchased, investments they made with the profits of that business, they would share equally, 50/50, between them.  And that's exactly what they did, because they were partners.

Now, five of those investments are what bring us here today.

The first one, Vivid NC.  Vivid NC.  That was an existing stone distribution company that was in Charlotte.  It was struggling.  And in 2009 Prasad and Vamsi had an opportunity to help turn it around, to make an investment in that business to try to help turn it around.  And this is important.  When they made that investment acquiring a 60.2 percent interest in Vivid NC, they made that investment not with their own money but with money from the Cosmos business that they started together with fruits of the partnership.  They acquired that interest, and they agreed therefore they were 50/50 owners of the interest that they acquired in Vivid NC.

Now, the way Vamsi set that up, you'll hear about a company, NC LLC, which was a holding company he set up to hold their interest, their investment.  And he set it up 50/50, 50/50 between Prasad and Vamsi, consistent with their partnership, consistent with their

agreement, consistent with their understanding.

You'll read an email from Vamsi that says specifically that he and Prasad were partners in Vivid.

The next three investments, number 2, 3, and 4, are three warehouses. Vamsi and Prasad decided together to buy three warehouses with fruits of their partnership: one in Raleigh, one in Greensboro, and one in Atlanta, three places where they had locations. And again, they didn't use their own money, their own personal money to buy those warehouses. They used profits from the business that they started together. And again, they agreed that they owned those properties 50/50 as partners. You'll see an email from the company attorney that said just that.

Now, Vamsi set this up with Nallapati Properties, Nallapati Properties, to hold those three pieces of real estate. Unlike NC LLC, which was set up 50/50, he set that one up with himself as the only paper owner, owner on paper. Again, that didn't affect their agreement that they owned those properties 50/50. But Prasad asked him about that. He got a similar explanation to the explanation about NVM. He was told -- Vamsi said that putting his name as a non-U.S. resident -- he still lives in India -- as a non-U.S. resident on the papers for Nallapati Properties would

impair their ability to get a loan.

Prasad trusted him. He believed him. He didn't want to disrupt things. So that's how they proceeded. But you'll see that there's a host of evidence acknowledging that the agreement controlled, their understanding controlled, that they were 50/50 owners in those properties because they bought those properties with fruits, with profits of the partnership that they started.

Now, ten years later, by 2015, as I said, as sometimes happens within a family, the relationship fractured between them. You'll hear from Prasad's perspective why that happened. But they agreed in 2015 that they needed to separate.

It was in the midst of that that the fifth -- I said there were five investments at issue here -- the fifth of these was made. And that's called -- it's a similar name -- Vivid Texas. Vivid Texas was a new Cosmos location that they opened in 2016 in Dallas, Texas. And they opened it using material and inventory from the Vivid NC business they invested in, which was in Charlotte.

Now, in this case the way Vamsi set up Vivid Texas, it actually appeared on paper as if Prasad owned more of Vivid Texas than did Vamsi. But that wasn't

consistent with their agreement. Their agreement is what controlled. And they agreed that they each owned equal shares, 50/50 shares -- I'm sorry, 25 percent each, equal shares between them of Vivid Texas. And that was what controlled. You'll see an email from the company accountant that says -- recognizing that there was a disconnect here between ownership on paper versus the agreements of the parties. So we have that here in Prasad's favor, and here where the papers seem to suggest that Prasad didn't have an interest, then we had one that was 50/50 just as it should be and was to be. But in all instances the agreement between them -- and you'll hear this, ladies and gentlemen -- was that they owned these investments that they made with fruits of their partnership 50/50, just as they owned the underlying partnership 50/50.

Now, as it came time to separate -- as I said, the relationship soured. They talked first about separating the three warehouses. You can't divide three by two, so they had to figure out what to do about that.

And you'll see where Vamsi made calculations, sent them to Prasad saying: Here's how much I owe you by taking two of the three properties. Vamsi took the warehouses in Raleigh and Greensboro;

Prasad took the one in Atlanta.  Vamsi made calculations saying:  Here's how much I owe you to square things up, even-steven.

The problem is he never made that payment. He never squared things up.  And that's one of the reasons why we're here today.

As 2016 moved into 2017, the process of splitting up their interests became more contentious, and they weren't able to separate their interests in the two Vivid entities.

It was during that time period that you'll hear -- I'm going to put two more names here, Vinay and Rohit.  Vinay and Rohit, they were two other partners in Vivid NC and Vivid Texas.

2017 moved into 2018.  Vamsi, Vinay and Rohit locked Prasad out of all financial information about Vivid NC and Vivid Texas.  Locked him out, shut him out, so he was in the dark completely about what the assets of those companies were, what his share was worth.

So when they proposed to him:  Do you want to sell your interest as a way of separating; he said no, because he was in the dark.  He didn't know what he would be selling because he didn't have the information that he needed, despite asking for it, to place a value

on his shares of those entities.

And it was during that time period, ladies and gentlemen, that Vamsi, Vinay, and Rohit hatched a plan to kick Prasad out -- that's the words that Vamsi used in an email that you'll see -- to kick Prasad out of Vivid NC and Vivid Texas without his knowledge, without his agreement, and without his approval.

So that will bring us, ladies and gentlemen, to the second big issue in this case: the broken trust. Vamsi, Vinay, and Rohit executed on this plan in February of 2020 when, again, without any notice or knowledge to Prasad, they sold all the assets of Vivid NC to a new company that only the three of them owned, excluding Prasad. Sold all the assets to a new company that only the three of them owned, excluding Prasad, which had the effect of kicking him out, just as was planned.

This is important, ladies and gentlemen. They did that in secret. They didn't tell him in advance what they were considering. They didn't tell him when they executed on that asset sale. And they didn't tell him after. They didn't tell him in response to an information request that you'll see that he made that asked specifically about any asset sales. They didn't tell him in the summer of 2020 when he received

some distributions and asked: What's the purpose of these? Didn't tell him then. Didn't even tell him, ladies and gentlemen, in December, almost ten months later, when Prasad, through his counsel, asked specifically: Has there been any change in the ownership or management of Vivid NC? Because they had heard a rumor; the family heard a rumor that there had been some change. Didn't tell him then.

Now, by that point in time, by late 2020, Vamsi had made clear to Prasad: I'm not going to pay this square up payment on the three properties, on the three warehouses. I'm not going to pay it.

So Prasad brought this action in the fall of 2020 asking that Vamsi be required to do that. He also asked in that lawsuit for the Court's help in separating his interest from Vamsi's in Vivid NC and Vivid Texas, not knowing that he had already been kicked out of Vivid NC ten months earlier, not knowing that; not knowing that the exact same thing was about to happen with respect to Vivid Texas.

And indeed, in January of 2021, he received notice for the first time that, again, Vamsi, Vinay and Rohit merged Vivid Texas into a new company that only the three of them owned, excluding Prasad. Again having the effect of kicking him out without any notice,

without any warning, without any discussion, without any approval, purporting to pay him for his share, which, as we'll hear, far, far undervalued the true value of his shares.  So he sent it back.

And that brings us to --

THE COURT:  It brings us to the end almost, since you're about to use up all your time.

MR. COBLE:  Yes, sir.

They took his shares in secret and underpaid.  You'll hear from the experts who will explain the two sets of books that Vamsi ran that resulted in the underpayment, that accounting rules were broken, and how inventory was valued that dramatically undervalued Prasad's share of the business, and therefore dramatically underpaid him, and that hurt him.

You'll hear from Tiffany Couch, who will explain that to you, our expert on forensic accounting.

And you'll hear from Mr. Wilhoite, our valuation expert, and he'll tell you what the fair value actually is.  And that, ladies and gentlemen, is the fix.  That's why we're here.  Fair value.  Mr. Wilhoite will tell you what the fair value of what Prasad's shares actually were.

You'll also, ladies and gentlemen, hear evidence of the why.  You'll read an email expressing

the resentment that Vamsi had towards Prasad, resentment towards the 50/50 arrangement that they had. Resentment.

Now, it's a free country. He's entitled to his opinion. He may believe that he deserved more than 50 percent, Prasad deserved less. But what he's not entitled to do is to act out on that and hurt Prasad, to take something that is not his, to hurt somebody out of that resentment.

So, ladies and gentlemen, at the end of the case, when the evidence is done, you've received your instructions, and you've retired to deliberations, you'll have a verdict form to complete. And when you do that, you'll indicate on that what decisions you've made. We submit, ladies and gentlemen, that when you do that, the evidence will show that Prasad and Vamsi indeed were partners in the business that they started together in 2005, that Vamsi broke his trust by taking these shares in secret and not paying him fair value for those. And ultimately, why we're here, what Prasad is asking from you that you fix this, that you make this right by paying him fair value, requiring Vamsi to pay fair value for the shares that he took.

Thank you, ladies and gentlemen.

Thank you, Your Honor.

THE COURT: Yes.

Do you want to make an opening?

MR. PARRY: Yes, Your Honor. May it please the Court.

Members of the jury, first of all, I want to thank you for your time and your attention today. We appreciate your service, and we look forward to putting on the evidence that you'll be able to consider.

Now, there's a lot going on, as you saw on Mr. Coble's chart. But this case, from our standpoint, comes down to one thing: Prasad's greed.

The evidence will show you that Prasad has already collected millions of dollars in value from companies he didn't start, he never worked for, and in one case he'd never even been to. He's not entitled to more. Particularly when the evidence will show you that it was his self-interest and actions that were causing considerable harm to the companies on which he's here to cash in.

My name is Alan Parry, and I am proud to represent the defendant in this case, Vamsi Nallapati, Prasad's younger cousin. You'll hear that Vamsi devoted his life to building the businesses you're going to learn about in this case. Many years of hard work, he invested his whole life savings to get the companies off

the ground. And you're going to see all kinds of evidence about these and other issues that Mr. Coble talked about. But fundamentally there are three issues here:

Number one, we believe the evidence will show, contrary to Prasad's claims, that Vamsi and Prasad were not partners in the businesses we're here to talk about, Nallapati Properties and the Vivid companies. Instead, you're going to see that their interests were documented and credited, and Prasad has been paid in full.

The second issue, you're going to see that Prasad got more than his fair share when they divided up those warehouses Mr. Coble told you about. He took an Atlanta piece of real estate worth millions of dollars and half the company's money from its bank accounts.

Thirdly, you're going to see that there is nothing unusual or improper about the way that Vivid entities' managers, including Vamsi, kept the books of those companies. There's nothing unusual about it. They kept the books the same way they had done it for years with the guidance of a long-time trusted CPA involved at every step of the way. And you'll see evidence that the actions those managers were forced to take in 2020 to buy out Prasad's interest, those weren't

designed to harm Prasad, those were designed to save those businesses and the jobs of every single person who worked there from his internal attacks. Even still you'll see that the Vivid managers went out of their way to treat him fairly, paying him millions of dollars more, even though at the time his conduct was threatening the very existence of those companies.

Mr. Coble told you a little bit about the background, as did the Judge, and the stipulations. I won't go too much through that.

But Vamsi came here in 2000, I think as Mr. Coble mentioned, as a software engineer. You'll see he got his start in the stone business, though, before that. He worked as a young man in India for a company you're going to hear a lot about in this case called DSG. That's a big supplier of these stone products, these countertop services. And at the time Vamsi's uncle and Prasad's father was the managing director of that company; that's sort of like a CEO here in our country.

So when Vamsi came over, he was a software engineer for a couple of years, but he got back into that business pretty quick. He opened up a new company and started importing and selling stone around the United States.

By 2005 you'll hear that was going well enough that Vamsi decided to take the leap and to devote himself full-time to his new business. He moved his family here to North Carolina, and he opened up his first physical warehouse and showroom right in Raleigh.

The evidence will show you Vamsi invested his own money to start that business. He also put in long days with his wife growing and managing the company over time. And he took on all of the risk. When somebody needed to stand behind the company's obligations under the lease, that was Vamsi. When somebody needed to sign up and put a guarantee on some other company debt, the evidence will show you that was Vamsi. That's how the business began in 2005.

Now, during this time Prasad still lived in India and was still working full-time for his father's company, DSG. You will see evidence that in 2005 the cousins talked about going into business together. But you'll learn that Prasad's father said he couldn't do it because of his role at DSG.

So Prasad didn't share the load of investing money and the start-up expenses of Vamsi's business, and he sure didn't share the workload. You'll learn Prasad never worked at any of these companies a day in his life. He also didn't sign up for an equal share of the

risk. He didn't put his name on the lease. He didn't put his name on any of the company debts and obligations. That was Vamsi.

What Prasad did do was serve as Vamsi's primary point of contact with DSG, which was an important early supplier for Vamsi. And you'll hear that Prasad claims to have played some role in convincing his father to give Vamsi favorable payment terms. Again, Vamsi didn't get anything for free. What he got was a longer period of time to pay for those stone slabs. You'll hear Vamsi say he was very appreciative of that. That was helpful; that helped get the business off the ground. And you'll see plenty of evidence of him expressing his appreciation to DSG, and to his uncle, and to his older cousin.

You'll also learn that DSG and Prasad and his family have done quite well on that deal. On DSG's early assistance, DSC secured a long-time customer for its products here in the States, and Vamsi agreed with his uncle to share some of the profits from that business with DSG in exchange for those payment terms.

Now, the evidence will show -- and that continued, by the way, as you'll hear about the business expanding to multiple locations and well beyond the time Vamsi figured out that wasn't a very good deal for him.

That still remained in place.

And the evidence will show that since Prasad took over DSG, he's now the managing director after his father's death. Since that happened, the share that was going to DSG is now secured to Prasad's personal benefit. His family is getting millions of dollars in cash, millions of dollars in valuable real estate, and ownership and control of multiple related entities. They've done well.

That's apparently not enough for Prasad, who's here, again, as you heard, claiming that he's due more, that he is an equal partner, he says, personally in all of the businesses. Well, the evidence will show you that's just not true.

As I mentioned a moment ago, his primary claimed contribution to these businesses was the favorable payment terms from DSG. But remember, that didn't come from him; that came from his father's company.

There's also no written partnership agreement. There's no evidence that any partnership between Vamsi and Prasad ever registered to do business anywhere or filed a tax return or opened a bank account, or did any of those things.

You'll also see with regard to the companies

we are here specifically talking about -- again, Nallapati Properties and the Vivid entities -- their interests were documented and credited, and Prasad got paid. He's not entitled to more.

Now, in the absence of any real evidence of a partnership, you will hear and see, as Mr. Coble alluded to, evidence that Vamsi, on occasion, maybe frequently, referred to Prasad as a partner. And he did. That's not surprising, though, when you hear from Vamsi how and how often he uses that term, just like people did. Vamsi calls his employees partners; he calls his suppliers, like DSG, partners; he calls his customers partners. It's in his email signature, for goodness' sake.

There is no doubt, Vamsi looked up to his cousin; he valued his relationship at that time as an older family member, and he valued Prasad's role as an important contact with DSG. All of that is true. But that doesn't make Prasad an equal partner in companies for which he shared none of the personal burden.

Now, as Mr. Coble mentioned, the companies expanded. They, for a time, briefly rolled up many of the locations into a single company that then broke apart, as you'll see, when Prasad ended it. He ended it after ten months, sending out a notice email saying

he was dissolving the relationship and complaining specifically that the U.S. companies weren't buying enough from his company, DSG.

Mr. Cobble mentioned that he was in charge of sourcing supply. He was sourcing supply from himself, from his company, DSG.

Now, that company, again, the rolled up company, CGM Group, only lasted about ten months. Then that began a process which has unfortunately been years of disputes and lawsuits, fighting over the separation and Prasad's claimed interest in these companies. And that's what brings us here today.

These companies, Nallapati Properties and Vivid, were not part of CGM Group, but they can't get away from this years-long messy business divorce.

Nallapati Properties -- I want to touch on each just briefly. Nallapati Properties, again, was set up solely in 2009 to own the warehouses. These are massive stone slabs that these guys are bringing in and store and then sell. The warehouses are where they store those slabs. So you'll see that Vamsi was the original sole owner of Nallapati Properties. You'll also see that in 2015, by the time they began to separate their interests, one of Prasad's companies had stepped in as a 50 percent interest owner. That's the

way it was when they separated their interests, with documented interest in the companies.

At that time Nallapati Properties owned warehouses in Georgia and North Carolina. And when they were going through this whole split in 2015, the deal was going to be Vamsi would continue doing business here in North Carolina; Prasad would take ownership of the Georgia location. So it made sense to divide up the warehouses the same way. And that's what they did.

You'll see emails between them back in 2015 talking about dividing up the warehouses that way. Also important, they talk in those emails about the fact that they don't need to do formal appraisals to value. They took the purchase price, backed out the amount of the loans that were due, and that was their estimate of value, which they both were okay with at the time.

You'll also see that there was a larger discussion going on in 2015. Remember, Prasad has dissolved the whole relationship. They're separating their interests. And they did, as part of that, talk about at that time the warehouses that went to Vamsi were worth a little bit under $200,000 more than the warehouse that went to Prasad. They talked about that. What they didn't do was agree that Vamsi was going to cut Prasad a check for the difference in warehouse

value. Not -- and not a loan, and not without factoring in who owed what to whom on everything they were separating.

What you'll see is that consistent with that, Prasad took the Atlanta warehouse; he took half the money in the company's bank account, and he went on his way, never breathing a word about a notion that he was somehow due more money independently on the warehouses. In fact, nearly five years went by without him ever making that claim, likely because the Atlanta warehouse he took has more than double in value since that time. He's done quite well. And only now in 2020 did he come, for the first, time making a claim that he's due some difference in value.

And he'll bring experts into this case to say he was due more than four times more than what the parties talked about in 2015, but the evidence will show you that's not true.

Now for the Vivid entities. Mr. Coble mentioned how Vamsi and Prasad came in in 2009 when they were on good terms; they invested in Vivid NC, which is the one based in Charlotte. They ended up owning, through another company, not directly, they owned a little over 60 percent; the rest is owned by two of the company's founders. You'll hear about those gentlemen

in the case.

A couple years later it expanded, and they had the Dallas location, which is Vivid Texas.  So you'll hear a lot of people talking about the Vivid entities; it's those two, Charlotte and Dallas, those two companies.

Now, I mentioned before Prasad had very little to do with the business of the Cosmos entities, those original entities that Vamsi started.  He had even less to do with Vivid.  He had, again, no job, no responsibilities of any kind.  In fact, he acknowledges he's never even been to Vivid Texas, never seen it.  He also acknowledges that his company, DSG, didn't give the same favorable payment terms that it gave to the Cosmos entities.

As you heard from Mr. Coble, his claims here focus on the buyout, which happened in 2020. And again, he's here to claim that the millions of dollars he was paid aren't enough; he's due more, he says.  But the evidence will show that the millions he was paid were more than fair under the circumstances.

And what do I mean by that?  You're going to see evidence of what was going on in the months and years leading up to the decision by all the Vivid managers, not just Vamsi; that the only way to save

those businesses and everyone's jobs was to remove Prasad as an owner. Here's why. The evidence will show that Prasad had filed lawsuits which caused defaults on the critical loans that the Vivid companies needed to do their business.

The evidence will also show that as the Vivid managers scrambled around desperately trying to find a new loan, Prasad refused reasonable requests for assistance, instead leveraging that situation to try to get information that the evidence will show he wasn't entitled to, and the Vivid managers were concerned about providing it.

You'll also see that at time Prasad was competing with Vivid NC through another entity he owned and threatening to sue it.

And also around that time the Vivid managers learned that Prasad had gone to the Trademark Office and staked personal claim of ownership over the brand name under which they did their business.

It was in that context of all those factors that the Vivid managers realized they had to act. These were internal attacks from someone who still owned an interest in the company.

What you'll first see, though -- and this is really important -- this wasn't a hasty decision. Over

the course of three years the Vivid managers tried again and again and again to go to Prasad and just have a dialogue: We're not getting along; we're at loggerheads; let's go our separate ways; let's have a process; let's buy you out at a fair price. They made that overture three times.

They invited his input on the process: Do you want one appraiser; do you want more than one appraiser; do you want some other kind of deal? Tell us what you want us to do.

They invited his ability to participate in the process. Each time he refused to even talk about it, just staying put, and those facts that I just described were playing out.

By 2020 the Vivid managers found themselves against an imminent bank deadline, facing foreclosure on what had once been successful thriving businesses, and they had to act. So you'll hear that they acted, the evidence will show, within their authority to sell most of the Vivid NC assets and all of the Vivid Texas assets to companies in which Prasad was not an owner.

Now --

THE COURT: Are you almost finished?

MR. PARRY: -- the reason we're here is the purchase price.

THE COURT:  Did you hear me?

MR. PARRY:  I'm sorry; I didn't, Your Honor.

THE COURT:  Okay.  I'll say it again.  Are you almost finished?

MR. PARRY:  Yes, Your Honor.  I apologize. I didn't hear you.

THE COURT:  Okay.  Go ahead.

MR. PARRY:  We're here about the purchase price, ladies and gentlemen.  And what you'll hear is the Vivid managers did not come up with that out of thin air.  They didn't sit down and make it up themselves. They hired independent experts to come in and appraise and value everything that was being sold, and then they paid every penny, every penny that those experts said his interest was worth, they paid him.

Now, Prasad criticizes the work of those experts and talks about Vivid's accounting practices; he says they were doing all these things to depress the value of the business.  You'll hear plenty of testimony on that, and the evidence will show that the bookkeeping practices weren't unusual.  They were the same bookkeeping practices they had been doing forever, not something they came up with in 2020 to hurt Prasad.  And they're bookkeeping practices of which he was well aware years before, because contrary to his claims, he had

plenty of access to accounting and financial information, and he knew exactly the bookkeeping methodologies they used that he's complaining about here.

Members of the jury, again, at the end of the case Prasad's lawyers will stand here and ask you to award a significant enormous amount of money, millions more dollars, to Prasad.

We believe the evidence will show you that Vamsi didn't breach any duties to his cousin here; he didn't, and that Prasad isn't due one dime more than he's already been paid.

Thank you again for your time.

And thank you, Your Honor.

THE COURT: Let me excuse the jury at this point, and we'll start with the case in a few minutes. But let them go in the jury room.

(The jury exits the courtroom.)

THE COURT: Having heard the opening statements, I'm going to impose time limits on the trial of this case. It's done routinely in the Eastern District of North Carolina. One of my colleagues does it in every civil case. I have no confidence in the expeditious presentation of this trial without time limits. I'll give each side six hours.

And this case -- you need to reassess where you are, where the parties are in this case. You need to look carefully at it, because somebody's going to be very disappointed.

So I'll take a recess.

And I'm serious about whether or not you're going to go forward.

(Recess taken.)

THE COURT: Call your first witness.

MR. COBLE: Your Honor, plaintiffs call Tejashree Nallapaty as the first witness.

THE CLERK: Please state your name.

THE WITNESS: Tejashree Nallapaty.

(Whereupon the witness was sworn by the clerk.)

- - -

TEJASHREE NALLAPATY, DIRECT EXAMINATION
BY MR. COBLE:

Q. Good morning. Please introduce yourself to the jury?

A. I'm Tejashree Nallapaty.

Q. Do you sometimes go by Shree?

A. Yes.

Q. To avoid confusion in this case, we often use first names to refer to parties and the witnesses. Is

that all right?

A. Yes.

Q. Where do you currently live?

A. Seattle, Washington.

Q. Where did you grow up?

A. In Hyderabad, India.

Q. When did you come to the U.S.?

A. In 2013.

Q. What did you come to the U.S. to do?

A. For my undergrad.

Q. Where was that?

A. I started out in Penn State and completed it in University of Michigan.

Q. In Michigan?

A. Yes.

Q. Where do you work?

A. For Cosmos.

Q. And what is Cosmos?

A. Cosmos is a stone distribution company.

Q. And what's the ownership of Cosmos?

A. It is held through a holdings company called Justh.

Q. Justh Holdings is the plaintiff in this case?

A. Yes.

Q. Who owns Justh Holdings?

A.   It's owned through my parents and myself.

Q.   Who are your parents?

A.   Jaishri and Prasad.

Q.   Prasad, who's sitting next to me, the plaintiff in this case?

A.   Yes.

Q.   You said that Cosmos is a stone distributor. Tell the jury what that is.

A.   A stone distributor basically we unload stone slabs and we put it up for display so fabricators or contracts go ahead and purchase it from us and ultimately they cut and install it at homeowners or in businesses.

Q.   So do stone distributors like Cosmos sell directly to homeowners?

A.   No.

Q.   Where do the slabs that Cosmos sell come from?

A.   They come from around parts of the world like from India, Brazil, Spain, Portugal.

Q.   What types of stone does Cosmos sell?

A.   We sell natural stone like granite, marble, quartzite, but also manmade materials like quartz.

Q.   Does your family's Cosmos business have physical locations?

A.   Yes.

Q. Tell the jury, what does a physical location look like?

A. So we own warehouses. In the warehouses we store all the stone slabs so they way homeowners and contracts can come view the slab and pick what they would like to purchase.

Q. Tell the jury about the process of ordering a slab.

A. So when a fabricator or a home owner, once they choose the slab, they go ahead and put it on hold. Once they're ready to purchase it, we go ahead and deliver the product to them.

Q. When is invoice issued?

A. Once we go ahead and send the material out to them.

Q. And what about the invoice from your supplier, when does that issue?

A. Once we go ahead and we approve the product.

Q. And how long does it typically take for the product to get from overseas to your location?

A. About 45 days.

Q. So the -- at what point in the process is payment on the invoice due?

A. It depends on our payment terms with the supplier itself.

Q.   Are you familiar with -- you used the word "payment terms."  Explain to the jury what that means.

A.   Payment terms are the time the invoice is due from the date of invoice itself.

Q.   Are you, yourself, involved in the purchasing of stone from suppliers?

A.   Yes.

Q.   So in your experience what are some examples of payment terms that suppliers typically provide to the stone distributors like Cosmos?

A.   It's typically some terms are we pay up front, or 30 days, or 60 days.

Q.   Are there some payment terms that are more advantageous to stone distributors?

A.   Yes.

Q.   What are those?

A.   The longer the terms, the better it is.

Q.   Why are longer terms more advantageous?

A.   It just helps us to retain the inventory and gives us enough time to sell it and then pay for the material itself.

Q.   Are you involved in the sale of your product to your customers?

A.   Yes.

Q.   Based on that experience, what are some common

payment terms that customers receive from stone distributors like Cosmos?

A. They either have to pay up front or they get net 30 days.

Q. 30 days?

When you said payment terms from the suppliers, you said up front, or 30 or 60 days; was that right?

A. Yes.

Q. And the 30 or 60 days is from what point in time?

A. The date of invoice.

Q. That's issued at shipment?

A. Yes, as the product itself ships from overseas or from the supplier.

Q. How long have you worked at Cosmos?

A. For about six years.

Q. So 2017; is that right?

A. Yes.

Q. And what led you to begin working there in 2017?

A. I really liked the business itself, but at the same time I wanted to help my parents out in the business and carry on the legacy of my grandfather.

Q. And do you interact with -- you said you interact with your customers in the course of your responsibilities?

A. Yes.

Q. What's your title with the company?

A. I'm the director of operations.

Q. In your experience what factors are most important to customers buying from stone distributors and deciding what slab to buy?

A. The quality of the material, the cost of the material, and the relation itself.

Q. What do you do to go about insuring that the quality of material is what your clients or customers are looking for?

A. So typically it depends on market research and our interaction with the customer itself; we know what kind of quality they're expecting from us.

Q. Are you familiar with the term "sourcing stone"?

A. Yes.

Q. Explain to the jury what sourcing stone is as far as the stone distributor's business?

A. It's finding and buying slabs from our suppliers.

Q. And do you source stone for the Cosmos business?

A. Yes.

Q. How did you learn how to do that?

A. From my father.

Q. From Prasad?

A. Yes.

Q. In your experience how important is sourcing

stone to the success of a stone distributor?

A. It plays a pivotal role.

Q. Why do you say that?

A. Because what material we source from our suppliers is what is going to help us actually do our day-to-day sale and sell our material.

Q. Can effective sourcing of stone save costs for the stone distributor?

A. Yes.

Q. Does the quality of stone slabs deteriorate over time?

A. No.

Q. Are you aware of customers choosing slabs based on their age?

A. No.

Q. Do other members of your family have an active role in the Cosmos business?

A. Yes.

Q. Who are they?

A. My sister and my parents.

Q. Your sister, what's her name?

A. Umashree.

Q. You said -- what are her responsibilities?

A. She is the director of purchasing and marketing.

Q. And you said your father and mother. Your

mother's name is Jaishri?

A. Yes.

Q. What are her responsibilities?

A. She takes care of strategy and financial planning.

Q. And she works out of where?

A. Seattle, Washington.

Q. And then your father, Prasad, what's his role in the business?

A. He is the chairman.

Q. So what does that include?

A. So he is the one taking all the responsibility.

Q. Was your family's Cosmos business already in operation when you started there in 2017?

A. Yes.

Q. Was your family's Cosmos business the only location using the name "Cosmos" at that point in time?

A. No.

Q. Where were some of the other locations that were using it?

A. Raleigh, Chicago, Charlotte.

Q. And the location in Charlotte, how did you refer to that location?

A. As Vivid Cosmos.

Q. Was there a location in Dallas?

A. Yes.

Q. And how did you refer to that one?

A. Vivid Cosmos.

Q. So what was the first Cosmos location to open?

A. In Raleigh.

Q. In Raleigh?

A. Yes.

Q. And how did the Raleigh location come about to your understanding?

MR. PARRY: Objection, Your Honor.

THE COURT: Overruled.

A. It started between my father and Vamsi.

Q. And Vamsi is who's sitting at the table over here?

A. Yes.

Q. And how does he fit into the family relative to your father?

A. My grandfather and Vamsi's father are brothers.

Q. Have you ever visited the Raleigh location?

A. Yes, multiple times.

Q. When did those visits begin?

A. From 2008.

Q. 2008?

Did Prasad, your father, accompany you on any of those visits to the Raleigh location?

A.   Yes.

Q.   And to your understanding what was the purpose of those visits that you made with your father to the Raleigh location?

A.   That was in regards to business.

Q.   In regards to business?

A.   Yes.

Q.   And do you recall during those visits hearing Vamsi say anything about his relationship with Prasad?

A.   That they were partners.

Q.   And you remember him using that word?

A.   Yes.

Q.   Do you remember anything else about activities that you observed your father and Vamsi engaged in in regards to the business in Raleigh?

A.   That they would travel together for business, other business purposes.

Q.   They would travel together.  Where would they travel, to your understanding.

A.   Sometimes overseas.

Q.   What sorts of places?

A.   Like Brazil.

Q.   You said that was for sourcing material?

A.   Yes.

Q.   For what business?

A.   For Cosmos.

Q.   And where does your father live now?

A.   He lives in Hyderabad, India.

Q.   In India?

And your mother lives in Seattle?

A.   Yes.

Q.   How did that come about?

A.   So in 2015 when they decided to split ways, they decided that my mom would move to Seattle, and she would take care of Cosmos over here, and my dad would stay in India and help out with the business over there.

Q.   And to your observations, when you travelled to Raleigh, what was your observation about the closeness of the relationship between Prasad and Vamsi?

A.   We were all extremely close.

Q.   Extremely close?

A.   Yes.

Q.   Can you give an example of that?

A.   Vamsi was my closest uncle.  He would come with me to college when I started my college.  Both times he helped me move.  And he used to stay with us -- or he used to live with us in India prior to him moving here.

Q.   Before he moved to the U.S., he actually lived with you in India?

A.   Yes.

Q.   In your family's home?

A.   Yes.

Q.   For how long was that?

A.   For about six years.

Q.   Six years.

     Going back to the arrangement with -- you said your mother moved to Seattle to help the business, and your father stayed in India.  How often does the whole family get together during the course of a year?

A.   Maybe once a quarter.

Q.   And how has that been?

A.   It's tough.  It's challenging at times.  But at the end of the day we do it for the success of the business.

          MR. COBLE:  That's all the questions I have.

          THE COURT:  Do you have any cross?

          MR. PARRY:  Yes, Your Honor.

                         - - -

     TEJASHREE NALLAPATY, CROSS-EXAMINATION

BY MR. PARRY:

Q.   Ms. Nallapaty, am I correct you weren't involved in the dealings between your grandfather, your father, and your Uncle Vamsi back in 2055?

A.   No, I wasn't.

Q.   You weren't involved in the formation of

Nallapati Properties back in 2009?

A. No, I wasn't.

Q. You weren't involved in the formation of NC LLC or its investment in Vivid in 2009 either, right?

A. No.

Q. You also weren't involved in any discussions around the termination of their relationship and the spinoff of interests in 2015, were you?

A. No.

Q. And you don't know whether or not your dad and Vamsi were partners, do you?

A. I know that they were partners.

Q. Didn't you testify before in this case, Ms. Nallapaty, that you didn't know if your dad and Vamsi were partners in the legal sense?

A. I don't know if they have a legal document.

MR. PARRY: No further questions, Your Honor.

THE COURT: All right. Thank you. You're excused.

THE WITNESS: Thank you.

MR. COBLE: Your Honor, we call Prasad Nallapaty as plaintiff's next witness.

THE CLERK: Place your left hand on the Bible and raise your right hand. State your name for

the record.

THE WITNESS: I'm Hari Hara Prasad Nallapaty.

(Whereupon the witness was sworn by the clerk.)

- - -

HARI HARA PRASAD NALLAPATY, DIRECT EXAMINATION
BY MR. COBLE:

Q. Please introduce yourself to the members of the jury.

A. My name is Hari Hara Prasad Nallapaty.

Q. Where do you currently live?

A. I live in India.

Q. Is that where you grew up?

A. Yes.

Q. What language do you use primarily to communicate?

A. I speak Telugu.

Q. Are you comfortable answering questions in English?

A. Yes, but my English is not perfect.

Q. If I say something you're not sure about or you need me to clarify, will you let me know?

A. Yes.

Q. Do you understand that we're here today for a

Q. lawsuit to which you're the plaintiff, the person who brought the lawsuit?

A. Yes, please.

Q. And you understand that Vamsi, seated over there, is the defendant in this lawsuit?

A. Yes.

Q. Why are you asking the jury to award you damages against Vamsi?

A. They took over my share in the businesses. I wanted my fair value.

Q. Now, we've established -- what's the family relationship between you and Vamsi?

A. He's my first cousin.

Q. As I said with Shree, just to avoid confusion, is it okay if I use first names in my questions to you?

A. Yes.

Q. How would you describe the closeness of your relationship with Vamsi?

A. He was more than my brother.

Q. Can you give an example of why you say that?

A. He used to live with us. For all the functions -- when he completed his education before joining the company, he used to live with us. Apart from that he used to take care of all the functions, all the festivals, he used to take care of our kids, and my

wife used to take care of him.  We were very close.

Q.  Very close.  And you've described a close family relationship.  Did you have a business relationship with Vamsi?

A.  Yes.

Q.  What was that?

A.  That was Cosmos.

Q.  And when did that begin?

A.  In 2005.

Q.  And where did that begin?

A.  Raleigh.

Q.  Prasad, do you understand that one of the issues in this case is whether you and Vamsi formed a partnership with respect to that business?

A.  We had an oral agreement.

Q.  And what was that oral agreement that you had when Cosmos started?

A.  When we started Raleigh, first location, we wanted a 50/50 partnership.

MR. COBLE:  Your Honor, I'm going to, if it's okay, use this over here.

BY MR. COBLE:

Q.  All right.  So, Prasad, I'm going to write partners here.  I'm going to talk about some aspects of that.  Is "partner" a word that you and Vamsi used to

refer to each other?

A. Yes.

Q. So you called each other partners; is that right?

A. Yes, please.

Q. If we could look at Exhibit 312, please. Blow up the top there.

You see this is an email from Vamsi to David Khatod?

A. Yes, please.

Q. Who is Mr. Khatod?

A. He's a business accountant.

Q. And you see here that Vamsi writes, "Dear David, Prasad and I are going to be partners but not directly with our names, we will be through a Holding company of our own." Do you see that?

A. Yes, please.

Q. Is that example consistent with how you and Vamsi used the word "partner" to refer to each other?

A. Yes.

MR. COBLE: Your Honor, I move Exhibit 312 into evidence.

THE COURT: What's that?

MR. COBLE: I said we move Exhibit 312 into evidence.

THE COURT: It's received.

(Whereupon Exhibit P-312 is admitted into evidence.)

THE COURT: I couldn't hear you. That's why I didn't answer.

MR. COBLE: I'm sorry.

BY MR. COBLE:

Q. We'll look at some examples in a bit, but I want to ask you now how you and Vamsi used profits from the Cosmos business you started together. Did you and Vamsi buy anything with the profits of that business?

A. Yes.

Q. What?

A. Real estate.

Q. You bought real estate?

A. Warehouses.

Q. Did you and Vamsi have an agreement as to how you owned those warehouses that you purchased with the profits of the business?

A. 50/50.

Q. Why is that?

A. Because we are 50/50 partners in the Raleigh location.

Q. If you'll pull up Exhibit 375. And let's blow up the email header first.

You see this is an email from Kim Swintosky to

Edward Hirsch and Russ Lawrence?

A.   Yes, please.

Q.   Who is Ms. Swintosky?

A.   The company's attorney.

Q.   What company?

A.   Cosmos.

Q.   Who is Edward Hirsch?

A.   He's my attorney.

Q.   Who is Russ Lawrence?

A.   He's a Cosmos accountant.

Q.   If we go down to the last paragraph Ms. Swintosky wrote.   You see that she writes, "Re:  Nallapati Properties, I spoke to Vamsi about it.  He indicated that the 50/50 split is not arbitrary.  Rather, Vamsi and Prasad have always been 50/50 partners in the properties owned by Nallapati Properties."

Do you see that?

A.   Yes.

Q.   Is her statement accurate?

A.   Yes.

MR. COBLE:  Your Honor, we move Exhibit 375 into evidence.

THE COURT:  Received.

(Whereupon Exhibit P-375 is admitted into evidence.)

BY MR. COBLE:

Q. Did you and Vamsi use profits from the Cosmos business you started to invest in any other businesses?

A. Yes.

Q. And what was that?

A. That was Vivid.

Q. And did you have -- what was your agreement with Vamsi about how you owned that investment in Vivid that you made with profits from the Cosmos business you started?

A. It's 50/50.

Q. And why was that?

A. Because we are 50/50 partners in Cosmos Raleigh.

Q. Pull up Exhibit 80. Blow up the top of that.

Do you see this is an email from Vamsi to Vinay. Who is Vinay?

A. Vinay is another partner in Vivid.

Q. Another partner in Vivid?

A. Yes, please.

Q. And to you, right?

A. Yes.

Q. And Vamsi writes, "Hi Vinay, Currently Prasad and I are partners in Vivid through Cosmos Granite & Marble NC, LLC." Do you see that?

A. Yes.

Q. Is his statement accurate?

A. Yes.

MR. COBLE: Your Honor, we move Exhibit 80 into evidence.

THE COURT: Received.

(Whereupon Exhibit P-80 is admitted into evidence.)

BY MR. COBLE:

Q. Did you and Vamsi accept any outside investors into the Cosmos business?

A. Yes.

Q. Who was that?

A. /STRAOE camp.

Q. /STRAOE camp?

A. Yes, please.

Q. What was the investment that he acquired?

A. He acquired 15 percent.

Q. Fifteen percent of what?

A. Of Atlanta location.

Q. How did he pay for that investment?

A. He paid by cash.

Q. And what did you and Vamsi do with the cash that he invested?

A. We split it 50/50.

Q. Why was that? Why did you split it that way?

A. We are partners in that location.

Q. Are you familiar with a transaction called the Rollup Transaction?

A. Yes.

Q. I'll refer to it that way.

Just give the jury a sense of -- what was the Rollup Transaction?

A. We used to own a number of locations in different cities, and we wanted to come up with one umbrella to form a group.

Q. You said different locations went into one umbrella?

A. Yes, please.

Q. Was the Raleigh location, the first one that you and Vamsi started together, was that part of the Rollup Transaction?

A. Yes, please.

Q. And how was ownership of the Raleigh location treated as between you and Vamsi for purposes of the Rollup?

A. 50/50.

Q. And that was because of what?

A. Pardon?

Q. Why was that?

A. Because we are 50/50 partners in that.

Q. Do you and Vamsi still have a close relationship today?

A. No.

Q. Why not?

A. We've got some things from 2016.

Q. Does that anything to do with why we're here today?

A. Yes, please.

Q. Can you explain that to the jury? What happened that brought us here today?

A. Pardon?

Q. What happened that brought us here today?

A. Because what we worked together, he has transferred secretly to other partners. That's why we are here.

Q. What are you asking the jury to do about that?

A. I want to have my fair value.

Q. Prasad, let's get just a little bit more about you, introduce you little bit more to the jury.

You said you grew up in India?

A. Yes, please.

Q. And did you attend school there?

A. Yes, please.

Q. What did you study?

A. I studied engineering.

Q. What industry do you work in?

A. I work in DSG.

Q. What is DSG?

A. It's a stone processing industry.

Q. How long have you been in the stone business?

A. Thirty years.

Q. And how did DSG start?

A. It was started by my father and me.

Q. Again, what is the business of DSG?

A. They process the blocks and cut and polish and export.

Q. Export stone?

A. Overseas. Yes.

Q. And did Vamsi ever work with you at DSG?

A. Yes.

Q. How did that come about?

A. Usually in the family when you finish engineering, graduation, then he came to our home. My father told him to join in the company.

Q. So your family made that available?

A. Yes, please.

Q. Is that when -- I think we heard from Shree that Vamsi actually lived in your home; is that right?

A. Yes, please.

Q. It was during that time period?

A. Yes, please.

Q. How long was that?

A. About six to seven years, approximately.

Q. Did at some point did Vamsi stop working at DSG?

A. Yes, please.

Q. Why was that?

A. He wanted to go to the U.S.

Q. To the United States?

A. Yes, please.

Q. What year was that?

A. Approximately 2000.

Q. What work did he do once he got to the United States?

A. Software, computers.

Q. Computers?

A. Yes, please.

Q. And did Vamsi have any involvement in the stone business after he moved to the United States?

A. Yeah. Yes.

Q. What was that?

A. He used to buy some containers from us, from DSG. And he used to sell the containers to the fabricators.

Q. So he would buy some containers from DSG, you said?

A. Yes, please.

Q.  Now, we heard from Shree about stone distributors.  Was Vamsi acting as a stone distributor when he was doing that?

A.  No, he was still working.

Q.  So what was the difference between what he was doing and a stone distributor?

A.  He was training, basically.

Q.  Training, you said?

A.  Yes.

Q.  What makes a stone distributor distinct from that?

A.  Stone distributor, we need to have a big warehouse, and we need to have the slabs physically presented.  And if anybody comes there, they can have a look, and they can buy.

Q.  You need a big warehouse with lots of stone in it?

A.  Yes, please.

Q.  And Vamsi didn't have that when he was selling some containers, you said, for DSG?  He wasn't doing that?

A.  No.

Q.  So let's move now to Cosmos.  Is Cosmos a stone distributor?

A.  Yes, please.

Q.   So the idea was that it would have a warehouse and hold inventory; is that right?   The idea was it would have inventory in a warehouse?

A.   Yes, please.

Q.   When did Cosmos start doing business?

A.   2005.

Q.   And where was its first location?

A.   Raleigh.

Q.   And who started it?

A.   Me and Vamsi.

Q.   Tell the jury what caused you and Vamsi to discuss starting Cosmos together in 2005?

A.   In 2005, once he called my wife, Jaishri, and he was working at Wal-Mart, and his contract is getting over.   Then he needs to come back to India because without job he could not sustain here.

And my wife told me that how he can stay in U.S., he can do some business, like that, she said to me then. I came over to Arkansas, where he was staying then.   We decided to do the business.

Q.   My understanding then is one of the reasons had to do with providing a way for Vamsi to stay in the United States?

A.   Yes, please.

Q.   And did Vamsi ever deny that you and he started

Cosmos together before this dispute started?

A. No, never.

Q. All right. Let's look at Exhibit 390, please. And let's blow up the top of that.

Do you see here that Vamsi's sending an email in 2011 to you and -- and Jaishri is your wife?

A. Yes, please.

Q. And we heard she's involved in the business too?

A. Yes, please.

Q. And the subject here is "Cosmos brochure text." And Vamsi writes, "Take a look at it. We will be finalizing on this very soon to go to printing." Do you see that?

A. Yes, please.

Q. Let's look at Exhibit 391. Is that a brochure that you've seen before?

A. Yes.

Q. Did Cosmos use brochures like this?

A. Yes.

Q. Let's look at the third page and blow up the upper right corner.

Do you see here that this version of the brochure that Vamsi asked you to take a look at says "Founded by Vamsi Nallapati, whose background spans two decades." Do you see that?

A. Yes, please.

Q. Did you provide any feedback to him about that?

A. Yes.

Q. Let's look at Exhibit 389. Let's look at the top.

So you see here in response to his email to take a look at it, you said, "Cosmos is founded by Nani and Vamsi I think is not only Vamsi." What is the Nani reference?

A. That is my nickname.

Q. Nani is your nickname?

A. Yes, please.

Q. What were you communicating to Vamsi?

A. When he sent that brochure, I said we both started together. Only his name was there. My name was not there.

Q. How did Vamsi respond to that?

A. He said: I don't want my name. You can keep your name.

I said no.

Q. Vamsi said that it could be only your name; is that --

A. Yes, please.

Q. Is that what you wanted it to say?

A. No.

Q. What did you want it to say?

A. I said: We will have both our names.

Q. Did Vamsi agree with that?

A. Yes.

Q. Is that how the brochure read as it went out?

A. Yes, please.

MR. COBLE: Your Honor, we move Exhibits 389, 390, and 391.

THE COURT: Received.

(Whereupon Exhibits P-389, P-390, and P-391 are admitted into evidence.)

BY MR. COBLE:

Q. What did you and Vamsi agree to in terms of how the new Cosmos business in Raleigh would be owned between you?

A. It is 50/50.

Q. And did you discuss this 50/50 business with your father in India?

A. Yes, please.

Q. Why did you do that?

A. Because we needed support from the company to start this business.

Q. The company being which?

A. DSG.

Q. And DSG, as I understand it, would be a supplier

of slabs to the new business?

A. Yes, please.

Q. So how did the discussions with your father go about this new idea?

A. Actually, my father didn't agree for a couple of times because we were doing a new business; it would be very risky. At that time we had a very good customer who was paying immediately and he's buying our entire production.

Q. And so what happened next?

A. Then he didn't agree for a couple of times. Then I requested him: Let me start this business, so that will be the first time for both of us. Any failure he said is my responsibility to pay back the company.

Q. Explain to the jury what you mean by that when you said that any failure is going to be your responsibility.

A. When we want to start a warehouse, we wanted material. That costs money. Because we are asking long-term payment.

And if that -- if the business fails, and who will pay for that? And my father asked that question.

I said I would be getting some share in the company. Usually in India we get the money from the

father's properties. I said: In that you can cut it and pay. And that will be done because that will be no risk for the company.

Q. So did you sign a written guarantee to your father?

A. No.

Q. Why not?

A. Because usually everything happens in India mostly with whatever we say, that is the final word for that.

Q. An oral agreement?

A. Yes, please.

Q. Did you consider that assurance you gave your father about -- well, let me back up.

So if the new business that you and Vamsi were starting failed and was unable to pay DSG, who would be responsible for that?

A. I would be responsible.

Q. You would be responsible?

A. Yes, please.

Q. And did you consider that a binding commitment on your part?

A. Yes, please.

Q. Did you tell Vamsi that you had done that?

A. Yes, please.

Q. How much were you assuring that your father would be paid?

A. Those first few shipments were 350,000 to 400,000.

Q. You said about 350,000 to 400,000?

A. Yes, please.

Q. So if the business had not been able to pay for those, who would have had to pay?

A. I would have to pay.

Q. So how would you describe the level of risk that you were taking? I mean, we heard earlier that they claim you weren't taking risks. Describe the level of risk that you were taking in this new business?

A. The risk is very high because one thing is the money, one thing is I lose my face in front of my father so that he doesn't listen to me next time whenever I propose anything to him, or he will not give an upper hand in the business, what he has.

Q. Why were you willing to take on that risk?

A. I trusted Vamsi, and he was very close to me.

Q. What did you think about the business idea?

A. I thought we -- because I know what sells in the U.S. by that time, and I thought it would be very successful for both of us.

Q. Would you have been willing to take the risk that

you've described, the monetary risk for payment and the risk within your family to your father if you had not been a partner in the business?

A. No.

Q. Was there any discussion with your father about DSG itself being an owner of the new business?

A. No. The relation is between me and Vamsi, not with -- Vamsi doesn't have a relation with DSG.

Q. The relation was between you and Vamsi?

A. Yes, please.

Q. Now, we've heard that you owned the businesses or you started the businesses 50/50 partners. What did you agree with Vamsi as to how profits would be shared between you?

A. Vamsi will be putting 100,000 K. Whenever money was required. And I'd be putting -- I'll be sourcing the stone with extended terms. And I give money --

Q. We'll get to that in a second. But in terms of the profits from the business, what did you and Vamsi agree as to how those would be shared between you?

A. 50/50.

Q. What if there were any losses?

A. 50/50.

Q. I'm going to come back over here to the board, and I'm going to write-up here "Contributions."

Because I want to walk through contributions so the jury can hear what each of you, Vamsi and Prasad, contributed. So I'll put a P over here and a V over there. P is for you.

Before we get to that, let's talk about the roles in the new business. What was your role going to be in that new business?

A. My role will be sourcing stone.

Q. Sourcing stone. Okay. We heard a little bit about that. We heard a little bit about sourcing stone from Shree, but let's have you explain. What does sourcing stone involve?

A. Sourcing stone is we have to go to the quarries and buy the blocks. We need to have good blocks so we get good quality so that in the factory we get a good quality of slabs. We inspect and send to Cosmos.

Q. Does sourcing stone for a stone distributor involve travel?

A. Yes.

Q. And did you travel --

A. Yes.

Q. -- sourcing stone?

A. Yes.

Q. Where were some places you went sourcing stone? And this was for Cosmos, right?

A.  Yes, sir.

Q.  Where did you travel sourcing stone for Cosmos?

A.  We started actually with the Indian colors. Apart from that we initially started with Saudi Arabia, then Finland, Norway.  And we bought -- later we bought from South Africa, Namibia and Madagascar and Brazil.

Q.  How much time did all of that take?

A.  It takes a lot of time.

Q.  And we heard that you didn't have any involvement in the business.  How time consuming was what you just described?

A.  Actually probably monthly over ten to 15 days.

Q.  How important in your view is sourcing stone to the success of a stone distributor business?

A.  Sourcing stone is very important.  We need to have good slabs for our distributors so that they can rotate faster.

Q.  What did you say?  Rotate it faster?

A.  Faster, yeah; inventory.

Q.  And what experience as of 2005 when you and Vamsi started Cosmos did you have in sourcing stone?

A.  By that time I had plenty of experience.

Q.  If you had not been involved in sourcing stone for the new Cosmos business, could Vamsi have done it the way you were able to?

MR. PARRY:  Objection.

THE COURT:  Overruled.

A.  No.

BY MR. COBLE:

Q.  Why not?

A.  Because he's taking care of day-to-day affairs here.  It's difficult for him to travel to India and other places to source the stone.

Q.  Did he have the same experience as you do?

A.  No.  In sourcing stone he doesn't have -- he has production knowledge.

Q.  So if you had not been sourcing stone for the new Cosmos business, what would the business have had to do to source stone?

A.  I'm sorry?

Q.  If you had not been sourcing stone for Cosmos, what would the new business have had to do to source stone?

A.  We would have to hire somebody to do that job.

Q.  You'd have to hire somebody?

A.  Yes, please.

Q.  What sort of cost would that have involved?

A.  It is expensive.

Q.  Give a ballpark.

A.  Maybe -- it depends on the volume, basically.

When we started, cost from $5,000 to $10,000.   Now it will be $20,000, $30,000 a month.

Q.   Were you paid a salary to source stone for Cosmos?

A.   No.

Q.   Why not?

A.   That is my investment.

Q.   In Cosmos?

A.   Yes, please.

Q.   All right.   So we have your role here, sourcing stone.   What was Vamsi's role?

A.   Vamsi used to take care of day-to-day affairs in Raleigh.

Q.   Day-to-day?

A.   Yes, please.

Q.   Let's talk about contributions.   Did you make any initial cash contributions to the start of Cosmos?

A.   It's about 15,000 to 20,000.

Q.   You paid 15,000 to 20,000?

A.   Yes.

Q.   And were there marketing materials for the new business?

A.   Yeah.   Marketing materials, brochures, I will pay from India.   We used to get it from India initially.

Q.   Who paid for those materials?

A.   Myself.

Q.   Marketing materials.

Now I want to go to Exhibit 67 and ask you about non-cash contributions.  Do you see here this is an email from Vamsi to Mr. Lawrence?  You said he's the Cosmos accountant?

A.   Yes, please.

Q.   And Jaishri is your wife?

A.   Yes, please.

Q.   You see here three-fourths of the way down Vamsi wrote in 2014 "Prasad's contribution is through supplying material with a better price and longer terms and in turn he has majority of the share in our entities."   Do you see that?

A.   Yes, please.

Q.   Do you agree with that statement?

A.   Yes, please.

Q.   So I'm going to write here, "better price and longer terms."

And that was the contribution you made?

A.   Yes, please.

Q.   Better price and longer terms.

So explain how you were able to provide material at a better price and longer terms to the new business?

A.   I talked to my father regarding the longer terms,

like 180 days from the date of shipment.

And better price, we know what the price we are getting. And we selected very good blocks to the factory so that we get a better recovery so that we can give a better price for Cosmos.

Q. For the new business?

A. Yes, please.

Q. I think you said 180 days; is that what I heard?

A. Yes, please.

Q. Were those longer terms, 180-day terms, were they a financial benefit to Cosmos?

A. Yes, a lot.

Q. Explain that, please, to the jury.

A. It takes usually from India, once we ship it, it takes about 30 to 40 days to come over here. And once we receive it in the warehouse, it takes about 30 to 40 days to sell it. And after that selling, we used to get the payment over 30 to 40 days back, we used to receive the money to the warehouse. And that money we use to buy additional block. We only have so much money. That money was used to buy other materials from other distributors, so that way we can sell it in Raleigh location.

Q. So I think, if we heard that right, you said that the longer terms allowed you to receive and sell the

material and use that money to buy other material before the first shipment was due?

A. Yes, please.

Q. Did DSG offer 180-day terms to other customers?

A. No.

Q. What terms did DSG typically offer to new businesses like Cosmos?

A. We pay before shipment.

Q. Before shipment?

A. Yes, please.

Q. So zero days?

A. Yes, please.

Q. Why did DSG offer 180-day terms to Cosmos?

A. Because I had given a guarantee to my father, and I asked him for long-term payment term.

Q. Without that guarantee would DSG have extended those terms to the new business?

A. Yes, please.

            MR. PARRY:  Objection.

            THE COURT:  Overruled.

BY MR. COBLE:

Q. I'm sorry.  Without that guarantee would DSG have offered those terms to Cosmos?

A. No.

Q. And if you had not been a partner in the new

business, would they have offered those terms?

A.   No.

Q.   Could the new Cosmos business have bought stone on 180-day terms from other suppliers besides DSG?

A.   No.

Q.   What sort of terms were available in the market from other suppliers to the new business in 2005?

A.   When we started it was -- nobody knows us. Sometimes we used to pay on board, once it's shipped on board.  Later we got 60 days.   Later when we grew we got 90 days.

Q.   So that was some period of time later?

A.   Yes, when we grew.

Q.   But initially what were the terms?

A.   Initially we had to pay up front, once it's on board.

Q.   Is that zero days?

A.   Yes, please.

Q.   In your view could the new business have gotten started without the 180-day terms that you made available?

A.   No.

Q.   Why not?

A.   Because we don't have money.

Q.   When the new Cosmos business started, what

percentage of its stone did it buy taking advantage of these 180-day terms that you made available?

A. Initially we -- from DSG, 100 percent.

Q. 100 percent initially?

A. Yes.

Q. Then what about over the first couple years?

A. It came up to 60 to 70 percent.

Q. Sixty to 70 percent that you bought this way?

A. Yes, please.

MR. COBLE: I'd like to move Exhibit 67 into evidence.

THE COURT: Received.

(Whereupon Exhibit P-67 is admitted into evidence.)

BY MR. COBLE:

Q. Let's look at Exhibit 381. You see here this is an email from Vamsi to -- Vinay is one of the persons on this email?

A. Yes, please.

Q. You see the second line there he writes, "For us to have reached this far, factory has been the biggest support?"

A. Yes, please.

Q. What do you understand that to be a reference to?

A. Because the factory has given a big support to

where Cosmos is as of that day.

Q. You mean the biggest support?

A. Yes, please.

Q. To reach this far?

A. Yes, please.

Q. Do you agree with that statement?

A. Yes, please.

Q. Let's go back to the contributions. What was Vamsi's contribution to the start of the business?

A. I asked him to put in 100,000 K.

Q. 100,000?

A. Yes, please.

Q. Did he pay that all at once?

A. No.

Q. How did he make that contribution?

A. We wanted to -- whenever it's required, paying advance to the vendors, shipments which are coming.

MR. COBLE: We move Exhibit 381 into evidence.

THE COURT: It will be received.

(Whereupon Exhibit P-381 is admitted into evidence.)

BY MR. COBLE:

Q. So what discussions did you and Vamsi have about the $100,000 contribution that he made over time?

A.   Then I told him once we get profits, he can take back that money.

Q.   That he could recover that money as the business made profit?

A.   Yes, please.

Q.   Did that happen?

A.   Yes.

Q.   How do you know that?

A.   He told me.

Q.   He told you?

A.   Yes.

Q.   Did Vamsi make any other initial contributions to the start of the business?

A.   He used to take day-to-day affairs.

Q.   Day-to-day affairs?

A.   Yes, please.

Q.   The third page I want to put here, I want to put "Decisions" up at the top.   I want you to explain to the jury about how decisions were made for the new Cosmos business after it started.

And so let's start:  High level generality.  Let's start with major decision.   Who made major decisions facing the Cosmos business?

A.   Together.

Q.   Together with whom?

A.   Vamsi.

Q.   And?

A.   Me and Vamsi.

Q.   Together.

Let's go now to some specific decisions.   The name "Cosmos."   Who decided that the name of the new business would be Cosmos?

A.   Together.

Q.   Tell the jury how you and Vamsi made that decision together?

A.   When we are deciding the name, I suggested some names, and he suggested some names.   And Vamsi suggested Cosmic.   And I said:   Cosmic, we have already a distributor in New Jersey.   Then he said Cosmos.   Then we said:   Okay, we'll go with Cosmos; we decided like that.

Q.   I think you said -- was the first location in Raleigh?

A.   Yes, please.

Q.   How did you decide -- who decided that the first location would be in Raleigh?

A.   Together.

Q.   And tell us how that decision was made?

A.   When he was in Arkansas, then I went there; we discussed about the business.   And we talked about we

want to start it.  Then coming back from there I said: See which city is good to open up a warehouse.

He inquired to friends and to everybody.  Then he called me and said:  Raleigh is a good place; we can start there.

I said:  Okay, we'll go forward.

Q.  You went forward in Raleigh?

A.  Yes, please.

Q.  And we've heard that stone distributors did business through warehouses; is that right?

A.  Yes, please.

Q.  So who made the decision about where the first warehouse location would be in Raleigh?

A.  Together.

Q.  And tell us how that decision was made.

A.  Because we need a warehouse because we have difference in the height and everything.

Vamsi had seen few warehouses.  He didn't like it.  Some are big, some are small.

And he told me that one day we have one warehouse across from a competitor.

And I said:  We'll go with that.  Because we are the first people going -- into the market.  Some company is already there.  Then the name can be spread easily, I said.

He said: Okay.

Then we are taking that warehouse.

Q. You said that the new warehouse was across from a competitor; is that what you said?

A. Yes, please.

Q. And why did you think it was a good idea for the new and the first location to be across from a competitor?

A. We are new to the market. Nobody knows us. Because a company is already there, there will be -- when we opened other side, everybody who comes there, they understand there's one more in the market.

Q. Did you visit the warehouse in Raleigh before any lease was signed?

A. I've seen. I don't remember exactly. I have seen. We decided we'll go together.

Q. You actually came to Raleigh?

A. Yes, please.

Q. Now, as far as daily operations go, were you planning -- where were you planning to be with regard to the new business?

A. India.

Q. You were going to be in India.

And who was going to be on site?

A. Vamsi.

Q. Who was in charge of managing finances for the new business?

A. Vamsi.

Q. What sort of visibility did you have into the finances of the new business as it started?

A. I don't have anything, but Vamsi is to tell -- whenever I ask, he's to tell everything. I trusted him a lot.

Q. You trusted him?

A. Yes.

Q. How often did you and Vamsi talk about the new business, Cosmos, after you started in 2005?

A. Every day.

Q. What sorts of things did you talk about every day?

A. We used to talk about the new colors, what we want to bring in, how the sales are going, how the money is coming, how can we pay the suppliers. We used to talk everything.

Q. Did you have conversations on a daily basis with customers of DSG like that?

A. No.

Q. Did you ever make visits to the business after it started?

A. Yes.

Q. How often did you make visits?

A. Every couple of months.

Q. Every couple months?

A. Yes, please.

Q. Did you visit customers of DSG every couple of months?

A. No.

Q. So why did you come to the United States every couple of months to visit Cosmos's business?

A. One thing is Vamsi is my closest cousin, and we have a business together; that's why I used to stay with him only.

Q. Would you have made those visits if you had not been a partner in the business?

A. No.

Q. Now, did you and Vamsi put the terms of your partnership on paper?

A. No.

Q. Why not?

A. Usually in India everything goes by oral agreement. And we had an oral agreement.

Q. Did you think you needed to put your agreement on paper for it to be honored?

A. Uh --

Q. Did you think it needed to be on paper for it to

be honored?

A. No.

Q. Did Vamsi ever tell you he thought it needed to be on paper for it to be honored?

A. No.

Q. Let's look at Exhibit 336. Let's grab the middle email there.

You see this is an email from Vamsi to Jay P. Singh. Who is he?

A. Jay P. Singh was a managing partner of Vivid eventually.

Q. Managing partner of Vivid. We'll get to him.

You see Vamsi wrote in the middle, "I'm not putting on the paper on excluding any customer, assuming the oral agreements have more strength than on the papers. I strongly believe, what is there on the paper can always be worked around." Do you see that?

A. Yes, please.

Q. Is that statement consistent with discussions you had with him about oral agreements?

A. Yes, please.

Q. Now, I think you said before that in terms of when Vamsi lived with your family, you trusted him as a family member. Did you trust him as a business partner?

A. Yes.

Q. Are you familiar with a company called NVM International?

A. Yes, please.

Q. What relationship, if any, did NVM International have to the business that you and Vamsi started in 2005?

A. NVM was started by Vamsi where he used to get the material initially before opening the Cosmos. He used to get containers under that name and he used to sell to the fabricators. He used to do trading on that name.

Q. I think we talked before. That was before -- that was not being a stone distributor, was it?

A. No.

Q. So what did that have to do with the new business that you and Vamsi started in 2005?

A. Once we started the Cosmos, we wanted to -- Vamsi told me that: I have already on my name, company name. The company is on my name. That we can start -- we can start the business with that.

Q. And why didn't you just set up a new company?

A. Vamsi told me that because we don't have money, we can start with that, because we can get some line of credit in that. So that when we need expenses, we can borrow from the bank.

Q. Did you believe his explanation?

A.   Yes.

Q.   Why?

A.   I trusted him a lot.

Q.   So did he add your name after that, after 2005, to the paperwork for NVM?

A.   Afterwards I asked him, a couple of years.   He said it's not possible because I'm a nonresident.

Q.   Let's look at Exhibit 63.

MR. COBLE:  I'm being told I need to move Exhibit 381 into evidence.

THE COURT:  Received.

(Whereupon Exhibit P-381 is admitted into evidence.)

BY MR. COBLE:

Q.   So Exhibit 63, we see that's an email from Vamsi to you and Jaishri again?

A.   Yes, please.

Q.   It's a long email, but we're going to grab the paragraph in the middle that starts with "I, again." Do you see where Vamsi wrote, "I again, reassure you, there is nothing on NVM (Raleigh) other than the Raleigh location."

Then he writes a couple of sentences, then he says, "The only way I can have your name put in Raleigh is if we can do something about the building loan."

Do you see that?

A. Yes, please.

Q. Is that statement that we've just read, the email that he sent to you, consistent with the explanation he gave you orally about why it was done this way?

A. Yes, please.

Q. Why didn't you demand that he put your name on there anyways?

A. Because when we are going for bank loan, he said bank will see it was a nonresident in NVM because bank will not give loans to properties.

Q. The bank wouldn't give you a loan if your name was on it?

A. Yes, please.

MR. COBLE: Your Honor, we move Exhibit 63 into evidence.

THE COURT: Received.

(Whereupon Exhibit P-63 is admitted into evidence.)

BY MR. COBLE:

Q. Did Vamsi ever tell you you weren't a 50/50 partner because your name wasn't on the NVM paperwork?

A. He never told me.

Q. Did Cosmos expand to other locations after the initial Raleigh location?

A. Yes.

Q. Let's go back over here to our decisions.

Who made the decision about where to expand?

A. Together.

Q. You made those together?

A. Yes.

Q. If we could pull up Demonstrative Number 2.

We'll walk through this. Prasad, are you familiar with a North Carolina entity called Vivid Granite & Marble, LLC?

A. Yes, please.

Q. What was that?

A. That was a small distributor in Charlotte.

Q. It was a stone distributor?

A. A small distributor at that time.

Q. How did you learn about Vivid Granite & Marble?

A. Vamsi told me.

Q. What year are we talking about here?

A. 2009.

Q. So 2009. Was Vivid Granite & Marble using the Cosmos name in 2009?

A. No.

Q. It was an independent business?

A. Yes.

Q. Tell the jury about the discussion that you and

Vamsi had about Vivid.

A. Vivid was a small distributor in Charlotte. And they asked -- Vinay asked Vamsi that we have an investment in that company so that they don't have money and inventory. And Vamsi told me that.

Q. So who was involved in Vivid -- the Vivid business in Charlotte when these discussions took place?

A. It was Vinay, Rohit, and Jay P. Singh.

Q. So it was Rohit, Vinay, and Jay P.?

A. Yes, please.

Q. So what ultimately happened as a result of this discussion?

A. Vamsi spoke to me. And then when I came to U.S., we both together went to their warehouse. It was a small warehouse with a few slabs. Then I met Vinay and Rohit. I met Vinay and Rohit there. And we have seen the slabs. It was not good slabs and very small. I told Vamsi that only. And later we had other discussions.

Q. Just to make sure we caught all that. So you travelled to Charlotte; did I hear that right?

A. Yes, please.

Q. With Vamsi?

A. Yes, please.

Q. And who did you meet with?

A.   Vinay and Rohit.

Q.   That was a discussion about this possible investment?

A.   No.   We saw the warehouse and the first time we met there.

Q.   So what ultimately happened?

A.   Once we came back, Jay P. Singh and Vinay come to Raleigh office.   We discussed if me and Vamsi wanted to join.

THE COURT:   We'll stop at this point for our lunch recess.   We'll resume at 2:00.

(Lunch recess taken.)

THE COURT:   Continue with Direct.

MR. COBLE:   Thank you, Your Honor.

And I'm told that I missed Exhibit P-336.

THE COURT:   It will be received.

(Whereupon Exhibit P-336 is admitted into evidence.)

BY MR. COBLE:

Q.   When we broke, I think we were looking at this illustration here relating to the investment discussions or opportunities that you and Vamsi had with respect to Vivid in Charlotte.

What ultimately became of the investment opportunity in Vivid that you and Vamsi were discussing?

A.   We discussed that.   Later we joined and we became Vivid Cosmos.

Q.   You decided to make the investment?

A.   Yes, please.

Q.   Who decided to make the investment in Vivid?

A.   Together.

Q.   Also together?

A.   Yes, please.

Q.   So how was the investment in Vivid that you and Vamsi made, how did you make that investment?

A.   We give some money and inventory to Vivid.

Q.   Let's look at the diagram here.

Did the money and the inventory, did that come from you and Vamsi personally?

A.   No, it came from Cosmos Raleigh.

Q.   That's what we see here in the orange circle?

A.   Yes, please.

Q.   That was the location you and Vamsi started in 2005?

A.   Yes, please.

Q.   And what was the ownership of that?

A.   Me and Vamsi, 50/50.

Q.   Let's look at Exhibit 232.

We're looking at an email from Jay P. Singh.  You said he was one of the three who was involved in Vivid

when you had these discussions?

A.  Yes, please.

Q.  He writes to Vamsi, "Subsequent to our meeting on May 3rd and the follow-up discussion yesterday regarding you & Mr. Prasad joining Vivid Granite as a LLC member." Do you see that?

A.  Yes, please.

Q.  Is this a reference to the meeting in Charlotte you discussed earlier?

A.  No, this was the meeting we had in Raleigh office.

Q.  In Raleigh.

And you were present for that meeting?

A.  Yes, please.

Q.  And in that meeting did you and Vamsi make clear that it was both of you who were making the investment?

A.  Yes, please.

Q.  And I think you mentioned that you visited the location in Charlotte before you made the investment?

A.  Yes, me and Vamsi.

Q.  What did you see when you went to the location?

A.  Me and Vamsi went there.  We saw only a few slabs which are not good, and the location is very small, and the quality of the slabs were not good at all.

Q.  So what did that indicate to you about the

business as it was at that point in time?

A. At that time I told Vamsi it will not run at all; it will be closed if it is like this.

Q. Why is that?

A. Because they don't have any good slabs or much inventory to sell.

Q. So the investment that you and Vamsi made, what was the percentage that you received as far as that investment?

A. Initially we invested for 30 percent in Vivid.

Q. Let's go back to the illustration.

MR. COBLE: Your Honor, may I move Exhibit 232 into evidence?

THE COURT: Received.

(Whereupon Exhibit P-232 is admitted into evidence.)

BY MR. COBLE:

Q. So initially you said 30 percent?

A. Yes, please.

Q. Did that change at some point?

A. After that we bought Jay P. Singh's share also.

Q. So you bought out Jay P.'s share?

A. Yes, please.

Q. So what was ultimately the percentage that was your investment?

Q. It was 60.2.

Q. 60.2 percent?

A. Yes, please.

Q. And how was that 60.2 percent investment -- how was that between you and Vamsi?

A. It was 50/50.

Q. Why was that?

A. Because we owned Cosmos Raleigh 50/50.

Q. Now, who put together the paperwork concerning the investment that you made in Vivid?

A. Our accountant, Russ; and Vamsi.

Q. Did you and Vamsi hold that 60.2 percent interest, did you hold it in your own names?

A. No, it was through NC LLC.

Q. Is that the green circle that we see up above?

A. Yes, please.

Q. What is the full name of NC LLC?

A. It's CGM and NC LLC.

Q. Why was NC LLC created to hold your investment?

A. Vamsi had talked to accountant Russ. They both decided that it should go like that.

Q. So how was the ownership of NC LLC set up?

A. We are 50/50 partners.

Q. So we see 50/50 there. Why was it set up that way?

A.   Because we are partners in Raleigh 50/50.

Q.   If we could go back to Exhibit 80.

Did Vamsi agree to set it up that way?

A.   Vamsi decided like that.

Q.   Here Vamsi is writing to Vinay and you: Currently Prasad and I are partners through Vivid through Cosmos Granite and Marble NC LLC.  Do you see that?

A.   Yes, please.

Q.   And I think you said Cosmos Granite and Marble NC LLC is that green circle "NC LLC" that we saw?

A.   Yes, please.

Q.   You said that the warehouse had only a few slabs of poor qualify when you visited before the investment?

A.   Yes, please.

Q.   Were there any changes after you invested?

A.   We moved to a bigger warehouse.  In less than a year or two years again we moved to a very big warehouse.

Q.   So you moved twice into bigger warehouses?

A.   Yes, please.

Q.   To your understanding, how was the business performing financially before you made the investment?

A.   Before the investment it was very bad.

Q.   And how about afterwards, to your understanding?

A.  It was good.

Q.  And to what do you attribute the fact that after the investment the business had moved into two successfully larger warehouses and performed better financially?

A.  They needed a lot of inventory to sell the material.

Q.  And how did they get that?

A.  Through DSG.

Q.  And did you make available the better price and longer terms that we discussed earlier with respect to the first location in Raleigh to Vivid?

A.  Yes, please.

Q.  After the investment?

A.  Yes.

Q.  All right.  Prasad, are you familiar with a company called Nallapati Properties LLC?

A.  Yes, please.

Q.  What is that?

A.  That is me and Vamsi bought some warehouses, and it was under that name.

Q.  Where did you buy warehouses?

A.  Initially we started with Raleigh, then Greensboro, and Atlanta.

Q.  So Raleigh, Greensboro, and Atlanta?

A. Yes, please.

Q. Raleigh was the first one?

A. Yes, please.

Q. We've put up here that the warehouse decision was made by who?

A. Together.

Q. Together.

Were any personal funds of yours or Vamsi's used to buy any of these three warehouses?

A. No.

Q. Where did the money come from to buy -- let's start with Raleigh -- the Raleigh warehouse?

A. Initially investment came from Raleigh, then loans from the bank. We were taking loans from the bank.

Q. What did you and Vamsi agree as to how the warehouses would be owned?

A. 50/50.

Q. Why was that?

A. Because we had partners in Cosmos Raleigh 50/50.

Q. That's where the money came from?

A. Yes, please.

Q. Was the Raleigh warehouse, after you bought it, was it held in yours and Vamsi's name personally?

A. No.

Q.   How was it held?

A.   Nallapati Properties.

Q.   Whose idea was that?

A.   We both decided so our last names were the same, we thought we'd go with that.

Q.   Why was it done that way to your understanding? What was it done that way to your understanding?

A.   Because we are partners; we are 50/50 partners.

Q.   Was your name listed on the Nallapati Properties paperwork?

A.   No.

Q.   Why not?

A.   Because Vamsi has to take loans from the banks because I'm a nonresident, because the banks will not allow to give loans to the nonresident.

Q.   That sounds similar to what Vamsi said about NVM; is that right?

A.   Yes, please.

Q.   Did you accept Vamsi's explanation about that?

A.   Yes.

Q.   Did you ever ask about adding your name to Nallapati Properties?

A.   Yes.

Q.   What did Vamsi say in response to that?

A.   He said that to give a guarantee you have it --

you should have your name and guarantee to the bank, then we can add it.

Q. Let's look at Exhibit 376. Let's just look at the top of that.

That's an email from Vamsi to you in 2014?

A. Yes, please.

Q. Let's look at your email in the middle.

Do you see there in the middle of your email you say: Nallapati Properties include my name? What were you writing there?

A. On the Nallapati Properties, my name was not that. I asked him to add my name.

Q. Let's look up at the top of the email and see what Vamsi said in response.

"I've asked Russ" -- is that Mr. Lawrence?

A. Yes, please.

Q. The accountant?

A. Yes.

Q. "I've asked Russ already to talk to BB&T."

What was BB&T's involvement?

A. That's the bank.

Q. That was the bank?

A. Yes, please.

Q. So "I've asked Russ already to talk to BB&T and inform them about the percent changes in Nallapati

Properties. Once it's conveyed to them and they respond with no more questions, we will make the change and have them revise any loan documents they need."

Do you see that?

A. Yes, please.

Q. Is that consistent with the explanations he gave you about why your name wasn't on Nallapati Properties?

A. Yes, please.

MR. COBLE: Your Honor, we move Exhibit 376 into evidence.

THE COURT: It's received.

(Whereupon Exhibit P-376 is admitted into evidence.)

Q. You said that all warehouses in Greensboro and Atlanta were also acquired this way.

A. Yes, please.

Q. Were they also -- what funds were used to acquire the warehouses in Greensboro and Atlanta?

A. Payments were from Cosmos Raleigh.

Q. The location in Raleigh?

A. Yes, please.

Q. Were any personal funds of yours or Vamsi's used to buy either of those two warehouses?

A. No.

Q. What did you and Vamsi agree as to how the

Greensboro and Atlanta warehouses would be between you?

A.    50/50.

Q.    Did Vamsi ever dispute that you and he owned those three warehouses 50/50 between you as partners?

A.    No.

Q.    Let's look at Exhibit 383.

Do you see Vamsi's writing to you, and Jaishri, and Mr. Lawrence, and also Ravi.    Who is Ravi?

A.    He is an accountant.

Q.    Whose accountant?

A.    My accountant.

Q.    Your personal accountant?

A.    Yes, please.

Q.    He writes, "Ravi, We are looking to start filing taxes for Prasad on his UTS for the real estate properties we hold currently through Nallapati Properties."

Do you see that?

A.    Yes, please.

Q.    When you received that email, who did you understand the "we" is in the reference to "we currently hold"?

A.    Me and Vamsi.

MR. COBLE:    Your Honor, I move Exhibit 383 into evidence?

THE COURT: Received.

(Whereupon Exhibit P-383 is admitted into evidence.)

BY MR. COBLE:

Q. We'll look at Exhibit 375. This is the email we looked at briefly before. You said Ms. Swintosky was the Cosmos attorney?

A. Yes, please.

Q. If you'll blow up the bottom part of that.

You saw where she wrote that, "Vamsi and Prasad have always been 50/50 partners in the properties owned by Nallapati Properties - they have made equal contributions and any distributions/benefits have been split 50/50." Do you see that?

A. Yes, please.

Q. Did you receive distributions from Nallapati Properties?

A. Yes.

Q. And to your understanding, how were they split between you and Vamsi?

A. 50/50.

Q. To your knowledge did Vamsi ever dispute that he told Ms. Swintosky that that was the arrangement?

A. Yes.

Q. Did he ever dispute that to your knowledge?

A. Never dispute it.

Q. Who was the person that interacted primarily with Ms. Swintosky?

A. Vamsi.

Q. And her statements here are correct about the arrangement you and Vamsi had?

A. Yes.

Q. All right, Prasad, let's now touch briefly on something that we mentioned before, which was the Rollup Transaction where the locations came into an umbrella, I think you said. Do you remember that?

A. Yes.

Q. Was Vivid NC, was that part of the Rollup?

A. No.

Q. Was Nallapati Properties part of the Rollup?

A. No.

Q. Was the let me ask: When did the Rollup Transaction take place?

A. 2014, December.

Q. December of --

A. First January of 2015.

Q. January, 2015?

A. Yes.

Q. Did the initial location that you and Vamsi started in Raleigh, was that part of the Rollup?

A. Yes.

Q. And what ownership credit between you and Vamsi was given for that property as part of the Rollup?

A. 50/50.

Q. And that was because why?

A. We are partners, 50/50.

Q. Let's look at Exhibit 87. Look at the header first so we can orient ourselves.

This an email from Mr. Lawrence, the accountant --

A. Yes, please.

Q. -- to a number of people, including you, Vamsi, Jaishri. Who is Jane Wang that it's addressed to?

A. Auditor, accountant.

Q. Your personal accountant?

A. Yes, please.

Q. And let's jump down to the third page of this email and look at what Mr. Lawrence writes at item 3. He's talking about distribution of earnings. He says, "Due to the disconnect between the ownership on paper versus the agreements of the parties," and he talks about the practice of how the distribution is made. Do you agree with Mr. Lawrence's statement that there was a disconnect between ownership on paper versus the agreement of the parties?

A.   Yes.

Q.   Did Vamsi reply to this email or respond in any way and say that Mr. Lawrence had it wrong, that there was no disconnect between the ownership on paper and the agreements of the parties?

A.   No.

Q.   Let's go back to the first page, and capture the bottom portion of this starting with "Notwithstanding."

He writes there were a number of unwritten agreements between you and Vamsi and others.   Do you see that?

A.   Yes, please.

Q.   And is that correct?

A.   Yes.

Q.   And then he talks about ownership being given in the Rollup, January 1st, 2015.   Do you see that?

A.   Yes, please.

Q.   He says that East - 15 percent of Atlanta only - Sreekanth; balance 50 percent Vamsi, 50 percent Prasad; is that correct?

A.   Yes, please.

Q.   And all of those percentages were the ones that were used in the Rollup Transaction?

A.   Yes, please.

Q.   Why were those used?

A.   When we are joining a group, it takes the percentage of each person, how much we come into the group.

Q.   Did those percentages reflect the agreements of the parties or the ownership on paper?

A.   Agreements.

Q.   Those were the agreements of the parties?

A.   Yes, please.

MR. COBLE:  Your Honor, we'd move Exhibit 87 into evidence.

THE COURT:  Received.

BY MR. COBLE:

Q.   Now I want to flip back.  We were talking about some aspects of the partnership.  And we looked at a couple of examples of how you and Vamsi referred to each other.  I want to quickly click through a couple more of those.

We'll go to Exhibit 353.

You see this is an email from Vamsi to Julia Young?

A.   Yes, please.

Q.   He writes, "I'm in trademark dispute with my long-term partner and cousin from India.  We have kind of separated on lot of things but there are still things we are fighting on."  Do you see that?

A. Yes, please.

Q. Do you see that this email is dated January 12th, 2021?

A. Yes, please.

Q. Was that before or after this lawsuit was filed?

A. After the lawsuit was filed.

Q. Let's look at Exhibit 365.

We see here -- can we blow that up in the middle of the e-mail from Vamsi to you. Let's capture that so we can be sure who it's from.

Vamsi writes -- looking towards the bottom, do you see where he writes, "As far as it goes for me, I don't see you as an enemy, just a bad partner for business"?

A. Yes, please.

Q. Let's look at Exhibit 359. That's another email from Vamsi to you and your wife Jaishri?

A. Yes, please.

Q. At the bottom he writes, "I've failed to be a good partner for you, but I don't want to drag it either."

A. Yes, please.

Q. Lastly let's look at 86. This is on the second page, I believe.

Vamsi writes, "Right now my attitude is not to

have any more partners, if I could not get along with you, I'll not be able to get along with anyone else." Do you see that?

A.   Yes, please.

Q.   So these four examples, are these additional -- I'm sorry; were these consistent with how you and Vamsi referred to each other as partners?

A.   Yes, please.

MR. COBLE:  Your Honor, we'd move Exhibit 353, 365, 359 and 86 into evidence.

THE COURT:  They're all received.

(Whereupon Exhibits P-353, P-365, P-359, and P-86 are admitted into evidence.)

BY MR. COBLE:

Q.   How did you understand -- when you received emails like these from Vamsi, how did you understand -- what did you understand the word "partner" to mean?

A.   Business partners.

Q.   How was Vamsi's English?

A.   It's good.

Q.   Did Vamsi ever indicate to you that he had a different understanding of "partner" than you did?

A.   No.

Q.   Now, we've already talked about real estate and Vivid, so I'm not going to come back to those.  I want

to follow up briefly, though, on this other investor.

If we could look at Exhibit 439. Let's just capture the top of this.

Vamsi is writing to you and Jaishri in 2013?

A. Yes, please.

Q. And what -- tell the jury, what is this email about?

A. We are taking an investor in the Atlanta warehouse. We are giving 15 percent. He was paying back the share value to us. We split it 50/50.

Q. So the dollar amounts that we see on his email, what are those dollar amounts?

A. Money from the investor, who is investing in the Atlanta warehouse.

Q. The third-party investor?

A. Yes, please.

Q. He writes: The first 50K was shared equally; do you see that?

A. Yes, please.

Q. So equally shared.

Who was that equally shared between?

A. Me and Vamsi.

Q. And then you see at the end after -- I won't rattle off all the numbers. You see it's written, "I owe you $14,941." What was that a reference to, to

your understanding?

A. The balance went to Vamsi, and he had given all the calculations, and he said he owes me $14,941.

Q. Did he pay that?

A. Yes.

Q. When he paid that, what did that mean as far as the overall split up of the monies that this investor paid?

A. We are 50/50 partners.

Q. And it was shared how between the two of you?

A. Equally.

Q. Equally.

MR. COBLE: Your Honor, we move Exhibit 439 into evidence.

THE COURT: It's received.

(Whereupon Exhibit P-439 is admitted into evidence.)

BY R. COBLE:

Q. I want to talk now about distributions. It's not on the list yet. I'm going to write "Distributions."

Did you receive any distributions from NVM prior to 2015?

A. Yes.

Q. And how were those calculated?

A. Vamsi used to calculate them, and he used to tell

me, and he used to transfer.

Q. Why were you receiving a distribution from NVM if you weren't shown on the paperwork?

A. We are orally partners in that.

Q. Let's look at Exhibit 68.

You see this is an email; it says "Money Transfer From NVM International"?

A. Yes, please.

Q. And it's dated January of 2014, if I'm reading that right; is that right?

A. Yes, please.

Q. So before the Rollup?

A. Yes.

Q. It says, "Hi, $200,000 is being transferred electronically to your account at Bank of America."

Do you see that?

A. Yes, please.

Q. And the email says NVM International Inc., Vamsi, and it's addressed to you?

A. Yes, please.

Q. And what was this $200,000, to your understanding?

A. It's a distribution.

Q. And did you receive other distributions like this from NVM?

A.   Yes.

MR. COBLE:   Your Honor, we move Exhibit 68 into evidence.

THE COURT:   Received.

(Whereupon Exhibit P-68 is admitted into evidence.)

BY MR. COBLE:

Q.   Now I'm going to put another item hereafter called Allocation of Income.   Allocation of income.

Let's go back to 87, which we looked at just a moment ago.   This was the email from Mr. Lawrence to you and Vamsi; do you remember that?

A.   Yes, please.

Q.   Let's look at the bottom again of this first page.   Do you see where he writes, "All the tax returns for East allocate 100 percent to Vamsi, the only official owner."   What, to your understanding, is the reference to East?

A.   East means NVM.

Q.   East and NVM were the same?

A.   Yes, please.

Q.   The next line says, "The tax returns for CGM NC specially allocate most if not all taxable income to Prasad (since he was not allocated anything in East).   Do you see that?

A. Yes, please.

Q. What is the reference to CGM NC?

A. NC LLC.

Q. That we looked at before that held the investment in Vivid?

A. Yes, please.

Q. What was the ownership on paper of NC LLC?

A. 50/50.

Q. So if the ownership of NC LLC was 50/50, why was Mr. Lawrence -- actually, let me take a step back.

Is this the way it was actually done, to your understanding?

A. Yes, please.

Q. So why was he allocating most if not all taxable income from NC LLC to you if it was 50/50 between you and Vamsi?

A. Because East and NVM was allocated to Vamsi, and NC LLC was allocated to me all the taxes.

Q. So overall how was it allocated between the two of you?

A. Vamsi and Russ had decided; they say it should be equal, and they are done like that.

Q. Giving 100 percent of NVM to Vamsi and 100 percent of NC LLC to you?

A. Yes, please.

Q. Let's now look at Exhibit 94.

I think you said earlier, but just to make sure, did there come a point in time when you and Vamsi decided to separate your interests from one another?

A. Yes.

Q. What year was that in?

A. End of 2015.

Q. End of 2015?

A. Yes, please.

Q. All right. And so Nallapati Properties, you said earlier, that was not part of the Rollup?

A. No.

Q. Let's look at this email. The subject: Real estate, from Vamsi to you and Jaishri. Do you see that?

A. Yes, please.

Q. Was this email after the point in time that you agreed that you and Vamsi needed to separate?

A. Yes, please.

Q. And what is this email discussing in that regard?

A. He told me that -- Naani, the valuation of the Nallapati Properties. He said I am sending an Excel spreadsheet, what is owed to me by Vamsi.

Q. Let's scroll to the second page.

Is this a spreadsheet that you just mentioned

that Vamsi prepared?

A. Yes, please.

Q. We're not going to get into the numbers, but what was the purpose of the spreadsheet, to your understanding?

A. When we want to split it, Vamsi said he's already having -- he's staying in Raleigh and Greensboro. He's taking care of the locations. He'll be having that, and he's giving to me Atlanta warehouse. So that email calculation is how much he owes me.

Q. So to recap then, there were three warehouses in Raleigh, Greensboro, and Atlanta?

A. Yes, please.

Q. And in the split, which ones was Vamsi getting?

A. Raleigh and Greensboro.

Q. Which one were you getting?

A. Atlanta.

Q. If you weren't on the Nallapati Properties paperwork, why were you getting any properties?

A. Because we have an oral understanding that we are 50/50 partners.

Q. Let's go back to the first page.

You see here "Naani." That's a reference to you?

A. Yes, please.

Q. Your nickname?

A.   Yes, please.

Q.   "Here is the Excel showing how much I owe you now after all payments through December on property taxes, closing costs, etc."

So explain to the jury, why would Vamsi owe you by virtue of taking two of the three warehouses?

A.   When we wanted to split, Vamsi is taking Raleigh and Greensboro; he's giving me the Atlanta warehouse. He emailed the calculations, how much each cost and everything.   And he said he owes me approximately 200K to me.

Q.   About $200,000?

A.   Approximately.

Q.   And the calculations, did those involve doing an actual appraisal or valuation of the properties?

A.   No.   Actually, Vamsi said no need of that.   Can go with this?

I said okay.

Q.   Why did you say that?

A.   Whatever he said, I said go with that.

Q.   Were the three warehouses actually separated?

A.   Yes.

Q.   And what year did that happen?

A.   2016.

Q.   Since 2016 have you made any use of the

Greensboro or Raleigh warehouse?

A. No.

Q. Have you gotten any benefit from either the Greensboro or Raleigh warehouse since 2016?

A. No.

Q. Were all three of the properties bought at the same time?

A. No.

Q. Which one was bought first?

A. Raleigh was the first one, next Greensboro, next is Atlanta.

Q. So you received the one that was bought most recently relative to this discussion?

A. Yes, please.

Q. So which properties had more time to increase in value?

A. First is Raleigh, next is Greensboro.

Q. So we see here that Vamsi is writing "showing how much I owe you." Did he pay that amount when the properties were split?

A. No.

Q. Has he paid it to this day?

A. No.

Q. When was the first time Vamsi said to you that he was not going to pay an amount that he owed you as a

result of splitting up these properties?

A. After filing this case.

Q. Now, are you seeking the amount that's reflected in the calculations that we just looked at in this case?

A. No.

Q. Why not?

A. Because he didn't pay on the day I agreed in 2016. But today the value is more. But as per Vamsi's word I had taken it and agreed. He didn't pay anything. I'm asking the jury to give me a fair value for that.

Q. Before we come back to Vivid NC. We need to tell the jury a little bit about Vivid Texas. Did there come a time that a Cosmos location was opened in Dallas, Texas?

A. Yes.

Q. How did that come about?

A. In 2016 when we are splitting, Vinay asked: Let us open in Texas.

I said: Not now because we are out doing -- we are splitting the group and everything. Not now, we'll go later.

He said: No, nothing to do with that. We are partners. We can move forward and open it.

Then I agree.

Q. You said that was in 2016?

A. Yes, please.

Q. What was used to open that location, what material?

A. We contributed 50,000 each. And apart from that, the inventory went from Charlotte to Texas.

Q. From Vivid in Charlotte?

A. Yes, please.

Q. Who was going to be involved in the new location in Dallas?

A. Me -- myself, Vamsi, Vinay and Rohit.

Q. Did you reach agreement as to what the relative ownership percentages were going to be?

A. It's 25 percent each.

Q. Let's look at Exhibit 312. Capture the top of this.

We've seen this briefly before, but now in context. Mr. Khatod, you said, is an accountant. Who is he the accountant for?

A. For Vivid.

Q. And Vamsi wrote to him, "Prasad and I are going to be partners but not directly with our names, we will be through a holding company of our own."

Did this relate to Vivid Texas?

A. Yes, please.

Q.   That you were going to be partners?

A.   Yes, please.

Q.   Let's look at Exhibit 306.   Capture the top of that.

This email was from Vinay to you, Vamsi, Rohit, and also Jaishri?

A.   Yes, please.

Q.   He writes at the bottom "We all are equal partners;" is that right?

A.   Yes.

Q.   Is that what the understanding was?

A.   Yes.

Q.   Is that what was reflected on paper?

A.   Yes.

Q.   Actually, let's look at that.

MR. COBLE:   Let's move Exhibit 306 into evidence.

THE COURT:   It's received.

(Whereupon Exhibit P-306 is admitted into evidence.)

BY MR. COBLE:

Q.   Prasad, does this show how ownership of Vivid Texas was set up on paper?

A.   Yes, please.

Q.   So Vinay and Rohit owning 25 percent interest

directly?

A. Yes.

Q. And we heard briefly, but just remind the jury, Justh Holdings, what is that?

A. That is my company. My family holds that one.

Q. So that 25 percent corresponded to your share?

A. Yes, please.

Q. And then NC LLC, is that the same NC LLC we've seen in Vivid NC?

A. Yes, please.

Q. How was that owned on paper?

A. 25 percent.

Q. I'm sorry. How was NC LLC held on paper between you and Vamsi?

A. 50/50.

Q. So does that mean that on paper you had 37 and a half percent in Vivid Texas, and Vamsi had 12 and a half percent?

A. Yes.

Q. What was the understanding of the parties?

A. 25 percent equally.

Q. Even though that's what the paper said?

A. Yes.

Q. We remember from Mr. Lawrence's email, his observation that there was a disconnect between

ownership on paper versus the agreement between the parties. Is this another example of that?

A. Yes, please.

Q. Let's look at Exhibit 89. Capture the top of that.

Vamsi is writing to Peter Meek. Who is Peter Meek?

A. He's an officer from Bank of America.

Q. He writes, "Not sure what is a confusion here. 25 percent of CGM NC's ownership in Vivid TX is 100 percent allocated to me."

Do you see that?

A. Yes.

Q. Does that reflect what was on paper or the agreement of the parties?

A. Agreement of the parties.

MR. COBLE: Your Honor, we move Exhibit 89 into evidence.

THE COURT: Received.

(Whereupon Exhibit P-89 is admitted into evidence.)

BY MR. COBLE:

Q. Let's go to Exhibit 119.

Let me ask this: Who was the manager of Vivid NC?

A. Vamsi.

Q. Who was in control of that entity?

A. Vamsi.

Q. How about Vivid Texas? Who was the manager of Vivid Texas?

A. Vamsi.

Q. And who controlled Vivid Texas?

A. Vamsi.

Q. Let's look at Exhibit 119, about midway down. Let's capture your email.

You write: "I want to be part of purchases."

You wrote that in 2016.

When was this email written relative to the start of Vivid Texas?

A. When they wanted to be -- what they want to do for the location, I said: I want to be part of the purchases.

Q. Why did you want to be part of the purchases?

A. Because we can negotiate better pricing, knowing what price we are buying.

Q. You mean you wanted to source stone?

A. Yes.

Q. Did that happen?

A. No.

Q. Why not?

A. They didn't agree.

Q. Who is "they"?

A. Vamsi -- everyone; Vamsi, Vinay, Rohit.

Q. They didn't agree to let you be part of purchases?

A. No.

MR. COBLE: Your Honor, we'd move Exhibit 119 into evidence.

THE COURT: Received.

(Whereupon Exhibit P-119 is admitted into evidence.)

BY MR. COBLE:

Q. Let's look at Exhibit 117 now. Let's scroll down several pages.

Do you see here in September of 2017 -- so that's after Vivid Texas is started?

A. Yes, please.

Q. You write to Vinay, Rohit, and the accountant for Vivid; you write: "Please send all the accounts by email and you have removed my login on ERP system also long back."

Do you see that?

A. Yes, please.

Q. What was that all about?

A. We have a software where we can see the sales,

purchases, everything.  The login was removed.

Q.  And is the  ERPS, is that the software you're referring to?

A.  Yes, please.

Q.  So if you have access to the ERP system software for Vivid Texas, what does that allow you to see?

A.  I can see the inventory, the sales, and the profitability.

Q.  So was your access taken away at some point?  Is that what you're saying here?

A.  Yes, please.

Q.  When did that happen?

A.  In 2017, early 2017.

Q.  And who took away your access?

A.  Mostly Rohit is the main person who takes care of the software.

Q.  So who had -- between you, Vamsi, Rohit, and Vinay, who had access to the ERP system?

A.  All of them.

Q.  All of them?

A.  Yes.

Q.  And you were the only one without?

A.  Yes.

Q.  Why did you want to have access to the ERP system?

A. We can see what is the sales, what is the inventory coming, how much we are making, and everything.

Q. Without that, what were you able to tell about how the business was doing or what its inventory levels and sales were?

A. Zero.

Q. Now, we're talking here about Vivid Texas, I believe. Was there any change in your access to financial information about Vivid NC during this time period?

A. No, I don't have any access to it.

Q. Did you have access to the ERP system for Vivid NC?

A. No.

Q. Did you ask for that?

A. I asked, but through our attorney -- I asked personally, then I asked through attorney also, but it was not given.

Q. How did you feel about having -- I take it the only one without access to the financial information about these businesses?

A. They wanted it.

Q. So from 2017 forward, was your access to the financial software -- was it ever restored?

A.   No.

Q.   For Vivid Texas?

A.   No.

Q.   Or Vivid NC?

A.   No.

Q.   So from 2017 forward did you have any involvement in how financial statements for Vivid NC or Vivid Texas were prepared?

A.   No.

Q.   Did anybody share those with you or discuss with you or ask for your approval about preparation of those?

A.   No.   I asked a few times through attorney, but it was not given.

Q.   Did you have any information about what the assets of those Vivid NC and Vivid Texas were worth or how they changed over time?

A.   No.

Q.   Did you have the ability to see what your shares in those companies were worth from 2017 forward?

A.   No.

Q.   Now, there was some reference to this earlier. During this time period as you were working to split your interest from Vamsi, were there disputes that came up?

A.   Yes, please.

Q. What was that about?

A. Vamsi sent me email that I owe him $1 million. And apart from that he didn't pay the DSG, the invoices was not paid. And he didn't pay the shared expenses, what we shared, what we agreed to share the expenses of the location. And employees, he didn't pay that.

Q. So during this period he wrote something saying you owed his company $1 million. But at the same time you said he didn't pay DSG invoices; he didn't pay shared expenses?

A. Yes, please.

Q. So with respect to the unpaid DSG amount, did Vamsi actually order the slabs that were reflected in those invoices?

A. Yes.

Q. And he accepted them?

A. Yes.

Q. Did he indicate there was any problem with them that prevented him from selling them?

A. No.

Q. So what ultimately happened with respect to those unpaid invoices?

A. DSG filed a case against Vamsi's entities.

Q. And who decided to file a case on behalf of DSG against Vamsi's entities?

A. DSG Board.

Q. The Board?

A. Yes, pleases.

Q. What happened in that case?

A. We got a summary judgment. DSG got a summary judgment. And Vamsi agreed to pay. And through attorney we ask a few times. He didn't pay. Then police went and collected the check.

Q. So you said there was a summary judgment entered. Was it the full amount of the amount owed?

A. Yes, please.

Q. And ultimately the sheriff went and collected the amounts?

A. Yes, please.

Q. Did Vamsi dispute that he owed the amounts in that lawsuit?

A. No.

Q. Did there come a time that default notices were sent to Vivid NC and Vivid Texas, to your understanding?

A. Yes.

Q. What's your understanding about what -- the reasons cited in those default notices were for sending them?

A. Bank said because Vamsi has not paid the supplier, that's why we are giving the default notices.

Q. Is that a reference to the same DSG lawsuit that we just described?

A. Yes, please.

Q. So in your view who was responsible for those default notices being issued?

A. Vamsi.

Q. Let's look at Exhibit 78.

You see Exhibit 78 is an email from Vamsi to Peter Meek at Bank of America?

A. Yes, please.

Q. Let's look at the bottom paragraph.

Do you see where he writes, "I've given him 50 percent share without putting a penny of his investment."

Do you see that?

A. Yes, please.

Q. Is it true that you didn't put a penny of investment into the Cosmos business?

A. Yes, I had given.

Q. What did you give?

A. The material, excellent terms, and some money.

Q. Then you see that he writes, "It is all for 20 percent of the material we used to buy from his factory for an extra 30 to 60 days terms."

Do you see that? Is that statement true?

A. No.

Q. When the Cosmos business started, what percent of its material did it buy under the 180-day terms that you were able to contribute?

A. First few shipments were entirely DSG materials.

Q. Entirely?

A. Entirely.

Q. 100 percent?

A. 100 percent.

Q. Then how about the first couple of years?

A. Then it slowly went to 60 to 70 percent is DSG's materials.

Q. Provided 60 to 70 percent that way?

A. Yes, please.

Q. Then the latter part of that sentence, "from his factory for an extra 30 to 60 days terms." Do you see that?

A. Yes, please.

Q. Was Cosmos, the new business that you and Vamsi started, were you able to get terms that were 120 to 150 days when the business started?

A. No.

Q. What terms were you able to get other than what you were able to contribute?

A. Initially when we are new we had to pay

immediate, before shipment, like what we have seen in Vivid case, because they also started, because they don't have any money for the material; that's why they asked for our -- Cosmos Raleigh investment in money.

Q. So initially the terms that were available, other than what you contributed, were zero?

A. Yes.

Q. Then he writes, "About 20 percent of share would have been way too far for him."

Do you see that?

Did Vamsi ever say to you that he thought that 20 percent would have been way too much for you in the business you had started?

A. Never.

Q. How do you feel reading that?

A. I feel very bad. And I was shocked to see what he says. If I take a step back and think what he was doing, he was not paying DSG. He owed me $1 million of intercompany payables, shared expenses, and has not paid me the Nallapati Properties. I have filed so many cases; I have spent so much money on the legal because of him.

Q. Let's look back up at the top of this email, the second paragraph.

You see at the bottom of that second paragraph he

wrote, "Apart from this, SE & West owe to East and DC over $700K."

Do you see that?

A.  Yes, please.

Q.  Is that a reference to the amount that you referred to earlier, the amount that he said you owed?

A.  Yes, please.

Q.  Did any third party ever look into that?

A.  Yes, the forensic accountants, when seeing the accounts, and they determined that I need to get $450,000 from the group.

Q.  Let's take that in smaller parts.  Why were forensic accountants looking into that question?

A.  Because Vamsi filed case in front of Judge McGuire.  There we have entered into a settlement agreement.  And we appointed forensic accountants to see all the accounts, what exactly it was.  And they decided that I need to get $450,000.

Q.  So it was part of the settlement, the forensic accountants looked at it?

A.  Yes, please.

Q.  Did they determine that Southeast and West owed East and DC over $700,000?

A.  No.

Q.  What did they decide?

A.   They decided that the group has to pay me $450,000.

Q.   Did you ever receive that amount?

A.   No.

Q.   Do you recall during this time period, 2017-2018 forward, do you recall whether there was any point in time where you were asked whether you were interested in selling your interest in Vivid?

A.   Yes.

            MR. COBLE:  Actually, I'm sorry, Your Honor. I need to move Exhibit 78 into evidence.

            THE COURT:  Received.

            (Whereupon Exhibit P-78 is admitted into evidence.)

BY MR. COBLE:

Q.   How did you respond to those?

A.   I said initially, no.   But through attorney I said:  We want to see the financials so that I can determine my value.

Q.   You wanted to see the financials so you can determine your value?

A.   Yes, please.

Q.   Why did you want that in response to a question about whether you were interested in selling?

A.   Because I wanted to see how much -- or the sales,

how much they made money, so that accordingly we can value the share.

Q. Did you receive the financial information you asked for?

A. No.

Q. Let's look at Exhibit 457. Grab the top of that.

So this is an email from Vamsi to Jerry Meek. Who is he?

A. He's attorney for Vivid.

Q. Attorney for Vivid?

A. Yes.

Q. And Vamsi writes to Jerry in 2019. Do you see that?

A. Yes, please.

Q. "Can you please order valuation to be updated only for Vivid Texas through current third quarter." Do you see that?

A. Yes, please.

Q. Did anybody tell you in 2019 that valuation of Vivid Texas was being ordered?

A. No.

Q. And was that shared with you?

A. No.

Q. Then you see the next sentence Vamsi writes, "We

will work towards kicking him out of Texas."

Did you have any notion that Vamsi was working towards kicking you out of any of these companies?

A. No.

Q. Was there any discussion with you at all about being moved out of these companies involuntarily?

A. No.

MR. COBLE: Your Honor, we move Exhibit 457 into evidence.

THE COURT: It's received.

(Whereupon Exhibit P-457 is admitted into evidence.)

BY MR. COBLE:

Q. Let's look apt Exhibit 432.

You see here this is a letter addressed in February of 2020 --

A. Yes.

Q. -- to both Vivid Texas and Vivid NC; is that right?

A. Yes.

Q. Why was this letter sent?

A. To have the financials.

Q. Let's look down, for example, on the second page.

There's a list of items that you're asking for with respect to Vivid Charlotte or -- that's Vivid NC?

A. Yes, please.

Q. Look at item H. You're asking about documents evidencing any transfer of assets. Do you see that?

A. Yes, please.

Q. Then if we go to the next page, the second to last paragraph. You write that -- the letter says that you were seeking these records, among other things, for assessing the value of all assets and liabilities of these companies. Do you see that?

A. Yes, please.

Q. So between 2017, the email we saw earlier where you're asking for your access to the financial information to be restored, between then and this letter in February of 2020, did you ever receive the information about the assets and liabilities of these companies to value your interests?

A. No.

Q. And what did you receive in response to this letter? Did you receive the information you asked for?

A. No.

Q. So what happened next as a result of not getting information that you asked for in the letter?

A. Then we filed a case.

MR. COBLE: I'm sorry, Your Honor. I'll move Exhibit 432 into evidence.

THE COURT: Received.

(Whereupon Exhibit P-432 is admitted into evidence.)

BY MR. COBLE:

Q. You filed a case, meaning this case?

A. Yes, please.

Q. What did you learn after you filed this case with respect to your share of Vivid NC?

A. It had been transferred.

Q. It had been transferred?

A. Yes, please.

Q. When did that happen?

A. Somewhere -- I don't remember exact date. 2019.

Q. It was sometime before the lawsuit was filed?

A. Yes, please.

Q. Had you been in any discussions about your share or your share being taken with Vamsi, Vinay, or Rohit?

A. No.

Q. Did anybody tell you or your counsel your share had been taken, when it occurred?

A. No.

Q. And how about in response to this information request where you asked specifically about any transfers of assets; did they tell you then in response to this letter?

A. No.

Q. Did you receive any distributions in the summer of 2020?

A. Yes.

Q. And do you remember whether you asked any questions about that?

A. We asked: What is it for? They didn't reply.

Q. They didn't say there had been a transfer of assets?

A. No, they didn't tell anything.

Q. Or that your share had been taken?

A. No, they never told that.

Q. How many distributions did you receive between June of 2020 and September of 2021 relating to Vivid NC?

A. Four distributions.

Q. What was the total amount of that?

A. Probably about 2.47.

Q. 2.47?

A. 2.47 million.

Q. 2.47 million.

And do you know when the majority of that amount was paid?

A. After we filed that lawsuit, we got that last one, 1.9-something.

Q. So if you received approximately 2.47 million,

why are you making claims in this case?

A.   NC LLC has more value than what they paid.  They paid under value.

Q.   What you asking for in this case?

A.   I'm asking the jury to give me fair value.

Q.   So when you filed this case, did you know that your share had already been taken?

A.   No.

Q.   Let's look at Exhibit 410.  You'll see it starts with yours truly there at the bottom.  In December of 2010, was that after this lawsuit was filed?

A.   Yes.

Q.   And you see that -- why was this email written?  Let's orient the jury.

A.   Because we are asking the financials, and somebody told us that Vivid Charlotte and Vivid Texas, they're transferred on different company.

Q.   They had been transferred to a different company?

A.   Yes.

Q.   Then you can see at the end of my email I wrote: "If there have been any changes since January of 2019, please explain what those are."

A.   Yes, please.

Q.   In response to that -- let's now go to the top email.  This was written by Mr. Meek, the attorney for

Vivid?

A. Yes, please.

Q. Did he say that your share had been taken ten months earlier?

A. No.

Q. Did he say that the assets had all been sold --

A. No.

Q. -- ten months earlier?

A. No.

Q. Look at this paragraph.

He writes, "With respect specifically to the email from Carmen Garcia below, she has clarified that she was referring in her email to management changes at her own company. (See the email copied below). There are no issues that I am aware of relating to Vivid being unable to pay its invoices as they come due."

Did they say anything at all about what had happened months earlier with your share?

A. No.

MR. COBLE: Your Honor, I move Exhibit 410 into evidence.

THE COURT: Received.

(Whereupon Exhibit P-410 is admitted into evidence.)

BY MR. COBLE:

Q. So when did you finally find out that your share of Vivid NC had been taken?

A. After filing this case.

Q. And after this --

A. And after letter, and we got from one more email from Jerry Meek.

Q. What did you think about when you found out that your share of Vivid NC had been taken without your knowledge?

A. They had taken my shares secretly, transferred to their name.

Q. What did you think about that?

A. I got cheated.

Q. And so the -- who owned -- who were the assets sold to of Vivid NC?

A. Cosmos.

Q. Who owned that company?

A. Vamsi, Vinay, and Rohit.

Q. Who sold the assets of out Vivid NC without your knowledge?

A. Vamsi, Vamsi, and Rohit.

Q. So they sold the assets to a company only they owned, excluding you?

A. Yes, please.

Q. Without telling you about it before or after?

A. Yes.

Q. Did they involve you at all in how the price was set for that?

A. No.

Q. Or share any information about how the price was set?

A. No.

Q. Let's look at what happened with respect to Vivid Texas. Let's look at Exhibit 124. This is a letter from Mr. Meek, the Vivid attorney?

A. Yes, please.

Q. On January 5, 2021?

A. Yes.

Q. Writing to advise that "effective 11:59 on December 31, 2020, Vivid Cosmos Granite, LLC has merged into Cosmos Granite Dallas, LLC." Who owns Cosmos Granite Dallas, LLC?

A. Vamsi, Vinay and Rohit.

Q. Do you have any interest in that?

A. No.

Q. So is Vivid Cosmos Granite, LLC, was that Vivid Texas?

A. Yes.

Q. Before this notice of January 5th, 2021, were you aware of any discussions about a merger of Vivid Texas

into a new company?

A. No.

Q. So who effectuated that merger. Who did that?

A. Vamsi, Vinay, and Rohit.

Q. And they merged it into a company owned by just the three of them excluding you?

A. Yes, please.

Q. It says, "Pursuant to the Plan of Merger, the full interest of Justh Holdings LLC has been purchased for the total fair market value of $490,000."

Do you see that?

A. Yes, please.

Q. Did you agree with that, that that was the total fair market value of your share of Vivid?

A. No.

Q. So what did you do?

A. I sent back the money.

Q. You sent that back?

A. Yes, please.

Q. Were you provided with anything that explained how the $490,000 was calculated?

A. No.

Q. And were you involved in any discussions at all about the merger or the terms of the merger before it happened?

A. No.

Q. Were you asked to approve either of these transactions that took your shares of Vivid NC or Vivid Texas?

A. No.

Q. Were you asked to agree with them? Were you asked to agree to the terms that were ultimately carried out?

A. I wasn't.

Q. So Vivid Texas, they merged into a new company, again, moving you out?

A. Yes.

Q. Or kicking you out, as they said in the prior email?

A. Right.

Q. How do you feel that you were treated in this process?

A. I got cheated.

Q. And since you sent the $490,000 back, have you actually received anything for your share of Vivid Texas at this point?

A. No.

Q. So with respect to Vivid Texas, what are you asking the jury to do?

A. I'm asking the fair value of my share.

Q. And what about with respect to Vivid NC?

A. Same thing, whatever I got apart from that, I need my fair value of the share.

MR. COBLE: Your Honor, no further questions for this witness.

THE COURT: Cross?

MR. PARRY: Yes, Your Honor.

- - -

HARI HARA PRASAD NALLAPATY, CROSS-EXAMINATION
BY MR. PARRY:

Q. Mr. Nallapaty, for the same reason as Mr. Coble, is it okay if I use your first name to avoid confusion with my client?

A. Yes, please.

Q. Now, Prasad, you agree with me that partnership is not just sharing the profits, right? It's also sharing the losses?

A. I'm sorry?

Q. Do you agree that partnership is sharing in the losses, not just sharing in the profits?

A. I didn't understand the question.

Q. Do you agree that partnership is not just sharing in the profits, but also sharing in any loss?

A. Any?

Q. If there is a loss.

A. Yes. Yes, loss and profit both.

Q. But you agree you didn't sign your name to any leases or company obligations of the original Cosmos business in Raleigh; am I right?

A. I don't agree with that.

Q. You don't agree with that?

A. Yes.

Q. Didn't you testify previously that you didn't sign your name to any leases or other company obligations for the original Cosmos business?

A. I didn't -- I never sign.

Q. Okay. So you did never sign your name?

A. Yes.

Q. And you never gave any personal guarantees for any debts of now defunct properties, did you?

A. No.

Q. Now, you also claim you have earned partnership interest in other similar businesses in Chicago and Georgia; is that right?

A. Yes, please.

Q. But you don't remember asking Vamsi to participate initially in the Atlanta venture, do you?

A. No.

Q. And you didn't ask him to participate in Chicago either, did you?

A. No.

Q. So the 50/50 partnership only applied to companies Vamsi owned? Is that how it worked?

A. Yes, please.

Q. Okay. It didn't work both ways?

A. What?

Q. It didn't work both ways?

A. No.

Q. Now, you talked about the materials provided by DSG and told Mr. Coble that was your contribution. Those materials that were supplied to the new business came from DSG and not you personally, correct?

A. Yes.

Q. DSG shipped the slabs?

A. Yes.

Q. DSG sent the invoice?

A. Yes.

Q. And Cosmos paid DSG, not you?

A. Yes.

Q. In fact, didn't you acknowledge in your prior testimony that you wanted to support your Cosmos business in part to insure there would be a stable customer who would pay competitive prices for DSG's products?

A. I didn't understand the question.

Q. Wasn't your -- didn't you state in your prior testimony that you wanted to support the new Cosmos business to insure there would be a stable customer that paid competitive prices for DSG's products? Wasn't that your interest?

A. I don't know. I don't remember.

Q. You don't remember that?

MR. PARRY: Your Honor, may I approach?

THE COURT: Yes.

BY MR. PARRY:

Q. Prasad, I'm going to hand you an affidavit you submitted earlier in this case. If you look at your prior affidavit -- first of all, on the very last page, is that your signature on this affidavit?

A. Yes, please.

Q. And you're swearing under oath, as you are in this courtroom, correct?

A. Yes.

Q. And in this affidavit, if you look with me at paragraph 23.

A. Yes, please.

Q. Didn't you say in paragraph 23 of your prior sworn testimony that, First: The symbiotic relationship between the startup, referring to the Cosmos business, and the Indian supplier, referring to DSG, would insure

that there would be a stable customer that paid competitive prices for product? Isn't that what you said?

A. Yes, please.

Q. Your hope was that the original Raleigh location and then the new ones would become a second customer paying competitive prices for DSG's goods; isn't that right?

A. It is here?

Q. That's what I'm asking you, Prasad. Isn't that what you were looking for?

A. Yes.

Q. And ultimately your dad was the one who got to make the call as to whether the Cosmos entity could get favorable terms at all, wasn't it?

A. Yes.

Q. You reported to your father as the managing director back at this time, back in 2005?

A. Yes.

Q. And you have no answer for us regarding why, if the materials and terms came from DSG rather than you personally, it wouldn't have been DSG who was the partner; isn't that right?

A. The relationship between me and Vamsi is the relation to have a partnership, not the DSG.

Q.   Even though it was DSG providing the goods and the payment terms, not you?

A.   Yes.

Q.   Now, you've testified before, haven't you, that you don't know one way or the other whether Vamsi, in fact, signed a memorandum of understanding or other agreement with DSG about those payment terms; isn't that right?

A.   Yes.

Q.   So you can't dispute Vamsi's testimony on that point?

A.   We don't have any with the DSG, any agreement at all.

Q.   Well, didn't you just say and confirm your prior testimony that you don't know one way or the other whether there was an agreement?

A.   Yes.

Q.   Isn't it true that since you've been the managing director of DSG, since you've been the boss, you've never approved or authorized any arrangement for anyone other than you under which some outside company gets favorable terms and, in return, a DSG employee gets the benefit?  Is that true?

A.   I didn't understand the question.

Q.   Have you, since you've been the boss at DSG, have

you ever approved a transaction where some company outside of DSG gets favorable treatment, and in exchange some DSG employee, not the company, gets the benefit? Have you ever approved that?

A. No.

Q. Now, aside from the cash, you also didn't work as an employee of the initial Cosmos business; is that right?

A. I didn't understand.

Q. You didn't work as an employee for the initial Cosmos business; isn't that true?

A. Yes.

Q. You've never -- likewise, you've never been employed at Vivid NC ever?

A. No.

Q. You've never had a title at Vivid NC?

A. No.

Q. You've never had any responsibilities at Vivid NC other than just being a passive owner, correct?

A. Yes.

Q. You likewise never had any job or title at Vivid Texas; isn't that right?

A. No. I asked for -- I be in purchases, but they didn't agree.

Q. And you were looking at purchases because you are

a supplier from DSG, correct?

A. No, I'm a partner.

Q. Weren't you looking to supply materials from DSG to Vivid Texas?

A. No.

Q. No? You have no interest in whether Vivid Texas buys DSG products?

A. Well, it depends on the price, basically. What is the best price we are getting.

Q. But you, in fact, never had any responsibility for any day-to-day operations of that company, whether purchasing or anything, have you?

A. They've not given me any responsibility.

Q. In fact, haven't you testified, Prasad, you've never even been to the Dallas location?

A. No.

Q. You haven't testified to that, or you haven't been?

A. I have not been there.

Q. And you've also testified that at all relevant times, all the period of time we're talking about, your full-time job was at DSG in India; isn't that right?

A. It's between Cosmos and DSG.

Q. Your full-time job was not in India at DSG at this time?

A.   At this time, yes.

Q.   You've been on the board of DSG since 2005?

A.   Yes.

Q.   And now you're the managing director?

A.   Yes, please.

Q.   And you and your immediate family are the majority owners of that company too, right?

A.   Yes.

Q.   I believe you testified before, between your work at DSG and your work for another family company, that's more than a full-time job for you throughout this period, correct?

A.   Usually I work full-time both the companies, depends on the time zones, I work.

Q.   And wouldn't you say that's, as you said, before more than a full-time job?

A.   Both, yes.

Q.   Do you admit that the partnership agreement that you claim with Vamsi was never committed to writing, correct?

A.   Pardon?

Q.   There was no written partnership agreement ever between you and Vamsi?

A.   No.

Q.   You've also recognized in your prior testimony,

Q. haven't you, that your tax returns didn't correctly reflect the existence of a partnership? Isn't that true?

A. Yes.

Q. And you claim, as you said earlier, that the reason you didn't show up on paper is because Vamsi always said you couldn't be on there because you're a nonresident. Isn't that what you said?

A. Yes.

Q. But you admit at the same time that since 2009 your name has been on the paper at NC LLC; isn't that right?

A. Yes.

Q. Did you ever go to Vamsi and say: Well, why can I be on that one but not that one?

A. Whatever he said, I believed.

Q. So even when he tells you you can't be on the paper because you're a nonresident, and puts you on the paper for a different company, you had no questions about that?

A. No.

Q. You admit that NC LLC, that company that was up on the board a moment ago, that was the company through which you and Vamsi invested in several different entities together back when you were on good terms,

correct?

A. Yes.

Q. One of those entities you invested in through NC LLC was Vivid NC, the one we're talking about here?

A. Yes, please.

Q. And Vamsi was the manager of NC LLC, correct?

A. Yes.

Q. And you'd agree that your personal interest in the entities you invested in through that company, including Vivid, were memorialized and documented through NC LLC, correct?

A. Yes.

Q. And now with Nallapati Properties you agree that you made tax filings with the federal government in 2015 that showed your company, also a plaintiff in this case, UTS, as a 50 percent interest owner, didn't you?

A. Yes.

Q. And you did that again in 2016? You made another federal tax filing with the government showing not just Vamsi, but your company UTS as a 50 percent owner?

A. Yes.

Q. And that's the way it was when you all separated your interests in 2015, wasn't it?

A. Yes, please.

Q. You never once objected to UTS being shown as an

owner on those companies, did you?

A. No.

Q. Now, your claim in this case is that you made, I believe you said, a binding commitment to DSG to personally guarantee payment if the new Cosmos business, back in 2005, couldn't pay. Isn't that what you said?

A. Yes, please.

Q. Now, you never had to do that, right? You never had to pay a dime on any kind of guarantee?

A. It paid the bill.

Q. Right, because they paid their bills?

A. Yes, please.

Q. That personal guarantee you claim to have made was also not in writing, correct?

A. Yes, please.

Q. And you testified that the DSG Board makes written resolutions to approve or authorize things, don't they?

A. Pardon?

Q. Haven't you testified that the DSG Board makes written resolutions to approve or authorize things?

A. Because we are the major shareholders, my father at that time.

Q. My question was a little different than that. Didn't you testify before that DSG, the Board, makes

written resolutions when it approves or authorizes something?

A. Some. Yes.

Q. You don't remember there ever being any Board resolution that's going to tell us about potential U.S. business ventures between you and Vamsi; isn't that right?

A. No.

Q. You're also not aware of that guarantee you say you made being documented anywhere in DSG's Board resolutions or minutes?

A. Yes.

Q. Now, you've talked about the favorable terms, and that's 180 days to pay, correct?

A. Yes, please.

Q. That was for the original Cosmos entity back in 2005?

A. Yes.

Q. And you testified, I believe, no other distributor was offered terms like that, right?

A. Yes.

Q. So from your standpoint those were definitely favorable and atypical terms that Cosmos got from DSG?

A. Yes.

Q. Isn't it true that you sought consent, Prasad,

from the DSG shareholders for DSG to conduct business with your other companies, Cosmos Granite West and Cosmos Granite Southeast?

A. Later we told them and the board, 2017 or '18.

Q. Right. So you made a disclosure to the DSG shareholders asking their consent for DSG to do business with your other companies, right?

A. Yes, please.

Q. And you did that in a DSG annual report that you sent out to all the shareholders, right?

A. Yes.

Q. And you sought that consent because you said in that report that you and your relatives were partners in the firm. Isn't that what you said?

A. Yes.

Q. And you also asked the shareholders in that same report to approve past transactions between DSG and your companies for the same reason, right?

A. Yes.

Q. And you said the reason you hadn't asked for it before was just an oversight?

A. I don't know about the rules. Usually the company secretary and our accountant CPA takes care of that.

Q. Right. But in your report where you made the

disclosure to the shareholders, didn't you tell them the only reason the company hadn't made that disclosure before was due to an oversight?

A.   I don't know.

MR. PARRY:   Your Honor, may I approach?

BY MR. PARRY:

Q.   Prasad, I'm going to hand you what's been marked for identification as Defendant's Exhibit 211.   Is this the DSG Annual Report you were just talking about?

A.   Yes, please.

Q.   And this is the DSG Annual Report from 2017 and 2018; is that right?

A.   Yes, please.

Q.   And in that report, if you look with me at page 9 -- are you with me on page 9?

A.   Yes, please.

Q.   If you look, there's a paragraph about midway down the page that starts "In view."   Do you see that? "In view of the provisions."

A.   Yes.

Q.   And that is talking about the disclosure you and I just discussed about your other businesses, correct?

A.   Yes, please.

Q.   It says midway through that paragraph, "As the approval of the members was not obtained due to

oversight and without prejudice to the interests of the company, in the previous years, those transactions are placed before the members for ratification of the transactions."

Do you see that?

A. Yes, please.

Q. So isn't it true that Divya Shakti, DSG, in this disclosure to the shareholders, sought not only their consent for business dealings going forward, but their approval of past business dealings with your companies due to an oversight?

A. Yes, please.

Q. And nowhere in that report, am I right, did you ask the shareholders to also consent to any business dealings between you and your alleged partnership with Vamsi?

A. No.

Q. Is there anywhere in that report that you asked the shareholders to ratify or approve past historical transactions with a partnership between you and Vamsi?

A. No.

Q. And nowhere in there did you disclose your alleged personal guarantee to the company either, did you?

A. No.

Q. Isn't it also true you didn't disclose your alleged partnership or the alleged guarantee in the prior years before that report in D-211?

A. That came from 2013. After that I don't know what the CPS -- not done that later. They said they are done.

Q. My question was a little bit simpler. It's just: Isn't it true that DSG did not disclose your alleged partnership with Vamsi or your alleged personal guarantee in the years prior to 2017?

A. No.

Q. That's not true, or you didn't disclose it?

A. We didn't disclose.

Q. You testified before that you simply don't know why DSG wouldn't have also disclosed to its shareholders that you, as a company director, individually have a partnership in place with a U.S. business?

A. I don't know the rules of the laws, the company laws. I don't know anything. That's taken care of by the company secretary.

Q. So you don't know why you tell the shareholders about the other Cosmos businesses but not the one you're claiming in this case?

A. I'm saying I don't know what rules are implied on that date. Usually the company secretary will take

care of that type of thing.

Q. Now, you talked a lot about your claimed interest in the first Cosmos business, NVM, back in 2005. Isn't it true that you admit your alleged interest in that company ended by January 1, 2015, on the effective date of the Rollup?

A. I didn't understand, sorry. 2015?

Q. Don't you agree, according to you, your alleged interest in NVM ended by January 1, 2015, on the effective date of that Rollup Transaction that we're talking about?

A. Yes.

Q. And that's because with regard to your claim to have owned an interest in the pre-Rollup companies in Raleigh, Chicago, and elsewhere, you admit you got full credit for your interest in those entities, whether they were on paper or not, didn't you?

A. Except Vivid, yes.

Q. With respect to the pre-Rollup entities, the ones that were in Group, you admit that whatever interest you claim to have going back to 2005, you got credit for it?

A. Yes.

Q. And your share of the Group was intended to take account of any interest you had at that time, 2015, whether it was written or unwritten, right?

168

A. Yes.

Q. And the end result was that you ended up with a significant ownership percentage in the group that was created in that Rollup, right?

A. Yes.

Q. So you got paid for the interest you claim to have back in 2005?

A. Yes, please.

Q. You also admit you sent a notice in October of 2015 that you say dissolved the partnership with your cousin, right?

A. Yes, please.

Q. That was the email where you intended to give notice to him and everybody else involved with the Group that you were ending the partnership?

A. Yes, please.

Q. You said in that email the reason you were doing it is you were having to beg for orders from DSG, right?

A. That's part of it.

Q. And you said you have 150 families dependent on the factory. That's DSG, right?

A. Yes, please.

Q. You testified that Vamsi had started ordering less material from DSG and demanding lower prices?

A. I don't remember exactly.

Q. Do you remember testifying that Vamsi had begun ordering less material and demanding lower prices from DSG?

A. Not Vamsi; other people. I don't remember exactly that email.

Q. Go back to that affidavit I just handed you, and look at paragraph 180, if you would. Are you with me at the bottom of page 29? It's the affidavit I handed you before.

A. Which one is that?

Q. The one I handed you that's your affidavit from earlier in this case.

A. Yeah.

Q. I'm on page 29, paragraph 180.

A. Yes, please.

Q. And if you look halfway down that paragraph, you're talking about this termination you sent in 2015. You say, "Vamsi on behalf of Group started asserting buying leverage against the Indian supplier." That's DSG, right?

A. Yes, please.

Q. Then you said, "Specifically Vamsi start ordering less material from the Indian supplier while demanding lower prices;" isn't that right?

A. Yes, please.

Q. You didn't like that?

A. Pardon?

Q. You didn't like that, did you?

A. Yes.

Q. And you go on to say in that same paragraph, "This result" -- if you turn over to the next page, "This result was the exact opposite of my original intent in creating a U.S. distributor that would be a consistent source of purchases at competitive prices for DSG," correct?

A. Yes.

Q. So Vamsi was trying to get a better deal for the Group, but that wasn't what you wanted, right?

A. No.

Q. You wanted a consistent buyer of DSG goods at good prices?

A. No.

Q. Isn't that what you testified before?

A. He was not ordering material correctly. That's my disdain.

Q. Right. He was ordering less and demanding lower prices, asserting buying leverage; that's what you said?

A. Yes, demanding lower prices compared to the market.

Q. Right. And he was asserting buying leverage on

behalf of the Group?

A. Yes.

Q. But what you wanted was a U.S. distributor that would be paying competitive prices to DSG? That was your goal?

A. Yes.

Q. Now, Prasad, you've testified some about your background. You've got significant experience in the stone business, don't you?

A. Yes.

Q. You've been in that business for over 30 years, you say?

A. Yes, please.

Q. That's more experience than Vamsi's got, right?

A. Yes, please.

Q. You characterize yourself as having long experience and success; isn't that what you say?

A. Yes, please.

Q. And you'd say you know what it takes to develop a successful distribution business too?

A. Yes, please.

Q. You've already said you're the managing director of DSG. That's a company that exports millions of dollars of products to the U.S. every single year; is that right?

A. Yes, please.

Q. You've also testified that by 2018, no later than that, you had become suspicious of everything Vamsi had done over the past 13 years before; isn't that right?

A. No.

Q. That's not what you said?

A. No. I don't -- I don't know where I returned that.

Q. Why don't we stick to the same affidavit we were looking at that you swore to earlier in the case. Can you look with me over on page 32.

A. Yes.

Q. Paragraph 205.

A. Yes, please.

Q. It says, "By 2018 I had to do something," right?

A. Yes.

Q. Then it talks about how you used to have faith and confidence in Vamsi, but now you no longer did. In the next paragraph, 206, you say, "I was suspicious of everything Vamsi had done over the past 13 years" in 2018. Correct?

A. Yes, please.

Q. So at least from that point forward you'd agree that your relationship with Vamsi was not one you'd consider to be based on trust and confidence, was it?

A.   Yes, please.

Q.   Now, you've also claimed, haven't you, that -- I think I heard the Vivid managers locked you out of financial information; is that right?

A.   Yes, please.

Q.   And you said that happened as early -- you said Vamsi locked you out of financial information as early as 2015; is that right?

A.   2017.

Q.   Haven't you said before that Vamsi locked you out of financial information going all the way back to 2015?

A.   I don't remember exactly.   I'm sorry.

Q.   Well, take a look and see if it refreshes. Paragraph 178 of that same affidavit you swore to before.

A.   Which paragraph?

Q.   We're on page 29 again, paragraph 178.   And you're talking about the dissolution of Group.   That happened in 2015, correct?

A.   Yes, please.

Q.   You say in paragraph 178, "Vamsi locked me out of the financial reporting for other locations," didn't you?

A.   Yes, please.

Q.   And, in fact, you've said in other places in this

case that beginning late 2015 you were excluded from information about Vivid NC too, right?

A. I don't remember.

Q. You don't remember that?

Haven't you testified earlier in this case that, in fact, prior to 2017 you had full access to that software system you all used at Vivid to manage all of your books?

A. Yes.

Q. That's called the ERP system?

A. Yes, please.

Q. What does that mean?

A. The software for in invoices, inventory, profitability and everything.

Q. What does "ERP" stand for?

A. Like -- it's like the stone profits where we use that system, the software system.

Q. In any event, prior to 2017 you agree you had full access to that system for the Vivid entities at all times?

A. Yes.

Q. 2017 was the year you caused two lawsuits to be filed by your company, DSG, against Vamsi's entities?

A. Correct.

Q. Those were the ones you talked to Mr. Coble

about?

A. Yes, please.

Q. You talked some about Vamsi's claim that your companies owed his money. And I think you mentioned there was a forensic audit that took place in 2019. Do you remember that?

A. Yes, please.

Q. When you look at that audit, and specifically the conclusions about the amounts that were owed to the entities, isn't it true that your company, Southeast, was found to owe over $1.4 million?

A. $1.4 million to whom? I'm sorry.

Q. Let's take a look at it. Do you remember that audit report?

A. Yes.

MR. PARRY: May I approach, Your Honor?

BY MR. PARRY:

Q. Prasad, I'm going to hand you what's been marked for identification as Defendant's Exhibit 328. Take a look at that and let us know if you recognize that as the audit report you and Mr. Coble were discussing.

Is that the forensic audit you and Mr. Coble were discussing?

A. Yes, please.

Q. Look with me over on page 6 of Exhibit 328, if

you would.

A.   Yes, please.

Q.   Do you see the part where there is a table that discusses on page 6 amounts that are owed by each of the Group entities to each other, right in the middle of the page, "Line of Credit True-Up as of February 29, 2016." Do you see that?

A.   Yes, please.

Q.   Doesn't that table show Southeast, which is your company, to owe $1.4 million on the line of credit?

A.   Yes, please.

Q.   And doesn't -- right next to it is East.   That's Vamsi's company, right?

A.   Yes, please.

Q.   Doesn't it show that on the Line of Credit East was owed almost $1.2 million?

A.   Yes, please.

Q.   And were those among the items that Vamsi was trying to discuss with you before you filed the lawsuits on behalf of DSG?

A.   No.

Q.   He wasn't trying to discuss the amounts that Southeast owed to East during that time?

A.   No.

Q.   Did he have other items that he wished to discuss

with you around the DSG lawsuits?

A. He said I owe to the Group $1 million.

Q. Didn't the forensic auditors find that Southeast owed $1.4 million on the line of credit?

A. Yes. But the same day, in the West, need to receive $1.35 million.

Q. Right. But Vamsi's company, East, is also due $1.2 million, isn't it?

A. Yes. Same way the West also need to get.

Q. And the auditors ultimately concluded that both you and Vamsi were due money from the Group, correct?

A. Yes, please.

Q. A few months after the lawsuits that DSG filed against Cosmos that you talked about with Mr. Coble, did you have your lawyers send a demand lawyer to Vivid NC also?

A. Demand letter to -- I don't remember.

Q. Did you -- were you represented by the Morris Manning law firm?

A. Yes, please.

Q. Did you have them send a letter in late 2017 to Vivid NC about what you called unlawful competition?

A. Yes, please.

Q. Do you remember accusing Vivid NC of competing improperly with your company, Southeast?

A. Yes, please.

Q. You had your lawyers threaten to sue Vivid NC too if it didn't cease and desist all competing conduct; isn't that right?

A. Yes, please.

Q. In fact, your lawyer ended the letter saying Vivid had to comply or be sued?

A. Yes, please.

Q. That was in 2017, correct?

A. Yes, please.

Q. So you have filed two lawsuits against the other Cosmos entities, and you threatened to sue Vivid NC if they don't stop all competing activity in 2017, correct?

A. I don't agree with that exactly.

Q. Didn't we just go through what the letter said?

A. But it has a different explanation. I am sorry, but I don't agree with that. Because Vivid is competing Southeast. Southeast is not competing Vivid. And we have an agreement that we should not sell each location. That's why we requested so many times before not to do that. But then it won't stop. They are coming and selling to our customers.

Q. So in 2017 you had your lawyers send Vivid a letter?

A. Yes, please.

Q. That you still owned an interest in?

A. Yes, please.

Q. And you said: Cease and desist all competing conduct or be sued, Vivid?

A. I requested so many times, but they not stop selling in my area. That's why that email is done.

Q. And even after that, the two lawsuits and the demand letter, when you had your lawyers ask for information in 2017, weren't you all provided access to the Vivid entities' accountant, David Khatod?

A. No.

Q. You were not?

MR. PARRY: May I approach, Your Honor?

THE COURT: Yes.

BY MR. PARRY:

Q. Prasad, I'm going to hand you what's been marked for identification as Defendant's Exhibit 330. Defendant's 330 is a letter from your lawyer, Mr. Coble, to Vivid demanding information as your right as an LLC member; isn't that right?

A. Yes, please.

Q. And in that letter -- look with me at the second paragraph that your lawyer wrote to Vivid. Are you with me, starting "On October 19, 2017"? Do you see that?

A.   Page number 2?

Q.   Sorry.   The first page of this letter, 330, from your lawyer to Vivid.   It starts off "On October 19, 2017."   Do you see that?

A.   Yes, please.

Q.   It says you served an inspection request on NC LLC relating to the Vivid entities on that date, correct?

A.   Yes, please.

Q.   It says from your lawyer, "In response, Vamsi's counsel indicated that the Vivid Charlotte records would be provided through its accountant, David Khatod."   Do you see that?

A.   Yes, please.

Q.   Then down at the end of that paragraph your lawyer says, "Our office worked with Mr. Khatod and his office to secure financial information about the Vivid entities."   Do you see that?

A.   Yes, please.

Q.   You were seeking to update that here in February of 2020, correct?

A.   Yes, please.

Q.   So isn't it true that in 2017, even after the lawsuits and the demand letters, when you asked for information about Vivid, they turned you loose to talk

to the accountant, and you did?

A. No, we didn't get it.

Q. Was your lawyer not telling the truth in Defendant's Exhibit 330 where it says, "Our office worked with Mr. Khatod and his office to secure financial information"?

A. Yes, but we didn't get it.

Q. You didn't get it?

He "seeks updated financial information with this letter," but your testimony is you didn't get it before?

A. In full we didn't get it.

Q. Okay. So your lawyer left that part out when he says they worked with Mr. Khatod and his office to secure financial information? Your testimony is: Not all of it?

A. We didn't get it all.

Q. And when he then says, "With this letter, Prasad seeks updated financial information," what he really meant was: What we got before and more?

A. What that says to me, that we didn't get fully -- fully information.

Q. Okay. So you deny what your lawyer suggests here, that you worked with Mr. Khatod and his office to secure financial information?

A. Yes.

Q.   Isn't it also true, Prasad, that in January of 2019 Vamsi agreed to provide you with access to financial records and information requested by your accountants and to allow your accountants to audit Vivid NC?

A.   I don't remember.

Q.   Do you remember the settlement that you were talking to Mr. Coble about?

A.   Yes.

Q.   And do you remember in that settlement agreement that part of the agreement was for Vamsi to agree, as manager of Vivid NC, to provide access to such financial records and information as may reasonably be requested by the accountants retained by Prasad?

A.   Yes.

Q.   Do you remember that?

A.   Yes.

Q.   You would also exercise the best efforts to do the same for Vivid Texas too, right?

A.   Yes, please.

Q.   And you all agreed that such information shall be provided and used for an audit to be scheduled to begin within 120 days, correct?

A.   Yes, please.

Q.   You never did that, did you?

A.   That second agreement was not done because they filed bankruptcy.

Q.   Did you ever at any point after the settlement agreement and prior to a bankruptcy filing follow up on that agreement you had with Vamsi to perform an audit on Vivid NC?

A.   Yes.

Q.   You did ask for an audit of Vivid NC?

A.   Yes.

Q.   Within 120 days?

A.   We asked the financials later.

Q.   Okay.  Do you know -- is it your testimony that you, under this settlement agreement, sent some request to perform an audit on Vivid NC after this settlement agreement?

A.   No.   Not settlement.  We wanted the financials.

Q.   Got it.   And you'd agree that in January of 2019, you had an agreement to request financials and do an audit if you wanted to?

A.   Yes.

Q.   In late 2019, Prasad, isn't it true that one of your other companies, Cosmos Central, sued the Vivid entities directly?

A.   Yes.

Q.   And in that case wasn't your company, Cosmos

Central, complaining about having paid too much for a company's assets it acquired?

A. We bought the assets of Central, Cosmos Central. Then it was there on the list of receivables that Vivid -- we had requested through attorney, but were not given, that's why we sent a -- sued them, when it was not given to us.

Q. And specifically in that case, where you sued Vivid in 2019, wasn't your other company, Cosmos Central, claiming that the inventory it bought in the transaction at issue was overstated and inflated?

A. Yes, please.

Q. That's the opposite of what you're claiming here?

A. Okay.

Q. Because of that, you claimed in that case your company got less than it paid for, right?

A. I don't remember exactly.

Q. But you were trying to avoid a payment obligation to the Vivid companies in which you still had an interest, correct?

A. I don't remember.

Q. You do remember that you sued them?

A. Yes.

Q. You just don't remember what for?

A. Yes.

Q. Do you remember that you sued the Vivid entities again just the next month on behalf of one of your other entities, late 2019?

A. I don't remember.

Q. You don't remember the second lawsuit?

MR. PARRY: Your Honor, permission to approach?

BY MR. PARRY:

Q. Prasad, I'm handing you what's been marked for identification as Defendant's Exhibit 332. See if you recognize that one as the second lawsuit you filed against the Vivid entities in 2019.

A. Yes. This is regarding the shared expenses.

Q. Right. In that case your other company, Southeast, the same one that sent the demand letter before, was seeking to recover almost $600,000 from Vivid NC; correct?

A. Yes.

Q. That case is still going on today, isn't it?

A. Yes.

Q. So in 2017, two lawsuits against the Cosmos entities that resulted in a default on the bank loan, correct?

A. I don't agree with that exactly.

Q. You don't agree that the bank default was related

to those lawsuits?

A. I'm saying not because of me, I'm saying.

Q. Right. But you'd agree that it was the lawsuits that prompted the bank default. Your position is it's Vamsi's fault you sued him?

A. Yes, please.

Q. And then you subsequently sent a demand letter telling Vivid, not the Cosmos entities, telling Vivid: Stop competing or be sued?

A. Yes.

Q. And then in 2019 your did sue them, not once, but twice?

A. Yes.

Q. Now, in this case, Prasad, you are critical of some of the accounting practices employed by the Vivid entities; is that right?

A. Yes.

Q. Isn't it also true you've known about and participated for years in the practice of writing down the valued inventory?

A. We have not done much. As per Vamsi, he asked me once before splitting. We said no.

Q. So back in 2015 you recall Vamsi writing to you to ask your opinion about depreciating the inventory for the Cosmos entities?

A. He asked me, yes.

Q. And he suggested writing down anything older than a year by 90 percent?

A. I don't agree with that.

Q. You don't agree that's what he suggested?

A. He suggested, but I didn't agree for that.

Q. Okay. Did you respond to that email?

A. I called him and said: We are going our own way, let it as it is and the calculations which were taken in 2019 by the forensic accountants regarding the inventories.

Q. So he sent you the email proposing a write-down. Your testimony is you didn't respond, but you called him and said no?

A. Yes, please.

Q. So you're at least aware, as of 2015, that the practice of writing down inventory values based on age was something that was being done in those entities, correct?

A. I don't know much about that. Usually Vamsi used to take care of that.

Q. But you certainly didn't respond to his email, which copied you and others, and say you wanted to avoid that happening?

A. Pardon?

Q. You didn't respond to the email and say you wanted to avoid that?

A. Yes, please.

Q. Do you recall in 2017 you were called to testify in a case for another former owner named Vintack [phonetically] who was arguing about how his buyout should be calculated?

A. Yes, please.

Q. And in your sworn testimony in that case didn't you agree with Vamsi that old inventory would lose value because of its age?

A. Yes, please.

Q. Didn't you also agree in that case with Vamsi that the Cosmos entities discounted old inventory?

A. Yes, please.

Q. So you did agree as of 2017 that you knew the Cosmos entities in which you were involved discounted old inventory based on age?

A. It depends on the age, basically.

Q. You understand it's your position in this case, Prasad, that the values of these companies in which you invested for years have been significantly understated, correct?

A. Yes, please.

Q. And one byproduct of that would be that the

owners, including you, would have been paying lower taxes, correct?

A. Yes, please.

Q. In fact, you testified previously in this case that you agree with the approach of taking aggressive deductions, right?

A. No.

Q. You didn't testify to that?

Look at the affidavit I handed you before, specifically paragraph 159. Are you with me?

I'm sorry, it's paragraph 150 on page 25. Are you with me?

A. Page 150?

Q. Paragraph 150 on page 25.

A. 23 or 25?

Q. And you said there in your prior sworn testimony that with respect to taxes, you agreed with Vamsi to take aggressive deductions; isn't that what you said?

A. I'm unable to see that.

Q. Paragraph 150 of your affidavit. You don't see that? Page 25?

A. No.

Q. Are you looking at the affidavit that's dated January 21 of 2022 at the bottom?

A. I'm sorry?

Q. That's all right. I need to do a few things.

It's the affidavit I've asked you about a couple of times. It says document 114 filed January 21, 2022 at the bottom. Are you with me?

A. I didn't get the page.

Q. It's paragraph 150 beginning on page 25.

A. Does the paper document say that --

Q. Paragraph 150 that begins, "With respect to taxes."

Are we looking at the same thing?

A. I don't have that.

MR. PARRY: Your Honor, can I approach and just show him?

THE COURT: Let's stop right now. We'll take our afternoon recess now, let you use the restroom. We'll be back in ten minutes.

(Recess taken.)

THE COURT: Go ahead.

MR. PARRY: Thank you, Your Honor.

BY MR. PARRY:

Q. Prasad, I think I've identified our problem. We're both looking at the same affidavit, but there are two paragraph 150s.

A. Yes.

Q. I'm looking at the one that is 150 at the very

bottom of page 25. Are you with me?

A. Yes, please.

Q. So you agree in your prior testimony you said, with respect to taxes, you agree with Vamsi to taking aggressive deductions to leave as much money as was possible in the original partnership; isn't that right?

A. Yes, please.

Q. And in light of your position in this case, that those companies were significantly undervalued, leaving the owners to pay lower taxes, have you taken steps to amend your own personal returns?

A. No.

Q. Why not?

A. I'll check with the accountant. If we need it, we'll do it.

MR. PARRY: Your Honor, subject to potentially calling him back in our case if needed, we don't have any further cross.

THE COURT: You don't have any further cross?

MR. PARRY: Right.

THE COURT: Do you have any redirect?

MR. COBLE: Very briefly, Your Honor.

- - -

HARI HARA PRASAD NALLAPATY, REDIRECT EXAMINATION

BY MR. COBLE:

Q. Prasad, the same exhibit Mr. Parry read you, the sentence rolls over from 25 to 26; do you see that? "I trusted Vamsi would work with the accountants to accomplish the same because Vamsi was supposed to be looking after my interests in the United States."

A. Page number? Sorry.

Q. Page 26.

A. Yes, please.

Q. The sentence that came next after what Mr. Parry read to you: "I trusted that Vamsi would work with the accountants to accomplish the same because Vamsi was supposed to be looking after my interests in the United States." Do you see that?

A. Yes, please.

Q. Who was working with the accountants on financial issues?

A. Vamsi.

Q. Mr. Parry asked you some questions about DSG annual reports. Do you remember those questions?

A. Yes, please.

Q. To be clear about that, before your father passed away in 2013, who was responsible for preparing those reports?

A. Our company secretary and CPA.

Q. Did you have any involvement preparing those reports?

A. No.

Q. Did you have any understanding about what the rules were about what goes in those reports?

A. No.

Q. Was your father aware of your partnership with Vamsi?

A. Yes.

Q. How do you know that?

A. Because I told him.

Q. And was the DSG Board aware of your partnership with Vamsi?

A. Yes.

Q. How do you know that?

A. Because my father told everyone there.

Q. Since your father passed in 2013, who is responsible for the content of the DSG Annual Reports?

A. Company secretary and CPA.

Q. Do you understand now what the rules are any more than you did before about what has to be in there?

A. I don't know anything.

Q. And do you understand what caused the item that he asked you about 2018 to appear in there for the first time?

A.   The company secretary and CPA, they got new rules in that regard.

Q.   Did you have trust and confidence in Vamsi in 2009 when you two decided to invest in Vivid NC?

A.   Yes, 100 percent.

Q.   Did you have trust and confidence in Vamsi when you two decided to purchase the warehouses in Raleigh, Greensboro, and Charlotte.

A.   Yes, please.

Q.   There was a little bit of confusion about the auditor's report -- will you pull that back up -- that Mr. Parry asked you questions about.

While he's doing that, will you pull up Plaintiff's Exhibit 78, please.

A.   Page number?

Q.   The table that he was asking you about in the auditor's report.

A.   Page number 5?   I'm sorry.

Q.   We were looking at 78 from before, the second paragraph.

Vamsi wrote, "Apart from this, Southeast and West owe to East and D.C. over $700,000."   Do you see that?

A.   Yes, please.

Q.   Just to be clear, the auditor's report that Mr. Parry showed you, does it say that Southeast and West

owed East and D.C. over $700,000?

A.   No.

Q.   What does it say?

A.   Entire group, we need to get -- East needs to get money, West needs to get money.   It says that all.

Q.   So what was the amount that was due to Southeast and West from that report?

A.   $450,000.

Q.   Did you receive that?

A.   No.

Q.   Mr. Parry asked you some questions about disputes that led to filing of a complaint in Georgia.   Do you recall that?

A.   Yes, please.

Q.   And I think you said it related to shared expenses?

A.   Yes, please.

Q.   Who proposed that the expenses would be shared?

A.   Vamsi.

Q.   And they were shared at what location?

A.   East locations, Raleigh, D.C., Vivid, all -- and Atlanta.

Q.   What were they sharing?

A.   They were sharing the space, the rent of the warehouse.

Q. Where?

A. On Savannah, and payrolls and the rental of the forklifts, and all expenses.

Q. So they were supposed to share, including Vivid NC, would share the expenses of the Savannah warehouse and payroll?

A. Yes, please.

Q. And who had to pay those expenses in Savannah?

A. Initially we shared all together. Vamsi told me you pay first; everyone will pay later, once it's end of the month.

Q. So Prasad paid first, then Vamsi said --

A. Everybody pays later.

Q. Did they ever pay their share?

A. No.

Q. Is that why that lawsuit was filed?

A. Yes, please.

Q. Mr. Parry asked you about some other issues and disputes. And I'm not going to go into all of those. But do you think those other issues gives Vamsi the right to take your interest in secret without paying fair value for them?

A. No.

MR. COBLE: That's all I have.

THE COURT: Do you have other witnesses?

MR. COBLE: Yes, Your Honor. Our next item, what we wanted to do was read about eight pages of transcript testimony from Mr. Vamsi into the record. It should be less than ten minutes.

THE COURT: He's the defendant?

MR. COBLE: Yes, sir.

THE COURT: Okay.

MR. MORSE: Good morning, Your Honor. Ladies and gentlemen of the jury, my name is Clint Morse. I'm one of Mr. Prasad's other attorneys.

With me is Will Robertson, who is also one of the attorneys. And Will will read the part of Vamsi from the trial transcript from January 22, 2019, where Vamsi was testifying in the prior lawsuit before the North Carolina business court.

MR. ROBERTSON: May I approach, Your Honor?

THE COURT: All right.

MR. MORSE: I'd like to start on Wednesday, January 23, 2019, pages 229 to 468. I'd like to start at page 361, Line 5.

- - -

(Whereupon the following excerpt of Testimony of Vamsi Mohan Nallapati, January 23, 2019, is read into the record:)

Q. And you testified on direct that you and Prasad

agreed orally that you and he would share 50/50 ownership of the new business in Raleigh, correct?

A. That's correct.

Q. And that same agreement extended to the locations you opened in Greenville -- I'm sorry, Greensboro and Ashville, correct?

A. That's correct.

Q. You, in fact, issued K-1 statements to Prasad during that time period that reflected his 50 percent ownership, correct?

A. No. I went on record very clear saying I proposed to add him on the company as per our understanding at 50 percent ownership. But his father refused with that idea. So NVM International, I ended up with 100 percent ownership, which eventually, as per my oral agreement, I have accounted for as 50 percent share through the Rollup transaction.

Q. Well, did NVM Corporation issue K-1 statements to Prasad at 50 percent ownership level, correct?

A. He was not a partner. How would I issue a K-1? K-1 is issued for number. I don't know if it would be called a K-1. NVM International was an S Corp. Again, he was not on the record as a partner, so he wouldn't get any tax-related documents.

Q. But the agreement, the 50/50 agreement that you

and he reached as to ownership, that was in exchange for Prasad providing extended terms from DSG to the new location, correct?

A.   That's correct.

Q.   And explain what "extended terms" means?

A.   We would typically get 90 to 120 days in our business from all our vendors overseas.  And Prasad had extended 180 days for those shipments.  Again, when we started the company, I had come up with $350,000 of my personal money as an investment, and his commitment was to provide the material, instead of 90 days, 180 days.

Q.   So that means that when the Raleigh location made an order for material from DSG, payment would be due 100 days after shipment, correct?

A.   From the date of billing date, that's correct.

Q.   And those terms were more favorable than the Raleigh location could otherwise get as a new business, correct?

A.   It was mutually beneficial.  I could have stayed to only get 90 days from the suppliers and kept all 100 percent to myself.  I chose to offer that 50 percent to Prasad for extending those extra 90 days.

Q.   Because that was a benefit to the Raleigh location to have those extended terms, correct?

A.   It was a mutual benefit because the factory would

be able to sell their material. Instead, if they sell to any other customer, that would only get that profit. Maybe they -- in our business nobody pays in 90 days when we say 90 days. Everybody runs 110 days or 120 days before they pay. So for those extra two months, three months time, they're extending in written -- they're getting 50 percent profits. And what DSG sells, we only -- it would only make 25 percent of our overall sales. The rest of the countries like Brazil, China, Spain, Italy, rest altogether make about 70 to 75 percent of sales. DSG product made about 20 percent, 25 percent of our sales.

Q. But the question was a little narrower. The extended 100 day terms provided a benefit to the Raleigh location; did it not?

A. On the face of it, yes. But I would like to expand and say it was a mutually beneficial setup. That's why we both agreed to do that.

Q. And because, in the case of the Raleigh location, you could order product from DSG, receive it, and sell it, receive money from your customers for those sales, before the payment was due to DSG, correct?

A. Partly that is true. If you look at our lifecycle of our inventory, it takes us about 120 to 150 days to sell their product and collect the money. So

what is that we are getting? 30 days of extra time, yes. But was it worth it for me to give over 50 percent of the profits on that day? Yes, it definitely made sense. That's why we went into business together.

Q. You said you invested personal funds in starting the Raleigh location of Cosmos?

A. That's correct.

Q. That's the only Cosmos location that you invested personal funds in; is that right?

A. That's correct.

Q. The other locations that you were involved in starting, you used cash from Raleigh Cosmos business to get them up and running, correct?

A. That's correct.

Q. The locations that you and Prasad shared 50/50, right?

A. That's correct.

MR. MORSE: Moving to page 372, line 7.

Q. Now, if we look at all the locations that were formed for Cosmos prior to 2015, Prasad was involved in setting up all those, correct?

A. Yes.

Q. And he was the only member of Grouper Holdings that was involved in setting up all the locations that had been formed at that point in time, correct?

A.   Can you be more clear on that when you say "setting up"?

Q.   Getting the locations started.

A.   Is he involved?   Yes, he was involved.   He was involved with me.   Yes, he has been involved setting up Seattle, Washington D.C., and all.   But I have been the person on the ground doing all the job, and he has been my partner.   I think that would be more clear.

MR. MORSE:   I'd like to move now to Vamsi's testimony on January 22, 2019, page 117, line 8.

Q.   Thank you.   And again, we may come back to that one a little bit later.   But you touched on something earlier about how the membership interest that we looked at was determined.   Can you explain -- explain that a little bit more for us in the Rollup?

A.   We interviewed and chose a third-party company to come in and valuate each company.   They determined the valuation for each company and thereby the total enterprise.   Initially when we did, Vivid was also part of the deal.   And when we know -- when we knew they were not participating, they had to drop that and redo. When the new ownerships were allocated in the new enterprise, I kept up with every oral agreement I had through that time.   From 2005 through 2014, me and Prasad were behaving like we were 50/50 partners of NVM

International.  I gave up that 50 percent.  Got it allocated to Prasad.

MR. MORSE:  Now I'd like to go to page 181, line 11.

Q.  Did you also make any changes to the ownership of the warehouses that were used in connection with the division -- or, excuse me, the North Carolina and Georgia locations?

A.  Yes.

Q.  Tell us about that.

A.  That's something hasn't come up in our conversations so far.  We used to have Nallapati Properties and LLC North Carolina company in existence since 2010.  That, on the books, again, just like any other stuff, it was 100 percent of myself.  And we first initially bought the Raleigh building, and eventually we ended up buying the Greensboro building, and later on Atlanta.  All these three buildings the Cosmos entities occupied were owned by Nallapati Properties.

But between me and Prasad, again, had an oral agreement that we would be 50/50 in it.  And during the spinoff conversations at the end of 2015, I brought up with Prasad, I mean:  We are splitting everywhere.  I don't think we need to continue to stay in this entity

together.  We need to come out with some plan.

So he came up with proposing:  Since I'm going to end up with Atlanta, I will take the Atlanta building.  And Greensboro and Raleigh, you're going to own the east, so you keep those two buildings.  And if there are any true ups, we can complete the true ups.

And as a part of my commitment, I went ahead and refinanced those two buildings.  To start with all the three buildings were on one loan with BB&T.  And end of 2015 about -- right about Christmas time, I refinanced those two buildings under Nallapati Properties at Bank of America.

And for whatever reason Prasad could not issue his refinancing end of the year.  Later in 2016 he got it refinanced under his own holding company called UTS.

Q.  So was that change executed moving the ownership of the Atlanta warehouse from an entity that you held to an entity that Prasad held?

A.  That's correct.

MR. MORSE:  Your Honor, that's all we have.

THE COURT:  And that's the testimony of the defendant?

MR. COBLE:  That's the testimony of the defendant; yes, Your Honor.

MR. ROBERTSON:  May I step down, Your Honor?

THE COURT: And this is in the lawsuit in the business court in 2019?

MR. MORSE: That's correct, Your Honor.

THE COURT: Between the two cousins?

MR. MORSE: That's correct, Your Honor.

THE COURT: Okay. What's next?

MR. MORSE: Your Honor, at this time we'd like to call Vinay Bharadwaj.

THE CLERK: Place your left hand on the Bible and raise your right hand. State your name for the record.

THE WITNESS: Vinay Bharadwaj.

(Whereupon the witness was sworn by the clerk.)

THE CLERK: Please be seated.

- - -

VINAY BHARADWAJ, DIRECT EXAMINATION
BY MR. MORSE:

Q. Mr. Vinay, you were also an owner of Vivid North Carolina and Vivid Texas; is that correct?

A. Yes.

Q. How much did you own of Vivid North Carolina?

A. Thirty percent.

Q. How much did you own of Vivid Texas?

A. Forty-five percent.

Q. And you oversaw the day-to-day operations in the Charlotte warehouse; is that correct?

A. That's correct.

Q. And you reported to Vamsi?

A. That's correct.

Q. And you could not make any independent decisions concerning Vivid North Carolina without Vamsi, right?

A. As per the operating agreement, yes.

Q. Is that true with respect to Vivid Texas well?

A. Texas there's not operating agreement signed.

Q. Can anyone make any independent decisions concerning Vivid North Carolina or Vivid Texas without Vamsi?

A. Can you rephrase the question, please?

Q. Could anyone make any independent decisions concerning the operations of Vivid North Carolina or Vivid Texas without Vamsi?

A. Major decisions --

THE COURT REPORTER: I'm sorry; I didn't hear the end of the answer.

A. Major decisions you need to include him.

THE COURT: I can't hear half of what they said, and what I did hear, I can't understand because of the language.

THE JUROR: We can't hear.

THE COURT: So we might as well be trying this in an empty room, because if your witnesses are impossible to understand, you have no case at all.

So start all over again. This guy, I have no idea what he's saying. If he wants to talk louder, that would be good. If he doesn't want to talk, then he can step down, and we'll do something else.

MR. MORSE: All right. Thank you, Your Honor.

BY MR. MORSE:

Q. Mr. Vinay, can you please speak up in response to the questions?

A. Yes.

Q. You oversee the day-to-day operations in the Charlotte warehouse, correct?

A. Yes.

Q. And in overseeing the day-to-day operations of the Charlotte warehouse, can you make any independent decisions concerning Vivid North Carolina without Vamsi?

A. As I said, major decisions, we have to make it together.

Q. So major decisions you have to make with Vamsi, right?

A. Yes. Correct.

Q. That's true for Vivid Texas as well, true?

A.  That's correct.

Q.  I'd like to bring up Exhibit P-344.  Can you pull up the top part of that for me, Keith.

Is this a Borrowing Base Certificate from Vivid Cosmos Granite from Bank of America?

A.  That's correct.

Q.  These are the reports you guys needed to do in order to get your loan, right?

A.  That's correct.

Q.  Can you pull up the middle part of that.

So I see as of 12/31/2017, you all reported to Bank of America that you had $9,300,000 and change of inventory; is that correct?

A.  Yeah, for the gross inventory, yes.

Q.  Did you report any obsolete or slow moving inventory to Bank of America?

A.  No, I don't see that.

Q.  So 12/31/2017, you reported $9.3 million of inventory and change to the bank, right?

A.  Yes, that's correct.

Q.  And no slow moving inventory?

A.  So basically the report which we generate for these things, we generate from the software what we have, and software don't have a capability to do the slow moving and the consignment inventory.

Q. But you did not report any slow moving or obsolete inventory to the bank as of 12/31/2017, did you?

A. Yes, because the reason I'm saying is because on the software there is no report where we can differentiate between the slow moving and the consignment inventory, so we put it together.

MR. MORSE: At this point I'd like to move Exhibit P-344 into evidence.

THE COURT: It's received.

(Whereupon Exhibit P-344 is admitted into evidence.)

BY MR. MORSE:

Q. Can you bring up D-445. Can you pull up the top.

Are these Vivid North Carolina's tax returns?

A. Yes.

Q. And can you look at who signed them on the bottom?

A. Can you --

Q. You signed these under penalty of perjury, correct?

A. Yes, that's correct.

Can I get a signed copy, please?

MR. MORSE: Yes.

May I approach, Your Honor?

THE COURT: Yes.

Is that his name, Vinay something?

MR. MORSE: Vinay, yes.

BY MR. MORSE:

Q. So, Mr. Vinay, that's your name under penalty of perjury for these tax returns, right?

A. The name there is mine, yes.

Q. And can you move to the 2017 records. So pull up the top part of this again.

This is a Vivid's 2017 tax return; is that right?

A. Yes.

Q. And then the signature at the bottom again?

A. Yes.

Q. That's your name under penalty of perjury?

A. Yes.

Q. Can you move to page 5 of Form 1065. Pull up the balance sheet for the inventory.

So this is the balance sheet for the 2017 tax return; is that correct?

A. That looks like, yes.

Q. So inventory for the end of the year, you reported to the IRS $6 million and change, right?

A. That's correct.

Q. So that's $3.3 million less than what you

reported to the bank on the same date?

A. No. If you go back to the previous report, the one report there, it shows on the bottom after reducing the ineligible inventories.

Can you go back to that report please? The BBC report, can you go back? I can show you where that number is coming from.

Q. You reported $9.3 million in gross inventory to the bank as of 12/31/2017, correct?

A. That is the gross. But the final inventory is this one. If you'll see there, because there was, like, a lot of ineligible inventory there also.

Q. As of 12/31/2017, you reported $3.3 million less in inventory to the IRS, correct?

A. Yeah. That's what it is.

Q. All right. And so can you move to Exhibit P-1. Pull up the header here. Pull up the header, the next part of this email.

Is this an email exchange between you and Prasad in 2016?

A. That's correct.

Q. Can you move to the second page.

Do you see where you wrote, "That is only in QuickBooks for tax purposes after inventory adjustment, look the reports from software for real number, Prasad."

Do you see that?

A. Yes.

Q. You were taking inventory adjustments for tax purposes, correct?

A. So basically that is inventory adjustment as per our CPA recommendation.

Q. You were taking inventory adjustments for tax purposes, correct?

A. Yes, inventory adjustment as per the CPA.

Q. But the real numbers, according to your email, are from the software, right?

A. Because software didn't have the capability to really do the obsolete inventory option there.

Q. So the real number, as reported to the bank, was $9.3 million, right?

A. No. That's what I said. If you to that BBC report, that was not the real number. Can you open that, please, again so I can explain to you better?

Q. And the tax number was the adjusted number, the 3.3?

A. Can I please explain before we can go forward.

Q. I would like you to answer my questions first. Okay?

A. Okay.

Q. The real number is the 9.3 million reported to

the bank, correct?

A. No.

MR. PARRY: Objection, Your Honor. He's asking to be able to explain.

THE COURT: I can't hear you.

MR. PARRY: He's asking to be able to explain from a document he just showed him.

THE COURT: Explain.

THE WITNESS: Can you pull up the document please?

MR. MORSE: He wants to pull up the bank -- This was Exhibit P-344.

A. Can you zoom in the bottom where the inventory?

So if you see the gross inventory is 9.3-some million. Then you see ineligible inventory is 3 million. So eligible inventory, what we reported to the bank, is 5.972 million. Because I explain, like, software didn't have the capability to differentiate between the slow moving and the consignment inventory.

Q. Can you go back to page 3 of this, Keith.

Can you pull up where it says "obsolete and slow moving inventory."

So you reported no obsolete or slow moving inventory to the bank, correct?

A. So that's what I'm saying, that the software

didn't have the capability to differentiate between obsolete inventory or slow moving inventory and the consignment. So we have to put under the same thing.

Q. But you did not report any of that to the bank, did you?

A. No, we only reported 5.9 million to the bank.

Q. Then the actual exclusions were not for obsolete or slow moving inventory, were they?

A. Because that is included in the consignment inventory. Obsolete inventory is included into the consignment inventory.

Q. So you would put it on the consignment inventory, correct?

A. That's correct.

Q. And also the in-transit inventory, correct?

A. In-transit inventory is there.

Q. So the in- transit and consignment were excluded from the bank, correct?

A. That's correct.

Q. But the gross number was 9.3, right?

A. The gross number is there. But for the CPA, the tax returns, and also the report to the bank is only 5.9 million.

Q. The report to the bank was 9.3 million, right? We just saw that three times, right?

A. But I explained to you right there, what is ineligible inventory is just 5.9 million only.

Q. All right. Go back to Exhibit P-1. Go down to page 2. Pull up the Prasad to Vinay email.

You see Prasad has asked you -- this is an email exchange to calculate your bonus, right?

A. That's correct.

Q. And Prasad's email said "The net profit is 1.63 million, not 3 million," right?

A. That's what it says there.

Q. And your response was "That is only in QuickBooks for tax purposes after inventory adjustment, look at the reports from the software for the real number Prasad"?

A. That is correct.

Q. So when you pay yourself, you use the unwritten-down inventory, didn't you?

A. So basically when we started the business, the main thing was how we are going to calculate our bonus. That time we negotiate from the beginning that this is how we are going to do bonus. That is going to be before any adjustment onto the inventory, which is slow moving inventory, obsolete inventory.

MR. MORSE: Your Honor, that is totally different than my question. Will you please strike that? It's not responsive to my question.

THE COURT: No, you can't strike it. Did you call this person, this witness as an adverse witness?

MR. MORSE: I did, Your Honor.

THE COURT: I didn't know that.

MR. MORSE: Yes, Your Honor. He is Vamsi's partner in the new businesses.

THE COURT: Okay. Well, I had no idea. You didn't say he was an adverse witness, and can I lead him? But you can, now that I know it.

MR. MORSE: All right. Thank you, Your Honor.

BY MR. MORSE:

Q. So when you paid yourself, you paid yourself with the non-written-down numbers, correct? You did not use the tax numbers; is that right?

A. That's what I'm saying, when we agreed onto my bonus thing -- see, like, the bonus, what you negotiate in the beginning. So when we negotiated my bonus structure, that's how we negotiated from day one, which is from the beginning. And you can see, it's from the beginning until the end is the same thing, which is what we negotiated, that Prasad also knows, as per all the emails and everything. And that's all I'm saying, that my bonus was negotiated onto those numbers, not after

the deductions and all those things.

MR. MORSE: Your Honor, this is not responsive at all.

BY MR. MORSE:

Q. When you paid yourself, you paid yourself with the non-written-down numbers, correct?

A. Calculated without the inventory adjustment, yes.

THE COURT: You know, you can lead him. Don't tell me it's non-responsive. You're the one asking the questions. If you're not getting the answers you want, then don't have him as a witness. And if you can't handle an adverse witness, don't call him as an adverse witness. Don't tell me what to do.

MR. MORSE: Thank you, Your Honor.

THE COURT: Thank you.

BY MR. MORSE:

Q. Moving on to the next demonstrative.

So you agree at the end of 2017, you reported to the IRS $6 million in inventory, right?

A. Yes, that's correct.

Q. And you reported to the bank $9.34 million in inventory, right?

A. I just explained to you how.

Q. That's a yes or no question. You reported to the bank $9.3 million in inventory, right?

A.   That is not the correct statement.

Q.   Okay.  And then you paid yourself based on the 9.3 million not the 6 million, right?

A.   That is -- the bonus structure has nothing to do with this.  The bonus structure --

Q.   It's a yes or no question.

A.   Bonus structure was decided from the day one, from 2009 when we came together.

Q.   This is a yes or no question:  You paid yourself based on the 9.3 million, not the 6 million, right?

A.   You can say that if you want to say that.

Q.   But when you bought Prasad out, you used the depressed inventory, didn't you?

A.   Yes.  See, the numbers are given from the CPA to the third-party valuator.  I was not involved in that one.

Q.   This is a yes or no question.  When you paid Prasad, you used the depressed numbers, didn't you?

A.   That, I really don't remember.  Because I was not the one who gave the numbers.

Q.   So moving to Exhibit P-311.

This is an email from you, November 2019, so three months before you bought Prasad out; is that right?

A.   That's correct.

Q. It's an email to one Kelly Collins at AmeriSource; is that right?

A. That's correct.

Q. Is she a lender or broker or something like that?

A. That is correct.

Q. You tell the truth, right?

A. Yes.

Q. So when you -- so when you sent this email with all these attachments to Ms. Collins, you believed what you put in these attachments was true, right?

A. That is correct.

Q. Can we move to the attachment.

So this is the attachment that you sent for Vivid Cosmos Granite management's projections? These are your projections, right?

A. No, these are not my projections.

Q. These are the projections you sent, right?

A. Yes, I sent, yes.

Q. And you believed them to be true, correct?

A. These are projections. Yes.

Q. Okay. So flipping to page 8.

You valued the business in 2019 at $30 million; is that correct?

A. When was this email sent?

Q. In November 2019?

A. Okay.

Q. And your projection says $30,948,000, correct?

A. Can I see the whole thing, please?

Q. It's behind tab 8 of your notebook.

A. The report at the end?

Q. The report is at the end, yes. This is page 7, Cosmos 35848?

A. Yes. I can see that, yes.

Q. Actually, no, it's not. 35849.

A. Yeah. Yeah, so this looks like the projections, but this is not done by me.

Q. But this is what you sent to the broker believing to be true, correct?

A. If I attached it, yes.

Q. And based on this work, you believed the business was worth $30,948,000 in 2019, correct?

A. And this includes all entities, North Carolina, South Carolina, Texas. Like, it includes Texas also.

Q. It includes Texas too?

A. That's what it says.

Q. So Vivid North Carolina and Vivid Texas combined for 30 million?

A. But these are projections.

Q. But this is what you believed the business was worth, right?

A. That was -- somebody created. Not created by me.

Q. Then P-107. This is the Asset Purchase Agreement?

A. Yes.

Q. This is the Asset Purchase Agreement by which you and Vamsi and Rohit removed Prasad from Vivid North Carolina?

A. Yeah, that's correct.

Q. This is three months after you sent that email to that broker, right?

A. Yeah, that's correct. I think that is the time where we were trying to save the company to get the money.

Q. This was three months after you sent the email to the broker, right?

A. Yeah. This agreement is after that one, yes.

Q. And so three months after you sent that email to the broker -- can we move to the payment.

This was signed by Vamsi Nallapati as both the purchaser and the seller; is that right?

A. That's correct.

Q. Move to the purchase price. Pull that up.

So this is how the purchase price was paid; is that right?

A. That's correct.

Q. So three months after you told a broker that the equity was worth $30 million, you have now sold the business for the equity being worth $9.6 million?

A. First of all, that includes --

Q. It's a yes no question.

A. That includes --

Q. Three months after you said --

A. But this is only North Carolina.

This includes Texas also.

Q. All right. Well, then you sold Texas for $2 million, right? So $11 million from the equity three months after you said --

A. These are projections. These are not the valuation -- or valuation done by anybody -- any certified people. This is just somebody put together some numbers to get the loan from the bank. And we never succeeded even with these numbers.

Q. So you told the bank $30 million, and you bought Prasad out for 11, right?

A. That is two different things. These are projections.

Q. Okay. Let's move to the last exhibit -- the last demonstrative.

THE COURT: Who is this witness? I have no idea. He just popped up out of the blue. Is he

connected in some way to the case?

BY MR. MORSE:

Q.  Vinay, you are an owner of Vivid North Carolina; is that correct?

A.  That's correct.

THE COURT:  Is he a relative?

MR. MORSE: He is not a relative.

BY MR. MORSE:

Q.  So you're an owner of Vivid North Carolina; is that correct?

A.  Yes.

THE COURT:  Is he a partner of the defendant's?

THE JUROR:  Yes, Your Honor.

THE COURT:  Well, we didn't know that.

Right?

THE JUROR:  We did.

BY MR. MORSE:

Q.  So valuation November 2019, equity 30 million. And then three months later, 9.6 million.  Isn't that right?

A.  I don't know about this.  Like, these are projections.

Q.  That you provided to a bank to get a loan, right?

A.  We never got any loan on those.

Q. But it was still a projection that you provided to a bank, believing it was true, to get a loan, right?

A. But it never got approved by anybody. Like, if the company valued that much, why would I struggle to even get $5 million loan, $10 million. If this is the projections, why bank will not give anything, even $5 million, if this is something that's believed?

MR. MORSE: I've got no further questions for this witness, Your Honor.

THE COURT: Any cross?

MR. PARRY: Yes, Your Honor.

- - -

VINAY BHARADWAJ, CROSS-EXAMINATION

BY MR. PARRY:

Q. Mr. Bharadwaj, is it okay if I use your first name as well?

THE COURT: What's his name? Never mind.

MR. PARRY: We'll go with Vinay.

BY MR. PARRY:

Q. Vinay, you were asked some questions by Mr. Morse about your bonus.

Again, it would be very helpful if you speak up and talk as slowly as you can.

Was the incentive bonus we looked at, was that something you negotiated for?

A.   Yeah.   That's what I mentioned in the beginning. That is something we negotiated in the beginning in 2009.

Q.   How often was that bonus paid to you?

A.   It was quarterly.   But sometimes we get a lapse, but it's supposed to be quarterly bonus.

Q.   And you've talked some about the inventory adjustments.   How often did you all at Vivid NC do those inventory adjustments?

A.   If I remember correct, we do, like, once in a year.

Q.   So was that part of the reason why your bonus was paid based on the unadjusted number rather than the adjusted one?

A.   That is correct.   Because if I see that email, that is the Tidewater bonus, which is, like, middle of the year.

Q.   When you referred to the unadjusted number as the real number, were you talking about -- when you were talking to Prasad in that email chain, were you talking about your bonus?

A.   Yes.

Q.   Was that the number you all had discussed and agreed upon to be paid for your bonus?

A.   That is correct.

Q.   Was Prasad involved in that?

A.   He was involved in it by email.

Q.   Did you have any understanding, Vinay, if you were to be bought out of the company whether your buyout would occur at the unadjusted or the adjusted number?

A.   Can you repeat one more time, please?

Q.   Sure.   Do you have any understanding if you were to be bought out, not talking about your bonus, if you were to be bought out, would you expect that to be at the unadjusted number or the one you all put on your tax returns?

A.   Which is going to be on the tax return.

Q.   Now, help us a little bit with the adjustments. What system did you make the inventory adjustments by age in?

A.   So basically any inventory over a year old in our business, basically if some inventory is sitting over a year old, it means you will never know when it's going to sell.   And we have limited space in the warehouse. It's like -- this is like a fashion industry; when something new comes up, if it sells within three to four months, it means we are going to sell.   If it sits there for more than a year, you never know; it might sell in two years, it might sell in ten years, or it might never sell.

So those are the experience, those are the trends that we do every year to find out what is in inventory which we need not to consider because it's been sitting there for more than a year. We have inventory sitting there from 2008 still, from 2008, which is, like, 15 years. And that inventory is just sitting there taking the space in the warehouse. So that's how with the experience, what the trends going on, and all those things, that's how we do the inventory adjustment. We propose those things to our CPA, and CPA go to the guideline, he look into it. And if he says no, that is fair enough that we can do that, and that's how he approve. So we just propose it. After that, CPA is the one who make the decision that this is doable or this is not doable.

Q. When you make those adjustments once a year, does that automatically update your inventory tracking software, that ERP stuff?

A. So as I said, like, in our software we don't have the capability where we can really adjust that thing in the software. And we don't have that capability in the software.

Q. Now, was this idea of adjusting inventory based on age, as you described, was that something you all just started doing around 2020?

A. No, sir. This is from the beginning. Every member, everybody knew we have been doing it, not only for Vivid entities; it was going for all the Cosmos locations. And that's what we've been doing from the beginning.

Q. Did your CPA that you spoke about earlier ever suggest to you as the guy running Vivid NC that there was a problem with the way you all adjusted your inventory based on age?

A. Never.

Q. Have you ever been audited -- "you" being Vivid NC -- has Vivid NC ever been audited by the IRS?

A. Never.

Q. To your knowledge was Prasad aware of how you were handling inventory adjustments for Vivid NC?

A. That is correct. Yes.

Q. How do you know that?

A. Because he was one of the ones who knew from the beginning. He was already included. He has all the records, all the system from both the systems. He has access to each and everything. And every year we've been doing the tax returns, and he never had any objection. So he knew from the beginning.

Q. Now, Vinay, you were asked some questions about that form you all submitted to Bank of America. When

you were communicating with your lender, did you submit a higher number in order to get a larger loan?

A. Never. That's what I explained on there also.

Q. Okay. Well, help me understand. You were saying something about why it wasn't a higher number. Help us understand what you meant.

A. So basically, if I take that particular example, if I remember, it was, like, $9 million gross inventory. Then there was some $3 million which is ineligible inventory. That's where we put it, those numbers, where we have those inventory, because our software didn't have the capability to do in the system, as I explained to you before.

So the number that we got from the bank, it was -- what was it, 5.9 million? If you see that in the bottom it says "ineligible inventory;" which we got the money for is 5.9 million.

Q. So are you saying on that form you put the unadjusted number from your software, but you also put a lower number that takes out ineligible inventory?

A. That is correct.

Q. What does "ineligible inventory" mean?

A. Again, "ineligible inventory," is the inventory, as I explained, is anything over a year old which is just sitting there, which is like a kind of a dead

inventory for us. So that is inventory that we don't know whether it will really sell or we are going to even sell those inventory. So those are the inventory that we call ineligible inventory.

Q. So you pointed out to us on that form the unadjusted number and the lower eligible number. Which one of those two do you borrow against?

A. We borrow onto the lower numbers. We never borrowed on that number. We always borrowed on the lower number, which shows there also, that 5.9 million.

Q. Does the bank let you borrow 100 percent of that lower number?

A. Even after that the bank only give only 50 percent from that $5.9 million.

Q. Did the bank also get from you all your tax returns?

A. Yes. That is correct.

Q. How often did you send them that?

A. It's every year whenever we file the taxes. After that, we give it to them.

Q. So separate and apart from those forms Mr. Morse was showing you, did you provide the bank information about that age-adjusted inventory number?

A. That is correct.

Q. You were asked some about your role at Vivid NC

and being the one working at that location.  Can you just give us a sense for your responsibilities leading up to 2020, say 2017 to 2020?  What were you doing at Vivid NC?

A.  Pretty much I was handling the whole entity, like, as a manager.  You can say it like I was doing from day-to-day activities and all those things.  Pretty much the whole entity's run through me.

Q.  Did Prasad have an office at the Vivid NC facility?

A.  I don't -- like, he -- over the 12, 13 years, I don't even remember -- maybe he's there, maybe, eight -- five or ten times.

Q.  Did he manage any employees at Vivid NC?

A.  No, never.

Q.  Did Prasad help with sales?

A.  Never.

Q.  Did Prasad call on customers?

A.  Never.

Q.  Did Prasad manage any supplier or vendor relationships other than DSG?

A.  Never.

Q.  Did you communicate regularly with Prasad about any kind of Vivid NC business?

A.  Hardly anything.

Q.   Were you a founder of Vivid NC before Vamsi and Prasad came in?

A.   That is correct.

Q.   Is the company meaningful to you?

A.   Definitely.  It's my baby.

Q.   Did you come to a point, Vinay, where you personally believed that Prasad needed to be removed as an owner?

A.   Sorry.  Can you repeat that question, please?

Q.   Did you come to a point where you personally believed that Prasad needed to be removed as an owner?

A.   Yes.

Q.   Why did you think that?

A.   Sorry.  Give me a minute, please.

     When you say it's your baby, and when you see your baby is in trouble, then you have to make some decisions.

Q.   Did you feel that the company was threatened by the things Prasad was doing?

A.   Yes.

Q.   Who hired all the employees at the Charlotte location of Vivid NC?

A.   Me.

Q.   Did you care about those folks?

A.   Yes.  We have about 35 to 40 families depends on

that business.

Q. Were you worried about them in 2020?

A. Yes.

Q. Now, you were asked some questions, Vinay, about that document that Mr. Morse showed you with the projections. Do your remember that one, the email with the projections attached to it?

A. It definitely gone through me.

Q. Okay. I just want to be clear. Did you prepare those projections that he asked you about?

A. No.

Q. Do you know who did?

A. No, not really.

Q. Did the bank loan you money based on those projections?

A. Nobody loaned us money.

Q. Are you a business valuation expert?

A. No.

Q. Did you hire one of those in 2020 before you did the transactions we're here to talk about?

A. Yes, we hired independent business evaluator.

Q. You didn't come up with the purchase price based on some projection?

A. We never even talked to the person who we hired. All was taken by somebody else, not us. We never even

talked to them.

Q. When the expert you all hired told you what it was worth, is that what you paid in the transaction?

A. Yes. Whatever he said, that's what we paid.

MR. PARRY: No further questions, Your Honor.

THE COURT: Any redirect?

MR. MORSE: Yes, Your Honor. First I'd like to move in P-1, P-311, P-107 and D-444 into evidence.

THE COURT: They'll be received.

(Whereupon Exhibits P-1, P-311, P-107, and D-444 are admitted into evidence.)

- - -

VINAY BHARADWAJ, REDIRECT EXAMINATION
BY MR. MORSE:

Q. Now, if I understand your testimony there correctly, clearly the relationship with Prasad was broken in 2019, right?

A. That was, you can say, the end, but it started even before that.

Q. And even if that relationship was broken, does that give you the right to take Prasad out in secret without paying fair value?

A. We did the third-party valuation, and that's what the fair value -- that's what he said.

THE COURT: I can't understand you. I'm sorry. And this is important. So try to -- I know you're trying your best at English, but I really don't understand you, your accent.

A. So we hired the third-party valuator. And whatever the third-party valuator told us, this is the value of the business, and that's what we paid.

THE COURT: What did he say is?

MR. MORSE: He said, if I understood you correctly, you hired a third-party valuator, and then you paid based on what the third-party valuator said; is that right?

THE WITNESS: Yes.

BY MR. MORSE:

Q. You gave the third-party valuator the reduced tax values, right?

A. That's why I said, like, I didn't do anything. Everything was gone through our CPA and all those people.

Q. You did not give the unadjusted numbers you used to pay yourself, did you?

A. I was not involved into that valuation.

Q. Okay. And then if this was so fair, did you come right out at the end of it and say: Prasad, we bought you out for fair value? Did you do that on March 1st,

2020?

A. As Vamsi is the manager, whatever he was supposed to do, he was supposed to do. I was not, like --

THE COURT: Again, just let me interrupt.

Again, identify who this witness is. I don't get where he fits into the package. Maybe the jurors do. But it's the two cousins who are fighting each other here in court. What's his deal?

BY MR. MORSE:

Q. So Vinay, are you one of the four owners of Vivid North Carolina?

A. When you say four, it's, like, three: me, Rohit, and NC LLC.

THE COURT: What did he say?

BY MR. MORSE:

Q. And NC LLC is owned 50/50 by Prasad and Vamsi, right?

A. They are the 50/50 members, yes.

Q. Then you and Rohit are the other members, right?

A. That is correct.

Q. Then Vivid Texas it's you, Prasad, Vamsi, and Rohit, right?

A. That is correct.

Q. And then in 2020, you, Vamsi, and Rohit voted to remove Prasad, correct?

THE COURT: Well, you can represent that that's what they did.

MR. MORSE: That's what they did, Your Honor.

THE COURT: All right.

BY MR. MORSE:

Q. So you vote to remove Prasad in February 2020, right?

A. Yes, I voted, yes.

Q. And then March 2020 you came in and said: Prasad, we have removed you and paid you fair value; that's what you did, right?

A. That's what I said; it is not my duty to say.

Q. But you did not do that, did you?

A. No, I didn't do that.

Q. In fact, in December of 2020 you still had not told Prasad that you had removed him from Vivid North Carolina, had you?

A. That is correct. But there is a reason for that also.

Q. And if this was fair, wouldn't it have been a whole lot easier to simply come out rather than keep it secret for a year?

A. So why we didn't do it, I can explain you the reason also. So when we were struggling to get financing, and we getting so many letters from the bank

that: Hey, this is going to be foreclosed, foreclosed; we are going to take you to the auction. We were struggling to find any lender to do that because of the lawsuits.

And in 2019, why this is triggered, in 2019 when Chicago location had the same situation where Prasad and his cousin partners -- I don't know what. So they had the same situation. According to the default, it went to the forecloser.

Q. There is an entirely different question.

If this was fair, wouldn't you have told Prasad?

A. Can I explain?

THE COURT: Just answer his questions. You're an adverse witness.

Q. So if this was fair, you would not have waited a year to tell Prasad about the transaction, right?

A. I didn't tell it.

MR. MORSE: Thank you, Your Honor. I have no further questions.

THE COURT: All right. That's all for this witness.

Call your next witness.

MR. COBLE: Your Honor, we call Tiffany Couch.

THE CLERK: Please place your left hand on

the Bible and raise your right hand.  State your name for the record.

THE WITNESS:  Tiffany Couch, C-o-u-c-h.

(Whereupon the witness was sworn by the clerk.)

- - -

TIFFANY COUCH, DIRECT EXAMINATION

BY MR. COBLE:

Q.  Good afternoon.  Please introduce yourself to the jury, if you would.

A.  Good afternoon.  My name is Tiffany Couch.

Q.  Ms. Couch, what do you do for a living?

A.  I am the owner and founder of Acuity Forensics.

Q.  Do you specialize in a particular area of accounting?

A.  I do.  I'm a forensic accountant.

Q.  What does it mean to be a forensic accountant?

A.  A forensic accountant is an accountant with specialized training.  I investigate accounting anomalies; I calculate damages in legal disputes, and I investigate allegations of white collar crime, so when folks are accused of stealing from another party.  And I testify as an expert witness in court.

Q.  For how long have you done that?

A.  So I've been an accountant for 26 years, and I've

specialized in forensic accounting approximately 18 of those years.

Q. Ms. Couch, were you asked to analyze the financial records for Vivid NC and Vivid Texas, two companies at issue in this case?

A. I was.

Q. Did you do that?

A. I did.

Q. What did you understand this case to be about as it relates to your role in the process?

A. As it related to my role in the process, my role was to determine whether or not the financial statements of the Vivid entities were fairly represented to base Prasad's price on.

Q. Did you reach a conclusion about that?

A. I did.

Q. What was it?

A. It's my professional opinion that the financial statements are materially misstated, and as they were -- as they were presented should not have been used to value the business.

Q. What was the consequence to Prasad of the material misstatements that you found?

A. It's my professional opinion that Prasad was underpaid by millions of dollars.

Q.   Before we get into that, let's just touch briefly a bit more, Ms. Couch, on your background.   What's your educational background?

A.   I have a bachelor of science degree in accounting from Central Washington University with honors, and I received that degree in 1997.

Q.   Have you obtained any professional certifications?

A.   I have.   I'm a CPA, so a Certified Public Accountant.   I am a CFF, which means I'm certified in financial forensics.   And I am a CFE, which means I am a certified fraud examiner.

Q.   So let's touch on those in the order that you gave them.   What's a Certified Public Accountant?

A.   A certified public accountant is a licensed accountant.   I have the education and training to be an accountant.   I have passed a very large CPA exam. Then I maintain my credentials every year with 40 hours of professional education.

Q.   And when did you become a CPA?

A.   The year 2000.

Q.   The second one you mentioned, I think, was certified in financial forensics.   What does that mean?

A.   So certified in financial forensics is a designation provided by the AICPA, the American

Institute of Certified Public Accountants. And it is for CPAs like myself who specialize in forensic accounting.

Q. How long have you had that?

A. Since approximately 2008.

Q. The third one, what does it mean to be a certified fraud examiner?

A. A certified fraud examiner is a professional designation for professionals who investigate fraud. That's pretty simple.

Q. Are all three of those certifications still in good standing?

A. They are and always have been.

Q. Tell the jury about your work experience since you became a CPA.

A. Since I became -- well, right out of school I was a parts inventory analyst for Boeing. I was then an in-house controller for a large international lumber company. I then went into very traditional accounting roles as a tax preparer/auditor, what I think most people think of a CPA as. Then in approximately 2005 I went to work for a large CPA firm in their forensic accounting department. And in 2007 I left that firm and started my own firm, where I've been since that time.

Q. And if you would, tell the jury about your work as an auditor in particular that you mentioned in that answer.

A. So as an auditor, when you're a brand new auditor, brand new CPA, one of the main things that they send, I call, the baby accountants out to do is count inventory. A big part of our job is to count the inventory, assist the client with identifying obsolete inventory, slow-moving inventory, and assisting with the adjustments that need to be made on the financial statements for any inventory that needs to be written down.

Q. Is that work relevant to your assignment in this case?

A. It's extremely relevant.

Q. How so?

A. Inventory is the largest asset of the Vivid entities. And it was the asset that was being improperly manipulated to reduce taxable income and Prasad's price.

Q. In total, Ms. Couch, how many times have you investigated company finances?

A. Hundreds of times at this point.

Q. Have you been accepted as a testifying expert on accounting matters in other lawsuits prior to this one?

A.   I have.

Q.   How many times have you testified?

A.   So I've testified approximately 85 times under oath, which means depositions, arbitrations, courtrooms like this.

Q.   How frequently do you review company financial statements to determine whether they accurately reflect financial performance, assets, liabilities, et cetera?

A.   So financial statement analysis is a big part of my job.  I'd say greater than 70 percent of the work that we do involves examining financial statements and tax returns.

Q.   Have you been involved in other cases in which the financial records of a company were at issue because they were used to buy out a particular owner of that business?

A.   I have.

Q.   And how did your analysis in those cases compare to the analysis that you did in this case?

A.   It's the same.

Q.   Are you prepared to tell us about your findings concerning the accuracy of the Vivid NC and Vivid Texas financial statements?

A.   I am.

MR. COBLE:  Your Honor, we tender Ms. Couch

as an expert.

THE COURT: The Court accepts the witness as an expert in the field of forensic accounting and allows her to express her opinions.

MR. COBLE: Thank you, Your Honor.

BY MR. COBLE:

Q. Ms. Couch, before we get to your opinions, I want to let you touch on a few accounting concepts that you'll use in your analysis, since we don't all have four-year accounting degrees like you. What are financial statements?

A. So financial statements are the high-level reports that companies use to make financial decisions.

Q. And did you view financial statements for the Vivid entities, Vivid NC/Vivid Texas, part of your assignment?

A. I did.

Q. Which ones did you look at?

A. So I primarily looked at the balance sheets and the income statements for both Vivid North Carolina and Vivid Texas.

Q. What's a balance sheet?

A. A balance sheet is a financial statement that shows what a company owes -- excuse me, what a company owns, what a company owes, and the net book value that

the owners have in that company.

Q. Did you make an illustration of that for your testimony?

A. I did.

Q. Let's pull up Exhibit Demonstrative 1.

Is this the illustration?

A. It is.

Q. So let's start over here in the red. What do you mean by "total assets"? What are those?

A. So assets are the items that a company owns. And I made a list here at the bottom. Things like cash, its cash balances; accounts receivable, which are the amounts that customers owe to the company; inventory; fixed assets. Those are the items you're going to see on the asset section of a balance sheet.

Q. Of those, which is most relevant to your assignment in this case?

A. Inventory.

Q. What is inventory?

A. So inventory are the items that a company can either make or buy to sell to its end customers.

Q. And what was the inventory in this particular case?

A. In this case the inventory is natural stone slab, so natural stone, granite, quartz, some of the things

that we've heard already today.

Q. Why do you say that inventory was the most relevant asset to your analysis in this case?

A. Number one it is the largest asset of the Vivid entities, but it was the asset that was being manipulated improperly to force certain financial outcomes.

Q. Who was doing the manipulating?

A. Vamsi.

Q. Why do you say that?

A. I say that because of testimony that I've reviewed which indicates that Vamsi was directing these adjustments. So primarily from those deposition and other testimony.

Q. Now, are there rules about how one values inventory or the balance sheet?

A. Absolutely, yes.

Q. Who makes those rules?

A. So primarily who makes those rules is an accounting body we call FASB, Financial Accounting Standards Board. And it's a set of rules. They make all kinds of rules on how accountants should put financial statements together, with inventory being one of the  -- included in that body of work.

Q. Why do these rules exist?

A.   So accounting rules, what we call GAAP, Generally Accepted Accounting Principles, those exist so that whether you're reading a financial statement for Nike or Microsoft or the Vivid entities, we should be relatively certain that they're put together with the same kinds of rules so that we understand, have an apples-to-apples comparison.

Q.   Were you familiar with the accounting rules that relate to inventory in particular?

A.   I am.

Q.   In your professional opinion did Vamsi follow those accounting rules in valuing inventory on the financial statements that you reviewed?

A.   Absolutely not.  Those rules were not followed at all.

Q.   What was the consequence of that?

A.   So the consequence of that is that the assets of the Vivid entities were understated, and that resulted in the book value or equity being understated.

Q.   And how did that affect Prasad?

A.   And that affected Prasad because Mr. Prasad's -- Mr. Prasad's price that he was paid in the Vivid entities was based on that green number or that green box, book value.  And by devaluing the inventory, it reduced that book value, and that resulted in a lower

price.

Q. You said that financial statements, like balance sheets, are high-level reports. What information makes up financial statements?

A. So financial statements are made up of what I call the everyday transactions that happen in a business. So sales to customers, and then the corresponding deposits that come in from those customers, payments to vendors for things like rent and insurance, payments to employees, payments on loans. So all of those detailed transactions that are occurring literally every day get compiled, and the financial statements are created from those.

Q. So how does someone actually go about generating a financial statement like a balance sheet?

A. In this day and age it's really quite easy. Most accounting systems it's the press of a button, and the accounting system will aggregate those numbers and print the financials for you.

Q. What accounting system did the Vivid entities use in this case?

A. QuickBooks.

Q. Do you have experience reviewing QuickBooks in connection with your assignments?

A. Yes, I do.

Q. Do you know how to use the platform yourself?

A. I do.

Q. Did you review in this case as part of your assignment the QuickBooks files for the Vivid entities?

A. I did.

Q. And we'll get to this in a bit, but when you looked at that, did you find what you were expecting to find?

A. So the QuickBooks records were, quite frankly, astonishing to me because they did not include the majority of the detailed transactions one would look for; for example, all of the deposits into the bank and all of the checks that were written from the bank account. All of that -- most of that was just missing from the QuickBooks reports or QuickBooks files we were given.

Q. All right. As we move toward your opinions, Ms. Couch, I want to make sure we've got some of the names right. When you say "Vivid entities," just to be clear, what are you referring to?

A. The Vivid entities are the entities that Mr. Prasad had an ownership with along with Rohit, Vinay, and Vamsi.

Q. What are the Vivid entities called?

A. Vivid NC, which is Vivid North Carolina; and

Vivid Texas.

Q. The two we've been talking about today?

A. Correct.

Q. When you say the "Cosmos entities," what are you referring to?

A. The Cosmos entities were the entities that Vinay, Rohit, and Vamsi created taking the Vivid NC assets and leaving Prasad out.

Q. Are you familiar with the term "freeze-out transaction"?

A. I am.

Q. Tell the jury what a freeze-out transaction is?

A. A freeze-out transaction is a transaction in which an owner or a group of owners force out another business partner, usually without that business partner's knowledge or consent.

Q. What applicability does that have here?

A. That's exactly what happened here with the Vivid NC and Vivid Texas freeze-out transactions.

Q. Did you prepare illustrations so we can see how that operated?

A. I did.

Q. If we could pull up the second.

Did you prepare this diagram?

A. I did.

Q. So tell the jury what we're looking at in the green up above?

A. So in the green up above is what the ownership interest of Vivid NC looked like before the freeze-out transaction. So we can see Vinay had 30 percent ownership interest, Rohit had 9.8 percent ownership interest, and Vamsi and Prasad had 60.2 percent interest via their ownership in that other entity which we call NC LLC. So that's who owned Vivid NC.

Q. That was the starting point before?

A. That's the before.

Q. What's the blue arrow?

A. The blue arrow is dated February 28, 2020. And it shows that the Vivid NC assets were sold below value to create Cosmos.

And if we could go to the orange.

So Cosmos Granite Charlotte received or purchased below value the Vivid entity's assets. And we can see now it's just Vamsi, Vinay, and Rohit are owners. Prasad is no longer an owner.

Q. So if you step back and look at the whole thing, the before and after, what changed with respect to Prasad?

A. What changed with respect to Prasad is he went from a 30.1 percent ownership in Vivid NC to a zero

percent ownership in Cosmos Granite Charlotte.

Q. How does that relate to the case to your understanding?

A. How it relates to the case is whether or not he was paid a fair price for his interest in Vivid NC.

Q. Did you reach an opinion in that regard?

A. I did.

Q. What is that?

A. He was not paid fairly and was significantly underpaid.

Q. Let's turn to your opinions in this case, Ms. Couch. Let's start with Exhibit 485, which is entitled "Final Report of Tiffany Couch." It's dated April 21st, 2022. Is this a document you've seen before?

A. It is.

Q. Who prepared it?

A. I did, along with the help of my staff.

Q. Did you also prepare other reports?

A. I've prepared five reports in total in this matter.

MR. COBLE: Your Honor, we move into evidence Exhibit P-485 with the other four, P-462, P-473, P-474, P-503.

THE COURT: They're received.

(Whereupon Exhibits P-485, P-462, P-473,and

P-474 are admitted into evidence.)

BY MR. COBLE:

Q. Does Exhibit P-485 and your other reports contain the opinions that you reached in this case after doing the analysis that you did?

A. It does.

Q. And have you prepared -- actually, let me -- I skipped one thing. Let's go back to make sure we get this. Let's go back to demonstrative 3 before I move into the opinions themselves.

Did you also prepare a diagram of the Vivid Texas freeze-out transaction?

A. I did.

Q. I think we can touch on this quickly, but the "before" there, let's remind ourselves what the "before" was there.

A. The "before" there is each of the members -- Vinay, Prasad, Vamsi, Rohit -- have 25 percent each with Prasad and Vamsi having their ownership through another company they own.

And then this freeze-out out transaction actually didn't happen until December 31st, 2020. And those assets of Vivid Texas were merged into Cosmos Granite Dallas. And as we can see, Vamsi, Vinay, and Rohit now each own a 33.3 percent share, and Mr. Prasad owns zero.

Q. Why did Vamsi, Vinay, and Rohit go from 25 percent to 33 percent?

A. They're essentially all sharing Prasad's former ownership.

Q. So how does that set of events, how does that relate to the issues in the case to your understanding?

A. It's the same issue in terms of the fact that: Was Prasad paid a fair price for his ownership interest in Cosmos -- excuse me, in Vivid Texas?

Q. Did you reach an opinion in that regard?

A. I did.

Q. What was it?

A. That that company too was significantly undervalued due to the manipulation of inventory.

Q. Coming back to your report, did you prepare a table that summarized the opinions that you reached in this case?

A. I did.

Q. Let's look at the fourth one. And so -- we won't need to go through the detail of the report. Let's start with your first opinion, Ms. Couch. What was your first opinion?

A. My first professional opinion is that the Vivid entities' books are unreliable.

Q. And tell the jury what you mean by that.

A. They're unreliable because the source documents, all of those detailed transactions that should make up the financial statements, those source transactions say one thing, while the financial statements say something else. That renders them unreliable.

Q. Why does it matter in this case that the books were unreliable?

A. They're unreliable because those were the books that were used to price Prasad's shares in the two companies.

Q. In those two freeze-out transactions that we just looked at?

A. Correct.

Q. What's your second opinion?

A. So my second opinion is that significant financial adjustments are required, meaning financial adjustments to those financial statements.

Q. So is that, in sort of everyday terms, does that mean in your professional opinion the financial statements were wrong?

A. Yeah, they're wrong, and they need to be fixed.

Q. What was wrong about them?

A. Primarily they are wrong because of the inventory, but there are other problems as well.

Q. So what was the upshot of the numbers being wrong

in your professional opinion?

A. So the upshot of the numbers being wrong is that the book value was undervalued, and Prasad was underpaid.

Q. What's your third opinion?

A. The freeze-out transactions were irregular.

Q. What do you mean by "irregular"?

A. There was no business purpose for these freeze-out transactions to occur. The companies were quite healthy, as we will see. And it appeared that they were transacted solely to remove Prasad and harm Prasad.

Q. We've heard some testimony about this. Did you look at the Vivid entities' financial records in terms of their financial health and performance in the years leading up to the freeze-out transactions?

A. Oh, yes.

Q. Did you see any evidence that those companies were in financial distress?

A. No, I actually saw quite the opposite.

Q. What did you see?

A. So I saw a company with healthy growing sales. I saw a company with a growing net income. I saw a company with increasing book value, which means their assets were increasing, and their liabilities were

decreasing. I saw them being able to pay themselves millions of dollars in distributions in the years in which they're claiming harm. And I was able to confirm that in addition to the distributions, they were able to come up with cash to not only pay off their bank, but pay themselves preferential payments. So there is the opposite of financial harm in terms of the financials of this company.

Q. All right. What was your fourth opinion?

A. My fourth opinion is that the Vivid entities' book values are materially misstated.

Q. I think we just looked at book value on the illustration with the red, gray, and green circles; is that right?

A. Correct.

Q. So just as a reminder, why is book value an important concept in this case?

A. So book value is really important because that, again, is the price that they attempted to pay Prasad for his shares. And the book value was materially misstated, which means significantly misstated.

Q. So what flows from your conclusion that the book values were materially misstated?

A. That Prasad was harmed financially.

Q. So we'll walk through the adjustments that you

recommend in just a bit.  But for now let's preview for the jury the adjustments that you recommend and look at Exhibit 507.

A.  Do I have these in a book?

Oh, I can read it.  I'm sorry.

Q.  So just tell the jury what we're looking at here in terms of the adjustments that you ultimately recommend be made to the Vivid NC and Vivid Texas book values.

A.  So these are the book values that -- book value increases that I believe need to happen for both Vivid NC and Vivid Texas.

So it's my professional opinion that the book value of Vivid NC needs to increase by $4,689,221, and it's my professional opinion that the book value for Vivid Texas needs to increase by $3,104,353 on each of the dates of the freeze-out transactions.

Q.  How does making those adjustments figure into what this case is about?

A.  It figures into the fact that, in fact, the financial statements were improper, unreliable, and Prasad was underpaid, primarily because of what we're looking at here.

Q.  So in making those adjustments, what are you recommending ultimately occur after those adjustments be

made?

A. It's my professional opinion that these adjustments have to be made first. And from there a business valuation can then occur based on those normalized numbers.

Q. Did that happen in this case, to your understanding?

A. It's my understanding that Mr. Wilhoite did that.

Q. Plaintiff's expert, Mr. Wilhoite?

A. That's correct.

Q. We'll hear from him later.

Let's go back to the list of your opinions and ask what your fifth opinion is?

A. My fifth opinion is that using book value harmed Prasad.

Q. Why is that?

A. That's because in my professional opinion that's not representative of a fair value of these companies.

Q. For now I'm going to skip six, seven, and eight. Let's finish off this opinion with nine. What was your ninth opinion?

A. My ninth opinion was that the opinions of Vamsi's experts are unreliable.

Q. How so?

A. They're primarily unreliable because they did not

do the significant amount of work that we did. And they did not properly analyze inventory to figure out what's really going on with this inventory and whether or not their clients were telling them the truth.

Q. So based on that, in your professional opinion does the analysis of Vamsi's experts, does it hold water?

A. It doesn't hold water. It just doesn't.

Q. All right. So let's now dive into your first opinion, which was that the books and records are unreliable of the Vivid entities. In your review of those books and records, did you develop any concerns about what you saw?

A. I did.

Q. Let's start with QuickBooks. You said you reviewed those?

A. I did.

Q. Why did you do that?

A. So QuickBooks, it's a normal and customary process in my office, if somebody is using QuickBooks, we can use it. And it's my normal and customary process to review the QuickBooks to verify, number one, that the transactions match the bank statements and other source documents and that they all match the tax returns.

Q. And what do you expect to find in QuickBooks or any accounting program when you're doing the sort of review that you did in this case for the Vivid entities?

A. In the accounting program you would expect to find all of the detailed transactions we talked about; so all of the deposits, all of the checks, sales records, accounts receivable. You would expect to find all of that in an accounting system.

Q. Is that what you found here?

A. No.

Q. What did you find?

A. I found that most of that detailed transaction was not in QuickBooks, and instead they were entering information at a summary level.

Q. What does it mean to enter information at a summary level?

A. It meant to me that there had to be a second set of books somewhere, because in order to create journal entries and enter information in at a summary level, you've got to have all of the detail level somewhere.

Q. In your professional experience how many companies and clients have you reviewed QuickBooks files like these?

A. Hundreds.

Q. And in that experience, how many -- on how many

occasions have you observed in the QuickBooks files what you observed in this particular case?

A. Never.

Q. This was the only time you've seen them like this?

A. Literally the only time.

Q. As a result of that, where did that lead you next in your work?

A. I indicated that there had to be another set of books somewhere. We were told that there weren't. So I proposed that we look at all of the bank statements and cancelled check images and that we literally itemize all of those transactions.

Q. It sounds like a lot of work.

A. It was.

Q. Did Vamsi's expert do that same work?

A. He did not.

Q. So what did you conclude from the work that you did?

A. So we took all of that data, about 20,000 lines of data, and I was able to conclude that we had a better ability to identify the sources or the deposits into this company and uses of money, which means the outgoing money, of this company than any of the accounting records we were provided.

Q.   Was inventory and sales detail available in the QuickBooks files that you reviewed for the Vivid entities?

A.   Inventory and sales records were not in QuickBooks either.

Q.   So where did that lead you next in your analysis?

A.   I asked for the detailed inventory and sales records for the Vivid entities.

Q.   Did you receive sales and inventory records?

A.   I received them in a very difficult way, but not in a complete way.

Q.   So what did you have to do as a result of that?

A.   Inventory, we only got a few years' worth of records.  And then for sales I had to put together the various reports that they gave me piecemeal.  And we put together a sales database of all of the sales, which were 110,000 sales of slabs.

Q.   Is it typical for you to have to do so much work to look into inventory and sales of a company of this size?

A.   No.  Typically these companies would have reports they could print and provide to us.  And that just did not happen in this case.

Q.   So did Vamsi's expert do this second layer of work that you just described with the inventory and

sales reports?

A. He did not.

Q. So once you had the inventory and sales reports in a form that you could use, did what you see in them match what you were seeing in QuickBooks?

A. No. So the source documents, the bank statements, the sales documents in particular, and inventory records were vastly different from those source documents as compared to what was in QuickBooks.

Q. Was that discrepancy a matter of concern to you?

A. Yes, because they were very large discrepancies.

Q. And what were the discrepancies in particular? What was the source of that?

A. So the primary discrepancy was inventory, where the inventory values in the Vivid North Carolina and Vivid Texas inventory systems, the ERP system that we've all heard about today, those inventory values were millions of dollars more in their system than they were being reported in QuickBooks, and QuickBooks is what the tax returns were based on.

Q. So how did those discrepancies arise?

A. I realized that those -- I figured out that those discrepancies arose because of journal entries they were making to manipulate and adjust the inventory improperly.

Q.   And you say "adjust inventory."  Is that the same as writing down inventory?

A.   Typically you would write down inventory. That's not what they were doing.  They say that's what they were doing, but --

Q.   Explain that to the jury.

A.   So writing down inventory, every company is going to buy or make things that they need to -- they can no longer sell.  Things get old. We call that obsolete inventory.  Or maybe they can sell it but at a bargain basement.  So the accounting rules tell us that we have to devalue or write down the portion of that inventory that we can no longer sell at the cost that we paid to procure it.  And so there are rules for that.  Those rules were not being followed in this case.

Q.   And in what respect were the rules  not being followed in this case?

A.   In this case they were writing down inventory to -- in order to get to a very certain net income number that they wanted.

And -- and I lost my train of thought.  I'm sorry.

Q.   And what reason was offered for writing down the inventory in this case?

A.   So the reason that was being offered was that the

inventory was obsolete.  But the Vivid entities' sales records show the opposite of that, that most of that inventory was actually not only not obsolete, but it was selling for very large gross profit margins.

Q.  Let's take that in parts there.  So you said the reason being offered was that the inventory that was written down was supposedly obsolete?

A.  Correct.

Q.  So what does it mean to be obsolete in terms of inventory?

A.  So inventory that's obsolete is inventory that a company can no longer sell or, if it can sell it, it has to sell it at what we might call a bargain basement price.

Q.  So what was Vamsi doing to figure out if the inventory being written down was obsolete?

A.  He was basically basing it on how old the inventory was, its age.

Q.  Was he doing an analysis of whether it was actually obsolete?

A.  There's no analysis whatsoever.

Q.  Did Vamsi's expert in this case do any analysis of whether the inventory was actually obsolete?

A.  No.

Q.  Did you do an analysis of whether the inventory

was actually obsolete?

A. I did.

Q. What did you find?

A. I found that inventory at the Vivid entities was moving very healthily through five years of age. Meaning the year that it got there through five years, it was going to sell for a very healthy gross profit before it became obsolete.

Q. Based on that, in your professional opinion was the treatment of inventory here in compliance with accounting rules?

A. Absolutely not. It was breaking all of the accounting rules.

Q. And so what is the upshot of that conclusion?

A. Again, the upshot of that is they were improperly devaluing inventory, and that was devaluing the book value. And that harmed Prasad because he was underpaid for his business interest in the Vivid entities.

THE COURT: I think this would be a good time to stop for the night. It's getting late, and I know you have to drive long distances. We have people from counties that are 40, 50 miles away. So we'll resume at 10:00 tomorrow morning.

You're just hearing the evidence in the case right now. Don't form any opinions. Don't discuss it

269

with anyone.

Have a safe trip, and come back tomorrow at 10:000, and we'll resume with the trial.

(Adjourned at 5:43 p.m.)

- - -

**C E R T I F I C A T E**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Tracy L. McGurk_____                    ___6/22/2023___
Tracy L. McGurk, RMR, CRR                         Date

I N D E X

Examinations                                              Page

TEJASHREE NALLAPATY, DIRECT EXAMINATION                    37
BY MR. COBLE:

TEJASHREE NALLAPATY, CROSS-EXAMINATION                     49
BY MR. PARRY:

HARI HARA PRASAD NALLAPATY, DIRECT EXAMINATION             51
BY MR. COBLE:

HARI HARA PRASAD NALLAPATY, CROSS-EXAMINATION             150
BY MR. PARRY:

HARI HARA PRASAD NALLAPATY, REDIRECT EXAMINATION          191
BY MR. COBLE:

Testimony of Vamsi Mohan Nallapati, January 23, 2019,     197
is read into the record

VINAY BHARADWAJ, DIRECT EXAMINATION                       205
BY MR. MORSE:

VINAY BHARADWAJ, CROSS-EXAMINATION                        224
BY MR. PARRY:

VINAY BHARADWAJ, REDIRECT EXAMINATION                     234
BY MR. MORSE:

TIFFANY COUCH, DIRECT EXAMINATION                         239
BY MR. COBLE:

```
                    E X H I B I T S
No.       Description                                    Page


          Whereupon Exhibit P-312 is admitted into        55
          evidence
          Whereupon Exhibit P-375 is admitted into        56
          evidence
          Whereupon Exhibit P-80 is admitted into evidence 58
          Whereupon Exhibits P-389, P-390, and P-391 are   67
          admitted into evidence
          Whereupon Exhibit P-67 is admitted into evidence 80
          Whereupon Exhibit P-381 is admitted into        81
          evidence
          Whereupon Exhibit P-381 is admitted into        90
          evidence
          Whereupon Exhibit P-63 is admitted into evidence 91
          Whereupon Exhibit P-336 is admitted into        94
          evidence
          Whereupon Exhibit P-232 is admitted into        97
          evidence
          Whereupon Exhibit P-376 is admitted into       104
          evidence
          Whereupon Exhibit P-383 is admitted into       106
          evidence
          Whereupon Exhibits P-353, P-365, P-359, and P-86 112
```

are admitted into evidence

Whereupon Exhibit P-439 is admitted into          114
evidence

Whereupon Exhibit P-68 is admitted into evidence   116

Whereupon Exhibit P-306 is admitted into          124
evidence

Whereupon Exhibit P-89 is admitted into evidence   126

Whereupon Exhibit P-119 is admitted into          128
evidence

Whereupon Exhibit P-78 is admitted into evidence   138

Whereupon Exhibit P-457 is admitted into          140
evidence

Whereupon Exhibit P-432 is admitted into          142
evidence

Whereupon Exhibit P-410 is admitted into          145
evidence

Whereupon Exhibit P-344 is admitted into          209
evidence

Whereupon Exhibits P-1, P-311, P-107, and D-444   234
are admitted into evidence

Whereupon Exhibits P-485, P-462, P-473,and P-474  253
are admitted into evidence

**$**

**$1.35** [1] - 177:6
**$10** [1] - 224:5
**$10,000** [1] - 75:1
**$100,000** [2] - 9:19, 81:25
**$11** [1] - 222:11
**$14,941** [2] - 113:25, 114:3
**$20,000** [1] - 75:2
**$200,000** [4] - 30:22, 115:14, 115:21, 120:12
**$3,104,353** [1] - 259:16
**$30** [3] - 219:22, 222:2, 222:18
**$30,000** [1] - 75:2
**$30,948,000** [2] - 220:2, 220:16
**$350,000** [1] - 199:9
**$4,689,221** [1] - 259:14
**$450,000** [4] - 137:11, 137:18, 138:2, 195:8
**$490,000** [3] - 148:10, 148:21, 149:19
**$5,000** [1] - 75:1
**$600,000** [1] - 185:16
**$700,000** [3] - 137:23, 194:22, 195:1
**$9,300,000** [1] - 208:12
**$9.34** [1] - 217:21

**'**

**'18** [1] - 163:4

**/**

**/s** [1] - 269:16
**/STRAOE** [2] - 58:13, 58:14

**1**

**1** [9] - 1:6, 1:10, 132:2, 132:8, 136:18, 167:5, 167:9, 177:2, 246:5
**1.2** [2] - 176:16, 177:8
**1.4** [4] - 175:11, 175:12, 176:10, 177:4
**1.63** [1] - 215:8
**1.9-something** [1] - 143:24
**100** [16] - 1:18, 80:3, 80:4, 116:16, 117:23, 126:10, 135:8, 135:9, 194:5, 198:15, 199:13, 199:20, 200:14, 203:15, 230:11
**100,000** [3] - 71:15, 81:10, 81:11
**104** [1] - 271:21

**106** [1] - 271:23
**1065** [1] - 210:17
**10:00** [1] - 268:23
**10:000** [1] - 269:3
**11** [2] - 203:4, 222:19
**110** [1] - 200:4
**110,000** [1] - 264:17
**112** [1] - 271:25
**114** [2] - 190:3, 272:2
**116** [1] - 272:4
**117** [2] - 128:13, 202:10
**119** [3] - 126:23, 127:9, 128:8
**11:00** [1] - 2:1
**11:59** [1] - 147:14
**12** [2] - 125:17, 231:11
**12/31/2017** [5] - 208:11, 208:18, 209:2, 211:9, 211:13
**120** [6] - 135:20, 182:23, 183:10, 199:6, 200:4, 200:24
**124** [2] - 147:9, 272:5
**126** [1] - 272:7
**128** [1] - 272:8
**12th** [1] - 111:2
**13** [3] - 172:4, 172:20, 231:11
**138** [1] - 272:10
**140** [1] - 272:11
**142** [1] - 272:13
**145** [1] - 272:15
**15** [5] - 58:17, 73:12, 109:18, 113:9, 227:5
**15,000** [2] - 75:18, 75:19
**150** [11] - 135:20, 168:20, 189:11, 189:13, 189:14, 189:20, 190:6, 190:8, 190:25, 200:24, 270:11
**150s** [1] - 190:23
**159** [1] - 189:10
**178** [3] - 173:14, 173:17, 173:21
**18** [1] - 240:1
**180** [8] - 10:15, 77:1, 77:8, 162:14, 169:7, 169:14, 199:8, 199:11
**180-day** [9] - 10:11, 10:13, 77:10, 78:4, 78:13, 79:4, 79:20, 80:2, 135:3
**1800** [1] - 1:16
**181** [1] - 203:3
**19** [2] - 179:24, 180:3
**191** [1] - 270:13
**197** [1] - 270:15
**1997** [1] - 241:6
**1st** [2] - 109:16, 235:25

**2**

**2** [5] - 14:4, 92:7, 180:1,

215:4, 222:11
**2.47** [5] - 143:17, 143:18, 143:19, 143:20, 143:25
**20** [4] - 134:22, 136:8, 136:11, 200:11
**20,000** [3] - 75:18, 75:19, 263:20
**2000** [4] - 8:22, 24:11, 62:11, 241:21
**2005** [28] - 7:1, 8:21, 8:24, 11:7, 21:18, 25:1, 25:14, 25:17, 53:9, 64:6, 64:12, 64:13, 73:20, 79:7, 86:12, 89:6, 89:15, 90:4, 95:19, 154:18, 158:2, 161:6, 162:17, 167:3, 167:21, 168:7, 202:24, 242:21
**2007** [1] - 242:23
**2008** [5] - 46:22, 46:23, 227:5, 242:5
**2009** [12] - 13:10, 29:18, 31:20, 50:1, 50:4, 92:19, 92:20, 92:21, 159:10, 194:4, 218:8, 225:3
**200K** [1] - 120:10
**2010** [2] - 144:11, 203:14
**2011** [1] - 65:6
**2013** [5] - 38:8, 113:4, 166:4, 192:23, 193:17
**2014** [5] - 76:11, 103:5, 107:19, 115:9, 202:24
**2015** [32] - 15:10, 15:13, 29:23, 30:5, 30:10, 30:18, 31:17, 48:8, 50:8, 107:21, 107:22, 109:16, 114:22, 118:7, 118:8, 160:14, 160:23, 167:5, 167:7, 167:9, 167:24, 168:10, 169:17, 173:8, 173:11, 173:19, 174:1, 186:23, 187:16, 201:20, 203:23, 204:10
**2016** [14] - 15:19, 17:7, 60:5, 120:24, 120:25, 121:4, 122:8, 122:18, 123:1, 127:12, 160:18, 176:6, 204:14, 211:20
**2017** [35] - 17:7, 17:15, 42:16, 42:18, 45:14, 128:15, 129:13, 130:24, 131:6, 131:19, 141:11, 163:4, 164:11, 166:10, 173:9, 174:6, 174:18, 174:22, 177:21, 178:9, 178:13, 178:23, 179:9, 179:24, 180:4, 180:23, 185:21, 188:4, 188:16, 210:9, 210:11, 210:19, 217:18, 231:3
**2017-2018** [1] - 138:5
**2018** [6] - 17:15, 164:12,

172:2, 172:15, 172:21, 193:24
**2019** [27] - 139:13, 139:20, 142:13, 144:21, 175:5, 182:2, 183:18, 183:21, 184:9, 185:3, 185:12, 186:11, 187:10, 197:13, 197:19, 197:23, 202:10, 205:2, 218:22, 219:22, 219:25, 220:16, 223:19, 234:18, 238:5, 270:15
**2020** [27] - 18:11, 18:25, 19:9, 19:14, 23:25, 31:13, 32:17, 34:15, 35:23, 140:16, 141:14, 143:3, 143:14, 147:15, 180:21, 227:25, 231:3, 233:2, 233:19, 236:1, 236:24, 237:6, 237:9, 237:15, 252:13, 254:22
**2021** [5] - 19:21, 111:3, 143:14, 147:12, 147:24
**2022** [3] - 189:24, 190:3, 253:14
**2023** [1] - 1:6
**205** [2] - 172:13, 270:17
**2055** [1] - 49:23
**206** [1] - 172:19
**209** [1] - 272:17
**21** [2] - 189:24, 190:3
**211** [1] - 164:8
**21st** [1] - 253:14
**22** [2] - 197:13, 202:10
**224** [1] - 270:19
**229** [1] - 197:19
**23** [6] - 153:20, 153:22, 189:15, 197:19, 197:23, 270:15
**232** [2] - 95:23, 97:13
**234** [2] - 270:21, 272:19
**239** [1] - 270:23
**25** [18] - 16:3, 123:14, 124:25, 125:6, 125:12, 125:21, 126:9, 189:11, 189:14, 189:15, 189:21, 190:6, 191:1, 192:3, 200:8, 200:12, 254:18, 255:1
**253** [1] - 272:21
**26** [3] - 192:3, 192:8, 239:25
**27517** [1] - 1:19
**27602** [1] - 1:16
**28** [1] - 252:13
**28560** [1] - 1:21
**29** [4] - 169:8, 169:14, 173:17, 176:6
**2:00** [1] - 94:11

**3**

**3** [7] - 14:4, 108:18, 213:15, 213:20, 215:9, 229:9, 254:9
**3.3** [3] - 210:25, 211:13, 212:20
**30** [17] - 41:12, 42:4, 42:5, 42:7, 42:9, 77:15, 77:16, 77:18, 97:10, 97:18, 134:24, 135:16, 171:11, 201:1, 220:22, 223:19, 252:5
**30.1** [1] - 252:25
**306** [2] - 124:3, 124:16
**31** [1] - 147:15
**312** [4] - 54:5, 54:20, 54:23, 123:15
**31st** [1] - 254:22
**32** [1] - 172:11
**328** [2] - 175:19, 175:25
**33** [1] - 255:2
**33.3** [1] - 254:25
**330** [4] - 179:17, 179:18, 180:2, 181:4
**332** [1] - 185:10
**336** [1] - 88:6
**35** [1] - 232:25
**350,000** [2] - 70:3, 70:5
**351** [1] - 1:18
**353** [2] - 110:18, 112:10
**35848** [1] - 220:7
**35849** [1] - 220:9
**359** [2] - 111:16, 112:10
**361** [1] - 197:20
**365** [2] - 111:7, 112:10
**37** [2] - 125:16, 270:5
**372** [1] - 201:18
**375** [3] - 55:23, 56:21, 106:5
**376** [2] - 103:3, 104:9
**381** [3] - 80:16, 81:18, 90:10
**383** [2] - 105:6, 105:24
**389** [2] - 66:4, 67:8
**390** [2] - 65:3, 67:8
**391** [2] - 65:15, 67:8
**392-6626** [1] - 1:21
**3rd** [1] - 96:4

**4**

**4** [1] - 14:5
**40** [6] - 77:15, 77:16, 77:18, 232:25, 241:18, 268:22
**400,000** [2] - 70:4, 70:5
**410** [2] - 144:9, 145:20
**413** [1] - 1:20
**419** [1] - 1:21
**432** [2] - 140:14, 141:25

**439** [2] - 113:2, 114:13
**45** [1] - 40:21
**457** [2] - 139:6, 140:8
**468** [1] - 197:19
**485** [1] - 253:12
**49** [1] - 270:7

**5**

**5** [6] - 147:12, 194:18, 197:20, 210:17, 224:5, 224:7
**5.9** [7] - 214:6, 214:22, 215:2, 229:15, 229:17, 230:10, 230:14
**5.972** [1] - 213:17
**50** [17] - 21:6, 29:25, 109:19, 134:12, 160:16, 160:20, 198:9, 198:13, 198:16, 198:19, 199:21, 200:7, 201:2, 203:1, 230:13, 268:22
**50,000** [1] - 123:5
**50/50** [64] - 7:2, 11:8, 12:5, 12:16, 13:4, 13:19, 13:24, 14:13, 14:18, 14:20, 15:6, 16:3, 16:11, 16:15, 16:16, 21:2, 53:19, 55:19, 55:21, 56:14, 56:15, 57:11, 57:13, 58:24, 59:21, 59:25, 67:16, 67:17, 71:12, 71:21, 71:23, 91:21, 95:22, 98:6, 98:8, 98:23, 98:24, 99:1, 101:18, 101:20, 102:8, 105:2, 105:4, 106:11, 106:14, 106:21, 108:4, 108:6, 113:10, 114:9, 117:8, 117:9, 117:15, 119:21, 125:15, 152:2, 198:1, 198:25, 201:15, 202:25, 203:22, 236:16, 236:18
**507** [1] - 259:3
**50K** [1] - 113:17
**51** [1] - 270:9
**55** [1] - 271:4
**56** [1] - 271:6
**58** [1] - 271:8
**5:20-cv-470-BO** [1] - 1:4
**5:43** [1] - 269:4
**5th** [1] - 147:24

**6**

**6** [6] - 175:25, 176:4, 210:23, 217:19, 218:3, 218:10
**6/22/2023** [1] - 269:16
**60** [10] - 31:24, 41:12, 42:7, 42:9, 79:10, 80:7, 134:24, 135:11, 135:13, 135:16

**60.2** [6] - 13:14, 98:1, 98:2, 98:4, 98:12, 252:7
**63** [3] - 90:8, 90:15, 91:15
**67** [3] - 76:3, 80:10, 271:9
**68** [2] - 115:5, 116:2

**7**

**7** [2] - 201:18, 220:6
**70** [6] - 80:7, 80:8, 135:11, 135:13, 200:10, 244:10
**700K** [1] - 137:2
**75** [1] - 200:10
**78** [5] - 134:7, 134:8, 138:11, 194:14, 194:19

**8**

**8** [4] - 1:6, 202:10, 219:21, 220:4
**80** [4] - 57:14, 58:3, 99:2, 271:11
**81** [1] - 271:12
**85** [1] - 244:3
**86** [2] - 111:23, 112:10
**87** [3] - 108:7, 110:9, 116:10
**89** [2] - 126:4, 126:17

**9**

**9** [3] - 164:15, 229:8
**9.3** [9] - 208:18, 211:8, 212:15, 212:25, 214:20, 214:24, 217:25, 218:3, 218:10
**9.3-some** [1] - 213:14
**9.6** [2] - 222:3, 223:20
**9.8** [1] - 252:6
**90** [9] - 79:11, 187:3, 199:6, 199:11, 199:20, 199:22, 200:3, 200:4, 271:14
**91** [1] - 271:16
**94** [2] - 118:1, 271:17
**97** [1] - 271:19

**A**

**a.m** [1] - 2:1
**ability** [7] - 10:13, 12:1, 12:3, 15:1, 34:11, 131:18, 263:22
**able** [19] - 10:11, 17:9, 22:8, 70:7, 73:25, 76:23, 112:2, 130:4, 135:4, 135:20, 135:23, 135:24, 200:1, 213:4, 213:6, 258:1, 258:3,

258:4, 263:21
**above-entitled** [1] - 269:13
**absence** [1] - 28:5
**absolutely** [3] - 247:17, 248:14, 268:12
**accent** [1] - 235:4
**accept** [3] - 4:7, 58:9, 102:19
**Accepted** [1] - 248:2
**accepted** [2] - 132:16, 243:24
**accepts** [1] - 245:2
**access** [18] - 36:1, 129:5, 129:9, 129:14, 129:18, 129:24, 130:9, 130:12, 130:13, 130:21, 130:24, 141:12, 174:6, 174:19, 179:9, 182:2, 182:12, 228:21
**accompany** [1] - 46:24
**accomplish** [2] - 192:5, 192:12
**accomplished** [1] - 7:12
**according** [3] - 167:8, 212:10, 238:8
**accordingly** [1] - 139:1
**account** [5] - 27:23, 31:6, 115:15, 167:24, 250:14
**accountant** [30] - 16:6, 54:11, 56:10, 76:6, 98:11, 98:20, 103:17, 105:9, 105:10, 105:11, 105:12, 108:10, 108:14, 108:15, 123:18, 123:19, 128:18, 163:23, 179:10, 180:12, 181:1, 191:14, 239:16, 239:17, 239:18, 239:25, 241:15, 241:16, 241:17
**Accountant** [2] - 241:10, 241:14
**accountants** [14] - 12:11, 137:9, 137:13, 137:16, 137:20, 182:4, 182:14, 187:10, 192:4, 192:12, 192:16, 243:6, 247:22
**Accountants** [1] - 242:1
**accounted** [1] - 198:16
**accounting** [31] - 7:14, 20:12, 20:17, 35:17, 36:1, 186:15, 239:15, 239:19, 240:1, 241:4, 242:3, 242:19, 242:23, 243:25, 245:3, 245:8, 245:10, 247:20, 248:1, 248:8, 248:12, 249:17, 249:18, 249:20, 262:2, 262:4, 262:8, 263:24, 266:11, 268:11, 268:13
**Accounting** [2] - 247:20, 248:2
**accounts** [6] - 23:16, 128:19, 137:10, 137:17,

246:12, 262:7

**accuracy** [1] - 244:22
**accurate** [2] - 56:19, 58:1
**accurately** [1] - 244:7
**accused** [1] - 239:22
**accusing** [1] - 177:24
**acknowledge** [1] - 152:20
**acknowledges** [2] - 32:11, 32:13
**acknowledging** [1] - 15:5
**acquire** [1] - 104:17
**acquired** [6] - 13:18, 13:19, 58:16, 58:17, 104:15, 184:2
**acquiring** [1] - 13:14
**act** [3] - 21:7, 33:21, 34:18
**acted** [4] - 12:20, 12:21, 34:18
**acting** [1] - 63:2
**action** [1] - 19:13
**actions** [2] - 22:17, 23:24
**active** [1] - 44:16
**activities** [2] - 47:13, 231:7
**activity** [1] - 178:13
**actual** [2] - 120:15, 214:7
**Acuity** [1] - 239:13
**add** [4] - 90:4, 103:2, 103:12, 198:12
**adding** [1] - 102:21
**addition** [2] - 12:18, 258:4
**additional** [2] - 77:20, 112:5
**addressed** [3] - 108:13, 115:19, 140:15
**adjourned** [1] - 269:4
**adjust** [3] - 227:20, 265:24, 266:1
**adjusted** [5] - 212:19, 225:14, 226:5, 228:8, 230:23
**adjusting** [1] - 227:23
**adjustment** [7] - 211:24, 212:5, 212:9, 215:12, 215:21, 217:7, 227:9
**adjustments** [19] - 212:3, 212:7, 225:8, 225:9, 226:13, 226:14, 227:16, 228:15, 243:10, 247:13, 256:16, 256:17, 258:25, 259:2, 259:7, 259:18, 259:24, 259:25, 260:3
**administer** [1] - 2:2
**admissible** [1] - 3:5
**admit** [7] - 158:18, 159:10, 159:22, 167:4, 167:15, 167:20, 168:9
**admitted** [50] - 55:1, 56:24, 58:6, 67:11, 80:13, 81:21, 90:12, 91:18, 94:17, 97:15, 104:12, 106:2, 112:13, 114:16, 116:5, 124:19, 126:20, 128:10, 138:13,

140:11, 142:2, 145:23, 209:11, 234:12, 254:1, 271:4, 271:6, 271:8, 271:10, 271:11, 271:12, 271:14, 271:16, 271:17, 271:19, 271:21, 271:23, 272:1, 272:2, 272:4, 272:5, 272:7, 272:8, 272:10, 272:11, 272:13, 272:15, 272:17, 272:20, 272:22
**advance** [2] - 18:20, 81:17
**advantage** [1] - 80:1
**advantageous** [2] - 41:14, 41:18
**adverse** [5] - 216:2, 216:9, 217:12, 217:13, 238:14
**advise** [1] - 147:14
**affairs** [5] - 9:11, 74:6, 75:12, 82:14, 82:15
**affect** [4] - 12:3, 12:5, 14:19, 248:20
**affected** [1] - 248:21
**affidavit** [14] - 153:11, 153:13, 153:14, 153:19, 169:6, 169:8, 169:11, 172:9, 173:14, 189:9, 189:20, 189:23, 190:2, 190:22
**Africa** [1] - 73:6
**afternoon** [3] - 190:15, 239:9, 239:11
**afterwards** [2] - 90:6, 99:25
**age** [12] - 44:14, 187:17, 188:11, 188:18, 188:19, 226:15, 227:24, 228:9, 230:23, 249:16, 267:18, 268:5
**age-adjusted** [1] - 230:23
**aggregate** [1] - 249:18
**aggressive** [3] - 189:5, 189:18, 191:5
**ago** [3] - 27:15, 116:11, 159:23
**agree** [50] - 2:15, 2:22, 30:24, 67:3, 67:13, 68:5, 68:11, 71:13, 71:20, 76:16, 81:6, 99:3, 101:16, 104:25, 108:23, 122:25, 128:1, 128:4, 148:13, 149:6, 149:7, 150:15, 150:19, 150:22, 151:2, 151:5, 151:6, 156:24, 160:8, 160:13, 167:8, 172:23, 174:18, 178:14, 178:17, 182:11, 183:17, 185:24, 185:25, 186:3, 187:4, 187:5, 187:6, 188:10, 188:13, 188:16, 189:5, 191:3, 191:4, 217:18
**agreed** [20] - 11:5, 11:7, 12:25, 13:18, 14:12, 15:13, 16:2, 26:19, 118:18, 122:7,

122:9, 132:5, 133:6, 182:2, 182:21, 189:17, 198:1, 200:18, 216:17, 225:24
**agreeing** [1] - 12:18
**Agreement** [2] - 221:3, 221:5
**agreement** [46] - 11:13, 14:1, 14:20, 15:5, 16:1, 16:12, 18:7, 27:21, 53:15, 53:16, 55:16, 57:7, 69:11, 87:21, 87:22, 108:25, 123:12, 126:1, 126:15, 126:16, 137:16, 155:7, 155:12, 155:16, 158:18, 158:22, 178:19, 182:10, 182:11, 183:1, 183:4, 183:5, 183:13, 183:15, 183:18, 198:4, 198:16, 198:25, 202:23, 203:22, 206:8, 206:10, 221:16
**agreements** [9] - 16:8, 88:15, 88:20, 108:21, 109:5, 109:10, 110:4, 110:6, 110:7
**ahead** [8] - 35:7, 39:11, 40:10, 40:11, 40:14, 40:18, 190:18, 204:7
**AICPA** [1] - 241:25
**air** [1] - 35:11
**ALAN** [1] - 1:17
**Alan** [1] - 22:20
**allegations** [1] - 239:21
**alleged** [8] - 165:15, 165:23, 166:2, 166:9, 167:4, 167:8
**allocate** [2] - 116:16, 116:23
**allocated** [7] - 116:24, 117:17, 117:18, 117:19, 126:11, 202:22, 203:2
**allocating** [1] - 117:14
**Allocation** [1] - 116:9
**allocation** [1] - 116:9
**allow** [3] - 102:15, 129:6, 182:4
**allowed** [2] - 10:16, 77:25
**allows** [1] - 245:3
**alluded** [1] - 28:7
**almost** [7] - 10:15, 19:3, 20:6, 34:23, 35:4, 176:16, 185:16
**alone** [1] - 2:11
**altogether** [1] - 200:10
**amend** [1] - 191:11
**America** [8] - 115:15, 126:8, 134:9, 204:12, 208:5, 208:12, 208:16, 228:25
**American** [1] - 241:25
**AmeriSource** [1] - 219:2
**amount** [15] - 30:14, 36:7, 121:19, 121:25, 122:3,

132:12, 133:10, 137:5, 137:6, 138:3, 143:16, 143:21, 195:6, 261:1
**amounts** [8] - 113:11, 113:12, 133:13, 133:15, 175:9, 176:4, 176:22, 246:13
**analysis** [12] - 244:9, 244:18, 244:19, 245:9, 247:3, 254:5, 261:6, 264:6, 267:19, 267:21, 267:22, 267:25
**analyst** [1] - 242:17
**analyze** [2] - 240:3, 261:2
**AND** [1] - 1:11
**ANDERSON** [1] - 1:17
**annual** [2] - 163:9, 192:20
**Annual** [3] - 164:9, 164:11, 193:18
**anomalies** [1] - 239:20
**answer** [8] - 3:8, 3:9, 55:4, 154:20, 206:20, 212:22, 238:13, 243:3
**answering** [1] - 51:19
**answers** [1] - 217:11
**anyways** [1] - 91:8
**apart** [7] - 28:24, 52:23, 73:4, 123:5, 132:3, 150:2, 230:21
**Apart** [2] - 137:1, 194:21
**apologize** [1] - 35:5
**appear** [1] - 193:24
**APPEARANCES** [1] - 1:12
**appeared** [2] - 15:24, 257:10
**apples** [2] - 248:6
**apples-to-apples** [1] - 248:6
**applicability** [1] - 251:17
**applied** [1] - 152:2
**apply** [2] - 2:12, 4:24
**appointed** [1] - 137:16
**appraisal** [1] - 120:15
**appraisals** [1] - 30:13
**appraise** [1] - 35:12
**appraiser** [2] - 34:8, 34:9
**appreciate** [1] - 22:7
**appreciation** [1] - 26:14
**appreciative** [1] - 26:12
**approach** [9] - 153:8, 164:5, 175:16, 179:13, 185:7, 189:5, 190:12, 197:16, 210:1
**approval** [5] - 18:7, 20:2, 131:11, 164:25, 165:10
**approve** [7] - 40:18, 149:2, 161:17, 161:21, 163:17, 165:19, 227:13
**approved** [4] - 155:20, 156:1, 156:4, 224:3
**approves** [1] - 162:1

**April** [1] - 253:13
**apt** [1] - 140:14
**Arabia** [1] - 73:4
**arbitrary** [1] - 56:14
**arbitrations** [1] - 244:4
**area** [2] - 179:6, 239:14
**arguing** [1] - 188:6
**argument** [1] - 5:23
**arguments** [2] - 2:25, 6:5
**arise** [1] - 265:21
**Arkansas** [2] - 64:19, 83:24
**arose** [1] - 265:23
**arrangement** [5] - 21:2, 49:6, 106:23, 107:6, 155:20
**arriving** [1] - 7:14
**arrow** [2] - 252:12, 252:13
**Ashville** [1] - 198:6
**aside** [1] - 156:6
**aspects** [2] - 53:24, 110:14
**asserting** [3] - 169:18, 170:22, 170:25
**assessing** [1] - 141:8
**Asset** [2] - 221:2, 221:5
**asset** [8] - 18:21, 18:24, 243:17, 243:18, 246:15, 247:3, 247:4, 247:5
**assets** [27] - 17:19, 18:12, 18:14, 34:20, 131:15, 141:3, 141:8, 141:15, 142:24, 143:9, 145:6, 146:14, 146:19, 146:22, 184:2, 184:3, 244:8, 246:9, 246:10, 246:14, 248:17, 251:7, 252:14, 252:18, 254:23, 257:25
**assignment** [4] - 243:13, 245:16, 246:17, 250:4
**assignments** [1] - 249:24
**assist** [1] - 243:8
**assistance** [2] - 26:18, 33:9
**assisting** [1] - 243:9
**assuming** [1] - 88:14
**assurance** [1] - 69:13
**assuring** [1] - 70:1
**astonishing** [1] - 250:10
**Atlanta** [25] - 14:8, 17:1, 23:15, 31:5, 31:10, 58:19, 100:24, 100:25, 104:15, 104:18, 105:1, 109:18, 113:8, 113:14, 119:9, 119:12, 119:17, 120:8, 121:11, 151:22, 195:22, 203:18, 204:3, 204:17
**attached** [2] - 220:14, 233:7
**attachment** [2] - 219:12, 219:13
**attachments** [2] - 219:9, 219:10
**attacks** [2] - 24:3, 33:22
**attempted** [1] - 258:19

**attend** [1] - 60:22
**attention** [3] - 5:11, 5:13, 22:6
**attitude** [1] - 111:25
**attorney** [14] - 14:14, 56:4, 56:8, 106:7, 130:17, 130:18, 131:12, 133:7, 138:17, 139:10, 139:11, 144:25, 147:10, 184:5
**attorneys** [4] - 6:4, 12:11, 197:10, 197:12
**attribute** [1] - 100:2
**atypical** [1] - 162:23
**auction** [1] - 238:2
**audit** [11] - 175:5, 175:8, 175:14, 175:21, 175:22, 182:4, 182:22, 183:5, 183:8, 183:14, 183:19
**audited** [2] - 228:11, 228:12
**auditor** [4] - 108:14, 243:2, 243:4, 243:5
**auditor's** [3] - 194:11, 194:17, 194:24
**auditors** [2] - 177:3, 177:10
**authority** [1] - 34:19
**authorize** [2] - 161:17, 161:21
**authorized** [1] - 155:20
**authorizes** [1] - 162:1
**automatically** [1] - 227:17
**available** [7] - 61:20, 79:6, 79:21, 80:2, 100:10, 136:5, 264:1
**avoid** [6] - 37:24, 52:14, 150:12, 184:18, 187:23, 188:2
**award** [2] - 36:7, 52:7
**aware** [9] - 35:24, 44:13, 145:15, 147:25, 162:9, 187:16, 193:7, 193:12, 228:14

## B

**baby** [4] - 232:5, 232:15, 232:16, 243:6
**bachelor** [1] - 241:4
**backed** [1] - 30:14
**background** [5] - 24:9, 65:24, 171:8, 241:2, 241:3
**bad** [3] - 99:24, 111:13, 136:16
**balance** [11] - 109:19, 114:2, 210:18, 210:19, 245:19, 245:22, 245:23, 246:15, 247:16, 249:2, 249:15
**balances** [1] - 246:12
**ballpark** [1] - 74:24

**bank** [52] - 23:16, 27:23, 31:6, 34:16, 89:24, 91:9, 91:10, 91:12, 101:14, 101:15, 103:1, 103:21, 103:22, 133:24, 185:22, 185:25, 186:4, 208:19, 209:2, 211:1, 211:9, 212:14, 213:1, 213:11, 213:17, 213:24, 214:4, 214:6, 214:18, 214:22, 214:24, 217:21, 217:25, 222:16, 222:18, 223:24, 224:2, 224:6, 229:14, 230:11, 230:13, 230:15, 230:22, 233:14, 237:25, 250:12, 250:13, 258:5, 261:23, 263:11, 265:6
**Bank** [8] - 115:15, 126:8, 134:9, 204:11, 208:5, 208:12, 208:16, 228:25
**bankruptcy** [2] - 183:2, 183:4
**banks** [2] - 102:13, 102:14
**bargain** [2] - 266:10, 267:13
**Base** [1] - 208:4
**base** [1] - 240:13
**based** [20] - 31:22, 41:25, 44:13, 172:25, 187:17, 188:18, 218:2, 218:10, 220:15, 225:13, 227:23, 228:9, 233:14, 233:22, 235:11, 248:23, 260:4, 261:5, 265:20, 268:9
**basement** [2] - 266:11, 267:13
**basing** [1] - 267:17
**basis** [1] - 86:20
**BB&T** [3] - 103:19, 103:24, 204:9
**BB&T's** [1] - 103:20
**BBC** [2] - 211:5, 212:16
**bear** [1] - 4:2
**became** [6] - 17:8, 94:24, 95:2, 242:15, 242:16, 268:8
**become** [3] - 154:6, 172:3, 241:20
**BEFORE** [1] - 1:11
**beg** [1] - 168:18
**began** [3] - 25:14, 29:9, 29:23
**begin** [6] - 5:21, 42:18, 46:21, 53:8, 53:10, 182:22
**beginning** [12] - 174:1, 190:6, 215:19, 216:19, 216:21, 216:22, 225:1, 225:2, 228:1, 228:5, 228:19, 228:23
**begins** [2] - 6:24, 190:8
**begun** [1] - 169:1

**behalf** [5] - 132:24, 169:18, 171:1, 176:20, 185:2
**behaving** [1] - 202:25
**behind** [2] - 25:10, 220:4
**below** [3] - 145:12, 252:14, 252:18
**below)** [1] - 145:14
**beneficial** [2] - 199:19, 200:17
**benefit** [10] - 10:12, 10:19, 27:6, 77:11, 121:3, 155:23, 156:3, 199:23, 199:25, 200:14
**Bern** [1] - 1:21
**best** [3] - 157:9, 182:18, 235:3
**better** [16] - 10:4, 10:8, 41:17, 76:12, 76:18, 76:22, 76:24, 77:2, 77:4, 77:5, 100:4, 100:10, 127:19, 170:12, 212:18, 263:21
**between** [54] - 13:4, 13:24, 15:12, 16:4, 16:7, 16:12, 27:22, 30:10, 46:12, 48:14, 49:22, 52:12, 59:19, 63:5, 67:15, 71:7, 71:9, 71:14, 71:20, 98:5, 105:1, 105:4, 106:20, 108:2, 108:20, 108:24, 109:4, 109:10, 113:21, 114:10, 117:15, 117:19, 125:13, 125:25, 126:1, 129:17, 141:11, 141:13, 143:13, 153:24, 154:24, 157:23, 158:9, 158:23, 162:6, 163:17, 165:15, 165:20, 203:21, 205:4, 209:6, 211:19, 213:19, 214:1
**beyond** [2] - 4:23, 26:24
**Bharadwaj** [3] - 205:8, 205:12, 224:15
**BHARADWAJ** [6] - 205:17, 224:13, 234:14, 270:17, 270:19, 270:21
**Bible** [3] - 50:25, 205:10, 239:1
**big** [9] - 18:9, 24:16, 63:12, 63:16, 80:25, 84:19, 99:18, 243:7, 244:9
**bigger** [2] - 99:17, 99:20
**biggest** [2] - 80:21, 81:2
**bill** [1] - 161:10
**billing** [1] - 199:15
**bills** [2] - 9:20, 161:11
**binding** [2] - 69:21, 161:4
**bit** [17] - 7:25, 24:8, 30:22, 55:7, 60:18, 60:19, 72:9, 72:10, 122:13, 166:7, 194:10, 202:12, 202:15, 226:13, 241:2, 250:6, 259:1

**block** [1] - 77:20
**blocks** [4] - 61:10, 72:14, 77:3
**blow** [7] - 54:5, 55:23, 57:14, 65:4, 65:20, 106:9, 111:8
**blue** [3] - 222:25, 252:12, 252:13
**Board** [9] - 133:1, 133:2, 161:16, 161:20, 161:25, 162:4, 162:10, 193:12, 247:21
**board** [7] - 71:24, 79:9, 79:10, 79:16, 158:2, 159:23, 163:4
**body** [2] - 247:20, 247:24
**Boeing** [1] - 242:17
**bonus** [19] - 215:6, 215:18, 215:20, 216:18, 216:19, 216:25, 218:4, 218:5, 218:7, 224:21, 224:24, 225:4, 225:6, 225:12, 225:16, 225:21, 225:24, 226:8
**book** [21] - 7:13, 245:25, 248:19, 248:24, 248:25, 257:3, 257:24, 258:11, 258:12, 258:16, 258:18, 258:20, 258:22, 259:4, 259:8, 259:10, 259:13, 259:15, 260:14, 268:16
**bookkeeping** [4] - 35:20, 35:22, 35:24, 36:2
**books** [13] - 7:15, 20:11, 23:19, 23:21, 174:8, 203:14, 255:24, 256:6, 256:8, 261:10, 261:12, 262:18, 263:10
**borrow** [4] - 89:24, 230:7, 230:8, 230:11
**borrowed** [2] - 230:9
**Borrowing** [1] - 208:4
**borrowing** [1] - 10:13
**boss** [2] - 155:19, 155:25
**bottom** [19] - 106:9, 109:8, 111:11, 111:19, 116:14, 124:8, 134:11, 136:25, 144:10, 169:8, 189:24, 190:4, 191:1, 209:19, 210:13, 211:3, 213:13, 229:16, 246:11
**bought** [23] - 15:7, 55:14, 73:5, 79:3, 80:8, 97:21, 97:22, 100:20, 101:23, 121:6, 121:9, 121:12, 184:3, 184:10, 203:16, 218:12, 218:23, 222:18, 226:4, 226:8, 226:9, 235:24
**box** [1] - 248:24
**BOX** [1] - 1:16
**BOYLE** [1] - 1:11

**brand** [3] - 33:18, 243:4, 243:5
**Brazil** [4] - 39:19, 47:22, 73:6, 200:9
**breach** [1] - 36:10
**breaking** [2] - 7:14, 268:12
**breathing** [1] - 31:7
**briefly** [9] - 28:22, 29:17, 106:6, 107:8, 113:1, 123:17, 125:3, 191:23, 241:1
**bring** [8] - 5:11, 5:12, 13:7, 18:8, 31:15, 86:17, 208:2, 209:14
**bringing** [1] - 29:19
**brings** [3] - 20:5, 20:6, 29:12
**brochure** [5] - 65:10, 65:15, 65:22, 66:14, 67:5
**brochures** [2] - 65:18, 75:23
**broke** [3] - 21:18, 28:23, 94:20
**broken** [4] - 18:9, 20:13, 234:18, 234:21
**broker** [6] - 219:4, 220:12, 221:10, 221:15, 221:18, 222:1
**BROOKS** [1] - 1:15
**brother** [1] - 52:19
**brothers** [3] - 7:4, 11:14, 46:18
**brought** [7] - 8:3, 8:5, 19:13, 52:2, 60:10, 60:12, 203:23
**builders** [1] - 9:7
**building** [5] - 22:23, 90:25, 203:16, 203:17, 204:3
**buildings** [5] - 203:18, 204:5, 204:8, 204:9, 204:11
**burden** [4] - 4:11, 4:20, 4:21, 28:20
**business** [197] - 5:2, 6:25, 7:2, 7:3, 8:11, 9:1, 9:2, 9:4, 9:10, 9:12, 9:16, 9:18, 9:24, 9:25, 10:2, 10:12, 10:24, 11:7, 11:9, 11:17, 11:18, 12:6, 12:15, 12:23, 12:24, 13:1, 13:3, 13:12, 13:16, 14:11, 15:21, 20:14, 21:17, 24:13, 24:23, 25:3, 25:7, 25:14, 25:18, 25:22, 26:13, 26:21, 26:23, 27:22, 29:15, 30:6, 32:8, 33:5, 33:19, 35:19, 39:23, 42:19, 42:21, 43:17, 43:19, 44:17, 45:9, 45:13, 45:16, 47:5, 47:6, 47:15, 47:16, 47:17, 47:25, 48:11, 49:7, 49:14, 53:3, 53:14, 54:11, 55:9, 55:10, 55:18, 57:3, 57:9, 58:10,

61:5, 61:9, 62:18, 64:5, 64:18, 64:20, 65:8, 67:14, 67:17, 67:22, 68:1, 68:6, 68:12, 68:22, 69:15, 70:7, 70:13, 70:18, 70:21, 71:3, 71:6, 71:19, 72:6, 72:7, 73:10, 73:14, 73:24, 74:13, 74:17, 75:22, 76:24, 77:6, 78:17, 79:1, 79:3, 79:7, 79:19, 79:25, 81:9, 82:3, 82:13, 82:20, 82:23, 83:7, 83:25, 84:10, 85:21, 86:2, 86:5, 86:12, 86:23, 87:9, 87:11, 87:14, 88:24, 89:6, 89:14, 89:19, 92:23, 93:7, 97:1, 99:22, 100:3, 111:14, 112:18, 130:5, 134:18, 135:2, 135:19, 135:21, 136:13, 151:4, 151:10, 152:11, 152:22, 153:3, 153:24, 156:7, 156:11, 161:5, 162:6, 163:1, 163:6, 165:9, 165:10, 165:14, 166:17, 167:3, 171:9, 171:11, 171:20, 197:15, 198:2, 199:7, 199:17, 200:3, 201:4, 201:12, 205:2, 215:17, 219:22, 220:15, 220:24, 222:3, 226:17, 231:24, 233:1, 233:17, 233:21, 235:7, 240:21, 244:16, 249:7, 251:15, 257:8, 260:4, 268:18
**businesses** [19] - 6:21, 22:23, 23:7, 24:2, 27:13, 27:16, 33:1, 34:17, 39:13, 52:9, 57:3, 71:11, 71:12, 78:7, 130:22, 151:18, 164:22, 166:22, 216:7
**button** [1] - 249:17
**buy** [24] - 10:17, 14:6, 14:10, 23:25, 34:5, 43:5, 55:10, 62:21, 62:23, 63:15, 72:14, 77:20, 77:21, 78:1, 80:1, 100:22, 101:9, 101:11, 104:23, 134:23, 135:3, 244:15, 246:21, 266:8
**buyer** [1] - 170:15
**buying** [9] - 29:2, 43:4, 43:18, 68:8, 127:20, 169:19, 170:22, 170:25, 203:17
**buyout** [4] - 7:15, 32:17, 188:6, 226:4
**buys** [1] - 157:7
**BY** [65] - 37:18, 49:20, 51:8, 53:22, 55:6, 57:1, 58:8, 67:12, 74:4, 78:21, 80:15, 81:23, 90:14, 91:20, 94:19, 97:17, 106:4, 110:12, 112:14, 114:18, 116:7,

124:21, 126:22, 128:12, 138:15, 140:13, 142:4, 145:25, 150:10, 153:10, 164:6, 175:17, 179:15, 185:8, 190:20, 192:1, 205:18, 207:10, 209:13, 210:5, 216:13, 217:4, 217:16, 223:2, 223:8, 223:18, 224:14, 224:19, 234:15, 235:14, 236:9, 236:15, 237:5, 239:8, 245:6, 254:2, 270:6, 270:8, 270:10, 270:12, 270:14, 270:18, 270:20, 270:22, 270:24
**byproduct** [1] - 188:25

## C

**C-o-u-c-h** [1] - 239:3
**calculate** [4] - 114:25, 215:6, 215:18, 239:20
**calculated** [4] - 114:24, 148:21, 188:7, 217:7
**calculation** [1] - 119:10
**calculations** [7] - 16:23, 17:2, 114:3, 120:9, 120:14, 122:4, 187:9
**camp** [2] - 58:13, 58:14
**cancelled** [1] - 263:12
**capability** [7] - 208:24, 212:12, 213:18, 214:1, 227:20, 227:21, 229:12
**capital** [1] - 10:13
**capture** [7] - 109:7, 111:9, 113:3, 123:15, 124:3, 126:4, 127:10
**care** [14] - 45:4, 48:10, 52:24, 52:25, 53:1, 74:6, 75:12, 119:8, 129:15, 163:23, 166:19, 167:1, 187:21, 232:24
**carefully** [1] - 37:3
**Carmen** [1] - 145:12
**CAROLINA** [1] - 1:1
**Carolina** [27] - 6:25, 25:4, 30:4, 30:7, 36:22, 92:9, 197:15, 203:7, 203:13, 205:20, 205:22, 206:7, 206:12, 206:16, 207:19, 220:17, 220:18, 220:21, 221:7, 222:8, 223:3, 223:9, 236:11, 237:17, 245:20, 250:25, 265:15
**Carolina's** [1] - 209:16
**carried** [1] - 149:7
**carry** [1] - 42:21
**case** [109] - 3:2, 3:17, 4:2, 4:9, 4:10, 4:11, 4:22, 4:24, 4:25, 5:6, 5:8, 5:9, 5:10,

5:14, 6:16, 8:3, 8:5, 10:22, 10:23, 15:23, 18:9, 21:11, 22:10, 22:15, 22:21, 22:24, 24:15, 31:15, 32:1, 36:6, 36:16, 36:21, 36:23, 37:1, 37:2, 37:24, 38:23, 39:5, 50:13, 53:13, 122:2, 122:4, 132:23, 132:24, 133:4, 136:2, 137:14, 141:23, 142:5, 142:7, 144:1, 144:4, 144:6, 146:3, 153:12, 160:15, 161:3, 166:23, 169:12, 172:10, 174:1, 174:5, 183:25, 184:8, 184:15, 185:14, 185:19, 186:14, 188:5, 188:9, 188:13, 188:20, 189:4, 191:8, 191:17, 200:19, 207:3, 223:1, 240:5, 240:9, 243:14, 244:19, 246:17, 246:23, 246:24, 247:3, 249:21, 250:3, 253:2, 253:4, 253:11, 254:4, 255:6, 255:17, 256:6, 258:17, 259:19, 260:6, 262:3, 263:2, 264:23, 266:15, 266:17, 266:18, 266:24, 267:22, 268:24

**cases** [3] - 136:21, 244:13, 244:18

**cash** [11] - 22:19, 27:7, 58:21, 58:22, 75:17, 76:4, 156:6, 201:12, 246:11, 246:12, 258:5

**categories** [1] - 11:3

**caught** [1] - 93:20

**caused** [4] - 33:3, 64:11, 174:22, 193:23

**causing** [1] - 22:18

**cease** [2] - 178:3, 179:3

**celebrations** [1] - 8:8

**central** [1] - 10:23

**Central** [6] - 183:22, 184:1, 184:3, 184:10, 241:5

**CEO** [1] - 24:19

**certain** [5] - 2:24, 5:1, 247:6, 248:5, 266:19

**certainly** [1] - 187:22

**Certificate** [1] - 208:4

**certifications** [2] - 241:8, 242:11

**certified** [8] - 222:15, 241:10, 241:12, 241:15, 241:23, 241:24, 242:7, 242:8

**Certified** [3] - 241:9, 241:14, 242:1

**certify** [1] - 269:12

**cetera** [1] - 244:8

**CFE** [1] - 241:11

**CFF** [1] - 241:10

**CGM** [6] - 29:8, 29:14, 98:18, 116:22, 117:2, 126:10

**chain** [1] - 225:20

**chairman** [1] - 45:10

**challenging** [1] - 49:12

**change** [9] - 19:5, 19:8, 97:20, 104:2, 130:9, 204:16, 208:12, 208:19, 210:23

**changed** [3] - 131:16, 252:22, 252:24

**changes** [5] - 99:16, 103:25, 144:21, 145:13, 203:5

**CHAPEL** [1] - 1:19

**characterize** [1] - 171:16

**charge** [2] - 29:4, 86:1

**CHARLES** [1] - 1:13

**Charlotte** [25] - 13:10, 15:22, 31:22, 32:5, 45:21, 45:22, 92:13, 93:2, 93:7, 93:21, 94:23, 96:8, 96:19, 123:6, 123:7, 140:25, 144:16, 180:11, 194:8, 206:2, 207:15, 207:18, 232:21, 252:17, 253:1

**chart** [1] - 22:10

**cheated** [2] - 146:13, 149:18

**check** [4] - 30:25, 133:8, 191:14, 263:12

**checks** [2] - 250:13, 262:6

**Chicago** [5] - 45:21, 151:18, 151:24, 167:15, 238:6

**childhood** [1] - 8:7

**China** [1] - 200:10

**choose** [1] - 40:10

**choosing** [1] - 44:13

**chose** [2] - 199:21, 202:16

**Christmas** [1] - 204:10

**circle** [3] - 95:16, 98:15, 99:11

**circles** [1] - 258:13

**circumstances** [1] - 32:21

**circumstantial** [2] - 3:20, 3:23

**cited** [1] - 133:22

**cities** [1] - 59:9

**city** [1] - 84:2

**City** [1] - 1:5

**civil** [4] - 4:10, 4:24, 6:10, 36:23

**claim** [14] - 31:10, 31:13, 32:18, 33:18, 70:12, 151:17, 158:19, 159:5, 161:3, 161:13, 167:13, 167:21, 168:6, 175:3

**claimed** [5] - 27:16, 29:11, 167:2, 173:2, 184:15

**claiming** [5] - 27:11,

166:23, 184:10, 184:13, 258:3

**claims** [7] - 4:15, 4:25, 23:6, 26:7, 32:16, 35:25, 144:1

**clarified** [1] - 145:12

**clarify** [1] - 51:23

**clear** [9] - 19:10, 96:15, 192:22, 194:24, 198:11, 202:1, 202:8, 233:9, 250:20

**clearly** [1] - 234:17

**clerk** [6] - 2:2, 2:6, 37:15, 51:5, 205:14, 239:5

**CLERK** [6] - 2:4, 37:12, 50:24, 205:9, 205:15, 238:25

**click** [1] - 110:16

**client** [3] - 3:3, 150:13, 243:8

**clients** [3] - 43:9, 261:4, 262:22

**Clint** [1] - 197:9

**CLINTON** [1] - 1:14

**close** [10] - 8:20, 11:11, 11:12, 48:15, 48:16, 53:1, 53:2, 60:1, 70:20

**closed** [1] - 97:3

**closeness** [2] - 48:13, 52:17

**closer** [2] - 7:3, 11:14

**closest** [2] - 48:19, 87:10

**closing** [2] - 6:4, 120:4

**co** [1] - 12:23

**co-owned** [1] - 12:23

**cobble** [1] - 29:4

**Coble** [16] - 23:2, 23:14, 24:8, 24:12, 28:6, 28:21, 31:19, 32:16, 150:11, 152:10, 174:25, 175:21, 175:22, 177:14, 179:18, 182:8

**COBLE** [79] - 1:13, 6:14, 8:17, 8:20, 20:8, 37:10, 37:18, 49:15, 50:22, 51:8, 53:20, 53:22, 54:20, 54:23, 55:5, 55:6, 56:21, 57:1, 58:3, 58:8, 67:7, 67:12, 74:4, 78:21, 80:10, 80:15, 81:18, 81:23, 90:9, 90:14, 91:15, 91:20, 94:14, 94:19, 97:12, 97:17, 104:9, 105:24, 106:4, 110:9, 110:12, 112:9, 112:14, 114:13, 114:18, 116:2, 116:7, 124:16, 124:21, 126:17, 126:22, 128:7, 128:12, 138:10, 138:15, 140:8, 140:13, 141:24, 142:4, 145:20, 145:25, 150:4, 191:23, 192:1, 196:24, 197:1, 197:6, 204:23, 238:23, 239:8,

244:25, 245:5, 245:6, 253:21, 254:2, 270:6, 270:10, 270:14, 270:24

**Coble's** [1] - 22:10

**collar** [1] - 239:21

**colleagues** [1] - 36:22

**collect** [1] - 200:25

**collected** [3] - 22:13, 133:8, 133:12

**college** [2] - 48:20

**Collins** [2] - 219:1, 219:9

**colors** [2] - 73:3, 86:16

**combined** [1] - 220:21

**comfortable** [1] - 51:19

**coming** [8] - 8:24, 81:17, 84:1, 86:18, 130:2, 178:21, 211:7, 255:15

**Commenced** [1] - 2:1

**commitment** [4] - 69:21, 161:4, 199:10, 204:7

**committed** [1] - 158:19

**common** [1] - 41:25

**communicate** [2] - 51:17, 231:23

**communicating** [2] - 66:13, 229:1

**communications** [1] - 12:10

**companies** [46] - 7:11, 17:19, 22:14, 22:18, 22:25, 23:8, 23:20, 24:7, 25:24, 27:25, 28:19, 28:21, 29:2, 29:11, 29:13, 29:24, 30:2, 32:6, 33:4, 34:21, 131:19, 140:3, 140:6, 141:9, 141:16, 152:3, 158:13, 161:1, 163:2, 163:7, 163:18, 165:10, 167:14, 175:4, 183:22, 184:19, 188:21, 191:9, 240:5, 245:13, 256:10, 257:9, 257:18, 260:18, 262:22, 264:21

**company** [130] - 9:5, 11:19, 11:20, 13:9, 13:22, 14:14, 16:6, 18:13, 18:14, 19:23, 24:14, 24:19, 24:23, 25:8, 25:13, 25:17, 26:2, 27:19, 28:23, 29:3, 29:6, 29:7, 29:8, 31:23, 32:13, 33:23, 38:19, 38:21, 43:1, 52:23, 54:14, 56:5, 61:19, 67:21, 67:23, 68:15, 68:25, 69:3, 84:24, 85:10, 89:2, 89:17, 89:18, 89:20, 93:4, 100:17, 123:23, 125:5, 132:8, 144:17, 144:18, 145:14, 146:17, 146:22, 148:1, 148:5, 149:10, 151:3, 151:9, 155:21, 156:1, 156:3, 157:11, 158:7, 158:10,

159:19, 159:22, 159:23, 160:9, 160:15, 160:20, 163:23, 164:2, 165:2, 165:23, 166:16, 166:18, 166:20, 166:25, 167:5, 171:23, 174:23, 175:10, 176:10, 176:13, 177:7, 177:25, 183:25, 184:9, 184:16, 185:14, 192:25, 193:19, 194:1, 198:12, 199:9, 202:16, 202:17, 202:18, 203:13, 204:15, 221:12, 224:4, 226:4, 232:4, 232:18, 242:19, 243:22, 244:6, 244:14, 245:24, 245:25, 246:1, 246:10, 246:13, 246:20, 254:20, 255:13, 257:22, 257:23, 257:24, 258:8, 263:23, 263:24, 264:19, 266:7, 267:12

**company's** [6] - 23:16, 25:10, 31:6, 31:25, 56:4, 184:2

**compare** [1] - 244:18

**compared** [2] - 170:23, 265:9

**comparison** [1] - 248:7

**compensation** [3] - 6:17, 6:19, 6:23

**competing** [8] - 33:14, 177:24, 178:3, 178:13, 178:17, 178:18, 179:3, 186:9

**competition** [1] - 177:22

**competitive** [6] - 152:23, 153:4, 154:2, 154:7, 170:9, 171:4

**competitor** [3] - 84:21, 85:4, 85:8

**compiled** [1] - 249:12

**complaining** [3] - 29:1, 36:3, 184:1

**complaint** [1] - 195:12

**complete** [4] - 7:8, 21:13, 204:6, 264:11

**completed** [2] - 38:12, 52:22

**completely** [1] - 17:18

**compliance** [1] - 268:10

**comply** [1] - 178:7

**compressed** [1] - 8:10

**computer** [1] - 8:22

**computers** [2] - 62:14, 62:15

**concept** [1] - 258:17

**concepts** [1] - 245:8

**concern** [1] - 265:10

**concerned** [1] - 33:11

**concerning** [6] - 98:9, 206:7, 206:12, 206:16,

207:19, 244:22

**concerns** [1] - 261:12

**conclude** [3] - 3:24, 263:18, 263:21

**concluded** [1] - 177:10

**conclusion** [3] - 240:15, 258:22, 268:14

**conclusions** [1] - 175:9

**conclusive** [1] - 5:15

**conduct** [5] - 5:4, 24:6, 163:1, 178:3, 179:4

**confidence** [6] - 11:12, 36:23, 172:18, 172:25, 194:3, 194:6

**confirm** [2] - 155:14, 258:3

**confusion** [5] - 37:24, 52:14, 126:9, 150:12, 194:10

**connected** [1] - 223:1

**connection** [2] - 203:6, 249:24

**consent** [6] - 162:25, 163:6, 163:12, 165:9, 165:14, 251:16

**consequence** [3] - 240:22, 248:16, 248:17

**consider** [6] - 4:3, 22:8, 69:13, 69:21, 172:25, 227:3

**considerable** [1] - 22:18

**considered** [4] - 2:25, 3:13, 3:15, 4:13

**considering** [1] - 18:20

**consignment** [8] - 208:25, 209:7, 213:19, 214:3, 214:9, 214:11, 214:12, 214:17

**consist** [1] - 2:19

**consistent** [12] - 13:25, 14:1, 16:1, 31:4, 54:17, 88:19, 91:4, 104:6, 112:6, 170:9, 170:15

**consuming** [1] - 73:10

**contact** [2] - 26:5, 28:18

**contain** [1] - 254:3

**containers** [5] - 62:21, 62:22, 62:23, 63:20, 89:9

**content** [1] - 193:18

**contentious** [1] - 17:8

**context** [2] - 33:20, 123:18

**continue** [3] - 30:6, 94:13, 203:25

**continued** [1] - 26:23

**contract** [1] - 64:14

**contracts** [2] - 39:11, 40:4

**contrary** [2] - 23:6, 35:25

**contribute** [2] - 135:4, 135:24

**contributed** [3] - 72:3, 123:5, 136:6

**contribution** [8] - 10:1, 27:16, 76:11, 76:20, 81:9, 81:15, 81:25, 152:10

**Contributions** [1] - 71:25

**contributions** [9] - 9:17, 9:23, 72:1, 75:16, 75:17, 76:4, 81:8, 82:12, 106:13

**control** [2] - 27:8, 127:2

**controlled** [5] - 15:5, 15:6, 16:2, 16:5, 127:7

**controller** [1] - 242:18

**conversations** [3] - 86:20, 203:12, 203:23

**conveyed** [1] - 104:1

**convincing** [1] - 26:8

**copied** [2] - 145:14, 187:23

**copy** [1] - 209:24

**corner** [1] - 65:21

**Corp** [1] - 198:22

**Corporation** [1] - 198:18

**correct** [122] - 49:21, 107:5, 109:13, 109:20, 152:12, 153:17, 156:19, 157:1, 158:12, 158:20, 160:1, 160:6, 160:11, 161:14, 162:14, 164:22, 170:10, 172:21, 173:19, 174:24, 177:11, 178:9, 178:13, 180:8, 180:21, 182:23, 184:20, 185:17, 185:23, 187:19, 188:23, 189:2, 198:2, 198:3, 198:6, 198:7, 198:10, 198:19, 199:3, 199:4, 199:14, 199:15, 199:18, 199:24, 200:22, 201:7, 201:10, 201:13, 201:14, 201:17, 201:21, 201:25, 204:19, 205:3, 205:5, 205:20, 206:2, 206:3, 206:5, 207:15, 207:24, 208:1, 208:6, 208:9, 208:13, 208:20, 209:22, 209:23, 210:20, 210:24, 211:9, 211:14, 211:21, 212:4, 212:8, 213:1, 213:24, 214:13, 214:14, 214:15, 214:18, 214:19, 215:7, 215:14, 216:15, 217:6, 217:20, 218:1, 218:25, 219:3, 219:5, 219:11, 219:19, 219:23, 220:2, 220:13, 220:16, 221:8, 221:11, 221:21, 221:25, 223:4, 223:5, 223:10, 225:10, 225:15, 225:25, 228:16, 229:21, 230:17, 230:24, 232:3, 236:20, 236:23, 236:25, 237:18, 251:3, 256:13, 258:15, 260:10, 267:8, 269:12

**correctly** [4] - 159:1, 170:19, 234:17, 235:10

**corresponded** [1] - 125:6

**corresponding** [1] - 249:8

**Cosmic** [2] - 83:13

**Cosmos** [140] - 7:1, 9:2, 9:3, 13:16, 15:19, 32:8, 32:14, 38:17, 38:18, 38:19, 38:20, 39:7, 39:14, 39:17, 39:20, 39:23, 41:10, 42:2, 42:14, 43:19, 44:17, 45:13, 45:16, 45:17, 45:24, 46:3, 46:4, 48:1, 48:10, 53:7, 53:17, 55:9, 56:6, 56:10, 57:2, 57:9, 57:13, 57:23, 58:10, 63:23, 64:5, 64:12, 65:1, 65:10, 65:18, 66:7, 67:14, 72:16, 72:25, 73:2, 73:21, 73:24, 74:13, 74:16, 75:4, 75:8, 75:17, 76:6, 77:5, 77:11, 78:7, 78:13, 78:23, 79:3, 79:25, 81:1, 82:20, 82:23, 83:6, 83:7, 83:14, 83:15, 86:12, 89:8, 89:16, 91:24, 92:21, 95:2, 95:15, 98:8, 99:7, 99:10, 101:20, 104:19, 106:7, 122:14, 134:18, 135:2, 135:19, 136:4, 146:16, 147:15, 147:16, 147:21, 151:3, 151:10, 152:18, 152:21, 153:2, 153:24, 154:14, 156:7, 156:11, 157:23, 161:5, 162:16, 162:23, 163:2, 163:3, 166:22, 167:3, 177:14, 178:12, 183:22, 183:25, 184:3, 184:9, 185:21, 186:8, 186:25, 188:14, 188:17, 201:6, 201:8, 201:12, 201:20, 203:19, 208:5, 219:14, 220:7, 228:3, 251:4, 251:6, 252:15, 252:17, 253:1, 254:23, 255:9

**Cosmos's** [1] - 87:9

**cost** [5] - 43:6, 74:22, 75:1, 120:9, 266:13

**costs** [3] - 44:7, 68:20, 120:4

**Couch** [14] - 20:16, 238:24, 239:3, 239:11, 239:12, 240:3, 241:2, 243:21, 244:25, 245:7, 250:18, 253:12, 253:13, 255:21

**COUCH** [2] - 239:7, 270:23

**counsel** [3] - 19:4, 142:19, 180:11

**count** [2] - 243:6, 243:7

**countertop** [1] - 24:17

**countertops** [1] - 9:8

**counties** [1] - 268:22

**countries** [1] - 200:9

**country** [2] - 21:4, 24:20

**couple** [15] - 24:22, 32:2, 68:5, 68:11, 80:6, 87:2, 87:3, 87:5, 87:9, 90:6, 90:23, 110:15, 110:16, 135:10, 190:2
**course** [5] - 2:16, 6:11, 34:1, 42:23, 49:9
**Court** [7] - 1:20, 2:13, 2:23, 3:12, 6:15, 22:4, 245:2
**court** [6] - 3:18, 12:14, 197:15, 205:2, 236:8, 239:23
**COURT** [92] - 1:1, 2:2, 2:7, 8:9, 8:18, 20:6, 22:1, 34:23, 35:1, 35:3, 35:7, 36:15, 36:19, 37:9, 46:11, 49:16, 50:19, 54:22, 54:25, 55:3, 56:23, 58:5, 67:9, 74:2, 78:20, 80:12, 81:20, 90:11, 91:17, 94:10, 94:13, 94:16, 97:14, 104:11, 106:1, 110:11, 112:11, 114:15, 116:4, 124:18, 126:19, 128:9, 138:12, 140:10, 142:1, 145:22, 150:6, 153:9, 179:14, 190:14, 190:18, 191:19, 191:22, 196:25, 197:5, 197:7, 197:17, 204:21, 205:1, 205:4, 205:6, 206:19, 206:22, 207:1, 209:10, 210:2, 213:5, 213:8, 216:1, 216:5, 216:8, 217:8, 217:15, 222:24, 223:6, 223:12, 223:15, 224:10, 224:17, 234:7, 234:10, 235:1, 235:8, 236:4, 236:14, 237:1, 237:4, 238:13, 238:20, 245:2, 253:24, 268:19
**Court's** [2] - 3:6, 19:15
**courtroom** [3] - 3:15, 36:18, 153:17
**courtrooms** [1] - 244:4
**cousin** [12] - 5:2, 6:21, 7:16, 22:22, 26:15, 28:16, 36:10, 52:13, 87:10, 110:23, 168:11, 238:7
**cousins** [5] - 6:24, 8:20, 25:18, 205:4, 236:7
**CPA** [21] - 23:22, 163:23, 192:25, 193:19, 194:1, 212:6, 212:9, 214:21, 218:14, 227:10, 227:13, 228:6, 235:18, 241:9, 241:17, 241:20, 242:15, 242:21, 242:22, 243:5
**CPAs** [1] - 242:2
**CPS** [1] - 166:5
**create** [2] - 252:15, 262:18
**created** [6] - 98:19, 168:4, 221:1, 249:13, 251:7

**creating** [1] - 170:8
**credentials** [1] - 241:18
**credibility** [1] - 4:8
**Credit** [2] - 176:6, 176:15
**credit** [7] - 11:21, 89:23, 108:2, 167:16, 167:21, 176:10, 177:4
**credited** [2] - 23:10, 28:3
**crime** [1] - 239:21
**criminal** [1] - 4:22
**critical** [2] - 33:4, 186:14
**criticizes** [1] - 35:16
**cross** [7] - 6:2, 6:3, 49:16, 150:6, 191:18, 191:20, 224:10
**CROSS** [6] - 49:19, 150:9, 224:13, 270:7, 270:11, 270:19
**CROSS-EXAMINATION** [6] - 49:19, 150:9, 224:13, 270:7, 270:11, 270:19
**cross-examine** [2] - 6:2, 6:3
**CRR** [2] - 1:20, 269:17
**crucial** [1] - 10:1
**current** [1] - 139:17
**customary** [2] - 261:19, 261:21
**customer** [9] - 26:18, 43:12, 68:7, 88:14, 152:23, 153:3, 154:1, 154:6, 200:2
**customers** [19] - 9:7, 10:17, 28:13, 41:23, 42:1, 42:23, 43:4, 43:9, 44:13, 78:4, 86:21, 87:5, 178:22, 200:21, 231:18, 246:13, 246:21, 249:7, 249:9
**cut** [5] - 9:7, 30:25, 39:12, 61:10, 69:1

## D

**D-211** [1] - 166:3
**D-444** [3] - 234:9, 234:12, 272:19
**D-445** [1] - 209:14
**D.C** [4] - 194:22, 195:1, 195:21, 202:6
**dad** [4] - 48:10, 50:10, 50:14, 154:13
**daily** [2] - 85:19, 86:20
**Dallas** [10] - 15:20, 32:3, 32:5, 45:25, 122:14, 123:10, 147:16, 147:17, 157:15, 254:24
**damages** [2] - 52:7, 239:20
**dark** [2] - 17:18, 17:23
**data** [2] - 263:20, 263:21
**database** [1] - 264:16

**date** [11] - 41:4, 42:10, 77:1, 142:13, 166:25, 167:5, 167:10, 180:7, 199:15, 211:1
**Date** [1] - 269:17
**dated** [5] - 111:2, 115:9, 189:23, 252:13, 253:13
**dates** [1] - 259:17
**David** [4] - 54:7, 54:12, 179:10, 180:12
**DAY** [1] - 1:10
**day-to-day** [12] - 9:11, 44:6, 74:6, 75:12, 75:14, 82:14, 82:15, 157:11, 206:1, 207:14, 207:17, 231:7
**days** [38] - 10:15, 25:8, 40:21, 41:12, 42:4, 42:5, 42:7, 42:9, 73:12, 77:1, 77:8, 77:15, 77:17, 77:18, 78:11, 79:10, 79:11, 79:17, 134:24, 135:16, 135:21, 162:14, 182:23, 183:10, 199:6, 199:8, 199:11, 199:14, 199:20, 199:22, 200:3, 200:4, 200:5, 200:25, 201:1
**DC** [2] - 137:1, 137:23
**dead** [1] - 229:25
**deadline** [1] - 34:16
**deal** [7] - 26:17, 26:25, 30:5, 34:9, 170:12, 202:20, 236:8
**dealings** [5] - 8:11, 49:22, 165:9, 165:10, 165:15
**DEANNA** [1] - 1:17
**Dear** [1] - 54:12
**death** [1] - 27:4
**debt** [1] - 25:13
**debts** [2] - 26:2, 151:15
**decades** [1] - 65:24
**December** [8] - 19:3, 107:19, 107:20, 120:3, 144:10, 147:15, 237:15, 254:22
**decide** [4] - 3:17, 4:4, 83:20, 137:25
**decided** [24] - 7:6, 7:9, 14:5, 25:2, 48:8, 48:9, 64:20, 83:6, 83:15, 83:20, 85:16, 95:3, 95:5, 98:21, 99:4, 102:4, 117:21, 118:4, 132:24, 137:18, 138:1, 194:4, 194:7, 218:7
**deciding** [2] - 43:5, 83:11
**decision** [10] - 32:24, 33:25, 82:22, 83:10, 83:23, 84:12, 84:15, 92:3, 101:4, 227:14
**decisions** [17] - 12:24, 12:25, 21:14, 82:19, 82:23, 83:5, 92:2, 206:6, 206:11, 206:15, 206:18, 206:21,

207:19, 207:20, 207:22, 232:17, 245:13
**Decisions** [1] - 82:18
**decreasing** [1] - 258:1
**deductions** [4] - 189:6, 189:18, 191:5, 217:1
**default** [8] - 133:18, 133:22, 133:25, 134:5, 185:22, 185:25, 186:4, 238:8
**defaults** [1] - 33:4
**defendant** [9] - 4:21, 6:2, 6:20, 8:4, 22:21, 52:5, 197:5, 204:22, 204:24
**Defendant's** [5] - 164:8, 175:19, 179:17, 181:4, 185:10
**defendant's** [3] - 4:17, 179:18, 223:13
**Defendants** [2] - 1:9, 1:17
**defense** [1] - 6:1
**definitely** [4] - 162:22, 201:3, 232:5, 233:8
**defunct** [1] - 151:15
**degree** [2] - 241:4, 241:6
**degrees** [1] - 245:10
**deliberate** [2] - 5:8, 6:7
**deliberations** [1] - 21:12
**deliver** [1] - 40:12
**demand** [7] - 91:7, 177:15, 177:17, 179:8, 180:24, 185:15, 186:7
**demanding** [6] - 168:24, 169:2, 169:23, 170:21, 170:23, 179:19
**demonstrative** [3] - 217:17, 222:23, 254:9
**Demonstrative** [2] - 92:7, 246:5
**denies** [1] - 12:16
**dent** [1] - 10:20
**deny** [3] - 9:21, 64:25, 181:22
**department** [1] - 242:23
**dependent** [1] - 168:20
**deposition** [1] - 247:13
**depositions** [1] - 244:4
**deposits** [4] - 249:8, 250:12, 262:6, 263:22
**depreciating** [1] - 186:24
**depress** [1] - 35:18
**depressed** [2] - 218:13, 218:18
**describe** [3] - 52:17, 70:10, 70:12
**described** [7] - 34:14, 53:2, 71:1, 73:11, 134:2, 227:24, 264:25
**Description** [1] - 271:2
**deserved** [2] - 21:5, 21:6
**designation** [2] - 241:25,

242:9
**designed** [2] - 24:1
**desist** [2] - 178:3, 179:3
**desperately** [1] - 33:7
**despite** [1] - 17:25
**detail** [3] - 255:20, 262:20, 264:1
**detailed** [6] - 249:11, 250:11, 256:2, 262:5, 262:12, 264:7
**deteriorate** [1] - 44:10
**determine** [5] - 137:22, 138:19, 138:21, 240:12, 244:7
**determined** [3] - 137:10, 202:14, 202:17
**determining** [1] - 4:8
**devalue** [1] - 266:12
**devaluing** [3] - 248:24, 268:16
**develop** [2] - 171:19, 261:12
**devote** [1] - 25:2
**devoted** [1] - 22:22
**diagram** [3] - 95:12, 251:24, 254:11
**dialogue** [1] - 34:3
**difference** [4] - 30:25, 31:14, 63:5, 84:17
**different** [14] - 7:25, 59:8, 59:11, 112:22, 144:17, 144:18, 159:19, 159:24, 161:24, 178:16, 215:24, 222:20, 238:10, 265:8
**differentiate** [3] - 209:6, 213:18, 214:1
**difficult** [2] - 74:7, 264:10
**dime** [2] - 36:11, 161:9
**direct** [4] - 3:20, 3:21, 197:25
**Direct** [1] - 94:13
**DIRECT** [8] - 37:17, 51:7, 205:17, 239:7, 270:5, 270:9, 270:17, 270:23
**directing** [1] - 247:12
**directly** [6] - 31:23, 39:15, 54:13, 123:22, 125:1, 183:23
**director** [9] - 24:18, 27:3, 43:2, 44:24, 154:18, 155:19, 158:4, 166:16, 171:22
**disappointed** [1] - 37:4
**disclose** [5] - 165:22, 166:1, 166:8, 166:12, 166:13
**disclosed** [1] - 166:15
**disclosure** [5] - 163:5, 164:1, 164:2, 164:21, 165:8
**disconnect** [5] - 16:7, 108:20, 108:24, 109:4, 125:25
**discounted** [2] - 188:14,

188:17
**discrepancies** [4] - 265:11, 265:12, 265:21, 265:23
**discrepancy** [2] - 265:10, 265:14
**discuss** [9] - 5:5, 5:6, 64:12, 67:17, 131:10, 176:19, 176:22, 176:25, 268:25
**discussed** [7] - 83:25, 94:8, 95:1, 96:9, 100:11, 164:22, 225:23
**discusses** [1] - 176:4
**discussing** [4] - 94:25, 118:20, 175:21, 175:23
**discussion** [9] - 20:1, 30:18, 71:5, 92:25, 93:12, 94:2, 96:4, 121:13, 140:5
**discussions** [11] - 50:6, 68:3, 81:24, 88:19, 93:7, 93:19, 94:21, 96:1, 142:16, 147:25, 148:23
**disdain** [1] - 170:20
**display** [1] - 39:10
**dispute** [8] - 65:1, 105:3, 106:22, 106:25, 107:1, 110:22, 133:15, 155:10
**disputes** [5] - 29:10, 131:23, 195:11, 196:19, 239:20
**disregard** [1] - 3:12
**disrupt** [1] - 15:3
**dissolution** [1] - 173:18
**dissolved** [2] - 30:19, 168:10
**dissolving** [1] - 29:1
**distances** [1] - 268:21
**distinct** [1] - 63:10
**distress** [1] - 257:19
**distribution** [9] - 9:3, 9:15, 13:9, 38:19, 108:19, 108:22, 115:2, 115:23, 171:20
**Distributions** [1] - 114:20
**distributions** [10] - 19:1, 106:16, 114:19, 114:21, 115:24, 143:2, 143:13, 143:15, 258:2, 258:4
**distributions/benefits** [1] - 106:13
**distributor** [21] - 9:4, 39:7, 39:9, 44:1, 44:8, 63:2, 63:6, 63:10, 63:12, 63:24, 72:17, 73:14, 83:14, 89:12, 92:13, 92:14, 92:15, 93:2, 162:20, 170:8, 171:3
**distributor's** [1] - 43:17
**distributors** [9] - 39:14, 41:10, 41:14, 42:2, 43:4, 63:2, 73:16, 77:22, 84:9
**DISTRICT** [3] - 1:1, 1:1,

1:11
**District** [1] - 36:22
**dive** [1] - 261:9
**divide** [2] - 16:19, 30:8
**divided** [1] - 23:13
**dividing** [1] - 30:11
**DIVISION** [1] - 1:2
**division** [1] - 203:7
**divorce** [1] - 29:15
**Divya** [1] - 165:7
**doable** [2] - 227:14, 227:15
**Docket** [1] - 1:4
**document** [7] - 50:16, 190:3, 190:7, 213:7, 213:9, 233:5, 253:14
**documented** [5] - 23:10, 28:3, 30:2, 160:10, 162:10
**documents** [9] - 2:20, 104:3, 141:2, 198:24, 256:1, 261:24, 265:6, 265:7, 265:9
**dollar** [2] - 113:11, 113:12
**dollars** [11] - 22:13, 23:15, 24:5, 27:6, 27:7, 32:18, 36:8, 171:24, 240:25, 258:2, 265:18
**done** [25] - 21:11, 23:21, 26:17, 27:9, 31:12, 36:21, 69:2, 69:24, 73:24, 91:5, 102:6, 102:7, 117:11, 117:22, 166:5, 166:6, 172:4, 172:20, 179:6, 183:1, 186:21, 187:18, 220:11, 222:14, 239:24
**double** [1] - 31:11
**doubt** [2] - 4:23, 28:15
**down** [31] - 11:13, 22:11, 35:11, 56:11, 76:10, 108:17, 127:9, 128:14, 140:23, 164:18, 169:16, 180:15, 186:19, 187:2, 187:12, 187:17, 204:25, 207:7, 215:3, 215:16, 216:15, 217:6, 243:12, 266:2, 266:3, 266:7, 266:12, 266:18, 266:23, 267:7, 267:16
**drag** [1] - 111:20
**dramatically** [2] - 20:13, 20:15
**DRIVE** [1] - 1:18
**drive** [1] - 268:21
**drop** [1] - 202:21
**DSC** [1] - 26:18
**DSG** [113] - 24:16, 25:17, 25:20, 26:5, 26:14, 26:16, 26:21, 27:3, 27:5, 27:17, 28:12, 28:18, 29:3, 29:6, 32:13, 61:2, 61:3, 61:7, 61:9, 61:14, 62:4, 62:21, 62:23, 63:20, 67:24, 67:25, 69:16, 71:6, 71:8, 78:4, 78:6, 78:13,

78:16, 78:22, 79:4, 80:3, 86:21, 87:5, 100:9, 132:3, 132:9, 132:12, 132:23, 132:24, 133:1, 133:5, 134:1, 135:5, 136:18, 152:10, 152:12, 152:14, 152:16, 152:18, 153:25, 154:21, 154:22, 154:25, 155:1, 155:7, 155:12, 155:19, 155:22, 155:25, 156:2, 156:3, 157:1, 157:3, 157:7, 157:22, 157:23, 157:24, 158:2, 158:10, 161:4, 161:16, 161:20, 161:25, 162:23, 163:1, 163:5, 163:6, 163:9, 163:17, 164:9, 164:11, 165:7, 166:8, 166:15, 168:18, 168:21, 168:24, 169:3, 169:20, 170:10, 170:15, 171:4, 171:23, 174:23, 176:20, 177:1, 177:13, 192:19, 193:12, 193:18, 199:2, 199:13, 200:7, 200:11, 200:20, 200:22, 231:21
**DSG's** [6] - 26:17, 135:11, 152:23, 153:4, 154:7, 162:10
**due** [21] - 9:21, 27:11, 30:15, 31:8, 31:14, 31:16, 32:19, 36:11, 40:23, 41:3, 78:2, 145:16, 164:3, 164:25, 165:11, 177:7, 177:11, 195:6, 199:13, 200:22, 255:14
**Due** [1] - 108:20
**during** [15] - 2:16, 5:5, 17:11, 18:2, 25:15, 47:8, 49:9, 61:25, 130:10, 131:22, 132:7, 138:5, 176:23, 198:9, 203:22
**duties** [1] - 36:10
**duty** [2] - 2:10, 237:12

**E**

**e-mail** [1] - 111:9
**early** [5] - 26:6, 26:18, 129:13, 173:6, 173:7
**earned** [1] - 151:17
**earnings** [1] - 108:19
**easier** [1] - 237:21
**easily** [1] - 84:25
**east** [4] - 116:19, 116:20, 195:21, 204:5
**East** [13] - 109:18, 116:16, 116:18, 117:17, 137:1, 137:23, 176:12, 176:15, 176:23, 177:7, 194:22, 195:1, 195:4
**East)** [1] - 116:24

EASTERN [1] - 1:1
Eastern [1] - 36:21
easy [1] - 249:16
education [3] - 52:22, 241:16, 241:19
educational [1] - 241:3
Edward [2] - 56:1, 56:7
effect [2] - 18:16, 19:25
effective [4] - 44:7, 147:14, 167:5, 167:10
effectuated [1] - 148:3
efforts [1] - 182:18
eight [3] - 197:2, 231:12, 260:19
either [10] - 42:3, 50:4, 104:23, 111:21, 121:3, 149:2, 151:25, 165:23, 246:21, 264:5
electronically [1] - 115:15
eligible [2] - 213:16, 230:6
Elizabeth [1] - 1:5
elsewhere [1] - 167:15
email [87] - 12:10, 14:2, 14:13, 16:5, 18:5, 20:25, 28:13, 28:25, 54:7, 55:24, 55:25, 57:15, 65:5, 66:6, 76:5, 80:17, 80:18, 88:7, 88:8, 90:15, 90:18, 91:3, 95:24, 103:5, 103:7, 103:8, 103:13, 105:20, 106:5, 108:9, 108:18, 109:2, 110:19, 111:2, 111:16, 113:6, 113:11, 115:6, 115:18, 116:11, 118:13, 118:17, 118:20, 119:9, 124:5, 125:24, 127:10, 127:13, 128:20, 132:2, 134:8, 136:23, 139:8, 141:11, 144:13, 144:20, 144:25, 145:12, 145:13, 145:14, 146:5, 149:14, 168:13, 168:17, 169:5, 179:6, 187:7, 187:12, 187:22, 188:1, 211:18, 211:19, 212:10, 215:4, 215:5, 215:8, 218:22, 219:1, 219:8, 219:24, 221:9, 221:14, 221:17, 225:15, 225:20, 226:2, 233:6
emailed [1] - 120:9
emails [5] - 10:21, 30:10, 30:12, 112:16, 216:24
employed [2] - 156:14, 186:15
employee [4] - 155:22, 156:3, 156:7, 156:10
employees [5] - 28:11, 132:6, 231:14, 232:21, 249:10
empty [1] - 207:2

end [28] - 4:2, 4:8, 5:7, 8:24, 20:6, 21:10, 36:5, 49:13, 113:23, 118:7, 118:8, 144:20, 168:2, 180:15, 196:10, 203:23, 204:3, 204:9, 204:14, 206:20, 210:22, 216:22, 217:18, 220:5, 220:6, 234:19, 235:24, 246:21
ended [9] - 28:24, 31:22, 167:5, 167:9, 168:2, 178:6, 198:14, 203:17
ending [1] - 168:15
enemy [1] - 111:13
engaged [1] - 47:14
engineer [2] - 24:12, 24:22
engineering [2] - 60:25, 61:18
English [4] - 51:20, 51:21, 112:19, 235:3
enormous [1] - 36:7
enter [2] - 262:15, 262:19
entered [2] - 133:9, 137:15
entering [1] - 262:13
enterprise [2] - 202:19, 202:23
entire [1] - 68:8
Entire [1] - 195:4
entirely [2] - 135:5, 238:10
Entirely [2] - 135:6, 135:7
entities [60] - 17:10, 18:1, 27:8, 28:2, 31:19, 32:5, 32:8, 32:9, 32:15, 76:14, 132:23, 132:25, 159:25, 160:3, 160:9, 167:16, 167:19, 174:19, 174:23, 175:10, 176:5, 178:12, 180:7, 180:18, 183:23, 185:1, 185:3, 185:12, 185:22, 186:8, 186:16, 186:25, 187:18, 188:14, 188:17, 203:19, 220:17, 228:3, 240:13, 243:18, 245:15, 247:5, 248:4, 248:18, 248:23, 249:20, 250:4, 250:19, 250:21, 250:24, 251:4, 251:6, 261:11, 262:3, 264:3, 264:8, 268:4, 268:18
entities' [6] - 23:19, 179:10, 255:24, 257:14, 258:10, 267:1
entitled [8] - 5:1, 21:4, 21:7, 22:15, 28:4, 33:11, 253:12, 269:13
entity [10] - 33:14, 92:9, 127:2, 154:14, 162:16, 203:25, 204:17, 204:18, 231:5, 252:8
entity's [2] - 231:8, 252:18
entries [2] - 262:19, 265:23

equal [8] - 16:3, 16:4, 25:25, 27:12, 28:19, 106:12, 117:22, 124:8
equally [8] - 11:8, 13:3, 113:17, 113:20, 113:21, 114:11, 114:12, 125:21
equity [5] - 222:2, 222:3, 222:11, 223:19, 248:19
ERP [9] - 128:20, 129:5, 129:18, 129:24, 130:13, 174:10, 174:15, 227:18, 265:16
ERPS [1] - 129:2
ESQUIRE [5] - 1:13, 1:14, 1:14, 1:17, 1:17
essentially [1] - 255:3
establish [1] - 11:4
established [1] - 52:11
estate [8] - 14:17, 23:15, 27:7, 55:13, 55:14, 105:15, 112:24, 118:14
estimate [1] - 30:15
et [1] - 244:8
etc [1] - 120:4
EUROPA [1] - 1:18
evaluator [1] - 233:21
even-steven [1] - 17:3
event [1] - 174:18
events [2] - 8:8, 255:5
eventually [3] - 88:11, 198:15, 203:17
everyday [2] - 249:6, 256:18
everywhere [1] - 203:24
evidence [133] - 2:11, 2:19, 2:24, 3:1, 3:2, 3:4, 3:10, 3:13, 3:15, 3:18, 3:20, 3:21, 3:23, 4:3, 4:12, 4:13, 4:17, 5:16, 5:22, 6:5, 11:1, 11:4, 12:7, 12:19, 12:22, 15:5, 20:25, 21:11, 21:16, 22:8, 22:12, 22:16, 23:2, 23:5, 23:24, 25:6, 25:13, 25:17, 26:14, 26:22, 27:2, 27:13, 27:21, 28:5, 28:7, 31:17, 32:20, 32:23, 33:2, 33:6, 33:10, 34:19, 35:20, 36:9, 54:21, 54:24, 55:2, 56:22, 56:25, 58:4, 58:7, 67:11, 80:11, 80:14, 81:19, 81:22, 90:10, 90:13, 91:16, 91:19, 94:18, 97:13, 97:16, 104:10, 104:13, 105:25, 106:3, 110:10, 112:10, 112:13, 114:14, 114:17, 116:3, 116:6, 124:17, 124:20, 126:18, 126:21, 128:8, 128:11, 138:11, 138:14, 140:9, 140:12, 141:25, 142:3, 145:21, 145:24,

209:9, 209:12, 234:9, 234:12, 253:22, 254:1, 257:18, 268:24, 271:5, 271:7, 271:8, 271:10, 271:11, 271:13, 271:15, 271:16, 271:18, 271:20, 271:22, 271:24, 272:1, 272:3, 272:4, 272:6, 272:7, 272:9, 272:10, 272:12, 272:14, 272:16, 272:18, 272:20, 272:22
evidencing [1] - 141:3
exact [3] - 19:19, 142:13, 170:7
exactly [14] - 6:19, 11:1, 11:7, 13:4, 36:2, 85:15, 137:17, 168:25, 169:5, 173:12, 178:14, 184:17, 185:24, 251:18
exam [1] - 241:17
EXAMINATION [18] - 37:17, 49:19, 51:7, 150:9, 191:25, 205:17, 224:13, 234:14, 239:7, 270:5, 270:7, 270:9, 270:11, 270:13, 270:17, 270:19, 270:21, 270:23
Examinations [1] - 270:3
examine [2] - 6:2, 6:3
examiner [3] - 241:12, 242:7, 242:8
examining [1] - 244:11
example [7] - 48:18, 52:20, 54:17, 126:2, 140:23, 229:7, 250:12
examples [4] - 41:8, 55:7, 110:15, 112:5
Excel [2] - 118:22, 120:2
excellent [1] - 134:21
except [1] - 167:18
excerpt [1] - 197:22
exchange [5] - 26:21, 156:2, 199:1, 211:19, 215:6
exclude [1] - 3:12
excluded [2] - 174:1, 214:17
excluding [6] - 18:14, 18:15, 19:24, 88:14, 146:23, 148:6
exclusions [1] - 214:7
exclusive [1] - 8:14
excuse [4] - 36:15, 203:7, 245:24, 255:9
excused [1] - 50:20
executed [3] - 18:10, 18:21, 204:16
exercise [1] - 182:18
Exhibit [118] - 54:5, 54:20, 54:23, 55:1, 55:23, 56:21, 56:24, 57:14, 58:3, 58:6, 65:3, 65:15, 66:4, 76:3,

80:10, 80:13, 80:16, 81:18, 81:21, 88:6, 90:8, 90:10, 90:12, 90:15, 91:15, 91:18, 94:15, 94:17, 95:23, 97:12, 97:15, 99:2, 103:3, 104:9, 104:12, 105:6, 105:24, 106:2, 106:5, 108:7, 110:9, 110:18, 111:7, 111:16, 112:9, 113:2, 114:13, 114:16, 115:5, 116:2, 116:5, 118:1, 123:15, 124:3, 124:16, 124:19, 126:4, 126:17, 126:20, 126:23, 127:9, 128:7, 128:10, 128:13, 134:7, 134:8, 138:11, 138:13, 139:6, 140:8, 140:11, 140:14, 141:25, 142:2, 144:9, 145:20, 145:23, 147:9, 164:8, 175:19, 175:25, 179:17, 181:4, 185:10, 194:14, 208:2, 209:9, 209:11, 211:16, 213:12, 215:3, 218:21, 246:5, 253:12, 253:22, 254:3, 259:3, 271:4, 271:6, 271:8, 271:11, 271:12, 271:14, 271:16, 271:17, 271:19, 271:21, 271:23, 272:2, 272:4, 272:5, 272:7, 272:8, 272:10, 272:11, 272:13, 272:15, 272:17

**exhibit** [2] - 192:2, 222:22
**Exhibits** [9] - 67:7, 67:10, 112:12, 234:11, 253:25, 271:9, 271:25, 272:19, 272:21
**exhibits** [1] - 2:21
**exist** [3] - 3:25, 247:25, 248:2
**existence** [3] - 24:7, 159:2, 203:13
**existing** [2] - 11:19, 13:9
**exits** [1] - 36:18
**expand** [3] - 91:24, 92:3, 200:17
**expanded** [2] - 28:22, 32:2
**expanding** [1] - 26:24
**expect** [4] - 226:9, 262:1, 262:4, 262:7
**expecting** [2] - 43:13, 250:7
**expeditious** [1] - 36:24
**expenses** [12] - 25:22, 89:23, 132:4, 132:5, 132:10, 136:19, 185:13, 195:16, 195:18, 196:3, 196:5, 196:8
**expensive** [1] - 74:23
**experience** [16] - 41:8, 41:25, 43:3, 43:25, 73:20, 73:22, 74:9, 171:8, 171:14,

171:17, 227:1, 227:8, 242:14, 249:23, 262:21, 262:25
**expert** [12] - 20:17, 20:19, 233:17, 234:2, 239:23, 243:24, 245:1, 245:3, 260:9, 263:16, 264:24, 267:22
**experts** [8] - 7:12, 20:10, 31:15, 35:12, 35:14, 35:17, 260:23, 261:6
**explain** [25] - 7:12, 20:11, 20:17, 41:2, 43:16, 60:9, 68:16, 72:11, 76:23, 77:13, 82:18, 120:5, 144:22, 199:5, 202:14, 212:18, 212:21, 213:4, 213:7, 213:8, 213:17, 237:23, 238:12, 266:6
**explained** [6] - 148:20, 215:1, 217:23, 229:3, 229:13, 229:24
**explanation** [6] - 14:22, 89:25, 91:4, 102:19, 178:16
**explanations** [1] - 104:6
**export** [2] - 61:11, 61:12
**exports** [1] - 171:23
**express** [1] - 245:4
**expressing** [2] - 20:25, 26:14
**extended** [8] - 71:17, 78:16, 198:4, 199:2, 199:5, 199:8, 199:24, 200:14
**extending** [2] - 199:22, 200:6
**extra** [5] - 134:24, 135:16, 199:22, 200:5, 201:1
**extremely** [3] - 48:15, 48:16, 243:15
**eyewitness** [1] - 3:22

## F

**fabricator** [1] - 40:9
**fabricators** [3] - 39:10, 62:22, 89:10
**face** [2] - 70:15, 200:16
**facility** [1] - 231:10
**facing** [2] - 34:16, 82:23
**fact** [18] - 3:21, 30:12, 31:9, 32:11, 100:2, 152:20, 155:6, 157:10, 157:14, 173:25, 174:6, 178:6, 189:4, 198:8, 237:15, 255:7, 259:20
**factoring** [1] - 31:2
**factors** [2] - 33:20, 43:3
**factory** [8] - 72:15, 77:4, 80:21, 80:25, 134:23, 135:16, 168:21, 199:25
**facts** [9] - 2:11, 2:12, 2:13, 2:19, 2:22, 3:23, 3:24, 4:14,

34:13
**failed** [2] - 69:16, 111:19
**fails** [2] - 4:20, 68:22
**failure** [2] - 68:14, 68:17
**fair** [36] - 6:17, 6:19, 6:23, 7:11, 7:20, 20:19, 20:21, 20:22, 21:19, 21:22, 21:23, 23:13, 32:21, 34:5, 52:10, 60:17, 122:10, 144:5, 148:10, 148:14, 149:25, 150:3, 196:22, 227:12, 234:23, 234:25, 235:23, 235:25, 237:10, 237:20, 238:11, 238:15, 253:5, 255:8, 260:18
**fairly** [3] - 24:5, 240:13, 253:9
**faith** [1] - 172:17
**fall** [1] - 19:13
**familiar** [8] - 41:1, 43:14, 59:2, 89:2, 92:9, 100:16, 248:8, 251:9
**families** [2] - 168:20, 232:25
**family** [24] - 5:2, 7:5, 8:8, 8:12, 15:11, 19:7, 25:4, 26:17, 27:6, 28:17, 44:16, 46:16, 49:9, 52:11, 53:2, 61:17, 61:20, 71:2, 88:23, 88:24, 125:5, 158:6, 158:10
**family's** [4] - 39:23, 45:13, 45:16, 49:1
**far** [11] - 20:3, 43:16, 80:21, 81:4, 85:19, 97:8, 111:12, 114:6, 136:9, 203:12
**FASB** [1] - 247:20
**fashion** [1] - 226:20
**faster** [3] - 73:17, 73:18, 73:19
**father** [36] - 24:18, 25:19, 26:8, 43:22, 44:25, 45:8, 46:12, 46:17, 46:18, 46:24, 47:3, 47:14, 48:2, 49:8, 49:22, 61:8, 61:19, 67:18, 68:3, 68:5, 68:23, 69:5, 69:14, 70:1, 70:15, 71:2, 71:5, 76:25, 78:14, 154:17, 161:22, 192:22, 193:7, 193:16, 193:17, 198:13
**father's** [4] - 25:16, 27:4, 27:18, 69:1
**fault** [1] - 186:5
**favor** [1] - 16:9
**favorable** [9] - 26:8, 27:17, 32:14, 154:15, 155:22, 156:2, 162:13, 162:23, 199:16
**February** [7] - 18:11, 140:16, 141:14, 176:6, 180:20, 237:6, 252:13

**federal** [3] - 6:9, 160:14, 160:19
**feedback** [1] - 66:2
**festivals** [1] - 52:25
**few** [14] - 5:4, 36:16, 70:3, 84:18, 93:15, 96:22, 99:13, 131:12, 133:7, 135:5, 177:13, 190:1, 245:8, 264:13
**field** [2] - 8:22, 245:3
**fifteen** [1] - 58:18
**fifth** [4] - 15:16, 15:17, 260:13, 260:14
**fighting** [3] - 29:10, 110:25, 236:7
**figure** [4] - 16:20, 259:18, 261:2, 267:15
**figured** [2] - 26:25, 265:22
**figures** [1] - 259:20
**file** [2] - 132:24, 230:19
**filed** [22] - 27:23, 33:3, 111:5, 111:6, 132:23, 136:20, 137:14, 141:23, 142:5, 142:7, 142:14, 143:23, 144:6, 144:11, 174:23, 176:19, 177:13, 178:11, 183:2, 185:11, 190:3, 196:16
**files** [5] - 250:4, 250:15, 262:22, 263:1, 264:2
**filing** [6] - 105:14, 122:2, 146:3, 160:19, 183:4, 195:12
**filings** [1] - 160:14
**final** [2] - 69:9, 211:10
**Final** [1] - 253:13
**finalizing** [1] - 65:12
**finally** [3] - 3:14, 5:15, 146:1
**finances** [3] - 86:1, 86:5, 243:22
**financial** [63] - 10:12, 10:19, 17:16, 36:1, 45:4, 77:11, 130:10, 130:21, 130:25, 131:7, 139:3, 141:12, 173:4, 173:7, 173:11, 173:22, 180:17, 181:6, 181:9, 181:14, 181:18, 181:24, 182:3, 182:12, 192:16, 240:4, 240:12, 240:18, 241:11, 241:23, 241:24, 243:10, 244:6, 244:8, 244:9, 244:11, 244:14, 244:23, 245:11, 245:12, 245:13, 245:14, 245:23, 247:6, 247:23, 248:3, 248:13, 249:2, 249:4, 249:5, 249:12, 249:15, 256:3, 256:4, 256:16, 256:17, 256:19, 257:14, 257:15, 257:19, 258:7, 259:21

**Financial** [1] - 247:20
**financially** [3] - 99:23, 100:5, 258:24
**financials** [9] - 138:18, 138:20, 140:22, 144:15, 183:11, 183:16, 183:18, 249:19, 258:7
**financing** [1] - 237:25
**findings** [1] - 244:21
**finish** [2] - 61:17, 260:20
**finished** [2] - 34:23, 35:4
**Finland** [1] - 73:5
**firm** [5] - 163:14, 177:19, 242:22, 242:23, 242:24
**first** [62] - 6:21, 6:24, 9:20, 11:5, 13:8, 16:18, 19:22, 22:5, 25:5, 31:13, 33:24, 37:9, 37:11, 37:25, 46:4, 52:13, 52:15, 53:18, 55:24, 59:14, 64:7, 68:13, 70:3, 78:2, 80:6, 83:17, 83:20, 84:12, 84:23, 85:7, 94:4, 100:12, 101:2, 107:21, 108:8, 109:7, 113:17, 116:14, 119:22, 121:9, 121:10, 121:17, 121:24, 135:5, 135:10, 150:12, 153:13, 167:3, 180:2, 193:24, 196:10, 196:12, 203:16, 212:22, 222:4, 224:15, 234:8, 255:21, 255:22, 255:23, 260:3, 261:9
**First** [1] - 153:23
**fit** [1] - 46:16
**fits** [1] - 236:6
**five** [8] - 13:6, 15:16, 31:9, 205:25, 231:13, 253:19, 268:5, 268:6
**fix** [3] - 7:18, 20:21, 21:21
**fixed** [2] - 246:14, 256:21
**flip** [1] - 110:13
**flipping** [1] - 219:21
**flows** [1] - 258:22
**focus** [1] - 32:17
**folks** [2] - 232:24, 239:22
**follow** [7] - 2:14, 3:11, 6:11, 96:4, 113:1, 183:4, 248:11
**follow-up** [1] - 96:4
**followed** [3] - 248:14, 266:15, 266:17
**following** [1] - 197:22
**force** [2] - 247:6, 251:14
**forced** [1] - 23:24
**foreclosed** [2] - 238:1
**forecloser** [1] - 238:9
**foreclosure** [1] - 34:16
**foregoing** [1] - 269:12
**forensic** [16] - 20:17, 137:9, 137:13, 137:16, 137:19, 175:5, 175:22, 177:3,

187:10, 239:16, 239:17, 239:18, 240:1, 242:2, 242:22, 245:3
**Forensics** [1] - 239:13
**forensics** [3] - 241:11, 241:23, 241:24
**forever** [1] - 35:22
**forklifts** [1] - 196:3
**form** [8] - 5:15, 21:13, 59:10, 228:25, 229:18, 230:5, 265:4, 268:25
**Form** [1] - 210:17
**formal** [1] - 30:13
**formation** [2] - 49:25, 50:3
**formed** [3] - 53:13, 201:20, 201:25
**former** [2] - 188:5, 255:3
**forms** [1] - 230:21
**forty** [1] - 205:25
**forty-five** [1] - 205:25
**forward** [12] - 22:7, 37:7, 84:6, 84:7, 122:24, 130:24, 131:6, 131:19, 138:6, 165:9, 172:23, 212:21
**Founded** [1] - 65:23
**founded** [1] - 66:7
**founder** [2] - 232:1, 239:13
**founders** [1] - 31:25
**four** [8] - 31:16, 112:5, 143:15, 226:21, 236:10, 236:12, 245:10, 253:22
**four-year** [1] - 245:10
**fourth** [3] - 255:19, 258:9, 258:10
**fourths** [1] - 76:10
**fractured** [1] - 15:12
**frankly** [1] - 250:9
**fraud** [4] - 241:12, 242:7, 242:8, 242:9
**free** [2] - 21:4, 26:9
**freeze** [12] - 251:9, 251:12, 251:13, 251:19, 252:4, 254:12, 254:21, 256:11, 257:6, 257:9, 257:16, 259:17
**freeze-out** [12] - 251:9, 251:12, 251:13, 251:19, 252:4, 254:12, 254:21, 256:11, 257:6, 257:9, 257:16, 259:17
**frequently** [2] - 28:8, 244:6
**friends** [1] - 84:3
**front** [6] - 41:11, 42:3, 42:7, 70:15, 79:15, 137:14
**fruits** [4] - 13:17, 14:6, 15:8, 16:14
**full** [15] - 23:11, 25:3, 25:16, 98:17, 133:10, 148:9, 157:22, 157:24, 158:11, 158:13, 158:16, 167:15, 174:6, 174:19, 181:11

**full-time** [7] - 25:3, 25:16, 157:22, 157:24, 158:11, 158:13, 158:16
**fully** [2] - 181:20, 181:21
**functions** [2] - 52:22, 52:24
**fundamentally** [1] - 23:3
**funds** [5] - 101:8, 104:17, 104:22, 201:5, 201:9

## G

**GAAP** [1] - 248:1
**Garcia** [1] - 145:12
**generality** [1] - 82:21
**generally** [1] - 3:19
**Generally** [1] - 248:1
**generate** [2] - 208:22, 208:23
**generated** [1] - 13:1
**generating** [1] - 249:14
**gentlemen** [21] - 2:7, 6:15, 7:18, 10:23, 11:4, 12:8, 12:17, 12:22, 16:13, 18:3, 18:8, 18:18, 19:3, 20:20, 20:24, 21:10, 21:15, 21:24, 31:25, 35:9, 197:9
**Georgia** [5] - 30:4, 30:8, 151:19, 195:12, 203:8
**given** [15] - 5:18, 78:14, 80:25, 108:3, 109:15, 114:2, 130:19, 131:13, 134:12, 134:19, 157:13, 184:6, 184:7, 218:14, 250:16
**goal** [1] - 171:5
**goodness'** [1] - 28:14
**goods** [3] - 154:7, 155:1, 170:15
**government** [2] - 160:14, 160:19
**grab** [3] - 88:6, 90:18, 139:6
**graduation** [1] - 61:18
**grandfather** [3] - 42:21, 46:18, 49:22
**granite** [3] - 9:6, 39:21, 246:25
**Granite** [18] - 57:23, 92:10, 92:16, 92:20, 96:5, 99:7, 99:10, 147:15, 147:16, 147:17, 147:21, 163:2, 163:3, 208:5, 219:14, 252:17, 253:1, 254:23
**gray** [1] - 258:13
**greater** [1] - 244:10
**greed** [1] - 22:11
**green** [7] - 98:15, 99:11, 248:23, 252:2, 252:3, 258:13
**Greensboro** [19] - 14:7, 16:25, 100:24, 100:25, 104:14, 104:18, 105:1,

119:7, 119:12, 119:15, 120:8, 121:1, 121:4, 121:10, 121:17, 194:8, 198:5, 203:17, 204:4
**Greenville** [1] - 198:5
**grew** [8] - 7:4, 7:23, 8:6, 13:1, 51:14, 60:20, 79:10, 79:13
**gross** [9] - 208:14, 211:8, 211:10, 213:14, 214:20, 214:21, 229:8, 267:4, 268:7
**ground** [3] - 23:1, 26:13, 202:7
**Group** [12] - 29:8, 29:14, 167:20, 167:23, 168:14, 169:18, 170:13, 171:1, 173:18, 176:5, 177:2, 177:11
**group** [9] - 59:10, 110:1, 110:3, 122:21, 137:11, 138:1, 168:3, 195:4, 251:14
**Grouper** [1] - 201:23
**grow** [1] - 38:5
**growing** [4] - 8:21, 25:8, 257:22, 257:23
**guarantee** [15] - 8:16, 25:12, 69:4, 78:14, 78:16, 78:22, 102:25, 103:1, 161:5, 161:9, 161:13, 162:9, 165:23, 166:2, 166:10
**guarantees** [1] - 151:14
**guidance** [1] - 23:22
**guide** [1] - 2:9
**guideline** [1] - 227:11
**guidelines** [1] - 4:7
**guy** [2] - 207:4, 228:7
**guys** [2] - 29:19, 208:7

## H

**half** [6] - 10:15, 23:16, 31:5, 125:17, 206:22
**halfway** [1] - 169:16
**hand** [12] - 2:5, 50:24, 50:25, 70:18, 153:11, 164:7, 175:18, 179:16, 205:9, 205:10, 238:25, 239:1
**handed** [4] - 169:6, 169:8, 169:11, 189:9
**handing** [1] - 185:9
**handle** [1] - 217:12
**handling** [2] - 228:15, 231:5
**Hara** [2] - 51:2, 51:11
**HARA** [7] - 1:4, 51:7, 150:9, 191:25, 270:9, 270:11, 270:13
**hard** [1] - 22:24
**hardly** [1] - 231:25
**Hari** [2] - 51:2, 51:11

**HARI** [7] - 1:4, 51:7, 150:9, 191:25, 270:9, 270:11, 270:13
**harm** [5] - 22:18, 24:1, 257:11, 258:3, 258:7
**harmed** [3] - 258:24, 260:14, 268:17
**hasty** [1] - 33:25
**hatched** [1] - 18:3
**header** [4] - 55:24, 108:7, 211:17
**health** [1] - 257:15
**healthily** [1] - 268:5
**healthy** [3] - 257:10, 257:22, 268:7
**hear** [49] - 4:1, 7:2, 7:12, 8:6, 8:9, 8:11, 9:14, 10:2, 10:10, 11:6, 11:10, 11:16, 11:18, 12:7, 12:13, 12:19, 13:21, 15:12, 16:13, 17:12, 20:3, 20:10, 20:16, 20:18, 20:24, 22:22, 24:15, 25:1, 26:6, 26:11, 26:23, 28:6, 28:9, 31:25, 32:4, 34:18, 35:1, 35:6, 35:9, 35:19, 55:3, 72:2, 93:21, 206:20, 206:22, 206:23, 206:25, 213:5, 260:11
**heard** [23] - 3:14, 4:23, 19:7, 27:11, 32:16, 36:19, 61:22, 63:1, 65:8, 70:11, 71:11, 72:9, 72:10, 73:9, 77:8, 77:24, 84:9, 125:3, 173:3, 247:1, 257:13, 265:17
**hearing** [2] - 47:8, 268:24
**height** [1] - 84:17
**held** [8] - 6:22, 38:21, 101:24, 102:1, 117:4, 125:13, 204:17, 204:18
**help** [12] - 13:11, 13:12, 19:15, 42:20, 44:5, 48:11, 49:7, 226:13, 229:4, 229:5, 231:16, 253:17
**helped** [2] - 26:12, 48:21
**helpful** [2] - 26:12, 224:22
**helps** [1] - 41:19
**hereafter** [1] - 116:8
**Hi** [2] - 57:22, 115:14
**high** [5] - 7:13, 70:14, 82:21, 245:12, 249:3
**high-level** [2] - 245:12, 249:3
**higher** [2] - 229:2, 229:5
**HILL** [1] - 1:19
**himself** [3] - 14:18, 25:3, 29:6
**hire** [3] - 74:19, 74:20, 233:19
**hired** [7] - 35:12, 232:21, 233:21, 233:24, 234:2,

235:5, 235:10
**Hirsch** [2] - 56:1, 56:7
**historical** [1] - 165:19
**history** [2] - 8:12, 11:21
**hold** [11] - 13:23, 14:16, 40:10, 64:2, 98:12, 98:13, 98:19, 105:16, 105:22, 261:6, 261:8
**Holding** [1] - 54:14
**holding** [3] - 13:22, 123:23, 204:15
**HOLDINGS** [1] - 1:4
**holdings** [1] - 38:21
**Holdings** [5] - 38:23, 38:25, 125:4, 148:9, 201:23
**holds** [1] - 125:5
**home** [4] - 40:9, 49:1, 61:18, 61:23
**homeowners** [3] - 39:12, 39:15, 40:4
**homes** [1] - 9:8
**Honor** [72] - 6:14, 8:17, 21:25, 22:3, 35:2, 35:5, 36:14, 37:10, 46:10, 49:17, 50:18, 50:22, 53:20, 54:20, 56:21, 58:3, 67:7, 91:15, 94:14, 97:12, 104:9, 105:24, 110:9, 112:9, 114:13, 116:2, 126:17, 128:7, 138:10, 140:8, 141:24, 145:20, 150:4, 150:7, 153:8, 164:5, 175:16, 179:13, 185:6, 190:12, 190:19, 191:16, 191:23, 197:1, 197:8, 197:16, 204:20, 204:24, 204:25, 205:3, 205:5, 205:7, 207:9, 210:1, 213:3, 215:23, 216:4, 216:6, 216:12, 217:2, 217:14, 223:14, 224:9, 224:11, 234:6, 234:8, 237:3, 238:18, 238:23, 244:25, 245:5, 253:21
**HONORABLE** [1] - 1:11
**honored** [3] - 87:23, 88:1, 88:4
**honors** [1] - 241:5
**hope** [1] - 154:5
**host** [1] - 15:4
**hours** [2] - 36:25, 241:18
**house** [1] - 242:18
**HUMPHREY** [1] - 1:15
**hundreds** [2] - 243:23, 262:24
**hurt** [4] - 20:15, 21:7, 21:8, 35:23
**Hyderabad** [2] - 38:6, 48:3

**I**

**idea** [12] - 9:1, 64:1, 64:2, 68:4, 70:21, 85:6, 102:3, 198:14, 207:5, 216:8, 222:25, 227:23
**identification** [4] - 164:8, 175:19, 179:17, 185:10
**identified** [1] - 190:21
**identify** [2] - 236:5, 263:22
**identifying** [1] - 243:8
**ignore** [1] - 3:7
**illustration** [5] - 94:21, 97:11, 246:2, 246:6, 258:13
**illustrations** [1] - 251:20
**images** [1] - 263:12
**immediate** [2] - 136:1, 158:6
**immediately** [1] - 68:8
**imminent** [1] - 34:16
**impair** [1] - 15:1
**implied** [1] - 166:24
**important** [20] - 9:14, 9:17, 9:21, 9:23, 10:19, 10:22, 12:24, 13:13, 18:18, 26:6, 28:18, 30:12, 33:25, 43:4, 43:25, 73:13, 73:15, 235:2, 258:17, 258:18
**importing** [2] - 10:7, 24:24
**imports** [1] - 9:5
**impose** [1] - 36:20
**impossible** [1] - 207:3
**improper** [2] - 23:18, 259:21
**improperly** [5] - 177:25, 243:19, 247:6, 265:25, 268:15
**in-house** [1] - 242:18
**in-transit** [2] - 214:15, 214:16
**Inc** [1] - 115:18
**incentive** [1] - 224:24
**include** [4] - 45:11, 103:9, 206:21, 250:10
**included** [4] - 214:9, 214:10, 228:19, 247:24
**includes** [6] - 220:17, 220:18, 220:19, 222:4, 222:6, 222:9
**including** [5] - 23:19, 108:12, 160:10, 189:1, 196:4
**Income** [1] - 116:9
**income** [7] - 116:9, 116:23, 117:15, 243:19, 245:20, 257:23, 266:19
**increase** [3] - 121:15, 259:14, 259:16
**increases** [1] - 259:11
**increasing** [2] - 257:24,

257:25
**indeed** [2] - 19:21, 21:17
**independent** [7] - 35:12, 92:23, 206:6, 206:11, 206:15, 207:18, 233:21
**independently** [1] - 31:8
**India** [29] - 7:23, 8:7, 14:24, 24:14, 25:16, 38:6, 39:19, 48:3, 48:4, 48:11, 48:22, 48:24, 49:8, 51:13, 60:20, 64:15, 67:18, 68:25, 69:8, 74:7, 75:24, 77:14, 85:22, 85:23, 87:20, 110:23, 157:22, 157:24
**Indian** [4] - 73:3, 153:25, 169:19, 169:23
**indicate** [5] - 2:17, 21:14, 96:25, 112:21, 132:18
**indicated** [3] - 56:13, 180:11, 263:9
**indicates** [1] - 247:12
**indicating** [1] - 2:18
**individually** [1] - 166:16
**industry** [3] - 61:1, 61:4, 226:20
**ineligible** [10] - 211:4, 211:12, 213:15, 215:2, 229:9, 229:16, 229:20, 229:22, 229:23, 230:4
**infer** [1] - 3:24
**inflated** [1] - 184:11
**influenced** [1] - 3:6
**inform** [1] - 103:25
**information** [37] - 17:16, 17:24, 18:23, 33:10, 36:2, 130:10, 130:21, 131:14, 139:3, 141:13, 141:15, 141:19, 141:22, 142:22, 147:5, 173:4, 173:7, 173:11, 174:2, 179:9, 179:19, 180:17, 180:25, 181:6, 181:9, 181:14, 181:18, 181:21, 181:24, 182:3, 182:13, 182:21, 230:22, 249:3, 262:14, 262:15, 262:19
**initial** [8] - 9:25, 10:18, 75:17, 82:12, 91:25, 107:24, 156:7, 156:10
**input** [1] - 34:7
**inquired** [1] - 84:3
**inspect** [1] - 72:16
**inspection** [1] - 180:6
**install** [1] - 39:12
**installation** [1] - 9:7
**instances** [1] - 16:12
**instead** [5] - 23:9, 33:9, 199:11, 200:1, 262:13
**Institute** [1] - 242:1
**instructed** [1] - 3:9

instruction [1] - 3:11
instructions [5] - 2:9, 2:14, 4:2, 6:6, 21:12
instructs [1] - 2:23
insurance [1] - 249:10
insure [3] - 152:22, 153:3, 153:25
insuring [1] - 43:8
intended [3] - 2:17, 167:23, 168:13
intends [1] - 5:24
intent [1] - 170:8
interact [2] - 42:22
interacted [1] - 107:2
interaction [1] - 43:12
intercompany [1] - 136:19
interest [45] - 7:10, 13:14, 13:18, 13:19, 13:23, 16:10, 17:22, 19:16, 22:17, 23:25, 29:11, 29:25, 30:2, 33:23, 35:15, 98:13, 124:25, 131:23, 138:8, 147:19, 148:9, 151:18, 153:5, 157:6, 160:8, 160:16, 167:2, 167:4, 167:9, 167:14, 167:16, 167:20, 167:24, 168:6, 179:1, 184:20, 196:21, 202:13, 252:4, 252:6, 252:7, 253:5, 255:8, 268:18
interested [2] - 138:7, 138:24
interests [14] - 17:8, 17:9, 23:9, 28:3, 29:24, 30:1, 30:20, 50:8, 118:4, 141:16, 160:23, 165:1, 192:6, 192:13
internal [2] - 24:3, 33:22
international [1] - 242:18
International [7] - 89:3, 89:5, 115:7, 115:18, 198:14, 198:22, 203:1
interpret [1] - 6:5
interrupt [3] - 8:13, 8:18, 236:4
interviewed [1] - 202:16
introduce [4] - 37:19, 51:9, 60:19, 239:9
inventories [2] - 187:11, 211:4
inventory [156] - 15:21, 20:13, 41:19, 64:2, 64:3, 73:19, 93:5, 95:11, 95:13, 97:6, 100:6, 123:6, 129:7, 130:2, 130:5, 174:13, 184:10, 186:20, 186:24, 187:17, 188:10, 188:14, 188:18, 200:24, 208:13, 208:14, 208:16, 208:19, 208:21, 208:25, 209:2, 209:7, 210:18, 210:22, 211:8, 211:10, 211:12,

211:14, 211:24, 212:3, 212:5, 212:7, 212:9, 212:13, 213:13, 213:14, 213:15, 213:16, 213:19, 213:22, 213:24, 214:2, 214:8, 214:10, 214:11, 214:12, 214:15, 214:16, 215:2, 215:12, 215:16, 215:21, 215:22, 217:7, 217:19, 217:22, 217:25, 218:13, 225:7, 225:9, 226:14, 226:16, 226:17, 227:2, 227:4, 227:6, 227:9, 227:17, 227:23, 228:9, 228:15, 229:8, 229:10, 229:11, 229:16, 229:20, 229:22, 229:23, 230:1, 230:3, 230:4, 230:23, 242:17, 243:7, 243:8, 243:9, 243:11, 243:17, 246:13, 246:18, 246:19, 246:20, 246:22, 246:24, 247:2, 247:16, 247:23, 248:9, 248:12, 248:24, 255:14, 256:24, 261:2, 261:3, 264:1, 264:4, 264:7, 264:9, 264:13, 264:19, 264:25, 265:3, 265:8, 265:14, 265:15, 265:16, 265:17, 265:24, 266:1, 266:2, 266:3, 266:7, 266:10, 266:12, 266:18, 266:24, 267:1, 267:3, 267:6, 267:10, 267:11, 267:16, 267:18, 267:23, 267:25, 268:4, 268:10, 268:16
invest [2] - 57:3, 194:4
invested [13] - 15:21, 22:25, 25:6, 31:21, 58:23, 97:10, 99:16, 159:24, 160:3, 160:9, 188:22, 201:5, 201:8
investigate [3] - 239:19, 239:21, 242:9
investigated [1] - 243:22
investigation [1] - 5:14
investing [2] - 25:21, 113:13
investment [36] - 13:12, 13:14, 13:15, 13:23, 50:4, 57:8, 58:16, 58:20, 75:7, 93:4, 94:3, 94:21, 94:24, 95:3, 95:5, 95:9, 95:10, 96:16, 96:19, 97:7, 97:9, 97:25, 98:4, 98:10, 98:19, 99:14, 99:23, 99:24, 100:3, 100:14, 101:13, 117:4, 134:14, 134:18, 136:4, 199:10
investments [5] - 13:2, 13:6, 14:4, 15:16, 16:14
investor [5] - 113:1, 113:8,

113:13, 113:15, 114:7
investors [1] - 58:9
invited [2] - 34:7, 34:11
invoice [7] - 40:13, 40:16, 40:23, 41:3, 41:4, 42:10, 152:16
invoices [6] - 132:3, 132:9, 132:14, 132:22, 145:16, 174:13
involuntarily [1] - 140:6
involve [4] - 72:12, 72:18, 120:14, 147:2
involved [28] - 23:23, 41:5, 41:22, 49:21, 49:25, 50:3, 50:6, 65:8, 73:23, 74:22, 93:6, 95:25, 123:9, 148:23, 168:14, 188:17, 201:11, 201:20, 201:24, 202:4, 202:5, 218:15, 226:1, 226:2, 235:22, 244:13
involvement [5] - 62:17, 73:9, 103:20, 131:6, 193:1
involves [1] - 244:11
irregular [2] - 257:6, 257:7
IRS [4] - 210:23, 211:14, 217:19, 228:12
issue [13] - 10:22, 10:23, 15:16, 18:9, 23:12, 40:17, 184:11, 198:18, 198:20, 204:13, 240:5, 244:14, 255:7
issued [5] - 40:13, 42:11, 134:5, 198:8, 198:21
issues [8] - 23:2, 23:3, 53:12, 145:15, 192:17, 196:18, 196:20, 255:6
Italy [1] - 200:10
item [6] - 3:10, 108:18, 116:8, 141:2, 193:23, 197:2
itemize [1] - 263:12
items [6] - 140:24, 176:18, 176:25, 246:10, 246:14, 246:20
itself [8] - 40:25, 41:4, 41:21, 42:12, 42:19, 43:7, 43:12, 71:6

## J

Jaishri [12] - 39:3, 45:1, 64:13, 65:6, 76:8, 90:16, 105:7, 108:13, 111:17, 113:4, 118:14, 124:6
Jane [1] - 108:13
January [20] - 19:21, 107:21, 107:22, 109:16, 111:2, 115:9, 144:21, 147:12, 147:24, 167:5, 167:9, 182:1, 183:17, 189:24, 190:3, 197:13,

197:19, 197:23, 202:10, 270:15
Jay [8] - 88:8, 88:10, 93:8, 93:9, 94:7, 95:24, 97:21, 97:22
Jerry [3] - 139:8, 139:13, 146:6
Jersey [1] - 83:14
job [11] - 32:10, 64:16, 74:19, 156:21, 157:22, 157:24, 158:11, 158:16, 202:7, 243:7, 244:10
jobs [2] - 24:2, 33:1
join [2] - 61:19, 94:9
joined [1] - 95:1
joining [3] - 52:23, 96:5, 110:1
journal [2] - 262:18, 265:23
JUDGE [1] - 1:11
Judge [2] - 24:9, 137:14
judges [1] - 2:12
judgment [3] - 133:5, 133:6, 133:9
Julia [1] - 110:19
jump [1] - 108:17
June [1] - 143:14
JUROR [3] - 206:25, 223:14, 223:17
jurors [4] - 2:3, 2:4, 5:4, 236:7
Jury [1] - 1:6
jury [48] - 2:6, 5:7, 5:19, 6:7, 6:10, 6:12, 22:5, 36:5, 36:15, 36:17, 36:18, 37:20, 39:8, 40:1, 40:7, 41:2, 43:16, 51:10, 52:7, 59:6, 60:9, 60:16, 60:19, 64:11, 68:16, 72:1, 77:13, 82:19, 83:9, 92:25, 113:6, 120:5, 122:10, 122:13, 125:3, 144:5, 144:14, 149:24, 197:9, 239:10, 242:14, 243:1, 251:12, 252:1, 255:25, 259:2, 259:6, 266:6
JURY [2] - 1:10, 1:11
Justh [5] - 38:22, 38:23, 38:25, 125:4, 148:9

## K

K-1 [5] - 198:8, 198:18, 198:20, 198:21, 198:22
keep [3] - 66:18, 204:5, 237:21
Keith [2] - 208:3, 213:20
Kelly [1] - 219:1
kept [5] - 5:3, 23:19, 23:21, 199:20, 202:23
Khatod [9] - 54:8, 54:10,

123:18, 179:10, 180:12, 180:16, 181:5, 181:13, 181:23

**kick** [2] - 18:4, 18:5
**kicked** [1] - 19:17
**kicking** [5] - 18:16, 19:25, 140:1, 140:3, 149:13
**kids** [1] - 52:25
**Kim** [1] - 55:25
**kind** [7] - 32:11, 34:9, 43:13, 110:23, 161:9, 229:25, 231:24
**kinds** [5] - 3:19, 4:3, 23:1, 247:22, 248:5
**knowing** [4] - 19:17, 19:18, 127:19
**knowledge** [9] - 18:6, 18:12, 74:11, 106:22, 106:25, 146:9, 146:20, 228:14, 251:16
**known** [1] - 186:18
**knows** [3] - 79:8, 85:9, 216:23

**L**

**ladies** [20] - 2:7, 6:15, 7:17, 10:23, 11:4, 12:7, 12:17, 12:22, 16:13, 18:2, 18:8, 18:18, 19:3, 20:20, 20:24, 21:10, 21:15, 21:24, 35:9, 197:9
**language** [2] - 51:16, 206:24
**lapse** [1] - 225:5
**large** [5] - 241:17, 242:18, 242:22, 265:11, 267:4
**larger** [3] - 30:17, 100:4, 229:2
**largest** [2] - 243:17, 247:4
**last** [7] - 56:11, 102:4, 141:6, 143:23, 153:13, 222:22
**lasted** [1] - 29:8
**lastly** [1] - 111:23
**late** [6] - 19:9, 174:1, 177:21, 183:21, 185:3, 268:20
**latter** [1] - 135:15
**LAW** [1] - 1:18
**law** [5] - 2:13, 2:14, 6:6, 177:19
**Lawrence** [10] - 56:1, 56:9, 76:5, 103:15, 105:8, 108:9, 108:18, 109:3, 116:11, 117:10
**Lawrence's** [2] - 108:23, 125:24
**laws** [2] - 166:18, 166:19

**lawsuit** [16] - 19:15, 52:1, 52:2, 52:5, 111:5, 111:6, 133:16, 134:1, 142:14, 143:23, 144:11, 185:5, 185:11, 196:16, 197:14, 205:1
**lawsuits** [14] - 29:10, 33:3, 174:22, 176:19, 177:1, 177:13, 178:11, 179:7, 180:24, 185:21, 186:1, 186:3, 238:4, 243:25
**lawyer** [10] - 177:15, 178:6, 179:18, 179:23, 180:3, 180:10, 180:16, 181:3, 181:12, 181:22
**lawyers** [8] - 2:22, 3:1, 3:3, 36:6, 177:15, 178:2, 178:23, 179:8
**layer** [1] - 264:24
**lead** [4] - 216:9, 217:8, 263:7, 264:6
**leading** [3] - 32:24, 231:2, 257:16
**leads** [1] - 4:14
**leap** [1] - 25:2
**learn** [7] - 22:24, 25:19, 25:23, 26:16, 43:21, 92:16, 142:7
**learned** [1] - 33:17
**lease** [3] - 25:11, 26:1, 85:14
**leases** [2] - 151:3, 151:9
**least** [2] - 172:23, 187:16
**leave** [2] - 5:19, 191:5
**leaving** [2] - 191:9, 251:8
**led** [2] - 42:18, 195:12
**left** [5] - 50:24, 181:12, 205:9, 238:25, 242:23
**legacy** [1] - 42:21
**legal** [4] - 50:15, 50:16, 136:21, 239:20
**lender** [3] - 219:4, 229:1, 238:3
**LEONARD** [1] - 1:15
**less** [11] - 21:6, 32:10, 99:17, 168:24, 169:2, 169:23, 170:21, 184:16, 197:4, 210:25, 211:13
**letter** [22] - 140:15, 140:21, 141:6, 141:13, 141:19, 141:22, 142:25, 146:5, 147:9, 177:17, 177:21, 178:6, 178:15, 178:24, 179:8, 179:18, 179:22, 180:2, 181:10, 181:17, 185:15, 186:7
**letters** [2] - 180:24, 237:25
**level** [10] - 70:10, 70:12, 82:21, 198:19, 245:12, 249:3, 262:14, 262:16,

262:19, 262:20
**levels** [1] - 130:5
**leverage** [3] - 169:19, 170:22, 170:25
**leveraging** [1] - 33:9
**liabilities** [4] - 141:8, 141:15, 244:8, 257:25
**licensed** [1] - 241:15
**lie** [1] - 7:22
**life** [3] - 22:23, 22:25, 25:25
**lifecycle** [1] - 200:24
**light** [2] - 4:14, 191:8
**likely** [2] - 4:15, 31:10
**likewise** [2] - 156:13, 156:21
**limit** [1] - 11:25
**limited** [2] - 3:10, 226:19
**limits** [2] - 36:20, 36:25
**line** [9] - 80:20, 89:22, 116:22, 176:10, 177:4, 197:20, 201:18, 202:10, 203:4
**Line** [2] - 176:6, 176:15
**lines** [1] - 263:20
**list** [5] - 114:20, 140:24, 184:4, 246:11, 260:12
**listed** [1] - 102:9
**listen** [2] - 5:9, 70:16
**literally** [3] - 249:12, 263:6, 263:12
**live** [7] - 38:3, 48:2, 48:22, 51:12, 51:13, 52:21, 52:23
**lived** [4] - 25:15, 48:23, 61:23, 88:23
**lives** [3] - 14:24, 48:3, 48:5
**living** [1] - 239:12
**LLC** [43] - 1:4, 1:8, 13:22, 14:17, 50:3, 57:24, 92:10, 96:5, 98:14, 98:17, 98:18, 98:19, 98:22, 99:7, 99:11, 100:17, 117:3, 117:7, 117:9, 117:15, 117:18, 117:24, 125:8, 125:13, 144:2, 147:15, 147:16, 147:17, 147:21, 148:9, 159:11, 159:22, 160:4, 160:6, 160:11, 179:19, 180:7, 203:13, 236:13, 236:16, 252:9
**LLP** [1] - 1:15
**load** [1] - 25:21
**loan** [18] - 12:3, 15:1, 31:1, 33:8, 90:25, 91:9, 91:12, 104:3, 185:22, 204:9, 208:8, 222:16, 223:24, 223:25, 224:2, 224:5, 229:2, 233:14
**loaned** [1] - 233:16
**loans** [9] - 12:1, 30:15, 33:4, 91:11, 101:14, 102:13, 102:15, 249:10

**location** [55] - 15:19, 30:8, 32:3, 40:1, 40:20, 45:17, 45:22, 45:23, 45:25, 46:4, 46:8, 46:19, 46:25, 47:4, 53:18, 55:22, 58:19, 59:1, 59:14, 59:18, 64:7, 77:23, 83:17, 83:21, 84:13, 85:7, 90:22, 91:25, 95:18, 96:19, 96:21, 96:23, 100:12, 104:20, 107:24, 122:14, 123:3, 123:9, 127:16, 132:6, 154:5, 157:15, 178:19, 195:20, 199:3, 199:12, 199:17, 199:24, 200:15, 200:19, 201:6, 201:8, 231:1, 232:22, 238:6
**locations** [20] - 14:8, 26:24, 28:23, 39:24, 45:19, 59:8, 59:11, 91:24, 107:10, 119:8, 173:22, 195:21, 198:4, 201:11, 201:15, 201:19, 201:24, 202:3, 203:8, 228:4
**locked** [6] - 17:16, 17:17, 173:3, 173:7, 173:10, 173:21
**loggerheads** [1] - 34:4
**login** [2] - 128:20, 129:1
**long-term** [3] - 68:21, 78:15, 110:23
**long-time** [2] - 23:22, 26:18
**look** [84] - 8:22, 10:21, 22:7, 37:3, 40:1, 54:5, 55:7, 63:15, 65:3, 65:11, 65:15, 65:20, 65:23, 66:4, 66:7, 80:16, 88:6, 90:8, 95:12, 95:23, 103:3, 103:7, 103:13, 105:6, 106:5, 108:7, 108:18, 111:7, 111:16, 111:23, 113:2, 115:5, 116:14, 118:1, 118:13, 123:15, 124:3, 124:15, 126:4, 127:9, 128:13, 134:7, 134:11, 136:23, 137:8, 139:6, 140:14, 140:23, 141:2, 144:9, 145:10, 147:8, 147:9, 153:12, 153:19, 164:14, 164:17, 169:7, 169:16, 172:11, 173:13, 175:8, 175:13, 175:20, 175:25, 179:22, 189:9, 200:23, 201:19, 209:18, 211:25, 215:12, 227:11, 245:18, 250:11, 252:21, 255:19, 257:14, 259:2, 263:11, 264:19
**looked** [14] - 28:15, 106:6, 110:14, 116:10, 117:4, 122:4, 137:20, 202:13, 224:24, 245:19, 250:7, 252:4, 256:12, 258:12
**looking** [20] - 43:10, 94:20,

95:24, 105:14, 111:11, 137:13, 154:11, 156:25, 157:3, 172:10, 189:23, 190:10, 190:22, 190:25, 192:6, 192:13, 194:19, 252:1, 259:6, 259:23

**looks** [2] - 210:21, 220:10
**loose** [1] - 180:25
**lose** [2] - 70:15, 188:10
**loss** [3] - 150:23, 150:25, 151:1
**losses** [4] - 11:9, 71:22, 150:17, 150:20
**lost** [1] - 266:21
**louder** [1] - 207:5
**low** [3] - 7:14, 7:15, 7:24
**lower** [13] - 168:24, 169:2, 169:24, 170:21, 170:23, 189:1, 191:10, 229:20, 230:6, 230:8, 230:10, 230:12, 248:25
**lumber** [1] - 242:18
**lunch** [2] - 94:11, 94:12

## M

**Madagascar** [1] - 73:6
**madam** [1] - 2:2
**mail** [1] - 111:9
**main** [3] - 129:15, 215:18, 243:5
**maintain** [1] - 241:18
**major** [7] - 82:22, 161:22, 206:18, 206:21, 207:20, 207:22
**majority** [4] - 76:13, 143:21, 158:7, 250:11
**man** [1] - 24:14
**manage** [4] - 9:11, 174:7, 231:14, 231:20
**management** [2] - 19:6, 145:13
**management's** [1] - 219:14
**manager** [6] - 126:24, 127:4, 160:6, 182:12, 231:6, 236:2
**managers** [12] - 23:19, 23:24, 24:4, 32:25, 33:7, 33:11, 33:16, 33:21, 34:1, 34:15, 35:10, 173:3
**managing** [10] - 24:18, 25:8, 27:3, 86:1, 88:10, 88:12, 154:17, 155:18, 158:4, 171:22
**manipulate** [1] - 265:24
**manipulated** [2] - 243:19, 247:6
**manipulating** [1] - 247:8
**manipulation** [1] - 255:14

**manmade** [1] - 39:22
**Manning** [1] - 177:19
**marble** [2] - 9:6, 39:21
**Marble** [6] - 57:23, 92:10, 92:16, 92:20, 99:7, 99:10
**March** [2] - 235:25, 237:9
**margins** [1] - 267:4
**marked** [4] - 164:7, 175:18, 179:16, 185:9
**market** [8] - 43:11, 79:6, 84:23, 85:9, 85:12, 148:10, 148:14, 170:24
**marketing** [4] - 44:24, 75:21, 75:23, 76:2
**marshals** [1] - 5:12
**Mart** [1] - 64:14
**massive** [1] - 29:19
**match** [3] - 261:23, 261:24, 265:5
**material** [31] - 10:3, 10:6, 15:20, 40:14, 41:21, 43:6, 43:7, 43:9, 44:4, 44:6, 47:23, 68:20, 76:12, 76:23, 78:1, 89:8, 100:7, 123:4, 134:21, 134:23, 135:3, 136:3, 168:24, 169:2, 169:23, 170:19, 199:11, 199:13, 200:1, 240:23
**materially** [4] - 240:19, 258:11, 258:20, 258:23
**materials** [12] - 39:22, 75:21, 75:23, 75:25, 76:2, 77:21, 135:5, 135:12, 152:9, 152:11, 154:21, 157:3
**matter** [4] - 253:20, 256:6, 265:10, 269:14
**matters** [1] - 243:25
**McGuire** [1] - 137:15
**McGurk** [3] - 1:20, 269:16, 269:17
**MCLENDON** [1] - 1:15
**mean** [21] - 10:5, 32:22, 68:16, 70:11, 81:2, 112:17, 114:6, 125:16, 127:21, 174:12, 203:24, 229:22, 239:17, 241:23, 242:6, 246:9, 255:25, 256:19, 257:7, 262:15, 267:9
**meaning** [3] - 142:5, 256:16, 268:6
**meaningful** [1] - 232:4
**means** [16] - 4:12, 10:8, 10:10, 10:14, 41:2, 116:19, 199:5, 199:12, 226:18, 226:22, 241:10, 241:11, 244:4, 257:24, 258:21, 263:23
**meant** [3] - 181:19, 229:6, 262:17
**mechanical** [1] - 1:24

**Meek** [7] - 126:6, 126:7, 134:9, 139:8, 144:25, 146:6, 147:10
**meet** [2] - 4:20, 93:25
**meeting** [5] - 96:3, 96:8, 96:10, 96:13, 96:15
**member** [6] - 28:17, 88:24, 96:5, 179:20, 201:23, 228:2
**members** [9] - 22:5, 36:5, 44:16, 51:9, 164:25, 165:3, 236:18, 236:19, 254:17
**membership** [1] - 202:13
**memorandum** [1] - 155:6
**memorialized** [1] - 160:10
**mentioned** [13] - 24:12, 27:15, 28:21, 29:4, 31:20, 32:7, 96:18, 107:9, 118:25, 175:4, 225:1, 241:22, 243:2
**merged** [5] - 19:23, 147:15, 148:5, 149:10, 254:23
**merger** [4] - 147:25, 148:3, 148:24
**Merger** [1] - 148:8
**messy** [1] - 29:15
**met** [3] - 93:15, 93:16, 94:5
**methodologies** [1] - 36:3
**Michigan** [2] - 38:13, 38:14
**Microsoft** [1] - 248:4
**Middle** [1] - 1:20
**middle** [9] - 88:7, 88:13, 90:19, 103:7, 103:8, 111:8, 176:5, 208:10, 225:16
**midst** [1] - 15:15
**midway** [3] - 127:9, 164:17, 164:24
**might** [7] - 11:25, 12:3, 207:1, 226:23, 226:24, 226:25, 267:13
**miles** [1] - 268:22
**million** [55] - 132:2, 132:8, 136:18, 143:19, 143:20, 143:25, 175:11, 175:12, 176:10, 176:16, 177:2, 177:4, 177:6, 177:8, 208:18, 210:23, 210:25, 211:8, 211:13, 212:15, 212:25, 213:15, 213:16, 213:17, 214:6, 214:23, 214:24, 215:2, 215:9, 217:19, 217:21, 217:25, 218:3, 218:10, 219:22, 220:22, 222:2, 222:3, 222:11, 222:18, 223:19, 223:20, 224:5, 224:7, 229:8, 229:9, 229:15, 229:17, 230:10, 230:14
**millions** [12] - 22:13, 23:15, 24:5, 27:6, 27:7, 32:18, 32:20, 36:7, 171:23, 240:25, 258:2, 265:18

**mind** [2] - 4:2, 224:17
**mine** [1] - 210:8
**minute** [1] - 232:14
**minutes** [4] - 36:16, 162:11, 190:16, 197:4
**missed** [1] - 94:15
**missing** [1] - 250:14
**misstated** [5] - 240:19, 258:11, 258:21, 258:23
**misstatements** [1] - 240:23
**MOHAN** [1] - 1:7
**Mohan** [2] - 197:23, 270:15
**mom** [1] - 48:9
**moment** [3] - 27:15, 116:11, 159:23
**monetary** [1] - 71:1
**Money** [1] - 115:6
**money** [55] - 9:19, 9:24, 9:25, 10:17, 13:15, 13:16, 14:9, 14:10, 23:16, 25:7, 25:22, 31:6, 31:8, 36:7, 68:20, 68:25, 70:15, 71:15, 71:17, 77:19, 77:21, 78:1, 79:24, 82:2, 82:3, 86:17, 89:21, 93:4, 95:11, 95:13, 101:11, 101:21, 113:13, 134:21, 136:3, 136:4, 136:21, 139:1, 148:17, 175:4, 177:11, 191:5, 195:5, 199:10, 200:21, 200:25, 221:13, 229:17, 233:14, 233:16, 263:23, 263:24
**monies** [1] - 114:7
**month** [3] - 75:2, 185:2, 196:11
**monthly** [1] - 73:12
**months** [26] - 9:20, 10:18, 19:3, 19:18, 28:25, 29:8, 32:23, 87:2, 87:3, 87:6, 87:9, 145:4, 145:8, 145:18, 177:13, 200:5, 200:6, 218:23, 221:9, 221:14, 221:17, 222:1, 222:7, 222:12, 223:20, 226:22
**morning** [4] - 6:15, 37:19, 197:8, 268:23
**Morris** [1] - 177:18
**MORSE** [44] - 1:14, 197:8, 197:18, 201:18, 202:9, 203:3, 204:20, 205:3, 205:5, 205:7, 205:18, 207:8, 207:10, 209:8, 209:13, 209:25, 210:4, 210:5, 213:11, 215:23, 216:4, 216:6, 216:11, 216:13, 217:2, 217:4, 217:14, 217:16, 223:2, 223:7, 223:8, 223:18, 224:8, 234:8, 234:15, 235:9, 235:14, 236:9, 236:15, 237:3, 237:5,

238:18, 270:18, 270:22

**Morse** [4] - 197:10, 224:20, 230:21, 233:5

**most** [14] - 9:18, 10:1, 34:19, 43:3, 116:23, 117:14, 121:12, 242:20, 246:16, 247:2, 249:17, 250:14, 262:12, 267:2

**mostly** [2] - 69:9, 129:15

**mother** [3] - 44:25, 48:5, 49:7

**mother's** [1] - 45:1

**move** [41] - 48:9, 48:21, 54:20, 54:23, 56:21, 58:3, 63:23, 67:7, 80:10, 81:18, 90:9, 91:15, 97:12, 104:9, 105:24, 110:9, 112:9, 114:13, 116:2, 122:24, 124:16, 126:17, 128:7, 138:11, 140:8, 141:25, 145:20, 202:9, 209:8, 210:9, 210:17, 211:16, 211:22, 219:12, 221:18, 221:22, 222:22, 234:9, 250:17, 253:21, 254:9

**moved** [12] - 8:21, 17:7, 17:15, 25:3, 48:23, 49:7, 62:18, 99:17, 99:18, 99:20, 100:3, 140:6

**Moving** [1] - 217:17

**moving** [18] - 48:22, 149:11, 201:18, 204:16, 208:15, 208:21, 208:25, 209:1, 209:6, 213:19, 213:22, 213:23, 214:2, 214:8, 215:22, 218:21, 243:9, 268:5

**MR** [160] - 6:14, 8:17, 8:20, 20:8, 22:3, 34:24, 35:2, 35:5, 35:8, 37:10, 37:18, 46:10, 49:15, 49:17, 49:20, 50:17, 50:22, 51:8, 53:20, 53:22, 54:20, 54:23, 55:5, 55:6, 56:21, 57:1, 58:3, 58:8, 67:7, 67:12, 74:1, 74:4, 78:19, 78:21, 80:10, 80:15, 81:18, 81:23, 90:9, 90:14, 91:15, 91:20, 94:14, 94:19, 97:12, 97:17, 104:9, 105:24, 106:4, 110:9, 110:12, 112:9, 112:14, 114:13, 116:2, 116:7, 124:16, 124:21, 126:17, 126:22, 128:7, 128:12, 138:10, 138:15, 140:8, 140:13, 141:24, 142:4, 145:20, 145:25, 150:4, 150:7, 150:10, 153:8, 153:10, 164:5, 164:6, 175:16, 175:17, 179:13, 179:15, 185:6, 185:8,

190:12, 190:19, 190:20, 191:16, 191:21, 191:23, 192:1, 196:24, 197:1, 197:6, 197:8, 197:16, 197:18, 201:18, 202:9, 203:3, 204:20, 204:23, 204:25, 205:3, 205:5, 205:7, 205:18, 207:8, 207:10, 209:8, 209:13, 209:25, 210:4, 210:5, 213:3, 213:6, 213:11, 215:23, 216:4, 216:6, 216:11, 216:13, 217:2, 217:4, 217:14, 217:16, 223:2, 223:7, 223:8, 223:18, 224:8, 224:11, 224:14, 224:18, 224:19, 234:5, 234:8, 234:15, 235:9, 235:14, 236:9, 236:15, 237:3, 237:5, 238:18, 238:23, 239:8, 244:25, 245:5, 245:6, 253:21, 254:2, 270:6, 270:8, 270:10, 270:12, 270:14, 270:18, 270:20, 270:22, 270:24

**multiple** [3] - 26:24, 27:8, 46:20

**must** [1] - 3:15

**mutual** [1] - 199:25

**mutually** [2] - 199:19, 200:17

## N

**Naani** [2] - 118:21, 119:23

**NALLAPATI** [2] - 1:7, 1:8

**Nallapati** [40] - 6:20, 7:9, 14:15, 14:16, 14:25, 22:21, 23:8, 28:2, 29:13, 29:16, 29:17, 29:22, 30:3, 50:1, 56:12, 56:16, 65:24, 100:17, 102:2, 102:9, 102:22, 103:9, 103:11, 103:25, 104:7, 105:16, 106:12, 106:16, 107:15, 118:10, 118:22, 119:18, 136:20, 160:13, 197:23, 203:12, 203:19, 204:11, 221:19, 270:15

**Nallapaty** [9] - 37:11, 37:13, 37:21, 49:21, 50:14, 50:23, 51:3, 51:11, 150:11

**NALLAPATY** [11] - 1:4, 37:17, 49:19, 51:7, 150:9, 191:25, 270:5, 270:7, 270:9, 270:11, 270:13

**name** [59] - 11:22, 14:23, 15:18, 22:20, 26:1, 26:2, 33:18, 37:12, 44:21, 45:1, 45:17, 50:25, 51:11, 66:15, 66:18, 66:19, 66:21, 83:6, 83:11, 84:24, 89:9, 89:10,

89:17, 89:18, 90:4, 90:24, 91:7, 91:12, 91:22, 92:21, 98:17, 100:21, 101:24, 102:9, 102:21, 103:1, 103:9, 103:11, 103:12, 104:7, 146:11, 150:12, 151:2, 151:9, 151:12, 159:11, 197:9, 205:10, 210:3, 210:6, 210:8, 210:15, 224:16, 224:17, 239:1, 239:11

**named** [1] - 188:5

**names** [12] - 7:24, 17:12, 37:25, 52:15, 54:14, 67:2, 83:12, 98:13, 102:4, 123:22, 250:18

**Namibia** [1] - 73:6

**Nani** [3] - 66:7, 66:8, 66:11

**narrower** [1] - 200:13

**natural** [3] - 39:21, 246:24, 246:25

**NC** [115] - 1:5, 1:16, 1:19, 1:21, 13:8, 13:15, 13:20, 13:22, 14:17, 15:21, 17:14, 17:17, 18:6, 18:13, 19:6, 19:16, 19:18, 31:21, 33:14, 34:20, 50:3, 57:24, 98:14, 98:17, 98:18, 98:19, 98:22, 99:7, 99:10, 99:11, 107:13, 116:22, 117:2, 117:3, 117:7, 117:9, 117:15, 117:18, 117:24, 122:12, 125:8, 125:9, 125:13, 126:25, 130:10, 130:14, 131:4, 131:7, 131:15, 133:19, 140:18, 140:25, 142:8, 143:14, 144:2, 146:2, 146:8, 146:15, 146:19, 149:3, 150:1, 156:14, 156:16, 156:18, 159:11, 159:22, 160:3, 160:4, 160:6, 160:11, 174:2, 177:15, 177:22, 177:24, 178:2, 178:12, 180:6, 182:5, 182:12, 183:6, 183:8, 183:14, 185:17, 194:4, 196:5, 225:8, 228:7, 228:12, 228:15, 230:25, 231:4, 231:9, 231:14, 231:24, 232:1, 232:22, 236:13, 236:16, 240:4, 244:22, 250:25, 251:7, 251:19, 252:4, 252:9, 252:14, 252:25, 253:5, 259:8, 259:12, 259:14

**NC's** [1] - 126:10

**NC/Vivid** [1] - 245:15

**nearly** [1] - 31:9

**need** [35] - 11:13, 11:14, 30:13, 37:1, 37:2, 51:23, 63:12, 63:13, 63:16, 72:14, 73:15, 84:16, 89:23, 90:9,

104:3, 120:16, 122:12, 137:10, 137:18, 138:11, 150:3, 177:5, 177:9, 190:1, 191:14, 195:4, 203:25, 204:1, 206:21, 227:3, 243:10, 255:20, 256:21, 259:11, 266:8

**needed** [16] - 7:6, 15:14, 17:25, 25:10, 25:12, 33:5, 67:21, 87:22, 87:25, 88:3, 100:6, 118:18, 191:17, 208:7, 232:7, 232:11

**needs** [6] - 64:15, 195:4, 195:5, 243:11, 259:14, 259:16

**negotiate** [3] - 127:19, 215:19, 216:18

**negotiated** [6] - 216:19, 216:20, 216:23, 216:25, 224:25, 225:2

**net** [5] - 42:3, 215:8, 245:25, 257:23, 266:19

**never** [48] - 17:4, 17:5, 22:14, 22:15, 25:24, 31:7, 32:12, 65:2, 91:23, 107:1, 136:14, 143:12, 151:11, 151:12, 151:14, 155:20, 156:13, 156:16, 156:18, 156:21, 157:10, 157:15, 158:19, 160:25, 161:8, 182:25, 222:17, 223:25, 224:3, 224:17, 226:18, 226:23, 226:25, 228:10, 228:13, 228:22, 229:3, 230:8, 231:15, 231:17, 231:19, 231:22, 233:24, 233:25, 263:3

**New** [2] - 1:21, 83:14

**new** [62] - 10:12, 11:21, 15:19, 18:13, 18:14, 19:23, 24:23, 25:3, 33:8, 67:14, 68:1, 68:4, 68:6, 69:15, 70:13, 71:6, 72:6, 72:7, 73:24, 74:12, 74:17, 75:21, 76:24, 77:6, 78:6, 78:17, 78:25, 79:3, 79:7, 79:19, 79:25, 82:19, 83:6, 85:3, 85:7, 85:9, 85:21, 86:2, 86:5, 86:11, 86:16, 89:14, 89:20, 123:9, 135:19, 135:25, 148:1, 149:10, 152:11, 153:2, 154:6, 161:5, 194:1, 198:2, 199:2, 199:17, 202:22, 216:7, 226:21, 243:4, 243:5

**next** [25] - 8:15, 14:4, 39:4, 50:23, 68:10, 70:16, 116:22, 121:10, 121:17, 139:25, 141:5, 141:21, 170:6, 172:19, 176:12, 185:2,

192:10, 197:1, 205:6, 211:17, 217:17, 238:22, 263:7, 264:6

**nickname** [3] - 66:10, 66:11, 119:25

**night** [1] - 268:20

**Nike** [1] - 248:3

**nine** [1] - 260:20

**ninth** [2] - 260:21, 260:22

**nobody** [4] - 79:8, 85:9, 200:3, 233:16

**non** [7] - 12:2, 14:23, 14:24, 76:4, 216:15, 217:6, 217:9

**non-cash** [1] - 76:4

**non-responsive** [1] - 217:9

**non-U.S** [3] - 12:2, 14:23, 14:24

**non-written-down** [2] - 216:15, 217:6

**none** [1] - 28:20

**nonresident** [6] - 90:7, 91:10, 102:14, 102:15, 159:8, 159:18

**normal** [2] - 261:19, 261:21

**normalized** [1] - 260:5

**NORTH** [1] - 1:1

**North** [27] - 6:25, 25:4, 30:4, 30:7, 36:22, 92:9, 197:15, 203:7, 203:13, 205:19, 205:22, 206:7, 206:12, 206:16, 207:19, 209:16, 220:17, 220:21, 221:6, 222:8, 223:3, 223:9, 236:11, 237:16, 245:20, 250:25, 265:15

**Norway** [1] - 73:5

**notebook** [1] - 220:4

**notereading** [1] - 1:24

**notes** [2] - 5:17

**nothing** [6] - 2:16, 23:18, 23:20, 90:21, 122:23, 218:4

**notice** [7] - 18:11, 19:22, 19:25, 28:25, 147:24, 168:9, 168:14

**notices** [4] - 133:18, 133:22, 133:25, 134:5

**notion** [2] - 31:7, 140:2

**Notwithstanding** [1] - 109:8

**November** [3] - 218:22, 219:25, 223:19

**nowhere** [2] - 165:13, 165:22

**number** [43] - 12:9, 12:21, 14:4, 23:5, 59:8, 108:12, 109:9, 180:1, 192:7, 194:15, 194:18, 198:21, 211:7, 211:25, 212:14, 212:17, 212:19, 212:25, 214:20, 214:21, 215:13, 225:13,

225:18, 225:19, 225:23, 226:5, 226:10, 229:2, 229:5, 229:14, 229:19, 229:20, 230:6, 230:9, 230:10, 230:12, 230:23, 247:4, 248:23, 261:22, 266:20

**Number** [1] - 92:7

**numbers** [19] - 113:24, 119:3, 212:10, 216:15, 216:16, 216:25, 217:6, 218:14, 218:18, 218:20, 222:16, 222:17, 229:10, 230:8, 235:20, 249:18, 256:25, 257:2, 260:5

**NVM** [27] - 11:18, 11:19, 12:6, 14:22, 89:2, 89:5, 89:7, 90:5, 90:21, 91:10, 91:22, 102:16, 114:21, 115:2, 115:7, 115:18, 115:25, 116:19, 116:20, 117:17, 117:23, 167:3, 167:9, 198:14, 198:18, 198:22, 202:25

## O

**oath** [4] - 2:2, 12:14, 153:16, 244:4

**objected** [1] - 160:25

**objection** [8] - 3:4, 3:6, 3:7, 46:10, 74:1, 78:19, 213:3, 228:23

**objections** [1] - 3:2

**obligation** [2] - 3:3, 184:18

**obligations** [4] - 25:11, 26:3, 151:3, 151:10

**observation** [2] - 48:13, 125:25

**observations** [1] - 48:12

**observed** [3] - 47:14, 263:1, 263:2

**obsolete** [21] - 208:15, 209:2, 212:13, 213:21, 213:23, 214:2, 214:7, 214:10, 215:22, 243:8, 266:9, 267:1, 267:3, 267:7, 267:9, 267:11, 267:16, 267:20, 267:23, 268:1, 268:8

**obtained** [2] - 164:25, 241:7

**occasion** [1] - 28:7

**occasions** [1] - 263:1

**occupied** [1] - 203:19

**occur** [4] - 226:5, 257:9, 259:25, 260:4

**occurred** [1] - 142:20

**occurring** [1] - 249:11

**ocean** [1] - 7:23

**October** [3] - 168:9, 179:24,

180:3

**OF** [2] - 1:1, 1:10

**offer** [4] - 78:4, 78:6, 78:13, 199:21

**offered** [7] - 3:4, 78:23, 79:1, 162:20, 266:23, 266:25, 267:6

**Office** [1] - 33:17

**office** [10] - 94:8, 96:11, 180:16, 180:17, 181:4, 181:5, 181:13, 181:23, 231:9, 261:20

**officer** [1] - 126:8

**official** [1] - 116:17

**often** [8] - 28:10, 37:24, 49:8, 86:11, 87:1, 225:4, 225:8, 230:18

**old** [8] - 188:10, 188:14, 188:18, 226:16, 226:18, 229:24, 266:9, 267:17

**older** [3] - 26:15, 28:17, 187:2

**once** [25] - 9:19, 34:17, 40:9, 40:11, 40:14, 40:18, 49:10, 62:12, 64:13, 77:14, 77:15, 79:9, 79:15, 81:13, 82:1, 89:16, 94:7, 104:1, 160:25, 186:11, 186:22, 196:10, 225:10, 227:16, 265:3

**one** [101] - 5:12, 7:13, 8:3, 8:4, 11:11, 13:8, 14:7, 14:18, 16:11, 17:1, 17:5, 22:11, 22:15, 23:5, 29:24, 31:22, 34:8, 36:11, 36:22, 45:12, 46:2, 53:12, 59:9, 59:11, 59:14, 64:21, 70:14, 70:15, 80:17, 84:20, 85:12, 87:10, 95:25, 101:2, 118:4, 119:16, 121:9, 121:10, 121:12, 125:5, 129:22, 130:21, 143:24, 146:5, 154:13, 155:5, 155:15, 159:15, 160:3, 160:4, 166:22, 169:10, 169:11, 172:24, 183:21, 185:2, 185:11, 185:15, 188:25, 190:25, 197:10, 197:11, 202:12, 204:9, 211:3, 211:11, 216:20, 217:9, 218:7, 218:16, 218:20, 219:1, 221:16, 225:14, 226:6, 226:10, 227:14, 228:18, 230:7, 231:1, 233:6, 233:19, 236:10, 241:22, 242:6, 243:5, 243:25, 247:4, 247:15, 247:23, 250:11, 254:8, 255:19, 256:4, 261:22

**ones** [7] - 109:22, 119:14, 154:6, 167:19, 174:25,

228:18, 245:18

**open** [6] - 46:4, 84:2, 122:19, 122:24, 123:3, 212:17

**opened** [8] - 15:19, 15:20, 24:23, 25:4, 27:23, 85:11, 122:14, 198:5

**opening** [6] - 5:22, 5:25, 6:13, 22:2, 36:19, 89:8

**operate** [2] - 11:17, 11:20

**operated** [1] - 251:21

**operating** [2] - 206:8, 206:10

**operation** [1] - 45:14

**operations** [7] - 43:2, 85:19, 157:11, 206:1, 206:16, 207:14, 207:17

**opinion** [29] - 21:5, 186:24, 240:18, 240:24, 248:11, 253:6, 255:10, 255:21, 255:22, 255:23, 256:14, 256:15, 256:19, 257:1, 257:5, 258:9, 258:10, 259:13, 259:15, 260:2, 260:13, 260:14, 260:17, 260:20, 260:21, 260:22, 261:5, 261:10, 268:9

**opinions** [11] - 5:15, 245:4, 245:7, 250:17, 253:11, 254:4, 254:10, 255:16, 260:12, 260:22, 268:25

**opportunities** [1] - 94:22

**opportunity** [2] - 13:11, 94:25

**opposite** [6] - 4:17, 170:7, 184:13, 257:20, 258:7, 267:2

**option** [1] - 212:13

**oral** [11] - 53:15, 53:16, 69:11, 87:20, 87:21, 88:15, 88:20, 119:20, 198:16, 202:23, 203:21

**orally** [3] - 91:5, 115:4, 198:1

**orange** [2] - 95:16, 252:16

**order** [12] - 4:19, 10:16, 10:18, 132:13, 139:16, 199:13, 200:20, 208:8, 229:2, 241:13, 262:18, 266:19

**ordered** [2] - 10:15, 139:21

**ordering** [6] - 40:7, 168:23, 169:2, 169:22, 170:19, 170:21

**orders** [1] - 168:18

**orient** [2] - 108:8, 144:14

**original** [8] - 29:22, 32:9, 151:3, 151:10, 154:5, 162:16, 170:7, 191:6

**origins** [1] - 7:22

**otherwise** [1] - 199:17

**ourselves** [2] - 108:8, 254:15
**outcomes** [1] - 247:7
**outgoing** [1] - 263:23
**outline** [1] - 5:23
**outside** [4] - 3:14, 58:9, 155:21, 156:2
**overall** [3] - 114:7, 117:19, 200:9
**Overruled** [1] - 74:2
**overruled** [3] - 3:8, 46:11, 78:20
**oversaw** [1] - 206:1
**overseas** [6] - 9:6, 40:20, 42:12, 47:20, 61:13, 199:7
**oversee** [1] - 207:14
**overseeing** [1] - 207:17
**oversight** [4] - 163:21, 164:3, 165:1, 165:11
**overstated** [1] - 184:11
**overture** [1] - 34:6
**owe** [13] - 16:24, 17:2, 113:25, 120:2, 120:5, 121:19, 132:2, 137:1, 175:11, 176:10, 177:2, 194:22, 246:13
**owed** [16] - 31:2, 118:23, 121:25, 132:8, 133:10, 133:15, 136:18, 137:6, 137:22, 175:4, 175:9, 176:4, 176:16, 176:23, 177:4, 195:1
**owes** [5] - 114:3, 119:10, 120:10, 245:24, 245:25
**own** [23] - 5:14, 5:18, 10:3, 13:15, 14:9, 25:7, 29:18, 40:3, 54:15, 59:8, 98:13, 123:23, 145:14, 187:8, 191:11, 204:4, 204:15, 205:22, 205:24, 242:24, 254:20, 254:25
**owned** [37] - 5:2, 12:23, 14:12, 14:20, 15:24, 16:2, 16:14, 16:15, 18:13, 18:15, 19:24, 30:3, 31:23, 31:24, 33:14, 33:22, 39:1, 55:17, 56:16, 57:8, 67:14, 71:11, 98:8, 101:17, 105:3, 106:11, 125:11, 146:14, 146:17, 146:23, 148:5, 152:3, 167:14, 179:1, 203:19, 236:16, 252:9
**owner** [23] - 14:19, 29:22, 29:25, 33:2, 34:21, 40:9, 71:6, 116:17, 156:19, 160:16, 160:20, 161:1, 188:5, 205:19, 223:3, 223:9, 232:8, 232:11, 239:13, 244:15, 251:14, 252:20
**owners** [11] - 12:5, 12:16, 13:19, 15:7, 158:7, 189:1,

191:10, 236:10, 246:1, 251:14, 252:19
**ownership** [40] - 16:7, 19:6, 27:8, 30:7, 33:18, 38:20, 59:18, 95:21, 98:22, 108:2, 108:20, 108:24, 109:4, 109:15, 110:5, 117:7, 117:9, 123:13, 124:22, 126:1, 126:10, 168:3, 198:2, 198:10, 198:13, 198:15, 198:19, 199:1, 203:5, 204:16, 250:22, 252:3, 252:6, 252:8, 252:25, 253:1, 254:19, 255:4, 255:8
**ownerships** [1] - 202:22
**owning** [2] - 31:22, 124:25
**owns** [5] - 38:25, 147:16, 245:25, 246:10, 254:25

**P**

**P-1** [5] - 211:16, 215:3, 234:9, 234:11, 272:19
**P-107** [4] - 221:2, 234:9, 234:11, 272:19
**P-119** [2] - 128:10, 272:8
**P-232** [2] - 97:15, 271:19
**P-306** [2] - 124:19, 272:5
**P-311** [4] - 218:21, 234:9, 234:11, 272:19
**P-312** [2] - 55:1, 271:4
**P-336** [3] - 94:15, 94:17, 271:17
**P-344** [5] - 208:2, 209:9, 209:11, 213:12, 272:17
**P-353** [2] - 112:12, 271:25
**P-359** [2] - 112:12, 271:25
**P-365** [2] - 112:12, 271:25
**P-375** [2] - 56:24, 271:6
**P-376** [2] - 104:12, 271:21
**P-381** [4] - 81:21, 90:12, 271:12, 271:14
**P-383** [2] - 106:2, 271:23
**P-389** [2] - 67:10, 271:9
**P-390** [2] - 67:10, 271:9
**P-391** [2] - 67:10, 271:9
**P-410** [2] - 145:23, 272:15
**P-432** [2] - 142:2, 272:13
**P-439** [2] - 114:16, 272:2
**P-457** [2] - 140:11, 272:11
**P-462** [3] - 253:22, 253:25, 272:21
**P-473** [1] - 253:23
**P-473,and** [2] - 253:25, 272:21
**P-474** [3] - 253:23, 254:1, 272:21
**P-485** [4] - 253:22, 253:25, 254:3, 272:21

**P-503** [1] - 253:23
**P-63** [2] - 91:18, 271:16
**P-67** [2] - 80:13, 271:11
**P-68** [2] - 116:5, 272:4
**P-78** [2] - 138:13, 272:10
**P-80** [2] - 58:6, 271:8
**P-86** [2] - 112:13, 271:25
**P-89** [2] - 126:20, 272:7
**P.'s** [1] - 97:22
**p.m** [1] - 269:4
**package** [1] - 236:6
**page** [45] - 65:20, 82:17, 108:17, 109:7, 111:24, 116:15, 118:24, 119:22, 140:23, 141:5, 153:13, 164:14, 164:15, 164:18, 169:8, 169:14, 170:6, 172:11, 173:17, 175:25, 176:4, 176:6, 180:1, 180:2, 189:11, 189:13, 189:14, 189:21, 190:5, 190:6, 191:1, 192:7, 192:8, 194:15, 194:18, 197:20, 201:18, 202:10, 203:3, 210:17, 211:22, 213:20, 215:4, 219:21, 220:6
**Page** [2] - 270:3, 271:2
**pages** [3] - 128:14, 197:2, 197:19
**paid** [52] - 9:20, 23:10, 28:4, 32:19, 32:20, 35:14, 35:15, 36:12, 58:21, 70:2, 75:3, 75:19, 75:25, 114:6, 114:8, 121:22, 132:4, 133:24, 136:19, 143:22, 144:2, 144:3, 152:18, 153:4, 154:1, 161:10, 161:11, 168:6, 184:1, 184:16, 196:12, 216:14, 217:5, 218:2, 218:9, 218:17, 221:23, 225:4, 225:13, 225:24, 234:3, 234:4, 235:7, 235:11, 237:10, 248:22, 253:5, 253:9, 255:8, 266:13
**paper** [30] - 11:13, 14:18, 14:19, 15:24, 16:7, 87:17, 87:23, 87:25, 88:4, 88:14, 88:16, 108:20, 108:24, 109:4, 110:5, 117:7, 124:13, 124:23, 125:11, 125:13, 125:16, 125:22, 126:1, 126:14, 159:6, 159:11, 159:18, 159:19, 167:17, 190:7
**papers** [5] - 11:23, 12:3, 14:25, 16:9, 88:16
**paperwork** [6] - 90:5, 91:22, 98:9, 102:10, 115:3, 119:19
**paragraph** [31] - 56:11,

90:19, 134:11, 136:24, 136:25, 141:6, 145:10, 153:20, 153:22, 164:17, 164:24, 169:7, 169:14, 169:16, 170:5, 172:13, 172:19, 173:14, 173:16, 173:17, 173:21, 179:23, 180:15, 189:10, 189:11, 189:14, 189:20, 190:6, 190:8, 190:23, 194:20
**Pardon** [1] - 158:21
**pardon** [5] - 59:23, 60:11, 161:19, 170:2, 187:25
**parents** [4] - 39:1, 39:2, 42:20, 44:20
**Parry** [8] - 22:20, 192:2, 192:10, 192:19, 194:12, 194:25, 195:11, 196:18
**PARRY** [40] - 1:17, 1:18, 22:3, 34:24, 35:2, 35:5, 35:8, 46:10, 49:17, 49:20, 50:17, 74:1, 78:19, 150:7, 150:10, 153:8, 153:10, 164:5, 164:6, 175:16, 175:17, 179:13, 179:15, 185:6, 185:8, 190:12, 190:19, 190:20, 191:16, 191:21, 213:3, 213:6, 224:11, 224:14, 224:18, 224:19, 234:5, 270:8, 270:12, 270:20
**part** [34] - 7:6, 29:14, 30:20, 59:15, 69:22, 106:9, 107:13, 107:15, 107:25, 108:3, 118:11, 127:11, 127:16, 127:18, 128:4, 135:15, 137:19, 152:22, 168:19, 176:3, 181:12, 182:11, 197:12, 202:19, 204:7, 208:3, 208:10, 210:10, 211:18, 225:12, 243:7, 244:9, 245:15, 250:3
**participate** [3] - 34:11, 151:22, 151:24
**participated** [1] - 186:19
**participating** [1] - 202:21
**participation** [1] - 2:9
**particular** [9] - 229:7, 239:14, 243:2, 244:15, 246:22, 248:9, 263:2, 265:7, 265:12
**particularly** [1] - 22:16
**parties** [13] - 16:8, 31:17, 37:2, 37:25, 108:21, 108:25, 109:5, 110:5, 110:7, 125:20, 126:2, 126:15, 126:16
**partly** [1] - 200:23
**partner** [28] - 12:12, 27:12, 28:8, 28:19, 53:25, 54:18, 57:17, 57:18, 71:3, 78:25, 87:14, 88:10, 88:12, 88:25,

91:22, 110:23, 111:13, 111:20, 112:17, 112:22, 154:23, 157:2, 198:20, 198:23, 202:8, 216:7, 223:12, 251:15

**partner's** [3] - 6:16, 6:18, 251:16

**partners** [60] - 7:2, 10:24, 10:25, 11:2, 11:5, 11:8, 12:8, 12:9, 12:16, 12:18, 12:19, 12:20, 12:22, 13:5, 14:3, 14:13, 17:13, 21:17, 23:7, 28:11, 28:12, 28:13, 47:10, 50:11, 50:12, 50:15, 53:24, 54:3, 54:13, 55:21, 56:15, 57:13, 57:23, 59:1, 59:25, 60:14, 71:12, 98:23, 99:1, 99:6, 101:20, 102:8, 105:4, 106:11, 108:6, 112:1, 112:7, 112:18, 114:9, 115:4, 119:21, 122:24, 123:22, 124:1, 124:9, 163:13, 202:25, 238:7

**partnership** [33] - 11:21, 13:17, 13:25, 14:7, 15:8, 16:15, 16:16, 27:20, 27:21, 28:6, 53:14, 53:19, 87:17, 110:14, 150:15, 150:19, 150:22, 151:17, 152:2, 154:25, 158:18, 158:22, 159:2, 165:15, 165:20, 166:2, 166:9, 166:17, 168:10, 168:15, 191:6, 193:7, 193:12

**partnerships** [1] - 5:1

**parts** [4] - 39:18, 137:12, 242:17, 267:5

**party** [11] - 113:15, 137:8, 202:16, 218:15, 234:24, 235:5, 235:6, 235:10, 235:11, 235:15, 239:22

**passed** [3] - 192:22, 193:17, 241:17

**passive** [1] - 156:19

**past** [5] - 163:17, 165:10, 165:19, 172:4, 172:20

**pay** [57] - 7:20, 10:14, 10:18, 19:10, 19:12, 20:2, 21:22, 26:10, 41:11, 41:20, 42:3, 58:20, 68:14, 68:23, 69:2, 69:16, 70:7, 70:8, 70:9, 75:24, 78:8, 79:9, 79:15, 81:13, 86:18, 114:4, 121:19, 121:25, 122:7, 122:9, 132:3, 132:4, 132:6, 132:9, 133:6, 133:7, 135:25, 138:1, 145:16, 152:23, 161:6, 161:9, 162:14, 191:10, 196:8, 196:10, 196:14, 200:5, 215:15, 235:21,

258:1, 258:5, 258:6, 258:19

**payables** [1] - 136:19

**paying** [16] - 6:17, 6:19, 6:23, 7:11, 21:19, 21:22, 24:5, 68:8, 81:16, 113:9, 136:18, 154:7, 171:4, 189:1, 196:21, 234:23

**payment** [27] - 10:10, 10:11, 17:4, 19:11, 26:8, 26:21, 27:17, 32:14, 40:22, 40:24, 41:2, 41:3, 41:9, 41:13, 42:1, 42:6, 68:21, 71:1, 77:18, 78:15, 155:2, 155:7, 161:5, 184:18, 199:13, 200:22, 221:18

**payments** [6] - 104:19, 120:3, 249:9, 249:10, 258:6

**payroll** [1] - 196:6

**payrolls** [1] - 196:2

**pays** [2] - 196:13, 200:3

**penalty** [3] - 209:21, 210:6, 210:15

**Penn** [1] - 38:12

**penny** [4] - 35:14, 134:13, 134:17

**people** [9] - 28:11, 32:4, 84:23, 108:12, 169:4, 222:15, 235:19, 242:21, 268:21

**per** [8] - 122:8, 186:21, 198:12, 198:15, 206:8, 212:5, 212:9, 216:23

**percent** [75] - 13:14, 16:3, 21:6, 29:25, 31:24, 58:17, 58:18, 80:3, 80:4, 80:7, 80:8, 97:10, 97:18, 98:2, 98:4, 98:12, 103:25, 109:18, 109:19, 113:9, 116:16, 117:23, 117:24, 123:14, 124:25, 125:6, 125:12, 125:17, 125:18, 125:21, 126:10, 134:13, 134:23, 135:2, 135:8, 135:9, 135:11, 135:13, 136:8, 136:12, 160:16, 160:20, 187:3, 194:5, 198:9, 198:13, 198:15, 198:16, 198:19, 199:21, 200:7, 200:8, 200:11, 200:12, 201:3, 203:1, 203:15, 205:23, 205:25, 230:11, 230:14, 244:10, 252:5, 252:6, 252:7, 252:25, 253:1, 254:18, 254:25, 255:2

**percentage** [5] - 80:1, 97:8, 97:24, 110:2, 168:3

**percentages** [3] - 109:22, 110:4, 123:13

**perfect** [1] - 51:21

**perform** [2] - 183:5, 183:14

**performance** [2] - 244:8, 257:15

**performed** [1] - 100:4

**performing** [1] - 99:23

**perhaps** [1] - 10:1

**period** [12] - 17:11, 18:2, 26:10, 61:25, 79:12, 130:11, 131:22, 132:7, 138:5, 157:21, 158:12, 198:9

**perjury** [3] - 209:21, 210:7, 210:15

**permission** [1] - 185:6

**permit** [1] - 5:6

**person** [8] - 24:2, 52:1, 107:2, 110:2, 129:15, 202:7, 216:2, 233:24

**personal** [18] - 5:18, 14:10, 27:5, 28:20, 33:18, 101:8, 104:22, 105:12, 108:15, 151:14, 160:8, 161:13, 165:23, 166:9, 191:11, 199:10, 201:5, 201:9

**personally** [9] - 27:12, 95:14, 101:24, 130:18, 152:12, 154:22, 161:5, 232:7, 232:10

**persons** [1] - 80:17

**perspective** [1] - 15:13

**Peter** [3] - 126:6, 134:9

**phonetically** [1] - 188:6

**physical** [3] - 25:5, 39:23, 40:1

**physically** [1] - 63:13

**pick** [1] - 40:5

**piece** [1] - 23:15

**piecemeal** [1] - 264:15

**pieces** [1] - 14:17

**PIERCE** [1] - 1:15

**pivotal** [1] - 44:2

**place** [12] - 4:16, 6:10, 17:25, 27:1, 50:24, 84:4, 93:7, 107:18, 166:17, 175:5, 205:9, 238:25

**placed** [1] - 165:3

**places** [5] - 14:8, 47:21, 72:24, 74:8, 173:25

**plaintiff** [15] - 4:10, 4:13, 4:15, 4:17, 4:18, 4:20, 4:25, 5:25, 6:3, 6:12, 8:2, 38:23, 39:4, 52:1, 160:15

**Plaintiff's** [1] - 194:14

**plaintiff's** [4] - 4:19, 6:1, 50:23, 260:9

**plaintiffs** [1] - 37:10

**Plaintiffs** [2] - 1:5, 1:13

**Plan** [1] - 148:8

**plan** [3] - 18:4, 18:10, 204:1

**planned** [1] - 18:17

**planning** [3] - 45:5, 85:20

**platform** [1] - 250:1

**played** [1] - 26:7

**playing** [1] - 34:14

**plays** [1] - 44:2

**pleases** [1] - 133:3

**plenty** [4] - 26:13, 35:19, 36:1, 73:22

**PLLC** [1] - 1:18

**PO** [1] - 1:16

**point** [24] - 19:9, 26:5, 36:16, 40:22, 42:9, 45:17, 62:4, 94:10, 97:1, 97:20, 118:3, 118:17, 129:9, 138:6, 149:21, 155:11, 172:23, 183:3, 201:25, 209:8, 232:6, 232:10, 243:23, 252:10

**pointed** [1] - 230:5

**police** [1] - 133:8

**polish** [1] - 61:10

**poor** [1] - 99:14

**popped** [1] - 222:25

**portion** [2] - 109:8, 266:12

**Portugal** [1] - 39:19

**position** [3] - 186:4, 188:20, 191:8

**possible** [3] - 90:7, 94:2, 191:6

**potential** [1] - 162:5

**potentially** [1] - 191:17

**practice** [3] - 108:22, 186:19, 187:17

**practices** [5] - 35:17, 35:21, 35:22, 35:24, 186:15

**PRASAD** [7] - 1:4, 51:7, 150:9, 191:25, 270:9, 270:11, 270:13

**Prasad** [198] - 7:16, 7:20, 7:23, 8:2, 8:4, 8:6, 8:25, 9:12, 9:21, 9:23, 10:10, 10:24, 11:6, 11:22, 12:4, 12:10, 12:12, 12:15, 13:10, 13:24, 14:3, 14:5, 14:21, 15:2, 15:24, 16:10, 16:23, 17:1, 17:16, 18:4, 18:5, 18:12, 18:14, 18:15, 19:4, 19:10, 19:13, 19:24, 21:1, 21:6, 21:7, 21:16, 21:20, 22:12, 23:6, 23:10, 23:13, 24:1, 25:15, 25:21, 25:23, 26:4, 26:7, 26:16, 27:2, 27:10, 27:22, 28:3, 28:8, 28:19, 28:24, 30:7, 30:18, 30:23, 30:25, 31:5, 31:20, 32:7, 33:2, 33:3, 33:8, 33:13, 33:17, 34:2, 34:21, 35:16, 35:23, 36:8, 36:11, 39:3, 39:4, 43:23, 45:8, 46:24, 47:9, 48:14, 50:22, 51:2, 51:11, 53:12, 53:23, 54:13, 56:15, 57:22, 60:18, 72:2, 92:8, 96:5, 99:6, 100:16,

105:15, 106:10, 107:8, 109:19, 116:24, 123:21, 124:22, 150:15, 153:11, 154:10, 157:14, 162:25, 164:7, 171:7, 175:18, 179:16, 181:17, 182:1, 182:14, 183:21, 185:9, 186:14, 188:21, 190:21, 192:2, 196:12, 197:25, 198:8, 198:19, 199:2, 199:7, 199:22, 201:15, 201:20, 202:25, 203:2, 203:21, 203:24, 204:13, 204:18, 211:19, 211:25, 215:4, 215:5, 215:13, 216:23, 218:12, 218:18, 218:23, 221:6, 222:19, 225:20, 226:1, 228:14, 231:9, 231:16, 231:18, 231:20, 231:23, 232:2, 232:7, 232:11, 232:19, 234:17, 234:22, 235:24, 236:16, 236:21, 236:25, 237:6, 237:10, 237:16, 238:6, 238:11, 238:16, 240:22, 240:24, 248:20, 248:21, 250:22, 251:8, 252:7, 252:20, 252:23, 252:24, 254:18, 254:19, 254:25, 255:8, 257:3, 257:11, 257:12, 258:19, 258:24, 259:22, 260:15, 268:17

**Prasad's** [27] - 6:21, 7:10, 7:17, 15:12, 16:9, 20:14, 20:23, 22:11, 22:22, 23:6, 23:25, 24:18, 25:19, 27:5, 28:17, 29:11, 29:24, 36:6, 76:11, 197:10, 215:8, 240:14, 243:20, 248:21, 248:22, 255:3, 256:9

**pre** [2] - 167:14, 167:19

**pre-Rollup** [2] - 167:14, 167:19

**preferential** [1] - 258:6

**prejudice** [1] - 165:1

**preliminary** [1] - 2:8

**preparation** [1] - 131:11

**prepare** [6] - 233:9, 251:20, 251:24, 253:18, 254:11, 255:15

**prepared** [6] - 119:1, 131:8, 244:21, 253:16, 253:19, 254:7

**preparer/auditor** [1] - 242:20

**preparing** [2] - 192:23, 193:1

**preponderance** [1] - 4:12

**present** [3] - 6:1, 6:2, 96:13

**presentation** [1] - 36:24

**presented** [3] - 3:18, 63:14, 240:20

**press** [1] - 249:17

**pretty** [4] - 24:23, 231:5, 231:7, 242:10

**prevented** [1] - 132:19

**preview** [1] - 259:1

**previous** [2] - 165:2, 211:2

**previously** [2] - 151:8, 189:4

**price** [32] - 7:15, 10:4, 10:8, 30:14, 34:5, 34:25, 35:9, 76:12, 76:18, 76:22, 76:24, 77:2, 77:5, 100:10, 127:20, 147:2, 147:5, 157:8, 157:9, 221:22, 221:23, 233:22, 240:14, 243:20, 248:22, 249:1, 253:5, 255:8, 256:9, 258:19, 267:14

**prices** [12] - 152:23, 153:4, 154:2, 154:7, 168:24, 169:2, 169:24, 170:9, 170:16, 170:22, 170:23, 171:4

**pricing** [1] - 127:19

**primarily** [8] - 51:16, 107:2, 245:19, 247:13, 247:19, 256:23, 259:22, 260:25

**primary** [3] - 26:5, 27:15, 265:14

**Principles** [1] - 248:2

**print** [2] - 249:19, 264:22

**printing** [1] - 65:12

**problem** [4] - 17:4, 132:18, 190:21, 228:8

**problems** [1] - 256:24

**proceeded** [1] - 15:4

**proceeding** [1] - 12:14

**Proceedings** [1] - 1:24

**proceedings** [1] - 269:13

**process** [14] - 7:8, 17:7, 29:9, 34:5, 34:7, 34:12, 40:7, 40:22, 61:10, 149:17, 240:10, 240:11, 261:20, 261:22

**processing** [1] - 61:4

**procure** [1] - 266:14

**produce** [1] - 4:13

**produced** [1] - 1:24

**product** [9] - 40:12, 40:18, 40:20, 41:22, 42:12, 154:2, 200:11, 200:20, 200:25

**production** [2] - 68:9, 74:11

**products** [6] - 24:16, 26:19, 152:24, 153:4, 157:7, 171:24

**professional** [16] - 240:18, 240:24, 241:7, 241:19, 242:8, 248:11, 255:23, 256:19, 257:1, 259:13, 259:15, 260:2, 260:17, 261:5, 262:21, 268:9

**professionals** [1] - 242:9

**profit** [6] - 82:4, 151:1, 200:2, 215:8, 267:4, 268:7

**profitability** [2] - 129:8, 174:14

**profits** [20] - 11:9, 13:1, 13:3, 14:11, 15:8, 26:20, 55:8, 55:10, 55:18, 57:2, 57:9, 71:13, 71:19, 82:1, 150:16, 150:20, 150:23, 174:16, 200:7, 201:3

**program** [2] - 262:2, 262:4

**projection** [3] - 220:2, 224:1, 233:23

**projections** [15] - 219:14, 219:15, 219:16, 219:17, 219:20, 220:10, 220:23, 222:13, 222:21, 223:23, 224:6, 233:6, 233:7, 233:10, 233:15

**prompted** [1] - 186:4

**proof** [3] - 3:21, 3:23, 4:23

**properly** [1] - 261:2

**PROPERTIES** [1] - 1:8

**properties** [18] - 14:12, 14:20, 15:7, 15:8, 16:24, 19:11, 56:16, 69:1, 91:11, 105:16, 106:11, 119:19, 120:15, 121:6, 121:15, 121:20, 122:1, 151:15

**Properties** [33] - 14:16, 14:25, 23:8, 28:2, 29:13, 29:16, 29:17, 29:22, 30:3, 50:1, 56:13, 56:16, 100:17, 102:2, 102:9, 102:22, 103:9, 103:11, 104:1, 104:7, 105:17, 106:12, 106:17, 107:15, 118:10, 118:22, 119:18, 136:20, 160:13, 203:13, 203:20, 204:11

**property** [4] - 6:17, 6:18, 108:3, 120:3

**propose** [3] - 70:17, 227:10, 227:13

**proposed** [4] - 17:21, 195:18, 198:12, 263:11

**proposing** [2] - 187:12, 204:2

**protected** [1] - 5:20

**proud** [1] - 22:20

**prove** [1] - 5:24

**provide** [8] - 41:9, 66:2, 76:23, 182:2, 182:12, 199:11, 230:22, 264:22

**provided** [12] - 9:18, 9:24, 148:20, 152:9, 179:9, 180:12, 182:22, 200:14, 223:24, 224:1, 241:25, 263:25

**Provided** [1] - 135:13

**providing** [5] - 10:3, 33:12, 64:22, 155:1, 199:2

**proving** [1] - 4:11

**provisions** [1] - 164:19

**Public** [3] - 241:9, 241:14, 242:1

**public** [1] - 241:15

**pull** [18] - 55:23, 57:14, 92:7, 194:11, 194:13, 208:3, 208:10, 209:14, 210:9, 210:17, 211:17, 213:9, 213:11, 213:21, 215:4, 246:5, 251:23

**Pull** [1] - 221:22

**purchase** [10] - 30:14, 34:25, 35:8, 39:11, 40:6, 40:11, 194:7, 221:22, 221:23, 233:22

**Purchase** [2] - 221:2, 221:5

**purchased** [4] - 13:2, 55:17, 148:9, 252:17

**purchaser** [1] - 221:20

**purchases** [8] - 127:11, 127:17, 127:18, 128:5, 129:1, 156:23, 156:25, 170:9

**purchasing** [3] - 41:5, 44:24, 157:12

**purporting** [1] - 20:2

**purpose** [5] - 3:10, 19:1, 47:2, 119:4, 257:8

**purposes** [6] - 47:17, 59:19, 211:24, 212:4, 212:8, 215:12

**Pursuant** [1] - 148:8

**put** [36] - 4:16, 11:13, 11:22, 17:12, 25:7, 25:12, 26:1, 26:2, 34:13, 39:10, 40:10, 72:3, 81:10, 82:17, 87:16, 87:22, 90:24, 91:7, 98:9, 101:4, 116:8, 134:17, 209:7, 214:3, 214:12, 219:10, 222:15, 226:10, 229:10, 229:18, 229:19, 247:22, 248:5, 264:14, 264:15

**puts** [1] - 159:18

**putting** [6] - 14:23, 22:7, 71:15, 71:16, 88:14, 134:13

**Q**

**qualify** [1] - 99:14

**quality** [7] - 43:6, 43:9, 43:13, 44:10, 72:15, 72:16, 96:24

**quarries** [1] - 72:13

**quarter** [2] - 49:10, 139:17

**quarterly** [2] - 225:5, 225:6

**quartz** [3] - 9:5, 39:22,

246:25

**quartzite** [1] - 39:22

**questions** [24] - 3:1, 3:2, 49:15, 50:17, 51:19, 52:15, 104:2, 143:6, 150:4, 159:19, 192:19, 192:20, 194:12, 195:11, 207:12, 212:22, 217:10, 224:8, 224:20, 228:24, 233:4, 234:5, 238:13, 238:19

**quick** [1] - 24:23

**QuickBooks** [22] - 211:24, 215:11, 249:22, 249:23, 250:4, 250:9, 250:15, 261:15, 261:19, 261:20, 261:22, 262:1, 262:13, 262:22, 263:1, 264:2, 264:5, 265:5, 265:9, 265:19

**quickly** [2] - 110:16, 254:14

**quite** [6] - 26:17, 31:12, 249:16, 250:9, 257:10, 257:20

## R

**raise** [4] - 2:4, 50:25, 205:10, 239:1

**Raleigh** [77] - 7:1, 9:11, 14:7, 16:25, 25:5, 45:21, 46:5, 46:6, 46:8, 46:19, 46:25, 47:4, 47:15, 48:13, 53:11, 53:18, 55:21, 57:13, 59:14, 59:18, 64:8, 67:14, 75:13, 77:23, 83:18, 83:21, 84:4, 84:7, 84:13, 85:13, 85:17, 90:21, 90:24, 91:25, 94:8, 95:15, 96:10, 96:12, 98:8, 99:1, 100:12, 100:23, 100:25, 101:2, 101:12, 101:13, 101:20, 101:23, 104:19, 104:20, 107:25, 119:7, 119:12, 119:15, 120:7, 121:1, 121:4, 121:10, 121:17, 136:4, 151:4, 154:5, 167:15, 194:7, 195:21, 198:2, 199:12, 199:17, 199:23, 200:14, 200:19, 201:6, 201:12, 203:16, 204:4

**RALEIGH** [1] - 1:16

**ran** [2] - 12:6, 20:11

**rather** [4] - 56:14, 154:21, 225:13, 237:21

**ratification** [1] - 165:3

**ratify** [1] - 165:19

**rattle** [1] - 113:24

**Ravi** [3] - 105:8, 105:14

**Re** [1] - 56:12

**reach** [5] - 81:4, 123:12, 240:15, 253:6, 255:10

**reached** [4] - 80:21, 199:1, 254:4, 255:16

**read** [12] - 5:9, 14:2, 20:25, 67:5, 91:3, 192:2, 192:11, 197:2, 197:12, 197:24, 259:5, 270:16

**reading** [3] - 115:9, 136:15, 248:3

**ready** [1] - 40:11

**real** [18] - 10:12, 10:13, 14:17, 23:15, 27:7, 28:5, 55:13, 55:14, 105:15, 112:24, 118:13, 211:25, 212:10, 212:14, 212:17, 212:25, 215:13, 225:19

**realized** [2] - 33:21, 265:22

**really** [13] - 11:3, 33:25, 42:19, 181:18, 212:13, 218:19, 227:20, 230:2, 233:13, 235:3, 249:16, 258:18, 261:3

**reason** [15] - 34:24, 150:11, 159:6, 163:18, 163:20, 164:2, 168:17, 204:13, 209:4, 225:12, 237:18, 237:24, 266:23, 266:25, 267:6

**reasonable** [2] - 4:23, 33:8

**reasonably** [1] - 182:13

**reasons** [3] - 17:6, 64:21, 133:22

**reassess** [1] - 37:1

**reassure** [1] - 90:20

**recap** [1] - 119:11

**receivable** [2] - 246:12, 262:7

**receivables** [1] - 184:4

**receive** [20] - 10:16, 42:1, 77:16, 77:19, 77:25, 106:16, 114:21, 115:24, 138:3, 139:3, 141:14, 141:18, 141:19, 143:2, 143:13, 177:6, 195:9, 200:20, 200:21, 264:9

**received** [40] - 2:21, 3:10, 5:16, 18:25, 19:21, 21:11, 54:25, 56:23, 58:5, 67:9, 80:12, 81:20, 90:11, 91:17, 94:16, 97:8, 104:11, 105:20, 106:1, 110:11, 112:11, 112:15, 114:15, 116:4, 121:12, 124:18, 126:19, 128:9, 138:12, 140:10, 142:1, 143:25, 145:22, 149:20, 209:10, 234:10, 241:6, 252:17, 253:24, 264:10

**Received** [1] - 97:14

**receiving** [1] - 115:2

**recently** [1] - 121:13

**recess** [6] - 37:5, 37:8, 94:11, 94:12, 190:15, 190:17

**recognize** [2] - 175:20, 185:11

**recognized** [1] - 158:25

**recognizing** [1] - 16:6

**recommend** [3] - 259:1, 259:2, 259:8

**recommendation** [1] - 212:6

**recommending** [1] - 259:25

**record** [10] - 2:21, 51:1, 197:3, 197:24, 198:11, 198:23, 205:11, 239:2, 269:13, 270:16

**recorded** [1] - 1:24

**records** [20] - 141:7, 180:11, 182:3, 182:13, 210:9, 228:20, 240:4, 244:14, 250:9, 257:14, 261:10, 261:12, 262:7, 263:25, 264:4, 264:8, 264:9, 264:14, 265:8, 267:2

**recover** [3] - 5:1, 82:3, 185:16

**recovery** [1] - 77:4

**red** [2] - 246:8, 258:13

**redirect** [2] - 191:22, 234:7

**REDIRECT** [4] - 191:25, 234:14, 270:13, 270:21

**redo** [1] - 202:21

**reduce** [1] - 243:19

**reduced** [2] - 235:15, 248:25

**reducing** [1] - 211:3

**refer** [6] - 37:25, 45:22, 46:2, 54:1, 54:18, 59:5

**reference** [11] - 66:9, 80:24, 96:8, 105:21, 113:25, 116:18, 117:2, 119:23, 131:21, 134:1, 137:5

**referred** [6] - 12:12, 28:8, 110:15, 112:7, 137:6, 225:18

**referring** [6] - 129:3, 145:13, 153:24, 153:25, 250:20, 251:5

**refinanced** [3] - 204:8, 204:10, 204:15

**refinancing** [1] - 204:14

**reflect** [4] - 110:4, 126:14, 159:2, 244:7

**reflected** [4] - 122:3, 124:13, 132:13, 198:9

**refreshes** [1] - 173:13

**refused** [3] - 33:8, 34:12, 198:14

**regard** [7] - 27:25, 85:20, 118:20, 167:13, 194:2, 253:6, 255:10

**regarding** [5] - 76:25, 96:4, 154:20, 185:13, 187:10

**regards** [3] - 47:5, 47:6, 47:15

**registered** [1] - 27:22

**regularly** [1] - 231:23

**reject** [1] - 4:7

**relate** [4] - 123:24, 248:9, 253:2, 255:6

**related** [5] - 27:8, 185:25, 195:15, 198:24, 240:11

**relates** [2] - 240:10, 253:4

**relating** [4] - 94:21, 143:14, 145:15, 180:7

**relation** [5] - 43:7, 71:7, 71:8, 71:9, 154:25

**relationship** [22] - 7:5, 11:11, 11:12, 15:11, 16:18, 28:16, 29:1, 30:19, 47:9, 48:14, 50:7, 52:12, 52:18, 53:3, 60:1, 89:5, 153:23, 154:24, 172:24, 234:17, 234:21

**relationships** [1] - 231:21

**relative** [6] - 46:16, 121:13, 123:12, 127:13, 223:6, 223:7

**relatively** [1] - 248:4

**relatives** [1] - 163:13

**relevant** [5] - 157:20, 243:13, 243:15, 246:16, 247:3

**remained** [1] - 27:1

**remember** [41] - 27:17, 30:18, 47:11, 47:13, 85:15, 107:11, 116:12, 125:24, 142:13, 143:5, 151:21, 153:6, 153:7, 162:4, 168:25, 169:1, 169:4, 173:12, 174:3, 174:4, 175:6, 175:13, 177:17, 177:24, 182:6, 182:7, 182:10, 182:16, 184:17, 184:21, 184:22, 184:24, 185:1, 185:4, 185:5, 192:20, 218:19, 225:10, 229:8, 231:12, 233:6

**remind** [2] - 125:3, 254:15

**reminder** [1] - 258:16

**remove** [4] - 33:1, 236:25, 237:6, 257:11

**removed** [7] - 128:20, 129:1, 221:6, 232:7, 232:11, 237:10, 237:16

**renders** [1] - 256:5

**rent** [2] - 195:24, 249:9

**rental** [1] - 196:2

**repeat** [2] - 226:6, 232:9

**rephrase** [1] - 206:14

**reply** [2] - 109:2, 143:7

**report** [30] - 163:9, 163:13, 163:17, 163:25, 164:14, 165:13, 165:18, 166:3,

175:14, 175:21, 194:11, 194:17, 194:24, 195:7, 208:15, 208:22, 209:1, 209:5, 211:2, 211:3, 211:5, 211:6, 212:17, 214:4, 214:22, 214:24, 220:5, 220:6, 255:15, 255:20

**Report** [3] - 164:9, 164:11, 253:13

**reported** [17] - 154:17, 206:4, 208:11, 208:18, 210:23, 211:1, 211:8, 211:13, 212:14, 212:25, 213:16, 213:23, 214:6, 217:18, 217:21, 217:24, 265:19

**Reporter** [1] - 1:20

**REPORTER** [1] - 206:19

**reporting** [1] - 173:22

**reports** [17] - 192:20, 192:24, 193:2, 193:5, 208:7, 211:25, 215:13, 245:13, 249:3, 250:15, 253:18, 253:19, 254:3, 264:15, 264:21, 265:1, 265:3

**Reports** [1] - 193:18

**represent** [2] - 22:21, 237:1

**representative** [1] - 260:18

**represented** [2] - 177:18, 240:13

**request** [5] - 18:23, 142:23, 180:6, 183:13, 183:18

**requested** [6] - 68:12, 178:20, 179:5, 182:3, 182:13, 184:5

**requests** [1] - 33:8

**required** [4] - 19:14, 71:16, 81:16, 256:16

**requirement** [1] - 4:24

**requiring** [2] - 7:19, 21:22

**research** [2] - 5:13, 43:11

**resentment** [4] - 21:1, 21:3, 21:9

**resident** [4] - 12:1, 12:2, 14:24, 14:25

**resolution** [1] - 162:5

**resolutions** [4] - 161:17, 161:21, 162:1, 162:11

**respect** [20] - 19:20, 53:14, 94:22, 100:11, 132:12, 132:21, 140:25, 142:8, 145:11, 147:8, 149:23, 150:1, 167:19, 189:17, 190:8, 191:4, 206:9, 252:22, 252:24, 266:16

**respond** [8] - 66:17, 104:2, 109:2, 138:16, 187:7, 187:13, 187:22, 188:1

**response** [12] - 18:22, 66:6, 102:24, 103:14, 138:23,

141:18, 142:22, 142:24, 144:24, 180:10, 207:11, 215:11

**responsibilities** [6] - 32:11, 42:24, 44:23, 45:3, 156:18, 231:2

**responsibility** [5] - 45:12, 68:14, 68:18, 157:10, 157:13

**responsible** [7] - 9:16, 69:17, 69:18, 69:19, 134:4, 192:23, 193:18

**responsive** [3] - 215:25, 217:3, 217:9

**rest** [3] - 31:24, 200:9, 200:10

**restored** [2] - 130:25, 141:13

**restroom** [1] - 190:15

**result** [8] - 93:11, 122:1, 141:21, 168:2, 170:6, 170:7, 263:7, 264:12

**resulted** [4] - 20:12, 185:22, 248:18, 248:25

**resume** [3] - 94:11, 268:23, 269:3

**retain** [1] - 41:19

**retained** [1] - 182:14

**retire** [2] - 5:7, 6:7

**retired** [1] - 21:12

**return** [5] - 27:23, 155:22, 210:11, 210:20, 226:12

**returned** [1] - 172:7

**returns** [13] - 116:15, 116:22, 159:1, 191:11, 209:16, 210:7, 214:22, 226:11, 228:22, 230:16, 244:12, 261:25, 265:20

**review** [5] - 244:6, 250:3, 261:11, 261:22, 262:3

**reviewed** [5] - 247:12, 248:13, 261:16, 262:22, 264:2

**reviewing** [1] - 249:23

**revise** [1] - 104:3

**risk** [10] - 25:9, 26:1, 69:3, 70:10, 70:13, 70:14, 70:19, 70:25, 71:1, 71:2

**risks** [1] - 70:12

**risky** [1] - 68:7

**RMR** [2] - 1:20, 269:17

**ROBERTSON** [3] - 1:14, 197:16, 204:25

**Robertson** [1] - 197:11

**Rohit** [35] - 17:13, 17:16, 18:3, 18:10, 19:23, 93:8, 93:9, 93:16, 94:1, 123:11, 124:5, 124:25, 128:3, 128:18, 129:15, 129:17, 142:17, 146:18, 146:21, 147:18, 148:4, 221:6,

236:12, 236:19, 236:22, 236:24, 250:22, 251:7, 252:6, 252:19, 254:18, 254:24, 255:1

**role** [14] - 25:20, 26:7, 28:17, 44:2, 44:17, 45:8, 72:6, 72:8, 75:10, 75:11, 230:25, 240:10, 240:11

**roles** [3] - 9:9, 72:5, 242:20

**rolled** [2] - 28:22, 29:7

**rolls** [1] - 192:3

**Rollup** [21] - 59:3, 59:7, 59:15, 59:20, 107:9, 107:13, 107:15, 107:17, 107:25, 108:3, 109:16, 109:23, 115:12, 118:11, 167:6, 167:10, 167:14, 167:19, 168:4, 198:17, 202:15

**room** [5] - 5:7, 5:19, 6:7, 36:17, 207:2

**rotate** [2] - 73:17, 73:18

**routinely** [1] - 36:21

**rules** [26] - 3:5, 7:14, 20:12, 163:22, 166:18, 166:24, 193:5, 193:20, 194:1, 247:15, 247:18, 247:19, 247:21, 247:22, 247:25, 248:1, 248:6, 248:8, 248:12, 248:14, 266:11, 266:14, 266:15, 266:16, 268:11, 268:13

**ruling** [1] - 3:6

**rumor** [2] - 19:7

**run** [2] - 97:2, 231:8

**running** [3] - 7:13, 201:13, 228:7

**runs** [1] - 200:4

**Russ** [8] - 56:1, 56:9, 98:11, 98:20, 103:15, 103:19, 103:24, 117:21

## S

**safe** [1] - 269:2

**sake** [1] - 28:14

**salary** [1] - 75:3

**sale** [3] - 18:21, 41:22, 44:6

**sales** [28] - 18:24, 86:17, 128:25, 129:7, 130:1, 130:6, 138:25, 200:9, 200:11, 200:12, 200:21, 231:16, 249:7, 257:22, 262:6, 264:1, 264:4, 264:7, 264:9, 264:14, 264:16, 264:17, 264:19, 265:1, 265:3, 265:7, 267:1

**sat** [1] - 4:22

**satisfy** [1] - 4:19

**Saudi** [1] - 73:4

**Savannah** [3] - 196:2,

196:5, 196:8

**save** [4] - 24:1, 32:25, 44:7, 221:12

**savings** [1] - 22:25

**saw** [13] - 22:9, 94:4, 96:22, 99:11, 106:10, 141:11, 214:25, 257:20, 257:22, 257:23, 258:1, 261:13

**scale** [2] - 4:18

**scheduled** [1] - 182:22

**school** [2] - 60:22, 242:16

**science** [2] - 8:22, 241:4

**scrambled** [1] - 33:7

**scroll** [2] - 118:24, 128:13

**SE** [1] - 137:1

**seated** [4] - 8:2, 8:5, 52:4, 205:15

**Seattle** [6] - 38:4, 45:7, 48:5, 48:9, 49:7, 202:6

**second** [23] - 18:9, 23:12, 71:18, 80:20, 111:23, 118:24, 136:24, 136:25, 140:23, 141:5, 154:6, 179:22, 183:1, 185:5, 185:11, 194:19, 211:22, 241:22, 251:23, 256:14, 256:15, 262:17, 264:24

**secret** [6] - 18:19, 20:9, 21:19, 196:21, 234:22, 237:22

**secretary** [6] - 163:23, 166:20, 166:25, 192:25, 193:19, 194:1

**secretly** [3] - 6:22, 60:14, 146:10

**section** [1] - 246:15

**secure** [5] - 10:11, 180:17, 181:5, 181:14, 181:24

**secured** [2] - 26:18, 27:5

**see** [158] - 6:11, 10:20, 12:9, 14:13, 15:4, 16:5, 16:22, 18:5, 18:23, 23:1, 23:9, 23:12, 23:17, 23:23, 24:4, 24:12, 25:17, 26:13, 27:25, 28:6, 28:24, 29:21, 29:23, 30:10, 30:17, 31:4, 32:23, 33:13, 33:24, 54:7, 54:12, 54:15, 55:25, 56:12, 56:17, 57:15, 57:24, 65:5, 65:13, 65:22, 65:25, 66:6, 76:4, 76:10, 76:14, 80:16, 80:20, 88:8, 88:13, 88:17, 90:15, 90:20, 91:1, 91:10, 95:16, 96:6, 96:21, 98:15, 98:24, 99:7, 103:8, 103:13, 104:4, 105:7, 105:18, 106:14, 109:11, 109:16, 110:19, 110:25, 111:2, 111:8, 111:12, 111:13, 112:3, 113:11, 113:18,

113:23, 113:24, 115:6, 115:16, 116:15, 116:25, 118:14, 119:23, 121:18, 126:12, 128:15, 128:22, 128:25, 129:6, 129:7, 130:1, 131:18, 134:8, 134:12, 134:15, 134:22, 134:25, 135:16, 136:10, 136:16, 136:25, 137:3, 137:17, 138:18, 138:20, 138:25, 139:13, 139:18, 139:25, 140:15, 141:3, 141:9, 144:9, 144:13, 144:20, 148:11, 164:18, 165:5, 173:13, 176:3, 176:7, 179:24, 180:4, 180:13, 180:18, 185:10, 189:19, 189:20, 192:3, 192:14, 194:22, 208:11, 208:17, 211:11, 211:23, 212:1, 213:14, 213:15, 215:5, 216:18, 216:21, 218:14, 220:3, 220:8, 225:15, 229:15, 232:15, 246:14, 251:20, 252:5, 252:18, 254:24, 257:10, 257:18, 257:21, 265:4

**See** [2] - 84:2, 145:14
**seeing** [2] - 137:9, 265:5
**seeking** [4] - 122:3, 141:7, 180:20, 185:16
**seeks** [2] - 181:9, 181:18
**seem** [1] - 16:9
**selected** [1] - 77:3
**self** [1] - 22:17
**self-interest** [1] - 22:17
**sell** [37] - 10:16, 17:22, 29:20, 34:19, 39:14, 39:17, 39:20, 39:21, 41:20, 44:6, 62:22, 77:17, 77:22, 77:25, 89:9, 97:6, 100:6, 178:19, 200:1, 200:20, 200:25, 226:19, 226:22, 226:24, 226:25, 230:2, 230:3, 246:21, 266:9, 266:10, 266:13, 267:12, 267:13, 268:7
**seller** [1] - 221:20
**selling** [11] - 10:7, 17:24, 24:24, 63:19, 77:17, 132:19, 138:8, 138:24, 178:22, 179:6, 267:4
**sells** [4] - 9:6, 70:22, 200:8, 226:21
**send** [8] - 40:14, 72:16, 128:19, 177:15, 177:21, 178:23, 230:18, 243:6
**sending** [4] - 28:25, 65:5, 118:22, 133:22
**sense** [5] - 30:8, 50:15, 59:6, 201:4, 231:2

**sent** [28] - 16:23, 20:4, 66:14, 91:4, 132:2, 133:19, 140:21, 148:17, 148:18, 149:19, 152:16, 163:10, 168:9, 169:17, 183:13, 184:6, 185:15, 186:7, 187:12, 219:8, 219:13, 219:17, 219:18, 219:24, 220:12, 221:9, 221:14, 221:17
**sentence** [4] - 135:15, 139:25, 192:3, 192:10
**sentences** [1] - 90:23
**separate** [9] - 7:7, 15:14, 16:17, 17:9, 29:24, 34:4, 118:4, 118:18, 230:21
**separated** [4] - 30:1, 110:24, 120:21, 160:22
**separating** [5] - 16:19, 17:22, 19:15, 30:19, 31:3
**separation** [1] - 29:10
**September** [2] - 128:15, 143:14
**serious** [1] - 37:6
**serve** [1] - 26:4
**served** [1] - 180:6
**service** [1] - 22:7
**services** [1] - 24:17
**set** [19] - 13:21, 13:23, 13:24, 14:15, 14:17, 14:18, 15:23, 29:17, 89:20, 98:22, 98:24, 99:3, 124:23, 147:3, 147:6, 247:21, 255:5, 262:17, 263:9
**sets** [2] - 7:13, 20:11
**setting** [4] - 201:21, 201:24, 202:2, 202:5
**settlement** [8] - 137:15, 137:19, 182:7, 182:10, 183:3, 183:13, 183:14, 183:16
**setup** [1] - 200:17
**seven** [2] - 62:3, 260:19
**several** [3] - 9:20, 128:14, 159:24
**Shakti** [1] - 165:7
**shall** [1] - 182:21
**share** [45] - 6:21, 13:3, 17:19, 20:2, 20:14, 23:13, 25:21, 25:23, 25:25, 26:20, 27:4, 52:9, 68:24, 76:13, 97:21, 97:22, 113:10, 125:6, 131:10, 132:5, 134:13, 136:8, 139:2, 142:8, 142:16, 142:17, 142:19, 143:11, 144:7, 145:3, 145:18, 146:1, 146:8, 147:5, 148:14, 149:20, 149:25, 150:3, 167:23, 196:4, 196:5, 196:14, 198:1, 198:17,

254:25
**shared** [19] - 5:18, 28:20, 71:13, 71:20, 113:17, 113:20, 113:21, 114:10, 132:4, 132:5, 132:10, 136:19, 139:23, 185:13, 195:15, 195:18, 195:20, 196:9, 201:15
**shareholders** [11] - 161:22, 163:1, 163:6, 163:10, 163:16, 164:1, 165:8, 165:14, 165:19, 166:15, 166:21
**shares** [16] - 7:10, 7:21, 16:3, 16:4, 18:1, 20:4, 20:9, 20:23, 21:19, 21:23, 131:18, 146:10, 149:3, 256:9, 258:20
**sharing** [10] - 11:8, 150:16, 150:17, 150:19, 150:20, 150:22, 150:23, 195:23, 195:24, 255:3
**sheet** [7] - 210:18, 210:19, 245:22, 245:23, 246:15, 247:16, 249:15
**sheets** [2] - 245:19, 249:3
**sheriff** [1] - 133:12
**ship** [1] - 77:14
**shipment** [7] - 42:11, 77:1, 78:2, 78:8, 78:9, 136:1, 199:14
**shipments** [4] - 70:3, 81:17, 135:5, 199:8
**shipped** [2] - 79:9, 152:14
**ships** [1] - 42:12
**shocked** [1] - 136:16
**show** [25] - 11:1, 21:16, 22:12, 22:16, 23:6, 25:6, 25:13, 26:22, 27:2, 27:13, 31:17, 32:20, 33:3, 33:6, 33:10, 34:19, 35:20, 36:9, 124:22, 159:6, 176:9, 176:15, 190:13, 211:6, 267:2
**showed** [4] - 160:15, 194:25, 213:7, 233:5
**showing** [5] - 12:22, 120:2, 121:18, 160:19, 230:22
**shown** [2] - 115:3, 160:25
**showroom** [1] - 25:5
**shows** [4] - 211:3, 230:10, 245:24, 252:14
**Shree** [5] - 37:22, 52:14, 61:22, 63:1, 72:11
**shut** [1] - 17:17
**side** [5] - 4:19, 5:21, 5:23, 36:25, 85:11
**sides** [1] - 4:17
**sign** [7] - 25:12, 25:25, 69:4, 151:2, 151:9, 151:11, 151:12
**signature** [3] - 28:13,

153:14, 210:13
**signed** [7] - 85:14, 155:6, 206:10, 209:18, 209:21, 209:24, 221:19
**significant** [5] - 36:7, 168:3, 171:8, 256:15, 261:1
**significantly** [5] - 188:22, 191:9, 253:9, 255:13, 258:21
**similar** [4] - 14:21, 15:18, 102:16, 151:18
**simple** [1] - 242:10
**simpler** [1] - 166:7
**simply** [2] - 166:14, 237:21
**Singh** [5] - 88:9, 88:10, 93:8, 94:7, 95:24
**Singh's** [1] - 97:21
**single** [3] - 24:2, 28:23, 171:24
**sister** [2] - 44:20, 44:21
**sit** [1] - 35:11
**site** [1] - 85:24
**sits** [1] - 226:22
**sitting** [7] - 39:4, 46:13, 226:17, 227:3, 227:4, 227:6, 229:25
**situation** [4] - 7:18, 33:9, 238:6, 238:8
**six** [5] - 36:25, 42:15, 49:4, 62:3, 260:19
**Six** [1] - 49:5
**sixty** [1] - 80:8
**size** [1] - 264:20
**sketch** [1] - 6:9
**skip** [1] - 260:19
**skipped** [1] - 254:8
**slab** [5] - 40:5, 40:8, 40:10, 43:5, 246:24
**slabs** [23] - 26:11, 29:19, 29:21, 39:10, 39:17, 40:4, 43:18, 44:10, 44:13, 63:13, 68:1, 72:16, 73:16, 93:15, 93:17, 96:22, 96:24, 97:5, 99:13, 132:13, 152:14, 264:17
**slow** [12] - 208:15, 208:21, 208:25, 209:1, 209:6, 213:19, 213:21, 213:23, 214:2, 214:8, 215:21, 243:9
**slow-moving** [1] - 243:9
**slowly** [2] - 135:11, 224:23
**small** [7] - 84:19, 92:13, 92:15, 93:2, 93:15, 93:17, 96:23
**smaller** [1] - 137:12
**software** [26] - 24:12, 24:21, 62:14, 128:25, 129:2, 129:5, 129:16, 130:25, 174:7, 174:13, 174:17, 208:23, 208:24, 209:5, 211:25, 212:11, 212:12,

213:18, 213:25, 215:13, 227:18, 227:19, 227:21, 227:22, 229:11, 229:19
**sold** [10] - 18:12, 18:14, 35:13, 145:6, 146:15, 146:19, 146:22, 222:2, 222:10, 252:14
**sole** [1] - 29:22
**solely** [3] - 3:17, 29:18, 257:11
**someone** [3] - 5:10, 33:22, 249:14
**sometime** [1] - 142:14
**sometimes** [6] - 7:4, 15:11, 37:22, 47:20, 79:9, 225:5
**somewhat** [1] - 4:19
**somewhere** [4] - 142:13, 262:18, 262:20, 263:10
**soon** [1] - 65:12
**Sorry** [1] - 192:7
**sorry** [28] - 8:13, 8:18, 8:23, 16:3, 35:2, 55:5, 74:15, 78:22, 112:6, 125:13, 138:10, 141:24, 150:18, 167:7, 173:12, 175:12, 178:16, 180:2, 189:11, 189:25, 194:18, 198:5, 206:19, 232:9, 232:14, 235:2, 259:5, 266:22
**sort** [6] - 24:19, 74:22, 79:6, 86:4, 256:18, 262:2
**sorts** [2] - 47:21, 86:14
**sought** [3] - 162:25, 163:12, 165:8
**sounds** [2] - 102:16, 263:14
**source** [15] - 9:12, 43:19, 44:4, 74:8, 74:14, 74:17, 75:3, 127:21, 170:9, 256:1, 256:3, 261:24, 265:6, 265:9, 265:13
**sources** [1] - 263:22
**sourcing** [27] - 9:14, 9:16, 29:5, 43:14, 43:16, 43:25, 44:7, 47:23, 71:16, 72:8, 72:9, 72:10, 72:12, 72:13, 72:17, 72:22, 72:24, 73:2, 73:13, 73:15, 73:21, 73:23, 74:10, 74:12, 74:16, 75:10
**soured** [2] - 7:5, 16:18
**South** [2] - 73:6, 220:18
**Southeast** [12] - 137:22, 163:3, 175:10, 176:9, 176:23, 177:3, 177:25, 178:18, 185:15, 194:21, 194:25, 195:6
**southeast** [1] - 178:18
**space** [3] - 195:24, 226:19, 227:7
**Spain** [2] - 39:19, 200:10
**spans** [1] - 65:24

**speaking** [1] - 3:19
**specialize** [2] - 239:14, 242:2
**specialized** [2] - 239:19, 240:1
**specially** [1] - 116:23
**specific** [2] - 9:9, 83:5
**specifically** [11] - 12:12, 14:3, 18:24, 19:5, 28:1, 29:2, 142:23, 145:11, 175:8, 184:8, 189:10
**Specifically** [1] - 169:22
**spent** [2] - 8:8, 136:21
**spinoff** [2] - 50:8, 203:23
**split** [14] - 30:5, 48:8, 56:14, 58:24, 58:25, 106:14, 106:19, 113:10, 114:7, 119:6, 119:14, 120:7, 121:20, 131:22
**splitting** [6] - 17:8, 122:1, 122:18, 122:21, 186:22, 203:24
**spread** [1] - 84:24
**spreadsheet** [3] - 118:23, 118:25, 119:4
**square** [2] - 17:3, 19:11
**squared** [1] - 17:5
**Sreekanth** [1] - 109:19
**St** [1] - 1:20
**stable** [3] - 152:22, 153:3, 154:1
**staff** [1] - 253:17
**staked** [1] - 33:18
**stand** [4] - 2:4, 25:10, 36:6, 174:15
**Standards** [1] - 247:21
**standing** [1] - 242:12
**standpoint** [2] - 22:10, 162:22
**start** [36] - 9:18, 9:24, 9:25, 10:1, 22:14, 24:13, 25:7, 25:22, 36:16, 61:7, 64:5, 67:22, 68:12, 68:19, 75:17, 81:9, 82:13, 82:21, 82:22, 84:1, 84:5, 89:18, 89:19, 89:22, 101:12, 105:14, 127:13, 169:22, 197:18, 197:19, 204:8, 207:4, 246:8, 253:12, 255:21, 261:15
**start-up** [1] - 25:22
**started** [62] - 7:2, 9:10, 9:12, 10:25, 11:6, 11:17, 12:6, 12:15, 13:17, 14:11, 15:9, 21:17, 24:24, 32:9, 38:12, 45:14, 46:12, 48:20, 53:17, 53:18, 55:9, 57:3, 57:10, 59:15, 61:8, 64:9, 64:25, 65:1, 66:15, 71:12, 73:3, 73:4, 73:21, 75:1, 79:8, 79:20, 79:25, 82:20, 86:5,

86:12, 86:24, 89:6, 89:7, 89:15, 89:16, 95:18, 100:23, 107:25, 128:16, 135:2, 135:20, 135:21, 136:2, 136:13, 168:23, 169:18, 199:9, 202:3, 215:17, 227:25, 234:19, 242:24
**starting** [8] - 6:25, 64:12, 69:16, 109:8, 179:24, 201:5, 201:12, 252:10
**starts** [4] - 90:19, 144:9, 164:18, 180:3
**startup** [1] - 153:24
**state** [5] - 37:12, 50:25, 153:1, 205:10, 239:1
**State** [1] - 38:12
**statement** [15] - 5:22, 6:13, 56:19, 58:1, 76:16, 81:6, 88:19, 91:3, 108:23, 134:25, 218:1, 244:9, 245:23, 248:3, 249:15
**statements** [31] - 2:25, 5:25, 36:20, 107:5, 131:7, 198:8, 198:18, 240:12, 240:19, 243:11, 244:7, 244:11, 244:23, 245:11, 245:12, 245:14, 245:20, 247:23, 248:13, 249:2, 249:4, 249:5, 249:13, 256:3, 256:4, 256:17, 256:20, 259:21, 261:23, 263:11, 265:7
**STATES** [2] - 1:1, 1:11
**States** [11] - 8:21, 8:25, 24:25, 26:19, 62:8, 62:13, 62:18, 64:23, 87:8, 192:6, 192:14
**stay** [6] - 48:10, 48:21, 64:17, 64:22, 87:11, 203:25
**stayed** [2] - 49:8, 199:19
**staying** [3] - 34:13, 64:19, 119:7
**stealing** [1] - 239:22
**stenography** [1] - 1:24
**step** [6] - 23:23, 117:10, 136:17, 204:25, 207:7, 252:21
**stepped** [1] - 29:25
**steps** [1] - 191:10
**steven** [1] - 17:3
**stick** [1] - 172:9
**still** [17] - 6:22, 14:24, 24:3, 25:15, 25:16, 27:1, 33:22, 60:1, 63:4, 110:24, 179:1, 184:19, 185:19, 224:1, 227:5, 237:15, 242:11
**stipulate** [1] - 2:22
**stipulations** [1] - 24:9
**stone** [85] - 9:3, 9:4, 9:5, 9:13, 9:15, 9:16, 10:6, 10:14,

10:16, 10:17, 10:19, 13:9, 24:13, 24:16, 24:24, 26:11, 29:19, 38:19, 39:7, 39:9, 39:14, 39:20, 39:21, 40:4, 41:6, 41:10, 41:14, 42:1, 43:4, 43:14, 43:16, 43:17, 43:19, 44:1, 44:7, 44:8, 44:10, 61:4, 61:5, 61:12, 62:17, 63:1, 63:2, 63:6, 63:10, 63:12, 63:16, 63:23, 71:17, 72:8, 72:9, 72:10, 72:12, 72:13, 72:17, 72:22, 72:24, 73:2, 73:13, 73:14, 73:15, 73:21, 73:23, 74:8, 74:10, 74:12, 74:14, 74:16, 74:18, 75:3, 75:11, 79:3, 80:1, 84:9, 89:12, 92:14, 127:21, 171:9, 174:16, 246:24, 246:25
**stop** [8] - 62:4, 94:10, 178:13, 178:21, 179:5, 186:9, 190:14, 268:20
**store** [3] - 29:20, 29:21, 40:3
**story** [1] - 6:24
**strategy** [1] - 45:4
**strength** [1] - 88:15
**strike** [2] - 215:24, 216:1
**strongly** [1] - 88:16
**structure** [4] - 216:20, 218:4, 218:5, 218:7
**struggle** [1] - 224:4
**struggling** [3] - 13:10, 237:24, 238:3
**studied** [1] - 60:25
**study** [1] - 60:24
**stuff** [2] - 203:15, 227:18
**subject** [3] - 65:10, 118:13, 191:16
**submit** [2] - 21:15, 229:1
**submitted** [2] - 153:12, 228:25
**Subsequent** [1] - 96:3
**subsequently** [1] - 186:7
**succeeded** [1] - 222:17
**success** [5] - 9:15, 44:1, 49:13, 73:14, 171:17
**successful** [4] - 7:3, 34:17, 70:24, 171:20
**successfully** [1] - 100:4
**sue** [4] - 33:15, 178:2, 178:12, 186:11
**sued** [9] - 178:7, 179:4, 183:22, 184:6, 184:8, 184:22, 185:1, 186:5, 186:9
**suggest** [2] - 16:10, 228:7
**suggested** [8] - 11:17, 11:20, 83:11, 83:12, 83:13, 187:2, 187:5, 187:6
**suggests** [1] - 181:22

**SUITE** [1] - 1:18
**summarize** [1] - 6:5
**summarized** [1] - 255:16
**summary** [6] - 133:5, 133:9, 262:14, 262:16, 262:19
**summer** [2] - 18:25, 143:2
**supplied** [1] - 152:11
**supplier** [12] - 24:16, 26:6, 40:16, 40:24, 42:13, 67:25, 133:25, 153:25, 157:1, 169:19, 169:23, 231:20
**suppliers** [10] - 28:12, 41:6, 41:9, 42:6, 43:18, 44:5, 79:4, 79:7, 86:18, 199:20
**supply** [3] - 29:5, 157:3
**supplying** [1] - 76:12
**support** [6] - 67:21, 80:22, 80:25, 81:2, 152:21, 153:2
**supposed** [6] - 192:5, 192:13, 196:4, 225:6, 236:2, 236:3
**supposedly** [1] - 267:7
**surprising** [1] - 28:9
**suspicious** [2] - 172:3, 172:19
**sustain** [1] - 64:16
**sustained** [1] - 3:7
**swearing** [1] - 153:16
**Swintosky** [6] - 55:25, 56:3, 56:11, 106:6, 106:23, 107:3
**swore** [2] - 172:10, 173:14
**sworn** [9] - 2:6, 2:8, 37:14, 51:4, 153:23, 188:9, 189:16, 205:13, 239:4
**symbiotic** [1] - 153:23
**system** [18] - 128:20, 129:5, 129:18, 129:25, 130:13, 174:7, 174:10, 174:17, 174:19, 226:14, 228:20, 229:12, 249:18, 249:20, 262:8, 265:16, 265:18
**systems** [3] - 228:20, 249:17, 265:16

## T

**tab** [1] - 220:4
**table** [5] - 46:13, 176:3, 176:9, 194:16, 255:16
**talks** [4] - 35:17, 108:21, 109:15, 172:17
**tax** [27] - 27:23, 116:15, 116:22, 159:1, 160:14, 160:19, 198:24, 209:16, 210:7, 210:11, 210:19, 211:24, 212:3, 212:7, 212:19, 214:22, 215:12, 216:16, 226:10, 226:12, 228:22, 230:15, 235:15,

242:20, 244:12, 261:24, 265:20
**tax-related** [1] - 198:24
**taxable** [3] - 116:23, 117:14, 243:19
**taxes** [9] - 105:15, 117:18, 120:3, 189:2, 189:17, 190:9, 191:4, 191:10, 230:19
**tech** [1] - 7:24
**Tejashree** [2] - 37:11, 37:21
**tejashree** [1] - 37:13
**TEJASHREE** [4] - 37:17, 49:19, 270:5, 270:7
**Telugu** [1] - 51:18
**ten** [13] - 7:6, 15:10, 19:3, 19:18, 28:25, 29:8, 73:12, 145:3, 145:8, 190:16, 197:4, 226:24, 231:13
**tender** [1] - 244:25
**term** [7] - 28:10, 43:14, 68:21, 78:15, 110:23, 251:9
**termination** [2] - 50:7, 169:17
**terms** [75] - 10:4, 10:9, 10:10, 10:11, 10:14, 26:9, 26:21, 27:17, 31:21, 32:14, 40:24, 41:2, 41:3, 41:9, 41:11, 41:13, 41:17, 41:18, 42:1, 42:6, 67:13, 71:17, 71:18, 76:12, 76:19, 76:22, 76:24, 76:25, 77:10, 77:25, 78:4, 78:6, 78:13, 78:17, 78:23, 79:1, 79:4, 79:6, 79:14, 79:20, 80:2, 87:16, 88:22, 100:11, 134:21, 134:24, 135:3, 135:16, 135:20, 135:23, 136:5, 148:24, 149:7, 154:15, 154:21, 155:2, 155:7, 155:22, 159:25, 162:13, 162:20, 162:23, 199:2, 199:5, 199:16, 199:24, 200:14, 255:7, 256:18, 257:14, 258:7, 259:7, 267:9
**TERRENCE** [1] - 1:11
**testified** [18] - 155:4, 157:14, 157:17, 157:20, 158:9, 161:16, 161:20, 162:19, 166:14, 168:23, 170:18, 171:7, 172:2, 174:5, 189:4, 197:25, 244:2, 244:3
**testify** [6] - 50:13, 151:8, 161:25, 188:4, 189:8, 239:23
**testifying** [3] - 169:1, 197:14, 243:24
**Testimony** [2] - 197:23, 270:15
**testimony** [28] - 2:20, 3:11, 3:22, 4:6, 12:13, 35:19, 152:21, 153:2, 153:23,

155:10, 155:15, 158:25, 181:10, 181:14, 183:12, 187:13, 188:9, 189:16, 191:3, 197:3, 202:10, 204:21, 204:23, 234:16, 246:3, 247:11, 247:14, 257:13
**Texas** [76] - 15:18, 15:19, 15:20, 15:24, 15:25, 16:4, 17:14, 17:17, 18:6, 19:16, 19:20, 19:23, 32:3, 32:12, 34:20, 122:13, 122:15, 122:19, 123:6, 123:24, 124:23, 125:17, 127:4, 127:5, 127:7, 127:14, 128:16, 129:6, 130:8, 131:2, 131:7, 131:15, 133:19, 139:17, 139:21, 140:1, 140:18, 144:16, 147:9, 147:22, 147:25, 149:4, 149:10, 149:20, 149:23, 156:22, 157:4, 157:6, 182:19, 205:20, 205:24, 206:9, 206:10, 206:12, 206:17, 207:25, 220:18, 220:19, 220:21, 222:9, 222:10, 236:21, 240:4, 244:22, 245:15, 245:21, 251:1, 251:19, 254:11, 254:23, 255:9, 259:8, 259:12, 259:16, 265:16
**text** [1] - 65:10
**THE** [108] - 1:11, 2:2, 2:4, 2:7, 8:9, 8:18, 20:6, 22:1, 34:23, 35:1, 35:3, 35:7, 36:15, 36:19, 37:9, 37:12, 37:13, 46:11, 49:16, 50:19, 50:21, 50:24, 51:2, 54:22, 54:25, 55:3, 56:23, 58:5, 67:9, 74:2, 78:20, 80:12, 81:20, 90:11, 91:17, 94:10, 94:13, 94:16, 97:14, 104:11, 106:1, 110:11, 112:11, 114:15, 116:4, 124:18, 126:19, 128:9, 138:12, 140:10, 142:1, 145:22, 150:6, 153:9, 179:14, 190:14, 190:18, 191:19, 191:22, 196:25, 197:5, 197:7, 197:17, 204:21, 205:1, 205:4, 205:6, 205:9, 205:12, 205:15, 206:19, 206:22, 206:25, 207:1, 209:10, 210:2, 213:5, 213:8, 213:9, 216:1, 216:5, 216:8, 217:8, 217:15, 222:24, 223:6, 223:12, 223:14, 223:15, 223:17, 224:10, 224:17, 234:7, 234:10, 235:1, 235:8, 235:13, 236:4, 236:14, 237:1, 237:4,

238:13, 238:20, 238:25, 239:3, 245:2, 253:24, 268:19
**themselves** [5] - 34:15, 35:11, 254:10, 258:1, 258:6
**thereby** [1] - 202:18
**therefore** [2] - 13:18, 20:15
**they've** [2] - 27:9, 157:13
**thin** [1] - 35:10
**third** [16] - 65:20, 82:17, 108:17, 113:15, 137:8, 139:17, 202:16, 218:15, 234:24, 235:5, 235:6, 235:10, 235:11, 235:15, 242:6, 257:5
**third-party** [9] - 113:15, 202:16, 218:15, 234:24, 235:5, 235:6, 235:10, 235:11, 235:15
**thirdly** [1] - 23:17
**thirty** [2] - 61:6, 205:23
**threaten** [1] - 178:2
**threatened** [2] - 178:12, 232:18
**threatening** [2] - 24:7, 33:15
**three** [41] - 11:3, 14:4, 14:5, 14:6, 14:8, 14:16, 16:19, 16:20, 16:24, 18:13, 18:15, 19:11, 19:12, 19:24, 23:3, 34:1, 34:6, 76:10, 95:25, 101:9, 105:4, 119:11, 120:6, 120:21, 121:6, 148:6, 200:6, 203:18, 204:9, 214:25, 218:23, 221:9, 221:14, 221:17, 222:1, 222:7, 222:11, 223:20, 226:21, 236:12, 242:11
**three-fourths** [1] - 76:10
**thriving** [1] - 34:17
**throughout** [1] - 158:11
**thumbnail** [1] - 6:9
**Tidewater** [1] - 225:16
**TIFFANY** [2] - 239:7, 270:23
**Tiffany** [5] - 20:16, 238:23, 239:3, 239:11, 253:13
**tip** [1] - 4:18
**title** [3] - 43:1, 156:16, 156:21
**today** [14] - 13:7, 17:6, 22:6, 29:12, 51:25, 60:2, 60:7, 60:10, 60:12, 122:8, 185:19, 247:1, 251:2, 265:17
**together** [50] - 6:22, 7:23, 8:7, 8:8, 9:10, 10:25, 12:15, 12:25, 13:17, 14:6, 14:11, 21:18, 25:18, 47:16, 47:18, 49:9, 55:9, 59:15, 60:13, 64:12, 65:1, 66:15, 82:24, 82:25, 83:4, 83:8, 83:10,

83:22, 84:14, 85:16, 87:11, 92:4, 92:5, 93:14, 95:6, 95:7, 98:9, 101:6, 159:25, 196:9, 201:4, 204:1, 207:21, 209:7, 218:8, 222:15, 247:23, 248:5, 264:14, 264:16
**Together** [1] - 101:7
**tomorrow** [2] - 268:23, 269:2
**took** [20] - 6:20, 6:22, 7:21, 16:25, 17:1, 20:9, 21:23, 23:14, 25:9, 27:3, 30:14, 31:5, 31:11, 52:9, 93:7, 129:14, 149:3, 175:5, 263:20
**top** [17] - 54:6, 57:14, 65:4, 66:5, 82:18, 103:4, 103:13, 113:3, 123:15, 124:3, 126:4, 136:23, 139:6, 144:24, 208:3, 209:15, 210:10
**total** [7] - 143:16, 148:10, 148:13, 202:18, 243:21, 246:9, 253:19
**totally** [1] - 215:23
**touch** [6] - 29:16, 107:8, 241:1, 241:13, 245:8, 254:14
**touched** [1] - 202:12
**tough** [1] - 49:12
**toward** [1] - 250:17
**towards** [5] - 21:1, 21:2, 111:11, 140:1, 140:3
**tracking** [1] - 227:17
**Tracy** [3] - 1:20, 269:16, 269:17
**trademark** [1] - 110:22
**Trademark** [1] - 33:17
**trading** [1] - 89:10
**traditional** [1] - 242:19
**train** [1] - 266:21
**training** [4] - 63:7, 63:8, 239:19, 241:16
**transacted** [1] - 257:11
**transaction** [14] - 59:2, 156:1, 184:11, 198:17, 234:3, 238:16, 251:10, 251:12, 251:13, 252:5, 254:12, 254:21, 262:12
**Transaction** [7] - 59:3, 59:7, 59:16, 107:10, 107:18, 109:23, 167:10
**transactions** [20] - 149:3, 163:17, 165:2, 165:4, 165:20, 233:20, 249:6, 249:11, 250:11, 251:19, 256:2, 256:3, 256:11, 257:6, 257:9, 257:16, 259:17, 261:23, 262:5, 263:13
**TRANSCRIPT** [1] - 1:10
**transcript** [4] - 1:24, 197:3, 197:13, 269:12
**transfer** [3] - 115:1, 141:3,

143:8
**Transfer** [1] - 115:6
**transferred** [7] - 60:14, 115:14, 142:9, 142:10, 144:17, 144:18, 146:10
**transfers** [1] - 142:23
**transit** [3] - 214:15, 214:16, 214:17
**travel** [7] - 47:16, 47:18, 47:19, 72:18, 72:20, 73:2, 74:7
**travelled** [2] - 48:12, 93:21
**treat** [2] - 3:8, 24:5
**treated** [2] - 59:19, 149:16
**treatment** [2] - 156:2, 268:10
**trends** [2] - 227:1, 227:8
**trial** [10] - 2:10, 2:17, 5:5, 5:21, 6:10, 8:10, 36:20, 36:24, 197:13, 269:3
**Trial** [1] - 1:6
**TRIAL** [1] - 1:10
**tried** [1] - 34:1
**tries** [1] - 5:11
**triggered** [1] - 238:5
**trip** [1] - 269:2
**trouble** [1] - 232:16
**true** [33] - 4:15, 4:16, 20:3, 27:14, 28:18, 31:18, 134:17, 134:25, 155:18, 155:23, 156:11, 159:3, 162:25, 165:7, 166:1, 166:8, 166:12, 167:4, 175:10, 180:23, 182:1, 183:21, 186:18, 200:23, 204:6, 206:9, 207:25, 219:10, 219:19, 220:13, 224:2
**True** [1] - 176:6
**True-Up** [1] - 176:6
**truly** [1] - 144:10
**trust** [7] - 11:12, 18:9, 21:18, 88:24, 172:25, 194:3, 194:6
**trusted** [10] - 12:4, 15:2, 23:22, 70:20, 86:7, 86:9, 88:23, 90:3, 192:4, 192:11
**truth** [3] - 181:3, 219:6, 261:4
**try** [3] - 13:12, 33:9, 235:2
**trying** [8] - 33:7, 170:12, 176:19, 176:22, 184:18, 207:1, 221:12, 235:3
**turn** [5] - 13:11, 13:12, 76:13, 170:6, 253:11
**turned** [1] - 180:25
**twice** [2] - 99:20, 186:12
**two** [41] - 3:19, 6:21, 6:24, 7:10, 7:13, 16:20, 16:24, 17:10, 17:12, 17:13, 20:11, 31:24, 32:5, 32:6, 65:24,

99:18, 100:3, 104:23, 114:10, 117:19, 120:6, 174:22, 178:11, 179:7, 185:21, 190:23, 194:4, 194:7, 200:5, 204:5, 204:8, 204:11, 205:4, 222:20, 226:24, 230:7, 236:7, 240:4, 251:2, 256:9, 256:11
**TX** [1] - 126:10
**type** [1] - 167:1
**types** [1] - 39:20
**typical** [1] - 264:18
**typically** [8] - 40:19, 41:9, 41:11, 43:11, 78:6, 199:6, 264:21, 266:3

## U

**U.S** [17] - 12:2, 14:23, 14:24, 29:2, 38:7, 38:9, 48:23, 62:7, 64:17, 70:23, 93:13, 162:5, 166:17, 170:8, 171:3, 171:24
**ultimately** [13] - 21:20, 39:12, 93:11, 94:6, 94:24, 97:24, 132:21, 133:12, 149:7, 154:13, 177:10, 259:7, 259:25
**Umashree** [1] - 44:22
**umbrella** [3] - 59:9, 59:12, 107:10
**unable** [3] - 69:16, 145:16, 189:19
**unadjusted** [7] - 225:13, 225:18, 226:5, 226:10, 229:19, 230:6, 235:20
**uncle** [4] - 24:18, 26:15, 26:20, 48:19
**Uncle** [1] - 49:23
**under** [20] - 3:5, 12:14, 25:11, 30:22, 32:21, 33:19, 89:9, 100:21, 135:3, 144:3, 153:16, 155:21, 183:13, 204:11, 204:15, 209:21, 210:6, 210:15, 214:3, 244:3
**undergrad** [1] - 38:10
**underlying** [1] - 16:16
**underpaid** [7] - 20:10, 20:15, 240:25, 253:10, 257:4, 259:22, 268:17
**underpayment** [1] - 20:12
**understated** [3] - 188:22, 248:18, 248:19
**understood** [1] - 235:9
**undervalued** [5] - 20:3, 20:14, 191:9, 255:14, 257:3
**unfortunately** [1] - 29:9
**UNITED** [2] - 1:1, 1:11
**United** [10] - 8:21, 8:25,

24:25, 62:8, 62:12, 62:18, 64:23, 87:8, 192:6, 192:13
**University** [2] - 38:13, 241:5
**unlawful** [1] - 177:22
**unlike** [1] - 14:17
**unload** [1] - 39:9
**unpaid** [2] - 132:12, 132:22
**unreliable** [9] - 255:24, 256:1, 256:5, 256:7, 256:8, 259:21, 260:23, 260:25, 261:11
**unusual** [3] - 23:18, 23:20, 35:21
**unwritten** [3] - 109:9, 167:25, 215:16
**unwritten-down** [1] - 215:16
**up** [121] - 4:4, 7:23, 8:7, 8:21, 9:1, 13:21, 13:23, 13:24, 14:15, 14:17, 14:18, 15:23, 17:3, 17:5, 17:8, 19:11, 20:7, 23:13, 24:23, 25:4, 25:12, 25:22, 25:25, 28:15, 28:22, 29:7, 29:18, 30:8, 30:11, 31:22, 32:24, 35:10, 35:11, 35:23, 38:5, 39:10, 41:11, 42:3, 42:7, 51:14, 54:5, 55:23, 55:24, 57:14, 59:9, 60:20, 65:4, 65:20, 69:14, 71:25, 79:15, 80:7, 82:18, 84:2, 89:20, 92:7, 96:4, 98:15, 98:22, 98:24, 99:3, 101:4, 103:13, 106:9, 111:8, 113:1, 114:7, 122:1, 124:23, 131:24, 136:23, 159:6, 159:22, 168:2, 183:4, 194:11, 194:13, 198:15, 199:9, 201:13, 201:21, 201:24, 202:2, 202:5, 202:23, 203:1, 203:11, 203:17, 203:23, 204:2, 204:3, 207:11, 208:2, 208:3, 208:10, 209:14, 210:10, 210:17, 211:17, 213:9, 213:11, 213:21, 215:4, 221:22, 222:25, 224:22, 226:21, 231:3, 233:22, 246:5, 249:4, 249:5, 251:23, 252:2, 252:3, 256:2, 257:16, 258:5
**Up** [1] - 176:6
**update** [2] - 180:20, 227:17
**updated** [3] - 139:16, 181:9, 181:18
**upper** [2] - 65:21, 70:17
**ups** [2] - 204:6
**upshot** [4] - 256:25, 257:2, 268:14, 268:15
**uses** [2] - 28:10, 263:23

## V

**UTS** [6] - 1:4, 105:15, 160:16, 160:20, 160:25, 204:15

**valuable** [2] - 8:15, 27:7
**valuate** [1] - 202:17
**valuation** [13] - 20:19, 118:21, 120:15, 139:16, 139:20, 202:18, 222:14, 223:19, 233:17, 234:24, 235:22, 260:4
**valuator** [6] - 218:15, 235:5, 235:6, 235:10, 235:11, 235:15
**value** [63] - 7:11, 7:15, 7:20, 17:25, 20:3, 20:19, 20:21, 20:22, 21:19, 21:22, 21:23, 22:13, 30:13, 30:16, 31:1, 31:11, 31:14, 35:13, 35:19, 52:10, 60:17, 113:10, 121:16, 122:8, 122:10, 138:19, 138:21, 139:2, 141:8, 141:16, 144:2, 144:3, 144:5, 148:10, 148:14, 149:25, 150:3, 188:10, 196:22, 234:23, 234:25, 235:7, 235:25, 237:10, 240:21, 245:25, 248:19, 248:24, 248:25, 252:14, 252:18, 257:3, 257:24, 258:12, 258:16, 258:18, 258:20, 259:10, 259:14, 259:15, 260:14, 260:18, 268:17
**valued** [6] - 20:13, 28:16, 28:17, 186:20, 219:22, 224:4
**values** [10] - 187:17, 188:21, 235:16, 247:15, 258:11, 258:23, 259:9, 259:10, 265:15, 265:17
**valuing** [1] - 248:12
**VAMSI** [1] - 1:7
**Vamsi** [363] - 6:20, 7:8, 7:19, 7:23, 8:4, 8:6, 8:21, 9:10, 9:18, 10:20, 10:24, 11:17, 11:20, 11:24, 12:10, 12:13, 13:11, 13:21, 13:24, 14:2, 14:5, 14:15, 14:23, 15:23, 15:25, 16:22, 16:25, 17:1, 17:15, 18:3, 18:4, 18:10, 19:10, 19:14, 19:22, 20:11, 21:1, 21:16, 21:18, 21:22, 22:21, 22:22, 23:6, 23:19, 24:11, 24:21, 25:2, 25:6, 25:11, 25:14, 26:3, 26:6, 26:8, 26:9, 26:11, 26:19, 26:25, 27:22, 28:7, 28:10, 28:11, 28:15, 29:21,

30:6, 30:21, 30:24, 31:20, 32:9, 32:25, 36:10, 46:12, 46:13, 47:9, 47:14, 48:14, 48:19, 49:23, 50:11, 50:14, 52:4, 52:8, 52:12, 52:18, 53:4, 53:13, 53:25, 54:7, 54:12, 54:17, 55:8, 55:10, 55:16, 56:13, 56:14, 57:2, 57:8, 57:15, 57:22, 58:9, 58:22, 59:15, 59:19, 60:1, 61:14, 61:23, 62:4, 62:17, 63:2, 63:19, 64:10, 64:11, 64:22, 64:25, 65:11, 65:23, 65:24, 66:8, 66:13, 66:17, 66:21, 67:3, 67:13, 69:15, 69:24, 70:20, 71:7, 71:8, 71:9, 71:13, 71:15, 71:19, 72:2, 73:20, 73:24, 75:12, 76:5, 76:10, 80:17, 81:24, 82:12, 83:1, 83:3, 83:9, 83:12, 84:18, 85:25, 86:3, 86:6, 86:11, 87:10, 87:16, 88:3, 88:8, 88:13, 88:23, 89:6, 89:7, 89:15, 89:16, 89:21, 90:15, 90:20, 91:21, 92:17, 93:1, 93:3, 93:5, 93:13, 93:18, 93:23, 94:8, 94:22, 94:25, 95:10, 95:14, 95:18, 95:22, 96:3, 96:15, 96:20, 96:22, 97:2, 97:7, 98:5, 98:11, 98:12, 98:20, 99:3, 99:4, 99:5, 100:20, 101:16, 102:13, 102:16, 102:24, 103:5, 103:14, 104:25, 105:3, 105:23, 106:10, 106:20, 106:22, 107:4, 107:6, 107:24, 108:2, 108:12, 109:2, 109:10, 109:19, 110:15, 110:19, 111:9, 111:11, 111:17, 111:25, 112:6, 112:16, 112:21, 113:4, 113:22, 114:2, 114:25, 115:18, 116:12, 116:16, 117:16, 117:17, 117:21, 117:23, 118:3, 118:14, 118:18, 118:23, 119:1, 119:6, 119:14, 120:5, 120:7, 120:16, 121:18, 121:24, 123:11, 123:21, 124:5, 125:14, 125:17, 126:6, 127:1, 127:3, 127:6, 127:8, 128:3, 129:17, 131:23, 132:2, 132:13, 133:6, 133:15, 133:24, 134:6, 134:8, 135:19, 136:11, 137:14, 139:8, 139:13, 139:25, 140:2, 142:17, 146:18, 146:21, 147:18, 148:4, 151:21, 152:3, 154:24, 155:5, 158:19,

158:23, 159:6, 159:14, 159:24, 160:6, 160:20, 162:6, 165:16, 165:20, 166:9, 168:23, 169:1, 169:4, 169:18, 169:22, 170:12, 172:3, 172:18, 172:20, 172:24, 173:7, 173:10, 173:21, 176:18, 177:11, 182:2, 182:11, 183:5, 186:21, 186:23, 187:20, 188:10, 188:13, 189:17, 191:4, 192:4, 192:5, 192:11, 192:12, 192:18, 193:8, 193:13, 194:3, 194:6, 194:21, 195:19, 196:9, 196:12, 196:20, 197:3, 197:12, 197:14, 197:23, 206:4, 206:7, 206:13, 206:17, 207:19, 207:22, 221:6, 221:19, 232:1, 236:2, 236:16, 236:21, 236:24, 247:9, 247:12, 248:11, 250:23, 251:7, 252:7, 252:19, 254:18, 254:19, 254:24, 255:1, 267:15, 270:15
**Vamsi's** [33] - 10:3, 19:16, 24:17, 25:22, 26:4, 46:18, 65:5, 75:11, 81:9, 101:8, 101:24, 102:19, 104:22, 105:7, 112:19, 122:9, 132:23, 132:25, 155:10, 171:14, 174:23, 175:3, 176:13, 177:7, 180:10, 186:5, 202:9, 216:6, 260:22, 261:6, 263:16, 264:24, 267:22
**various** [1] - 264:15
**vastly** [1] - 265:8
**vendor** [1] - 231:20
**vendors** [3] - 81:17, 199:7, 249:9
**venture** [1] - 151:22
**ventures** [1] - 162:6
**verdict** [5] - 2:18, 4:21, 5:8, 6:8, 21:13
**verify** [1] - 261:22
**version** [1] - 65:22
**versus** [4] - 16:7, 108:21, 108:24, 126:1
**via** [1] - 252:8
**view** [7] - 40:5, 73:13, 79:19, 134:4, 164:18, 164:19, 245:14
**Vinay** [53] - 17:12, 17:13, 17:15, 18:3, 18:10, 19:22, 57:15, 57:16, 57:17, 57:22, 80:17, 93:3, 93:8, 93:9, 93:15, 93:16, 94:1, 94:7, 99:5, 122:18, 123:11, 124:5,

124:25, 128:3, 128:18, 129:18, 142:17, 146:18, 147:18, 148:4, 205:8, 205:12, 205:19, 207:11, 210:3, 210:4, 210:6, 215:4, 223:3, 224:18, 224:20, 226:3, 228:24, 232:6, 233:4, 236:10, 250:22, 251:6, 252:5, 252:19, 254:18, 254:24, 255:1
**VINAY** [6] - 205:17, 224:13, 234:14, 270:17, 270:19, 270:21
**Vintack** [1] - 188:5
**virtue** [1] - 120:6
**visibility** [1] - 86:4
**visit** [4] - 8:25, 85:13, 87:5, 87:9
**visited** [3] - 46:19, 96:18, 99:14
**visits** [7] - 46:21, 46:25, 47:3, 47:8, 86:23, 87:1, 87:13
**Vivid** [280] - 13:8, 13:14, 13:20, 14:3, 15:18, 15:21, 15:23, 15:25, 16:4, 17:10, 17:14, 17:17, 18:6, 18:12, 19:6, 19:16, 19:17, 19:20, 19:23, 23:8, 23:18, 24:4, 28:2, 29:14, 31:19, 31:21, 32:3, 32:4, 32:10, 32:12, 32:24, 33:4, 33:7, 33:11, 33:14, 33:16, 33:21, 34:1, 34:15, 34:20, 35:10, 45:24, 46:3, 50:4, 57:6, 57:8, 57:17, 57:18, 57:23, 88:10, 88:12, 92:9, 92:16, 92:20, 93:1, 93:2, 93:6, 94:23, 94:25, 95:2, 95:5, 95:9, 95:11, 95:25, 96:5, 97:10, 98:10, 99:6, 100:12, 107:13, 112:25, 117:5, 122:12, 122:13, 123:7, 123:20, 123:24, 124:22, 125:9, 125:17, 126:10, 126:24, 127:4, 127:5, 127:7, 127:14, 128:16, 128:19, 129:6, 130:8, 130:10, 130:13, 131:2, 131:4, 131:7, 131:15, 133:19, 136:2, 138:8, 139:10, 139:11, 139:17, 139:21, 140:18, 140:25, 142:8, 143:14, 144:16, 145:1, 145:15, 146:2, 146:8, 146:15, 146:19, 147:8, 147:10, 147:15, 147:21, 147:25, 148:14, 149:3, 149:10, 149:20, 149:23, 150:1, 156:14, 156:16, 156:18, 156:21, 157:4,

157:6, 160:4, 160:10, 167:18, 173:3, 174:2, 174:7, 174:19, 177:15, 177:22, 177:24, 178:2, 178:7, 178:12, 178:17, 178:18, 178:23, 179:4, 179:10, 179:19, 179:23, 180:3, 180:7, 180:11, 180:17, 180:25, 182:4, 182:12, 182:19, 183:6, 183:8, 183:14, 183:22, 184:5, 184:9, 184:19, 185:1, 185:12, 185:17, 186:8, 186:15, 194:4, 195:21, 196:4, 202:19, 205:19, 205:20, 205:22, 205:24, 206:7, 206:9, 206:12, 206:16, 206:17, 207:19, 207:25, 208:4, 209:16, 219:13, 220:21, 221:6, 223:3, 223:9, 225:8, 228:3, 228:7, 228:11, 228:12, 228:15, 230:25, 231:4, 231:9, 231:14, 231:24, 232:1, 232:22, 236:10, 236:21, 237:16, 240:4, 240:13, 243:17, 244:22, 245:15, 245:20, 245:21, 247:4, 248:4, 248:18, 248:22, 249:20, 250:4, 250:19, 250:21, 250:24, 250:25, 251:1, 251:7, 251:18, 251:19, 252:4, 252:9, 252:14, 252:18, 252:25, 253:5, 254:11, 254:23, 255:9, 255:23, 257:14, 258:10, 259:8, 259:11, 259:12, 259:14, 259:16, 261:11, 262:3, 264:2, 264:8, 265:15, 265:16, 267:1, 268:4, 268:18

**Vivid's** [2] - 35:17, 210:11
**volume** [1] - 74:25
**vote** [1] - 237:6
**voted** [2] - 236:24, 237:8

## W

**waited** [1] - 238:15
**Wal** [1] - 64:14
**Wal-Mart** [1] - 64:14
**walk** [3] - 72:1, 92:8, 258:25
**Wang** [1] - 108:13
**wants** [2] - 207:5, 213:11
**warehouse** [42] - 25:5, 30:23, 30:25, 31:5, 31:11, 63:13, 63:16, 64:1, 64:3, 68:19, 77:16, 77:19, 84:2, 84:13, 84:16, 84:20, 85:2, 85:3, 85:13, 93:14, 93:15,

94:4, 99:13, 99:17, 99:19, 101:4, 101:12, 101:23, 113:9, 113:14, 119:9, 120:8, 121:1, 121:4, 195:25, 196:5, 204:17, 206:2, 207:15, 207:18, 226:19, 227:7
**warehouses** [36] - 14:5, 14:6, 14:10, 16:19, 16:25, 19:12, 23:14, 29:18, 29:20, 30:4, 30:9, 30:11, 30:21, 31:9, 40:3, 55:15, 55:17, 84:10, 84:18, 99:20, 100:4, 100:20, 100:22, 101:9, 101:17, 104:14, 104:18, 104:23, 105:1, 105:4, 119:11, 120:6, 120:21, 194:7, 203:6
**warning** [1] - 20:1
**Washington** [4] - 38:4, 45:7, 202:6, 241:5
**water** [2] - 261:7, 261:8
**ways** [7] - 7:7, 12:21, 34:4, 48:8, 152:5, 152:7
**Wednesday** [1] - 197:18
**week** [1] - 8:15
**West** [9] - 137:1, 137:22, 163:2, 177:5, 177:9, 194:21, 194:25, 195:5, 195:7
**WESTERN** [1] - 1:2
**whatsoever** [1] - 267:21
**white** [1] - 239:21
**whole** [9] - 22:25, 30:5, 30:19, 49:8, 220:3, 231:5, 231:8, 237:21, 252:21
**wife** [7] - 25:8, 53:1, 64:13, 64:17, 65:6, 76:8, 111:17
**Wilhoite** [4] - 20:18, 20:22, 260:8, 260:9
**WILLIAM** [1] - 1:14
**willing** [2] - 70:19, 70:25
**wish** [1] - 5:16
**wished** [1] - 176:25
**witness** [22] - 37:9, 37:11, 37:14, 50:23, 51:4, 150:5, 205:13, 216:2, 216:3, 216:9, 217:11, 217:12, 217:13, 222:24, 224:9, 236:5, 238:14, 238:21, 238:22, 239:4, 239:23, 245:2
**WITNESS** [7] - 37:13, 50:21, 51:2, 205:12, 213:9, 235:13, 239:3
**witness's** [1] - 4:6
**witnesses** [9] - 2:20, 4:5, 4:8, 6:1, 6:3, 37:25, 196:25, 207:2
**word** [8] - 31:7, 41:1, 47:11, 53:25, 54:18, 69:9, 112:17, 122:9
**words** [3] - 5:4, 10:3, 18:4

**workload** [1] - 25:23
**works** [1] - 45:6
**world** [1] - 39:18
**worried** [1] - 233:2
**worth** [13] - 17:20, 23:15, 30:22, 35:15, 131:15, 131:19, 201:2, 220:16, 220:25, 222:2, 222:3, 234:3, 264:13
**write** [11] - 53:23, 71:25, 76:18, 114:20, 127:11, 128:18, 128:19, 141:6, 187:12, 266:3, 266:12
**write-down** [1] - 187:12
**write-up** [1] - 71:25
**writes** [25] - 54:12, 56:12, 57:22, 65:11, 80:20, 90:23, 96:3, 105:14, 108:18, 109:9, 110:22, 111:11, 111:12, 111:19, 111:25, 113:17, 116:15, 124:8, 126:9, 134:12, 134:22, 136:8, 139:13, 139:25, 145:11
**writing** [17] - 99:5, 103:10, 105:7, 113:4, 121:18, 126:6, 147:14, 158:19, 161:14, 186:19, 186:23, 187:2, 187:17, 266:2, 266:7, 266:18, 266:23
**written** [18] - 27:20, 69:4, 113:24, 127:13, 144:13, 144:25, 158:22, 161:17, 161:21, 162:1, 167:25, 200:6, 216:15, 217:6, 243:11, 250:13, 267:7, 267:16
**wrote** [15] - 10:3, 12:10, 56:12, 76:11, 88:13, 90:20, 106:10, 123:21, 127:12, 132:7, 137:1, 144:20, 179:23, 194:21, 211:23

## Y

**year** [29] - 10:15, 49:9, 62:10, 92:18, 99:18, 118:6, 120:23, 171:24, 174:22, 187:3, 204:14, 210:22, 225:11, 225:17, 226:16, 226:18, 226:23, 227:2, 227:4, 227:16, 228:21, 229:24, 230:19, 237:22, 238:16, 241:18, 241:21, 245:10, 268:6
**years** [39] - 7:6, 15:10, 22:24, 23:22, 24:22, 29:9, 29:15, 31:9, 32:2, 32:24, 34:1, 35:25, 42:15, 49:4, 49:5, 61:6, 62:3, 80:6, 90:6, 99:18, 135:10, 165:2, 166:3,

166:10, 171:11, 172:4, 172:20, 186:19, 188:22, 226:24, 227:6, 231:11, 239:25, 240:2, 257:15, 258:2, 268:5, 268:6
**years'** [1] - 264:13
**years-long** [1] - 29:15
**yesterday** [1] - 96:4
**Young** [1] - 110:20
**young** [1] - 24:14
**younger** [1] - 22:22
**yourself** [14] - 37:19, 41:5, 51:9, 171:16, 215:15, 216:14, 217:5, 218:2, 218:9, 235:21, 239:9, 250:1

## Z

**zero** [6] - 78:11, 79:17, 130:7, 136:6, 252:25, 254:25
**zones** [1] - 158:14
**zoom** [1] - 213:13