UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

|  |  |
|---|---|
| _____ )<br>HARI HARA PRASAD NALLAPATY, )<br>UTS HOLDINGS, LLC, AND JUSTH )<br>HOLDINGS, LLC, )<br> )<br> Plaintiffs, )<br>v. )<br> )<br>VAMSI MOHAN NALLAPATI, )<br>NALLAPATI PROPERTIES, LLC, )<br>ROHIT GANGWAL, AND VINAY )<br>BHARADWAJ, )<br> )<br> Defendants. )<br>_____) | 5:20-cv-00470-BO |

MAY 9, 2023

DAY 2 - JURY TRIAL

BEFORE THE HONORABLE TERRENCE W. BOYLE

UNITED STATES DISTRICT JUDGE

APPEARANCES:

    (See Page 2)

Glenda L. Biggerstaff, Court Reporter
WORDSERVICES, INC.
3103 Virginia Pine Lane
Apex, North Carolina 27539
919.548.4914
wanda@mywordservices.com
Stenomask with computer-aided transcription

APPEARANCES:

On behalf of the Plaintiffs Hari Hara Prasad Nallapaty and UTS
Holdings, LLC:

Charles E. Coble, Esq.
William A. Robertson, Esq.
Brooks, Pierce, McLendon, Humphrey & Leonard, LLP
150 Fayetteville Street, Suite 1700
Post Office Box 1800 (Zip 27602)
Raleigh, North Carolina  27601

Clinton Shepperd Morse, Esq.
Brooks, Pierce, McLendon, Humphrey & Leonard, LLP
Post Office Box 26000 (Zip 27420)
230 North Elm Street, Suite 2000
Greensboro, North Carolina  27401


On behalf of the Defendants Vamsi Mohan Nallapati and Nallapati
Properties, LLC.:

Kirk Alan Parry, Jr., Esq.
Deanna Anderson, Esq.
Parry Law Firm
100 Europa Drive, Suite 351
Chapel Hill, North Carolina  27517


_____

(Tuesday, May 9, 2023, commencing at 10:04 a.m.)

(The jury is present in the courtroom.)

THE COURT: Good morning, ladies and gentlemen.

All right. We were on direct with the expert witness. Go ahead.

MR. COBLE: Yes, sir. Your Honor, one quick housekeeping matter: a couple of exhibits slipped through the cracks yesterday. So we move into evidence P-94, P-117, P-124, P-485, P-507, P-445, and P-383.

THE COURT: Okay. Received.

(Plaintiffs' Exhibit Numbers 94, 117, 124, 383, 445, 485, and 507 were received.)

MR. COBLE: Thank you, Your Honor.

CONTINUATION OF DIRECT EXAMINATION BY MR. COBLE:

Q. Good morning, Ms. Couch.

A. Good morning.

Q. Let's pick up where we left off yesterday and see if we can straighten out a little bit of what we've heard from Vinay about what the Vivid entities told the banks about their inventory.

Did -- did the Vivid entities make regular financial submissions to the banks they borrowed money from?

A. Yes, every single month.

Q. And did you look at those to see what they said about inventory?

A.   I did.

Q.   And -- and what did you observe when you reviewed those reports?

A.   What I observed was that they were consistently telling the bank that they had no obsolete or slow-moving inventory.

Q.   And how did that compare to what you saw in QuickBooks?

A.   So the opposite was true in QuickBooks.  In QuickBooks, they were generally writing off millions of dollars' worth of inventory every quarter.

Q.   So is that discrepancy a -- a problem in your opinion?

A.   Yes, because the discrepancies were quite large.

Q.   Right.  And did you illustrate that on some -- some charts that you prepared?

A.   I did.

        MR. COBLE:  Okay.  If we could start with the chart 5A.  And we'll -- if you can blow up the top of this first.

BY MR. COBLE:

Q.   And what -- what are we looking at here?

A.   So this is one of the monthly borrowing base certificates that was sent to Bank of America.  This one's dated December 31st, 2017.

Q.   And let's now get -- grab another one as far as that inventory.  Is this the same one we looked at yesterday?

A.   It is.

Q.   So what did -- what did the Vivid -- what did Vivid NC

report on -- on this Vivid NC report as of December 31st, 2017?

A.    They reported $9,312,718 worth of gross inventory value, and then they reported $3,340,032 of ineligible inventory.

Q.    And did the -- did Bank of America define what it considered to be ineligible inventory?

A.    Yes.  So if you scroll to the bottom of this page, Bank of America actually included a definition of what ineligible inventory consists of.

Q.    What was that?

A.    So we can see here highlighted with number three consigned inventory, in transit inventory, off-site inventory, slow-moving, obsolete, and the list goes on there.

Q.    Okay.  And so let's look now at 5B, the next illustration. So blowing up the top portion of this, what -- how much inventory did Vivid NC tell the bank was obsolete?

A.    So if we actually go to the section right below where those red letters are, we can see those top two lines.  The first line, I believe, yes -- thank you.  The first line says obsolete.  The second says slow-moving, and we can see that those line items are blank --

Q.    Right.  And then third, let's go --

A.    -- which means zero.  I'm sorry.  I'm sorry.

Q.    I'm sorry.  I cut you --

A.    I just meant, you know, they're blank, ostensibly zero.

Q.    Okay.

A.    Yeah.

Q.    And let's look at 5C.  And tell us what we see here in the portion that you've highlighted in red.

A.    So this is the balance sheet for the Vivid NC entity on the same date, December 31st, 2017.  We can see the same inventory asset number, $9.3 million, but they're actually recorded to obsolete inventory transactions, which are summarized here on the financial statement totaling $3.2 million of obsolete inventories in QuickBooks.

Q.    So how does that square with the worksheet we just looked at?

A.    So what they were telling the bank was that they had zero obsolete inventory.  What they're telling QuickBooks and ostensibly the IRS is that they have $3.2 million of obsolete inventory.

Q.    And is this the only example -- this particular reported balance sheet the only example of that phenomenon that you observed?

A.    No, sir.

Q.    What did you observe when you looked across the range of these reports?

A.    When I looked across the range of these reports by quarter, we see the same pattern over and over and over again.

Q.    And in -- in your professional opinion, is it proper -- ever proper to report one thing to the banks about inventories

and something else to the IRS?

A.    No.  So in general, your financial report should be the same no matter who you're reporting those financial numbers to.

Q.    Is it consistent with the accounting rules that you talked about yesterday to have that sort of discrepancy?

A.    No.  This breaks the rules.

Q.    And so why does that matter here in this case?

A.    It matters here in this case because they're telling the bank one thing.  They're telling the IRS something else.  The IRS numbers are the lower numbers.  The lower numbers are what was used to price Prasad's shares in the Vivid entities.

Q.    In your opinion, are the lower numbers correct?

A.    The lower numbers are not correct.

Q.    All right.  Let's look at Exhibit 475.  There's a huge number of figures here.  We won't --

A.    Yes.

Q.    -- go through that granularity.  But tell the jury what this chart that you prepared reflect with respect to the VNC reports.

        (Plaintiffs' Exhibit Number 475 is identified.)

A.    So this chart is every single VNC report that I had.  I had 40 months' worth of VNC reports.  So I itemized the VNC reports by what they were reporting to the bank, and then I compared those figures to what was in QuickBooks.  And what I found was that of the 40 months of -- of -- of VNC reports that

we had, there were only five months.  And we can -- if we want to blow up that first box, there were only five months in which they showed slow-moving inventory, and that -- those were in 2016.  And after that they never showed a slow-moving inventory again.

BY MR. COBLE:

Q.   Now, did you hear testimony yesterday from Vinay that -- saying that the software was not able to distinguish between consigned and -- and written down inventory?

A.   Yes, I did.

Q.   Is that consistent with what you saw in these VNC reports -- sorry, in the -- in the VNC reports that you reviewed?

A.   No, not at all.  Because as we can see, they were able to report slow-moving inventory to the bank.

Q.   And so what -- what conclusion did you draw from that in regards to the ability to reflect slow-moving inventory on the reports like the VNC reports?

A.   It was just simply not an accurate statement.

Q.   As we heard yesterday?

A.   Correct.

Q.   All right.  Now, in addition to looking at bank submissions, did you also look at something called the audit trail of QuickBooks?

A.   I did.

Q.   And tell the jury what an audit trail is.

A.   So an audit trail is a back end accounting report that -- that shows when each of those detailed transactions are entered, and then it shows if those transactions are changed or deleted.

Q.   And why were you looking at that report?

A.   Because I wanted to understand, you know, how these inventory numbers were being entered and whether the timing of those were potentially questionable.

Q.   And what did you find when you looked?

A.   What I found was astounding.  It -- there were dozens sometimes adjustments every single quarter of these inventory numbers in QuickBooks, which is not normal when you put a general journal entry into an accounting system.

        MR. COBLE:  If we'll look at Exhibit P-465.

BY MR. COBLE:

Q.   What is 465?

A.   So 465 is an example of the audit trail for Vivid NC, and I color-blocked every quarter of -- of the inventory adjustments so that we could highlight just the number of times each of these adjustments was being chain -- each of these numbers was being changed.

        (Plaintiffs' Exhibit Number 465 is identified.)

        MR. COBLE:  If we'll scroll down to the fifth page of this report, please, and -- and just grab the -- the bottom portion in yellow.

BY MR. COBLE:

Q.   What are we looking at here --

A.   Yeah.

Q.   -- in that portion?

A.   I -- yeah, I -- I know it's hard to read.  But in the yellow, that color block is the number of times that the inventory was changed on the date of the freeze-out transactions, February 28th, 2020.

Q.   And how many times was the Vivid NC inventory value changed on the -- as of the date of the freeze-out transaction?

A.   They changed that entry four times.

Q.   Is that unusual in your professional opinion?

A.   It's very unusual.  You would expect a journal entry to be -- you take a source document.  You enter a journal entry to make an adjustment to the books, and you leave it there.  Sometimes humans make errors, and you might see a change, maybe two on occasion.  These -- these were extensive and numerous adjustments, and the numbers were wildly fluctuating in -- in terms of value.

Q.   And so what did that indicate to you in your professional experiences -- well, actually, let me ask this.

        Was this the only day for which you saw multiple changes like this to inventory value?

A.   No.  They were adjusting inventory every quarter.  And every -- almost every quarter, we see these kinds of entries, a

lot of times, many more than just, you know, the three that we see here -- four.

Q.   And what -- what did that indicate to you in your professional experience when you see -- you're seeing multiple changes of the same day in inventory values?

A.   In my professional opinion, that is a very significant red flag for financial statement manipulation.

Q.   Do you remember yesterday that when Vinay was on the stand he made a statement to the effect that inventory was only adjusted once a year?

A.   He said that, yes.

Q.   And is that consistent with what the audit trail reports that you reviewed show?

A.   No.   We -- they changed their inventory values every quarter.

Q.   Not every year as he said?

A.   That's correct.

Q.   Now, in your analysis in this case, did you also review communications between the accounting firm for Vivid and representatives of Vivid about inventory?

A.   I did.

Q.   And did you review sworn testimony of the bookkeeper at the accounting firm who interacted with Vivid personnel about inventory?

A.   I did.

Q.   And in your professional experience, do forensic accountants such as you rely on and consider such communications when forming their opinions about the validity of financial statements?

A.   Very much so, yes.

Q.   And -- and what about the statements that are sworn statements that accountants make about -- about asset values and such?

A.   Yes, we rely on those as well.

Q.   And so what conclusions did you make about the communications and testimony that you reviewed in regards to your opinion that accounting rules were broken here with respect to inventory?

A.   The communications that I saw were unbelievable to me because it appeared that the CPA firm was helping and assisting the Vivid entities in making these bogus adjustments.

Q.   All right.

     MR. COBLE:  And let's look at Exhibit 39, and blow up the email here.

BY MR. COBLE:

Q.   Is this an example of one of the communications that you were just referring to?

A.   Yes.

Q.   And so tell the jury just in -- in general what -- what are we looking at here in this email.

(Plaintiffs' Exhibit Number 39 is identified.)

A.   So this is one of the emails that you could see going back and forth between the Vivid entities and the CPA firm every single quarter.  And in this one, Haresh from Cosmos is telling the CPA firm:

"Good morning" -- and I'm -- I'm gonna lean in -- "change -- the change for DFW Dallas, third quarter 2019.  As per our discussion, the bottom line in the P&L should be 8.5 percent."

Or I think that number is 588,212.  He then goes on to say:

"The reflection for this, we can increase the decline in inventory by the difference of $773,800.  The final decline in inventory on the balance sheet will be $1,320,942."

BY MR. COBLE:

Q.   And did -- and did you look to see if that -- that actually happened?

A.   So that email is on or about October 30th, 2019, at a certain time of the morning.  I believe that adjustment in QuickBooks in the audit trail was made within minutes.  And within minutes after that, they sent that financial statement to the attorney who was helping them put this freeze-out transaction together.

Q.   And so what -- explain to the jury the significance that

-- that relative to what the accounting was -- are for valuing inventory.

A.   Here's the significance.  They wanted an 8.5 percent net income.  That's what they wanted.  They didn't have that based on the numbers that they actually had.  So they had to change their financial statement number to get to the number they wanted, and the way that they did that was adjusting their inventory.

Q.   And did you hear some testimony yesterday from Vinay saying that they just went with whatever the accountant said about inventory value?

A.   I did.

Q.   Is that what's going on here?

A.   It's not going -- that's not what's going on here.

Q.   Explain that to the jury, please.

A.   He -- this is an email coming from Vivid to the accounting firm telling them what to do, and they did exactly what they -- he told them to do.

Q.   Let's look at another example.

        MR. COBLE:  Let's go to Exhibit P-5.  And we'll blow up the middle of this.  It shows an email.

        THE WITNESS:  I think you have to scroll up a little bit.

        MR. COBLE:  Yeah.  That was the signature line.

        THE WITNESS:  The signature, yeah.

BY MR. COBLE:

Q.   And is this another communication that you reviewed?

A.   Yes.

     (Plaintiff's Exhibit Number 5 is identified.)

BY MR. COBLE:

Q.   And what was your reaction to this email?

A.   This email is -- is -- it's totally shocking to see something like this come from a CPA firm.  She is asking him -- she's asking Vinay, "Please send me AR," which is accounts receivable, "your accounts payable," which is AP, "and your ideal net income for the second quarter."

Q.   And what -- what is the significance of that in this -- in this case?

A.   The significance of that is an ideal net income is what they were adjusting their books to, and that's that lower number that we know Prasad's price was being paid at.

Q.   All right.  Let's look now at Exhibit P-327.  Let's grab the email.  This is an email between Rohit, and we've heard about him, one of the three that was part of the freeze-out transaction of Prasad, right?

A.   Correct.

     (Plaintiff's Exhibit Number 327 is identified.)

BY MR. COBLE:

Q.   And who's Mr. Khatod?

A.   Mr. Khatod is the CPA.

Q.   And -- and was this another communication of the sort that you've been describing?

A.   It is.

Q.   And tell the jury what is significant about this email.

A.   So if we read this email, Mr. Khatod says:

"Hi, Rohit.  I have the balance sheet, and I am right now working on the depreciation schedule," which is for fixed assets.  "So I can give you two documents. Inventory on December 31 shows $1.4 million.  It is on my balance sheet.  It is adjusted based on the amount of loss Vinay wanted me to show.  I don't know what kind of control sheet I could come up with for it.  This is your internal document.  I will send the balance sheet before the end of the day."

Q.   How does that square with Vinay's testimony yesterday that they just went with whatever the accountant said they should use for inventory?

A.   The emails that I reviewed over and over again show the opposite.  It shows that the Vivid entities were telling the CPA firm what net income they wanted to have, and the -- the CPA firm was making the changes in QuickBooks for them.

Q.   And is this the -- is this -- this manner of setting inventory value, is that consistent with the accounting rules?

A.   It -- it breaks all of the accounting rules.

THE COURT:  So what you're saying is this isn't math.

It's make-believe.

THE WITNESS:  That's -- that's correct, Your Honor.

BY MR. COBLE:

Q.   And -- and the reference to an inventory control sheet, what -- what is that?

A.   So an inventory control sheet is something that I would expect to come out of an inventory system.  It would sort of be your summary schedule that would show the value of your inventory, and it would be something that comes out of that ERP system that we heard about yesterday.

Q.   And if an accounting firm is actually going to look at and figure out the actual value of inventory, would it need an inventory control sheet?

A.   The inventory control sheet is typically what an accountant would start with to then, you know, work with that inventory value.

Q.   And in these communications, did you see any indication whether the accounting firm had an inventory control sheet that it would need to value the inventory correctly?

A.   No.  So as we can see here, Mr. Khatod doesn't have any source document, and I've seen other testimony and communications which indicate they asked for it but were never provided those documents.

MR. COBLE:  Let's look at Exhibit P-7.  If you'll go to the second page and grab the top email.

BY MR. COBLE:

Q.   And who is Ms. Hicks?

A.   So Ms. Hicks is the bookkeeper who works in Mr. Khatod's office, and she appeared to be the primary bookkeeper working on the Vivid matters.

     (Plaintiff's Exhibit Number 7 is identified.)

BY MR. COBLE:

Q.   And what does she say here?

A.   She says the revised reports -- the revised financial statements is what she's talking about -- are attached. "Please remember to send the supporting documents" -- or excuse me, "supporting documentation for the quarterly AR, AP, and inventory for our records as discussed."

Q.   And this is from September of 2020?

A.   That's correct.

Q.   And -- and in the materials you reviewed, did you have any indication whether the accounting firm ever received any supporting documentation?

A.   Ms. Hicks testified under oath that she never did.

Q.   Never received it?

A.   Never received it.

          MR. COBLE:  And if we'll go now to Exhibit P-333. And grab the top email.

BY MR. COBLE:

Q.   And, again, Mr. Khatod writing to Rohit again.  And what

does he say here about the needed inventory control sheet?

A.    He says it -- it comes from you.  I don't keep -- he says:

          "Inventory control sheet comes from you based on the
     amount of inventory on the balance sheet.  I don't have
     the inventory control sheet.  I don't keep the inventory
     detail sheet with all the increases and decreases.  You
     have the income statement and balance sheet."

     And then they're going on to say what else that they're
doing that day.

          (Plaintiffs' Exhibit Number 333 is identified.)

BY MR. COBLE:

Q.    And so --

A.    So -- I'm sorry.  Go ahead.

Q.    And just sort of to cap all this off, in -- in -- in all
of the -- and did you review -- go through other examples?  But
are there other examples of communications of this sort of
among Vinay and others that -- the Vivid entities with the
accounting firm?

A.    Yes.

Q.    And do they support at all the notion that the accountants
did some true and accurate valuation of inventory?

A.    Never.

Q.    What do they show?

A.    They simply show what they were deciding what they wanted
as their net income and they were adjusting the inventory based

on that number every single quarter.

Q.   All right.

          MR. COBLE:  Your Honor, we move into evidence Exhibits P-475, 465, 395, 327, P-7, and P-333.

          THE COURT:  They'll be received.

     (Plaintiffs' Exhibit Numbers 7, 327, 333, 395, 465, and
     475 were received.)

BY MR. COBLE:

Q.   Okay.  Let's look at one final email, one that we saw, I think, yesterday, P-1.  Is this an email that you also reviewed as part of your analysis in this case?

A.   Yes, it is.

Q.   And -- and remind us, what was the context for this email?

A.   The context of this email is that Vinay is calculating a bonus he was going to pay to himself, and he calculates it and then he attaches some financial statements to it as well -- to this email as well.

          MR. COBLE:  And let's go down to the second page, and grab the middle exchange between Prasad and Vinay.  Actually, if you could get both emails.

BY MR. COBLE:

Q.   And so what was the context of the -- the message from Prasad?

A.   So Prasad is writing back to the group, to Vinay, Rohit -- Rohit, and Vamsi, saying the net profit -- meaning the net

profit on the document you attached to your email is $1.63 million, not three million. Three million is what Vinay was -- was calculating his -- $3 million of net profit is what Vinay's bonus was calculated on.

Q. And so what -- and what was Vinay's response?

A. Vinay tells Prasad:

"That," meaning the 1.63 million, "is only in QuickBooks for tax purposes after the inventory adjustment. Look at the reports from the software for the real number, Prasad."

Q. So why is that exchange relevant to your analysis?

A. It was very relevant to my analysis because it's another indication that there was in fact two sets of books, and that, in fact, there was a higher number, and that -- that higher number was not used in -- in valuing the freeze-out transactions, and, in fact, it's the lower number that was used to -- for tax purposes and the freeze-out transaction.

Q. Did you hear testimony yesterday from Vinay that the way his bonus was calculated was something he negotiated?

A. Yes.

Q. Does that matter at all to the questions that you analyzed about the validity of the inventory write-downs?

A. Not at all.

Q. And, again, which of the figures were used for Prasad's buyouts?

A.    The lower number.

Q.    Is that something that Prasad negotiated?

A.    Prasad did not negotiate that to my understanding.

Q.    Let's move now, Ms. Couch, to your second and -- and fourth opinions, which I'll take together.

MR. COBLE:  If we'll go back to the summary of her --

BY MR. COBLE:

Q.    So Exhibit -- sorry, opinion two, was it significant financial adjustments are required?  And so in -- in your opinion, which financial reports of the Vivid entities need to be adjusted?

A.    It's my professional opinion that the balance sheet inventory -- or the balance sheet book value needs to be increased.

Q.    And then your fourth opinion is that the book values were materially misstated as of the freeze-out --

A.    Correct.

Q.    -- transaction dates.  And so in what way was the book value materially misstated?

A.    Primarily, it -- inventory was understated.

Q.    Based on the things that we were just talking about?

A.    Correct.

Q.    What documents did you review in determining that significant adjustments were needed to the balance sheets for the Vivid entities?

A.   So I initially had some inventory reports, and then I later had some sales reports, and I analyzed all of those.

Q.   And what did the inventory report show?

A.   The inventory reports show that the Vivid entities' slabs of -- of granite -- or slabs of everything were selling briskly for the first five years that it was in its existence at the warehouse.

Q.   All right.  Let's look at illustration six.  Is that a -- is that a table that you prepared?

A.   It is.

        MR. COBLE:  And we'll just grab the far right-hand column.

BY MR. COBLE:

Q.   Just tell the jury what this captures about your analysis.

A.   I know you can't see it.  But on the left-hand side, I'm taking the inventory that was purchased and procured in a specific year and then just watching it, how it reduces over time.  And what I was able to determine was that by the end of year two 90 percent of that inventory was no longer in inventory, which means it had been sold.  And by the end of year four, you know, it's -- it's a -- it's a little higher. It's, like, 93 percent.  So the vast majority of inventory that's on hand and procured in a certain year is going to sell over the next, really, four years.

Q.   Well, we've heard some testimony about distressed --

whether these businesses were distressed.  Is what you're seeing here and what you just described to the jury a sign of a healthy or an unhealthy business?

A.   This is a very healthy business.  If -- if they're able to reduce their inventory by nine -- over 90 percent in three to four years and, as we will see, sell it for a profit, this is not only inventory that doesn't need to be written down, but this is a company that's very healthy.

THE COURT:  And the inventory is nonperishable.  It's not like you got bananas and peaches.

THE WITNESS:  It's not bananas, Your Honor, and it's not peaches.

BY MR. COBLE:

Q.   In your professional experience, would you have recommended that a company write down inventory based on what you observed of the movement of inventory over time?

A.   No.  I would have recommended that they have a very small inventory reserve or inventory write-down that was representative of those very old and, quite honestly, very few slabs that were five years old or older.

Q.   All right.  So let's take a look at illustration seven.  And tell the jury what you did next in your analysis, Ms. Couch.

A.   So this is just a representation of the inventory that was on hand at the end of 2017.  On the left-hand side, that's the

year that the Vivid entities purchased those slabs.  I then show the number of slabs that were -- that were on hand at the end of 2017 and the actual value they paid for those slabs, which I believe is about 9.6 million.  And then on the right-hand side, I compare that to how they were writing it down in QuickBooks and show that that $9.6 million of inventory that's actually on hand in QuickBooks is only showing a value of 5.4 million.

Q.   And that was about half, in other words?

A.   Correct.  There's a very small number at the bottom.  We can see that 44 percent of the total value of that inventory was written off as of that date.

Q.   They're saying that the inventory was worth about half of what they paid for it?

A.   I would agree with that.

Q.   And so -- and so what do we see here as far as the write-downs in particular years?

A.   So I would point to --

        THE WITNESS:  If we just kind of go back to the overall.  Yes.  Thank you.

A.   So I would just point to the fact that everything that was purchased in the prior year -- so everything purchased in 2016 or prior is just flat written off by 98 percent, right.  It's -- it's across the board.  And then we can see the inventory that was purchased in that same year, and this was written down

to 86 percent of its value or about -- let's just call it 13 and a half percent of its value was written off.

Q.   And so for easy math, for all those years that we see two percent numbers, if they bought the inventory for $100, what were they saying it was worth?

A.   $2.

Q.   And so for purposes of the accounting rules, what does that mean when you say inventory that you bought for $100 is only worth $2?

A.   The accounting rules tell us that we have to write down inventory at the lower of cost or market.  We have to write it down if we can no longer sell it above the cost we paid for it.

And so what they are telling the IRS and the readers of their financial statement and Prasad is that all of this inventory that's -- that's more than two years -- or more than a year old or older can only be sold at not more than any of those numbers that you see, those very low numbers that you see.

Q.   And then to sort of pick up on the peaches and bananas example, I mean, is what you saw in the records consistent at all with the idea that these stone slabs became essentially worthless after a year?

A.   No.  The inventory reports were showing brisk movement. And then once we got the sales reports, we could see very healthy gross margins.

Q.   And so was what we're looking at here for 2017 a one -- a one-year anomaly in how inventory was treated?

A.   No, sir.  I -- I saw that literally every single year for all the years that I had, and I saw that for both Vivid North Carolina and Vivid Texas.

Q.   So let's look at Exhibit P-198 and sort of see how this was done in practice.  We'll go to page 2.  This is a -- is this one of the giant spreadsheets that you looked at?

A.   So this is one of the downloads that come from the ERP system, and this is the summary -- we call it a pivot table.  It's the summary schedule that was at the -- the front of it.

     (Plaintiffs' Exhibit Number 198 is identified.)

BY MR. COBLE:

Q.   And then just comparing it to the table that you prepared, what are we looking at --

        MR. COBLE:  If you'll blow up the column that says "sum of landed costs down to 10.9 million" number.

A.   So this is the inventory report as of the end of 2019, which is important because Mr. Robinette relied on this.  And we can see that for the slabs only there -- they had $10.9 million dollars worth of slabs on hand on December 31st, 2019.

BY MR. COBLE:

Q.   So then what did they do with that?  You said Mr. Robinette.  Who -- who's he?

A.   Mr. Robinette is the appraiser who appraised the -- the

Vivid North Carolina inventory for Vamsi.

Q. And -- and what did he use to do that appraisal?

A. It's my understanding he used the 2019 inventory records.

Q. And did he do any of the analysis to your understanding that you've described that you did?

A. No. He testified that he relied on what Vamsi told him about the -- or what the folks at Vivid North Carolina told him about the inventory.

Q. Vamsi being Rohit?

A. Correct.

Q. Did you reach a conclusion about the validity of Mr. Robinette's report?

A. I did. As we will see, number one, he -- he says that they wrote it down based on color. As we can see, if we -- if we highlight that second right-hand side, they're not basing their write-downs on color. They're basing it on age.

Q. And so the -- is -- the two percent that we see here, is this the same as we just saw on your table --

A. Correct.

Q. -- namely everything, and all the -- all the slabs in those rows are being written from 100 down to two?

A. Correct. So now, we're in 2019. The earlier one was 2017. This is now 2019. You see the exact same pattern. Anything that is 2018 or prior, 98 percent of the value is written off. And then we can see they have more aggressive

write-offs now.  That's the end of 2019.  So they've written off 40 percent of the value of the first and second quarter. They've written off 15 percent of the value of the third quarter, and they've not written off anything for the fourth quarter.

Q.   And this was for Vivid NC?

A.   That's correct.

Q.   You said December 31st, 2019?

A.   That's correct.

Q.   And that Mr. Robinette used these numbers for purposes of the freeze out transaction?

A.   He did.

Q.   So how did that impact Prasad?

A.   This impacts Prasad because this is the number that was used for the freeze out transaction, or a number very close to it.  And that lower number is what was used to base the inventory and the book value of Vivid NC.

Q.   When you say that lower number, which one are you referring to?

A.   The $6 million.

Q.   So rather than use almost $11 million of what they actually pay for the inventory, they used the $6 million number to price the -- the share that they took from Prasad?

A.   That's correct.

          THE COURT:  And your position is that was fraudulent

or deceitful?

THE WITNESS:  Yes, Your Honor, because that $6 million -- excuse me, that $10.9 million of inventory was worth $12.6 million over the next 24 months.  So that inventory sold. All the inventory we're seeing here sold for $12.6 million in the following 12 point -- 12 -- or excuse me, 24 months.  So there would be no reason to write down 40-something percent of that inventory, because clearly, it not only had more value than the six million they wrote it down to, it had more value than the 10.9 million that was on hand that day.

BY MR. COBLE:

Q.   And did you review similar reports for other years?

A.   Yes, I did.

Q.   And did you -- and did you see similar treatment of inventory those other years?

A.   It was the same.

Q.   And did you see any support at all for the -- this -- the write-downs here that were used in the -- in the freeze-out transactions that we're here today to address?

A.   There are no working papers.  There are no Excel spreadsheets.  There is nothing to support these other than the ideal net income.

Q.   And so to -- to go from the question that you were just asked about, sort of the next step in your analysis, did you look at the sales reports?

A.   I did.

Q.   And what work did you do in analyzing the sales reports looking at what these slabs actually sold for?

A.   I looked at all of the sales of all of the slabs, slab by slab, for both Vivid Texas and Vivid North Carolina.

Q.   And did -- Vamsi's expert, Mr. Burns, did he do that work?

A.   He never did.

Q.   Did -- Mr. Robinette who did the appraisal that was used in the freeze-out transaction, did he do that work?

A.   Never did.

Q.   And so what -- what kind of -- what consequence are those failures to do the work by Mr. Burns and Mr. Robinette in your opinion?

A.   Mr. Robinette did not verify whether what Vamsi was telling them was true.  So he is basing his adjustments based on exactly how they were always doing it.  He never -- he didn't change it.  And from there, Mr. Burns, who is the valuation expert for Vamsim, says that Robinette's evaluation of the inventory was proper and was fine and thus bases his valuation of the business on that lower number as well.

Q.   And do you agree with that?

A.   No.  It -- it -- it falls apart based on what we're looking at here and what we're about to look at with the sales.

Q.   Right.  So let's -- let's turn to that.  Let's look at illustration 8.  This is a table that you prepared?

A.    It is.

Q.    And -- and tell the jury what -- what we see here.  Is it relevant to the sales that you noted in your exchange with the Judge?

A.    So our earlier schedule that looked very similar to this was the inventory that was on hand at the end of 2017 by year.  So then I wanted to sit -- to figure out, well, of that inventory that's on hand, how did it sell just in 2018 in the following 12 months.  And so this is a represent- -- this is a summary of all of the sales of the inventory that was on hand in 2017, sold in 2018 alone.

Q.    And so let's look at 2016 in particular and -- and explain to the jury what -- what we see there in terms of the sales of the slabs that were written down.

A.    So remember, the left-hand side is just the year that they had purchased that inventory, meaning it's been in the warehouse since that time.  And if we scroll into 2016 --

THE WITNESS:  I'll just give him one second.  There you go.

A.    So if we scroll into 2016, they sold 1,689 slabs in 2018 that had been purchased in 2016.  So these slabs are about two years old.  They sold those 1,689 slabs for $1,071,996.  They put on the -- on the books in QuickBooks, those very same slabs had a value of just $13,865.

Q.    So the -- the 1,689 slabs, how much did they actually cost

to -- to acquire?

A.    Those -- those had a book value, an actual landed cost value, of $693,272.

Q.    And they wrote them all the way down to 13,000?

A.    They wrote them off to 13,000.  So their actual gross profit that year on those slabs should have been 98.71 percent --

Q.    And what --

A.    -- basically everything they collected.

Q.    And what does that say about the validity of the -- of the write-downs, Ms. Couch?

A.    When you go back to the write-downs, you can clearly see that these slabs had value despite the fact that they were two years old, and that the write-downs were improper and had no -- they were improper.

Q.    And at -- at what point in your review of these records did you see, if ever, the Vivid entity shop being able to sell slabs for a profit?

A.    So if we look at this schedule -- and I -- I have some other for other years -- it looked like in year five the inventory -- not only was there not very much left of it, but it was starting to sell for what we call a negative gross margin, meaning it was selling for less than cost.  So that's why I said earlier that I would have proposed writing off inventory that was five years old or older or having a reserve

for those, but not for anything older than that -- or excuse me, newer than that.

MR. COBLE:  And if you'll grab the -- just the 2008 through 2012 inventory -- three columns there.  Yeah.

BY MR. COBLE:

Q.  I mean, what sort of volume are we talking about relative to the total number of slabs where they were unable to sell above cost?

A.  I think we have 14,000 total slabs sold here.  I think -- but you can see that those earlier slabs is, what, less than 50 were sold and for very low amounts.  So these are -- if you look at their total sales for any given year, these are minuscule numbers in terms of how it relates to the overall financial statements.

Q.  One of the things that struck me yesterday that we heard Vinay say, the suggestion that stone slabs go out of fashion like clothes.  Are we seeing any indication of that in these records?

A.  I see no indication of that whatsoever in their financial records or inventory or their sales records.

Q.  And did you look at other years as you did here in this chart?

A.  I looked at every single year I was given.

Q.  Is that all detailed in your reports?

A.  It is.

Q.   And was the findings for those other years consistent with what you saw here?

A.   They're very consistent, almost exactly the same.

Q.   Then were -- the write-downs were -- in your opinion were improper?

A.   The write-downs were improper every year.

Q.   All right.  Let's look at one -- one final set here on this point.

          MR. COBLE:  Let's look at Exhibit P-4.  And let's just grab the bottom portion, the left bottom portion of this with Taj Mahal.

BY MR. COBLE:

Q.   What -- what is called the Taj Mahal?  What are we looking at here?

A.   So Taj Mahal is what, I believe, they would call a color or a type of slab.

     (Plaintiffs' Exhibit Number 4 is identified.)

BY MR. COBLE:

Q.   And what did we -- is this an inventory record that you received from the Vivid entities?

A.   Yeah.  So this is coming from their ERP system.

Q.   And -- and does each row correspond to a specific slab?

A.   Yes.  So that second column -- we have the Taj Mahal, which is the color or the type of slab.  Then we have the slab number.  It's their identification number like an inventory

control number, then the size of the slab, and then the date it came -- that they procured it or it came into the warehouse.

Q.    And what are the numbers on the right?

A.    The right-hand side was the written-down value of those slabs.  So --

Q.    So --

A.    Yeah.  Go ahead.

Q.    Continue to explain what we see, then, with that sort of cascading downward number.

A.    I believe this is the 2019 inventory report, and so you can see the inventories -- these Taj Mahal slabs that were purchased -- or received in October of 2019 were worth $1,100. But if we go up above to the year prior, December 2018, they're saying that those same slabs are only worth $28.  What struck me was, if you look at 12/28/2018, you have a slab worth $28.58, but then a slab that was -- was received, like, two weeks later in -- January 3rd of 2019, is worth $554.  So this is a granular example of how they were writing down each of these slabs.

Q.    And did you in your analysis look to see how these actual slabs, the various slabs we're looking at here, wound up selling?

A.    I did.

Q.    All right.  So let's look at illustration 9.  And did you prepare this based on your analysis of the sales records for

the Vivid NC?

A.    Yes.  So I traced each of the slabs we saw in the previous -- in the Taj Mahal.  I traced each of those to the sales records to see what they sold for.

Q.    So the slabs that they had written down to 23 and $26 because they were slightly over a year old, how much did they sell for?

A.    Over $2,200 per slab.

Q.    And was there any difference in sales price among that group of slabs from those that were acquired in October of 2019 back to December of 2018?

A.    No.  If we scroll in on the first set of numbers which says sales price that Cosmos charged to their customers, we can see that each and every single one of those slabs sold for approximately $2,200 or more.

Q.    Irrespective of when it was purchased?

A.    Irrespective of when it was purchased.  The -- the -- the small numbers on the right-hand side are its age.  So 2.2 means over two years old.  1.4 means approximately 18 months old, maybe 16 months old, and on down the line.  And so we can see that those slabs -- for example, up above the first line $26 is what they paid Prasad for that slab.  They were able to sell it for 20 -- Prasad bought it for $1,300, and the Cosmos entities were able to sell it for 2,200.

Q.    So what does this analysis say as it relates to the issues

in this case, Ms. Couch?

A.   This is just an example of the slab-by-slab detail, the sales detail.  So now we've got inventory records and sales records that do not support the financial statements or the QuickBooks.  And so when you've got data like this, and lots of it, and it doesn't support the financial statements, it means the financial statements are wrong.  It means the financial statements need to be fixed.  And it means that Prasad was underpaid for his value in the Vivid entities.

Q.   All right.  Let's look now at your sixth opinion going back to the illustration for -- you say Prasad suffered post retail damages.  What -- what are you referring to there?

A.   What I'm referring to there is the example we saw with the Taj Mahal where Vamsi and the others purchased slabs for pennies on the dollar and sold them for thousands of dollars each, and so they benefitted from that windfall while Prasad was totally frozen out of all of that.

Q.   And so the -- this -- actually, let me ask this first.  If we look at Taj Mahal, is that a unique phenomenon with respect to that particular color of slabs in your analysis?

A.   No, it was not.

Q.   And what did you see when you looked across the -- the range of colors and slabs that were purchased?

A.   So we looked at over 100,000 lines of data, of sales data, and you see the same thing over and over again.  It doesn't

matter the color or the age.  The slabs are selling at -- at -- at very healthy gross margins all the way through that five-year period of time.

Q.   And if we'll go back to -- to nine, the one we were just looking at, make sure that we all understand what you just said about how this relates to the freeze-out transaction and why we're here.

A.   Okay.

Q.   Which figures -- which column was used to price Prasad's share in the freeze-out transaction?

A.   So the -- the -- I'll call it the $26 column, but the column that says "Written Down Value," or the lower numbers, that's the price Prasad was paid for the inventory and -- and really his shares in the company.

Q.   And then were -- all of these particular slabs that we're looking at, were they all sold after the freeze-out transaction?

A.   Correct.

Q.   And so they were all sold at the 2,100 to 2,500 price --

A.   Correct.

Q.   -- despite being written down in some cases to 26 or $28?

A.   Correct.

Q.   And did Prasad have any -- did he share at all in the -- the -- the benefits of those sales?

A.   He did not.

Q.   And who did benefit from those sales?

A.   Vamsi, Vinay, and Rohit.

Q.   And did Mr. Robinette or Mr. Burns take any of the analysis that we've just walked through into account in either the -- the -- the report that Mr. Robinette prepared before the freeze-out transaction or the reports that Mr. Burns prepared in this case?

A.   They did none of the detailed work at -- whatsoever.

          MR. COBLE:  So let's look now at Exhibit P-4 --

          Actually, I'm sorry.  Your Honor, let me move into evidence Exhibits P-198 and P-4.

          THE COURT:  Received.

     (Plaintiffs' Exhibit Numbers 4 and 198 are received.)

BY MR. COBLE:

Q.   Let's look at Exhibit P-476.  Is a table that you prepared as part of your assignment in this case?

A.   Yes.

     (Plaintiffs' Exhibit Number 476 is identified.)

BY MR. COBLE:

Q.   And let's grab just the top portion.  Tell the jury what we're looking at here.

A.   It's a lot of numbers, but this is my reconciliation of the inventory according to the accounting records as compared to the inventory in QuickBooks on the freeze-out date.

Q.   And so then to sort of -- to cut to the bottom line, is

after the freeze-out transaction date for Vivid NC, what was the write-down?

A.    The write-down was the largest I had seen to date.  It was -- 47.81 percent of the inventory was written off the books on that date.

Q.    So for purposes of pricing Prasad's share that was taken, the numbers that were used said that the inventory was worth about half what it was paid for?

A.    That's correct.

Q.    All right.  And what about the Vivid Texas?

A.    The same.  It was one of the larger ones in Vivid Texas that I had seen, and on the date of the freeze-out transaction, which was December of 2020, they wrote 41 percent of the inventory value off the books before they calculated his share.

Q.    And in terms of pricing the value of his share for Vivid Texas, they treated the inventories as if it were worth a little less than 60 cents on the dollar relative to what it was paid?

A.    Correct.

Q.    And in your professional opinion, are either those numbers supported at all in the material that you reviewed?

A.    There is no basis for these write-downs that I've ever been provided.

Q.    And in your opinion, do they comply with accounting rules?

A.    They break every single accounting rule I've ever learned.

Q.   And so what was the consequence of that?

A.   Consequence of that is the book value of the balance sheets of the Vivid entities are undervalue primarily because of this inventory issue we're seeing and Prasad was underpaid.

Q.   And who benefitted from the underpayment of Prasad?

A.   Vamsi, Vinay, Rohit.

Q.   Now, did you say about the calculated adjustments in your professional opinion needed to be made in light of these broken accounting rules and improper write-downs?

A.   I did.

Q.   And were the records that you reviewed adequate for you to arrive at those adjustments that you say should be made to those financial statements?

A.   Yes.  Once we received them and put them all together, I would say they were.

Q.   And were -- the adjustments that you say should be made, were they calculated in accordance with accepted accounting principles for others in your field?

A.   Yes.

Q.   So let's look at those.  If we would look at Exhibit 505, is that a document that you prepared?

A.   Yes.  This itemizes all of the adjustments that need to be made to the Vivid NC books.

     (Plaintiffs' Exhibit Number 505 is identified.)

BY MR. COBLE:

Q.   And so let's start with inventory.

           MR. COBLE:  If you'll just grab the -- the number at the top.

A.   There's two lines -- there's two lines there.

BY MR. COBLE:

Q.   I'm sorry.

A.   Yep.

Q.   What -- what was the total -- let me just ask you.

A.   Yeah.

Q.   What was the amount of the inventory adjustment that should be made to Vivid NC?

A.   So it's my professional opinion that Vivid NC's inventory needs to be increased by 4.1 million.

Q.   And let's now look at Exhibit 476.  I'm sorry.  486.  That's my fault.  And did you do the same thing with respect to Vivid Texas?

A.   I did.

     (Plaintiffs' Exhibit Number 486 is identified.)

BY MR. COBLE:

Q.   And what inventory adjustments should be made to Vivid Texas in your professional opinion?

A.   For inventory, my proposed -- my opinion is that the inventory needs to be increased by $1.8 million.

Q.   1.8 million?

A.   That's correct.

Q. And is -- the 4.1 million inventory adjustment for Vivid NC and the 1.8 million adjust- -- inventory adjustment for Vivid Texas, why -- why -- why are you saying that those need to be made?

A. Those need to be made because the inventory was improperly devalued, and those -- that those values need to be brought back onto the books on the -- on the freeze-out transaction dates so that a proper valuation can be performed.

Q. And was -- to your understanding, was a proper valuation done in this matter after the corrections that you say should be made had been made?

A. Yes. It's my understanding that Mr. Wilhoit -- he based his valuation based on the adjusted numbers.

Q. And that's another expert of Plaintiffs?

A. That's -- yes. That's another expert.

Q. And we'll get to him in -- in just a bit. Your adjustments, by the way, that 4.1 million and the 1.8, do they take account for inventory over five years that you say may truly be obsolete inventory?

A. Yeah. So I have an adjustment of approximately eight percent of the total inventory value sort of baked into that number to -- to account for truly obsolete or slow-moving inventory.

Q. And so were there other adjustments that you recommended in addition to inventory adjustments?

A.    There were.

Q.    And without getting into the -- sort of the weeds of that, explain to the jury the nature of those other adjustments.

A.    So there was a company called IGM Surfaces.  Vamsi, I understand, was the sole owner of that.  He was transferring slabs to himself without paying for them; or if he was paying for them, he wasn't paying for them on time, and/or he wasn't paying for them at a -- a -- at a fair market value that we could see the regular slabs were selling for.  So I am proposing adjustments to those transactions to bring them back in line with a third -- with a -- what we call a third-party transaction figure.

On just days -- just days prior to the freeze-out transactions, they sent money to themselves.  Vinay, Vamsi, and Rohit sent money to themselves to the tune of approximately $330,000.  I call those preferential payments to partners, and so I'm adding those back in as well because those have the effect of reducing the book value.  So the inventory, the -- the IGM transactions, and the preferential payments of partners are all in my -- my adjustments for Vivid NC and Vivid Texas.

Q.    And are -- those other adjustments, are they all laid out in detail in your reports?

A.    They are.

Q.    All right.  And so just to the -- the grand total here in Exhibit 486, which is Vivid Texas, what's the total aggregate

amount of adjustments that you say need to be made?

THE WITNESS:  So if we could scroll in on that yellow number, the yellow line.  Thank you.

A.   So for Vivid Texas, my total proposed adjustments -- so this is inventory and everything else -- is $3,104,353 to be added back to the book value of Vivid Texas on December 31st, 2020.

BY MR. COBLE:  And then if we go back to Exhibit 505.

BY MR. COBLE:

Q.   And what about for Vivid NC?

A.   For Vivid NC, again, this is baking in all of the rest of the numbers we just briefly spoke about.  I'm -- it's my professional opinion that the adjustment should be $4,689,221.

Q.   In your professional opinion, are the analysis of these adjustments that you say need to be made immaterial?

A.   They're very material.

Q.   And what does that mean to -- tell the jury what that means.

A.   Material is an accounting term that indicates that if a financial statement is materially misstated, it could change the nature of somebody's decision making on those financial statements and certainly a business valuation.  So each of these numbers is technically material to the financial statements of Vivid Texas and Vivid North Carolina.

Q.   There's another way to say that.  Do these changes really

matter?

A.   They really matter, yes.

Q.   Let's -- let's finish out, Ms. Couch, with your third opinion, which was that the freeze-out transactions were regular.

        MR. COBLE:  And as we move to that, Your Honor, I'll move Exhibits P-476, 486, and 505 into evidence.

        THE COURT:  Received.

    (Plaintiffs' Exhibit Numbers 476, 486, and 505 were
    received.)

BY MR. COBLE:

Q.   What would you mean by the freeze-out transactions would be irregular?

A.   The freeze-out transactions were irregular, because as I testified yesterday, there was no financial harm that you could see on the books.  In fact, you see the opposite.  You see growing revenues.  You see debt being paid down.  You see growing book values.  You see more purchases of inventory.  You see all of the opposite things financially than what you would see in a distressed company or a company that had to do this.

        And so in my professional opinion, the only reason to do this was to remove Prasad out of the equation and financially benefit Vamsi, Rohit, and Vinay.

Q.   So if they were benefitted, who was wronged?

A.   Prasad.

Q.   And let's look at Exhibit P-251.  And let's go down to the second page and look at the email from Vamsai up top.  Is this a document that you reviewed?

A.   Yes.

     (Plaintiffs' Exhibit Number 251 is identified.)

BY MR. COBLE:

Q.   And -- and without going into, you know, reading a lot of words here, can you explain to the jury what -- what we're seeing here as it relates to your conclusion that this transaction was intended to harm Prasad?

A.   In this transaction, Vamsi is concerned about an initial balance sheet that he had seen and that that initial balance sheet would result in too high of a price paid to -- to Prasad.

Q.   And so what happens next if we go up to -- is that -- is that what we see at the bottom, it's going to be a lot -- can we be more cheaper, is that the reference there the --

A.   Correct.  Are you in paragraph 2?

Q.   Yes.

A.   Correct.

Q.   Yeah.

A.   He -- yes.  So that whole paragraph, he's talking about the price being too high.

Q.   And then looking for a cheaper --

A.   Right.

Q.   -- for the -- for the freeze-out transaction.

A.   This is correct because he's emailing the attorney related to the freeze-out transaction in this email.

MR. COBLE:  And then let's go to the first page of that and -- and grab the -- the email -- or the paragraph down at the bottom, the last valuation.

BY MR. COBLE:

Q.   And -- and how did that response bear on the -- on the point you just made?

A.   So the attorney writes back.  So the -- she gets a new version of the balance sheet a little later after the one she'd already received.  And she says the -- the last valuation -- oh, I'm sorry.  Maybe I'm reading the wrong email.

MR. COBLE:  Let's go -- I'm sorry.  It's one paragraph above that one, Keith.

A.   So there's a portion of this email in which she says:

"I don't -- your -- your inventory went down by a million dollars.  What happened in this short period of time?  How are you going to answer the questions to Prasad?"

So she is responding back saying why did the inventory go down even further and what are you going to ask -- what is Prasad going to say when he sees this?

BY MR. COBLE:

Q.   Okay.  I apologize.  I -- I think we -- I directed you to the wrong paragraph.

A.   Sorry.  Yeah.

Q.   So in -- in terms of Vamsai's email that we looked at first, how does that relate to the -- the point that you're making here about the transaction being irregular?

A.   So the transaction's irregular because it appears that they are trying to get to a lower number to pay out Prasad and force him out.

Q.   And so can you summarize and -- to sort of finish off here?  Ms. Couch, can you summarize what that -- what that means in terms of your opinion here as it relates to the -- to the transaction -- transaction at issue?

A.   There was no -- there were no financial markers that would have required this transaction to happen.  They used the lower numbers and even lower numbers than they had ever used before to price Prasad out.  And they underpaid him and harmed him, in my professional opinion, by millions of dollars.

Q.   Thank you, Ms. Couch.  That's all.

        MR. COBLE:  Actually, I'm sorry.  Your Honor, we move Exhibit 251 into evidence.

        THE COURT:  Received.

    (Plaintiffs' Exhibit Number 251 is received.)

        MR. COBLE:  Those are all the questions I have.

        THE COURT:  Any cross?

        MR. PARRY:  Yes, Your Honor.

CROSS-EXAMINATION BY MR. PARRY:

Q.   Ms. Couch, to paraphrase your criticisms of the Vivid entities books, they don't relate to practices that just started around the time of these transactions in 2020, do they?

A.   That's correct.

Q.   In fact, your very first opinion in this case is that the books and records of the Vivid entities, in your view, aren't reliable to use to form an opinion of the value of the entities of the older assets at any given point in time between January 2015 and December 2020.  Is that right?

A.   That's correct.

Q.   For example, you'd agree from your review of materials you describe the Vivid entities have been writing down the value of aged inventory in the way you saw since at least 2015.

A.   It appeared so, yes.

Q.   You heard Prasad testify yesterday even by his account he had full access to the whole system prior to 2017, right?

A.   Correct.  That's my understanding.

Q.   And, in fact, you testified before you saw documentation in your review that Prasad knew about the practice of writing down inventory even way back then.

A.   He knew that they were what they call depreciating or writing it down.  I don't know to what extent.

Q.   And you would agree that at least some of the Cosmos entities in which Prasad was involved per your review began writing down the value of aged inventory as early as 2014?

A.   I would not have specific knowledge of the -- those earlier points in time for Cosmos.

Q.   You didn't testify before that you would agree at least some of the Cosmos entities began writing down the value of aged inventory in 2014?

A.   In -- not in detail.

Q.   I'm sorry.  I'm not following you.

A.   I'm not following your question.

Q.   Let me --

          MR. PARRY:  If I can approach, Your Honor, can I hand her a copy of her deposition?

          THE COURT:  Yes.

BY MR. PARRY:

Q.   Ms. Couch, I'm gonna give you a copy of your deposition that you gave in this case in January of 2022.

A.   Okay.

Q.   Turn with me, I believe, to page 145.  Are you with me?

A.   Are you on 145?

Q.   145 beginning on line 24, are you with me?

A.   Yes.

Q.   So the question posed to you in your deposition was -- was this:

          "So based upon your previous testimony you would
     agree that they -- at least some of the Cosmos services
     began writing down the value of aged inventory in 2014 and

Vivid entities did it beginning of 2015.  Is that -- is that correct?"

A.    That -- that -- that's what I testify to.  That's correct.

Q.    And you said, "It appears so, yes."

A.    Correct.

Q.    So these downward inventory value adjustments you've been describing began years before the two transactions at issue; that's what you saw?

A.    I didn't analyze the Cosmos entities in detail, but it did appear that they were occurring at least as early as 2015 and maybe even as early as 2014, according to this testimony.

Q.    And that's five or six years before the transaction where Prasad was brought in and bought out, right?

A.    That's correct.

Q.    And none of the emails you reviewed in your email -- in your -- in your review of correspondence, none of those you saw Prasad objecting in any way to the practice, correct?

A.    Prasad was not on the majority of those emails at all.

Q.    I'm asking you if any emails that you saw that involved him did he object to the practice.

A.    I wouldn't say that he objected.  He questioned it.

Q.    Well, let's take a look at --

        MR. PARRY:  If I could, Your Honor, approach with Defendants' Exhibit 31 marked for identification.

BY MR. PARRY:

Q.   Defendants' Exhibit 31, Ms. Couch, was one that you were asked about in your deposition that we just looked at a moment ago.

A.   Correct.

Q.   And in this one, we're looking at an email exchange in December of 2015.  Is that right?

A.   That's correct.

     (Defendants' Exhibit Number 31 is identified.)

BY MR. PARRY:

Q.   And at the bottom, we've got Vamsai writing to Nun [phonetic].  You understood that to be Prasad, right?

A.   I do.

Q.   You -- you agreed in your deposition that this email we're looking at from December of 2015 shows that Vamsai and Prasad were writing down inventory even prior to that year, correct?

A.   Yes.  They are -- they are talking about the -- what they call the depreciated inventory as of 2014.  Yes.

Q.   Correct.  And in this message, the approach reflected here in the sense that they rely on the age of the inventory and then picked a percentage for the time period, that's similar to the approach the Vivid entities used, correct?

A.   Correct.  They are talking about -- they're writing it down less.  You know, anything prior to 2014, they're depreciating by 90 percent instead of 98, and then they're depreciating the current year items by 50.

Q.   But you agree that the approach of those substantial discounts of items even within the same year, that was an approach they were talking about and using as far back as December 2014?

A.   It does appear so, yes.

Q.   And Prasad was involved in that communication that you looked at?

A.   He was.

Q.   And you didn't see him anywhere say, "Hey, wait.  We shouldn't do that."

A.   I do not.

Q.   In fact, you saw other emails, did you not, indicating Prasad's knowledge that there was discussion about inventory adjustments?

A.   There were a few.

Q.   And in none of the emails you saw in which Prasad was copied on communications about doing exactly these kinds of adjustments, you never saw him object in any way, did you?

A.   Correct.

Q.   Now, Ms. Couch, you've also -- you mentioned you did several reports in this case.  In -- in your most recent one, you acknowledge that you made some errors that needed correcting, right?

A.   I did.

Q.   And you agree that those errors changed the value of your

proposed adjustments, right?

A.   They did.

Q.   And one of those mistakes alone was a mistake of more than $643,000.  Is that right?

A.   It was.  I transposed a number.

Q.   Transposed, what does that mean?

A.   I transposed a number.  I took a number from one spreadsheet, and when I entered it into the second spreadsheet, the -- the finger slipped.

Q.   And that finger slip resulted in you understating Vivid NC's reported gross margin, correct?

A.   That would be correct.

Q.   Because you overstated Vivid NC's reported cost of goods sold by over $640,000?

A.   That's correct.

Q.   And that also caused you to overstate the proposed inventory adjustment by the same amount, more than $640,000?

A.   That's correct.

Q.   That error was pointed out by Mr. Burns?

A.   It was.

Q.   And you agreed with him and came back and fixed your calculations, right?

A.   I did.

Q.   Now, sticking with that last report, you also took issue in your most recent report with Mr. Burns' claim about the size

of your inventory discounts compared to landed cost.  Is that right?

A.   That sounds familiar.  It's been a little while since I've read that report.

Q.   And landed cost is a term we've seen.  What does that mean?

A.   So landed cost is the -- we've -- you might have seen that.  That's the -- that's the cost that the Vivid entities had in their ERP system that to my understanding takes into account the value or the price they paid for the slab and the freight and some of, I think, the customs charges.  I think there's a few things that kind of get added on to the price of the slab.  And those numbers are the landed cost value.

Q.   And Mr. Burns had said -- and he's Vamsai's expert, right, that looked at your work?

A.   That's correct.

Q.   And he had said your opinions resulted in discounts to landed costs of only 5.7 percent and 0.3 percent for Vivid NC and Vivid Texas respectively.

A.   He said that, and I totally disagree with him.  I have no idea how he came up with that number.

Q.   Right.  You said --

         THE COURT:  We're going to take a recess at this point.

         (A recess was taken at 11:14 a.m. and proceedings resumed

at 11:35 a.m.)

THE COURT:  Please continue.

BY MR. PARRY:

Q.   Ms. Couch, when we left off, we were talking about Mr. Burns' criticism of you with regard to the discounts he said you came up with relevant to landed costs.  He said 5.7 percent and 0.3 percent were the two.  Do you remember that?

A.   He did say that.

Q.   And you said he was flat out wrong about that, right?

A.   Correct.  And in my -- my fifth report in September, I create -- I made calculations to show that I was wrong.

Q.   Yeah.  Well, let's look at those.  You've got it up there, I think, in the books Mr. Coble gave you.  It's P-503.  And I think the table you were talking about is on page 9, but let me know.

A.   503?

Q.   Yeah.  503.

A.   I only have a 489 and a 505, sir.

Q.   You don't have a 503?

A.   No, sir.

Q.   Okay.  See if I can --

MR. PERRY:  Your Honor, can I approach?

THE COURT:  Yes.

BY MR. PARRY:

Q.   Ms. Couch, Exhibit Plaintiffs' 503, I believe, is the

September report you were just referring to.

A.   Okay.

Q.   Is that right?

A.   Correct.

     (Plaintiffs' Exhibit Number 503 is identified.)

BY MR. PARRY:

Q.   And I was looking at page 9, table one, which I think is the one you were just telling us about.

A.   Correct.

Q.   So if I'm reading right in your table here in your -- in your most recent report, you claim among other things that you were not proposing a discount of 0.3 percent for Vivid Texas like Mr. Burns said.  Instead, it was over 25 percent.  That's what you came up with, correct?

A.   According to this table, correct.

Q.   Right.  And in that table to get to that 25 percent that you said showed Mr. Burns was wrong, you started with a total inventory for QuickBooks for Vivid Texas of $1,699,983.  Is that right?

A.   That's correct because that's what's in QuickBooks.

Q.   Okay.  Keep that number handy.  Do you have your original report, Plaintiff's 462?

A.   It's not in this book.

Q.   All right.

          MR. PARRY:  Your Honor, if I can approach.

BY MR. PARRY:

Q.   Ms. Couch, Plaintiffs' 462 is the report, the first one, you issued, I think in December of 2021.  Is that right?

A.   It is.

     (Plaintiff's Exhibit Number 462 is identified.)

BY MR. PARRY:

Q.   All right.  So we looked at the total inventory value from your new report at 1.7 million.  If we look the -- at your original report, look with me on page 25.

A.   Okay.

Q.   Page 25 of your report, are you with me?

A.   I am.

Q.   And there's a table five there where you put out the inventory values as of the dates of the transaction additionally.  Are you with me?

A.   I am.

Q.   Okay.  So in that one, you say in your report that the total inventory value for Vivid Texas was 4.406 --

A.   I --

Q.   -- correct?

A.   I did.

Q.   And the total inventory right now is $1,699,983.  Is that right?

A.   That's what this says.

Q.   Right.  And so the 1.699 million that you used as a total

inventory for QuickBooks in your latest report was, in fact, a much lower number of the inventory write-down.  Isn't that correct?

A.   It's the same number, sir.

Q.   Right.  The inventory write-down is 1.7 million, correct?

A.   Correct.

Q.   And in your table one in your original report, you're saying that is the total inventory for QuickBooks, which is 1.7.

A.   Well, that's -- you have to understand that the balance sheets for the Vivid entities on the transaction dates are a disaster.  So if you look in there, it -- it -- it is.  It's $1.6 million.

Q.   Well --

A.   We -- I could go get QuickBooks.  We could see it.

Q.   Yeah.  Maybe we'll look at that in a second.  If -- you were able to figure it out in your first report.  In table five you said the total inventory you're taking account of that write-down is 2.7 million, right?

A.   So I say total inventory value 4.4 minus the write-down with the net being 2.7.

Q.   Right.

A.   Which is very similar to the total slab inventory value here, right?

Q.   Well, if the total inventory value were 2.7, wouldn't that

be one point -- a little over a million dollars more than you said it was in your latest report?

A. I -- I'm sorry. I really don't understand your question.

Q. Let's look at your latest report. Don't you in your table conclude that Mr. Burns was wrong about the percentage? You say the total inventory, not the total inventory write-down, but the total inventory was 1.699 million.

A. I say that that's what was in QuickBooks, correct.

Q. And then over in your other report, you say that that's the amount of the write-down, not the total inventory value.

A. That's correct.

Q. And you say in your other report that the total inventory value is, in fact, more than a million dollars more than that.

A. Where do you see that?

Q. 2.7 million is more than -- a million dollars more than 1.699, right?

A. It's -- it's about one million exact.

Q. Right. And so isn't it fair that table one in your most recent report understates the total inventory for QuickBooks by a little over a million dollars?

A. I would have to go back to QuickBooks to verify what you're asking me.

        MR. PARRY: Your Honor, if I could approach.

BY MR. PARRY:

Q. Ms. Couch, I'm going to hand you for identification what's

been marked as Defendants' Exhibit 452.  Sorry about that.

Now, is Defendants' 452 a printout of numbers from QuickBooks?

A.   No.  Absolutely not.  These are the printouts directly from the inventory reports.

(Defendants' Exhibit Number 452 is identified.)

BY MR. PARRY:

Q.   Okay.

A.   That's what 452 is.

Q.   And so is this part of what you've reviewed in your analysis?

A.   This -- yes.  So the inventory reports were part of what I reviewed, but this is not QuickBooks.

Q.   Okay.  And at -- the bottom line of this inventory report shows a number of what for the total inventory value as of this day?

A.   This shows a written-down value of 2,000,706.

Q.   And that matches up with what you said was in your original report, correct?

A.   That's correct.

Q.   And, again, more than a million dollars than you -- more than what you said it was in your most recent report?

A.   That's correct.

Q.   So is that another big mistake?

A.   It's not a mistake as I sit here today.

Q.   It's not a mistake to put inventory write-down which is a

million dollars lower in for inventory value?

A.    It is potentially an error.  But, again, I -- I -- I would need to go back to QuickBooks to understand.  You're showing me the inventory report, not what QuickBooks says.  So QuickBooks is totally different from what these reports say.

Q.    Let's look back at your original report, Plaintiffs' 462 --

A.    Okay.

Q.    -- and Exhibit B-H.

A.    I don't have exhibits --

Q.    You don't have --

A.    -- attached to this, sir.

Q.    -- exhibits.  I'm sorry.  All right.  Do you know --

      Ms. Couch, if you were to correct the total inventory number on your table one in your most recent report, wouldn't that make the discount percentage go way down just like Mr. Burns said?

A.    It -- it would potentially reduce it, yes.  I would agree with that.

Q.    And, in fact, wouldn't it show if the accurate total inventory number was in there that your proposed adjustment would result in a premium to cost as opposed to a 25 percent discount?

A.    I would have to go back and verify that.

Q.    Would you agree that that wouldn't make any sense?

A.    I would agree with that.

Q.    Now, in your reports, isn't it true that you also say you made proposed inventory adjustments for Vivid NC -- or excuse me, for both entities based on the transaction dates at issue or inventory dates closest thereto?

A.    Correct.

Q.    But you don't dispute Mr. Burns' contention that you, in fact, calculated your proposed adjustment for Vivid NC at 12/31/19, not February 29th, 2020?

A.    I did because that's the date that Mr. Robinette used, and I needed to be able to compare what was being used to propose the freeze-out date to what was in Mr. Robinette's report.  And had I gone and updated it through February 2020, there would have actually been an additional write-down -- or excuse me, write-up as of February 2020 because of the huge write-off they made on February 28th.

So it's true that I did not go all the way through February, but if I had, I would have actually had an additional adjustment to -- that would be required because of the massive write-offs they did in those two months.

Q.    Is it your position that Mr. Robinette -- that they used Mr. Robinette's number from 12/31/19 for the freeze-out transaction --

A.    It's -- it's my understanding that that was the basis that they were using.  You can see it in the emails.  They're

talking about it in the emails.  Mr. Burns indicates that it was a reasonable inventory value.  So it was important to me to -- to have a delineation.  And, again, because QuickBooks is so messed up on the transaction dates, they're a disaster, that that was a point in time that could be compared from one -- from -- one set of numbers from one expert to -- to my own.

Q.   But you -- you -- if you are incorrect that they used Mr. Robinette's number from 12/31/19, that would be a mistake and assumption in your report?

A.   No.  Not at all, sir, because when you make an adjustment to a balance sheet, it flows through to the future balance sheets.  That's just accounting.

Q.   You'd agree, wouldn't you, that the inventory balance changed significantly between 12/31/19 and 2/29/20?

A.   Did it change significantly?  I don't know that it changed significantly.

Q.   You didn't take account of any change, though, right?

A.   I looked at the inventory as of February 28th, 2020.  But understand that my analysis was based on gross margin.  You could not -- you could not figure out gross margin in 2020 because the books were a disaster.  So I chose to make the adjustment as of 12/31/19, and I could see that if I made an additional adjustment in February of 2020 I would have added additional book value to the books of Vivid NC on that date because they wrote the inventory down to 47.81 percent on that

date.  So my number's conservative because I didn't do what you're indicating potentially I should've done.

Q.   In fact, the total unadjusted inventory balance went down between those two dates by over 800,000.  Isn't that right?

A.   The total unadjusted?

Q.   Yes.

A.   It's been a little while since I've looked.  The total unadjusted might have, but the adjustment went up from 44 percent in December of 2019 to 47.81 percent in February of 2020, two months later.  So even though their inventory had basically gone down from sales and other things, they actually bumped up the amount that they were writing down the inventory and basically removed more value from that inventory than they should have.

Q.   But your conclusions don't take account of the 800,000 or so inventory that went away from sales, right?

A.   But, sir, they would have -- they would have sold.  They would have bought.  They put more slabs on the books that Vamsai had taken in 2019 that were not on the books in 2019.  So there's a lot of things that happened in those two months prior to the freeze-out date that occurred.  But when I went back, because I knew this question was coming, and tried to figure out, well, what would have happened in 2020 if I had made that adjustment, I would have added $260,000 of additional book value to that inventory because of the massive write-offs

they were doing on the date of the freeze-out transaction.

Q.   That's not something you did in any of your five reports in the case?

A.   No, sir.  And that renders my opinion conservative.

Q.   Now, am I correct, Ms. Couch, you don't have any certificates or licensures or other credentials related to business valuation?

A.   I do not.

Q.   You don't do business valuation work, do you?

A.   I do not.

Q.   In particular, you don't render opinions on a company's valuations in cases like this?

A.   I do not.

Q.   And you, likewise, don't have any certificates or credentials that relate to fixed asset valuations?

A.   Not as -- other than it pertains to being a licensed CPA and knowing how to do the accounting for those things, nothing for appraising.

Q.   Not the kind of credentials that Lee Robinette, the appraiser, who was hired in this case has?

A.   Correct.  He has a totally different job than I do.

Q.   You don't have certificates or credentials related specifically to inventory valuation, correct?

A.   That's correct.

Q.   But you do agree you're offering in this case opinions on

the value of the inventory of both Vivid NC and Vivid Texas?

A.   I'm providing accounting opinions to ensure the accounting for inventory is according to GAAP, Generally Accepted Accounting Principles.  I'm basically doing the accounting for inventory.  I'm not proposing a -- a value as an appraiser.  I am proposing how accounting -- what the accounting should look like for that inventory.

Q.   Didn't you testify before in deposition that you were providing an opinion as to the value of the inventory?

A.   I potentially used those words.  But, again, it's -- it's accounting, right?  The value -- it is -- I would agree with my original opinion.  I am providing a value that should be on the books of the Vivid entities for that inventory number for the freeze-out transaction date.  That's accounting.

Q.   So you agree you're providing an opinion on the value of the inventory for both entities?

A.   According to GAAP, yes, sir.

Q.   And you also agree you don't have credentials as an inventory appraiser like Mr. Robinette does?

A.   I do -- I'm not an appraiser.  I'm a certified public accountant.

Q.   And you also agree that your inventory valuations aren't prepared in compliance with USPAP standards, the standards that govern appraisals, correct?

A.   That's correct because I'm not an appraiser.  I'm a

certified public accountant.

Q.   Your methodology didn't come from any appraisal standard guidelines.  Robinette's did?

A.   That's correct.

Q.   Now, you testified about the batch journal entries in QuickBooks a couple of times.  You've testified before you knew that -- you're not aware of any accounting rule or standard or statute or regulation anywhere that requires a company not to do batch journal entries?

A.   Batch journal entries are really rare in a small business, very rare in a small business.  I would say that they would be fine as long as we were able-- Prasad and his experts were able to review the source documents that support those batch entries.  That was the problem, not to mention the fact that the batch entries are -- are entered and changed in QuickBooks too many times to count.

Q.   Well, your answer is a little different from my question.  My question, which you testified to before:  but you're not aware of any accounting rule, accounting standard, statute, regulation anywhere that says doing batch journal entries is improper?

A.   I would say that -- that would be accurate.  But -- but the accounting standard would be that any such journal entries have to be supported by the source documents, and in this case, they weren't.

Q.   You also testified before you have no idea whether your own client in his other businesses uses QuickBooks in the same way with batch journal entries.

A.   That's correct.  I do not know.

Q.   That's not something you asked.

A.   I was asked to look at the Vivid entities and the Cosmos entities -- the new Cosmos entities.

Q.   You're likewise not aware of any appraisal standard that prohibits the practice of writing down the value of inventory based on the date of receipt?

A.   I would not know any specific rules for appraisers, no.

Q.   And, in fact, you -- you testified before you're aware of businesses that have had to write down the value of inventory even though they're successful at moving it?

A.   Correct.  Because it's like a banana, right?  I mean, sometimes I can sell everything else in the grocery store, but I can't sell the bananas.  So there's absolutely times when you have to write down inventory, which is what I'm doing here.  In this case, what they were doing was improper.

Q.   You testified before that it's your belief the CPA firm, Mr. Khatod, a licensed certified public accountant like yourself, he was in on it?

A.   Well, clearly, you can see the emails, right?  You can see the emails that are what I would say extremely problematic. You can see the deposition of Ms. Hicks who's the bookkeeper

who was saying she was -- had problems with the fact that she could not get source documents and was being asked to make these entries, and she was uncomfortable with it.  So I don't know how else to interpret that other than they were making the adjustments in QuickBooks without source documents, and in my professional experience, certified -- reputable certified public accountants don't do that.

Q.  Well, before you leveled that accusation at Mr. Khatod, did you talk to him as part of your review to find out what he knew and what he did?

A.  No.  I'm not allowed to talk to him.

Q.  Did you -- you're not allowed to talk to Mr. Khatod?

A.  That's -- not -- not usually in a litigation setting, no, sir.

Q.  Did you look at a deposition from Mr. Khatod in preparation?

A.  I asked if there was one.  It's my understanding there was not.

Q.  But you don't have any idea of what source documentation Mr. Khatod had as opposed to someone who -- who worked in his office?

A.  I have his emails in which he indicated that he had no inventory control sheets.  So I only have his communications to go on to understand what he did or did not have or what his office did or did not have.

Q.   Were you a party to any discussions between Mr. Khatod and his clients about their monthly books?

A.   I was not.

Q.   And you didn't talk to him before you accused him of fraud?

A.   I haven't accused him of fraud.

Q.   What are you accusing Mr. Khatod of participating in?

A.   I am -- I am indicating that Mr. Khatod -- that in my professional opinion -- and I have been an investigator for the Oregon Board of Accountancy.  And in my professional opinion, this is a -- a potential violation of Mr. Khatod's CPA professional standards, and so I -- in my professional opinion, it's a huge question for him.

Q.   Based on that opinion of yours, did you report him as a fellow CPA?

A.   No, I did not.

Q.   Why didn't you?

A.   No.  It's not my job.

Q.   You testified before the Vivid entities prepared their financial statements at the end of each quarter.  Is that right?

A.   I did.

Q.   And it would it make sense to you, I believe you said before, the Vivid entities wouldn't have adjusted the value of their inventory monthly if they updated their financial

statements quarterly?

A.   I didn't say it didn't make sense.  I just said that they were doing it quarterly as opposed to what Mr. Vinay said yesterday.

Q.   You didn't say it would make sense that they wouldn't have adjusted the value of the inventory on a monthly basis?

A.   Oh.  Are you -- I -- I am so sorry.  Are you asking about a deposition question --

Q.   No.

A.   -- earlier?

Q.   I'm asking about your prior sworn testimony in the case when you were asked if it would make sense that they wouldn't have updated the value of the inventory monthly.

A.   Correct.  I -- I testified about that because they were keeping that in a separate system.  Yes.

Q.   Now, in valuing inventory, you agree that you can consider the time value of money, right?

A.   I think that is a yes potentially.

Q.   And what is time value of money?

A.   Time value money, to put it very simply, is an indication that, for example, the value of the dollar in the year 2000 could get us a lot further than the value of a dollar today, or, you know, just going to buy orange juice right now is ridiculous, and we could buy it for a lot cheaper a few years ago.  So the -- the -- what we can get with our money and -- is

that's -- is exactly that term, the time value of money.

Q.   And you'd also agree that in valuing inventory you would consider the opportunity costs, right?

A.   So you mean -- an opportunity cost, you're talking replacement cost, any --

Q.   I'm talking about the opportunity to sell a different product because inventory is taking up space.

A.   Potentially, yes.

Q.   And you'd agree that you could also consider the carrying costs in value of inventory, right?

A.   Correct.

Q.   What's that?

A.   Carrying costs are -- that goes into the net realizable value method of accounting for inventory.  So carrying costs are those things that cost us money because we have inventory sitting in the warehouse.

Q.   And I believe you testified before you understand that two pieces of stone even from the same quarry don't necessarily look the same.

A.   I would agree with that.

Q.   And there can be differences or flaws or variations even though they come from the same place and the same quarry, right?

A.   That would make perfect sense to me, yes.

Q.   And you're not of the opinion that two slabs of the same

color or from the same brand are always equally valued, are you?

A.   It did not appear that the prices they were charging were wildly different, so I wouldn't have any personal knowledge of that.  But I can only say when I looked at the thousands of slabs and you sort of analyze them by color, like we saw Taj Mahal, you could generally see that the price they were paying for them and the landed cost was very similar and that the price they were then eventually selling it for was pretty similar.  So I wouldn't have any personal knowledge, but it -- it did appear that those numbers, both cost and sales, were very tight based on the color of the slab.

Q.   You'd also agree, wouldn't you, when you're doing lower of cost or market accounting you can do it as a group of goods rather than just a single unit?

A.   So GAAP recommends that you do it by a -- what they would call a item by item or in this case a slab by slab analysis, but that you can aggregate -- you can aggregate your inventory and sort of write off based on the aggregate.

Q.   So you'd agree that you can -- but you can do that as a group rather than as a single unit?

A.   Certainly as long as it does not violate the lower of cost or market rules and fairly represents the value -- the accounting value of inventory.

Q.   Now, you didn't go to any of your clients' other

facilities in connection with your work on this case?

A.    That's correct.

Q.    And, in fact, you didn't visit any granite or natural stone distribution facility as part of your holdings?

A.    That's correct.

Q.    You did pull industry information, didn't you, to try and understand what other stone-related businesses were doing in terms of write-down?

A.    I attempted to.

Q.    You'd agree that when you're doing an inventory valuation it's appropriate to compare it to industry benchmarks to see whether your adjustments are aligned, right?

A.    So I would -- I would agree, yes.

Q.    Now, would you also agree that by accounting for inventory in a way that reduces income but also more than likely reduces the tax liability of all the owners?

A.    Yes.

Q.    And are you aware of Prasad's documented earnings related to your opinions you're offering in this case?

A.    It is my understanding that he's looking to work with his accountant to make those adjustments.  It would not be necessary until which time this case is over, and those adjustments need to be made.  So his tax returns have to flow through from the Vivid entities.  The Vivid entities need to change their tax returns first, because they're reported, I

believe, on a partnership a 1065 -- I can't remember if it's that or an S corp, but meaning the income or loss from Vivid entities flows through to Prasad, Rohit, Vamsi, or their other entities that kind of go up the chain.  So they -- your client needs to fix the tax returns first, issue Mr. Prasad a K1, and then Mr. Prasad can -- can then properly report his income to the IRS in every single year.

Q.   And you talked some about related party transactions. You'd agree, wouldn't you, that related party sales are normal and customary for corporate affiliates?

A.   I do.

Q.   And they might do those sales for reasons like meeting customer needs?

A.   I'm sorry.  I didn't hear you.

Q.   They might do those sales to meet particular customer needs or demands?

A.   Correct.

Q.   Maybe a particular customer wants a particular type of slab they don't have in a location, so you get it from a different one, right?

A.   That might be one reason.

Q.   Or maybe it's easier to source material from a particular location, right?

A.   Might be faster, correct.

Q.   Now, when you were doing your analysis of related party

transactions and we talked about IGM, but at the time of your deposition, you had no idea who DSG was, right?

A.    That's correct.

Q.    Prasad never told you about it before you issued your report talking about related party transactions.  He never told you about DSG?

A.    That did not come up.  That -- it was my understanding -- I was looking at the sales side, not the sourcing side.  And it's my understanding they were sourcing inventory from DSG.

Q.    But you agree that at the time of your deposition, at least, payments to DSG would be related to partner payments if Prasad was an owner or officer of that company?

A.    I do agree.

Q.    But at the time you didn't know if he was or he wasn't, right?

A.    At the time, I was not aware of the DSG relationship, no, sir.

Q.    And so you put in your report an analysis of these related party transactions you had concerns about, and you listed them all out.  You didn't include any Prasad DSG related party transactions in there, did you?

A.    That's correct.

Q.    Have you gone back to correct that table to include Prasad's transactions?

A.    No.  Because it did not -- it did not impact the sales-

related analysis that was going on here.

Q.   Now, you also talked about payments of some 333,000, I think you said, before the transaction.  Do you recall that?

A.   I did.

Q.   And that relates to a company called Covatis.

A.   Yeah, Covatis.  Covatis, yes.

Q.   Now, you'd agree with me that software is a necessary expense for a business?

A.   Yes.

Q.   And you don't know when Covatis software services were provided to the Vivid entities?

A.   It's my understanding that they were providing software services the entire time of my review because you could see the payments that were going there that appear to be related to that piece of the service.

Q.   Have you learned that since your deposition?

A.   I don't recall when I did the Covatis analysis in detail.  And then we had -- I -- was it Rohit's? -- somebody's deposition that indicated what all the payments were for.  So potentially, that came after my deposition.

Q.   But you don't know, do you, if Prasad's other businesses used similar software to the kind that Covatis provided to Vivid?

A.   I don't know who used what software, no, sir.

Q.   And you didn't ask him that either?

A.    Not in that detail, no.

Q.    And you did no research into what this kind of software that Covatis made for Vivid would cost, right?

A.    I only researched what was being paid regularly and normally, and then I looked at the payments -- excuse me, I looked at accounts payable to see if there was any amount due to a Covatis as of the transaction date.  There was nothing on the accounts payable.  And then I looked at the wire transfer information, and the wire transfer information actually says CGM, Cosmos Granite Marble.

So the payments that were made two days or four days prior to the transaction dated issue, and then you can trace to the -- or excuse me, Cosmos bank deposit, it appears that it has nothing to do with software and has everything to do with having cash available to open up at the Cosmos -- the new Cosmos bank accounts.  So it does not appear, sir, that it was for software because it's never been on their books as a payable ever.

Q.    Did you hear my question?

A.    I did.

Q.    My question was, did you do any research as to what this sort of software that Covatis provided would cost?

A.    I did not.

Q.    Do you know if there's other software like it that's used by other businesses in the industry?

A.    It would be my understanding -- most industries that are a distributorship, they're going to have an inventory or ERP software system, some of which might be very technical to whatever they're distributing.  So I would expect there to be software systems out there for distributorships of stone slabs.

Q.    You testified before you don't know what it costs to maintain a system like that?

A.    I testi- -- yeah.  That would be correct.  I would not.

Q.    And you've done no research to see if Covatis was paid an amount that would correspond with market price for its services?

A.    They were being paid every single month or very regularly outside of the payments to Vinay for his wages.  So they were paying something to them for what appeared to be software services.  That's all I know --

Q.    And you did --

A.    -- what they were paying.

Q.    You did no research to see if the amounts paid to Covatis corresponded with market price for the services they were offering?

A.    No, sir, I didn't do that.

Q.    And you have no idea whether Covatis provided software without having to pay up front and were still owed money at the time of the transaction, right?

A.    I did actually do that work, and I looked at the accounts

payable. So when a company owes money to a vendor, it would be set up as an accounts payable. And the Vivid companies have accounts payable where they were listing who they owe money to, and they never -- at one -- at any point in time had an amount due to Covatis ever. So I did try and see if what was being told to me was accurate, and that just didn't simply ring true. They -- they never booked a bill or an accounts payable, payable to Covatis.

And when they made the payment on their wire transfer, they didn't say -- they did -- they usually had an ID and they would say what they were doing it for. They didn't say software services. It says CGM, Cosmos Granite Marble. And you take those payments that leave the Vivid accounts, you get the Cosmos bank account, and guess what? That money lands in that bank account or at least the majority of it.

So I did do -- I did try and figure out if this was for software, and none of the evidence pointed to the fact that it was software. All of the evidence pointed to the fact that this was a preferential payment to the partners, and the majority of it was used to open the new Covet- -- the new Cosmos bank accounts.

Q. You testified, Ms. Couch, that even if the evidence was that the money was owed to Covatis and the amount paid to them was less than it would cost to acquire similar software in the market, you would still find that to be an improper

preferential payment?

A.    Absolutely, sir.

Q.    You talked some about the condition of the Vivid entities and whether they were distressed.  The -- the forbearance agreement between Bank of America and the Vivid entities, that in no way factored into your opinions, did it?

A.    It did factor in, in that I knew that the bank was calling their loan into forbearance, which means they are technically out of compliance with all of the things they agreed to with the bank.  And this is something that happens quite regularly, actually.  And so one of the things I needed to understand was, okay, is this impacting the financial somehow, because, for example, if their line of credit was -- was frozen.

And, again, my financial analysis of the Vivid entities' books show a company that despite being in forbearance had a significant amount of cash from their operations that was made available to them to grow their sales, to -- to pay off their debt, including their line of credit debt, to pay themselves $3 million in 2018, which is when the forbearance agreement happened, to pay themselves $1.8 million of additional distributions in 2019, which is the year after the forbearance.  It allowed for the $333,000 of payments. They were buying very fancy cars.

Gosh, they were -- even though the bank had said they were in forbearance, the financial records indicated that they

were still not only able to operate but that they were able to operate quite successfully. So I would say that it did, you know -- I -- I was aware of it, but the financial records were not showing that that was causing them financial harm.

Q. Do you remember what you said when you were asked that same question when you testified before?

A. No. But I can go back to it.

Q. Look at page 80 of your deposition which you gave in January of 2022, line 3. Are you with me?

A. I'm getting there. Just give me a sec. It says did the -- yes. I said no.

Q. Did the forbearance in any way factor in your opinion you rendered in your report? You answered no, right?

A. Correct. Because, again, the financial analysis that I did indicated that the -- the -- my -- it doesn't change what my -- my -- my prior answer is, right, because the forbearance agreement matches -- excuse me, my opinion here matches what my opinion has been since day one, is that these companies were actually very successful.

Q. And that's your opinion even though, as you testified before, you have no understanding of what the terms of the various forbearance agreements were that they were dealing with?

A. I -- I hadn't -- not specifically, no, sir.

Q. You have no idea if the Vivid entities were able to obtain

financing from other sources.  Isn't that right?

A.   It's my understanding that they -- it's my understanding -- I -- I don't know specifically what they tried to do or what is -- eventually happened, no.

Q.   And you also don't know whether the bank determined they were in default on their loan?

A.   I don't recall.

Q.   And you don't know whether Vivid NC was having difficulty retaining credit?

A.   Retaining credit?  I know that they were out of compliance with their bank loan.  But despite the fact that they were out of compliance with their bank loan, it wasn't harming them financially because they had -- so let me back up.

A bank loan, a line of credit, is something that you use to sort of -- you -- you use it and then you wait for your customers to pay you, and you pay it off.  And you sort of float that money back and forth.  And instead of using your own money, you're using the bank's money, right?

And so what happens when you are in -- what happens when the bank calls your loan is you can no longer use the bank's money, right?  You have to use your own money.  You have to float your own money, and they were able to do that.  But they were not only just able to do that, sir, they were able to do that and generate an extraordinary amount of cash, pay down that line, and, again, pay those distributions.

So understand that the financial outcomes of the Vivid entities, despite the fact that their bank called them into default, was not harming them financially because, yes, it's true they could not use the bank's money. But it didn't harm them because they were -- they had sufficient cash to run their operations, pay themselves, pay for their fancy cars, pay -- pay the Covatis money to go into Cosmos. They did all of that, sir, with their own cash.

Q. Back to my simpler question, though. You don't know if Vivid was having difficulty refinancing its defaulted loan?

A. I understand that they may have had -- they may have had problems refinancing the line of credit.

Q. And didn't you agree before also that in assessing whether a company is distressed or not a factor would be if the company was involved in excessive litigation?

A. It can be a factor. But the question then becomes -- because companies, again, their lines get pulled for different reasons. People go into litigation for different reasons. The question becomes, is that litigation now harming them financially so that they cannot operate their business? So my answer is the same.

Q. But you had no idea at the time you offered these opinions whether the Vivid entities were made parties to any litigation involving Prasad prior to the disputed transactions?

A. Say that one -- I'm so sorry. Say that one more time.

Q.   At the time you issued these opinions, you didn't even know if the Vivid entities had been sued by Prasad prior to the transactions?

A.   I did not know the full extent and history of all the litigation at the time of my deposition.  No, I did not.

Q.   And you also didn't have any idea at the time you issued your opinions whether any of Prasad's other businesses were competing with the Vivid entities at the time of the transactions, did you?

A.   I did not have any understanding of who was compete- -- who was competing with whom.

Q.   Now, you -- you've also offered the opinion that the Vivid transactions were irregular.

A.   I did.

Q.   So let's talk about that for a minute.  At the time of your prior testimony, you said you were not opining that the Vivid NC transaction in any way violated any accounting rule, standard, or principle.  Do you stand by that?

A.   Can you point to where I said that?  Is that in my deposition?

Q.   It is.

A.   Are you talking -- okay.

Q.   Page 107.

A.   Let me read -- if you just give me a sec, let me read the question that was asked of me that day.

Q.   Sure.  Page 107 starting at line 18.

A.   So as I answer to you, or to your colleague, I don't provide legal opinions on whether this transaction or something -- I -- I think I meant this transaction is legal or not.  So that would be an accurate statement.  I was not providing any legal opinions on whether or not this transaction was legal.

Q.   Right.  And I'm -- I was looking further down the page where we talked about your accounting things.

A.   Okay.

Q.   There on page 8 -- or line 18, it says, "Are you opining by saying it's irregular it violated any accounting rule?"

        You said, "No, not specifically," right?

A.   So in terms of the transaction as a whole, I would agree with that.  I did testify to that, and I agree with that.

Q.   And later on, on line 22, "Are you saying it's irregular relative to some accounting rule?"

        Answer:  "No."

A.   The -- the -- the -- the transaction we're talking about in this set of questions, the legality of kicking Prasad out, so I did not -- I was not opining about the accounting irregularities there, right.  The accounting irregulator [verbatim] -- irregularities I'm talking about are the actual books and records, not the transaction itself.

Q.   And you don't know, do you, whether the Vivid NC operating agreement authorized the transaction with the asset purchase

agreement?

A.    I don't -- I -- I -- it's probably been two years since I've read the operating agreement, sir.  So I would not -- as I sit here today, I don't know.

Q.    And you don't know if Prasad was entitled to vote on the transaction, do you?

A.    If he was entitled to vote?

Q.    Entitled to vote.

A.    I'm so -- I don't know.

Q.    You've testified, though, it wouldn't change your opinions that this was not a legitimate transaction even if the evidence was that Prasad was doing things that undermine the ability of the company to continue operating and the operating agreement authorized it.  Isn't that right?

A.    That's correct.  Because in my professional opinion, he -- if that had to happen, he should get paid a fair price for his shares.

Q.    I'm talking about the price you mentioned earlier, the two experts who were hired at the time, ones who weren't being hired for litigation, Mr. Damon and Mr. Robinette.

A.    Correct.

Q.    And with respect to those gentlemen, you testified before you're not here to say either of them failed to perform their professional responsibilities, correct?

A.    I did not say that.

Q.   You did not say that?

A.   I don't -- no.  I -- sorry.  You're correct.

Q.   Okay.  So you're not --

A.   Yes.  Sorry.

Q.   You're not here to tell us that Mr. Damon and Mr. Robinette failed to perform their professional responsibilities?

A.   I'm not a business valuator and I'm not an inventory appraiser in terms of how Mr. Robinette performs his business.

Q.   And Mr. Damon was the one who, not in connection with litigation, but at the time of the transaction valued Vivid Texas, correct?

A.   Correct.  Based on the inventory -- the low inventory numbers he was provided.

Q.   Well, you testified before you don't have any indication that that expert not hired for litigation wasn't provided with all the information he requested, right?

A.   I have no idea what he requested or what he looked at or -- or didn't look at.

Q.   Well, you testified before that you believe Mr. Damon relied on the information appraisers would typically rely on in rendering their appraisals, correct?

A.   That's correct.

Q.   Now, you were critical in your initial deposition of Mr. Robinette saying he failed to do a specific analysis of,

among other things, the movement of inventory via sales or consignment. Do you remember that?

A. I did.

Q. But you also testified you're not aware of any appraisal standards that would have required him to do that, right?

A. It would be my understanding -- because, again, even though I'm not a business valuation expert or an inventory appraiser specifically for litigation or family disputes, I do understand what they rely on, right, and I understand that what clients tell us as professionals and our general responsibilities in understanding whether or not what they tell us is what's really happening. So I -- I -- I can't speak to what their specific responsibilities are.

I -- I can speak to what I believe Mr. Damon probably looked at, but I can say that if a client is telling you that 47 percent of their inventory is obsolete and cannot be sold, one would have to just -- as a professional, as somebody who just understands how inventory moves and how business works and in -- a business that's writing off 50 percent of its inventory as obsolete is a business with problems, right? It's a business with problems.

And so I don't understand as a professional how it's possible that those -- at least Mr. Robinette specifically did not do additional work to just verify what these guys are telling me is true, and that's my testimony on that.

Q.   Do you remember my question, though?

A.   I thought I answered it.  I'm sorry.

Q.   My question was simply, as you testified before, you're not aware of any appraisal standard that would have required Mr. Robinette to do the analysis you are critical of.

A.   A specific slab by slab, I -- I don't know what all the USPAP regulations are.  I just understand generally.  You would expect an appraiser to have done additional due diligence because what he says in his reports or -- doesn't match his end- -- his ending appraisal.

Q.   In fact, you said before it -- it has not been your testimony and is not your opinion that Mr. Robinette was required to separately value each slab.  Is that still true?

A.   That's true.

Q.   Isn't it true, Ms. Couch, that at least one other time you've offered testimony in a case where the judge chose not to credit your opinion or found it uncredible?

A.   Yes.

Q.   That was another case where you were offered to provide a calculation of what -- the alleged loss, right?

A.   That's correct.

Q.   And the judge in that case said he wouldn't put any weight in your testimony.  Isn't that right?

A.   That -- yes, that's correct.  Because I -- my number -- he got very upset because I used the word evidence, and so he did

not like the -- the -- the fact that I used the term, and I indicated that -- it was a criminal case.  I was defending a criminal defendant.  My job was to calculate the loss, because when a criminal defendant goes to jail, it depends on the loss amount.  It's a big factor in their sentencing.

And so myself and the FBI and all of us had a certain level of evidence for a certain period of time where we all agreed on the number.  There was a period of time prior to that where neither the FBI nor myself had documents because those documents had gone away.  And I indicated -- and just so you know, the Government put all of those figures into their loss calculation, and I disagreed.

I said, "Listen, if we're going to send somebody to jail based on stealing money, we should not estimate a certain amount.  We -- we should have the evidence."

And I didn't have the evidence to make the calculation, and that's what I told the Court that day.  And the judge got upset, and he said, "It's my job to estimate, and I can estimate, and I'm going to estimate.  And I'm not going to -- I'm not going to take your opinion," which is his right to do.  And that's what happened that day.  But I did not make the calculation because I did not have the evidence.  I didn't have the documents.  The judge disagreed with me, and he has the right to do what he wants to do in his sentencing.  That's the only time that it's ever happened.

MR. PARRY: No further questions, Your Honor.

THE COURT: Any redirect?

MR. COBLE: No.

THE COURT: Okay. Thank you.

(The witness left the stand.)

MR. ROBERTSON: Your Honor, at this time the Plaintiffs call Michael Watts to the stand.

THE COURT: And I'm just counting up the time that you've used. I hope you're being frugal and pay very close attention to it because this case is going to be over before you know it. Let's go.

MR. ROBERTSON: We'll move as expeditiously as possible.

THE COURT: No. I mean, it's up to you. You can waste it or you can use it efficiently. I could care less.

I have imposed time limits on these lawyers so that they have some discipline and so that they don't abuse the jury by keeping you here for a week or something like that. So if they run out of time, the clock's over. It's like a basketball game.

(The witness, Michael Watts, is sworn.)

THE CLERK: You may be seated in the witness box. Watch your step.

DIRECT EXAMINATION BY MR. ROBERTSON:

Q. Good afternoon, Mr. Watts. Will you please state your

full name for the record?

A.    Aaron Michael Watts.

Q.    Are you currently employed, sir?

A.    Yes.  I'm a self-employed real estate appraiser and consultant.

Q.    And how long have you been an appraiser?

A.    Since 1975.

Q.    Do you hold any licenses, certifications, or designations?

A.    I hold the MAI designation and the SRA designation from the Appraisal Institute.

Q.    What do you have to do get an MAI designation, sir?

A.    You have to do your prepared coursework, your preparatory work.  You have to have 4,500 hours, plus or minus, in gradable of work that has to be reviewed by your peers.  You have to pass a comprehensive examination, which I understand now lasts three days.  And then you are admitted to membership.

Q.    Is that a lot of work?

A.    It took me five years.

Q.    And how many hours of formal appraisal training have you received?

A.    Counting continuing education, which is required by both the Appraisal Institute and the state, right now, it -- it -- it would be an estimate at somewhere between 3,500 and 4,000 hours.

Q.    Now, Mr. Watts, if I use the term "Raleigh property" to

refer to the real estate located at 501 South New Hope Road in Raleigh, North Carolina, will you understand what property I'm referring to?

A.   Yes.

Q.   And if I use the term "Greensboro property" to refer to the property located at 4300 Federal Drive in or around Greensboro, North Carolina, will you understand what property I'm referring to?

A.   Yes, sir.

Q.   Have you appraised property in Guilford County before?

A.   Yes.

Q.   Have your appraised property in Wake County before?

A.   Yes.

Q.   Have you testified as an expert in real property appraisal in other cases?

A.   Yes.

Q.   Have you been recognized by other courts in cases as an expert in real estate appraisals?

A.   Yes.  I have testified in North Carolina Superior Court, federal court, Virginia Commonwealth Court.

        MR. ROBERTSON:  And Your Honor, at this time, Plaintiffs would tender Mr. Watts as an expert in the field of real estate appraisal.

        THE COURT:  I'll accept him as an expert and allow him to express his opinions.

BY MR. ROBERTSON:

Q.   Mr. Watts, when were you hired by the Plaintiffs in this case?

A.   As I recall, it was -- I was first contacted in October 2021.

Q.   And were you asked to provide an appraisal of the value of the Raleigh and Greensboro properties as of January 2016?

A.   Yes, I was.

Q.   Can you briefly explain to the jury the different approaches you can use to appraise real estate?

A.   Basically, in the appraisal of real estate, there are three accepted methods:  the cost approach, which is a process in which you estimate the value of the land assuming it's vacant and then you estimate either the reproduction or the replacement costs of the building.

          In the market approach, you research your data and find properties of -- sales of properties that are similar to this property that you are appraising.  You get the -- then go through a process of making adjustments for items of variance that would affect value and come to a conclusion of value by that method.

          The income approach, you go through essentially the same process, although you find properties that are leased and you compare those properties to the property you're appraising to come to a conclusion as to what their fair market rent would

be.  You then reproduce an income and expense statement and capitalize that income stream into an indication of value.

The three approaches combined with themselves or two of the three, depending on the circumstances, each provide a system of checks and balances, and when you make your comparison, you come to a final conclusion of value for the subject property.

Q.  Now, Mr. Watts, I'm going to put Plaintiffs' Exhibit 519 up on the screen, and I can bring a copy up to the witness stand if you need one.  Can you see the screen, sir?

A.  Yes.  That is mine.

Q.  And is that your appraisal report of the value of the Raleigh property as of January 1st --

A.  Yes.

Q.  -- 2016?

A.  It is.

(Plaintiffs' Exhibit Number 519 is identified.)

BY MR. ROBERTSON:

Q.  Sorry.  So that --

A.  Yes.

Q.  Now, what approaches did you use to determine this value?

A.  I used the market and income approaches to determine the value.

Q.  Okay.  Did you investigate the property by pulling tax records?

A.   I -- I'm sorry.  I couldn't hear your question.

Q.   Did you investigate the property by pulling tax records?

A.   Yes, I did.

Q.   Did you obtain sales data for the area?  Did you obtain sales data for the area?

A.   I'm sorry.  I didn't hear you.

Q.   Did you obtain sales data for the area?

A.   Yes, I did.

Q.   Did you investigate market conditions in the area?

A.   Yes, I did.

Q.   Did you visit the Raleigh property?

A.   I made an exterior inspection of the subject property.

Q.   And why did you only inspect the exterior?

A.   I was instructed not to make an interior inspection.

Q.   What did you --

Well, let's turn to the market approach.  What did you do to analyze the value of the Raleigh property on January 1st, 2016, that's in that approach?

A.   Well, after I made my initial inspection on a subsequent visit to Raleigh after I had made contacts with some of my colleagues and peers in the Raleigh area who provided me with a list of sales and leases, I made a subsequent trip to Raleigh, went by all of the comparables that had been provided to me, came to an -- an opinion of which ones would be useful and most similar to the subject property, and then completed my report

and that map.

Q.   Did you take -- comparable properties, you said?

A.   Yes.

Q.   And you pulled those from a data set of how many comparables?

A.   I initially had -- used it with both the income and the lease comparables from the sale comparables, I had somewhere in the neighborhood of 30 --

Q.   Now --

A.   -- plus or minus, and then I took an entire day and rode by, took a look at them, saw where they were located, made notes on the type of construction, quality of construction, and picked the ones that I thought were most appropriate.

Q.   Now, let's talk -- can you please tell the jury what you did to analyze the Raleigh property using the income approach?

A.   Essentially, the same procedure.  You analyze the leases of those -- those properties that are in your data set.  You again look at the -- which ones are most similar.  You use your -- use your data -- your lease data, reconstruct operating statements, come to a conclusion as to what lease rate your property would lease for if it were placed on the market even though in the case of the subject, this one is an owner-occupied property.

Q.   Now, Mr. Watts, we have your report blown up here on the screen.  Using the market approach and the income approach

together, what was the value of the Raleigh property on January
1st, 2016?

A.   All right.  My -- my indication, the market approach
indicated a value of 3,976,000.  The income approach was three
million five hundred.  The two values in my opinion supported
each other very closely, and I came to the conclusion -- it was
my professional opinion that 3,800,000 --

Q.   So is --

A.   -- is the --

Q.   So is that --

A.   -- value.

Q.   Sorry.  So is 3,800,000 your appraisal of the value of the
Raleigh property on January 1st, 2016?

A.   Yes, sir.

Q.   Now, Mr. Watts, prior to your February 2022 appraisal, did
you provide a prior appraisal to Plaintiffs in this case?

A.   Yes, I did.

Q.   Did that appraisal reach a different value than the report
here?

A.   Yes, it did.

Q.   Why is that?

A.   Data changed.  A little further investigation revealed
some other properties that I wanted to consider, which I did,
and then amended -- I amended -- amended my report.

Q.   Does anything in your prior report change your assessment

of the value of the Raleigh property that you testified to today?

A.   No, it does not.

MR. ROBERTSON:  Your Honor, I move Plaintiffs' Exhibit 519 into evidence.

THE COURT:  Received.

(Plaintiffs' Exhibit Number 519 is received.)

BY MR. ROBERTSON:

Q.   Now, Mr. Watts, I'm gonna put up another report that you did, this time Plaintiffs' Exhibit 520.  Mr. Watts, is this document your appraisal report for the Greensboro property?

A.   Yes, it is.

(Plaintiffs' Exhibit Number 520 is identified.)

MR. ROBERTSON:  Your Honor, we move admission of Plaintiffs' Exhibit --

THE COURT:  Received.

MR. ROBERTSON:  -- 520.

(Plaintiffs' Exhibit Number 520 is received.)

BY MR. ROBERTSON:

Q.   Mr. Watts, did you determine the estimated value of the Greensboro property as of January 1st, 2016?

A.   Yes, I did.

Q.   And what approaches did you use to determine that value?

A.   I used both the market and income approaches.

Q.   And did you do the same due diligence with the Greensboro

property that you did with the Raleigh?

A.   The -- the procedure is identical.

Q.   Okay.  Did you forward -- did you visit the Greensboro property?

A.   Pardon me?

Q.   Did you visit the Greensboro property?

A.   I -- again, I made an exterior inspection of the Greensboro property.

Q.   Did you use the market approach to determine the value of the Greensboro property to follow the same general steps you've outlined for the jury with respect to the Raleigh property?

A.   Well, my two approaches on the Greensboro property, you will note there, that the market approach developed a value of 2,446,000, the income approach 2,500,000.  I had more income -- I had more confidence in the value indicated by the income approach and concluded that the value as of January 1st, 2016, is $2.5 million.

Q.   And, Mr. Watts, your analysis with respect to the -- well, let me ask this first.  Is that your -- is $2,500,000 your appraisal of the Greensboro property as of January 1st, 2016?

A.   Yes, it is.

Q.   And your analysis of the appraisal of each of those properties is set out in full in your reports.  Is that right?

A.   Yes.

Q.   Now, Mr. Watts, I'm gonna show you what's been previously

admitted as Plaintiffs' Exhibit 94.

MR. ROBERTSON:  If we could go down to the second page, please.

BY MR. ROBERTSON:

Q.  Sir, if you would take a look at this chart just for a moment.  Let me know when you've had a chance to see it.

A.  All right.

Q.  I'm going to put up -- put up another visual on the screen here.  Now, Mr. Watts, what value was listed by the defendant as the value of the Raleigh property?

A.  I'm -- I'm sorry, sir.  I didn't --

Q.  What value is listed by the defendant as the value of the Raleigh property?

A.  Three million one twenty-five.

Q.  And based on your appraisal, is $3,125,000 a fair price for the Raleigh property as of January 1st, 2016?

A.  In my opinion, no.

Q.  Is it about $375,000 less than what your appraisal found?

A.  That -- that is a difference between my appraisal and what they indicated the value was.  I have no idea how they came to that value.  But, yes, I do agree it is low.

Q.  And what value is listed by the defendant as the value of the Greensboro property?

A.  Two million.

Q.  And based on your appraisal, is $2 million a fair price

for the Greensboro property as of January 1st, 2016?

A.   No, it's not.  It's about $500,000 low based on my appraisal of 2.5 million, and that was my professional opinion.

MR. ROBERTSON:  If we could pull up Plaintiffs' Exhibit 94, again, please.

BY MR. ROBERTSON:

Q.   Now, Mr. Watts, you see that there's a column on this chart that says "Loan Balance."  Do you see that?

A.   Yes.

Q.   Based on that exhibit, what was the amount of debt on the Raleigh property on January 1st, 2016?

A.   The amount of debt on the Raleigh property:  6,437,831.

Q.   I'm -- I'm sorry, sir.  Let me direct you to the top line that says "RDU."  Is that the Raleigh property?

A.   Yes.

Q.   And what number is on the line that --

A.   Excuse me.  Loan -- the loan balance:  1,989,549.

Q.   And what was the amount of debt on the Greensboro property as of January 1st, 2016?

A.   According to that 1,492,282.

Q.   Mr. Watts, I'm gonna put up one more -- one more visual here for -- for us to look at having had the chance to see this -- that amount.  So based on your appraisal on the debt amounts we just looked at, what was the net value of the Raleigh property on January 1st, 2016?

A.    Three million eight.

Q.    Again, sir, I'll refer you to the line that says Raleigh --

A.    Okay.  The value as of the separation date, 3/8, the loan balance indicates there was a net value of 1,810,451.

Q.    And then what was the total value of the Greensboro property on January 1st, 2016?

A.    1,700,718 for a total net value of both properties of 2,818,169.

Q.    Thank you, sir.

        MR. ROBERTSON:  No further questions.

        THE COURT:  Any cross?

        MS. ANDERSON:  Yes.

CROSS-EXAMINATION BY MS. ANDERSON:

Q.    Mr. Watts, you were not involved when the parties decided to split up the warehouses between Prasad taking the Georgia warehouse and Vamsi taking the North Carolina warehouse.  You weren't involved --

A.    No.

Q.    -- in that?

A.    No, ma'am, I was not.

Q.    They decided and -- you were just showed an -- an exhibit. They decided at that time to split the properties based on the amount that they paid for the properties minus the loan balance, correct?

A.   I have no knowledge of that.

Q.   Isn't that the -- the very numbers that you were shown --

A.   Well -- well --

Q.   -- the number --

A.   Well, yes.  But my function was to -- I was -- I was asked to appraise the market value of fee simple interest.  I did not have any knowledge at that time of any -- any agreement between the parties.

Q.   You didn't know that they had agreed back in 2015 to split the warehouses and to use the purchase price minus the loan balance to value the properties.  You didn't know they agreed to that?

A.   I -- I did not know anything about that, no, ma'am.

Q.   And -- and it was six years later that you were even contacted to do an appraisal for these properties, right?

A.   Yes, that's correct.

          MS. ANDERSON:  May I approach, Your Honor?

          THE COURT:  Yes.

BY MS. ANDERSON:

Q.   I'm gonna hand you three stacks just to -- and you've got a lot of stuff up here -- just to avoid multiple trips.

          MS. ANDERSON:  Your Honor, would it be okay if I removed a few of these things so I can put some documents for this witness?

          THE COURT:  I think we -- we'll do that.

MS. ANDERSON:  Okay.  I just don't want to add to the pile.

THE COURT:  This is all from the expert witness?

MS. ANDERSON:  These are from prior experts, I believe.  And I'm coming with new documents.

BY MS. ANDERSON:

Q.  I'm gonna hand you, if you don't mind, just -- I'll hand you three stacks of documents.  I'm going to hand you the Greensboro stack --

A.  Okay.

Q.  -- the Raleigh stack, and the Keystone stack.

A.  Okay.

Q.  That way I don't have to keep coming back and forth.

A.  Okay.

Q.  And if you'll just -- I'll -- I'll point you to what we're talking about.

THE COURT:  Are you going to take a long time?

MS. ANDERSON:  I think I'm going to take hopefully about 15 minutes.

THE COURT:  Never mind then.  We'll have lunch.  I think your lunch is here, right?  Yeah.  So we'll break under -- consider -- consider whether you need to take a lot of time, but that's up to you.

All right.  Let the jury go out, and then we'll recess court until 1:45.

(A lunch recess was taken and proceedings resumed at 1:45 p.m.)

THE COURT:  Do you have anymore questions?

MS. ANDERSON:  Yes, Your Honor.

BY MS. ANDERSON:

Q.   Mr. Watts, good afternoon.

A.   Good afternoon.

Q.   We were talking about the fact that you were first contacted in this case almost six years after the parties separated the warehouses and took possession, correct?

A.   That's correct, yes.

Q.   And you were asked to appraise both the Greensboro property and the Raleigh property, and you were asked to give valuations for those properties for both 2016 and 2021, correct?

A.   Yes.

Q.   And you produced a report for Greensboro first, and that is before you as Plaintiffs' Exhibit 516.  First, you produced a report on December the 12th for the Greensboro property, correct?

A.   That's correct.

(Plaintiffs' Exhibit Number 516 is identified.)

BY MS. ANDERSON:

Q.   And then you gave a deposition in this case on February 10th of 2022.

A.   Yes.

Q.   And you talked about how there were substantial mistakes in that report, correct?

A.   That's correct.

Q.   And you -- you called it pure carelessness, and that there was no excuse for it, true?

A.   That's correct.

Q.   And one of those mistakes was that you had taken the numbers from one property and put it into your report under a totally different name, correct?

A.   I still cannot figure out what happened there.

Q.   Right.

A.   That was, as I recall, a comparable sale that was in an old report.  When I transferred it, I don't know whether the file got corrupted or not.  My son-in-law works for IT -- he's head of the IT department at his -- in his company, and he couldn't figure it out.

Q.   And --

A.   When I became aware of it, I immediately corrected it.

Q.   Yes, sir.  And what you had put into the report was for the 8320 Triad Drive, which you had put in your report, was that it sold for $4,000,322, but it actually had sold for $605,000, right?

A.   As I recall, that is correct, yes.

Q.   And that was just a mistake?

A.    It was a mistake.

Q.    But you kept that same mistake in your report that you've testified to the jury, didn't you?

A.    I'm -- I'm sorry.  I didn't hear you.

Q.    That same property that you testified was a careless mistake, there was no excuse for, that's in Exhibit Number 520, your report for Greensboro, that you've testified to the jury about, isn't it?

A.    I believe it is.  I have, you know, the corrected copy, yes.

Q.    I'm sorry?

A.    I believe I corrected that copy.

Q.    Actually, in the -- Exhibit 520 that Mr. Robertson asked you about that you offered your opinion here today, are you aware that that same property is included in that report on page 74?

A.    I thought it had been corrected, but I will take your word for it.

Q.    Were there other mistakes that you made in the report?  Did you use the wrong sinking fund factor that changed the report by about a million dollars with regard to that calculation?

A.    Well, the -- when I capitalize an income stream, I do it as many ways as possible.  And, yes, I did use the wrong sinking -- sinking fund factor which I readily admit to.

Q.   And did you also use the wrong RERC national market indicator in that you used the one for the south when you should've used the east?

A.   No, ma'am.  I used the east.  That was simply a typographical error from an appraisal template.  I am quite aware that North Carolina is in the eastern RERC --

Q.   But you --

A.   -- instead --

Q.   -- included --

A.   -- of the south.

Q.   Pardon me.  But you -- you included south in your report.

A.   I stated south in the report, but it's actually the east, yes.

Q.   And when you did the valuation for the Greensboro property, what you did was took comparables from 2021, and you backdated them to 2016, correct?

A.   Yes, ma'am.  As additional support, there's no reason you can't do it.  If you -- if you have a sale that occurred sometime before your date of appraisal, you make a forward adjustment.  It is just as easy using the same criteria to make a negative adjustment.

Q.   So you picked comparables -- when you were doing your Greensboro 2016 valuation, you picked comparables from September of 2019, December of 2019, December of 2020, and then you just applied a discount factor --

A.   And I --

Q.   -- to that?

A.   And I back-dated them, and that's a very valid method.

Q.   And you did an income approach also for the Greensboro property, correct?

A.   That's correct.

Q.   And then that was the higher number, and you picked that as the value for the Greensboro warehouse.  True?

A.   Well, you look at your data and you correlate to the approach that you feel that you have the most confidence in.  And that's the reason the income approach was used.

Q.   And you had the most confidence in the income approach, correct?

A.   Yes.

Q.   And that turned out to be the highest number for Greensboro?

A.   Yes, it did.

Q.   And are you aware that the Plaintiffs' appraisal -- appraiser from Atlanta didn't even do an income approach because he felt that that approach for properties such as this, which were owner-occupied, was both unreliable and not applicable?

A.   Well, I disagree with that statement.

Q.   And you're aware, aren't you, Mr. Watts, that, in fact, there was appraiser -- appraisal done for the Greensboro

property just less than three months before January of 2016 by a party that is not involved in this litigation.  There was a Keystone appraisal done for the Greensboro property.

A.    There was a Keystone appraisal done.  There was also an appraisal done by Richard Foster.

Q.    And in less than three months before the January '16th date, which is the date you're using -- one of the dates you're using to valuate, there was an appraisal done by Keystone, correct?

A.    Yes, that's correct.

Q.    And Keystone appraised the Greensboro property at 2.3 million, and you appraised it at 2.5 million, correct?

A.    Yes, that's correct.

Q.    All right.  Now, turning to Raleigh, you would -- you would agree that you first issued a report, a preliminary report, on the appraisal for the Raleigh property, correct?

A.    That's correct.

Q.    And the next day, you issued another report, correct?

A.    That's correct.  I found an error.

Q.    And -- and that error was a $600,000 error, right?

A.    Yes, it was, as I recall.

Q.    And then after you issued your second report, you realized that you used the wrong square footage?

A.    No, ma'am.  I did not realize that I used the wrong square footage.  I used -- since I was not allowed to do anything but

ride around the property and make photographs, I could not measure the building. I could not get an interior inspection. I could not measure the finished office space. We could solve the problem if I'm allowed to go back and do that.

Q. But you --

A. I was -- I was using the data that I had on hand from the previous reports in order to get as close as I could since I was not allowed to go in and do my own work. I could not even measure the outside of the building. All I was instructed to do was to just make photographs and do -- do as best an inspection I could.

Q. Right. And you agree with the Plaintiffs' counsel that you would use a square footage that -- that showed up on a tax card, correct?

A. Yes, that's correct, as I recall.

Q. But -- but at the time that you did that, you had an appraisal from Shaw Boykin that showed the square footage, didn't you?

A. Well, it had -- it had -- as I recall from the Shaw Boykin report, it was low compared to what was shown on the tax card, and compared to the Keystone report, it was low. So I opted not to use that.

Q. So you opted to use the higher square footage?

A. Of finished office space, yes.

Q. But when you did your second amended report, you actually

adopted that lower square footage because you realized that there had been three appraisals on that property all showing square footage that was much lower than the one you used, right?

A.   As I recall, yes.

Q.   And you were shown a page by Mr. Robertson on page 81 of your final -- your third, your final, appraisal for the Raleigh property.  That's on Plaintiffs' Exhibit 519 before you on page 81.  Do you see that?

A.   What page again, please?

Q.   I'm on 81.  Mr. Robertson put that up on the screen, and he said you did an income approach and came up with three thousand five hundred.  You did a market approach and came up with three thousand nine hundred and seventy-six.  And you picked a number of three --

A.   Well, ma'am, on the -- on the Raleigh report that I have here in front of me, the last page of the appraisal document itself is page 77.

Q.   Are you on Exhibit 519, sir?

A.   501 South New Hope Road?

Q.   It's -- there's -- there's three of them, right, because you did three different appraisals?  So I'm looking at Exhibit P-519 on page 81.

A.   All right.  I'm on page 81.

Q.   And that's the -- that's the page that Mr. Robertson put

up on the screen, correct?

A.    Pardon me?

Q.    That's the page that Mr. Robertson put on the screen for the jury to see?

A.    Yes, that's correct.

Q.    And that's where you take your income approach that you valued at three million five hundred and you compared it with -- with what you came up with the market approach, which you valued at three million nine hundred and seventy-six.

A.    That's correct.

Q.    And you concluded that -- and you testified today that the value is 3.8, right?

A.    Well, the numbers are very supportive of each other. You're never going to have an approach that's going to come out exactly the same in another approach. So I picked the midpoint as a supportable opinion of value.

Q.    You picked the midpoint between 35 -- 3.5 million and 3.96 million?

A.    Yes.

Q.    But you used the wrong number when you put the 3.976 million on this page, didn't you? Go back to your report on page 68 where you calculate the market approach for Raleigh 2016.

A.    That's simply a typographical error.

Q.    Well, it's --

A.    But it -- it is an error.

Q.    Would you go back to page 68, please?

A.    Yes, I did.

Q.    When you did the -- when you did your third calculation for Raleigh --

A.    Three -- I -- I said on page 66 it was three million nine seventy-six, and that's on page 81.  And on page 66 --

Q.    68 --

A.    -- it was three million seven ninety-six.

Q.    If -- you could at least --

A.    And I said that -- that -- that is -- that is my fault.  But that is simply a typographical error.

Q.    Can you go to page -- page 68, please?

A.    Pardon me?

Q.    Page 68, please.

A.    Yes.  Three million seven thirty-two.

Q.    Okay.  And that's the market approach that you came up with for your third try for the Raleigh property, correct?

A.    Yes, it is.

Q.    And then when you went to compare that to the income, you used the number from the old report, right?

A.    Well, the situation --

Q.    Is that what you did?

A.    -- is, the 3.5 million and 3.7 million, the three more -- 3.8 is a good rounded number.  You have to just look at the

data.  And I do have a typographical error in here.  I'll admit that.

Q.  You -- you took the number from your old record, and you compared it to your income approach for this -- on -- on page 81, correct?

A.  That's correct.

Q.  Now, there was also a Keystone appraisal done for the Raleigh property, correct?

A.  Pardon me?

Q.  There was also a Keystone appraisal.

A.  Yes.

Q.  It's done by an independent appraising company, nobody involved in this litigation, less than three months before January of 2016.  They also appraised the Raleigh property, correct?

A.  Yes, they did.

Q.  And they appraised the Raleigh property at $3 million, correct?

A.  Yes, they did.

Q.  And Mr. Robertson showed you this exhibit right here, if you can -- I'm sorry.  I don't have a bigger one.  I don't have the ability --

A.  Yes.

Q.  -- to put it --

A.  I see it.

Q.  -- on the screen for you.  He showed you this exhibit, and he said you appraised Raleigh at 3.8 and you appraised Greensboro at 2.5.  And so he came out with a value, correct?

A.  Yes.  I believe that is correct.

Q.  But if you use the Keystone appraisals that were done less than three months before the date that you used, one of the dates that you used, you overvalued these properties by $1 million, correct?

A.  Well, no, ma'am.  I -- I don't agree with that.

Q.  If you use the Keystone appraisal numbers --

A.  Well, I --

Q.  -- then --

A.  -- didn't appraise for Keystone.  I appraised for myself. I came to my own independent conclusion based on the data I had on hand.  So an appraisal is an opinion of that.  That is my opinion.  Keystone has their opinion.  You're just -- you're -- you're never going to have two appraisers that agree.  Based on the data set that I analyzed, I came up with a number that I felt was defensible and I felt was fair.

Q.  And that data set included that comparable that you meant to exclude but you included, and it also included you using numbers from your old report, correct?

A.  That's correct.

Q.  All right.  And then you valued the Raleigh and Greensboro properties as well for 2021 and came up with values of 3.2 for

Greensboro and 5.4 for Raleigh. Is that correct?

A. Yes, that's correct.

Q. And is it true that before you are your two reports for Greensboro, which have been marked as Plaintiffs' Exhibit 516 and 520, and your three reports for Raleigh, which are 517, 518, and 519, correct?

A. Yes.

(Plaintiffs' Exhibit Numbers 517 and 518 were identified.)

Q. Okay. Thank you so much.

THE COURT: Is that it?

MR. ROBERTSON: No redirect, Your Honor.

THE COURT: You can step down. Call your next witness.

MR. ROBERTSON: Sorry. Your Honor --

THE COURT: If you're all finished, you can step down.

(The witness left the stand.)

THE COURT: Call your next witness.

MR. ROBERTSON: Yes, Your Honor. Plaintiffs would call Robert Ryan to the stand.

THE CLERK: Good afternoon, sir. Place your left hand on the Bible, raise your right hand.

(The witness, Robert Ryan, is sworn.)

THE CLERK: Thank you. You may take a seat on the witness stand. Judge, if we could let that witness --

DIRECT EXAMINATION BY MR. ROBERTSON:

Q.   Good afternoon, Mr. Ryan.  Will you please state your name for the record?

A.   My name is Robert L. Ryan.

Q.   Mr. Ryan, are you a real estate appraiser?

A.   Yes, sir, I am.

Q.   How long have you been a real estate appraiser?

A.   I went into commercial real estate in -- in about 1989. And in 1992, I started actively appraising and joined the Appraisal Institute.

Q.   Can you please tell the jury your post secondary educational background?

A.   I have an undergraduate degree in marketing and a master's in business administration with real estate finance concentration.

Q.   Do you hold any real estate appraisal licenses?

A.   I am licensed in the states of North Carolina, South Carolina, Georgia, Tennessee, Florida, and Alabama and Louisiana.

Q.   Do you hold any real estate appraisal designations?

A.   Like Mr. Watts, I'm an MAI, which is part of the Appraisal Institute.

Q.   And would you say that designation took a lot of work to obtain?

A.   To -- I would summarize that it's very similar to a

graduate degree but in the profession of appraising.

Q. How many hours of formal appraisal training have you received?

A. I -- I would just venture to say it has been a -- a -- a lot. I would think easily probably 1,000 hours of some sort of real estate valuation or real estate training.

Q. Do you know about how many appraisals you've done in your career?

A. I have no idea.

Q. Is that because it's --

A. I --

Q. -- a lot?

A. I would say it's way too many to count.

Q. Do you know how many properties you've appraised in Gwinnett County, Georgia?

A. I -- I would imagine over the last ten years I've easily appraised over 100 properties in Gwinnett.

Q. Mr. Ryan, if I refer to the real estate located at 6582 Peachtree Industrial Boulevard in the Peachtree corner suburb of Atlanta, Georgia, as the Atlanta property, will you understand what I'm referring to?

A. Yes, sir, I would.

Q. Okay. Mr. Ryan, were you hired to -- well, let me back up.

MR. ROBERTSON: Your Honor, we tender Mr. Ryan as an

expert in real estate.

THE COURT: The Court will accept him as an expert and allow him to express his opinions.

BY MR. ROBERTSON:

Q. I'm going to now, Mr. Ryan, put up Plaintiffs' Exhibit 521. And, sir, can you please tell the jury if that is your appraisal report for the Atlanta property?

A. It would appear so, yes.

(Plaintiffs' Exhibit Number 521 is identified.)

MR. ROBERTSON: Your Honor, we move Plaintiffs' Exhibit 521 into evidence.

THE COURT: Received.

(Plaintiffs' Exhibit Number 521 is received.)

BY MR. ROBERTSON:

Q. Now, Mr. Ryan, as part of this appraisal, were you asked to determine the value of the Atlanta property on January 1st, 2016?

A. Yes, sir, I did -- I was.

Q. And what approach did you use to determine that value?

A. I used a sales comparison approach.

Q. And that's similar to what Mr. Watts referred to as the market approach?

A. That would be correct. Basically, if I could just make this comparison, it's very similar to looking at comparable sales that -- that you would use in a residential scenario

where you're trying to determine the value of your home.

Q.   And that was done in accordance with appraisal standards done in -- in your profession?

A.   Yes, sir.

Q.   Okay.  And what number did you determine for the appraised value of the Atlanta property on January 1st, 2016?

A.   Yes, sir.  I believe it was 4,290,000 as of the date aforementioned in January of 2016.

Q.   Okay.  And your analysis is set out in this report, right?

A.   Correct.

Q.   So if the jury went -- the jury can look at your analysis?

A.   Yes.  It -- it basically just -- it -- it presents comparable sales, a map, and a discussion of adjustments made to those comparable sales to reflect the value of the subject property.

Q.   Now, Mr. Ryan, did the Defendants hire an appraiser to do a valuation of this property on January 1st, 2016?

A.   I -- I think more technically, I believe, the Defendants had a reviewer review my appraisal and -- is -- is that correct? -- and -- and concur with my value, but I don't think the Defendants had an appraisal.  Did I answer your question?

Q.   I think so.  Let me just make sure I heard you correctly.

A.   Yes.

Q.   The Defendants hired a reviewer of your appraisal?

A.   Yes.

Q.   And what was the value the reviewer determined for January 1st, 2016, of the Atlanta property?

A.   The reviewer concurred with my 2016 value is my understanding.

Q.   So that's the same value that you came up with?

A.   Yes.  We -- we both agree that that was the value as of that date.

MR. ROBERTSON:  No further questions, Your Honor.

THE COURT:  You have any --

MS. ANDERSON:  Yes, Your Honor.

THE COURT:  -- questions?

CROSS-EXAMINATION BY MS. ANDERSON:

Q.   Hi, Mr. Ryan.

A.   Yes.  Hi.

Q.   Your report indicates that UTS Holdings, LLC, which is a company that Mr. Prasad -- that Prasad's family owned, acquired the property in Atlanta on December the 18th, 2015, for no consideration, correct?

A.   That was my understanding of what was in the public record.

Q.   And he got the property in Atlanta as part of the split between the parties.  Is that --

A.   I --

Q.   -- your understanding?

A.   I -- I -- I did not see a title report.  I -- I can't

comment.

Q.   And it's true, you weren't contacted until Thanksgiving -- around Thanksgiving of 2021 -- that was six years later -- to do a valuation of this property, correct?

A.   Actually, more technically, if I can answer this way, I was initially contacted -- to give the jury some context -- in the spring of 2020 to do an appraisal for J.P. Morgan Chase unrelated to this matter for financing.  And that's how I ended up being approached for this particular matter.

Q.   And I want to talk about that appraisal.  When you did the appraisal for the bank, that wasn't for the context of this litigation, but you have appraised this property for actually three different dates, correct?

A.   That would be correct.

Q.   You were retained in this litigation and provided appraisals for the dates of January 1st of 2016.  You had also provided an appraisal for J.P. Morgan Chase for March of 2020.  And then you also provided a value for the Atlanta property as of December 8th, 2021, correct?

A.   That's -- yes.

Q.   Now, you heard Mr. Watts testify.  You decided that the income approach was not a reliable method to utilize for this Atlanta property, correct?

A.   I -- I would say it's -- it's less applicable, if I can say it that way.  We do -- for J.P. Morgan Chase, I -- in fact,

I think I did do an income approach because they asked for two approaches to value. It could also be because it was an SBA financing potentially. I'm not positive. That -- sometimes they do ask for two approaches. But it -- it -- it very much is a secondary supporting approach and did not feel to be necessary for our purposes.

Q. Right. What you said was, "Because the subject property has historically been owner-occupied with the current owner occupying the property since 2014, the income approach is not considered applicable," correct?

A. Correct.

Q. And are you aware that the Raleigh warehouse has been owner-occupied since 2009?

A. I -- I -- I would take your word for it.

Q. And that the Greensboro property has been owner-occupied since 2013. So both of those well before the Atlanta property, correct?

MR. ROBERTSON: Objection. Relevance and scope.

THE COURT: Overruled.

BY MS. ANDERSON:

Q. And then you talk about the sales comparison approach in your report. And just briefly, you talk about how you want to select a unit of comparison, in this case square footage, search around for similar properties, confirm those sales, then you have to make adjustments because not -- those properties

are not going to be identical to the property that's at issue, and then you reconcile all that.  Are those generally the steps that --

A.    That -- that -- your summation is correct.

Q.    And -- and you can't skip any of those steps, can you?

A.    You shouldn't.

Q.    Right.  Okay.  And you made adjustments for the properties that you picked, correct?

A.    Yes, ma'am.

Q.    You would agree that the met- -- Atlanta metro where Mr. Prasad's warehouse is located is one of the best real estate markets in the country, correct?

A.    I -- I would surmise that -- that would be a fair assessment, yes.

Q.    I mean, that's what you testified in your deposition, right?

A.    Yeah.

Q.    All right.  Let's talk about the values that you gave the properties for the three times that you --

        MS. ANDERSON:  May I use the easel, Your Honor?

        THE COURT:  Yes.

        MS. ANDERSON:  Thank you.

BY MS. ANDERSON:

Q.    And it's fair to say there were three different dates, true?

A.  Correct.

Q.  The first one, you value the property for the -- for this litigation at 1/16, correct?  That's January '16.

A.  Yes, ma'am.

Q.  And your opinion at that point was that the property was worth how much?

A.  I believe that was four million two-ninety.

Q.  Okay.  And then in between the two values that you gave in -- for this litigation is your J.P. Morgan appraisal, right?  And that's in March of '20, correct?

A.  Correct.

Q.  And what was your valuation at that point?  Do you remember?

A.  I -- I don't recall.

Q.  I have it for you.  It's 5.7.  Would you like a copy?

A.  I -- I take your word for it.

Q.  Sure.  So in March of 2020, you believe the value of the property that Mr. Prasad got was 5.7 million, correct?

A.  Yes, ma'am.

Q.  And then you gave a valuation in this case for December of '21.  And what was your valuation for -- for the Atlanta warehouse as of December of '21?

A.  It's over eight million.  I don't recall the exact number.

Q.  I can -- I think you have your report in front of you.  Do you not?  I can --

A.   I do not.

Q.   -- bring that to you?

A.   No, ma'am.

Q.   Is it true that you gave a valuation of 8.27 million?

A.   That sounds correct.

Q.   Sure.  And now, we're in March -- no, we're not.  We're in May of '23.  Is there any reason that you believe that this number isn't even bigger than these numbers?

A.   The market has softened a little over the last six to 12 months, but it has also obviously had a significant amount of appreciation over that '20, '22 period.

Q.   Right.

A.   So --

Q.   And so there's no reason to believe that -- that today the property isn't worth even more than the 8.27 that you valued it back in December of 2021, correct?

A.   I think that's a fair assessment.

Q.   And so taking your numbers, would you agree that the warehouse that -- that Prasad got in Atlanta has doubled in value?

A.   It -- it -- it's very possible.

        MS. ANDERSON:  Those are my questions.  Thank you.

        THE COURT:  You have anything further?

        MR. ROBERTSON:  No further, Your Honor.

        THE COURT:  All right.  Thank you. You're excused.

THE WITNESS:  Thank you.

(The witness left the stand.)

MR. MORSE:  Your Honor, we call Mr. Charles Wilhoite.

THE CLERK:  Place your left hand on the Bible and raise your right.  Will you state your name for the record?

MR. WILHOITE:  Charles Wilhoite.

(The witness, Charles Wilhoite, is sworn.)

THE CLERK:  Thank you.  You may be seated.  Watch your step.

DIRECT EXAMINATION BY MR. MORSE:

Q.   Please state your name.

A.   Charles Wilhoite.  Good afternoon.

Q.   Good afternoon.  And who's your employer?

A.   Willamette Management Associates.

Q.   What's the business focus of Willamette Management Associates?

A.   My firm was started in the late 1960s, and we focus on financial and economic analysis and business valuation services.  We help individuals and companies with the purchase and sale of companies.  We help with property tax, gift and state tax, income tax dispute matters.  We help with employee stock ownership, plan ownership.  We do valuations for those purposes.  And we value a fair amount of intangible assets to help with licensing and royalty rate situations.

Q.   And how long have you been with Willamette Management

Associates?

A.    33 years.

Q.    And what's your position?

A.    I'm a managing director with the firm.

Q.    And -- and what's your responsibilities in that role?

A.    As a managing director, I'm responsible for business development for identifying, hiring, and training professionals on our staff.  I'm responsible for firm practice management, and I'm responsible for engagement management such as this case that I'm working on here today.

Q.    And what's your educational background?

A.    I have Bachelor of Science degrees in finance and accounting from Arizona State University.

Q.    And please identify here your -- your professional certifications.

A.    I currently maintain ten professional certifications.  I'm certified as a public accountant.  I'm accredited in business valuation.  I'm certified in financial forensics by the AICPA. I'm certified as a management accountant, and I'm certified in financial management by the Institute of Management Accountants.  I'm an accredited senior appraiser of business valuation as designated by the American Society of Appraisers. I'm certified as a valuation analyst and certified as a business appraiser by the National Association of Certified Valuators and Analysts, and I'm a certified fraud examiner as

designated by the Association of Certified Fraud Examiners.

Q.   Have you served on any relevant professional committees?

A.   I've served on a number of committees over my 33 years. I'm currently reappointed to the ABV credentialing committee of the AICPA.

Q.   And what do you do on that committee?

A.   ABV stands for Accredited and Business Valuation.  That committee is responsible for determining the credentials and the qualifications that professionals who are seeking the designation need to attain in order to receive a designation and maintain it over time.  We also are responsible for determining the questions that go on the examination that individuals have to take to obtain a designation.

Q.   All right.  Did you serve boards that are relevant to the work you did on this matter?

A.   Now, at this ripe old age, I've served on about 30 different boards.  Four of those boards, I think, are very relevant to the valuation services that I provide.  I'm currently a trustee with Meyer Memorial Trust, which maintains a trust fund of about a billion dollars, and we're responsible for making grants into the community for housing, education, health, and employment.

        I served as a member of the Oregon Investment Council.  That Council oversaw about $120 billion of assets for the state of Oregon with regard to their public employee

retirement system and the State Accident Insurance Fund. I served as a board member of the Jensen Quality Growth Fund, which is a publicly traded fund, which manages about $14 billion of assets. And I served for one year on the economic advisory council of the Federal Reserve Bank for the 12th District. And I served for six years as a board member on the Federal Reserve Bank of San Francisco in the Portland branch two years as a board chair.

Q. And -- and what were you asked to do in this matter?

A. I was asked to estimate the fair value of 100 percent of the members' equity in Vivid North Carolina and Vivid Texas and by extension Prasad's 25 percent interest in Texas and his 30.1 percent interest in Vivid North Carolina.

Q. Have you previously valued companies that focus on providing building materials similar to those provided by Cosmos companies?

A. Yes. In my 33 years, I've valued hundreds of interests in building materials and construction-related companies, including companies that sold tile and stone.

Q. Have you previously testified as an expert witness in the field of business valuation?

A. Yes. I've probably testified -- testified over 100 times in arbitration, deposition, and court.

MR. MORSE: Your Honor, at this time I would like to tender Mr. Wilhoite as an expert in the field of business

valuation.

THE COURT: The Court will accept the witness as an expert in the field of business valuation and allow him to express his opinions.

MR. MORSE: Will you bring up P-512?

BY MR. MORSE:

Q. Do you see this report, fair -- fair value analysis of 100 percent of the members' equity in Vivid Cosmos Granite, LLC, North Carolina and South Carolina as of February 29th, 2020, dated April 29th, 2022?

A. Yes.

Q. Is that your evaluation?

A. Yes. It appears to be my report.

(Plaintiff's Exhibit Number 512 is identified.)

BY MR. MORSE:

Q. What premise of value did you use?

A. I assumed a going concern premise of value.

Q. All right. And --

MR. MORSE: Can you put up slide 1?

BY MR. MORSE:

Q. And why did you -- why do you think the going concern premise of value is the way to go?

A. Well, as part of every valuation, you review the history of a company. In this particular certain circumstance, both Vivid North Carolina and Vivid Texas had grown extensively over

a five-year period through each valuation date.

As you can see on the screen, or possibly not, the assets of Vivid North Carolina increased from roughly 7.4 -- or five million in 2016, all the way to 14.6 million by 2020, if you look from left to right 2015 to 2/29/20, the last line on the screen. So the growth rate was approximately 17 percent a year over that roughly five-year period. And that's a sign of a company that's growing.

As Ms. Couch testified to earlier, the company performed very well financially. Going concern premise assumes that the company will continue to perform from the point of your valuation date going forward, and that's why I assumed the going concern premise of value.

MR. MORSE: And can you pull up P-313? Pull up the email at the top.

BY MR. MORSE:

Q. All right. What is this email showing?

A. This is an email from Vamsi to a gentleman by the name of Peter Mink at Bank of America, and it's basically describing his intent and desire to buy Prasad out of his interest in the company.

(Plaintiffs' Exhibit Number 313 is identified.)

BY MR. MORSE:

Q. And that's in 2018?

A. That's correct.

Q.   And did -- was there more than enough time to sell his business as a going concern since 2018?

A.   If you're suggesting between 2018 and the February 29, 2020, date that Prasad was squeezed -- squeezed out, you assume that there was time to sell the company in between that date and February of 2020.

Q.   So that's another reason to use a going concern value?

A.   Yes.  And primarily it's because the company was performing in a financially sound way.  There's no reason to assume it would discontinue sound performance.

        MR. MORSE:  Your Honor, at this time, I'd like to move in P-512 and P-313.

        THE COURT:  Received.

    (Plaintiffs' Exhibit Numbers 313 and 512 are received.)

BY MR. MORSE:

Q.   What definition of value were you asked to use?

A.   I was asked to assume the fair value definition of value.

Q.   All right.  What other definitions could you have used?

A.   The other most frequently used standard of value is fair market value.

Q.   Is fair market value relevant to this case?

        MR. PARRY:  Objection.  Your Honor, that calls for a legal conclusion.

        THE COURT:  Overruled.

A.   Fair market value is a standard of value.  I'll give you

the definition.  It's the price at which a transaction or transfer would occur between a willing and able buyer and a willing and able seller, neither acting under compulsion, and both reasonably informed about the facts.  And the key there is there's no compulsion.  That's when fair market value is a standard of value that's relevant.

BY MR. MORSE:

Q.   And was there a compulsion in this case based on your understanding of the facts?

A.   Well, as we heard in the testimony, Prasad didn't even realize he had been bought out of North Carolina for a year. So from a layperson's perspective and valuation expert's perspective, that suggests compulsion to me.  He didn't have a choice in the transaction, and that's why I think the fair value standard is relevant.

Q.   And how do you go about determining fair value for this case?

A.   Well, once again, you first and foremost consider all the facts and circumstances in any setting.  And you, as a jury, have heard a lot of testimony about what happened with regard to Prasad and his ownership interest in North Carolina, and I sat in the courtroom and I heard that testimony as well.  It was fairly clear to me that, once again, when you're bought out of a company and you're not told about it, that that's a forced action.

MR. MORSE:  Can you pull P-512?  Next page.

BY MR. MORSE:

Q.   So in determining fair value, did you look at the law of North Carolina on the subject?

A.   I did.

Q.   Is that something you'd normally do on appraisals?

A.   Yes.  As a valuation expert, we're required to comply with generally accepted valuation practice.  That includes the standards of the associations to which we belong, as well as the court precedent in whatever state in which we're rendering the opinion.

Q.   And how many fair value appraisals have you done?

A.   I -- I would estimate hundreds.

Q.   Okay.  And this is a quote from your report from the *Royals* case.  What -- what does, generally, this say?

MR. PARRY:  Objection.

A.   I can see people trying to read it, and it's a lot of words, so I'll summarize it.  Generally, fair value is the court taking the position that it would be unfair to force out a minority owner in a company at a price that included discounts.  Basically, the courts conclude that if a minority shareholder is forced out of the company, that shareholder should be paid based on his or her pro rata interest in the total value of the company.

BY MR. MORSE:

Q.   So no discounts?

A.   No discounts.

Q.   Is this -- is this quote in *Royals* consistent with your general knowledge of fair value?

A.   Yes, it is.  And there are other cases in North Carolina, *Vernon versus Cuomo*.  And another case was a case involving Piedmont -- I'm sorry, Southeast Gas and Power.  Those cases also suggested that the court was not willing to apply discounts for lack of control or lack of marketability to a noncontrolling minority interest in a company when that shareholder was forced out by the majority.

Q.   Did Vamsi's expert, Mr. Burns, do a fair valuation for Vivid?

A.   Not to my knowledge.

Q.   Okay.  So he applied discounts to Texas?

A.   I believe so, yes.

Q.   So what would happen if you accepted Burns' value for Vivid?

A.   Basically, the dollar value of the discounts are transferred to the controlling owner.  The courts are basically saying if you discount a minority interest position, meaning you reduce the value, that value is automatically transferred to the controlling owners, because once the controlling owners take the minority owner shares, they can then sell all of the shares at a controlling price that doesn't include the

discounts.  So the value of the discount is transferred to the controlling shareholders, which would be the case here if we discounted Prasad's interest in either of these companies.

Q.   All right.  So after deciding to use fair value, what did you do next?

A.   Well, standard valuation process, you consider the history of the company, the governing documents.  You consider the industry in which the company operates.  You consider the economy, both the regional and the national.  You consider market circumstances, prices of companies that are transferred in the same industry.  It's a very routine and standard process.  It's not rocket science.  It's very laid out, but you want to follow the process and consider all the relevant information and all the steps that are required to produce a credible appraisal.  And that's what was done.

Q.   And did you consider Ms. Couch's work?

A.   I did significantly.

Q.   All right.  And was there anything particular about Ms. Couch's work that you took into consideration in your appraisal?

A.   Well, as you heard Ms. Couch testify, there is a significant amount of data, and she performed a significant amount of analysis suggesting -- I would say not even suggesting -- proving that the company was operating with two sets of books:  One set of books to produce earnings that could

result in lower taxes; another set of books that allowed them to present information to the banks and pay themselves at -- at a level based on a higher performance level.

And my analysis, because of the information provided to me, focused first on the tax returns, the financial information presented in the tax returns. That is the information which produced the lowest operating results and financial results for the company because of the way management manipulated inventories.

Q. So because they were using two sets of books, you needed to make adjustments to the tax reported earnings?

A. That's correct.

Q. Did Mr. Burns, Vamsi's expert, make any adjustments to the multiple sets of books?

A. Not to my knowledge, no.

Q. So real quick, what are the standard accepted valuation approaches using a value of -- to -- use to value a business?

A. There are only three. There's either an asset based approach, an income approach, or a market approach.

Q. And what is an asset approach?

A. An asset approach is basically identifying the assets of a company, valuing those assets, and adding them together, and then subtracting all the liabilities to get the equity value of the company.

Q. And what's a market approach?

A.   A market approach is basically looking at comparable information, or similar information, companies that are in the same industry or a similar operating circumstance, looking at the prices that investors have paid to acquire those companies and comparing those prices to certain underlying fundamentals of the companies that were acquired, such as revenue or earnings or cash flow.  You then use those multiples to apply to your subject company to value the company.

It -- it was testified to earlier by Mr. Ryan, I believe.  It's just like valuing a house.  If your house is on a certain street in a certain neighborhood, you can look at houses in that area that have been acquired and see what was paid per square foot or per bedroom or per bathroom and then apply that to your own house to develop some indication of the value of your house.

Q.   All right.  And what's an income approach?

A.   Income approach is based on the theory of expectation. Meaning if I have a company and I can estimate how much I think it will provide to me in the way of earnings or cash flow over time, I can estimate the risk of that cash flow and then convert that risk to a multiple -- multiple and apply that to the earnings of the company to estimate the value of the company.  Basically, earnings times a multiple gives you value.

Q.   Did you do asset approach in this case?

A.   I did not.

Q.   Okay.  And why not?

A.   Once again, these companies are successful.  They're growing.  For example, North Carolina increased in revenue from 14 million to roughly 26 million between 2016 and 2020.  Texas increased in revenue from about a half a million dollars to about $11 million between 2016 and 2020.  So they're growing companies generating positive bottom line.  An asset approach is not relevant for this particular type of company in this particular circumstance.

Revenue ruling 5960 makes it pretty clear, when you're valuing a company that generates revenue through the sale of product that you're basically looking at an operating company, not a holding company, you would use the asset approach for a holding company.

Q.   And Mr. Burns in his -- Vamsai's expert in his initial report, did he use an asset approach?

A.   Mr. Burns did, yes.

Q.   Did you use an income approach?

A.   I did.

MR. MORSE:  Can you pull up Epic from slide -- would you pull out the first margin from Plaintiff's Exhibit (inaudible)?

BY MR. MORSE:

Q.   Okay.  Did you do an income approach?

A.   I did.

Q.    And does this slide show the adjustments you had to make to the -- the reported income because there were two sets of books?

A.    That's correct.

Q.    And so what did you have to do to make the income approach work?

A.    As testified, Ms. Couch demonstrated quite clearly that the company was being very aggressive with regard to the write-down of inventory that resulted in higher cost of goods sold and lower gross margin.  Her analysis concluded that reasonable gross margin for the company was roughly 36 percent.  So I adjusted the historical results of the company to produce a gross margin level of roughly 36 -- 36 percent.  I then deducted the operating expenses they reported from gross margin to get to a bottom line for the company.  And as you can see, that ranged from roughly $2.7 million in 2015 to as high as $4.7 million in 2020.  I -- I didn't give much weight to 2020 because it's a 12-month period through February, meaning only two months of 2020 were -- were recognized.

So if you look at that performance level, however, on an adjusted basis, taking into consideration two sets of books and adjusting the gross margin to 36 percent, the bottom line ranged from about 2.7 to 3.7 million dollars.

Q.    And in coming up with the 36.6 percent number, did you also consider Burns' own work?

A.    Yes.   I considered a number of factors to convince myself that a 36.6 percent margin -- gross margin was reasonable. Once again, I keep pointing to Ms. Couch's analysis because it was extensive.  You heard all of the testimony.  You heard that slabs were sold at a price of $2,200 when they had a carrying value of $28.  So she had extensive analysis that made it clear to me a higher gross margin was reasonable.

I also considered industry data that produced gross margins ranging from roughly 25 to as high as 42 percent.  I considered information provided to me by Jasihiri Nallapatti indicating that companies within the Nallapatti group of companies generated gross margins at a level of 41 percent. And I also considered Mr. Burns' own analysis.  He in his own report produced information suggesting that gross margins as high as 41 percent were achievable.

MR. MORSE:  If you can go to P-512, page 23.  Pull out the chart.

BY MR. MORSE:

Q.    Is this the chart of Burns' own analysis?

A.    That is straight from his report, yes.

Q.    Okay.  And what does that chart show?

A.    I should say, well, I'm taking an eye test.  That chart, trust me, shows for North Carolina, South Carolina, and Texas the gross margins that Mr. Burns presented in one of his own reports where he's analyzing the trademark, or trade name, of

Cosmos.  You can see the highlighted lines.  If you look at North Carolina --

THE WITNESS:  Let's -- let's move up the page a little.  Yes.

A.   So we can see Charleston at the top.

THE WITNESS:  If you just focus on the shaded lines, it's easier to follow.

A.   In that first segment, you can see there's a gross margin in Mr. Burns' report ranging from 38.6 percent to as high as 41.5 percent in that first line.  If you move down to Charlotte, same thing, you can see gross margins ranging from 35.1 percent for quartz in that left-hand column to as high as 36.6 percent moving left to right second column from the right.

So generally speaking, Mr. Burns' own analysis makes it clear that the company is achieving gross profit margins higher than the 36 percent margin that I assumed.

BY MR. MORSE:

Q.   And did Mr. Burns critique your normalization of gross profit margin in this case?

A.   I -- I believe he referred to my adjustment of -- to a 35 percent gross margin when I issued my first report as inflated and fictitious.

Q.   Okay.  And your response to that critique?

A.   I think his own exhibit makes it clear that it's not inflated or fictitious.  It's historically demonstrated by the

companies in the group.

MR. MORSE:  Go to the income capitalization slide.

BY MR. MORSE:

Q.   All right.  And is this the slide showing your work to capitalize the income?

A.   Yes, it is.

Q.   Okay.  Then what -- how does this work?

A.   Once again, as I testified earlier, valuation based on the income approach is simply estimating an expected income or earnings level and applying a multiple to it.  And that's what's done in this particular analysis.

You can see I start with representative earnings at $3.8 million, a tax effect on those earnings, and I come down to expected net cash flow about a quarter of a way down the page of $2,790,000.  So that's the expected cash flow from the business going forward.

At this point, you have to estimate risk.  And generally speaking, when you're valuing companies, you start with, well, what can I invest in.  You can invest in a U.S. Government bond, and the risk of that bond is one and a half percent.  I analyzed the company relative to a -- an investment in a bond, and I concluded that the risk is significantly higher for a company like Vivid North Carolina.

I completed the assessment in the same way that we would in any valuation.  There's a capital asset pricing model.

You look at risks.  You look at all these other factors.  And at the end of the day, I came to the conclusion that the risk of investing in Vivid North Carolina was about 11 times the risk of investing in a U.S. Government bond.  That translated into a multiple of 7.4 times cash flow.

If I apply that cash flow multiple to the expected earnings, 7.4 times 2,790,000, you get to a an indicated value of about $20,667,000 for the company.  That represents a value of all the company's invested capital.  Basically, we have to deduct debt from that to get to the equity value before any other adjustments.  I subtracted the debt of $1,256,000, and I arrived at unadjusted equity value on a controlling basis -- once again, this is a pro rata valuation, a fair value valuation, of 19.4 million.

I then consider typical adjustments you would consider when you're valuing a company for potential sale or acquisition.  I added the cash, added inter-company receivables, added a note receivable, I subtracted an asset purchase deposit, and I subtracted a contingent liability to arrive at a total value of $21.4 million for the company.

MR. MORSE:  The final valuation slide for Vivid North Carolina.

BY MR. MORSE:

Q.  All right.  You also did a market approach too.  Is that right?

A.    That's correct.

        MR. MORSE:  We're going to skip to the final valuation slide.  Can you pull out the --

BY MR. MORSE:

Q.    And so does this slide here show your final valuation for Prasad's interest in Vivid North Carolina?

A.    It does.  I, once again, just walked through the income approach.  I arrived at $21.4 million of value.  I completed a market approach, and I will share with you that the multiple that I applied in the market approach was 5.5 times rather than seven, and that was based on the analysis of 21 transactions in the industry sector.  And I selected a multiple based on consideration of the company's returns relative to the returns of those 21 companies.  The two indications of value were weighted equally to arrive at a concluded value of $19.2 million.

Q.    And what was your final determination as to Prasad's -- the fair value of Prasad's interest in Vivid North Carolina?

A.    I took into consideration inventory that was still on hand based on Ms. Couch's analysis, but I discounted it 50 percent. Because it was older, it needed to be considered.  I did adjust that a bit.  But after that add-back of 2.397 million to the 19,218,000, the total equity value was $21,615,000, 30.1 percent of which is 6,505,000 for Prasad's interest.

Q.    So your opinion of value of Prasad's interest in Vivid

North Carolina is that it was worth $6.5 million?

A.    That's correct.

Q.    Did you do the same analysis for the Vivid Texas?

A.    Exact same analysis, yes.

Q.    With the same adjustments for the fact that they were running two sets of books?

A.    That's correct.

        MR. MORSE:  Could you bring up the Vivid Texas slide?

BY MR. MORSE:

Q.    You did, again, income approach?

A.    That's correct.

Q.    And a market approach?

A.    Yes.

Q.    And what is the fair value of Prasad's ownership interest in Vivid Texas?

A.    I arrived at a conclusion of 2,181,000 as the fair value. And once again, that does not include any discounts for lack of control or lack of marketability considering the fact that he was forced out of ownership in the company.

Q.    All right.

        MR. MORSE:  Can you go to the different exhibit?

        THE COURT:  What's the combined deficit?  About eight million?  8.7 million?

        THE WITNESS:  Between --

        THE COURT:  If you add the -- both --

THE WITNESS: The two together add up to about $30.3 million.

MR. MORSE: Your Honor, we have the next slide up here for that calculation for you.

BY MR. MORSE:

Q. So let's do a little math to come up with the total -- the total difference. Vivid North Carolina, what's the difference between what Prasad got and what his interest was actually owed?

A. Once again, my conclusion is 6.5 million, less amount paid 2.5 million, so the difference is approximately $4 million.

Q. And for Vivid Texas?

A. I concluded fair value of Prasad's interest was 2.181 million. He hasn't received anything to my knowledge, so the net difference is $2.181 million.

Q. And the real -- you were here when the real estate appraisers testified?

A. Yes. I did sit through that testimony.

Q. And based on real estate, how -- what's owed for Prasad's equity?

A. The conclusions provided in the testimony were about 4.152 million. He received 50 percent of real estate equity, that -- that subtracted 2.1 million, less the value of equity in Atlanta, 1.3 million, leaves a net about 742,000.

Q. So combined of the real estate equity and the equity in

the two businesses, what's the total amount?

A.   Approximately $6.954 million.

Q.   Now, one last --

        MR. MORSE:  Actually, no further questions, Your Honor.

        THE COURT:  What's that?

        MR. MORSE:  No further questions.

        THE COURT:  Cross?

        MR. PARRY:  Yes, Your Honor.

CROSS-EXAMINATION BY MR. PARRY:

Q.   Mr. Wilhoite, you're not a fixed asset or intangible asset appraiser.  Is that right?

A.   I am not.

Q.   And -- and you're not offering in this case any inventory valuation opinions, correct?

A.   Other than the adjusted add-back to account for inventory that's still on hand, that's correct.

Q.   That's the part you took from Ms. Couch?

A.   That's correct.

Q.   And on that point, you -- you relied as -- as I think you testified on the work of Ms. Couch in your reports and your conclusions, correct?

A.   Yes.  Based on the extensive analysis she performed and the testimony she provided.

Q.   And you did not rely on the appraisals done in early 2020

by Lee Robinette, the one who was hired not in the context of litigation, correct?

A.   I did not.

Q.   And part of your reason for deciding not to consider either Mr. Robinette or Mr. Damon's appraisals was Ms. Couch's analysis.  Is that right?

A.   Yes.  Once again, the extensive analysis she performed, I found credible.

Q.   And you expressly chose to rely on her rather than the two who were hired before there was a lawsuit?

A.   Well, Ms. Couch wasn't valuing inventory.  She was performing forensic analysis.  So I did rely on her analysis and her conclusions.

Q.   Instead of theirs?

A.   Well, they weren't performing forensic analysis.

Q.   You didn't regard their opinions of value as credible?

A.   I relied on Mrs. Couch's analysis and her conclusions.

Q.   And you directly factored her conclusions, I believe you just testified, into your opinions of value, correct?

A.   I did.

Q.   And in your initial report, you took 100 percent of her proposed adjustments, right?

A.   I believe that's correct.

Q.   And in later reports after Mr. Burns issued a rebuttal, you changed it from 100 percent down to only 50 percent.

A.   I did make a change based on consideration of additional information, which was stated in my original report.  She issued another report, April 21, 2022.  I issued my final report, April 29, 2022.

Q.   And whereas originally, you had given 100 percent credit to her proposed adjustments.  Later on, you changed it and -- and only gave half credit to it?

A.   That's correct.

Q.   But still, her adjustments flow through, and if there's a problem with those adjustments, that would flow through into your numbers too, wouldn't it?

A.   Not entirely true.  No.  Once again, I considered other factors.  I had a reasonableness of the 36 percent margin.  I considered industry data.  And as you saw on the screen, I considered Mr. Burns' own analysis that made it clear that 40-plus percent margins were achievable.

Q.   But you're taking account of her adjustments to inventory, her proposed adjustments, right?

A.   I'm taking into consideration her analysis substantiating the existence of two sets of books and all the other things she identified that could affect earnings for the company.

Q.   And don't you numerically take her adjustments into your opinions at 50 percent?

A.   The amount of inventory that's still on hand that's older, yes.

Q.   And you said your last reports in this matter were dated in April of 2022?

A.   My last valuation reports, I believe, that's correct.

Q.   And your opinions regarding the value or Prasad's interests in the Vivid entities in the April 2022 reports are the ones we just saw here.  Is that correct?

A.   That's correct.

Q.   Now, in your April 2022 report, didn't you rely on Ms. Couch's report where she concluded that inappropriate inventory write-downs and adjustments totaled nearly $4.8 million?

A.   That was considered, yes.

Q.   And you understand that after the date of your April '22 report Mr. Burns issued a supplemental report in August?

A.   Yes, I believe so.  There were a lot of reports.

Q.   And in that report, Mr. Burns identified the $640,000-plus mistake that you heard Ms. Couch testify about earlier?

A.   I heard her testify to it.  I don't believe that was in her final conclusion.

Q.   Do you recall that she testified that she agreed with Mr. Burns on that and came back in September and fixed her numbers?

A.   Yes.  I heard that testimony.

Q.   But you didn't come back after September and fix your numbers, did you?

A.   I don't believe I adjusted anything after September if you're talking September of 2022.

Q.   So your -- your latest number, which we're looking at here, doesn't account for the mistake Ms. Couch admitted -- admitted in September that she made?

A.   I don't believe I adjusted anything after I issued my report in April of 2022.

Q.   Now, you've testified, I believe, about getting some gross margin numbers from your client or specifically Prasad's wife, Jasihiri.

A.   That's correct.

Q.   And you got information from her for some related or similar entities they operated.  Is that right?

A.   That's correct.

Q.   And you testified before she just gave you a summary and no backup detail, right?

A.   I received an exhibit that demonstrated the margins that she was representing, yes.

Q.   And that was a summary with no underlying data to show where those numbers came from, right?

A.   I did not have any underlying data.

Q.   You had a one-page summary?

A.   Yes, I believe it was.  It was very small.

Q.   But you didn't go review any other financial documents or valuation documents from those companies to test that number

and see if it was right?

A.    Well, once again, Mr. Burns' numbers corroborated what Ms. Nallapatti provided.

Q.    I want to talk about those in a sec.  But you agree with me you didn't go to look behind the one-page summary you got from your client's wife?  You just put that in your report at 41 percent?

A.    I considered it as one point along with four others, so that's correct.

Q.    And then you talked about Mr. Burns using a 35 percent gross margin in his report in another case, correct?

A.    No.  I talked about the fact that he presented data that suggested margins supporting 35 percent and higher.

Q.    But as of the time you issued your opinion and cited that, you acknowledge you hadn't even read that report, right?

A.    I don't believe I said I hadn't read it.  I think I -- I think I said I hadn't read it word for word.

Q.    I think you said you were just provided with an excerpt from a single page.  Isn't that true?

A.    He performed, if I'm recalling correctly, an analysis regarding the trade name, and I had seen excerpts from that report.  So that's correct.

Q.    So you agree that you never read the report that you talked about from Mr. Burns?

A.    I did not read it word for word.  That's correct.

Q.   And that the only information you have to talk about what Mr. Burns concluded there was an excerpt from a single page of that report?

A.   Well, I -- I saw multiple pages in front of it and behind it, but I didn't read the report word for word.  There was information in that report that made it clear the revenue level for North Carolina increased almost $30 million by 2021.  And that -- it also broke down the breakdown between quartz sales and other stone sales.  So there's a lot of information in those four pages.  It was just a number of data tables.

          MR. PARRY:  Your Honor, if I could approach?

BY MR. PARRY:

Q.   Mr. Wilhoit, I'm going to hand you a copy of your deposition transcript from February of last year.  And turn with me, sir, to page 107.  Are you with me?

A.   Almost there.

Q.   Okay.

A.   I'm there.

Q.   And on page 107, line 20 in your prior testimony, you were asked with reference to these margin figures you've cited, "Do you know what Mr. Burns based that on?"

          Your answer below that:

              "I do not.  I haven't read the report.  I just have an excerpt from one page, or excerpt of one page from this report."

A.    That -- that's correct.

Q.    Is that correct?

A.    Yes.

Q.    Now, you would agree that in your analysis you -- you compared the Vivid financials to industry benchmarks.  Is that right?

A.    Yes.

Q.    And that means you look at other companies you consider to be similar?

A.    I looked at aggregated industry data more than other companies specifically.  I did look at some other companies in my guideline analysis.

Q.    So you looked at some other companies, and you also pulled data from some places called RMA and Integra.  Is that right?

A.    Yes.  RMA stands for Risk Management Association.

Q.    You agree that comparing the subject companies to industry benchmarks and comparable entities is an appropriate way to analyze financial loss?

A.    It's a consideration, yes.

Q.    And you agree that RMA Integra specifically are appropriate sources of industry data for that?

A.    They are.

Q.    Now, you also looked into some of the suggestions we've heard about the compensation of the -- of the employees at Vivid NC, Vivid Texas, specifically the managers, Vinay and

Rohit.  Did you look at that?

A.   Yes, I did.  That was an adjustment I made.

Q.   And specifically, you estimated what market-based compensation for owner operators would be.  Is that right?

A.   Yes.  2.1 percent of revenue.

Q.   And that analysis appears in an exhibit to your report. Is that right?

A.   Yes.

Q.   And -- and the bottom line of that analysis, you concluded that Vinay and Rohit were actually paid less than what you contend would be a reasonable market compensation for their positions, correct?

A.   I would say I replaced their reported compensation for management with what I estimated to be market-based compensation, and the end result was to reduce the earnings level so it would reduce the value.  So, yes, that's correct.

Q.   And so each year from 2015 to 2019 for Vinay, you concluded he was actually paid less than what you concluded would be reasonable market comp?

A.   I made an adjustment to reflect compensation for management based on my understanding of how the company was operated.  It's my understanding that Vinay was the day-to-day operator, and it's my understanding that he was receiving compensation for that.  I added back what he was reported to have received, and I deducted an amount at 2.1 percent of

revenue for -- for the entity.

Q.    Right.  And my question was just as between those two numbers you just talked about.  The reasonable market compensation you found was greater than what he had actually been paid in each of those years, right?

A.    Based on that analysis and over the five-year period, it resulted in an average deduction, I think, of about $30,000.

Q.    And the same was true for Rohit in Vivid Texas.  In -- in the years you looked at, he was paid less than the number you concluded would have been reasonable for the market?

A.    In -- in -- that's a conservative estimate.  To say, if you deduct more in expense, you have a lower earnings level. Therefore, you have a lower indication of value.  So that would have driven my value conclusion down.

Q.    And so do you agree with me that Rohit was paid less in each of those years than what you concluded is reasonable market?

A.    I would agree that's what's implied by my analysis, yes.

Q.    Now, you've testified before that you believe fair value is an appropriate standard rather than fair market.  Did you take a look at the Vivid NC operating agreement?

A.    I did.  And I believe that agreement states that if you're going to sell all the assets, you have to have 100 percent approval of the members.

Q.    Well, let's look at that.  In the --

MR. PARRY:  If I could approach, Your Honor?

THE COURT:  All right.

A.   I believe that's stated in my report.

BY MR. PARRY:

Q.   I've got what's been marked for identification as Plaintiffs' Exhibit 458, the Vivid NC operating agreement.

A.   I'm getting old.  My eyes used to work there.

Q.   If you look, sir, there -- the pages at the bottom right have little Bates numbers on them with a VN.  Do you see that?

(Plaintiffs' Exhibit Number 458 is identified.)

A.   Yes.

BY MR. PARRY:

Q.   Over on the page VN 0006599, which is section 4.3(b) of the agreement.

A.   Yes.  I'm there.

Q.   Okay.  And do you agree with me, sir, that section 4.3(d) provides that the company could sell substantially all of its assets with the consent of members owning 65 percent of the company?

A.   That's what's stated up above, which would be the majority owners still forcing out a minority owner.

Q.   And by the same percentage vote, 65 percent, if you go on to page -- excuse me, turn with me to 6600, Article 11.  You with me?  And I'm looking specifically at 11.1.  And do you see that by the same percentage vote, 65 percent not 100, any

member could also have been dissociated from the company?

A.   And that's still a majority forcing -- forcing out a minority owner, yes.

Q.   Correct.  But it's 65 percent, not 100?

A.   But it's still a majority.

Q.   Right.

A.   Yes.

Q.   And did you also understand -- if you keep reading there on page 6601, Section 11.3, that these parties agreed in their operating agreement if a member had been kicked out for any reason, the agreement expressly provided the price paid would be the fair market value of that member's interest.  Isn't that right?

A.   Which line are you looking at?

Q.   I'm looking six lines down in Section 11.3.  Talks about redemption price an a buyout transaction.  Doesn't that say it shall be the fair market value?

A.   It does say fair market value.  I don't believe it contemplates the member being kicked out as a result of the existing majority transferring assets to themselves.  I don't believe that's contemplated in the agreement.

Q.   Well, aside from what's contemplated, what it says is that if a member is disassociated by a vote of 65 percent, the price has to be paid by agreement at fair market value?

A.   That's what it states.

Q.   Okay.  And that's just not something you considered in your analysis of Vivid NC?

A.   Well, once again, we consider all the circumstances.  It's not very often that the majority at 65 percent kicks out a minority owner and ultimately acquires the stock in their own company.  They merged the assets of these two businesses into companies that they owned.

Q.   Do you agree with what the parties agree to in their governing document as to what price will be paid to someone is important consideration?

A.   As well as the circumstances of the force-out, yes.

Q.   Now, you talked about your approach to valuing the company, Vivid NC, specifically being a going concern.  Do you recall that testimony?

A.   Yes.

Q.   And that assumes the company would continue operating as a viable business for the foreseeable future, right?

A.   Yes.

Q.   And if that's wrong, you'd agree that your approach is wrong?

A.   I would not.  Once again, you have to consider the circumstances.  This is a long-running dispute, and all Prasad wanted was his fair value of the value of the company effective the day he was basically kicked out of the company.  At that point, this was an operating company realizing revenue and

earnings based on the use of all of the company's assets on a going concern basis.

Q.   Let me put it this way.  You didn't do an alternative valuation of the assets, did you?

A.   No, I did not.

Q.   And so --

A.   It wasn't --

Q.   -- if --

A.   -- warranted --

Q.   -- if --

A.   -- in my opinion.

Q.   -- the going concern was not appropriate because the company was not viable for the foreseeable future, you don't have an alternative approach, do you?

A.   I don't.  And I -- I would be speculating to conclude that the company was not viable.  For -- based on a 16 percent revenue growth rate over five years and a 35 percent growth in equity over five years, that would be an unreasonable assumption.

Q.   Now, you acknowledge, don't you, that the Vivid entities had an experienced management team but one that you said had limited depth.

A.   That's based on size, yes.

Q.   And you agree that the principles of the company not having -- they -- they have no form, as best you can tell, a

non-compete or other restriction on their leaving and going and starting up a new business?

A.   I didn't see any non-compete.  So that's correct.

Q.   And you would agree that having experienced management with limited depth and no restrictions on leaving could potentially impair the value of the company's customer relationship?

A.   It could.

Q.   Are --

A.   You're assuming that the owners of a company that's growing at a very high rate and generating a lot of income would want to leave and go compete against the company that they own.

Q.   But the fact that they could and take the customer relationships with them is a factor that impacts companies, doesn't it?

A.   It could, but it would be a little irrational to compete against a company you owned that's making a lot of money.

Q.   You also agree that ongoing litigation is a factor that would weigh into your consideration in determining whether a business is distressed?

A.   Yes.  It's a factor to consider.

Q.   And you were generally aware at the time, weren't you, that there was a dispute between the parties regarding trademarks?

A.    Yes.

Q.    But you didn't do any analysis to determine whether the potential loss of a trademark might impact the going concern valuation of Vivid?

A.    Once again, the loss of the trademark will be driven by the behavior of the owners of the company.  They would be hurting themselves and the company that they own.  So I was aware of it, but I also, once again, considered all of the circumstances.

Q.    But you didn't do an analysis of how that might impact if they lost their trademark?

A.    I did not.

Q.    You do agree that the continued right to use the Cosmos trademark they've been operating under would be part of the going concern value?

A.    Because it was being used at the time that Prasad was kicked out of the company, yes.

Q.    And you agree that the ongoing trademark litigation introduces uncertainty as to their ability to continue doing it?

A.    Yes.

Q.    And that uncertainty could potentially negatively affect the ongoing -- going concern value?

A.    It could, yes.  But once again, a long running dispute, that's why the, in my opinion as a valuation expert, state

courts take the position that you have to value this company on a controlling basis and pay fair value if you're going to remove someone against his will or her will.

Q.   Any of those cases you talked about involve folks who had an operating agreement where they agreed on a different standard of value?

A.   I don't recall.

Q.   Another potential factor to consider in determining whether a business distress -- is distressed would be whether they had defaults on their loans, right?

A.   That's another factor.  I believe I test- -- testified in my deposition that small companies are generally understood to have limited access to capital.

Q.   And you understood that the Vivid entities in particular rely on their credit facility to fund their inventory, right?

A.   I think we heard that testimony in the trial, yes.

Q.   Is a credit facility a loan?

A.   A line of credit.  Ms. Couch testified to that.

Q.   And so you agree that loan that they relied on to fund their inventory was important to the Vivid entities' business?

A.   Pretty much important to every company, yes.

Q.   And so when you look at their performance over a period of years leading up to 2020, those didn't involve being in default on an important bank loan, did they?

A.   Once again, those years involves significant growth,

significant increase in inventory, and a reduction in debt.  As Ms. Couch testified, the companies were making money, growing, paying off debt, and distributing significant cash to the owners.  The owners could have easily used their own cash to fund the operation.

Q.  But the fact that they were making money in prior years when they did not have a bank default on a loan you called important to funding their inventory is a factor, right?

A.  It is a factor.  But also cash flow generation is a factor.  There are many private small companies that don't have any debt.  I have a number of clients that have zero debt that generate hundreds of millions of dollars in revenue.  So that's a choice of the owners.

Q.  It would also be a factor to consider, you said, if a company had defaulted on its loan covenants was unable to remedy that default by getting an alternative loan, right?

A.  I did.

Q.  But you, in part of your opinions here, didn't look at any documents relating to the Vivid refinancing efforts, correct?

A.  I wouldn't say that's correct.  I believe I testified in my deposition that I was aware they were having issues obtaining replacement capital, or funding.  And -- and I believe I testified also that it is an option for owners to sell fund.

Q.  But didn't you testify also you don't recall seeing any

specific documents that related to their efforts to find refinancing?

A.   I got into the case in 2021, so I read a lot of documents. I can't really remember exactly when I read them, but I believe I testified to that in my deposition. But I also had other comments regarding how privately owned companies are funded by their owners, and it's not always bank loans.

Q.   Let's take a quick look at page 82, if you would, starting at line 4 in your deposition.

A.   You said page 82?

Q.   Yes, sir.

A.   I'm there.

Q.   Now, the question beginning at -- at line 4 was:

     "Do you know whether Vivid NC sought to refinance its
     loans with Bank of America for the loans that Bank of
     America had underwritten?"

     Your answer, "I don't recall seeing any specific
documents related to refinancing efforts," right?

A.   That's my answer, yes.

Q.   In any event, don't you agree, Mr. Wilhoite, that an uncooperative member who's causing litigation and loan covenant defaults would be another potential consideration in determining whether a company is distressed?

A.   Well, I think we need to first define distress. If you have an uncooperative member, I can probably name 50 companies

that have some uncooperative members.  That doesn't necessarily make them distressed.  I think it's a consideration.  It could be a disruption.  But once again, for a growing company that's generating profits, you would think the owners would figure out how to address that issue, and the way to address it is to buy out that individual at fair value.

Q.   You agree in your deposition, didn't you, that a way to remedy that issue was removing the member?

A.   By buying the member out at fair value, yes.

MR. PARRY:  No further questions, Your Honor.

THE COURT:  Is that it for this witness?

MR. MORSE:  Your Honor, it is the -- it is -- yes. That's -- sorry.  That's it for this witness, and we would like to move in P-503 and P-291.

THE COURT:  They're received.

(Plaintiffs' Exhibit Numbers 291 and 503 are received.)

MR. MORSE:  Thank you.

(The witness left the stand.)

THE COURT:  You have any other witnesses?

MR. COBLE:  No, Your Honor.  Plaintiff rests.

THE COURT:  Do you have any witnesses?

MR. PARRY:  We do, Your Honor.  We also have a Rule 50 motion.

THE COURT:  All right.  Let the jury go out for a recess.

(Jury exits the courtroom.)

THE COURT:  Somebody make a motion.

MR. PARRY:  Your Honor, under Rule 50, we believe there are several grounds to find on several key issues that a reasonable jury wouldn't have sufficient evidentiary basis to find those issues.  First being, there is no basis for a fiduciary duty here.  No -- the first reason for that is we're talking about two LLCs.  And while there is a big dispute and lots of testimony about what happened back in 2005, there is no dispute that Prasad or his companies had a 50 percent --

THE COURT:  You and I must not be in the same room because there's no way you're gonna get a Rule 50 motion at this point, and this is a fraud case.  Your client is accused of committing fraud and deceit on his partner, and it's gonna go to the jury.  But thank you.  We'll be in recess.  You think about that.

(A recess was taken at 3:11 p.m. and proceedings resumed at 3:20 p.m.)

THE COURT:  Call your next witness.

MR. PARRY:  Your Honor, the defense calls Vamsi Nallapati.  We also move for admission some of the documents we've discussed.

THE COURT:  All right.  Go ahead and do that.

MR. PARRY:  Those are Defendants' 310, 311, 201, 210, 85, 319, 320, 328, 321, 330, 326, 329, 332, 372, and

Plaintiffs' 458.

THE COURT:  Received.

(Defendants' Exhibit Numbers 85, 201, 210, 310, 311, 319, 320, 321, 326, 328, 329, 330, 332, and 372 are received.)

(Plaintiffs' Exhibit Number 458 is received.)

THE CLERK:  Good afternoon, sir.  Would you place your left hand on the Bible and raise your right hand?

(The witness, Vamsi Nallapati, is sworn.)

THE CLERK:  Please be seated on the witness stand.

DIRECT EXAMINATION BY MR. PARRY:

Q.   Would you introduce yourself to the jury?

A.   Good afternoon, ladies and gentlemen.  I'm Vamsi Nallapati.  I'm the defendant in this case.

Q.   Vamsi, what do you do for a living?

A.   I have import and distribution businesses.  I work out of Raleigh, North Carolina, office.  We have multiple businesses in different parts of the country, and I manage and run them.

Q.   If you could speak up just a little bit, Vamsi; it's a little bit hard to hear you.  When did you first come to live in the U.S.?

A.   I came to U.S. early 2000.  I came here as a software engineer to work in computers.

Q.   Did you become a U.S. citizen at some point?

A.   Yes.  I am a proud U.S. citizen now.

Q.   When was that?

A.    It's about 2011.

Q.    And you said you came as a software engineer.  Did you reach a point where you started working in the stone business?

A.    Yes, that's correct.  The year 2001, I started to work in the stone business as a part time.

Q.    And what were you doing part time?

A.    I used to import -- buy materials from India from different suppliers, and I used to sell to the distributors like me at the time.

Q.    Had you worked in the stone business before you came to the States?

A.    That's correct.  I'm a mechanical engineer by education. And for -- between 1993 and 2000 before I came to the U.S., I was working in the stone business.

Q.    And when you were working as a software engineer, by the way, did you set up a company to do that stonework on the side?

A.    That's correct.  I had the company NVM International Incorporation registered in New Jersey.

Q.    How did you come up with that name?

A.    NVM is -- goes by my name, Nallapati Vamsi Mohan.

Q.    Who were the owners of NVM?

A.    I'm the only one, 100 percent.

Q.    Did that at some point become your full-time job?

A.    That's correct.

Q.    When did you start to make that change?

A.   The year 2005, I moved to Triangle area to set up a full-time business with the physical location for import and distribution.

Q.   Were you still operating under the NVM company at that point?

A.   That's correct.  The company registered in New Jersey was also registered to do business in North Carolina.  And I was operating under NVM International.

Q.   Did you start to operate when you opened up a facility in Raleigh under a different name?

A.   Legally, it was NVM International, but we have registered in name for doing business as Cosmos Granite and Marble.

Q.   Now, Vamsi, back when you were starting that facility in, I think you said 2005, around that time, did you ever have discussions with your cousin Prasad about going into business with you?

A.   That's correct.

Q.   Did he actually end up going into business with you?

A.   No.

Q.   Why not?

A.   So about 2005 -- around 2004, I decided to go into full -- full-time business.  And as I was working my full-time job, I was traveling throughout the U.S. to pick my next home.  And at that time, few of the suppliers I worked with have approached me saying they would support me for my full-time business in

whichever way I chose. And I responded them, I cannot tell you an answer now. My family's in the same business. I would talk to my family first and see if they would be interested in doing business with me. If that is the case, I cannot work with you. But until I check with them, I will not answer you.

That's when I approached Prasad. I told him the same: a few people approached me offering me -- to work with me, and if you would choose to work with me, we can work together as a family. And at the time, we -- we talked. We both can be 50-50 and start a business in Raleigh. At the time, Prasad's father, my uncle, was the managing director of the company in India, DSG. And we told him what we were thinking to do, and he quickly said, "No, you cannot do, Prasad being a director in a public limited company. DSG is a public registered company in India." He said, "An officer cannot have a relation with his customer. So that would violate security laws. So for that reason, he cannot be on the business. You go ahead and go do it yourself on your company."

Q. Did you and Prasad ignore your uncle's direction and -- and form a business together anyway?

A. No.

Q. Why not?

A. My uncle was the oldest in our family, and from the culture, you just follow elders to say -- when my uncle said, no, there is no way we would hide things behind him and go back

and do the opposite of that.

Q.   Did you end up reaching an understanding with your uncle about a relationship between your new business and DSG?

A.   That's correct.

Q.   Tell us about that.

A.   So after we started the business in 2005, within a year or so, I traveled to India to visit my family.  And I visited my uncle's office.  At the time, he put forward a piece of document where it said memorandum of understanding.  It said NVM International, North Carolina, location would share 50 percent of its profits with the DivyaShakti Granites, DSG.  And the document was signed by my uncle as the managing director of the company, and I signed as a president of NVM International.

Q.   And did you understand that the profits would go to Prasad personally or to the company DSG?

A.   No.  That memorandum of understanding memorized that all the profits would be shared with the DSG.

Q.   Do you have a copy of that document today?

A.   I do not.

Q.   Why not?

A.   It -- it is in our culture that uncle puts forward a piece of document you read and sign.  You do not -- it's very disrespectful to ask him give me a copy for my file.  If my uncle had it, the whole family had it.  That's kind of respect we always give, and that's how it worked.

Q.   Did you understand Prasad to be aware of your arrangement with your uncle?

A.   That's correct.

Q.   How did you know that?

A.   We were the only three people in that room when I signed that piece of document:  my uncle, my cousin Prasad, and myself.

Q.   Let's take a look, Vamsi, at what's been marked as Defendants' Exhibit 208.  And specifically -- well, let's take a look at the first -- the -- the heading first.  This is a June of 2010 email from you to Prasad.  Is that right?

     (Defendants Exhibit Number 208 is identified.)

A.   That's correct.

BY MR. PARRY:

Q.   And, now, let's look down at the third paragraph from the bottom about midway through.  I'm looking at the sentence, Vamsi, you can see that it starts "For the second question." Do you see that?

A.   Yes.

Q.   And you say, "For the second question, I've already signed an MOU with DSG three years back."  Is that the memorandum of understanding you just told us about?

A.   That's correct.

Q.   Did Prasad respond to this email when you sent it to him in June of 2010 and said, "What are you talking about?"

A.   No.

Q.   In this email, you reference Pedananna.  Who is that?

A.   That is my uncle.  That is the word we use to refer to uncle in local language.

Q.   You go on to say in your email to Prasad here in 2010, "If that," referring to him or you, "does not seem enough, whatever makes you and Pedananna comfortable, I'll sign."  Do you see that?

A.   Yes.

Q.   Did Prasad respond and send you any other documents he or your uncle wanted you to sign to make them more comfortable?

A.   No, he did not.

Q.   Now, did you get -- we've heard about payment terms from DSG, and you've been here for the testimony.  Did -- did your company get favorable payment terms from DSG?

A.   That's correct.

Q.   And I want to ask you about that.

          MR. PARRY:  First, Your Honor, I'd like to move admission of Defendants' 208.

          THE COURT:  Received.

     (Defendants' Exhibit Number 208 is received.)

BY MR. PARRY:

Q.   All right.  Tell us what you mean when -- when we talk about favorable payment terms.  What was that?

A.   It -- it is normal in our business of import and

distribution all the factories and suppliers typically provide 90 to 120 days from the bill of lading, which means when it gets shipped onboard on the -- on a ship in the origin country. From that date, we get 90 to 120 days. Whereas, my uncle and my cousin has provided me with 180 days. So it's -- and it's 90 to 60 days extra time that was very valuable at the time.

Q. Did DSG give you any slabs for free?

A. Nothing. No.

Q. Did you get a discount?

A. No.

Q. Just to be clear, was the source of supply Prasad or the company DSG?

A. Everything was sourced, provided, and any wised by DSG.

Q. What did you understand Prasad's involvement, if any, to be in securing those slabs?

A. Prasad was the executive director of the company at the time. He's on the board. He is -- was reporting to his father as a managing director. And he was the face of DSG for me, for all business -- business purposes. Any material we needed, we -- I would tell him what we need for which location, what color, how many slabs, and he would source and process and help us load those containers for us.

Q. If -- if all you got from -- from your uncle's company was longer payment terms, why were you willing to give them a share of the profits?

A.   So it was my first business in my lifetime.  Getting into the distribution business in the U.S., I assumed I can bring everything my uncle's factory produced, and I can run a successful distribution at the time.  I was ignorant that just with the ten to 12 Indian colors I cannot be successful in a distribution business.  Pretty quickly, I learned how to have materials from all over the world to be a successful distributor.  But by then, I already made my commitment with my uncle.  I gave a word.  I'm a man of word, and I lived up to that expectation and commitment for the rest of my life.

Q.   So at what point did you realize, Vamsi, that that wasn't a great deal for your new business?

A.   Pretty quick.  The very first month before my first containers arrived from DSG from India, I was trying to go into the market and pre-sale, saying the material is coming.  I would be able sell.  None of them were interested.  Nobody took me for serious having just Indian materials.  Then before that Indian -- I said I had to go run find sources in Brazil and I ordered more material.  And we opened our first location in Raleigh in November.  I could not make a sale until -- about after New Year 2006 right about 6th of -- 10th of 2006 January was my first sale.  That's -- the sale happened with the Brazilian material I had received in the location.

Q.   Did you ever --

          THE COURT:  Can you -- see, half the jury doesn't

understand a word he said.  I can't understand a word he said.

Raise your hand if you understood everything he said.

Okay.  So three of the eight jurors understood everything he said.  Sorry.

BY MR. PARRY:

Q.  Vamsi, just try to speak up and speak as slowly as you can.  Did you ever seek to revisit a deal with your uncle?

A.  No.

Q.  You mentioned something earlier about him being an older member of your family.  Is that something of cultural significance to you?

A.  That's correct.  So --

Q.  What does that mean?

A.  The -- the oldest uncle in the family is, like -- he takes place of the grandfather after he -- after he passed.  So my father's uncles, everybody would respect and look up to my uncle.  And when -- my father stands up when he walks into the room.  I just follow that.  That's kind of respect he demand.

Q.  Now, we've seen that you sometimes refer to Prasad as your partner or refer to a partnership in the context of Prasad.  Why did you do that if you didn't think that was the arrangement?

A.  Like I said in my previous testimonies, Prasad has been the face of DSG.  And when I talk to Prasad, I'm talking to DSG.  When ask him for material, it is Prasad I'm talking to.

He would arrange and have them shipped. So partnership is a very loose term we use. I mean, I didn't know until I got into this lawsuit it was a sin to use partnership. I continue to use partner with my suppliers, my customers, my fellow members of LLC. I know it is the LLC anybody introducing. He is another member of my LLC. We always refer them as partner. If we're working for a common cause and if we are working towards a common goal, whoever is on our side is our partner.

Q. Did Prasad ever contribute any of his own money to your new U.S. Cosmos business?

A. No. Never.

Q. Did you?

A. Yes.

Q. How much?

A. It's totally accounted for about 500,000 at the time for the first location in between 2000 -- at least 2005 and -- late 2005 and early 2006. That was all the money I had of -- I put in everything I had.

Q. Did you have to lease the warehouse you operated from when you opened up in Raleigh?

A. That's correct.

Q. Did the landlord require a personal guarantee in order to get that lease?

A. Yes. We -- that was the first time we were leasing a building. Not having any history, the landlord required me to

sign a personal guarantee.

Q. Did you agree to provide that guarantee?

A. Yes. I did sign that.

Q. And does that mean that if the company can't pay its lease that's on you?

A. That's correct. I was personally responsible for that.

Q. Did Prasad sign a guarantee for the lease?

A. No.

Q. Were there any other company obligations you had to stand behind like that?

A. Over the years, every time we expanded into a new market, every time we leased a building, we had to sign a lease. And most of them went with the personal guarantee. I was the only one signing personal guarantees. Apart from that, if we bought a truck, bought a forklift, we financed from the bank, we had to sign personal guarantees.

Q. Once the company got going in Raleigh, what was your day-to-day role?

A. I was pretty much involved in doing everything right from hiring people, training people, loading the trucks, unloading the containers, going out to sell, collect, and providing all the information required to the accountants to do the accounting and taxes.

Q. Did Prasad have a job title with that first Cosmos entity?

A. No.

Q. Did he have any job responsibilities at all?

A. No.

Q. Did you ever have any written agreement under which you and Prasad would be partners in that business?

A. No.

Q. Did you ever register to do business anywhere a partnership between you and Prasad?

A. No.

Q. Are you aware if that ever happened?

A. No. Never.

Q. Did any entity claim to be a partnership between you and Prasad ever open up a bank account to your knowledge?

A. No.

Q. Did any entity claiming to be a partnership between you and Prasad ever file a tax return?

A. No.

Q. Did the business eventually expand beyond Raleigh?

A. Yes.

Q. All right. Give us a general quick overview of where and over what period of time.

A. After 2005, we expanded into Washington state in Seattle in 2008. And from there between 2008 and 2014, we had 12 different locations. 2008, 2009, 2010, '11, and 12, every year, we had one or two locations expanded. In about 2009, we acquired, or bought into, that time called Vivid Charlotte.

Q.   Did -- did new owners also come in in some of those different locations?

A.   That's correct.

Q.   Did you have any role at the startup of those locations as they spread around the country?

A.   Yes.

Q.   Tell us generally what you had to do with that.

A.   Every location we went into, I was very instrumental in doing the -- doing the ground research to figure out whether that is -- the location would survive and be a -- successful. And I would go in and meet the customers, find the buildings to sign the leases, and bring in somebody else.  I do a business as a minority partner to run the business, trying them and help them meeting the customers and how to sell and help them how to buy and where to buy and how much to pay.

Q.   Did Prasad get involved in the day-to-day operations of any of those locations?

A.   No.

Q.   Did you understand his arrangement would be similar to his involvement with Raleigh in order of being the face of DSG for supply?

A.   That's correct.

Q.   Did the organization of all those locations change in some way in 2015?

A.   That's correct.

Q.   Tell us generally what happened that year.

A.   At the end of 2014, we decided that we had five or six different entities, legal entities.  We brought them all under one umbrella, brought up in a holding company to hold the interests of the -- all the members and the entities and make one legal company and rest of them as operating under the same.

So everybody's ownership has rolled up into the holding company.  And the purpose of it is to be able to grow and be able to afford more resources, whether it is the CFO or inventory manager or the purchase manager or a sales manager and so on, thereby we can grow to the rest of the country.

Q.   And were there -- were there unwritten agreements prior to that -- to that roll up in 2015 in some of these locations?

A.   That's correct.

Q.   And in 2015, when you did that big transaction, did -- did everyone's ownership interest get documented at that time?

A.   That's correct.

Q.   Did Prasad and his family and DSG get credit for whatever interest they claimed?

A.   By the time -- 2013, my uncle passed away, and Prasad assumed his role as the managing director of DSG.  And in his new role, as we are doing this transaction, he chose to have all the interest on his personal name and his holding company with his family.  I didn't have a problem with that.  And we accounted for everything, documented or undocumented, at the

time, and he got full credit for everything I promised to my uncle.

Q. So whatever interest he claimed based on DSG's share from those other locations became his interest in the group?

A. Correct.

Q. Are there any other undocumented agreements regarding ownership after that 2015 transaction?

A. No. There was nothing left.

Q. What was your role generally in -- in connection with the consolidated company? That was called CGM Group, right?

A. That's correct.

Q. What was your role?

A. I was working, as you see, looking after all the locations. All the managers working at these locations were reporting to me, continue to do the accounting part, and maintaining the banking relations, supplier relations, and making payments to the customers, and so on.

Q. And what was Prasad's role with the consolidated group entity?

A. He continued to stay in India and work. His full-time job was a managing director at DSG. And he continued to support us with our requirements from India for the materials.

Q. How long did CGM Group last?

A. Less than a year.

Q. Who ended things?

A.   Prasad.

Q.   Why?

A.   All -- all of a sudden, in October 2015, he sent an email saying we are not buying enough from DSG and he's feeling awkward to ask us for more orders to process for DSG, and he had 150 employees to feed and keep them.  So for those reasons, he said we should be split, and I'll take locations whatever I would get for -- for my share and then run them on my own, and we'll go our ways.

Q.   Did that begin a process of -- of everyone trying to separate their interests from the companies?

A.   That's correct.

Q.   Has that process been smooth?

A.   No, it has not.

Q.   Has it led to other lawsuits besides this one?

A.   Correct.

Q.   How many?

A.   I wish I could keep up with the number of lawsuits.  I -- somewhere between seven and ten.

Q.   Let's talk about the companies at issue specifically in this case.  What is Nallapati Properties?  We've heard that name.  What is it?

A.   Nallapati Properties is the real estate holding company. I was advised when I was buying the first real estate property by professionals that we should have an LLC to hold a building

for any liability issues.  And we registered in 2009 to buy the first building in Raleigh.

Q.   Did you also talk to Prasad about him potentially going into business with you on that real estate holding company?

A.   That's correct.

Q.   Could he do that?

A.   So 2009 when we were -- when we registered Nallapati Properties, the seed money to be paid for the down payment to buy the building was coming from NVM International.  And as I promised my uncle, 50 percent of the profits, I would share with the DSG.  At the time, I told them DSG or Prasad should come in and become a member of the LLC for the remaining 50 percent.

And when we approached the bank to get a loan, we could not come up with the 20 percent they asked for.  We could only come up with five percent.  The bank advised us we should go and approach the SBA, Small Business Administration.  It's a loan backed up by the federal government.  And that's what we did.  When I went to the SBA, they said if there is a foreign citizen in the -- in the company it would be hard for them to lend the money.  So that's what I told Prasad, that I'll keep it 100 percent on my name until we can get through the SBA or we can -- if we can pay off the loan, eventually we can bring you back on board.

Q.   Did you have a similar understanding regarding sharing

profits, if any?

A.    That's correct.

Q.    Were there ever any distributions made to you as the owner of Nallapati Properties other than to cover your tax payments to the government?

A.    No.  Never.

Q.    Now, before you transfer the properties, which we've heard about in this case, was there a change to the ownership of the Nallapati Properties, LLC?

A.    That's correct.

Q.    When and why was that change made?

A.    As we agreed at the 2015, we are going to separate, and in agreement with 2015 coming into the group, I made a promise that Prasad would bring his own company to represent his 50 percent into the real estate.  He came up with the company name UTS Holdings.  And we made that a 50 percent owner of Nallapati Properties, and we filed taxes starting from January 2015, 50 percent on UTS and 50 percent assigned to me.

Q.    Let's take a quick look at Defendants' 297.  This is an April 2015 email exchange between you and Prasad.  Is that right?

A.    That's correct.

      (Defendants' Exhibit Number 297 is identified.)

BY MR. PARRY:

Q.    And is this about having his company UTS that you just

told us about as an interest owner in Nallapati properties?

A. Yes.

MR. PARRY: Scroll down to the email signatures.

BY MR. PARRY:

Q. I just want to make our box a little bit bigger here, Vamsi. There's a --

MR. PARRY: There you go. That's good.

BY MR. PARRY:

Q. Sorry about that. I don't know if you can see, Vamsi. What is that underneath the logo where you -- email signature? What does it say there?

A. It says solid partnerships, mutual benefits. Not just me. Most of our people working at Cosmos has the same slogan for the company. That's a tag line. We -- we value all the partnerships with customers, vendors, and suppliers, and thereby mutual success for all.

Q. So that goes out to every single person you send an email to from work?

A. Yes.

Q. Now, did Prasad object to adding UTS as an interest owner in 2015?

A. No.

Q. Did he ask why he hadn't been a member before?

A. No.

Q. Was that done around the time of the 2015 roll-up

transaction you told us about when things were being documented?

A.   That's correct.

Q.   Did you stop showing UTS as an interest owner in Nallapati Properties at some point?

A.   That's correct.

Q.   When was that?

A.   2016 tax returns were the last time UTS was shown and issued a K1 for its share.  After that, it did not show as Atlanta property was registered into UTS.

Q.   Did Prasad object to UTS no longer being an interest owner of Nallapati Properties?

A.   No.

     MR. PARRY:  Your Honor, we would move admission of 297.

     THE COURT:  Received.

     (Defendants' Exhibit Number 297 is received.)

BY MR. PARRY:

Q.   Now, when you started separating your interest, did you reach an understanding with Prasad about the properties that were owned by Nallapati Properties?

A.   Yes.

Q.   And where, again, were those?

A.   Those were -- those were three buildings:  Raleigh, Greensboro, in North Carolina; and one in Atlanta, Georgia.

Q.   Are these the warehouses we just heard about?

A.   That's correct.

Q.   What was the understanding you reached with Prasad about how those would be divided?

A.   So it was -- he -- he proposed that since I'm going to keep the operating locations in North Carolina I would keep the two buildings and he would keep the Atlanta location because the operating company running out of Atlanta is going with him.

Q.   And did you send an email to Prasad suggesting what you thought the values of the warehouses would be roughly?

A.   That's correct.

Q.   Let's look at Defendants' 93.  Is this the copy of the email you just mentioned, Vamsi?

A.   That's correct.

     (Defendants' Exhibit Number 93 is identified.)

BY MR. PARRY:

Q.   And you're emailing Prasad.  This is November of 2015 at the bottom.  And again, Nania [phonetic] is Prasad.  Is that right?

A.   Yes.

Q.   And you're emailing him some numbers.  Are those the purchase prices of the warehouses and the amounts of the loans outstanding?

A.   On each of those properties, that's correct.

Q.   And what did you say in the last line of your email to

Prasad about whether you-all want to get another valuation done?

A.   So this is in line with how we split from the group, CGM Group operating companies.  I propose that we should value the entities when we are going out.  And Prasad said we are not selling the company, we are only transferring among ourselves. We should just go with the book value.  And in similar lines, I was proposing here also we are just transferring between us. It is not selling.  So we should just go by the book value, and he replied saying that's okay.

Q.   So when you said, "I don't think we need anymore valuations at this time," Prasad responded, "Vamsi, it's okay"?

A.   Yes.

Q.   Did he ever object to that or ask to have any appraisals done back at this time before lawsuits?

A.   No.

Q.   Did you follow up with a calculation of what amount would be owed if you split the properties that way?

A.   Yes.

Q.   Well, we talked about those.  Were you-all talking about just the warehouses or a whole bunch of things?

A.   So at this time, we were still working out ways and means to separate ourselves from the operating companies, who would take which locations and who would operate those locations. Having everything -- still working out, I was proposing this is

what I would be owing based on these valuations. And we were

trying to figure out when everything is put together who would

owe what is what we were trying to see at the time.

Q.   Was there ever an understanding in 2015 that either one of

you was going to pay the other for some difference on just the

warehouses without taking into account those other things?

A.   No.

Q.   Let's take --

          MR. PARRY:  Can you pull up D-94 and D-95?

BY MR. PARRY:

Q.   So D-94 is an email that you sent in the next month,

December 2015.  And I think we've seen this one attached to

your Excel spreadsheet.

A.   Yes.

Q.   And -- and is this the one where you put in those numbers

and came to the total that -- that would be the offset for the

warehouses?

A.   That's correct.

     (Defendants' Exhibit Number 94 is identified.)

BY MR. PARRY:

Q.   And let's look quickly at D-95.  Now, without going

through all those numbers, using this methodology, Vamsi, what

would have been the amount on the warehouse differential as

that piece of the separation?

A.   If you look at the right bottommost number, 2.887 million,

that is the total value.  And if it split -- if it is shared 50-50, that would have been 1.44 million, whereas I was walking away with 1.64 and Prasad was walking out with 1.244.  That's right about 199,000 difference.

(Defendants' Exhibit Number 95 is identified.)

BY MR. PARRY:

Q.   And at this point, did you think you-all had an agreement that no formal appraisal would be needed?

A.   That's correct.

Q.   And -- and that you would treat the difference in value as of that time as 199,000 or so?

A.   That's correct.

Q.   Did Prasad ever push back and say "I'll need more than that"?

A.   No.

Q.   Was it your understanding -- well, strike that.  Did you pay Prasad 199,000?

A.   No.

Q.   Why not?

A.   Like I said before, we were trying to figure out the differences between the other entities we are going to split.  And we needed to put all together, add up and subtract and figure out who would owe who.  So that's the reason we didn't have to exchange money at this point of time.

MR. PARRY:  Your Honor, we move the admission of D-93

and D-94 and D-95.

THE COURT: Received.

(Defendants' Exhibit Numbers 93, 94, and 95 are received.)

BY MR. PARRY:

Q. Now, based on that exchange, did you go ahead and transfer the Atlanta warehouse from Nallapati Properties to Prasad's company, UTS?

A. That's correct.

MR. PARRY: Let's put up D-303 briefly.

BY MR. PARRY:

Q. Is D-303 a copy of the deed by which the Atlanta warehouse was transferred to Prasad's company?

A. That's correct.

(Defendants' Exhibit Number 303 is identified.)

MR. PARRY: Your Honor, we move the admission of D-303.

THE COURT: Received.

(Defendants' Exhibit Number 303 is received.)

BY MR. PARRY:

Q. Did you also transfer, Vamsi, half of the money Nallapati Properties had to UTS?

A. That's correct. At the time, we had two business accounts for Nallapati Properties, one at Bank of America and one at BB&T. Until at that point, Prasad and I both had access to the bank accounts. I emailed him and his wife to go log in and see

the monies available, and I would split 50 percent of the available monies, and I would transfer into UTS.  And I did transfer, and they acknowledged they received the money.  And they asked me to block his access to the bank accounts at -- with Nallapati Properties.

Q.   Let's take a quick look at D-305.  You mentioned emailing about the amounts that were in the bank accounts, Vamsi.  Can you just confirm if Defendants' 305, January of 2016, was the email exchange where you provided the totals in the bank accounts and indicated that half would be transferred to UTS?

A.   That's correct.

     (Defendants' Exhibit Number 305 is identified.)

BY MR. PARRY:

Q.   And why were you emailing Prasad, his wife Jasihiri, about this?

A.   Jasihiri is Prasad's wife, and she's in -- she's an attorney, used to practice law in India.

Q.   Is she involved in the businesses?

A.   Yes.

Q.   Is it common for her to communicate on Prasad's behalf regarding these businesses?

A.   Yes.

Q.   Did she respond when you sent her this email and said "Here's the totals and we're gonna send half to UTS"?  Did she respond and say they would need more?

A.   No.  In fact, she responded back saying we are actually divorced now, a final goodbye.

Q.   She says, "We are officially divorced now.  A final goodbye."  Is that right?

A.   Yes.

        MR. PARRY:  Your Honor, we move the admission of D-305.

        THE COURT:  Received.

    (Defendants' Exhibit Number 305 is received.)

BY MR. PARRY:

Q.   Now, did Prasad's wife Jasihiri also tell you to remove his access to the Nallapati Properties accounts?  I think you mentioned that.

A.   That's correct.

Q.   Let's take a quick look at D-306.  This, Vamsi, appears to be an email from the next day, if we zoom in on the top there. After that money is transferred, what did Prasad's wife tell you to do here on January 9th, 2016?

A.   She authorized me to go ahead and block, remove, Prasad's login.

    (Defendants' Exhibit Number 306 is identified.)

BY MR. PARRY:

Q.   That's Hari Prasad?

A.   That's -- his first name is Hari.

Q.   So did Prasad record the deed and take ownership of the

Georgia warehouse under the name of UTS?

A.   Yes.

Q.   Did he accept the cash you sent from Nallapati Properties representing half that company's available funds?

A.   Yes.

Q.   Did he demand any additional payment in 2015 or 2016?

A.   No.  Never.

Q.   When was the first time you ever heard anything about that?

A.   Right before this lawsuit was filed in 2021, '20 sometime.

Q.   Did Prasad ever explain why he never said anything if he believed you owed him money for five-something years?

A.   No.

          MR. PARRY:  Your Honor, we move admission of D-306.

          THE COURT:  Be received.

     (Defendants' Exhibit Number 306 is received.)

BY MR. PARRY:

Q.   Now, let's talk about things in the Vivid entities, Vamsi. We've heard a little bit about this.  But can you explain did you and Prasad own your interest in Vivid NC directly or through another company?

A.   Through another holding company.

Q.   Okay.  Can you tell the jury what that name -- what the name of that company was?

A.   The company is Cosmos Granite and Marble NC, LLC, of

Raleigh. This litigation purposes, we say NC LLC to be simple and easy.

Q. Now, when you say you and Prasad invested through that company, did Prasad show up on paper as an owner of NC LLC?

A. Yes. We have -- we still have the operating agreement. And he -- from the day one, he has shown as a 50 percent member of the company.

Q. How much of Vivid NC did you-all end up owning through NC LLC?

A. We eventually ended up 60.2 percent of Vivid NC, and that was assigned to NC LLC.

Q. Now, when did Vivid Texas start?

A. 2016.

Q. And was the ownership different from Vivid NC?

A. That's correct.

Q. Why was that?

A. So Rohit was -- Rohit is still living in Dallas, Texas. We needed somebody to operate the location, and we trained him when he showed interest in running the location. And in Vivid NC, he's only 9.8 percent shareholder, and he requested that he should have little more as he's coming full time in running the location, and we all talked and they agreed that each -- each of us would give -- give away five percent and make him equal 25 percent owner. So all four of us would be 25 percent each in the Vivid Texas.

Q.   Did you and Prasad own your interest in Vivid Texas directly or through some other company?

A.   No.  We both ended up with our holding companies.  I went in to Texas as an NC LLC, representing my 25 percent, and Prasad came with his holding company called Justh representing his 25 percent.

Q.   Has Prasad even during this litigation changed his position about how much of Vivid Texas he owned?

A.   That's correct.

Q.   Tell us about that.

A.   At about 2018 when we were having difficulties with the banks, we called for a board meeting for all the members.  At the time, we didn't have any ways to talk to the members directly.  Everything was going through attorneys.  We requested for a board meeting.  We thought we can speak face to face and resolve issues.

Unfortunately, Prasad didn't show up, but he sent his attorney for the meeting.  And we couldn't get any answers from him.  Everything we asked for, he was saying I need to go and check with my customer -- my client.

And during that call, I propose that NC LLC is stuck in limbo.  I would rather change -- we will tax as my ownership to my personal name.  And he said, no, that's not possible because that is -- Prasad owns also.  And our attorney wrote a letter to them asking to clarify whether once he owns 25

percent in Vivid Texas or not.  He came back saying my client owns 37.5, 35 percent from his holding company and the 50 percent of NC LLC.

Q.   And let's take a look at Defendants' 334.  And just the email on the top.  Is this the email you were just referencing from Prasad's lawyer?

A.   That's correct.

       (Defendants' Exhibit Number 334 is identified.)

BY MR. PARRY:

Q.   And so as late as March of 2020, was Prasad claiming that rather than 25 percent ownership by everyone that he owned 37 and a half percent?

A.   That's correct.

Q.   Has he changed his position since then?

A.   Yes.

         MR. PARRY:  Your Honor, we move admission of D-334.

         THE COURT:  Received.

       (Defendants' Exhibit Number 334 is received.)

         MR. PARRY:  And I think I might have forgotten.  We'll move admission for D-306 as well.

         THE COURT:  Received.

BY MR. PARRY:

Q.   What was your role, Vamsi, in the business of the Vivid entities?

A.   I've been doing the same thing I have been for Cosmos

entities. I will help Vinay and Rohit, reaching out to the suppliers, purchasing the materials, what materials to buy, and managing the banking relations, and anything needed -- training, the -- hiring the employees. I've been involved doing everything it required.

Q. Did Prasad do any work for either of the Vivid companies at any point?

A. No. In fact, he has never seen our Vivid Texas location.

Q. Did Prasad at least help, as he had with the Cosmos entities, secure the longer payment terms from DSG?

A. No.

Q. Does Vivid get more advantageous terms than anybody else from DSG?

A. No.

Q. Has it ever?

A. No.

Q. Now, you understand Prasad is complaining in this case about the way the Vivid entities kept their books?

A. Yes.

Q. I want to turn briefly to that. First of all, has either one of the Vivid entities ever been audited by the IRS?

A. No.

Q. Now, before we get to the particulars of the things that he's raised, can you just tell us, based on your experience, how quickly do you expect to sell inventory when -- when the

slabs come into your warehouse?

A.   When we bring in the inventory, our hope is to be able to turn around three to four months time.  If something is not selling in three to four months, there -- there is a problem. A lot of what we bring in is natural stone, and natural stone differ from slab to slab.  Every slab comes differently because it comes from the nature.  When we cut and polish, one can have a lot of black.  Another can have a lot of orange.  There are -- certain colors do not sell in this market.  And even if we brought the whole container of 50 slabs, it is very possible that 15, 20 from the same block came defective with the colors customers do not like.

Q.   Now, if inventory sits around and doesn't sell for longer than you expect, does that impact your business in any way?

A.   Yes.

Q.   How is that?

A.   Our biggest expense in our business being a distributor after payroll is the rent, and we have limited space.  We can only stock so many slabs.  And as a distributor, our strength is bringing in the material and be able to sell and bring more because we don't add any value.  We only mark up the material. We bring it, add our expenses, and some profit margin.  And so if some -- some material is sitting longer, it is stopping us from bringing more material and be able to sell and rotate.

Q.   Is that why you adjust the value over time, by the age of

the inventory?

A.    That's correct.

Q.    Is that an approach you just started using at the Vivid entities around the time of the 2020 transaction?

A.    No, that's not correct.

Q.    How long have you been doing it that way?

A.    The practice goes as -- back as 2009.  It is not just the Vivid entities.  All the entities I have run and managed, they were -- through the time, I have managed 12 different entities.  Every entity, now, I want and Prasad wants, and we both work together through the time.  Every entity will follow the same procedure.  You kept people --

He say we managed and we kept two sets of books.  That's the wrong notion.  We have two sets of systems.  One system meant for managing the inventory life cycle, and the -- another set -- another system is the QuickBooks for the accounting.  It is very normal.  In the industry, a lot of people do.

I'll put an example, Mohawk Dal-tile.  Mohawk is a company.  They sell tile, carpet, slabs, you name it.  It's probably an eight to $10 billion stock listed company here in the U.S.  They have different systems, at least seven, eight different systems, depending on what product and what they sell.  At the end, they bring all the information into one accounting software, and they produce their financials to the

market in New York Stock Exchange. So it is a wrong notation that -- for me to say they have seven different, eight different sets of books. No. They have seven or eight different systems. At the end, they consolidate everything into one financial accounting package to produce their financials.

Q. Is that what you did?

A. Yes.

Q. Where did you get the idea -- you say you've been doing it since 2009. Where did the idea of adjusting the values by age come from as far as you're concerned?

A. The inventory adjustments was not something I knew. Prasad was well aware of that. He had been in DSG. Since 1993, he was a director, and they do the inventory practices in India. That's when he suggested to me, we do this, you need to find out with your CPAs if that is something allowed under -- can be done in U.S. That's how I approach it to my CPAs, both Vivid and Cosmos CPAs. And both said, yes, it is in -- allowed and adopted methodology by IRS, lower of cost or market value. And that's what we adopted, and we continue for over, what, 2008 to '09. So we are talking over a decade now.

Q. So the idea of adjusting your slabs' value by age came to you from Prasad?

A. That's correct.

Q. Now, you mentioned the Vivid entities CPA. Is that

Mr. Khatod who we saw before?

A.   That's correct.  His name is David Khatod, and he has been our CPA from the inception.  The Vivid entities initially were started by -- when I, Rohit, and another guy, and since then he has been working for us.  He is probably in his late 70s.  He has been practicing his CPA accounting for over 50 years, and he still teaches in a couple of colleges in the Charlotte area.

Q.   What kind of responsibilities did Mr. Khatod, the CPA, handle for the Vivid entities in particular?

A.   As a CPA, he has the responsibility and he signs off those tax returns.  And he signs off the reviewed statements we provide to the bank.  He is basically saying he -- he has seen, he has reviewed all the statements and financials, and he's putting his name to it.  I -- I don't know what else I can say. A man with 15 -- 50 years of experience and he is putting his name to it saying I have reviewed and there are no false or material discrepancies in this accounting methodology.

Q.   Let's take a look at Defendants' Exhibit 3.  You were talking about review of financials.  If we can go to the -- to the next page.  Is this an example of a review of the Vivid entity financials done by Mr. Khatod?

A.   Yes.

     (Defendants' Exhibit Number 3 is identified.)

BY MR. PARRY:

Q.   And this was done in December of 2017?

A.   That's correct.

Q.   What was the purpose of this particular review of Vivid's financials?

A.   This is part of our agreements with the banks we borrow money from.  They require us to provide at every -- at the end of every financial year, we provide CPA reviewed financial to the bank, that gives them the comfort that the financials have not just provided by the owners who could do whatever they want.  For that reason, they choose to ask for the CPA, putting his name and certify that these financials are sound and materially no discrepancies.

Q.   So you got the financials reviewed by the CPA and provided that to the bank.  Is that the same bank we saw before with the borrowing certificate?

A.   That's correct.  Bank of America.

Q.   How often did you provide a Bank of America with your reviewed financials?

A.   At end -- end of every financial year.

Q.   Now, this packet, this Defendants' Exhibit 3 includes separate reviewed financials for each of the two.  But just for example, let's look at page 5.

          MR. PARRY:  We may need just the last paragraph of that letter.

BY MR. PARRY:

Q.   So this is a letter from Mr. Khatod.  Is that correct?

A.    Correct.

Q.    And -- and is this where you said -- you said he puts his name or signs his name on -- no -- no material modifications. Is this what you're talking about, "Based on my review, I'm not aware of any material modifications which have been made"?

A.    That's correct.

Q.    And is it -- does he sign something like this when he does the review of financials each time you do it?

A.    Yes.  Every year.

Q.    Now, look with me over on page 11.

      MR. PARRY:  If you skip over there.

BY MR. PARRY:

Q.    Did Mr. Khatod, as a part of his review of the Vivid financials, specifically look at the inventory?

A.    That's correct.

Q.    And he describes the inventories are stated for lower of cost or market and how that's determined.  In -- in the course of this review, Vamsi, did Mr. Khatod raise any issues or concerns or questions with you about how you-all were applying that methodology?

A.    No.

Q.    Has Mr. Khatod ever once in all these years of working with you ever raised any questions or concerns about the way you-all apply this methodology?

A.    No.

Q.    Was he involved at all in the process of -- of determining how to age-adjust the inventory for Vivid?

A.    Yes.

Q.    Can you give the jury a sense of what Mr. Khatod's involvement in that process was?

A.    Every time we have to finalize the financials, depending on the bank required, whether it is quarterly or yearly, I -- or when I or both -- we would physically go to his office or we would have a call and go through the inventory.  When we go to his office, we would have the inventory system open to h\im, and he would see what is the inventory, what is -- what are the sales, what are the AP, AR, everything.  And he would go through the inventory reports and make a -- suggestions.  And he would ask for our recommendations on what is selling and what is not selling, what is slow -- slow selling.  Based on our recommendations, he would make us -- he would tell us what he would do with the inventory and how he would finalize the financials.

Q.    Now, you heard Ms. Couch testify that she saw examples of older slabs that turned out to -- to sell later for more than cost.  Did you hear that?

A.    Yes.

Q.    Does that happen sometimes?

A.    Yes.  We --

Q.    Does that cause you --

A.    We --

Q.    Does that cause you concern, Vamsi?  Does that fact cause you concern about the way you-all value your inventory on your books?

A.    No.

Q.    Why not?

A.    That's all taken into account when we come up with the least of market, our cost.  We take -- take into consideration that some are going to sell about the cost price and some are not going to sell at all.  Some are going to sell at under price.  We average that all and make an assumption and put together a number for that year.

Q.    And the CPA's involved in that discussion?

A.    That process, yes.

Q.    And you've been doing it since 2009?

A.    That's correct.

Q.    Now, why don't you just go slab by slab and track when each one of them sells and value the whole lot that way rather than making an estimate for a group?

A.    For example, in -- in Vivid NC, we probably sell about 3,000 slabs a month.  We are talking about 36,000 slabs.  If you are not aware of these slabs, there are typically about 10 and a half to 11 feet long, and five and a half to six and a half feet tall with three centimeters thickness, which is one-fourth inch.  They weigh anywhere between 700 pounds to 1,200

pounds. It's impossible for any business to be able to go through ten, 15 thousand slabs one by one moving it. It is not something you can move by hands. You need special equipment: forklifts or overhead cranes. And if we start doing that, probably we'll be closed for a few months every year just doing this.

Q. And you touched on this earlier, but I want to make sure it's clear for the jury. You heard Ms. Couch say that you-all have two sets of books because you got inventory numbers in QuickBooks and tax returns that don't match up with the ERP. Did you hear that testimony?

A. That's correct.

Q. And tell us again what -- what is the ERP system?

A. So it is -- it's Enterprise Resource Planning. It is the software that we use to control and track the life cycle of the inventory. Life cycle of the inventory starts from purchase order issuing to the supplier, and it gets at the location, and it is sold to the customer and money is collected and deposited to the bank. That is the life cycle we track in that system.

Unfortunately, that ERPs are not built for accounting. It is only built for the inventory life cycle. And it is very common in any industry and many industries, particularly in our stone distribution industry. It -- there is no one software as such covers the whole thing. Somebody -- like QuickBooks, they only do accounting. They are supposed to

be the best in the industry for accounting, and thousands of businesses use that system. Like I said earlier, we have two different systems, not two sets of books. It is mis-assumption from the people.

Q. And you also heard Ms. Couch say along the same lines that you-all are misrepresenting your inventory values to the lender, and you saw that borrowing base form. Do you remember that?

A. That's correct.

Q. Do you agree with her assessment of that?

A. No.

Q. Why not?

A. Like when I testified, when we are reporting to the bank, what we are borrowing, we are showing the gross number and then we say discounted and applied. It -- it has multiple lines where it says consigned, depreciated, or discounted inventory and multiple -- everything is by -- put together into one line. And net is what we are showing and borrowing. And at the end of the day, even on the net, we don't borrow the full money from the bank. The bank allows us to only borrow 50 percent of it.

The ERP system, like I said, it is not an accounting system. It is an inventory life cycle. It is not built to apply accounting methods of devaluing or depreciating in that system. For that reason, if you pull your report from the ERP,

it shows you what is the numbers without any discounts applied to the inventory. But that's what they are making noise about saying we have two different system, which is not true. And it is the same system we use for most entities -- even on to today the entities Prasad own as well as I own.

Q. Do you know if Prasad knew about how you-all handled your inventory accounting before --

A. That's correct.

Q. -- this lawsuit?

A. That's correct.

Q. Is that something you-all talked about internally?

A. Yes.

Q. Did you use age-adjusted values or original costs when you-all valued inventory for that roll=up transaction you told us about in 2015?

A. That was based on the devalued inventories.

Q. Did you bring in an outside firm to do that work?

A. That's correct.

Q. Who was that?

A. I forgot the company name. It is from Charlotte office, but their main office is in Florida.

Q. Was it Cherry Bekaert?

A. Cherry Bekaert, yes. Correct.

Q. Did you-all discuss specifically how the appraisers were going to value inventory in connection with that roll-up

transaction where everything consolidated into the group?

A.   That's correct.

Q.   Did you discuss it internally?

A.   Yes.

Q.   And what -- how did they value inventory for purposes of that transaction?

Q.   They took the same numbers from the QuickBooks, which is the devalued inventory values, to value each enterprise value and at the same time each member's percentages into the roll-up transaction.

Q.   Did Prasad participate in that process?

A.   Yes.

Q.   Did you at any point ask Cherry Bekaert to run a different set of numbers?

A.   Yes.

Q.   Why did you do that?

A.   So I have given Cherry Bekaert the numbers from the systems, which was before the valuation, and I had them value the companies based on that.  The reason for that is, when we were going to become one company, our goal was to grow and make these companies work efficiently.  I was trying to show the rest of my team that if we manage our inventory well, if we had one manager who can help us manage inventory, bring in right on time, right inventory, and sell quickly see how much upside value we have for these enterprises we can build over time.

Q.   So you ran one set with the unadjusted inventory numbers and one set with the adjusted numbers?

A.   That's correct.

Q.   And then which ones did you and the valuation company end up using for the final numbers for the transaction?

A.   With the adjusted numbers.

Q.   Why?

A.   That's the only basis any -- any company would value anybody, any enterprise and Cherry Bekaert said they would not be able to value your company without that.  It would be based on the tax returns and the history of the financials, not something from the systems.

Q.   Did Prasad object at that time to using the adjusted inventory numbers rather than the original cost of purchase?

A.   No.

Q.   Now, you-all -- you said Group only lived for about ten months, and then you had a transaction that you called a spinoff, right, where everybody went back to their separate company?

A.   That's correct.

Q.   Did you-all use age-adjusted values or original costs when you valued inventory for purposes of that transaction in later 2015 and 2016?

A.   We used the same methodology we used for roll-up, which is with the adjusted inventory numbers.

Q.   Was Prasad involved in that?

A.   That's correct.

Q.   Did he object to using the adjusted numbers then?

A.   No.

Q.   Now, tell the jury, have you-all ever bought out another owner in one of these companies you've been telling us about?

A.   Through -- through my tenure at Cosmos and Vivid entities, we have negotiated and bought three different owners, one from Vivid NC, and one from the parent Prasad's west -- Cosmos West location, and one in Cosmos DC location.  And all the three times, we bought those members from the company, all the purchases were based on the inventories from the QuickBooks, the accounting system, after the adjusted values.

Q.   So each of the three times a prior owner has been bought out in all these years, you-all have used the age-adjusted inventory numbers for that value?

A.   That's correct.

Q.   Was Prasad involved in each of those three times?

A.   Yes.

Q.   Did he ever once before this lawsuit object to using the age-adjusted values of the inventory to calculate another's buyout?

A.   No.

Q.   Have you been involved in any transactions with unrelated companies where the inventory values were adjusted in the same

way?

A.    Yes.

Q.    Tell us about that.

A.    In about mid-2019, we have had an opportunity to acquire a company.  It was in business for over 70 years.  The owner turned 92, 93, and he was looking to completely retire and sell to somebody who can take the company and his employees forward.  And we were one of the people participated in that transaction.  And he chose us, me and my team, over the other people.  He believed in us, we would be able to keep all their employees jobs and be able to take his torch forward.  And through the transaction -- in the transaction we negotiated the inventory valuation exactly the same way has been questioned and accused me of doing.

Q.    So for internal transactions in all these companies you-all have together, you used age-adjustment inventory values.  Is that right?

A.    That's correct.

Q.    And same for owner buyouts every time?

A.    That's correct.

Q.    And same for when you-all purchased assets from this IGM company, you used the adjusted numbers then too?

A.    That's correct.

Q.    Before this case, have you ever heard of anyone involved in any of these companies suggest that inventory should be

priced back up to its original cost for purposes of a buyout?

A.    Yes.

Q.    Who was that?

A.    We were involved early 2016 in another lawsuit by another minority member from the parent Cosmos West, and he sued us saying he wanted a price for his share.  And in that lawsuit he claimed that he should be paid for a -- more value and inventory should be valued differently than what is on the books in QuickBooks and accounting system.  And at that time, Prasad and I both work on the same side fighting that guy.  And we both took the same stance, saying that's not correct, and this is how the inventory would be valued.

Q.    So when another former owner took the position Prasad's taking in this case, Prasad disagreed with him.  Is that what you're saying?

A.    That's correct.

THE COURT:  How many lawsuits have you been involved with over the course of your business?

THE WITNESS:  Unfortunately, like I said, seven to ten, and not even one from any other supplier, vendor, or a customer, or employee.  It is all coming from my family.  That is the --

THE COURT:  So your family has had seven to ten lawsuits involving business?

THE WITNESS:  Yes.

BY MR. PARRY:

Q.   Now, Vamsi, you understand that Prasad's also raised questions in this case about what -- what are called related party transactions?

A.   That's correct.

Q.   Is that Vivid entities doing business with other companies that have some kind of ownership?

A.   Yes.

Q.   And we've heard a lot about a company called Covatis.  Are you -- are you familiar with that name?

A.   Yes.

Q.   And specifically some payments that were made from Vivid entities to Covatis around the time of these transactions.  Do you remember that?

A.   That's correct.

Q.   Do you own any interest in that company, Covatis?

A.   No, I'm not part of Covatis, and I -- I didn't get a penny of what is paid to Covatis.

Q.   Who owns that company?

A.   A wonderful fellow member, Rohit and his family.

Q.   So just to be clear, if one of the Vivid entities did pay Covatis, are you personally making money or losing money on that deal?

A.   I would lose money for every penny goes out of the company as an expense.

Q.   Now, are you aware that Prasad's also raised issues with the Vivid entities doing business with IGM, that company you just told us about?

A.   That's correct.

Q.   Was it unusual in the experience of these companies for there to be transactions between one -- one location and another?

A.   No.

Q.   Were companies owned by Prasad ever involved in transactions with the Vivid entities?

A.   Yes.

Q.   Tell us about that.  What kinds of business?

A.   It has been very common practice within our Cosmos group of entities that we buy from an entity who has the material. If I don't have some material in Raleigh and the customer needs, if it is available in Charlotte or Washington DC, I would go and bring them and make it available for my customer.

And the same way, if Prasad entity in Atlanta didn't have a material, he would buy from us.  And for that, we established a -- a formula, that cost plus a fixed percentage, we would add on the exchange of materials endwise, sell and buy between our entities.

Q.   So you had an understanding amongst all of you for how those internal related party transactions would work?

A.   That's correct.

Q.   Did Prasad's entities get that deal?

A.   Yes.

Q.   Was that same deal IGM got?

A.   Yes.

Q.   Now, you mentioned just a moment ago there's been a number of lawsuits.  Did any of the suits directly impact the Vivid entities?

A.   Yes.

Q.   Were there two suits specifically in 2017 filed against Cosmos companies by DSG?

A.   That's correct.

Q.   And how did those impact the Vivid entities?

A.   At the time, we -- all of our Cosmos entities had working capital line of credits with the Bank of America.  Because of the -- the -- those lawsuits, the bank has called all the loans, which means they would not extend anymore, and they would freeze those lines at -- where they are.  And we are required to pay off and get out of the bank.  And two of those loans were for Vivid entities, and both loans without their fault because of the problems I and my cousin have between us affected those entities.

Q.   Let's take a look at Defendants' 335.

        MR. PARRY:  If you can zoom in on the -- on the first paragraph, David.

BY MR. PARRY:

Q.   Vamsi, is this a March 2018 notice of default letter from Bank of America's lawyer to the Vivid entities?

A.   That's correct.

     (Defendants' Exhibit Number 335 is identified.)

BY MR. PARRY:

Q.   And was this with regard to the lines of credit you were just telling us about?

A.   Yes.

Q.   Was this loan that was in default in March 2018 important to the Vivid entities?

A.   That's correct.

Q.   How did you-all use that?

A.   That is the line of credit.  We -- we borrow money from bank to be able to buy new inventory and be able to support paying our suppliers on time.  That is very critical to our business and operations.

Q.   And if we look at the second paragraph of this letter, Vamsi, what does Bank of America's lawyer say was the cause of default for the Vivid entities line of credit?

A.   It is the DSG lawsuit.  Again, it's Cosmos East and Cosmos DC, and the claims are over 250,000.  That's the reason they call as a default on the loans.

Q.   So when he says, "Certain events of default" -- in Section A, he talks about commencement of litigation against related entities in the matters of DivyaShakti Granites, et cetera, are

those the two lawsuits Prasad filed against the Cosmos entities in 2017?

A.    That's correct.

Q.    How did that default that we're looking at here -- how did that impact the Vivid entities business?

A.    It impacted it in a great way.  Bank would not give us more money.  And he was pressurizing us every -- every week, what is the status, when you are getting out, when we would get paid, and you need to get out.  I need to see who we are going to borrow, how you will come up with the money.  And it was very critical for our business operation.

          And during the time -- I mean, until that time, I never had to go and knock on at door of the bank to borrow money.  I had bankers knocking my door every month.  Hey, can you borrow money from us?  In all my 2005 to 2018, 13 years, it's -- it's the first time.  If somebody said that there is a bank on the street here, somehow we would find a contact and go and knock at their door and say, "Can you please lend us money?"  When they look at the company and the financial, they would say, "Wow, yeah, what a nice company you are running. Yeah, come on.  We'll talk."  The minute they get to know the lawsuits filed by a member from the -- within the company, a shareholder, trying to disrupt the operations, nobody would want to touch us with even a ten-feet pole.

Q.    Were you able -- did you have to enter into a forbearance

agreement in order to get the bank not to shut you-all down in March of 2018?

A.   That's correct.

Q.   And did the forbearance agreement make the loan terms worse than they were before?

A.   That's correct.  We were borrowing money.  I mean, don't hold me to the numbers, but approximately, about three percent, four percent interest is what we were paying.  Eventually, they charged us ten percent interest and some audit fee, monthly fee, documentation fee.  Everything was humongous, way too expensive for the company for no reason of the mistake of these entities.  I understand my companies had to suffer because of my disputes with my cousin, and his companies had to suffer and spend money.  But for no reason, Vinay and Rohit being members, they had to go through all that pain and costs.

        MR. PARRY:  Your Honor, we move the admission of Defendants' 335.

        THE COURT:  Received.

    (Defendants' Exhibit Number 335 is received.)

        MR. PARRY:  And also Defendants' 3, which I think I might've failed to do before.

        THE COURT:  Received.

    (Defendants' Exhibit Number 3 is received.)

BY MR. PARRY:

Q.   Did you dispute, Vamsi, on behalf of your other companies

that Prasad caused DSG to sue in 2017?  Did you dispute that DSG was owed money?

A.   No, I did not.

Q.   Were there other issues that you were trying to discuss with Prasad at the time?

A.   That's correct.

Q.   Let's look at Defendants' 314.

MR. PARRY:  If you take the middle part out --

BY MR. PARRY:

Q.   Is this a December of 2016 email exchange between you and Prasad?

A.   That's correct.

(Defendants' Exhibit Number 314 is identified.)

BY MR. PARRY:

Q.   And is this where you're trying to talk about the items that you want to seek resolution for?

A.   That's correct.

Q.   Give us just a quick sense of what were the outstanding issues and how those impact your ability to even pay DSG.

A.   This is later part of 2016.  At the end of 2015, we all agreed that we -- we part our ways and be gone.  And these were the pending issues still at the end of 2016.  I have been begging for the whole year let's conclude and be gone.  We need not to keep -- keeping the things pending.  One of those things is Nallapati Properties.  Let us sign off and clear the issues,

and NC LLC Charlotte and the Dallas entities of -- my ownership is supposed to be through NC LLC, and Prasad promised in Vivid NC he would come with his own holding company to represent his ownership. And with the same promise, I went into Vivid Texas keeping the NC LLC assuming Prasad would move out of NC LLC, and it will become my own. And at this time, he did not fulfill that.

And next one is 2016 transaction. There were some internal transactions, companies owed one to the other. And I was requesting him to have his CPAs look into it and resolve that. And the last one was CGM Group and Holdings. We did not -- though we were operating as if we were completely spun off and separated, but on the paper legally, it was not done. I was requesting him to conclude that part.

These were the requests I was making. Let us finish this along with the payments to DSG. But unfortunately, he chose not to take care of any of these. He said, they are two different items. This is DSG, and that is your personal problem. And he went ahead anyhow and caused those lawsuits.

Let me remind you, DSG, though it is a public limited company, it is majorly -- majority 90 percent or something is owned by him and his family. Though there are directors on the company board, all of them are either directly related to him or his friends. Basically, they're all his puppets. Whatever he would ask them to do, they would do. And he has full

control on them, and he could have stopped those lawsuits until these items were resolved, but he didn't care.  He never worked.  He never contributed a single penny, or he never worked at these locations for a single day.  He didn't have to lift a pen, though he got all this ownership.  If they fail, he didn't care.  He's way too rich from his father's wealth in India and other entities I have earned for him.  He was looking to destroy us.  That's what -- that's why we are here today.

Q.   Was this email an -- an effort by you to invite Prasad to sit down and talk through all of these outstanding issues, including the DSG payments as family?

A.   That's correct.

Q.   Did he agree to do that?

A.   No.

Q.   What did he do instead?

A.   He -- he went ahead and filed these lawsuits and more lawsuits eventually.

        MR. PARRY:  Your Honor, we move the admission of Defendants' 314.

        THE COURT:  Received.

    (Defendants' Exhibit Number 314 is received.)

BY MR. PARRY:

Q.   Now, were you -- were you involved personally, Vamsi, in efforts to get a new loan to replace the one that was put in default?

A.    Yes.

Q.    Was it easy to find a new loan for the Vivid entities?

A.    No, sir.  Like I said earlier, we approached every bank we could think of.  Nobody would want to touch us.  And I -- my only job at the time -- by this time, we were trying so desperately to get money.  It's the first time in my -- I mean, I heard earlier, Mr. Collins says default and forbearance generally happens.  No.

In fact, in 14 years of my experience, I never had a default in any of my loans, forget about line of credit.  First time, we were pissing our pants, and I ran everywhere I could run to borrow money.  Not only the traditional banks, we went to private financials who would lend money at 18 percent interest and more fees.  Still, they wouldn't touch us with a ten-feet pole.  And every time the only reasons a member from within the company is suing you.  This is not good.  We can't touch you.  If it is outsider, we can look at the merits and the demerits of the lawsuits.  We can analyze what is the exposure of the company and its assets.  We can work with. When it is within the company, a member causing this, we can't deal with you.

Q.    Let's look at Defendants' 350, and just confirm for us that this is an example of what you're talking about.  If you've look on -- on page 2 of your June 21st, 2018, email to Bank of America --

MR. PARRY:  If you'd just blow that part up.

BY MR. PARRY:

Q.   Is this you reporting to Bank of America the lender who has you in default about the status of Vivid's efforts to fund a new loan?

A.   Yes.

(Defendants' Exhibit Number 350 is identified.)

BY MR. PARRY:

Q.   And what's the report here in June of 2018?

A.   So one of my major job during the time is managing, keep the Bank -- Bank of America happy.  So every -- every time I had an update about any of my efforts to get financing, I've been updating him.  And a few days before that, I told him we are talking to Wells Fargo.  It looks like it's going to happen.  And I had to report him -- unfortunately, Wells Fargo dropped out, and they would not help me with the money.

Q.   And why did Wells Fargo say they weren't interested?

A.   Because of the lawsuits from the member inside.

Q.   Did you need cooperation from Prasad in your efforts to find a new loan?

A.   Yes.

Q.   Did you get it?

A.   No.

Q.   Did Prasad have preconditions for his assistance?

A.   Yes.

Q.   Tell us what he was asking for.

A.   So one of the times before -- of course, eventually, that also dropped out the bank, but before they came to a point, and they said we would need personal guarantees from the members. Anybody owning 20 percent or more should be giving personal guarantees.  That would be myself, Vinay, and Prasad.  When we asked Prasad if he would give a personal guarantee, first, he said no.  Then he came back saying, I need 100 different things to do that.  I mean, if he was really concerned about his investment and saving these jobs and the company, he would say, "Yeah, let's do that," and then come back and say, "Give me these things."

     But one of the most important requests for him out of those conditions was access to the system, the ERP system, we were talking about.  About 2017 time, we chose to cut his access to the system.  Until 2017, gentlemen and ladies, he had access to everything anybody had access to as a member.  In 2017, he was indulging in competitive -- he is competing with the customers from the Charlotte -- from his location in Atlanta.  And if he had access to that system, he would know which customer we are selling, what price we are selling, what color we are selling, and what kind of payment terms we are giving.  It would be very easy for him and his salespeople with that data to go and beat us and undersell us with five cents, ten cents.  So for that reason, we chose not to give him.  He

-- he has been a passive investor. And a passive investor does not involve in the day-to-day to day operations, and he does not need any access to the everyday business. That's what we did, and it is legally correct. And that's why we could do it, and we prevailed.

Q. And so you were concerned about providing the volume of information he was demanding because of the competition and the lawsuits?

A. That's correct.

Q. Was that entirely your decision to make?

A. No.

Q. Whose decision was it?

A. I'm -- I'm also a minority member in these entities. None of the decisions go out as my own. We all -- rest of the members in the company would sit and make a unanimous decision for everything.

Q. So you mentioned, I think, a moment ago that prior to 2017 Prasad had access to the whole system. Is that right?

A. Correct.

Q. And did that change in that year?

A. Yes.

Q. Was that because of the lawsuits and the competition?

A. Yes.

Q. Did Prasad make requests in 2017 through his lawyers for additional information?

A.   That's correct.

Q.   Let's look at Defendants' Exhibit 323.  This is an October 2017 letter from your lawyer, Vamsi.  And if we can look at page 7 just to cut to the chase, is this a letter from your lawyer to Prasad's lawyer in October 2017, Vamsi?  Is this responding to some of those information demands Prasad was making?

A.   That's correct.

     (Defendants' Exhibit Number 323 is identified.)

BY MR. PARRY:

Q.   And is this table that's been blown up here your response to his request in October 2017 about information he says he wants from Vivid?

A.   Correct.

Q.   And is that an accurate summary from your lawyer of the information that had been provided to Prasad as of October 2017 about Vivid?

A.   That's correct.  Prasad and his CPA and attorneys were provided everything the company had until that date about the company, bank statements, system access, QuickBook file -- QuickBook file from the CPA.  And more than anything, we had put our CPA in touch with his attorneys, and we told him anything they ask you just give him, no questions asked, and his attorneys got everything.

Q.   So as of this date, October 2017, Prasad had all financial

statements 2013 to the present?

A.   Correct.

Q.   And the tax returns 2013 to the present?

A.   Correct.

Q.   And Prasad had previously acknowledged receipt of all bank statements?

A.   Correct.

Q.   Was he being denied access to information in October 2017?

A.   No.

Q.   And you said that he was also provided direct access to Mr. Khatod, the CPA?

A.   That's correct.

Q.   Were you in on those meetings?

A.   Yes.

Q.   Did -- did Mr. Khatod get to provide whatever information whatever Prasad wanted?

A.   Yes.  He back up the Quickbook copy, and he gave it to his attorneys.  His attorneys arranged someone to go and pick up everything they had.

        MR. PARRY:  Your Honor, we move the admission of Defendants' 323 and 350.

        THE COURT:  Received.

    (Defendants' Exhibit Numbers 323 and 350 were received.)

BY MR. PARRY:

Q.   Now, in 2019, did Prasad also engage in a lengthy audit of

the Cosmos entity?

A.    That's correct.

Q.    Is that part of the settlement of some of this other litigation you've been telling us about?

A.    Yes.

Q.    Did you also agree in that same settlement to give Prasad an opportunity to do a full audit of the Vivid entities if he wanted one?

A.    Yes.

Q.    Did he ever take you up on that or pursue the information you agreed to give him in 2019?

A.    Never.

Q.    To your knowledge, Vamsi, was Prasad ever denied information he was actually entitled to as a passive investor in Vivid?

A.    No.  In -- in fact, during the settlement agreement in 2019, he and his attorneys insisted that I have to sign and agree for that, to be able to audit Vivid NC and Vivid Texas. Without that, I would not get a settlement agreement, though I was not -- I've never been the manager of Vivid Texas.  I've been and I'm still manager for Vivid NC, but I never been a manager of Vivid Texas.  I told them, I'm not the manager.  I cannot fulfill this promise for Vivid Texas, but Vivid NC, I would allow.  But they insisted I had to negotiate the terminology, say I would make my sincere effort in convincing

rest of the members to be able to give you everything.  And by the document, he had 120 days to ask for anything he needed to do an audit of both accounts, both companies, but he never chose to access -- I mean, ask for that information during that 120 days or until this lawsuit was filed.

Q.  Did you end up, Vamsi, paying off the Vivid Taxes debt to Bank of America?

A.  Yes.

Q.  How did you manage that?

A.  So in about 2019, October, Bank of America had a deadline to pay off everything or face the legal implications.  And we -- I personally came up with some money, and Vinay and Rohit, we all together came up with our personal money, and we went to negotiate with Bank of America.  We would pay Texas line of credit with our personal money if you can give us some more time, thereby, for Vivid NC so we can come up with more money and pay off Vivid NC.

And somehow we were able to convince him, and he let us pay Vivid Texas debt and gave us an extra time with the condition, he said, "You will never come back to me.  I'm not going to answer your phone or email.  This is the last extension.  And if you don't come back with money, I'm done dealing with you.  I have pressure from higher authorities.  We are going to move to the legal.  From the agreement, whatever we can legally do, we will proceed to the next level," dot,

period, is what we said, which was the deadline of 2020 February end.

Q. So the -- the deadline, you were able to secure by paying off the Vivid Texas debt with your own money. What -- the deadline to pay Vivid NC was February 2020?

A. That's correct.

Q. Did Prasad help at all with paying off Vivid Texas?

A. No.

Q. And when you came up on that deadline, was -- was the proceeds of the Vivid NC asset sale that were used to pay off Bank of America?

A. That's correct.

Q. In early 2020, did you, Vamsi, have concerns about Vinay or Rohit or both leaving Vivid?

A. Yes.

Q. Why?

A. They were really pissed off. Like, how do we generally say it is a family feud. Two cousins fighting, they think -- they were thinking we are stupid and idiots, and they're -- they are fighting, and it is hurting us. And they both have their own companies and they still be able to survive. But if anything happens to these companies, we and our families would be on the road. They were looking at what can we do. Can we just quit and go and start a new business?

None of these -- these two guys are my biggest

resources.  I mean, the same money we paid to Prasad he's complaining about, even if it comes half the price to me, and Vinay and Rohit are not there to run these companies, I won't touch them.  I can't go physically and run.  These companies are as good as my resources, my people.  It is -- because everything is done by people.  It is -- there are no robotics. There are no computers there.  If they are gone, I'm done.  My value in these companies, all investments, and a lifetime hard work would be gone to zero.  And these guys did not have any non-compete.  They can open a shop next-door and take all my customers, employees, and suppliers.  And we would just end up with these buildings with the loans, and the leases we signed with the guarantees.  That's what we would have ended up with. And 60.2 percent of it would have been -- ended up on a burden of NC LLC at that time.  I think in all of my best efforts I tried to save my interest along with Prasad in NC LLC by doing what we had to do in these transactions.

Q.   So you had no contractual agreement to prevent Vinay and Rohit from walking out the door if they wanted to?

A.   No.  They did not have any contractual obligations.

Q.   And did Vinay have the customer relationships and employee relationships in Charlotte?

A.   That's correct.

Q.   Did Rohit have the customer relationships and employee relationships in Texas?

A.    That's correct.

Q.    And what would happen to the companies if they had gotten fed up with the family feud and walked out the door?

A.    Well, just like I said, we would have ended up with that building with the rents to pay and the bank loans to pay and nobody to run the business.

Q.    Why not just walk away, Vamsi, and let the bank foreclose and focus on something else?

A.    It's not easy.  We have put lifetime's work into it. Everything we have is in there.  And we have employees we help. We help employees.  They're -- since the inception, many of them over a decade working.  Most of them think they are returning in those businesses.  We have emotional contacts with these employees and families.  We go wine and dine with our employees and their families.  And like how Vinay got emotional yesterday in his testimony when -- it was like his baby.  I mean, you can't let it just go fall apart into pieces.

Q.    Now, did you-all try to talk to Prasad before doing the transactions about a buyout process in which he can participate?

A.    Yes.  Not -- not once, we have tried three or four times over the span.

Q.    Let's show the jury real quickly those requests.

      MR. PARRY:  Defendants' 337, please.  And you can circle at the bottom.

BY MR. PARRY:

Q.   Yeah.  Vamsi, is Defendants' 337 a June 2017 proposal from Vivid's lawyer to Prasad?

A.   That's correct.

     (Defendants' Exhibit Number 337 is identified.)

BY MR. PARRY:

Q.   And in the second -- well, what was the issue that prompted this letter?  Can you tell us about that?

          MR. PARRY:  Maybe capture the first paragraph.

A.   Yeah.  I -- I remember.

BY MR. PARRY:

Q.   What -- what was the issue that prompted this letter in the summer of 2017 from Vivid's letter to Prasad -- or Vivid's lawyer to Prasad's lawyer?

A.   Until the -- until about that time, we -- we used to have one warehouse in Savannah, Georgia, where we used to give that location for everybody to receive material and stock there, and everybody would pull from there as required.  And we all would share the expenses for that entity for that location, let it be employees, our equipment, our rent.  And by this time, we -- all other entities have moved out, but Vivid NC still using that location.  By then it became Prasad's 100 percent, and Vivid was paying him for expenses.

          At this time, we were terminating that relation. Vivid NC was moving all its material to Charlotte.  And when

the truck operator went there to pick up the equipment and slabs, the employees said my owner said he will not give you a slab or equipment piece, which was the property of Vivid NC. And the employee was working for Prasad, and the warehouse was Prasad's. And we had to involve attorneys to convince them to release our material and equipment. That was the first time we had a dispute with Prasad at Vivid entities. Immediately, we realized maybe it's going to damage our relation over the time if we stayed together. Maybe it is a good idea to separate our ways. That's when we proposed -- our attorney -- through our attorney let's -- let us discuss an exit plan so we can separate our ways.

Q. And this first proposal here in the summer of 2017 says it would be -- intended, you, Vinay, and Rohit, to offer a purchase for Prasad's interest using an agreed-upon method for determining its fair market value. Is that right?

A. That's correct.

Q. Did Prasad or his lawyer respond to indicate that they were willing to have a discussion about an agreed-upon method to determine the value?

A. No. Never. It -- it -- all those emails would just come back saying, nope, my client is not interested.

MR. PARRY: Your Honor, we move the admission of Defendants' 337.

THE COURT: Received.

(Defendants' Exhibit Number 337 is received.)

BY MR. PARRY:

Q.   Did Vivid try again a year later in 2018?

A.   Yes.  That's correct.

Q.   Let's look quickly at Defendants' 146.  Defendants' 146, Vamsi, is another proposal from Vivid's lawyer.  This time, it's to both your lawyer and Prasad's a year later in 2018.  If -- if you look at the last line of the second paragraph in -- in the -- the third paragraph, here you go.  The last line of this paragraph, Vamsi, reads:

          "The Vivid Cosmos entities have identified a
          certified valuation specialist who is ready, willing,
          and able to appraise the interest in an expedited
          manner."
          Do you see that?

A.   Yes.

(Defendants' Exhibit Number 146 is identified.)

BY MR. PARRY:

Q.   Did -- did Vivid's lawyer go on to offer other alternatives in this letter if the certified valuation specialist wasn't good enough?

A.   Yes.

Q.   Let's look at the next paragraph.  And so if for some reason the proposed evaluation specialist is unacceptable, the Vivid entities would consider an arrangement in which multiple

appraisers are involved. Was that something you were willing to do?

A. So at this time, Vinay and Rohit approached me saying you two fighting is causing the trouble and likely to have these entities collapsed. Prasad -- last year, we sent a letter. He did not agree for us buying out. So probably he -- because you are involved, he may -- he may be not liking you. For that reason, we would propose we buy out you and Prasad completely together. And I said, that's fine. If -- whatever I need to do to save these companies, I will do. If you want to buy just go ahead and do the process, I will participate. And that's how they ended up sending that letter to Prasad's attorney and my attorney saying they would buy interest -- both of us direct or indirect. And they've proposing we have an appraiser we -- we located. And if you are willing, we can use. If you don't, we can -- you can come up with your own appraisers. We can take an aggregate value or average value, or if you propose a different methodology, we can talk that or a shotgun approach where they said you put your value, I put your value, if you want to buy, you can buy the whole thing, or we -- if we can buy, we can buy with for the same value. So it was, like, not just we buy you, you can also buy us was what the letter was saying.

Q. And let's look quickly at Defendants' 351.

        MR. PARRY: If you just pull up the email there,

please.

BY MR. PARRY:

Q.   Is this a copy of Prasad's response to the multiple alternatives Vivid's lawyer offered in 2018?

A.   That's correct.

     (Defendants' Exhibit Number 351 is identified.)

BY MR. PARRY:

Q.   Did you make a final attempt in 2019, now, the third year in a row to -- to purchase Prasad's interest in a way he can participate?

A.   That's correct.

Q.   Let's look at Defendants' 356.  And is this a copy of that final proposal, Vamsi?

A.   Yes.

     (Defendants' Exhibit Number 356 is identified.)

BY MR. PARRY:

Q.   If we look at the --

          MR. PARRY:  Yeah.  Go to the -- the last paragraph there.

BY MR. PARRY:

Q.   This paragraph starts, "Unfortunately."  So this is in the -- this is August of 2019.  Is that right?

A.   That's correct.

Q.   We don't have to read the whole thing.  We can see it.  Do you agree, Vamsi, or did you agree in the summer of 2019 with

the Vivid lawyer's assessment of where things stood and the prospects for the company?

A.    Yes.

Q.    And -- and that as long things continued in the status quo, new financing can't be secure?

A.    Correct.

Q.    And then, consequently, he writes in the next paragraph, "Once again, offer number three for an interest in purchasing your client's Prasad's interest in the Vivid entities."  Is that right?

A.    Correct.

Q.    And the desire is to purchase it at a fair and reasonable price?

A.    Yes.

Q.    Did Prasad respond and indicate any willingness to have a conversation about any method to get to a fair and reasonable price?

A.    No.

        MR. PARRY:  Your Honor, we offer the admission of D-146, D-351, and D-356.

        THE COURT:  Received.

    (Defendants' Exhibit Numbers 146, 351, and 356 were
    received.)

BY MR. PARRY:

Q.    Was Prasad ever in any of those three years, 2017, 2018,

or 2019, willing to even talk to the rest of you about any kind of process where you can separate and go your separate ways without fighting?

A.   No.

Q.   Let's look at Defendants' Exhibit 359.  This is an email, Vamsi, from October of 2019 from Vivid's lawyer, Jeremy, to Bank of America, Peter Leak.  In the first -- is the first paragraph an accurate summary, Vamsi, of where things stood for the Vivid entities on October 17th of 2019?

A.   Yes.

     (Defendants' Exhibit Number 359 is identified.)

BY MR. PARRY:

Q.   You had been working in serious discussions with a potential lender.  But that one, like several before it, concluded it wasn't interested because of the history of litigation?

A.   Correct.

Q.   No active leads for replacement financing?

A.   Yes.

Q.   Let's take a look at the very last paragraph, if we could. What -- what was Vivid's lawyer proposing to Bank of America here about financing options?

A.   We were asking for a payment plan so we can pay over a period of time.

Q.   Was the bank willing to do that for you?

A.   No.

Q.   Was this where you got the direction you described before where they said you had until February of 2020 and no longer?

A.   Yes.

MR. PARRY:  Your Honor, we would move the admission of Defendants' 359.

THE COURT:  Be received.

(Defendants' Exhibit Number 359 is received.)

BY MR. PARRY:

Q.   Now, Vamsi, I don't know that we talked about these, but I would like to show the jurors a couple of the documents that were drawn up in connection with the transactions.  Can you --

MR. PARRY:  Can we look at Defendants' 363?

BY MR. PARRY:

Q.   Is this, Vamsi, the -- the February 18 of 2020, unanimous consent of the members of Vivid NC to proceed with the 2020 asset sale?

A.   That's correct.

(Defendants' Exhibit Number 363 is identified.)

BY MR. PARRY:

Q.   Was it your understanding Prasad was required to sign this?

A.   No.

Q.   Why not?

A.   He's not a direct member of Vivid NC, so he did not have

to sign.

Q.   So the members signed unanimously to approve the transaction?

A.   That's correct.

Q.   And let's look at Defendants' 107.  Vamsi, is Defendants' 107 a copy of the actual asset purchase agreement between Vivid NC and Cosmos Charlotte?

A.   That's correct.

(Defendants' Exhibit Number 107 is identified.)

BY MR. PARRY:

Q.   And if we look over to page 14 --

MR. PARRY:  If you can just blow up the numbers parts, and you can see those --

BY MR. PARRY:

Q.   If you can see this, Vamsi, does this tell us -- this page 14 of the asset purchase agreement, does this tell us how much was paid to Vivid NC in this transaction?

A.   That's correct.

Q.   What was the total purchase price?

A.   13.464 million.

Q.   Did Prasad get his share of that total?

A.   Yes.

Q.   About what was that?

A.   About three million.

Q.   Who got the cash that's identified here as the up front

cash payment of 695,000?

A.    The -- that is the money we paid off Bank of America debt.

Q.    Was part of the payment as indicated here in the form of a promissory note to be paid over time?

A.    At the time of this agreement, we did not have money to pay for the Vivid NC.  So we signed a promissory note with an interest to be paid over five years.  And the very next year, if I remember, we were able to secure a loan for the new entity.  We borrowed money and paid everything off.

Q.    So was the promissory note actually paid in full early?

A.    That's correct.

Q.    Did Prasad receive and keep those funds?

A.    Correct.

        MR. PARRY:  Your Honor, we move the admission of Defendants' 107 and Defendants' 363.

        THE COURT:  They'll be received.

    (Defendants' Exhibit Numbers 107 and 363 are received.)

BY MR. PARRY:

Q.    And now, Vamsi, let's look at Defendants 365.  Can you just confirm that this is the December 2020 agreement and resolution of 75 percent of the members of Vivid Texas to move forward with that transaction?

A.    That's correct.

    (Defendants' Exhibit Number 365 is identified.)

BY MR. PARRY:

Q.   Is that just you?

A.   No.  It is all the rest of the members in the Vivid Texas.

Q.   And is Defendants' 366 a merger agreement between Vivid Texas and Cosmos Dallas?

A.   That's correct.

     (Defendants' Exhibit Number 366 is identified.)

BY MR. PARRY:

Q.   Let's look at, if we could, at paragraph 5 of that.  Is paragraph 5, for the jurors to look -- to see, the purchase price -- or calculation for -- for each member's interest under this agreement?

A.   Yes.

Q.   And what did the total amount come to that was due for each -- for Prasad's 25 percent interest?

A.   So we -- we have hired a third-party evaluator to value the company, the Vivid Texas.  He came up with the $19,600 for each share, by which Prasad's 25 percent valued at 499,000.  And we wired that money, and obviously, Prasad didn't like and sent the wire back.

Q.   So you attempted to pay Prasad the full amount that the independent expert told you to pay?

A.   Yes.

Q.   And he sent it back?

A.   Yes.

          MR. PARRY:  Your Honor, we move the admission of

Defendants' 365 and 366.

THE COURT:  Received.

(Defendants' Exhibit Numbers 365 and 366 are received.)

BY MR. PARRY:

Q.   Now, you mentioned that you had two outside valuators, Vamsi.  Now, let's look at Defendants' 362.  And this is a disclosure dated December of '20 from Lee Robinette.

(Defendants' Exhibit Number 362 is identified.)

BY MR. PARRY:

Q.   Is that the person who was hired to do the appraisal of the assets for Vivid NC?

A.   Yes.

Q.   And the first page of this exhibit is a disclosure prepared for this lawsuit.  But when was Mr. Robinette actually retained?

A.   I wasn't involved directly in engaging him.  The attorneys hired him, so I think it was end of 2019.

Q.   And if you look at "Summary of Opinions" in the middle of this page, do these two bullets accurately reflect his findings about the fair market value of the machinery, equipment, and inventory of Vivid NC?

A.   That's correct.

Q.   Did Mr. Robinette, in fact, come in and -- and do an appraisal of those things?

A.   Yes.  He visited the locations, and he got the VIN

numbers, mileage, number of hours, pictures of the equipment. And he went back and valued the fair -- fair market value for each piece of equipment.

Q.   Did Mr. Robinette request information in connection with this appraisal?

A.   Yes.

Q.   Do you know of anything he requested during the time he was working on it that wasn't provided to him?

A.   No.

Q.   Did you, Vamsi, have any reason to doubt the conclusions of this appraiser that came in and did this work?

A.   No.

        MR. PARRY:  Your Honor, we move the admission of Defendants' 362.

        THE COURT:  Received.

    (Defendants' Exhibit Number 362 is received.)

BY MR. PARRY:

Q.   So Vamsi, when you-all hired independent experts to come in and tell you what the value of everything was, were you trying to pay Prasad nothing for his interest and take it from him?

A.   No.  That's not correct.

Q.   Why did you bring in independent experts and figure it out rather than just coming up with a number yourselves?

A.   We -- we wanted to make sure my cousin and his family gets

the fair market value for his interest.  And I would be the last one to do anything wrong to my family.  Like, I heard testimony earlier, for one word, I gave to my uncle.  I lived up to my commitment even after he was gone.  So we were trying to make every effort to make sure we give him the fair market value.  And that's the reason we hired these third parties.  Neither of them I -- I talked to.  I -- if they walk into this room, I would -- I wouldn't recognize them.

Q.   Did you tell Prasad right away when the Vivid NC transaction happened?

A.   No.  We did not.

Q.   Why not?

A.   We did not require to let him know because he's not a direct member, number one.  That's a legal stand.  Number two, we know, if we tell him what he was going to do, we were fear of his more lawsuits.  We just paid the money to get out.  And we have a huge promissory note sitting on our head.  We need to be able to go find a bank who would lend us money to get going. We needed time to be able to get on our feet.

     And eventually, we did let him know, and he didn't prove us wrong.  He immediately went so far to file another lawsuit, and he was able to shut us down for three days.  We were able to go back, fight, and be able to reopen.  Those three days, I can't tell you, we were counseling the employees. They were in tears.  They expected to work for us until they

retire.  And they didn't know next day whether they will have a paycheck.  When the doors are open or whatnot, he won't care. He wanted to see us gone from this business.

Q.  So did you-all need to secure the alternative financing you had been looking for by this time for years?

A.  Yes.

Q.  And another lawsuit would have thwarted that, wouldn't it?

A.  No.

Q.  If he had filed another lawsuit while you were still looking to secure financing, would that have helped or hurt your ability to get it?

A.  That would have made it, again, very difficult to secure more funding.

Q.  And, in fact, when Prasad did get notice when he was entitled to do it, what did he do?

A.  He did -- he did go ahead and file this lawsuit.

Q.  Vamsi, do you think you treated your cousin fairly in connection with Nallapati Properties and the Vivid entities, what we're here talking about?

A.  Yes.  I -- I think I have done more than fair to my cousin's family.  Like he testified, we were very close.  If I had to pick after my father and mother, and he and his wife were the closest family members I had.  I don't have them anymore.  And his children were the first kids I ever held in my arms.  They grew up in my arms.

Q.   Is this the first time, Vamsi, that Prasad has sued you claiming specifically that there were discrepancies between the inventory balances and different systems?

A.   No.  He did -- he did file another lawsuit a few years back.

Q.   And did he claim there, just like here, that there were variances between balances?

A.   Exactly.

Q.   And did he then end up in the forensic audit we talked about before?

A.   That's correct.

Q.   And did the -- what did those auditors, including one that he hired, have to say about his claims?

A.   So in 2018, we had two lawsuits going battle.  One he caused, filed in the federal court, saying I have stolen millions of rupees and inventory, and the accounts, they were a mess, all the exact things claimed here in Vivid entities.

During the business court lawsuit, we had a settlement agreement.  And I told him, he can go ahead and audit all the books, and he hired a forensic accounting team.  And I hired you a forensic team.  The judge approved that saying both forensic accountants together would come with one report back to the business court judge within 90 days.  And both forensic accountants did 90 days of hard work going through every book, every square foot, every dollar in the

bank. At the end of 90 days, both of them came together to issue a report saying neither a square foot nor a dollar is missing. And that's how we ended up separating and coming out of that business court lawsuit.

Q. And is -- in the settlement agreement you were just talking about, did the forensic accountants get full access to all of the financial information that was requested, including ERP, QuickBooks?

A. That's correct.

Q. And that included, didn't it, financial information and records, et cetera, about Nallapati Properties and NC LLC?

A. Yes.

Q. Let's look at Defendants' 328. And ultimately, is -- is Defendants' 328 the forensic accountants' joint report? These are accountants hired by both you and Prasad to look at those things.

A. That's correct.

Q. And did these folks ultimately agree on their conclusions?

A. Yes. They both signed off on that report and issue to the court.

Q. And did they specifically agree in April of 2019 on the conclusions about the inventory variances Prasad pointed out like he is here?

A. Correct.

Q. And let's look at page 3. And did the auditors conclude

in their joint report, Vamsi, that they deemed it important to outline that the assertion about inventory variances was untrue?

A.   Yes.  That's correct.

Q.   And they specifically noted, didn't they, that the significant reduction in inventory value from one year to the next was understood by both the forensic accounting teams to be an allowance taken across inventory?

A.   That's correct.

        MR. PARRY:  Your Honor, we would move the admission of Defendants' 328.

        THE COURT:  Received.

     (Defendants' Exhibit Number 328 received.)

BY MR. PARRY:

Q.   And just for confirmation, Vamsi --

        MR. PARRY:  Can we put up Defendants' 325?

BY MR. PARRY:

Q.   Will you just confirm for us, Vamsi, this is the -- the earlier 2018 lawsuit Prasad filed in this same court making the same claims about the Cosmos entity?

A.   That's correct.

     (Defendants' Exhibit Number 325 is identified.)

        MR. PARRY:  And then put up Defendants' 326.

BY MR. PARRY:

Q.   Is this the prior settlement agreement you referenced a

couple of times that gave Prasad the right to do the audit of the Cosmos entities that we just saw and to do an audit of the Vivid entities as well?

A.    That's correct.

MR. PARRY:  Your Honor, we move the admission of 325, 326, and 328.

THE COURT:  Received.

MR. PARRY:  No further questions.

(Defendants' Exhibit Numbers 325, 326, and 328 are received.)

THE COURT:  Okay.  It's quarter after.  You -- you can start.

MR. MORSE:  Thank you, Your Honor.

CROSS-EXAMINATION BY MR. MORSE:

Q.    Now, you testified that the 50 percent profit split agreement that you had with -- I think you claimed that it was with the DSG was not a good deal for you, correct?

A.    That's correct.

Q.    Now, in 2005 when the Cosmos business started, your taxable income was around $100,000, correct?

A.    That -- that sounds right.

Q.    Now, in 2017, your taxable income had increased to over $5 million per year, correct?

A.    By 2015?

Q.    2017.

A.   It's very possible.

Q.   In fact, true, correct?

A.   I -- I don't have the numbers to -- I mean, it -- it must be true you if you're reading them from somewhere.

Q.   But you said that that 50 percent profit split agreement was not a good deal for you.

A.   No.

Q.   Even though your income increased during that business relationship by 5,000 percent.

A.   That -- that's not all would be given to DSG.  Like I always said, DSG materials accounted for 20 to 25 percent of the sales.  The remaining 75 percent come from different countries around the world.  So if I had worked off my butt and if I made money, should I give that credit to you and your client?  I think that's not right.

Q.   Now, with all that money, you had the ability at any time to buy Prasad out at fair value, didn't you?

A.   That's what I think we tried to do on multiple occasions.

     THE WITNESS:  As you have seen, every year, we sent you a letter saying we want to buy you at a fair market value. We would like to propose a methodology or you can propose a methodology or you can choose your choice of your accounting and the methodology.  We want to talk to you.

A.   We begged for -- again and again, and he chose not to even talk to us.

BY MR. MORSE:

Q.   Instead, what you did was you forced Prasad out without telling him, right?

A.   Did we do anything wrong?  The operating agreement provided us the abilities to do.  We have tried everything we could to try, asking him again and again, please come talk to us.  Let us resolve.  We ran out of every other options, and we used what is written in the operating agreement.  And we did everything we needed to do to make these entities survive, businesses survive, and we get -- continued to keep the employees employed.

Q.   And when you forced him out without telling him, you did so at the devalued inventory, right?

A.   That's what I have testified.  When we bought any other member in the company, that's what we applied.  When we assign interests for each member in the companies, that's how we assigned.  And it goes -- the same formula for everybody and every time.

Q.   And as a result of buying out at the devalued inventory, you made millions more, didn't you?

A.   Do you think so?  Is that your opinion?

Q.   I'm asking you.  As a result of buying him out at the devalued inventory, we saw all that in the report from Tiffany Couch.  You bought inventory at $26 a slab and sold it for $2,000 a slab.  So you made millions more, didn't you?

A.   I mean, if you want to talk about Tiffany Couch's testimony, I mean, we heard that she didn't have any credentials to value inventory.  The only job he had was -- her early times of her job as an intern, counting some inventory, and she was able to count.

And she kept on calling my name, saying I was making changes to this QuickBooks.  I'm -- I'm not an accounting guy.  I never know how to use the QuickBooks, and we read books.  I'm meeting with the CPA.  I never had access to QuickBooks.  I never changed any numbers into it.  So if you are going by her testimony and if that's what conclusion you want to make, that's up to you.  I can't change.

Q.   All right. And, you know, these other buyouts you talked about, those were negotiated buyouts with the other owners, right?

A.   That's correct.  I mean, when I'm in the position to negotiate and the other party comes to the table, that's what we negotiated.

Q.   And they aren't relevant here because you forced Prasad out without telling him, right?

A.   Did we -- did he leave us any other chances?  We ran out of -- exhausted of -- everything we could do.  And that's the last option we had to do.

Q.   Now, I also think I heard you testify that you were partners with DSG and not Prasad.  Is that what your testimony

was today?

A.  Did I say partners?  I said I signed a memorandum of understanding with my uncle that DSG would get 50 percent of its profits for all the work it was doing, which is helping me get on my feet and grow in business by providing the material, on invoices to get paid back with extended terms.

Q.  So are you saying today there were no oral 50-50 partnership agreements with anybody?

A.  No.  There was never any partnership.  Like I said, gentlemen and ladies, I use partnership or partner as a term we all use in common world, and these sophisticated attorneys after going to law school, they are trying to twist my tongue for the purposes of what it is convenient to them.  That is the only -- looks like that's the only way they can make it all stick to me.  They're using it.  Like I said, I use partner for my customers, my employees, my suppliers, my vendors.

Q.  But in 2019, you and Prasad were in trial in Raleigh, correct?

A.  That's correct.

Q.  And that was in the North Carolina Business Court.  Is that right?

A.  That's correct.

Q.  And you, not Prasad, were the plaintiff in that case, right?

A.  That's correct.

Q.   And you were sworn in as a -- as a witness?

A.   Yes.

Q.   And just like today, you were sworn in to the truth?

A.   Yes.

Q.   And you were here yesterday when Mr. Robertson and I read in your testimony in that case, right?

A.   That's correct.

Q.   And you said over and over again 50-50 ownership, 50-50 partnership, 50-50 agreement, right?

A.   I --

Q.   So directly contrary to what --

A.   Let -- let me explain to the jury.  Like I said, always, prior to this lawsuit, I did not know that partner means something else in the legal world.  All I know was anything on my site working for a common goal and interest as a partner.  That's how I interpreted it.  And, again, like I testified earlier in the testimony, Prasad was the face of the DSG.  And every time I used Prasad, DSG, and when DSG was -- who -- to get the 50 percent of the profits, it is Prasad and DSG.  It did not mean any different to me.  And at the end in 2015, when I assigned all the 50 percent to -- supposed to be DSG, Prasad and his family wanted to -- on their names, I didn't have problem.  So that's how I treated all the way, and I'm still treating the same way.

          MR. MORSE:  No further questions, Your Honor.

THE COURT: Anything further?

MR. PARRY: No.

THE COURT: All right. Thank you. You can step down.

THE WITNESS: Thank you, Your Honor.

(The witness left the stand.)

THE COURT: That's -- that's it for today, ladies and gentlemen. We're -- I -- I know you've been patient and very considerate in the work that you're doing. And I'm going to represent to you that the case will go to you tomorrow for a decision. They're just about out of time, and they'll have a little time in the morning. But I think we'll have closing arguments and my instructions during the day tomorrow, and you will -- the case will get to you tomorrow for a decision.

So have a safe trip. I appreciate your service, and be careful and come back tomorrow at 10:00, and we'll resume where we are. You can leave your material in the jury room.

So just for timekeeping purposes, I've been keeping a strict log, and the Plaintiff has 30 minutes left. You've used five hours and 30 minutes. And the Defendant has an hour and 30 minutes left. You've used four hours and 30 minutes. So you know -- and I'm gonna adhere to that. This case needs to go to the jury tomorrow in my opinion. Thank you. We'll be in recess.

(Proceedings end at 5:28 a.m.)

_____

(CONTINUED IN VOLUME IV.)

_____

NORTH CAROLINA

SCOTLAND COUNTY

Case 5:20-cv-00470-BO    Document 258    Filed 08/01/23    Page 270 of 275

INDEX

PAGE

PLAINTIFFS' WITNESSES

Tiffany Couch
    Continuation of direct examination by Mr. Coble      3
    Cross-examination Mr. Parry                          51

Michael Watts
    Direct examination by Mr. Robertson                 96
    Cross-examination by Ms. Anderson                  107

Robert Ryan
    Direct examination by Mr. Robertson                123
    Cross-examination Ms. Anderson                     127

Charles Wilhoite
    Direct examination by Mr. Morse                    133
    Cross-examination Mr. Parry                        155

Rule 50 Motion                                         171

DEFENDANTS' WITNESSES

Vamsi Nallapati
    Direct examination by Mr. Parry                    176
    Cross-examination by Mr. Morse                     263

_____

INDEX (Cont'd.)

| PLAINTIFFS' EXHIBITS | IDENT. | OFFERED | REC'D. |
|---|---|---|---|
| P-004 | 35 | 40 | 40 |
| P-005 | 15 | | |
| P-007 | 18 | 20 | 20 |
| P-039 | 13 | 18 | |
| P-094 | | 3 | 3 |
| P-117 | | 3 | 3 |
| P-124 | | 3 | 3 |
| P-198 | 37 | 40 | 40 |
| P-251 | 48 | 50 | 50 |
| P-291 | | 174 | 174 |
| P-313 | 138 | 139 | 139 |
| P-327 | 15 | 20 | 20 |
| P-333 | 19 | 20 | 20 |
| P-383 | | 3 | 3 |
| P-395 | 11 | 20 | 20 |
| P-445 | | 3 | 3 |
| P-458 | 165 | 175 | 176 |
| P-462 | 60 | | |
| P-465 | 9 | 20 | 20 |
| P-475 | 7 | 20 | 20 |
| P-476 | 40 | 47 | 47 |
| P-478 | 18 | | |
| P-485 | | 3 | 3 |

INDEX (Cont'd.)

| PLAINTIFFS' EXHIBITS | IDENT. | OFFERED | REC'D. |
|---|---|---|---|
| P-486 | 43 | 47 | 47 |
| P-503 | 59 | 174 | 174 |
| P-505 | 42 | 47 | 47 |
| P-507 | | 3 | 3 |
| P-512 | 137 | 139 | 139 |
| P-516 | 110 | | |
| P-517 | 122 | | |
| P-518 | 122 | | |
| P-519 | 99 | 103 | 103 |
| P-520 | 103 | 103 | 103 |
| P-521 | 125 | 125 | 125 |

_____

| DEFENDANTS' EXHIBITS | IDENT. | OFFERED | REC'D. |
|---|---|---|---|
| D-003 | 212 | 230 | 230 |
| D-031 | 54 | | |
| D-085 | | 175 | 176 |
| D-093 | 197 | 200 | 201 |
| D-094 | 197 | 200 | 201 |
| D-095 | 200 | 200 | 201 |
| D-107 | 253 | 254 | 254 |
| D-146 | 247 | 250 | 250 |
| D-201 | | 175 | 176 |
| D-208 | 181 | 182 | 182 |

INDEX (Cont'd.)

| DEFENDANTS' EXHIBITS | IDENT. | OFFERED | REC'D. |
|---|---|---|---|
| D-210 | | 175 | 176 |
| D-297 | 194 | 196 | 196 |
| D-303 | 201 | 201 | 201 |
| D-305 | 202 | 203 | 203 |
| D-306 | 203 | 204 | 204 |
| D-310 | | 175 | 176 |
| D-311 | | 175 | 176 |
| D-314 | 231 | 233 | 233 |
| D-319 | | 175 | 176 |
| D-320 | | 175 | 176 |
| D-321 | | 175 | 176 |
| D-323 | 238 | 239 | 239 |
| D-325 | 262 | 263 | 263 |
| D-326 | | 175<br>263 | 176<br>263 |
| D-328 | | 175<br>262<br>263 | 176<br>262<br>263 |
| D-329 | | 175 | 176 |
| D-330 | | 175 | 176 |
| D-332 | | 175 | 176 |
| D-334 | 207 | 207 | 207 |
| D-335 | 228 | 230 | 239 |
| D-337 | | 246 | 246 |

INDEX (Cont'd.)

| DEFENDANTS' EXHIBITS | IDENT. | OFFERED | REC'D. |
|---|---|---|---|
| D-350 | 235 | 239 | 239 |
| D-351 | 249 | 250 | 250 |
| D-356 | 249 | 250 | 250 |
| D-359 | 251 | 252 | 252 |
| D-362 | 256 | 257 | 257 |
| D-363 | 252 | 254 | 254 |
| D-365 | 254 | 255 | 256 |
| D-366 | 255 | 255 | 256 |
| D-372 | | 175 | 176 |
| D-452 | 63 | | |

_____